AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT JUDGE SULLIVAN

for the

Southern District of New York

| | |
|---|---|
| YULIA TYMOSHENKO, and JOHN DOES 1 through 10, on behalf of themselves and all those similarly<br>*Plaintiff*<br>v.<br>DMYTRO FIRTASH,  ROSUKRENERGO AG("RUE") and JOHN DOES 1 through 100,  et al,<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

11 CIV 2794
Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* DMYTRO FIRTASH,  ROSUKRENERGO AG("RUE") and JOHN DOES 1 through 100,  et al,

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: McCALLION & ASSOCIATES LLP
100 Park Ave, 16th floor
New York, NY 10017

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

CLERK OF COURT

Date:  _____04/26/2011_____

_____
*Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

YULIA TYMOSHENKO, and JOHN DOES 1
through 10, on behalf of themselves and
all those similarly situated,

               Plaintiffs,

-vs-

DMYTRO FIRTASH,  ROSUKRENERGO
AG("RUE") and JOHN DOES 1 through 100,
et al,

               Defendants.

Index No:

# 11 CIV 2794

CLASS ACTION COMPLAINT



APR 2 6 2011

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Yulia Tymoshenko and John Does No. 1 through 10 (collectively referred to as "the Plaintiffs"), by their undersigned attorneys, bring this Complaint on behalf of themselves and all other similarly situated in Ukraine who have had their fundamental human and political rights violated by defendants and others against the named defendants and their co-conspirators who have, through various schemes and concerted efforts, deprived plaintiffs and their fellow citizens of Ukraine of various fundamental human and political rights recognized under international law.

Plaintiffs bring this action pursuant to the Alien Torts Statute ("ATS") and the Torture Victims Protection Act ("TVPA"), codified as part of the United States Code, 28 U.S.C.§1350, as well as under the Racketeering Influenced and Corrupt Practices Act

(""RICO"), 18 United States Code, § 1964(c), to recover monetary damages and other relief arising out of the defendants' concerted efforts to defraud the Ukrainian people of their valuable natural resources, as well as their political and human rights.

## PARTIES

### Plaintiffs

1.     Plaintiff, YULIA TYMOSHENKO, the Ukrainian Prime Minister for the period from 2007 to 2010, has been subjected by the defendants to politically-motivated investigations and prosecutions by the administration of the current Ukrainian government , which is led by President Victor Yanukovych ("the Yanukovych administration"), as part of a concerted attempt to discredit her, deny her basic political and human rights, and to intimidate her associates and opposition-party members from exercising their fundamental political and human rights.

2.     Plaintiffs JOHN DOES # 1 through 10 are former members of the previous executive administration of Ukraine during the time period when Plaintiff Tymoshenko served as Prime Minister. They have all been subjected to politically-motivated investigations and selective prosecutions by the current Ukrainian administration under the leadership of President Victor Yanukovych. The reason why their names are not specifically listed as plaintiffs in this matter is that, in some cases, they are incarcerated under conditions that severely restrict their ability to communicate freely, and both those who are incarcerated and those that are not, but are under intense investigation,

2

would likely be subjected to further intimidation and persecution if their names were listed as plaintiffs in this action.

**The Defendants**

3.      Defendant DMYTRO FIRTASH ("Firtash") owns 45% of RUE, and a partner owns 5%. The other 50% of RUE is owned by Gazpron, the Russian natural gas monopoly. Firtash has admitted that he got his start in the gas trading business with the assistance of Semion  Mogilevich, the Russian organized crime boss.  Firtash is also a close associate and advisor to the current Ukrainian President, Victor Yanukovych.

4.      Defendant RosUkrEnergo AG ("RUE") is headquartered in the Swiss canton of Zug.  Firtash controls his shares in RUE through a company called Centragas Holding,  which has offices in Vienna, Austria and is affiliated with the DF Group, which is also located in Austria.

5.      Defendants JOHN DOES # 1 through 100 are other individuals and companies, some of whose identities are presently unknown, who conspired with and/or aided and abetted the named defendants as part of a conspiracy and racketeering enterprise designed to deprive plaintiffs and other class members of fundamental political and human rights, and to divert natural gas and other natural resources of Ukrainian natural resources of Ukraine for the benefit of themselves and others associated with their racketeering enterprise.

3

## JURISDICTION

6.      This Court has subject matter jurisdiction over this matter pursuant to the Alien Tort Statute and the Torture Victims Protection Act, 28 U.S.C. §1350 with regard to the Plaintiffs, who are Ukrainian citizens living in Ukraine and elsewhere, as well as non-Ukrainian citizen who have been victimized and suffered damages as a result of the defendants' racketeering enterprise, in that the claims of the plaintiffs involve violations of international law, including the deprivation of fundamental political and human rights, as well as the systematic diversion of natural gas and other valuable natural resources of Ukraine for the benefit of the defendants and their associates.

7.      This Court also has jurisdiction over this matter pursuant to the Racketeering Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. Section 1961 et seq. in that the defendants conducted their multiple acts of fraud and racketeering through a racketeering enterprise that had a continuity of structure and purpose over an extended period of time.

8.      This Court has subject matter jurisdiction over this matter with regards to members of the Plaintiff class who may be United States Citizens, pursuant to the Torture Victims Protection Act, Pub. L. No. 102-256, § 2(a), 106 Stat. at 73, 28 U.S.C.§1350, and pursuant to 28 USC §1331 that the claims of the plaintiffs and other class members involve federal questions and international law questions which are incorporated into federal common law.

4

**FACTUAL BACKGROUND**

9.      For many years, RUE bought cheap gas from Russia and Turkmenistan and had Gasprom deliver it to the Ukrainian border, where most of the natural gas was sold at a favorable price to the state-owned Ukrainian company, Naftogaz, and the rest to European customers at global market prices. The rest of Ukraine's demand for gas was supplied by Gazprom from Russian sources, also using RUE as the intermediary.

10.      In early 2009, defendants Firtash and RUE owed Gazprom, the Russian gas monopoly, $1.7 billion for gas that Gazprom had already delivered but which Firtash and RUE were storing in Ukraine, with the intention of exporting it to Poland and Rumania.

11.      On January 19, 2009, following negotiations in Moscow, plaintiff Tymoshenko, who was then the Ukrainian Prime Minister, and Prime Minister Putin of Russia reached an agreement that eliminated RUE as the middleman in the natural gas transactions between Russia and Ukraine. It was agreed that Gazprom would transfer RUE's debts to Naftogaz, which would then pay Russia the $1.7 million that was owed by RUE and Firtash. In return, Naftogaz would receive access to the 11 billion cubic meters of gas that Firtash and RUE was storing in Ukrainian government storage tanks. Under the agreement, the governments of Russia and Ukraine would conduct their gas dealings directly with each other in the future.

5

12.     Pursuant to the January 19th agreement, Naftogaz paid Gazprom $1.7 million for 11 billion cubic meters of gas and complied with all other provisions of the agreement.

13.     Naftogaz Deputy Chairman Ihor Didenko signed the agreement on behalf of Ukraine at the express instructions of then-Prime Minister Tymoshenko. However, while he was in Moscow and about to sign the agreement, he received threatening phone calls from Kiev warning him that he would "do time" if he signed the agreement.

14.     The January 19, 2009 agreement, which basically eliminated RUE as a costly middleman in the natural gas transactions between the two countries, was celebrated by the Western European countries who were the major recipients and users of the natural gas. Even the U.S. Embassy, which had described Firtash as a "questionable character" in cables to Washington, expressed the view that the elimination of RUE could introduce "transparency and accountability" into the gas trade.

15.     Firtash was understandably outraged by the January 19th agreement, which basically eliminated one of the most lucrative aspects of RUE's business. He complained to the U.S. Ambassador to Kiev that the agreement was "criminal" and that if anyone other than Tymoshenko had made the agreement, "he would have already been hanging from the street lights." One Firtash ally, Yury Boyko, energy minister in the opposition's shadow cabinet and a former member of the coordinating council of RUE, called the agreement a "betrayal of national interests."

16.     Firtash and his associates filed an arbitration claim with the Arbitration Institute of the Stockholm Chamber of Commerce.  Firtash claimed the agreement between Russian and Ukraine was illegal. However, the Ukraine Government, appearing confident that it would win the arbitration, arguing that Naftogaz, not RUE, had actually paid for the gas, so there was no monetary consideration for RUE's claim to the ownership of the gas.

17.     While the arbitration proceedings in Stockholm were still ongoing, the Ukraine government changed hands. In February 2010, Tymoshenko's rival, Victor Yanukovych, became president. Since Firtash was one of the key financial backers of the new president, he was immediately included in Yanukovych's inner circle.

18.     Many of Firtash's associates were appointed to government posts in the new Yanukovych administration. Two of his close friends and associates, Yury Boyko and Serhiy Lyovochkin, became energy minister and the president's chief of staff, respectively. In addition, Firtash's confident, Valeriy Khoroshkovsky, owner of the Inter media empire, in which Firtash owned a purchase option at the time, was named the chief of the SBU, the Ukrainian state security system and successor to the KGB.

19.     The entire management team of the state-owned Naftogaz were replaced with managers loyal to Yanukovych, Firtash and the rest of their associates and inner circle. One of the managers that was removed was Igor Didenko, who had signed the January 19, 2009 agreement and was the subject of a politically-motivated investigation that led to his arrest and imprisonment.

20.     Since the entire management team at Naftogaz now reported to the Yanukovych administration, the two parties that were facing each other in the Stockholm arbitration were now friends and allies. Indeed, there was now really only one side. Firtash was negotiating in the interest of RUE and himself, while the Ukrainian government, which was supposed to be on the other side of the table, was represented by Energy Minister Boyko, who was a longstanding friend and ally of Firtash.

21.     Not surprisingly, once the Ukrainian government changed hands in February-March of 2010, it also its position in the Stockholm arbitration proceedings 180 degrees, now "admitting" that the gas in dispute had always been owned by RUE. As the Supreme Court of Ukraine later noted in its November 2010 written opinion on the matter, "Naftogaz of Ukraine admitted completely that there were no legal reasons [for it] to acquire [the] disputed quantity of natural gas, thus [admitting] the illegality of [the] seizure of [the] natural gas from RosUkrEnergo...."

22.     Upon information and belief, Naftogaz's "change of position" was due to the fundamental conflict of interests, collusion and corrupt agreement  between defendants Firtash/RUE and the Yanukovych administration.

23.     Since the Ukraine government and Naftogaz had basically defaulted by withdrawing their opposition to RUE's claim to ownership of the gas, the Stockholm Arbitration Tribunal ("the Tribunal") was left with no alternative to granting RUE's claim. In June 2010, the Tribunal ruled that Naftogaz owed its former gas supply intermediary, RUE, 11 billion cubic meters of natural gas, which RUE claimed was illegally confiscated

8

in January 2009 and which the Yanukovych administration and the new management of

Naftogaz did not contest. In addition, the Tribunal fined Naftogaz 1.1 billion cubic

meters, for a total award of 12.1 billion cubic meters of gas.

24.     The Stockholm arbitration ruling in favor of Firtash's company (RUE) has

been widely perceived as a means of generating huge sums of cash with which Firtash

and his associates could continue to illegally fund the pervasive system of corruption

that encompasses every level of government, while at the same time suppressing

political dissent through intimidation, racketeering and other violations of fundamental

human and political rights.

25.     When RUE moved to affirm the Tribunal award in the Ukrainian courts,

Naftogaz and the current Ukraine administration again essentially defaulted and failed

to provide the courts with any facts or proof that the recognition and enforcement of

the Tribunal award was contrary to the public policy of the state and would result in

untold hardship and suffering to the Ukrainian people. As the Ukrainian Supreme Court

noted in its November 24, 2010 decision, Naftogaz failed to furnish any proof of even

the most basic facts that should not have been in dispute, namely, that the transfer of

the natural gas to RUE "exceeds 50% of the total volume of natural gas extracted in the

country annually from [the] country's own resources, and 50% of [the] annual needs of

natural gas by the population." Accordingly, since Naftogaz and the administration failed

to provide the courts with any facts or proof that would have provided a basis for the

courts to reject the Tribunal award as contrary to the public policy and welfare of the

9

country, the Supreme Court of Ukraine was left with no alternative but to recognize and confirm the Tribunal award.

26.     Another reason why the Ukrainian courts had to confirm the Tribunal award was that the Yanukovych administration had succeeded in stripping away all remaining vestiges of an independent judiciary and the Rule of Law. The administration, in collusion with its allies in the Parliament, including the members affiliated with the Party of Regions (POR), declared that the 2004 Constitution, which had been established after the pro-democratic "Orange Revolution" had swept away the corrupt administration in power, was procedurally "defective," and should be replaced by the prior constitution from 1996, which gave much greater power to the President and the executive branch of government.

27.     The POR, with the full support of the administration, petitioned the Ukraine Constitutional Court to set aside the 2004 Constitution in favor of the prior one. While the matter was under consideration of the Constitutional Court, four of the eighteen judges on the Court resigned on the same day, and two of the four admitted that they had been pressured to resign. After these four judges were replaced with more "reliable" judges, the Constitutional Court voted unanimously during the summer of 2010 to set aside the 2004 Constitution and to replace it with the prior one, giving the President the power of appointment over the Chief Prosecutor's Office and virtually every other important office and branch of government.

28.     In July 2010, under the guise of "Judicial Reform," the administration also
granted the Supreme Council of Judges certain powers not specifically enumerated or
even mentioned in the constitution, including the power to appoint the head judges of
all the courts, to control the assignment of cases and the allocation of offices,
computers and other resources, and to remove judges within one month's period
without hearing, the right to defend against the charges, or other indicia of due process.
Since the Yanukovych administration has the allegiance of at least 16 of the 20 members
on the Supreme Council of Judges, through the increase powers granted to the Supreme
Council, the administration has virtual complete control over the hiring and firing of
judges, thus precluding the possibility of any independent judiciary.

29.     The administration has also consolidated its control over the judiciary by
establishing new courts, such as the High Special Court, which can hear both civil and
criminal cases, and is headed up by the President's hand-picked appointee, a former
POR member of the Parliament.

30.     Perhaps the most powerful assault on any residual independence on the
part of the judiciary came when government prosecutors initiated a criminal case
against the younger daughter of the Chairman of the Supreme Court, Vasyl Onopenko,
and arrested Onopenko's son-in-law, Yevhen Korniychuk, an attorney and former
Deputy Justice Minister. On December 22, 2010, Korniychuk was summoned to the
Prosecutor's office from the hospital, where his wife had just delivered their newborn
child. At the time of Korniychuk's  pre-trial detention and arrest in December, 2010,

Onopenko was the last Ukrainian in a high position of power not politically aligned with the Yanukovych regime.

31.     Korniychuk was accused of rigging the government procurement process in 2009 in favor of his old law firm, Magisters, as attorneys for Naftogaz, a charge that both he and his former law firm vigorously denied. These charges had been previously reviewed twice by the courts and found to be meritless. Korniychuk was eventually released after 55 days in jail, after a clear "message" had been sent to Supreme Court Judge Onopenko.

32.     At about the same time, after the Prosecutor's office bought an obviously politically-motivated criminal case against Onopenko's younger daughter, designed to either intimidate Onopenko and/or force him to resign. Rather than discussing the matter with the Prosecutor's office that was investigating and prosecuting the case, Onopenko decided to go directly to the Prosecutor's boss, President Yanukovich. The charges against Onopenko's daughter were dismissed the day after Onopenko and Yanukovich had their meeting.

33.     Another scheme hatched by the current administration to solidify control over the Supreme Court was to reduce the number of Supreme Court judges from 49 to 20, and to hold what has been referred to as "casting calls" for all of the judges to determine which ones will stay on the Court and which ones will be dismissed.

34.     The loss of an independent judiciary and resulting transfer of huge amounts of natural gas from Naftogaz to RUE after the confirmation by the Ukrainian

courts of the Tribunal award had a dramatic and immediate impact on the Ukrainian economy and the social well-being of its citizens.

35.    Although the Tribunal award was technically against Naftogaz, since that company is state owned, the payments were made with natural gas that was, in essence, owned by Ukraine and its citizens. This represented a colossal disaster. Not only had the gas that was now transferred to RUE already been paid for through a transfer of $1.7 from Naftogaz to Gasprom, but the Ukrainian economy and its citizens were now being deprived of a huge amount of the gas that was needed domestically within Ukraine to heat homes, hospitals, schools and other facilities critical to the well-being of Ukrainian people. In order to fill this shortfall in supply of gas for domestic consumption, Naftogaz had to go purchase gas from foreign sources; however, the price of the 12.1 billion cubic meters of gas had increased dramatically since the pricing at the time of the original transaction, which averaged out to $1.7 billion, and was now worth at least $3.5 billion.

36.    In order to understand the enormity of the transaction, it should be noted that the 12.1 billion cubic meters of gas that Naftogaz transferred to RUE following the Tribunal award represented approximately 50% of the 25 billion cubic meters of gas produced in Ukraine annually, and approximately one-sixth of Naftogaz's total annual "gas balance" of 75 billion cubic meters, which includes the gas shipped by pipeline into Ukraine from Russia and Turkmanistan.

37.    Prior to the transfer of the 12.1 billion cubic meters of gas from Naftogaz to RUE, the gas prices used for domestic consumption within Ukraine each year were

maintained significantly below the market price of the natural gas that was exported from Ukraine to Western Europe. These domestic charges were stabilized at below-market prices in recognition of the inability of individual citizens, pensioners, homeowners, small businesses, hospitals and schools to pay for gas at any price other than substantially below the market price.

38.     This all changed when the Yanukovych administration took control in February and March of 2010. Domestic gas prices were increased by 50%, which most homeowners, pensioners, hospitals and schools could not afford to pay. As a result, the gas pressure to homes, hospitals, schools and other facilities was reduced to the point where the inside temperature of many of these facilities was barely above the freezing level during the winter of 2010-2011. This not only resulted in widespread pain and suffering among the Ukrainian populace, but also dramatically added to the already serious health care crisis in the country, particularly in the public hospitals.

39.     Since Firtash and RUE did not pay either the $1.7 billion original price or the $3.5 billion that the 12.1 billion cubic meters of gas was worth at the time that it was recently transferred from Naftogaz to RUE/Firtash, the defendants reaped a windfall profit of at least $3.5 billion when they sold the gas (for which they had paid nothing) on the open market.

40.     Upon information and belief, Firtash and his associates have used part of those funds to purchase at least three petrochemical plants in Ukraine, thus creating a virtual monopoly on the production of fertilizer in the country, which is critical to the

entire agricultural sector of the Ukrainian economy. Moreover, Firtash is well positioned to acquire a huge portion of the agricultural farm land that the current administration plans to sell off through privatization plans.

41.     Also, upon information and belief, Firtash has used $600 million of the huge financial windfall from the Tribunal award to exercise his option to buy a percentage interest in the Inter media empire from his co-owner and close associate Valeriy Khoroshkovsky, who is also the chief of the SBU, the Ukrainian state security system.

42.     The corrupt agreement with the current administration that permitted Firtash/RUE to make a windfall profit of at least $3.5 billion also has permitted those defendants to extend their control over the natural gas distribution sector in Ukraine since, upon information and belief, Firtash and his associates owns and controls approximately 75% of the regional gas distribution companies in Ukraine, which are commercial, privately owned companies.

43.     The failure of the current Ukrainian government to mount a credible opposition during the Stockholm arbitration proceedings, due to fundamental conflicts of interest, self-dealing, political manipulation and corruption, and the subsequent rubber-stamping of the Tribunal award by the Ukrainian courts, is but one aspect of the alarming deterioration of the rule of law in Ukraine. Another major aspect is the selective and politically motivated investigation and prosecution of virtually every significant executive in the administration of former Prime Minister Tymoshenko.

15

Indeed, the situation has become so alarming that a senior official of the European Union, Stefan Fuele, warned the Ukraine government in January 2011 not to use criminal law for political ends, a clear reference to the prosecution of Plaintiff Tymoshenko and other opposition leaders by the Yanukovych administration. Unfortunately, the protestations and warnings by the EU and international human rights organizations have fallen on deaf ears.

44.     Since taking power, the Yanukovich administration, aided and abetted by the defendants and other co-conspirators, have launched a wave of arrests and investigations aimed at Plaintiff Tymoshenko and her political allies in what most objective observers consider to be a concerted campaign to intimidate, suppress and ultimately eliminate any and all political opposition in Ukraine.

45.     In addition to the investigations and prosecutions of Plaintiff Tymoshenko, Yevhen Kornychuk, and the younger daughter of Chief Justice Vasyl Onopenko, as described above , YURIY  LUTSENKO, the former Interior Minister of Ukraine, was arrested on criminal charges brought be the Prosecutor's General Office on November 5, 2010, and remains jailed at the Lukyanivska prison in Kiev on politically motivated and trumped-up charges of "overpaying" his former official driver and other alleged "misappropriation" of state funds.

46.     In addition,  ANATOLY MAKARENKO, the former Customs Chief of Ukraine, was jailed in July 2010  and charged on August 30, 2010 on politically motivated  charges, as part of the defendants' concerted effort to intimidate all political

16

opponents and to suppress political and human rights. Specifically, Mr. Makarenko was charged with "suspicion of the abuse of official position" relating to the customs clearance of 11 billion cubic meters of gas, which ownership was challenged by defendant RosUkrEnergo ("UKE") in 2009.

47.     Similarly, IHOR DIDENKO, the former First Deputy Head of the National Joint Stock Company "Naftogaz of Ukraine" (" Nafogaz") and political ally of plaintiff Tymoshenko, was arrested and jailed on July 9, 2010 by officers of the Ukraine Security Service (SUB) on false and politically motivated charges as a "person involved in a care regarding infliction of damages on the State of Ukraine" relating to the claim to 11 billion cubic meters of gas that were submitted by RUE for arbitration in Stockholm. Mr. Didenko, like Lutscenko and other political prisoners who were targeted for selective prosecution, was incarcerated at the notorious Lukyanivska prison in Kiev, which was designed to house 2800 prisoners, but is now overfilled with 4000 men, including other political prisoners.

48.     TARAS SHEPITKO, the former Deputy Head of the Department of the Kyiv Regional Customs Office, was arrested on July 21, 2010 and selectively prosecuted on charges of "misappropriation of property" relating to the transfer of the natural gas claimed by RUE from Naftogaz.

49.     TETYANA SLYUZ, the former head of the State Treasury of Ukraine, and TETYANA GRYTSUN, the former First Deputy Head of the State Treasury, were also

selectively prosecuted on political-motivated criminal charges allegedly involving his "abuse of official position."

50.    On August 5, 2010, criminal proceedings were initiated against BOGTDAN DANYLYSHYN, the former Minister of the Economy, on charges of abuse of his official position relating to procurement procedures. He was granted asylum by the Czech Republic, where he remains.

51.    On August 21, 2010, VALERIY IVASHCHENKO, the former Acting Minister of Defense, was arrested on charges of "abuse of power of official position."

52.    This systematic suppression of the political opposition in Ukraine by means of politically-motivated investigations and criminal prosecutions, forcing a number of opposition leaders into exile or imprisonment, violates fundamental human and political rights recognized by various international conventions and covenants, and itself could provide the factual basis for a civil action in U.S. courts against the government and various individuals for violations of international law.

## CLASS ACTION ALLEGATIONS

53.    Plaintiffs bring this action as a class action on behalf of a class of all Ukrainian people that who have had their fundamental political and human rights violated either through politically-motivated investigations, prosecutions and/or incarceration, or who suffered damages as a result of the Tribunal award that has

severely depleted the national treasury and resulting in the looting and theft of valuable national resources.

54.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be learned through appropriate discovery, Plaintiffs' claims are typical of the claims of the members of the Class as all members of each Class are similarly affected by Defendants' wrongful conduct in violation of the federal, state and international law complained of herein.

55.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and complex litigation.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by many members of the Class may be relatively small in proportion, the expense and burden of individual litigation makes it virtually impossible for the Class members to seek redress on an individual basis for the wrongful conduct alleged. Separate trials for the large number of plaintiffs would be difficult, if not impossible, to judicially manage.  Plaintiffs do not know of any difficulty which would be encountered in the management of this litigation that would preclude its maintenance as a class action.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.

19

Among the questions of law and fact common to the Class are: (a) whether the defendants manipulated the Stockholm arbitration process in order to ensure that the arbitration award would be favorable to Firtash and RUE, and thereby ensuring that the Ukrainian treasury would be improperly charged for billions of dollars worth of natural gas that had already been paid for by Naftogas; (b) whether the defendants conspired together and with others to loot the Ukrainian national treasury of funds through the manipulation of the Stockholm arbitration process in order to generate cash that could be used for corrupt purposes; (c) whether the defendants engaged in multiple acts of fraud and racketeering through a racketeering enterprise that included the defendants and their associates and co-conspirators both inside and outside the current Ukrainian government; and whether the plaintiffs and other class members were damaged as a result of defendants' racketeering acts.

58.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of the controversy.

59.     A class action is the appropriate method for the fair and efficient adjudication of this controversy.  The presentation of separate actions by the individual class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for the Defendants, and/or substantially impair or impede the ability of class members to protect their interests.

60.     Plaintiffs are adequate representatives of the Class because each is a member of the Class and the interests of each do not conflict with the interests of the members of the Class he or she seeks to represent.  The interests of the members of the classes will be fairly and adequately protected by the Plaintiffs and their undersigned counsel.

**COUNT I**

**Violations of the Alien Torts Statute and the
Torture Victims Protection Act, 28 U.S.C.§ 1350**

61.     Plaintiffs repeat and reallege each and every foregoing paragraph of the complaint as if fully set forth herein.

62.     The Alien Torts Statute, 18 U.S.C. § 1350, grants aliens (non-U.S citizens) the right to seek recourse and judicial relief in the United States courts for violations of international law. Similarly, the Torture Victims Protection Act, which is also codified in 18 U.S.C. § 1350, gives recourse to the U.S. courts for victims of torture and other inhumane or degrading treatment.

63.     The Universal Declaration of Human Rights, which was recognized by the United Nations General Assembly in 1948, recognizes that there are certain fundamental and inalienable human and political rights to which the citizens of all nations are entitled, including, among other things, the right of the accused to a public and impartial hearing by an independent and impartial tribunal pursuant to the Rule of

21

Law, equal protection and treatment under law, the right to be presumed innocent until proven guilty according to law in a public trial at which he has all the guarantees necessary for his defense, the right not to be subjected to arbitrary arrest, incarceration or exile, the right to the full protection of law, and the right not to be subjected to torture or to cruel, inhuman or degrading treatment.

64.     In addition, the International Covenant on Civil and Political Rights, which has been adopted by all United Nations member states, including Ukraine, protects the freedoms of expression and association, without retaliation by the state through arrest, incarceration of forced exile.

65.     The rights protected by the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, as well as those articulated by other treaties, as well as treaties and scholarly writings, are now generally accepted by the international community of nations as part of customary international law, and is a peremptory or *jus cogens* norm of international law, *i.e.,* the prohibition is specific, universal and obligatory and binding upon all states and their citizens.

66.     The defendants actions, including the subjecting of members of the political opposition and other class members to arbitrary arrest, incarceration under cruel and inhumane conditions, without food or water for extended time periods, and without access to counsel for extended periods of time, constituted violations of customary international law, for which the plaintiffs and other class members are

entitled to damages pursuant to the Alien Torts Statute and the Torture Victims

Protection Act, 28 U.S.C.§ 1350.

      67.    In addition, the defendants' failure to defend the interests of the

Ukrainian people in the Stockholm arbitration proceedings, and the corrupt

manipulation of the arbitration process to ensure that defendants Firtash and RUE

received an award worth literally billions of dollars, and which resulted to the further

depletion of the public treasury and further impoverishment of the Ukrainian

government, its economy and its people, such as to deprive much of its citizenry of the

right to live with fundamental decency, also constituted violations of customary

international law, for which plaintiffs and other class members are entitled to damages

pursuant to the Alien Torts Statute.

      68.    Defendants' violations of international law, the Alien Torts Statute and

the Torture Victims Protection Act were the proximate cause of the injuries sustained by

Plaintiffs and others similarly situated.

      69.    As such, all plaintiffs and other members of the class are entitled to

recover damages against the Defendants in an amount to be determined at trial.

## COUNT II

### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") -18 U.S.C.§1964(c)

70.     Plaintiffs repeat and reallege each and every foregoing paragraph of the complaint as if fully set forth herein.

71.     Defendants participated in a scheme to defraud plaintiffs and other class members by conducting and participating, directly and indirectly, in the conduct of the affairs of a Racketeering Enterprise ("the Enterprise"), which conduct and activities affected foreign commerce, over an extended period of time through a pattern of racketeering. including mail and wire fraud, which had to effect of depriving the citizens of Ukraine the right to the full and honest representation of their governmental representatives, without conflict of interest or corruption.

72.     The defendants actions, including the use of the telephone, faxes, emails and other communications between Stockholm and Kiev, and between other international locations, were intended to further defendants' scheme to defraud the member of the class by ensuring that defendants Firtash and RUE would win an arbitration award that would deprive Ukraine and its citizens of substantial monies and assets, and would further provide defendants with huge sums of monies whereby they could finance their scheme to undermine the Rule of Law in Ukraine and to deny plaintiffs and other opposition leaders of their fundamental human and political rights, including the arbitrary arrest, incarceration and forced exile, and the deprivation of

24

political prisoners of food and water over extended periods of time, the use of
psychological torture of incarcerated political prisoners, and the deprivation of political
prisoners of their right to counsel and the presumption of innocence, among other
rights.

73.    As a result of defendants' acts of racketeering, plaintiffs and other class
members suffered damages in an amount to be determined at trial.

## COUNT III
## (RICO CONSPIRACY- 18 U.S.C. § 1964(d))

74.    Plaintiffs repeat and reiterate the foregoing paragraphs of this Complaint
as though fully set forth herein.

75.    Defendants conspired with each other and with others with their
Racketeering Enterprise to deprive plaintiffs and class members of fundamental human
and political rights.

## JURY TRIAL DEMAND

76.    Plaintiffs demand trial by jury on all issues so triable.

**WHEREFORE**, the Plaintiffs, by and through their attorneys, on behalf of themselves and
all others similarly situated, demand judgment against each of the Defendants, as
follows:

a.      Certifying this action as a class action, including any subclasses which this Court

deems appropriate;

b.      Designating the law firm listed below as class counsel;

c.      On the First Count for violations of the Alien Torts Statute and the Torture

Victims Protection Act, an award of compensatory, punitive and exemplary damages to

each of the named Plaintiffs and members of the Class;

d.      On the Second and Third Counts for violations of the Civil Rico statute, an award

of treble damages (three times the actual damages) sustained by the plaintiffs and class

members as a result of defendants' racketeering acts and Rico Conspiracy;

e.      Awarding plaintiffs and class members their attorneys' fees and costs of pursuing

this action; and

f.      Granting such other and further relief as this Court deems just and proper.



Dated:  New York, New York
        April 26, 2011

                                        McCALLION & ASSOCIATES LLP

                                        By: _____
                                        Kenneth F. McCallion (Bar # KFM-1591)
                                        100 Park Ave, 16th floor
                                        New York, NY 10017-5538
                                        (646) 366-0880

                                        *Attorneys for Plaintiffs*

VERIFICATION

YULIA TYMOSHENKO, hereby affirms that she has read the foregoing complaint and knows the contents of the same to be true of her own personal knowledge and belief, except as to those matters affirmed on information and belief, and as to those matters, she believes them to be true.

Dated: Kyiv, Ukraine
~~March~~    , 2011
12 - APRIL,

_____

YULIA TYMOSHENKO