## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**YULIA TYMOSHENKO and JOHN DOES 1 through 50,** on behalf of themselves and all of those similarly situated,

                         *Plaintiffs,*           Civ. No. 11-02794 (RJS)

       v.

                                 **AMENDED COMPLAINT**

**DMYTRO FIRTASH a/k/a DMITRY FIRTASH, SEMYON MOGILEVICH, ROSUKRENERGO AG, GROUP DF, GROUP DF LIMITED, GROUP DF FINANCE LIMITED, GROUP DF REAL ESTATE, NADRA BANK, CENTRAGAS HOLDING AG, CMZ VENTURES, LLC,  KALLISTA INVESTMENTS LLC a/k/a CALISTER INVESTMENTS LLC, THE DYNAMIC GROUP a/k/a THE DYNAMIC FUND, BARBARA ANN HOLDINGS LLC, VULCAN PROPERTIES, INC., BRAD S. ZACKSON, PAUL J. MANAFORT, YURIY BOYKO, VALERIY KHOROSHKOVSKY, VIKTOR PSHONKA, RENAT KUZMIN, OLEKSANDR NECHVOGLOD and LILIA FROLOVA and JOHN DOES 1 through 100,**
                         *Defendants.*

_____

## AMENDED COMPLAINT

### I.     INTRODUCTION

       1.        This case concerns the arbitrary prosecutions, arrests, and detentions of former Ukrainian Prime Minister Yulia Tymoshenko and other political opposition members in violation of international law, which have been carried out by or with the assistance of Defendants, representing a collection of private and public figures that stand to benefit politically and/or financially by eliminating Ukraine's political opposition.  These political persecutions are part of a larger complex racketeering scheme, involving the laundering of money in the United States and abroad, and the payment of illegal kickbacks to Ukrainian government officials, perpetrated

by Defendants, who have worked both inside and outside of government channels for the purpose of unjustly enriching themselves at the expense of Ukrainian citizens.

2.      Since Viktor Yanukovych assumed office as President of Ukraine in February 2010, at least 12 of his administration's senior political opponents—former Prime Minister Yulia Tymoshenko and 11 senior officials in her administration - have been arbitrarily arrested, detained, and prosecuted on unfounded, politically-motivated criminal charges in violation of international law.  These political persecutions have been carried out at the direction of Defendant Viktor Pshonka, Ukraine's Prosecutor General, with the knowledge, consent, and material support, if not at the request, of the remaining Defendants and their agents and co-conspirators, in an attempt to quash political opposition in Ukraine and unjustly enrich Defendants at the expense of Ukrainian citizens.

3.      The current regime's political persecution of its opponents has been facilitated by a number of measures instituted by the Yanukovych Administration to consolidate power in the executive branch and weaken judicial independence, in what has been described by international observers as a move towards a more authoritarian state.

4.      The international community has strongly criticized the Yanukovych Administration for allowing the criminal law to be used in this manner as a tool to achieve political ends.  The United States has repeatedly "reiterate[d] its concern about the appearance of politically-motivated prosecutions of opposition figures in Ukraine," stating, "[w]hen the senior leadership of an opposition party is the focus of prosecutions, out of proportion with other political figures, this creates the appearance of a political motive."  *See* **Exhibit 1**.  The European Union (EU) likewise issued a resolution decrying the selective prosecution of Tymoshenko and other members of Ukraine's political opposition and calling for comprehensive reforms that

would ensure a fair, impartial, and independent judiciary, which the EU has emphasized is presently lacking in Ukraine.  *See* **Exhibit 2**.

5.      Other countries have echoed the statements of the U.S. and EU, including Canada, Poland, Hungary, the Czech Republic, Slovakia, and Russia.  Human rights organizations in both Ukraine and abroad have also reported procedural abuses and other human rights violations in connection with the current regime's prosecution and suppression of the political opposition. *See, e.g.,* Second Preliminary Report of Danish Helsinki Committee for Human Rights, **Exhibit 3**.

6.      A primary focus of the political persecution suffered by Plaintiffs has centered around Ukraine's natural gas dealings with Russia, from which certain Defendants, working both inside and outside of government channels, have secured ill-gotten gains over the years.  The unfounded criminal "Gas Charges" on which former Prime Minister Yulia Tymoshenko was recently arrested and subjected to a political show trial (and the related charges for which a number of other former high ranking Ukrainian officials have also been detained) are part of an effort by these Defendants to entrench their influence in Ukraine's natural gas trade by retaliating against and thus silencing Tymoshenko and her political allies, who worked to expose and eliminate Defendants' corrupt business dealings while in office.

7.      From 2004 to early 2009, Defendant RosUkrEnergo AG ("RUE") received substantial profits for serving as a middleman in natural gas dealings between Naftogaz, a Ukrainian state-owned gas company, and Gazprom, a Russian company.  Ukrainian billionaire Defendant Dmytro Firtash a/k/a Dmitry Firtash ("Firtash"), who largely controls RUE, was able to secure profits from the Russia-Ukraine gas deals due to his close relationship with, and payment of illegal kickbacks to, Ukrainian government officials, including then Naftogaz

Chairman Yuriy Boyko and Deputy Chairman Ihor Voronin, both of whom were nominated to RUE's Coordination Committee after securing RUE's initial brokerage contract.

8.     Firtash and his co-conspirators, agents, and affiliates laundered the proceeds from the Russia-Ukraine gas deals using a complex web of shell companies through which they were able to acquire and maintain investments in several foreign countries, including the United States. These transactions were intended to and enabled Firtash and those Defendants in active concert and participation with him to hide illegal kickbacks paid to government officials and place a significant portion of the proceeds from the gas contracts outside the reach of Ukrainian courts.

9.     Throughout the relevant time period, former Prime Minister Tymoshenko was a vocal critic of RUE's gas contracts and the government corruption that enabled RUE to secure these contracts. Early in 2008, for example, during Tymoshenko's second term as Prime Minister, she revoked the authority of a RUE/Naftogaz joint venture to operate in Ukraine. Thereafter, to end the European "gas crisis" in January 2009, Tymoshenko facilitated the negotiation of gas purchase and transit contracts with Gazprom (hereinafter referred to as Ukraine's "2009 gas contracts"), which eliminated RUE as a middleman, resulting in a significant loss of business to RUE. As part of the 2009 gas contract negotiations, Ukraine and Russia further agreed that Gazprom would transfer to Naftogaz approximately 11 billion cubic meters of RUE's natural gas stored in Ukraine in exchange for settling RUE's existing debt to Gazprom of $1.7 billion.

10.     Although Firtash, Boyko, and their agents and co-conspirators attempted to sabotage the 2009 gas contracts during Tymoshenko's term as Prime Minister, they were unsuccessful in doing so at the time. Following the conclusion of the contracts and Naftogaz's

confiscation of RUE's gas, Firtash and RUE thus developed a multi-pronged strategy to redress the damage done to their interests by Tymoshenko and her allies in the Russia-Ukraine gas trade moving forward.  Upon information and belief, an integral part of this strategy was the payment of illegal kickbacks and other support to government officials who had proven willing in the past to protect the financial interests of Firtash and his associates at the expense of Ukrainian citizens.

11.     First, Firtash and RUE commenced civil litigation challenging the confiscation of its gas by Naftogaz, both in Ukrainian courts (in which they were initially unsuccessful) and by filing a complaint with the Arbitration Institute of the Stockholm Chamber of Commerce.  In their Stockholm Complaint, Firtash and RUE alleged that by signing the new contract with Gazprom, Naftogaz illegally seized RUE's 11 billion cubic meters of gas, even though Naftogaz had lawfully purchased this gas from Gazprom.  During former Prime Minister Tymoshenko's tenure in office, Naftogaz and the Ukrainian government defended this claim on the basis that Naftogaz, not RUE, had paid Gazprom for the gas in question; thus, RUE had no ownership rights in it.

12.     Second, Firtash, RUE, and their associates contributed substantially to the campaign of presidential candidate Yanukovych, with Firtash being one of Yanukovych's biggest campaign contributors.  When Yanukovych took office, Firtash's close allies, including certain Defendants, were appointed to senior posts in the Yanukovych Administration and other positions of influence.  For example, Yuriy Boyko, a close associate of Firtash who was instrumental in securing RUE's brokerage contracts in Ukraine's earlier Naftogaz-Gazprom gas deals, was appointed Minister for Fuel and Energy.  A close Firtash and Boyko associate also replaced Naftogaz CEO Ihor Didenko, who has since been arrested for signing the 2009 gas contracts on behalf of Naftogaz.

13.     Yanukovych's election as President in February 2011, followed by the appointment of Firtash's close associates to positions of power within the Yanukovych Administration, led to a complete reversal of Ukraine's position in the Stockholm arbitration, with the Yanukovych government essentially conceding RUE and Firtash's claims.  As a result of the Yanukovych Government's failure to defend Ukrainian citizens' financial interests in the Stockholm arbitration, RUE and Firtash were awarded 12.1 billion cubic meters of gas, equal in value to $3.5 billion and exceeding half of Ukraine's domestic reserves at the time.  Because Naftogaz is entirely state-owned, the colossal judgment is ultimately being paid by Ukrainian citizens.

14.     The election of Yanukovych and the appointment of Firtash's associates to senior positions in the Yanukovych Administration continues to pay financial dividends for RUE, which now again has authority to operate as an intermediary in Ukraine under the auspices of a former joint venture with Naftogaz.

15.     To ensure that RUE continues to be in a position to profit from Ukraine's gas deals, Firtash, RUE, and their agents and co-conspirators, with the assistance of certain Defendants, targeted former Prime Minister Tymoshenko and other political opposition members who either participated in the 2009 gas contracts that were disadvantageous to Firtash and RUE, or were outspoken critics of RUE's involvement in the Russia-Ukraine gas trade in an attempt to prevent them from regaining political power.

16.     The 2009 gas contracts are the subject of the Gas Charges on which Tymoshenko recently stood trial.  Naftogaz, at the direction of and with the approval of certain Defendants, also recently filed a civil lawsuit against Tymoshenko on substantially the same basis as the criminal charges.

17.      In addition, Ihor Didenko, Naftogaz's former CEO who signed the 2009 gas contracts on behalf of Naftogaz, was arrested by officers of Ukraine's state security service (SBU)on July 9, 2010 on false and politically-motivated charges of "inflict[ing] damages on the State of Ukraine" in connection with the gas contracts. Didenko has been arbitrarily incarcerated at the horrendously overcrowded Lukyanivska prison since his initial arrest, which is the same prison where Tymoshenko is being held. *See* **Exhibit 4.**

18.      Similarly, Yevhen Korniychuk, the First Deputy Minister of Justice in the Tymoshenko administration and the son-in-law of Supreme Court President Vasyl Onopenko, a Tymoshenko ally, was arrested and arbitrarily detained on December 22, 2010, mere hours after his wife gave birth on false and politically-motivated charges that courts had twice concluded to be without merit. After two months of arbitrary detention, Korniychuk was released to house arrest the day after Onopenko met with President Yanukovych. *See* **Exhibit 5**.

19.      Similarly, Anatoly Makarenko, the former Customs Chief of Ukraine during Tymoshenko's premiership, was arbitrarily jailed in July 2010 prior to being formally charge. A month later, on August 30, 2010, he was charged with "suspicion of the abuse of official position" relating to the customs clearance of the natural gas acquired from RUE pursuant to Ukraine's 2009 gas contracts. Makarenko was arbitrarily detained for almost a year since his initial arrest. He was recently released by the Kyiv Court of Appeals on July 5, 2011. *See* **Exhibit 6 and 7.**

20.      Taras Shepitko, the former Deputy Head of the Department of the Kyiv Regional Customs Office in the Tymoshenko administration, was arrested on or about July 21, 2010 on false and politically-motivated charges of "misappropriation of property" in connection with the transfer of RUE's natural gas to Naftogaz pursuant to Ukraine's 2009 gas contracts. He

was arbitrarily detained in proson for almost a year since his initial arrest, having only recently bee released on or about July 5, 2011.

21.     Valeriy Ivashchenko , the former Acting Minister of Defense in the Tymoshenko administration, was arrested on August 21, 2010 on false and politically-motivated charges of "abuse of power of official position" relating to the privatization of a ship and mechanical plant. Ivashchenko has been arbitrarily detained since his arrest, and despite his repeated complaints about his health, the Yanukovych Administration has repeatedly and unnecessarily delayed his medical examination and treatment, first by refusing to comply with a court order to transport Ivashchenko to a military hospital, and then, by failing to share his medical diagnosis with him for three months. Ivashenko's access to family members has also been excessively restricted. For four months, he was not allowed any family visits. *See* **Exhibit 3, supra.**

22.     Mykola Petrenko was a member of Ukraine's executive administration during Tymoshenko's term as Prime Minister and is the former Director of UkrMedPostach, the Ukrainian state-run enterprise through which Ukraine's Ministry of Health entered into a medical equipment supply contract intended to improve the health of Ukraine's rural population. Petrenko was arrested in December 2010 on false and politically-motivated charges brought against Petrenko and Tymoshenko, and remains arbitrarily detained.

23.     These cases do not represent merely an isolated occurrence, but rather are part of a widespread and systematic pattern of political persecution, including prolonged arbitrary detention, carried out by the Yanukovych Administration, with the assistance of Defendants, against former members of the political opposition.  As part of their scheme and conspiracy, one of the Defendants' major goals is to eliminate Tymoshenko as a political contender and threat to

the Yanukovych regime through a criminal "conviction" of her by means of a sham political

trial. Tymoshenko, who is expected to run against Yanukovych in the upcoming 2012

presidential elections, and her allies, will be ineligible for public office, and unable to prevent

RUE and Firtash from continuing to profit substantially from future gas contracts between

Ukraine and Russia.

24.     Defendants' conduct violates state, federal, and international law, including

the prohibitions against prolonged arbitrary detention and participation in a Racketeering

Enterprise in violation of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18

U.S.C. § 1961 *et seq*.

## II.     PARTIES

### A.          <u>Plaintiffs</u>

25.      Plaintiff **YULIA TYMOSHENKO** brings this action individually as a

subject, citizen, and resident of Ukraine.  Tymoshenko was the Prime Minister of Ukraine for a

period of time in 2005, and again from 2007 to 2010.  She is now the leader of the largest

opposition party in Ukraine, the Batkivshchyna Party.  As part of a concerted attempt to discredit

Tymoshenko, deny her fundamental human rights, and intimidate her associates and opposition-

party members, Defendants have subjected Tymoshenko to politically-motivated investigations

and prosecutions.  In the course of these prosecutions, Tymoshenko has been arbitrarily detained

for interrogation on at least 44 occasions, was subject to an arbitrary travel ban since December

15, 2010, and has been arbitrarily incarcerated since August 5, 2011, when, in the midst of her

trial on the Gas Charges, the presiding Judge Rodion Kireyev, ordered Tymoshenko arrested for

contempt of court. Despite widespread calls for her immediate release by the United States and

other international leaders, Ms. Tymoshenko remains in jail today.  Her trial has been fraught

with procedural abuses and violations of her rights.

26.      Plaintiffs **JOHN DOES # 1 through 50** are former Ukrainian administration

officials that served during Tymoshenko's terms as Prime Minister.  They have all been

subjected to politically-motivated investigations and selective prosecutions by the current

Ukrainian administration.  Their names have not been specifically listed as plaintiffs in this

action because they would likely be subjected to further intimidation and persecution if they

were listed.  In addition, several of the John Does are presently incarcerated under conditions

that severely restrict their ability to communicate freely.

### B.        Defendants and their Co-Conspirators

27.      Defendant **DMYTRO FIRTASH** a/k/a Dmitry Firtash ("Firtash") is a subject

and citizen of Ukraine.  Firtash is one of Ukraine's few billionaires, and a close associate and

advisor to the current Ukrainian President, Victor Yanukovych.  Firtash exercises complete

dominion and control over at least six companies, including a number of American companies,

which he has used in his corrupt business dealings to obtain profits and launder his ill-gotten

gains in the United States and other countries at the expense of Plaintiffs and all Ukrainian

citizens: defendants Centragas Holding AG ("Centragas"); CMZ Ventures, LLC; the Dynamic

Fund a/k/a The Dynamic Group; Group DF Limited (a/k/a Group of Dmitry Firtash), and its

subsidiaries and affiliates Group DF Finance Limited and Group DF Real Estate; Kallista

Investments LLC a/k/a/ Calister Investments LLC; RUE and **NADRA BANK**.

28.      Defendants **GROUP DF LIMITED** (otherwise known as Group of Dmitry

Firtash), and its subsidiaries and affiliates **GROUP DF FINANCE LIMITED** and **GROUP DF**

**REAL ESTATE** (collectively, "**GROUP DF**") operate as Firtash's alter egos.  Group DF is Firtash's international private holding company and identifies itself on its website as "The Firtash Group of Companies" and "the international private holding company of prominent Ukrainian businessman Dmitry Firtash."  *See* **Exhibit 8**.  Firtash and his silent partner Semyon Mogilevich own a controlling interest in Group DF, with Firtash serving as Group DF's executive chairman.  Firtash has total control and dominion over Group DF, which he has used to purchase and control interests in several companies in the Racketeering Enterprise.

29.     Defendant **SEMYON MOGILEVICH** is a natural born citizen of Ukraine and notorious leader of the Russian organized crime syndicate.  Mogilevich has been investigated repeatedly for masterminding elaborate money laundering schemes.  He is on the FBI's "Most Wanted" list and has been described as "the most dangerous mobster in the world."  *See* **Exhibit 9**.  Mogilevich was the subject of a 45-count racketeering and money laundering indictment in the United States District Court for the Eastern District of Pennsylvania, captioned *United States v. Mogilevich*, Crim. No. 02-157, in which the U.S. Government alleges Mogilevich organized a sophisticated stock fraud and money laundering scheme using complicated financial transactions made through shell companies located in Europe.  *See* **Exhibit 10**.  Firtash has admitted that he got his start in the gas trading business with Mogilevich's assistance.  *See* U.S. Embassy Cables: "Gas Supplies Linked to Russian Mafia." The Guardian (Dec. 1, 2010), **Exhibit 11**.

30.     Defendant **CENTRAGAS HOLDING AG** is also a Firtash alter ego and holding company incorporated in Vienna, with offices in Austria.  Centragas does business in the United States and is 90% owned by Group DF.  As such, Centragas is controlled by Firtash through Group DF and is essentially indistinct from Group DF and Firtash himself.  Centragas,

in turn, has been used repeatedly by Firtash in the Racketeering Enterprise as an intermediary to purchase stock in and control various other entities.

31.     Defendant **ROSUKRENERGO AG ("RUE")** was created to serve as a middleman in the transportation of natural gas from Turkmenistan through Russia to Ukraine. Firtash acts as the face of RUE, of which he owns 45% through his holding company, Centragas Holding AG.  Ukrainian businessman and Firtash associate Ivan Fursin also owns a 5% share of RUE through Centragas, with Gazprom owning the remaining 50% of RUE through Arosgas Holding AG.  *See* Minutes from RUE Meeting (July 29, 2004), **Exhibit 12**, at 5**.**  Upon information and belief, Firtash, although not a majority shareholder, effectively controls RUE's operations.  *See* **Exhibit 13**.

32.      From 2004 to 2009, RUE and Firtash, through RUE, profited substantially as the intermediary in natural gas deals between Gazprom, the Russian-owned natural gas company, and Naftogaz Ukrainy National Joint-Stock Company ("Naftogaz"), a natural gas company owned solely by the Ukrainian state. For example, on July 29, 2004, Naftogaz and RUE entered into a contract (No. 14/935-1/4) for the sale and purchase of natural gas during the period from 2005-2028, which was signed by defendant Boyko as the Chairman of the Board of Naftogaz, and which designated two Naftogaz bank accounts in New York at the Bank of New York (Acct. 890-0260-947) and Deutsche Bank (Acct. 04-094-040) through which huge sums of money were transferred to RUE and other defendants and their co-conspirators in furtherance to their racketeering scheme and enterprise. *See* **Exhibit 14**. Naftogaz and RUE entered into another contract on July 29, 2004 (No. 13/935-3/04) that was similarly signed by Boyko and designated the same two New York bank accounts to be used for the wire transfer of funds. *See* **Exhibit 15**. On January 4, 2006, Gazprom, Naftogaz and RUE entered into a contract "on development of

relations in gas sector," that designated RUE as the sole "supplier" of Gazprom natural gas for the transport of the natural gas through Ukraine and export to Western Europe. *See* **Exhibit 16**.

33.     Defendants **CMZ VENTURES, LLC**, **the DYNAMIC FUND** a/k/a The Dynamic Group, and **KALLISTA INVESTMENTS LLC** a/k/a/ Calister Investments LLC operate out of shared offices at 1501 Broadway, 25th floor, New York, New York 10036.  CMZ Ventures and Kallista Investments were incorporated in Delaware and do business in New York. The Dynamic Fund is an international investment fund established by Group DF and Firtash, through CMZ Ventures and Kallista Investments.  Although the three companies have different names, they have no meaningful corporate structure, but rather are shell corporations that operate collectively and primarily as a single investment vehicle for Firtash and his associates to channel their illegal proceeds from the Naftogaz-Gazprom gas contracts to business ventures and investments in New York City and elsewhere in the United States.  CMZ Ventures has had, and, upon information and belief, still has an account at the Metropolitan National Bank in New York (Acct. No. 2000506) that it uses for various money laundering and other racketeering purposes.

34.     CMZ Ventures "Preliminary Term Sheet" lists as joint owners the following three corporations:  (1) Defendant **BARBARA ANN HOLDINGS, LLC**, a corporation registered in Delaware and 90% owned by Defendant **BRAD S. ZACKSON**; (2) Defendant **VULCAN PROPERTIES, INC.**, a corporation run and controlled by Arthur Cohen, although wholly owned by his wife, Karen Cohen; and (3) a corporation described in the formation papers as "XXX LLC", controlled by Paul Manafort.  *See* **Exhibit 17**. Each of these corporations and their owners acted as agents for Firtash and his associates by covertly investing their money through CMZ Ventures, Kallista Investments, and the Dynamic Fund.

35.     Defendant **PAUL J. MANAFORT** is a well-known Washington D.C. lobbyist and political consultant. He is the senior partner in the firm Davis, Manafort and Freedman. Manafort also worked in Ukraine on various political campaigns, including the successful 2010 presidential campaign of Victor Yanukovich, who is the President of Ukraine at present. Manafort played a key role in the defendants' conspiracy and racketeering enterprise by assisting Firtash to become a major "investor" and silent partner in defendants CMZ Ventures (sometimes referred to as "ZMC Investors"), Group DF and their affiliated companies, through which Firtash and his associates were able to money launder a large portion of the funds that Firtash, Group DF and RUE were skimming from numerous Gazpron/Naftogaz natural gas transactions, as well as the windfall payments and profits worth approximately $3.5 billion that they received as a result of the corrupt transactions and breaches of fiduciary duties that resulted in the Stockholm Arbitration award, as described below in greater detail. These monies were then laundered through various New York based bank accounts under the guise of otherwise legitimate real estate and other investment activities in New York and elsewhere in the United States, and the contracts, agreements, meetings, discussions and electronic communications (e.g., computer, email and fax transmissions) relating to said money laundering and investment activities were primarily conducted through defendants' offices located at 1501 Broadway, 25th floor. Each of the defendants had substantial and purposeful contacts with New York in that the defendants either were based at the New York offices ("the New York defendants") or, as to the defendants who were based elsewhere, they had the New York defendants act as their agents with regard to all activities of their racketeering enterprise that were conducted from the New York offices.

36.     A large portion of these money laundered funds, particularly the New York bank accounts of the various defendant companies and their co-conspirators, was then funneled back to Ukraine to provide the "financing" for the persecution and deprivation of human rights of the plaintiffs and plaintiff class members.

37.     Since Manafort been a key advisor to President Yanukovich and other Ukraine political figures since approximately 2003, he knew exactly how Firtash and his affiliated companies and associates were able to skim billions of dollars from the natural gas deals between Russia and Ukraine, and he knew that the monies were used to pay off political figures and government officials in Ukraine. By inviting Firtash to utilize the various U.S. based companies to facilitate Firtash's money laundering and political corruption activities, Manafort gave Firtash the opportunity to expand the scope of his money laundering activities into the United States.

38.     Defendant **YURIY BOYKO**, a Ukrainian subject, citizen, and resident, has been an ally of Firtash for many years, and has strong financial ties to Firtash.  In 2004, Boyko served as Chairman of Naftogaz's Board.  In this capacity, Boyko signed and, upon information and belief, helped to secure RUE's contracts as an intermediary in the Russia-Ukraine gas trade despite significant conflicts of interest. *See*, e.g., **Exhibits 14 and 15**. Among other conflicts of interest, Boyko was simultaneously serving on RUE's Coordination Committee, which was responsible for all major decisions of the company, and was authorized to represent Firtash's interests before Ukrainian state and local bodies and in all contracts, agreements, and legal transactions pursuant to a Power of Attorney executed by Firtash.  *See* **Exhibits 12**, **18 (at p. 51) and 19**.  After Yanukovych's election, Boyko was named Ukraine's Minister of Fuel and Energy, leading the Ukrainian government to reverse its stance on the legality of the 2009 gas

contracts that Tymoshenko had negotiated cutting out RUE as a middleman. *See* **Exhibit 20**. As a result of this change in position, an arbitral award against Naftogaz valued at over $3 billion was issued and must be paid by Ukrainian citizens.

39.     Defendant **VALERIY KHOROSHKOVSKY** is a subject, citizen, and resident of Ukraine.  He is a close ally of Firtash and owns Inter Media Group Ltd., a company in which Firtash owned a purchase option.  Upon coming to power, Yanukovych named Khoroshkovsky to be chief of Sluzhba Bezpeky Ukrayiny ("SBU"), Ukraine's state security service and successor to the KGB.  He was also appointed to Ukraine's High Council of Justice, which is responsible for the appointment and discipline of judges in Ukraine. Khoroshkovsky has been instrumental in bringing politically-motivated charges against Tymoshenko and her allies.

40.     Defendant **VIKTOR PSHONKA**, a subject, citizen, and resident of Ukraine, is Ukraine's Prosecutor General.  A close ally of Yanukovych, Pshonka has opened baseless, politically-motivated criminal cases against at least 12 former senior government officials in Tymoshenko's administration, including Plaintiffs.

41.     Defendant **RENAT KUZMIN** is Ukraine's Deputy Prosecutor General.  He has been involved in the arbitrary arrests, detentions, and prosecutions of Tymoshenko and at least one former senior official from her administration.

42.     Defendant **OLEKSANDR NECHVOGLOD**,  is the Senior Investigator in Ukraine's PGO assigned to Tymoshenko's case.  Nechvoglod has expedited Tymoshenko's criminal trial without giving Tymoshenko adequate time to review the prosecution's case against her and mount a defense.

43.     Defendant **LILIA FROLOVA** is one of the prosecutors in Tymoshenko's trial.  She requested that Tymoshenko be arrested on August 5, 2011 on the ground that

Tymoshenko had been disrespectful while examining current Prime Minister, Mykola Azarov, who testified for the prosecution.

44.       Defendants **JOHN DOES # 1 through 100** are other individuals and companies, some of whose identities are presently unknown, who conspired with and/or aided and abetted the named defendants as part of a conspiracy designed to deprive plaintiffs and other class members of fundamental human rights, as well as to unlawfully divert and acquire millions of dollars worth of funds generated through natural gas transactions under the guise of "commissions," and then to "launder" said funds though various U.S. based, as well as other, bank accounts, as part of a pattern of racketeering activity spanning a time period of at least several years, and which continues through the present and into the foreseeable future.

## III.    JURISDICTION AND VENUE

45.       This Court has personal jurisdiction over all parties by virtue of their residence in New York, their business and/or tortious activities in this state, or by operation of Fed. R. Civ. P. 4(k)(1-2).

46.       This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1350 (Alien Tort Statute (ATS)), and 18 U.S.C. § 1964(c) (RICO).  Plaintiffs allege claims involving Defendants' tortious violations of international law under the ATS, which provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.  Plaintiffs also allege that Defendants conducted multiple racketeering activities that had a continuity of structure and purpose over an extended period of time.  RICO provides federal jurisdiction for persons "injured in [their] business or property" by acts taken pursuant to a racketeering "enterprise." 18 U.S.C. § 1964(c).

47.       This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under the laws of the State of New York.

48.       Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c).  Furthermore, there is no foreign independent or impartial forum in which to bring this action.

## IV.    STATEMENT OF FACTS

### A.    Ukraine's Political Leadership

49.       Yulia Tymoshenko first came to power as Prime Minister of Ukraine in 2004 following Ukraine's bloodless "Orange Revolution," which was sparked by mass demonstrations in Kyiv's Independence Square protesting the election of Viktor Yanukovych as Ukraine's next President.  Yanukovych had been declared the 2004 election winner by a small margin amidst widespread complaints of voting fraud.  At the time, he was the incumbent Prime Minister under then President Leonid Kuchma, whose presidency had been marred by corruption scandals, erosion of civil rights, and suppression of the press.

50.       Under international and domestic pressure, Ukraine's Supreme Court ultimately struck down the initial 2004 election results and ordered a run-off election to be held, for which greater protections against election fraud were implemented.  When Yanukovych's opponent, Victor Yushchenko emerged victorious in the 2004 run-off elections, Yulia Tymoshenko was appointed Prime Minister.  She served in this role until September 8, 2005.  On December 18, 2007, Tymoshenko again assumed the office of Prime Minister of Ukraine and ran for President against Yanukovych in 2009.  In February 2010, however, Yanukovych beat Tymoshenko for the presidency by 3% of the vote.

51.     Tymoshenko was thereafter forced to resign as Prime Minister on March 4, 2010.  She is now the leader of the largest opposition party in Ukraine's Parliament, the Batkivshchyna Party.

**B.     Yanukovych's Consolidation of Power**

52.     Since his election to the presidency, Yanukovych has consolidated his power through far-reaching "reforms" of the executive, legislative, and judicial branches and the use of politically-motivated criminal prosecutions brought against his opponents in an attempt to intimidate them and prevent former Prime Minister Tymoshenko and her allies from regaining political power.  The Yanukovych Administration's policies have drawn criticism for pushing through changes without respecting democratic procedures and turning Ukraine into an authoritarian state.  *See* **Exhibit 21**.

53.      Upon his election, Yanukovych's political coalition still fell seven votes short of a parliamentary majority.  The Ukrainian Parliament, however, amended its procedural rules for forming a new government to enable a majority coalition to be formed by both factions and individual members of Parliament, notwithstanding the fact that this was in conflict with a prior 2008 decision by Ukraine's Constitutional Court.  Nevertheless, under pressure by the Yanukovych Administration, the Constitutional Court reversed its prior decision, sanctioning Yanukovych's majority coalition and the unseating of the Tymoshenko-led majority.

54.     The Constitutional Court's decision marked the beginning of the politicization of Ukraine's judiciary.  In September 2010, four of the Court's justices who opposed the decision resigned, with two of whom admitting that they had been pressured to step down by Ukraine's Congress of Judges.  On September 21, 2010, new justices loyal to Yanukovych were sworn in as replacements.  Fifteen of the eighteen judges on Ukraine's Constitutional Court are now considered loyal to Yanukovych.  One of the four new justices, Oleh Serhiychuk, served as

head of the Central Election Commission in 2004, when allegations of voter fraud sparked the Orange Revolution.

55.    Nine days after these new justices assumed office, the Constitutional Court invalidated Ukraine's 2004 Constitution due to cited "procedural irregularities" in its adoption, notwithstanding that the 2004 Constitution was a direct result of Ukraine's Orange Revolution and, ironically, its decentralization of presidential powers was a concession demanded by Yanukovych in exchange for agreeing to allow free and fair elections in Ukraine to proceed at the time.

56.    The Constitutional Court's decision effectively reinstated the 1996 Constitution, which conferred upon Yanukovych greater powers, including the power of appointment over the Prosecutor General's Office ("PGO") and virtually every other important government office.  Thereafter, under the guise of administrative reform and budgetary cuts, Yanukovych substantially reduced the number of ministries, executive advisors, and government agencies, replacing current government appointees with Yanukovych's allies, many of which were also close associates of Defendant Dmitry Firtash and, upon information and belief, had accepted illegal kickbacks and other support from Firtash and his agents, associates, and other co-conspirators in the past.

57.    In addition to working to achieve dominion over Ukraine's Constitutional Court, the Yanukovych Administration "reformed" other aspects of the judiciary, which has effectively deprived Ukraine of any semblance of judicial independence and impartiality.  In order to solidify control over Ukraine's separate Supreme Court, for example, the Yanukovych Administration decreased the number of Supreme Court judges from 49 to 20, and held what

have been referred to as judicial "casting calls" to determine which judges were loyal to the administration and would stay on the Court, and which would be dismissed.

58.     A new "Law on the Judicial System and the Status of Judges," signed by President Yanukovych, also significantly reduced the Supreme Court's role by creating a new High Specialized Court in Civil and Criminal Matters, which is headed by a Yanukovych ally and previous Member of Parliament ("MP") for Yanukovych's political party, the Party of Regions ("PoR").  The Law also granted increased powers to Ukraine's High Council of Justice, such that with the allegiance of at least 16 of the 20 members on the High Council of Justice, the Yanukovych Administration has virtually complete control over the hiring and firing of judges.

59.     The European Commission for Democracy Through Law ("Venice Commission"), the Council of Europe's independent advisory body on constitutional matters, and the Council of Europe's Directorate General of Human Rights issued a joint opinion strongly urging Ukraine to reduce the High Council's extensive powers granted by this Law in light of "the absence of constitutional guarantees for a balanced composition," and expressed concern at the Supreme Court's "drastically reduced role." *See* **Exhibit 22.**

60.     The European Union also issued a Resolution on June 9, 2011 recognizing that the "principle of fair, impartial and independent judicial proceedings[] has not yet been implemented in Ukraine," and calling on the current administration to ensure that judicial measures are not being used selectively. *See* **Exhibit 2**.  The ongoing trial and arbitrary detention of former Prime Minister Yulia Tymoshenko, in which due process violations have been rampant, has borne out these concerns on an individual level.  EU Parliament President Jerzy Buzek stated on Ukraine's independence day, "[r]ecent events, unfortunately, also remind us of the importance of an independent judicial system free of any political influence." *See*

**Exhibit 23**.  In addition, United States Court of Federal Claims Judge Bohdan Futey has warned that "judicial independence is in great danger" in Ukraine.  *See* **Exhibit 24**.

### C.  Arbitrary Prosecutions, Arrests, and Detentions of Plaintiffs

61.     What the Yanukovych Administration has not been able to accomplish through such institutional "reforms" of Ukraine's executive, legislative, and judicial branches described above, it has attempted to achieve through the illegitimate use of the criminal law to target and eliminate the political opposition in Ukraine.  These efforts have been assisted by Defendants, working both inside and outside of government channels, many of whom stand to benefit financially if successful.

62.     On November 4, 2010, Viktor Pshonka assumed office as Ukraine's new Prosecutor General.  Pshonka has publicly referred to himself in this role as "a member of President Yanukovych's team."  *See* **Exhibit 25**.  As observed by the Danish Helsinki Committee on Human Rights, "the Ukrainian Prosecutor General holds an immensely powerful function not much different from the Prokuratura of Soviet times."  *See* **Exhibit 3**.  To silence political opposition, ensure Yanukovych's victory in the 2012 Presidential elections, and protect the financial interests of Defendants, the PGO has been engaging in a practice of arbitrarily detaining the administration's political opponents.

63.     Pshonka has opened politically-motivated criminal cases against former Prime Minister Tymoshenko and at least 11 other former senior government officials who served in her administration.  These officials have been detained on nebulously defined criminal charges such as "excess of authority" and "causing state losses."  The United States Department of State has recognized the "sharp increase in charges brought against opposition politicians after the appointment of [Prosecutor General Pshonka], giving rise to the appearance of selective and politically-motivated prosecution by the Yanukovych government."  *See* **Exhibit 26**.

64.      There has been widespread international outcry against the Yanukovych Administration's arbitrary arrests and detentions of its opponents.  On December 24, 2010, 32 members of Ukraine's intelligensia published an open letter demanding a stop to the "political persecution" of Yanukovych's opposition.  *See* **Exhibit 27**.  U.S. Senator John McCain and European People's Party President Wilfried Martens have called on Ukraine repeatedly to reconsider such selective prosecutions.  Likewise, American Vice-President Joe Biden personally spoke with Yanukovych to voice concerns over the selective prosecutions of political opposition members, which were echoed in a private letter to Yanukovych by Secretary of State Hillary Clinton.  *See* **Exhibit 28**.  The U.S. State Department also officially issued a statement reiterating the United States' concern that the prosecution of former Prime Minister Tymoshenko is politically motivated and calling for her immediate release.  *See* **Exhibit 29 and 30.**  In addition, the European Union (EU) issued a resolution criticizing the selective and politically-motivated prosecution of Tymoshenko and other opposition leaders and warning against the use of the criminal law as a tool to achieve political ends.  *See* **Exhibit 2**.

65.      The Danish Helsinki Committee for Human Rights reported rampant human rights violations in the prosecutions and trials of Tymoshenko and other opposition members.  *See* **Exhibit 3**.  Professor Paul Wilson, a criminologist and Forensic Psychologist observing Tymoshenko's trial as part of a team from human rights NGO Humanitad has even stated that if Tymoshenko is convicted, "the case could go down in history as one of the worst cases of a miscarriage of justice inflicted upon a political leader anywhere in the world."  *See* **Exhibit 31**.

### 1.      Criminal Charges Against Yulia Tymoshenko

66.      Beginning in December 2010, the PGO issued a string of indictments against Tymoshenko, which were consolidated on February 21, 2011, setting forth two sets of criminal charges referred to throughout as the "Kyoto Charges" and the "Opel Combo Charges."  *See*

**Exhibits 32 and 33**.  Tymoshenko's most recent trial, however, was on a third set of criminal charges initiated in an April 11, 2011 order, referred to throughout as the "Gas Charges." *See* **Exhibit 34**.  Other political opposition members have been arbitrarily investigated, prosecuted, and detained on similar and other criminal charges as well.

67.     The charges against former Prime Minister Tymoshenko and other political opposition members are groundless, and the due process violations attendant to the related prosecutorial and judicial proceedings underscore the political motivations behind them. Although the Yanukovych Administration claims that the charges against Tymoshenko are an attempt to fight against corruption, none of the charges against her include even an allegation that she benefited financially as a result.

68.     Rather, as explained by an August 12, 2011 Report by the Danish Helsinki Committee for Human Rights, the charges against Tymoshenko and other opposition members "relate to normal political or administrative decisions with which the present government disagrees. . . . Most of the charges are of a character which would never be considered a criminal offense in countries with a different legal tradition and would not be dealt with in the Criminal Justice System.  Such activities might potentially draw political consequences for politicians or disciplinary consequences for public servants, but not criminal."  *See* **Exhibit 3**.

69.     The Yanukovych Administration has brought these charges against Tymoshenko and her allies for political gain and retribution, with the assistance of Firtash and other Defendants and co-conspirators who stand to benefit financially from the elimination of these opposition members as a political threat to their interests.

a)     Kyoto and Opel Combo Charges

70.     Both the Kyoto and Opel Combo Charges attempt to hold Tymoshenko responsible for actions taken collectively by Ukraine's Cabinet of Ministers and other

governmental bodies, contrary to clear Ukrainian Supreme Court precedent.  As has been observed by Ukraine's preeminent state-supported research institute, the Council of Scientific and Legal Appraisal of the National Academy of Science of Ukraine, Tymoshenko cannot properly be held criminally liable under Ukrainian law in her individual capacity for actions that were committed by the Cabinet of Ministers as a collective body.  *See* **Exhibit 35**.

71.     The Kyoto Charges allege that Tymoshenko abused her power and improperly used budgetary funds related to the handling of revenues received by Ukraine in 2009 pursuant to international agreements for the sale of carbon emission credits under the framework of the Kyoto Protocol (referred to as "Kyoto Revenues").  Specifically, the PGO accuses the Tymoshenko Government of spending these Kyoto Revenues for purposes other than those specified in the agreements, thereby causing state losses to Ukraine and undermining the country's prestige among other Kyoto Protocol member states.  *See* **Exhibits 32 and 33**. Notably, the Kyoto Charges do not even allege personal financial gain on the part of former Prime Minister Tymoshenko or members of her government.  As noted by the Danish Helsinki Committee for Human Rights Report, "the political nature of the Kyoto case is seen in the description of the consequences and of the motivation."  *See* **Exhibit 3**.

72.     The Kyoto Charges are also not substantiated by fact.  Contrary to the allegations in the Kyoto Charges, an independent review of government documents by law firm Covington & Burling LLP and auditing firm BDO USA confirmed that none of the Kyoto Revenues were expended during Tymoshenko's tenure in office, with the balance of the Kyoto Special Purpose Fund set up to account for the revenues remaining constant as of the date of receipt.  *See* **Exhibit 36**.  Indeed, the Ukrainian Government privately assured Japan that the revenues were fully accounted for.  *See* **Exhibit 37**.  Japanese officials are thus reportedly

content with how the Kyoto Revenues were handled and have no objection to purchasing carbon emission credits from Ukraine in the future, which is strong evidence that the Kyoto Revenues were handled in a manner consistent with the terms of the international agreements as the parties understood them. *See* **Exhibit 38**.

73.     Heorhiy Filipchuk, who served as Environmental Protection Minister under Tymoshenko, was also arrested on charges of abuse of power and misuse of funds related to Ukraine's sale of carbon emission credits under the Kyoto Protocol. *See* **Exhibit 39**.   Filipchuk has been arbitrarily incarcerated in pre-trial detention since his arrest, despite Defendant Renat Kuzmin stating that a decision has been made on his case and the fact that Ukraine's PGO completed its investigation against Filipchuk on February 4, 2011. *See* **Exhibit 40**.

74.     The Opel Combo Charges allege that Tymoshenko abused her powers as Prime Minister by mandating and signing various orders and resolutions of the Cabinet of Ministers, which secured financing for and executed a contract with Austrian company Vamed Engineering GmbH & Co. KG ("Vamed") for the provision of medical equipment to Ukraine's rural areas, including 1,000 Opel Combo vehicles that were retrofitted to run on rural terrains. *See* **Exhibit 36**.  The Opel Combo Charges principally allege that the Tymoshenko Government paid an inflated price for the vehicles as a result of the financing fees charged.  As with the Kyoto Charges, however, the Opel Combo charges do not allege any *quid pro quo* or other personal financial benefit received by Tymoshenko or others negotiating the Vamed contract.

75.     The Opel Combo Charges are also not supported by the facts.  Contrary to the allegations in the Opel Combo Charges, a Ukrainian Ministry of Economics Review found that the price paid for the Opel Combo vehicles was obtained at a significant discount. *See* **Exhibit 41**.  Law firm Covington & Burling LLP and auditing firm BDO USA also concluded, based on

independent research, that the price Ukraine paid for the Opel Combo vehicles was no worse than market price.  *See* **Exhibit 36**.  Likewise, the firms concluded the Vamed contract was a direct commercial contract, with no intermediaries, that followed well-established practices for supporting a major export transaction.

76.    Moreover, it is undisputed that in early 2009, Ukraine's Ministry of Health determined that the country's regional health departments were in "urgent need" of specialized vehicles to "make it possible to render expert medical care and qualified emergency care to patients residing in [Ukraine's] distant and hard-to-reach areas."  *See* **Exhibit 42**.

77.    Plaintiff Mykola Petrenko, the former director of the state-owned enterprise through which Ukraine entered into the Vamed contract, was also arrested in December 2010 on politically-motivated charges relating to the Opel Combo Charges brought against Tymoshenko. Petrenko has been arbitrarily detained since his arrest, without being brought to trial.  *See* **Exhibit 43**.

b).    Gas Charges

78.    As it became clear that the Kyoto and Opel Combo Charges were based on politically popular decisions by the Tymoshenko Government, the Yanukovych Administration narrowed its focus on a third set of criminal charges set forth in an order dated April 11, 2011. These Gas Charges allege that during the regional gas crisis of January 2009, Tymoshenko exceeded her powers as Prime Minister by signing "directives" instructing Ukraine's state-owned energy company, Naftogaz, to enter into an agreement with its Russian counterpart, Gazprom, which set gas purchase and transit prices at rates that the Yanukovych Administration asserts in hindsight were unfavorable for Ukraine.

79.     The Gas Charges, however, contain no allegation that Prime Minister Tymoshenko profited financially from the 2009 gas contract negotiations, that the contracts were entered into in bad faith, or even that the price Naftogaz paid or received for the purchase and transit of natural gas would have been different but for Tymoshenko's actions.  In addition, the price Ukraine negotiated and ultimately paid Gazprom for the purchase of natural gas in 2009, the year on which the Gas Charges' damages claims are based, was reasonable in light of European rates during that period.  The contracts in question were also welcomed by the EU as they immediately restored Russian gas flows to Ukraine and Western Europe after they had been completely shut off in the middle of winter.

80.     The Gas Charges thus attempt to impose criminal liability on former Prime Minister Tymoshenko for gas purchase and transit contracts that the present Government now speculates in hindsight were not concluded on terms as favorable as they should have been.  At the time, however, the 2009 gas contracts were ratified by the Naftogaz board, as well as Ukraine's Cabinet of Ministers and Parliament. The Danish Helsinki Committee for Human Rights has criticized the fact that the charges against Tymoshenko and other members of the political opposition "are criminalizing normal political decisions with which the present government disagrees."  *See* **Exhibit 3**.

81.     The political background surrounding Ukraine's gas trade with Russia make clear that the Gas Charges, in particular, are not only motivated by a desire for political power, but are also part of a larger collective effort by Firtash and other Defendants, working inside and outside of governmental channels, who stand to benefit financially if Tymoshenko is removed as a political threat to their interests.

        (1)    *Defendants Worked Inside and Outside of Government Channels to Secure a Favored Position in the Russia-Ukraine Gas Trade for RUE, from Which Defendants Benefited Financially*

82.      Ukraine relies upon natural gas as its primary source of energy.  Because its domestic production is modest, Ukraine must import large volumes of gas each year.  Gazprom, the Russian natural gas monopoly, has supplied Ukraine's imported natural gas for many years.  From 2004 to 2009, RUE served as an intermediary in the Russia-Ukraine gas trade.

83.      RUE is owned by Russian state-owned energy company, Gazprom (owning a 50% share of RUE), Firtash (owning a 45% share of RUE through holding company Centragas), and Ukrainian businessman and Firtash associate Ivan Fursin (owning a 5% share of RUE also through holding company Centragas, which is almost wholly owned by Firtash through Group DF).  Upon information and belief, RUE was created by Firtash and his associates to replace its predecessor Eural Trans Gas ("ETG"), an intermediary also controlled by Firtash, Mogilevich, and their associates that became too mired in scandal and allegations of corruption to function credibly.  *See* **Exhibit 18**, at 54-56 (detailing connections between ETG and RUE).

84.      From its inception, RUE has been the subject of concerns and allegations regarding its opaque ownership structure, possible connections with organized crime, conflicts of interest by two of its directors, and challenges to its basic necessity in so critical a role.  *See* **Exhibits 44, 45 and 46**.  Sharing nearly all of the same managers and directors, RUE appears to have been created merely to serve as an extension of ETG by a different name, enabling Firtash, Mogilevich, and their associates to continue to profit covertly from Ukraine's gas deals with Russia.

85.      KPMG International, RUE's auditor, resigned because it determined that RUE "may be part of a larger undisclosed business group, presenting an unacceptable risk to KPMG's

reputation." **Exhibit 44.**  The press has exposed RUE's and Firtash's connections to Russian organized crime through Mogilevich, who has been indicted in federal court on 45 counts relating to racketeering activities.  The United States Department of Justice also conducted an investigation in 2006 into RUE's suspected organized crime elements.  *See* **Exhibit 45.** American Ambassador to Ukraine William B. Taylor, Jr.'s diplomatic cables note that Firtash has acknowledged his ties to Russian mafia figure Mogilevich.  *See* **Exhibits 11, 46.**

86.     It has been widely acknowledged that RUE's involvement in the Russia-Ukraine gas trade is the result of corrupt business dealings and illegal kickbacks paid to government officials. RUE came into existence in connection with a July 2004 contract with Naftogaz regarding the supply and transport of natural gas to Ukraine. *See* **Exhibits 14 and 15**. The contract stipulated that beginning in 2005, RUE would act as a shipping intermediary, whereby Naftogaz would purchase a fixed volume of gas from Turkmenistan and then sell this gas to RUE at the Turkmen border, with RUE transporting the gas and selling it back to Naftogaz at an inflated price at the Russia-Ukraine border. *See* **Exhibit 15.**

87.     In January 2006, Naftogaz, Gazprom, and RUE negotiated a new contract that dramatically expanded RUE's intermediary role, establishing RUE as the exclusive supplier of both Russian and Central Asian gas to Ukraine. *See* **Exhibit 16**. The 2006 contracts also provided that RUE would no longer sell gas to Naftogaz, but instead to Ukrgaz-Energo, a new joint venture established between RUE and Naftogaz.  This arrangement gave RUE direct access to Ukraine's domestic wholesale markets, essentially surrendering half of Naftogaz's domestic monopoly to Gazprom and Firtash and his associates.

88.     Upon information and belief, RUE secured its privileged position in the Russia-Ukraine gas trade as a result of Firtash's close personal and financial ties to Naftogaz's

leadership, including Yuriy Boyko and Ihor Voronin (Chairman and Deputy Chairman of Naftogaz's Board respectively), who benefited financially, albeit illegally, for their involvement in securing the 2004 and 2006 intermediary contracts for RUE

89.     On July 29, 2004, the same day that Boyko signed the gas intermediary contract with RUE on behalf of Naftogaz, Centragas appointed Boyko and Voronin to sit on RUE's Coordination Committee, which made "all the major decisions" for RUE.  *See* **Exhibits 12 and 18**.  The two men served as key decision makers and leaders of both Naftogaz and RUE notwithstanding the obvious conflict of interest presented by their simultaneous representation of two opposing parties in a commercial relationship of great importance to Ukraine.

90.     Further compounding this conflict of interest was a Power of Attorney executed by Firtash on December 13, 2005, which authorized Naftogaz Chairman Boyko to represent Firtash's interests at Ukrainian state and local bodies, including notarial bodies, insurance companies, credit and banking institutions, and land resource authorities. *See* **Exhibit 19.**  The Power of Attorney further gives Boyko "all necessary powers for the management and disposal of all property owned by" Firtash, including "property in collective ownership," such as real property, securities, cash resources, and corporate rights.  The document also authorizes Boyko to submit and sign on Firtash's behalf "all documents, including contracts, agreements, [and] legal transactions."  *See* **Exhibit 1**9.

91.     Notwithstanding this long history with Firtash and RUE, Boyko falsely testified at Tymoshenko's trial that he has no connection with RUE.  *See* **Exhibit 47**.

(2)     *Defendants Laundered Ill Gotten Gains Through Investment Vehicles in the United States and Elsewhere*

92.     RUE's privileged position under both the 2004 and 2006 gas contracts allowed the company and its owners to profit substantially.  In 2005 alone, RUE reported a net profit of

approximately $755 million.  *See* **Exhibit 48**.  In 2006, the company reported an increase in its net profits to $785 million.  *See* **Exhibit 49**.  Likewise, RUE received at least $3.5 billion as a result of the Stockholm arbitration award.

93.     Upon information and belief, part of these proceeds were distributed to Defendant government officials in the form of illegal kickbacks or to others involved in the Racketeering Enterprise.  The kickbacks paid to Ukrainian government officials have been widely recognized as part of RUE's *modus operandi*.  Russian Prime Minister Vladimir Putin even alluded to RUE's position as an intermediary in the Russia-Ukraine gas trade as allowing Ukrainian officials to "receive dividends, and finance their political campaigns."  *See* **Exhibit 50**.

94.     As a direct result of the illegal kickbacks paid to government officials, Firtash has been able to entrench his interests in Ukrainian politics and ensure that these officials do his bidding, including targeting and eliminating those who act against Defendants' financial interests, such as former Prime Minister Tymoshenko.

95.     Upon information and belief, a sizable portion of RUE's proceeds from its natural gas transactions and the Stockholm arbitration award have also been invested by Firtash and his affiliated companies and associates through various investment vehicles in the United States and elsewhere in Europe.  These offshore investments, including those in the United States, put a significant portion of the proceeds from the company's natural gas deals outside the jurisdiction of Ukrainian courts.  The complexity of the financial transactions also enabled Firtash and other Defendants to conceal subsequent illegal kickbacks made to Ukrainian government officials and others who profited from RUE's corrupt business dealings.  Consequently, Defendants have largely been able to carry out their racketeering activities with the mask of legitimacy.

96.     Firtash and his agents and co-conspirators made investments through a

labyrinth of shell companies, including the following:

American Land Capital Advisors, LLC
American Land Diversified Fund I, LP
Arthur G. Cohen & Partners
Barbara Ann Holdings, LLC (Delaware corporation)
Balcott & Morgan Management, LLC (New York corporation)
Belles Dynamic Holdings, LLC
Blue Acquisition Member, LLC
Brookmar Corp. (New York corporation)
Brooklyn Marina Corp. (Delaware corporation)
Calister Investments LLC
CMZ Ventures Fund Advisors, LLP (Delaware limited liability partnership)
CMZ Ventures, LLC
CMZ Ventures Real Estate Fund I, LP (Delaware limited partnership)
CMZ Ventures Real Estate Fund II, LP (Delaware limited partnership)
Dvn Eleuthera Development, Inc. (Panama corporation)
Dynamic Capital Corporation
Dynamic Capital Inc.
Dynamic Fund Advisors, LLC (Delaware limited liability company)
Dynamic Fund Management, LLC (Delaware limited liability company)
The Dynamic Group
Dynamic Nevada Eleuthera, LLC
Dynamic Vulcan Eleuthera Inc. (Panama corporation)
Dynamic Real Estate Fund 1, LP (Delaware limited partnership)
Dynamic Real Estate Solutions Ltd. (New York corporation)
Dynamic Worldwide Development LLC (New York corporation)
Dynamic Worldwide Energy LLC
Dynamic Worldwide Properties, LLC
Dynamic Worldwide Solar Energy, LLC
Grandrock International, LLC
Highrock Holdings (Cyprus firm with Mogilevich's wife as a major shareholder)
JAB Holdings LLC (Nevada limited liability company)
Kallista Investments LLC (Delaware corporation)
Nadra Bank (5th largest Ukrainian bank purchased by Firtash through Centragas in May 2011)
Vulcan Properties, Inc. (Delaware corporation)
Waterview Holdings, LLC
ZMC Investors, LP
ZMC Kallista LLC
ZMC Partners, LP (Cayman Islands exempted limited partnership)
ZMC Ventures, LLC

97.     Upon information and belief, these companies did not observe corporate formalities or engage in arms-length transactions when conducting business, but rather intermingled funds, shared office space, management, and personnel, and operated as shell companies for Firtash and his associates

98.     When one company was investigated by a government agency or sued, it would be closed down, and its operations transferred to a new, clean company with a similar name to confuse government regulators.  This made it more difficult for government regulators to monitor each company's operations and trace its financing.

99.     Upon information and belief, Firtash and Mogilevich are already being investigated by the United States Department of Justice for engaging in racketeering and money laundering activities.  Mogilevich has been indicted on racketeering, securities fraud, wire fraud, mail fraud, and money laundering charges in the United States District Court for the Eastern District of Pennsylvania.  *See* **Exhibit 10**.  Although no federal criminal indictment has been brought yet against Firtash, upon information and belief, his application for a U.S. visa has been denied pending the outcome of the Department of Justice's investigation.

100.    Firtash, Mogilevich, and their affiliated companies used three U.S. companies in particular—CMZ Ventures LLC, Kallista Investments LLC, and the Dynamic Fund (which were sometimes referred to collectively as "The Dynamic Group)—to launder money in the United States and abroad under the guise of investing in legitimate business ventures.

101.    CMZ Ventures, a Delaware-based company, was formed in mid-2008 with the help of Firtash and companies affiliated with Group DF.  Although CMZ's three publicly listed owners were Barbara Ann Holdings LLC (controlled by Brad Zackson), Vulcan Properties, Inc. (run by Arthur Cohen and wholly owned by his wife), and a third company referred to as XXX

34

LLC (owned by Paul Manafort). *See* **Exhibit 17**. Firtash was an undisclosed "silent partner" in both CMZ Ventures and its affiliated companies, including Kallista Investments LLC (which also went by the name of "Callister Investments"), as would be made clear by subsequent communications with and among the individuals who control the listed owners

102.     Firtash and CMZ Ventures' listed owners then agreed that CMZ Ventures and Kallista Investments would establish an international investment fund called "the Dynamic Fund" (also sometimes referred to as the "Global Real Estate Funds") which would be used to invest Firtash's funds in New York and abroad.

103.     In order to further solidify their relationship with Firtash, on August 25, 2008, Manafort sent an email to defendants Zackson and Rick Gates, one of Firtash's agents and associates, attaching a revised "Vision Statement" for "CMZ Ventures- Global Real Estate Funds" that Manafort wanted "DF"[Dimitry Firtash] to "sign off" on. *See* **Exhibit 51** attached hereto.

104.     Upon information and belief, Firtash was also advised that CMZ Ventures had already entered into a Letter of Intent ("LOI") on July 16, 2008 with 440 Park Avenue Owners Associates LLC and Macklowe Properties to purchase the Drake Hotel project site in Manhattan, with an initial deposit of $10 million and $885 million to be paid upon closing. *See* **Exhibit 52.**

105.     Firtash, both directly and through David Brown, the CEO of the DF Group**,** agreed to make a large commitment of funds to the U.S. investment ventures with which Manafort was associated, including CMZ**,** Kallista Investments, the Dynamic Group, the Dynamic Fund and their numerous affiliated companies. In addition, Firtash agreed to put various real estate holdings that he had in Ukraine into the Fund so that the New York-based companies could market his properties to U.S. investors, providing him and his associates with a

virtual labyrinth of corporate and investment structures that were utilized for their money laundering purposes.

106.     In December 2008, Firtash met with Paul Manafort to discuss establishing one of their various funds, referred to as the "Global Real Estate Fund,"  that would enable Firtash and his associates to acquire and purchase real estate investments in the United States.  The Global Real Estate Fund was to be incorporated in New York, with Group DF to secure offices for the Fund in Kyiv.

107.     At this meeting, Firtash and Manafort agreed that Group DF would make initial capital commitments of $100 million to invest in the Global Real Estate Fund.  Firtash further agreed that Group DF would pay an initial fee of $1.5 million to CMZ to manage the establishment of the Fund, which reflected 1.5% of the initial capital commitments.  After determining which additional assets Group DF would invest, Firtash and CMZ Ventures would then complete and execute the Limited Partnership Agreement and other documents necessary to establish the Fund.  *See* **Exhibit 53** (e-mail dated January 9, 2009 from Rick Gates to David Brown summarizing Firtash and Manafort's December 2008 meeting).

108.     Then, on June 8, 2009, in an e-mail sent to Zackson, attached as **Exhibit 54**, Manafort summarized his recent trip to Kyiv, Ukraine to discuss additional foreign investments by Firtash, Mogilevich, Group DF, and their associates.  Manafort's email reported that "DF is still totally on board and a wire will be forthcoming either the end of this week or next week as a partial payment on the 1.5."

109.     The American companies, however, were never legitimate businesses and violated several laws during their operation.  They shared the same office space in New York

and operated interchangeably as agents under the control of Firtash in furthering his racketeering scheme through interstate investments in the United States.

110.     After receiving a formal complaint from present and former employees of certain of the defendant companies, the New York State Department of Labor ("NYSDOL") opened an investigation of CMZ Ventures, Dynamic Worldwide Properties and their related companies operating out of the 25th floor of 1501 Broadway, N.Y., N.Y., for failing to fully pay employee wages and back wages, misclassifying employees as "independent contractors" to avoid paying them worker's compensation and unemployment benefits, and misidentifying salary payments as expense reimbursements and travel expenses. The employees' complaint stated, in relevant part: "It has recently become clear as to how the employer's [Dynamic Worldwide Properties, LLC's] partnership fraudulently operates within the offices located at 1501 Broadway, 25th floor, N.Y., N.Y. 10036 and how we have been considerably harmed by being denied our full salary-or any for that matter." The complaint identifies the partners as including Brad S. Zackson, Karen B. Cohen, Arthur G. Cohen and Paul Manafort, Jr., who is described as having "close ties to the businesses of troubled Ukranian billionaire, Dmitry Firtash of Group DF." As part of its investigation, the NYSDOL urgently "requested" employment and wage data relating to, among others, Samuel S. Lee, the Senior Acquisitions Director, who filed for unemployment insurance but was unable to establish the "gross wages paid" to him since, upon information and belief, the defendant New York-based companies never gave him a W-2 and, instead, falsely reported most of his salary as "expense reimbursement." *See* **Exhibit 55.**

111.     Upon information and belief, the Internal Revenue Service also launched an investigation of the defendant New York-based companies for violating federal tax laws by failing to issue either W-2 or 1099 forms, for not deducting and maintaining accurate records

regarding federal and state withholdings, and for not making Medicare, Social Security, and Workers' Compensation Insurance deductions.

112.     In addition, one principal of  the New York-based companies, Brad Zackson, had his real estate license revoked on November 3, 2008, because Zackson had "failed to cooperate with a New York Department of State investigation" and "demonstrated untrustworthiness" in violation of New York's real property law.  *See* **Exhibit 56**.

(a)     <u>Real Estate Transactions</u>

113.     Firtash and his associates used the defendant New York-based companies, among other things, to funnel money through the United States under the guise of investing in real estate projects, such as the Drake Hotel and St. Johns Terminal project in Manhattan.  Upon information and belief, Firtash committed funds to these companies directly and through Group DF Director David Brown with assurances that he and Mogilevich would be treated as "silent partners" In the case of the real estate projects, however, after the "investment funds" had been sufficiently "laundered," such funding was abruptly "withdrawn" prior to closing.

114.     These real estate projects gave the impression that Firtash and his affiliated companies were investing in legitimate business ventures when in fact Firtash only ever intended to transfer funds to American and foreign bank accounts to keep them out of the jurisdiction of Ukrainian courts and conceal the illegal kickbacks being paid to Ukrainian government officials and others benefiting financially from Defendants' Racketeering Enterprise.

(i)     *The Drake Hotel's Bulgari Tower Project*

115.     On July 16, 2008, CMZ Ventures, "c/o The Dynamic Group," submitted a Letter of Intent ("LOI") to purchase the Drake Hotel project site to build a 65-story Bulgari Tower that would include a mall, a private club, and a spa.  *See* **Exhibit 52**.  The LOI was accompanied by an initial deposit of $10 million and an offer to pay $885 million upon closing.

116.     On August 20, 2008, CMZ Ventures' listed owners were confident that Firtash had committed to finance the purchase of the Drake Hotel property.  Brad Zackson, who owned 90% of Barbara Ann Holdings, emailed Harry Macklowe, the then-owner of the Drake Hotel site, to report that he had just "returned from our investor meeting in Monte Carlo and want you to know it could not have gone better," and that "CMZ's 112[ ]m[illion] in equity has been firmed up and is ready to go."  *See* **Exhibit 57**.  Pursuant to Firtash's explicit instructions, Zackson never disclosed the identity of CMZ Ventures's foreign investors.

117.     On November 6, 2008, Group DF Director David Brown sent a letter to Calister (a/k/a Kallista) Investments c/o the Dynamic Fund, in which Group DF Real Estate, "a subsidiary company of Group DF Limited, the holding company of Dmitry Firtash" and the "major financial source" behind Calister Investments, "confirm[ed] [its] commitment to the Bulgari Tower Project."  *See* **Exhibit 58**.  Brown's letter stated that Group DF Finance Limited was "prepared to provide $112 million in equity for the project" and had executed a $25 million escrow deposit with the First American Title Insurance Company.

118.     Later that day, Brown signed an escrow agreement with Calister Investments on Group DF's behalf, which confirmed that $25 million had been wired from Raiffeisen Bank AG, Group DF's primary bank, to CMZ Ventures, Calister Investments, and the Dynamic Fund's New York escrow account with the First Amendment Title Insurance Company.  *See* **Exhibit 59** The escrow agreement was then forwarded by  e-mail from one of Firtash's agents and representatives, Rick Gates, to Zackson.

119.     On January 21, 2009, using the $25 million in funds wired by Firtash through Group DF, Kallista Investments and the Dynamic Group made a formal offer, attached as **Exhibit 60**, to purchase the Senior A-1 and A-2 Notes secured by the Drake Hotel site.  The

same day, Zackson reported via e-mail that he had received "everyone's approval" on the offer for the Drake site proposal, including the approval of "our overseas partners." *See* **Exhibit 61**.

120.     Despite having sufficient financing from Group DF and Firtash, CMZ Ventures, Kallista Investments, and the Dynamic Group, never closed on the Drake property, which another company purchased.  Group DF and Firtash never had any intention to purchase the Drake property, but instead used the real estate project as a vehicle for investing $25 million in New York bank accounts.

(ii)     *The St. Johns Terminal Project*

121.     The Drake Hotel is not the only real estate investment that Firtash and Group DF agreed to finance before abruptly withdrawing their support.  In early 2008, Firtash and Group DF agreed to finance the Dynamic Group, the Dynamic Fund, and other entities controlled by Defendants to acquire the St. Johns Terminal project, a 200,000 square foot plot located at 550-570 Washington Street, New York, New York, which encompassed three entire city blocks and 850 linear feet of high-exposure waterfront along Hudson River Park.

122.     The Dynamic Group, also referring to itself as "Dymanic Worldwide Properties, LLC," prepared a brochure, dated March 14, 2008,  regarding defendants' proposed acquisition of the "St. John's Center Redevelopment" project, which included plans for a 4 to 5 star hotel tower with over 600 rooms, and a letter of interest from MGM Mirage Hospitality. *See* **Exhibit 62**.  Brad Zackson and others associated with The Dynamic Group included this brochure in a packet of materials mailed and e-mailed to Group DF, Firtash, and others.

123.      CMZ Ventures never closed on the St Johns Terminal project.  Firtash and Group DF never had any intention of investing in the project; instead, they expressed interest in the project to demonstrate that they were working on legitimate real estate investment deals

while, at the same time, secretly "laundering" the funds, a large percentage of which was funneled back to Ukraine to "finance" their political corruption and other racketeering activities.

### (iii.) *South Cat Cay Island*

124.     Firtash, Mogilevich, and Group DF also agreed to provide financing to CMZ Ventures, Kallista Investments, and the Dynamic Group to acquire and develop the South Cat Cay island, one of the Bimini Islands in the Bahamas.  The island is located close to Miami.  The project was estimated to cost $35 million, and included plans to develop 150 estates on the island valued at $1 million per estate, 50 townhouse condominiums, 50 luxury bungalows, a 9-hole golf course, a deep water marina and a helipad.  A copy of the development plan and brochure for the island is attached as **Exhibit 63.**

125.     As with the Drake Hotel and St. Johns Terminal Projects, although Firtash Mogilevich, and Group DF allocated substantial funds to the project, the project never closed.

### (b)     Group DF's American Marketing Campaign

126.     At Firtash and his associates' request, CMZ Ventures and its affiliated companies also agreed to actively market Group DF's properties in Kyiv and elsewhere to American customers.  Such investments were aimed at soliciting American investments to enhance Firtash's financing.  A color brochure and PowerPoint presentation prepared for CMZ Ventures' marketing campaign on behalf of "DF Properties" (meaning properties of Dmitry Firtash) is attached as **Exhibit 64**.

127.     On November 13, 2008, Carolyn Schlam, who was working on a DF properties presentation, sent an email to a CMZ Ventures employee to request pictures to complete the PowerPoint portion of the "DF Report."  *See* **Exhibit 65**.  The same day, Rick

Gates of Pericles LP, one of Firtash's agents and representatives, e-mailed Zackson a copy of a presentation on Group DF.

128.     Various Defendants and CMZ Ventures employees who worked on the DF Properties presentation e-mailed various drafts to one another, including the "Revision Notes for DF Properties Presentation," attached as **Exhibit 66**.

(a)     Panamanian Corporations

129.     Firtash, Mogilevich, and their associates, with the assistance of Brad Zackson, also created a number of additional companies registered in Panama to siphon off and transfer their funds to New York bank accounts.  Firtash associate Robert Entler registered three corporations for Firtash in Panama: DVN Eleuthera Development, Inc., Dynamic-Vulcan Eleuthera, Inc., and Grey Wolf Enterprises Inc.  The incorporations are attached as **Exhibit 67**.

130.     Dynamic Worldwide Development, LLC was listed as part owner of Dynamic-Vulcan Eleuthera, Inc., which in turn owned 50% of DVN Eleuthera Development, Inc., as explained in an email exchange between Stephen B. Delman, Defendants' New York attorney, and Alvaro Aguilar, a Panamanian attorney Entler had used to file Grey Wolf's incorporation papers.  *See* **Exhibit 68**.  Brad Zackson was named one of the Directors of DVN Eleuthera Development, Inc., with Arthur Cohen serving as President.  *See* **Exhibit 67**.

131.     The "First Draw" on the DVN Eleuthera Development Inc.'s account was a deposit of $500,000, as reflected in a letter emailed from Zackson to Entler, which is attached as **Exhibit 69.**  Defendants used two New York bank accounts for the wire transfers:  CMZ Ventures account with Metropolitan National Bank, and a law firm account with Capital One bank.  *See* **Exhibit 70**.

132.     Firtash, Mogilevich, and their associates also used American Capital Holding LLC to sign a "Facilitation and Broker Disbursement Agreement" with Firtash's Panamanian

and U.S. companies to create another vehicle to siphon off and "launder" funds from the various investment projects for Defendants' benefit.

133.    On September 16, 2009, Aguilar reminded Zackson and other Defendants by an email, attached as **Exhibit 71**, that United States law required them to file Foreign Bank Account Reports (FBARs) disclosing information regarding offshore accounts, and that the United States Amnesty program to report offshore accounts expired on September 23, 2009. Defendants nonetheless failed to file any FBARs with the American government because they did not want to disclose the connections between their American companies, their Panamanian companies and offshore bank accounts, or the wire transfers among the various companies that Firtash, Mogilevich, RUE, and their associates controlled.

(b)    <u>Pharmaceutical Company</u>

134.    In June 2009, although Defendants had no experience or expertise in the medical or pharmaceutical fields, they established another company, Dynamic BL Health, LLC, that was purportedly aimed at importing low-cost prescription drugs from Canada to the United States.  *See* **Exhibit 72**.  Once again, Defendants' actual intention was to create yet another vehicle to launder funds for the Racketeering Enterprise, targeted at the United States.

(c)    <u>Nadra Bank</u>

135.    On May 4, 2011, Firtash, through Centragas, acquired a controlling interest in Nadra Bank, Ukraine's fifth largest bank.  Upon information and belief, Firtash was able to acquire Nadra Bank using the proceeds received from the fraudulently procured Stockholm arbitration award.

136.    As of June 2011, Nadra Bank had approximately $500 million on deposit in New York bank accounts at JP Morgan Chase (Acct No. 762804508), BNY Mellon (formerly

Bank of New York) (Acct. No. 8900341629); and Standard Chartered Bank (Acct No. 3582021684001).

137.     Since the acquisition, Firtash and Centragas have used Nadra Bank to transfer unlawfully obtained proceeds from the Stockholm arbitration and recent natural gas transactions involving the Racketeering Enterprise to bank accounts in New York and elsewhere and to Firtash, Mogilevich, and their organized crime associates to be used for political bribery and other unlawful purposes.

> (3)     *Tymoshenko and her Allies Have Attacked Firtash And RUE Repeatedly, Ultimately Depriving the Company of its Lucrative Position in the Russia-Ukraine Gas Trade*

138.     Tymoshenko and her allies have been outspoken critics of RUE's privileged position in the Russia-Ukraine gas trade and have raised concerns about government and corporate corruption involving the company and its owners, including Firtash.  Tymoshenko and other opposition members have openly questioned RUE's lack of transparency and have often argued that RUE serves no legitimate business purpose as an intermediary in the Naftogaz-Gazprom contracts.  *See* **Exhibit 73**.

139.     In June 2005, during Tymoshenko's first term as Prime Minister following the Orange Revolution, Oleksandr Turchynov, then head of Ukraine's state security service (SBU) and a Tymoshenko ally, opened a criminal investigation into ETG and RUE, including the companies' alleged ties to organized crime.  Turchynov later reported, however, that President Yushchenko had pressured him to terminate the investigation and accused Turchynov of persecuting "[President Yushchenko's] people" by having the SBU "work[] against his team." *See* **Exhibit 18** at 56-57 & n. 450.  Shortly after the investigation was opened, President Yushchenko dismissed Tymoshenko's government.  The SBU later denied that it had ever investigated RUE's activities.  *See* **Exhibit 18** at 56-57, & nn. 447, 452.

140.      Tymoshenko resumed her position as Prime Minister in December 2007 having pledged to eliminate RUE and other intermediaries from the Russia-Ukraine gas trade. Early in 2008, Tymoshenko revoked the authority of Ukrgaz-Energo (the RUE-Naftogaz joint venture) to operate in Ukraine, effectively requiring RUE to sell directly to Naftogaz. *See* **Exhibit 20**, at 10-12. The loss of access to Ukraine's lucrative domestic industrial customers through Ukrgaz-Energo was financially damaging to RUE.

141.      Thereafter, in negotiating Ukraine's 2009 gas purchase and transit contracts, then Prime Minister Tymoshenko reached an agreement with then Russian Prime Minister Vladimir Putin to eliminate RUE as an intermediary, providing for the direct sale of natural gas from Gazprom to Naftogaz. *See* **Exhibit 74**. This agreement was an important step forward in shifting the Russia-Ukraine gas relationship to a less politicized, more purely commercial footing. The United States Embassy, which had described Firtash as a "questionable character" in cables to Washington, opined that eliminating Firtash and RUE as intermediaries would introduce "transparency and accountability" to the natural gas trade. *See* **Exhibit 75**.

142.      Ukraine's 2009 gas purchase and transit contracts negotiated by Tymoshenko and Putin also included an agreement by Naftogaz to assume the payment of $1.7 billion of RUE debt to Gazprom, in exchange for 11 billion cubic meters of natural gas that Gazprom had delivered, but for which RUE and Firtash (through Centragas) had not yet paid. Natogaz then assumed the 11 billion cubic meters of natural gas being stored by RUE in Ukrainian government storage tanks.

143.      The 2009 gas contracts were a disaster for RUE and Firtash, resulting in a significant loss of profits for the company. Firtash was outraged by the 2009 gas contracts and publicly denounced them, stating that if anyone aside from Tymoshenko had negotiated the

contracts, "he would have already been hanging from the street lights." *See* **Exhibit 75**. He further complained to the United States Ambassador to Ukraine that the 2009 gas contracts were "criminal and the 'most stupid contract in Ukraine's history.'" *See* **Exhibit 75**. Firtash's ally Yuriy Boyko, then the energy minister in the opposition's shadow cabinet and who had remained loyal to Firtash and RUE, called the contracts a "betrayal of national interests." *See* **Exhibit 75**.

144.     Although Firtash, Boyko, and their associates attempted to sabotage the 2009 gas contract negotiations, they were unsuccessful at the time. As a result of RUE and Firtash's influence over former President Yushchenko, however, the Naftogaz delegation ceased negotiations with Gazprom in December 2008 rather than finalize an agreement in principle that the parties had accepted. This resulted in the widely publicized 2009 European gas crisis. Tymoshenko publicly blamed Firtash and Boyko for having interfered with, and prevented, the finalizing of the parties' gas contracts at that time. *See* **Exhibit 76**.

145.     While in Moscow to sign the January 19, 2009 gas contracts, Naftogaz Deputy Chairman and Plaintiff Ihor Didenko received phone calls from RUE and Firtash's agents and co-conspirators threatening that if he signed them, he would "do time." Following Yanukovych's election, Firtash and his allies assisted in bringing politically-motivated criminal charges against Didenko related to the January 2009 gas contracts, for which Didenko has been arbitrarily detained since July 2010.

> (4)     *RUE and Firtash Aided and Conspired with Government Officials and other Defendants to Retaliate Politically Against Tymoshenko and Regain Their Financial Foothold in the Russia-Ukraine Gas Trade*

146.     Unable to prevent the conclusion of Ukraine's 2009 gas purchase and transit contracts at the time, Firtash and RUE have since worked to redress the damage done to their interests as a result of the contracts negotiated by Tymoshenko and her allies. Upon information

and belief, these efforts have been successful in large part as a result of Firtash and RUE's influence over Yanukovych Administration officials, who are financially rewarded for their assistance.

            (a)    <u>RUE and Firtash's Influence in the Yanukovych Administration</u>

147.    Firtash contributed substantially to the political campaigns of President Yanukovych and his allies and has continued to financially reward Ukrainian government officials that have proven willing to protect Firtash and RUE's interests.  Firtash has been described as Yanukovych's "most important financial backer."  Yanukovych's election, which saw the return of many Firtash allies and associates to influential positions in the new administration, has paid substantial dividends for RUE and Firtash.

148.    Upon Yanukovych's election to the presidency, three of Firtash's close friends and associates were appointed to top leadership roles in Ukraine.  Serhiy Lyovochkin, another "reputedly Firtash-friendly administration official[]," was appointed Chief of Staff to the President.  *See* **Exhibit 50.**  Firtash's confidant, Valeriy Khoroshkovsky, owner of Inter Media Group Ltd., in which Firtash later obtained a purchase option was named chief of the SBU, Ukraine's state security service.  Yuriy Boyko, who had served on RUE's Coordination Committee and acted as Chairman of Naftogaz's Board during the period when RUE and Firtash significantly profited from the Naftogaz-Gazprom gas deals, became Ukraine's Minister of Fuel and Energy.

149.    Naftogaz's entire management team was also replaced with managers loyal to Yanukovych, Firtash, and their allies and associates.  Plaintiff Didenko, who had signed the January 19, 2009 agreement, was replaced by Evgeny Bakulin, who had held the position during

Boyko's previous tenure as energy minister. In addition, former Firtash employees Yuri Borisov and Sergei Vinokurov were named to head two of Naftogaz's most profitable subsidiaries.

150.     With Firtash and RUE's influence over officials within the Yanukovych Administration, Defendants have operated both inside and outside of government channels to redress the damage done to Firtash and RUE's interests by Tymoshenko and her allies, employing a three-pronged strategy aimed at (1) obtaining compensation for the gas transferred to Naftogaz as part of the 2009 gas contracts; (2) arbitrarily prosecuting and detaining Tymoshenko and her allies who participated in the 2009 gas contract negotiations to ensure they do not regain political power; and (3) reestablishing RUE's financial stake in the Russia-Ukraine gas trade.

(b)      <u>Yanukovych Administration Failed to Defend
Ukraine's Interests in Stockholm Arbitration and
Ukrainian Court Proceedings Related to Transfer of
Natural Gas Pursuant to 2009 Gas Contracts</u>

151.     Upon the conclusion of the 2009 gas contracts, RUE and Firtash initially attempted to void Naftogaz's confiscation of RUE's natural gas in Ukrainian court.  Under Tymoshenko's leadership, however, the Ukrainian government successfully defended the transfer on the basis that Naftogaz, not RUE, had paid for the gas in question, meaning that RUE had no claim of ownership over the gas.

152.     Firtash and his associates then filed an arbitration claim, on behalf of RUE, with the Arbitration Institute of the Stockholm Chamber of Commerce, alleging that Gazprom's assignment of RUE's debt and subsequent transfer of gas to Naftogaz was illegal. Upon information and belief, Firtash retained U.S. law firm DLA Piper, LLP to provide legal assistance with respect to the Stockholm arbitration claim.

153.     As in the Ukrainian courts, Naftogaz initially defended the transfer of natural gas as a legal collection of the debt owed by RUE and assigned to Naftogaz by Gazprom. During the pendency of the Stockholm arbitration proceedings, however, Ukraine's political leadership changed, with Yanukovych becoming President in February 2010.  By March 2010, under the leadership of Yanukovych and new Energy Minister Boyko, the Ukrainian government had completely reversed its position in the Stockholm arbitration.

154.     As explained by a November 2010 Supreme Court of Ukraine opinion, "Naftogaz of Ukraine admitted completely that there were no legal reasons [for it] to acquire [the] disputed quantity of natural gas."  **Exhibit 77**.  The Ukrainian government conceded that the gas in dispute had always been owned by RUE and that the government's seizure of RUE's natural gas had been illegal.  This complete reversal of Naftogaz's position adverse to the interests of Ukraine and its citizens was a shocking about-face and can only be explained by the corrupt business ties Boyko and other government officials had to Firtash, RUE, and their agents and co-conspirators, who, upon information and belief, substantially assisted in bringing about this reversal.

155.     In June 2010, in light of the Ukrainian government's and Naftogaz's withdrawal of their opposition to RUE's ownership claim over the disputed gas, the Stockholm Arbitration Tribunal ("Tribunal") granted RUE's claim.  The Tribunal held that Naftogaz owed RUE 12.1 billion cubic meters of gas:  the 11 billion cubic meters which allegedly had been confiscated from RUE in 2009, as well as a fine of 1.1 billion cubic meters.  Because Naftogaz is a state-owned company, the arbitral award, which is valued at approximately $3.5 billion, is being paid by Ukrainian citizens.

156.     Following the Tribunal's decision, RUE moved to enforce the Tribunal award in Ukrainian court.  Naftogaz and the current Ukrainian government again failed to defend Ukrainian citizens' interests in these proceedings by neglecting to produce any evidence countering the award.  Naftogaz "did not challenge the jurisdiction, the competence of the arbitration and arbitrability of the dispute," but rather again admitted completely "the illegality of seizure of natural gas from RosUkrEnergo."  Although Naftogaz asserted that the award would be contrary to public policy, the company did not "furnish any proof" of this claim.  *See* **Exhibit 77**.  Upon information and belief, Naftogaz's actions in this regard are attributable to the loyalty government officials had to protecting their own financial interests and those of Firtash and RUE over the interests of Ukraine and its citizens.

157.     On November 24, 2010, the Ukrainian Supreme Court affirmed the Stockholm Tribunal award, which inflicted severe economic harm upon Naftogaz and, by extension, Ukraine and its citizens.  As Naftogaz has acknowledged, its satisfaction of the arbitral award directly transferred to RUE natural gas "exceed[ing] 50% of the total natural gas extracted in the country annually from [the] country's own resources, and 50% of [the] annual needs of natural gas by the population."  *See* **Exhibit 77**.

158.     As a result of this significant depletion of Ukraine's natural gas supply, Naftogaz had to purchase gas from foreign sources at much higher prices.  The domestic price of gas also increased substantially as a result of the Tribunal award.  Prior to the Tribunal award, Ukrainian gas prices for domestic consumption were stabilized at below-market prices to aid individual citizens, small businesses, hospitals, and schools unable to otherwise afford gas. Since the award, however, domestic gas prices have increased by 50%, meaning that in the

winter of 2010, hospitals, schools, and other facilities were barely kept above freezing

temperature, exacerbating the pain and suffering borne by Ukrainian citizens

159.     Upon information and belief, Firtash and his affiliates, agents, and co-

conspirators have widely distributed portions of the proceeds received from the sale of the

Ukrainian gas transferred pursuant to the Tribunal award—which sources have estimated to be

valued between $3.5 billion and $5.4 billion—to their associates and friendly corporations in

order to curry favor with them and to reward them for their loyalty.  For example, Firtash used

approximately $600 million of the windfall award to exercise his option to buy a percentage

interest in the Inter Media Group Ltd. from his co-owner and close associate Valeriy

Khoroshkovsky, who is also the chief of Ukraine's SBU (the state security service) and as such,

reports directly to the President.

                (c)     Defendants Politically Prosecuted Opposition
                                 Members to Eliminate Threat to RUE's Financial
                                 Interests

160.     In exchange, Valeriy Khoroshkovsky and other Defendants have in active

concert and participation with Firtash and his agents and co-conspirators, brought criminal

charges against Tymoshenko and her allies who participated in the 2009 gas negotiations.  At

least four other former government officials have been arrested on charges relating to the 2009

gas contracts and, specifically, Naftogaz's confiscation of the 11 billion cubic meters of RUE's

gas.  These cases include the following:

    a)     Ihor Didenko, the former First Deputy Head of Naftogaz was arrested and jailed
on July 9, 2010 by officers of Ukraine's state security service (SBU) on false and
politically-motivated charges of "inflict[ing] damages on the State of Ukraine" in
connection with Ukraine's 2009 gas agreements, which he signed.  Didenko has
been arbitrarily incarcerated at the overcrowded Lukyanivska prison since his
initial arrest.  *See* **Exhibit 4.**  Prosecutors recently agreed to reduce the charges
against Didenko in exchange for him testifying at Tymoshenko's trial in favor of
the prosecution.  *See* **Exhibit 7**.  Specifically, Didenko testified that he would
never have signed Ukraine's 2009 gas contracts if he had known that the

directives in question issued by Tymoshenko had not been authorized by the Cabinet of Ministers, which is a hyper technical point on which the PGO is resting its case, reminiscent of the purported procedural irregularity on which Ukraine's Constitutional Court invalidated the 2004 Constitution.  *See* **Exhibit 7**.

b)   Anatoly Makarenko, former Customs Chief of Ukraine, was arrested and jailed in July 2010.  On August 30, 2010, he was charged with "suspicion of the abuse of official position" relating to the customs clearance of the natural gas acquired from RUE pursuant to Ukraine's 2009 gas contracts.  Makarenko was arbitrarily detained in prison since his initial arrest until July 5, 2011, when he was finally released.  *See* **Exhibit 6**.

c)   Taras Shepitko, the former Deputy Head of the Department of the Kyiv Regional Customs Office, was arrested on July 21, 2010 on charges of "misappropriation of property" in connection with the transfer of RUE's natural gas to Naftogaz pursuant to Ukraine's 2009 gas contracts.  He was arbitrarily detained in prison until July 5, 2011

d)   Maria Kushnir, former Naftogaz Chief Accountant, was arrested on September 14, 2010 for allegedly embezzling Naftogaz property.

161.   In addition, Naftogaz has instituted a civil case against Tymoshenko on substantially the same factual basis as the Gas Charges.

162.   These legal proceedings are both retribution against the individuals who assisted in damaging RUE and Firtash's financial interests, as well as an effort by Defendants to eliminate Plaintiffs as political and financial threats in the future.

(d)   Defendants are Working Inside and Outside of Government Channels to Reestablish RUE's Privileged Position in the Russia-Ukraine Gas Trade Through Illegal Government Kickbacks

163.   In addition to the monetary windfall received by Firtash and RUE in the form of the Stockholm Arbitration award, Firtash, with the assistance of certain Defendants, have reestablished the company's foothold in the Russia-Ukraine gas trade.  On or about March 24, 2011, for example, the Yanukovych Government restored the ability of Ukrgaz-Energo—the Naftogaz-RUE joint venture whose authority to operate had been revoked by Tymoshenko in 2008— to operate again in the Ukrainian market.  *See* **Exhibit 79**.  Similar to Ukraine's 2006 gas

contract, the new arrangement permits Ukrgaz-Energo to distribute large amounts of gas domestically to Ukraine's industrial consumers

164.     A June 30, 2011 decision of the Kyiv Economic Court of Appeals thereafter ruled that Naftogaz was not a joint shareholder in Ukrgaz-Energo, retroactively applying its ruling to the company's founding in 2006.  *See* **Exhibit 80-81**.  This decision, which was based on Naftogaz's own submissions, both excused Ukrgaz-Energo from having to pay millions of dollars in back dividends owed to Naftogaz and turned control of the company over to RUE entirely.  At least one source has estimated that the future lost profits to Naftogaz resulting from this decision may be as high as $2.4 billion.  *See* **Exhibit 81**.

### 2.     Other Criminal Charges Brought Against Plaintiffs and Political Opposition Members

165.     Several other former government officials who served in Tymoshenko's administration, prominent allies of Tymoshenko, and their family members have also been targeted for politically-motivated arrests and prosecutions by the Yanukovych Administration, who are engaging in a state policy or practice or arbitrarily detaining Tymoshenko political allies.

### a)     Criminal Charges Against Former First Deputy Minister of Justice, Yevhen Korniychuk

166.     Government prosecutors, for example, have targeted for criminal prosecution family members of Ukrainian Supreme Court Chief Justice Vasyl Onopenko, who has publicly criticized the Yanukovych Government's judicial reforms.   By December 2010, Onopenko was the last Ukrainian in a high position of power who was not politically aligned with the Yanukovych regime.  Onopenko reported facing pressure from the Yanukovych Administration to resign from his position, which is considered one of the most influential in Ukraine's judiciary.  *See* **Exhibit 5**.

167.     On December 22, 2010, Yevhen Korniychuk, Onopenko's son-in-law and former First Deputy Minister of Justice under the Tymoshenko Government, was summoned to the PGO from the hospital where his wife had just delivered their newborn child.  Upon his arrival, he was arrested by a team of masked police officers and thereafter detained for two months.

168.     Korniychuk was accused of exceeding his authority in writing a legal opinion in 2009 regarding the possible use of a single-source public procurement procedure to allow his former law firm, Magisters, to provide legal assistance to Naftogaz, a charge both he and his former law firm vigorously denied.  At the time he wrote the opinion, Korniychuk no longer had any financial or business ties to the firm.  Previously, courts had twice reviewed these charges and found them to be meritless.  As recognized by the Danish Helsinki Committee for Human Rights, the mere writing of such an opinion "should not constitute [a] criminal offense[]."  *See* **Exhibit 3**.

169.     At around the same time, Ukraine's PGO also brought a politically-motivated criminal case against Onopenko's younger daughter based on a civil dispute involving an unpaid loan.  On February 15, 2011, the day after Onopenko met with President Yanukovych and made a conciliatory public statement acknowledging the President's expressed commitment to European standards of justice, the charges against Onopenko's daughter were dismissed and Korniychuk was released to house arrest, sending a clear "message" to Onopenko and other critics of the Yanukovych Administration.  *See* **Exhibit 5**.

      b)     <u>Criminal Charges Against Former Minister of Interior Yuriy Lutsenko</u>

170.     Yuriy Lutsenko, the leader of opposition party Narodna Samooborona, has also been arbitrarily detained for a prolonged period of time.  Lutsenko was an important ally of

Tymoshenko during her second term as Prime Minister of Ukraine, heading a block of political parties, which, together with Tymoshenko's political party, formed the parliamentary majority from 2007 until Tymoshenko's forced resignation from office in 2010

171.   Beginning in or about November 2010, Ukraine's PGO brought false and politically-motivated charges against Lutsenko alleging primarily that he had improperly arranged various work-related benefits for his former official driver.  *See* **Exhibit 82**.  As recognized by the Danish Helsinki Committee for Human Rights, "Lutsenko's exceeding the budget . . . would in other countries be considered normal political activities . . . and should not constitute [a] criminal offense[]."  *See* **Exhibit 3.**

172.   On or about December 26, 2010, Lutsenko was arrested by masked SBU police officers and a PGO Investigator for failing to cooperate with the prosecution.  During his arrest, Lutsenko was neither informed about the reasons for his arrest nor given a copy of his charge sheet.  Lutsenko has been arbitrarily detained since his initial arrest, with his trial not commencing until or about May 23, 2011.  The PGO has refused to release Lutsenko on bail, citing an alleged flight risk.

173.   Lutsenko has filed a complaint alleging that the PGO violated his human rights with the European Court of Human Rights ("ECHR"), which accepted his application and gave it priority status.  On its own initiative, the ECHR asked the parties to brief the Court on whether Lutsenko's detention "was applied for a purpose other than those envisaged by [the European Convention on Human Rights], given [Lutsenko's] active participation in the political life in Ukraine and his opposition to the Government."  *See* **Exhibit 82**.

c)   <u>Additional Criminal Charges Brought Against Political Opposition Members</u>

174.     In April 2010, former Deputy Head of the State Committee of State Material Reserves under the Tymoshenko Government, Mykola Synkovsky, was arrested on politically-motivated "abuse of office" charges for allegedly forging documents and illegally seizing state ore mining reserves.  Following his arrest, Synkovsky was moved to a prison in the Dnipropetrovsk region of Ukraine.  On or about February 21, 2011, the Dzerhynsky District Court sentenced Sinkovsky to 10 years in prison for misappropriating, embezzling, and converting state property

175.     On August 5, 2010, criminal proceedings were initiated against Bogtdan Danylyshyn, the former Minister of the Economy in the Tymoshenko Government, on politically-motivated charges of abuse of his official position relating to a non-bid contract granted for an expansion at Boryspil International Airport in Kyiv.  Danylyshyn has since been granted asylum by the Czech Republic, where he remains.

176.     On August 21, 2010, Valeriy Ivashchenko, the former Acting Minister of Defense in the Tymoshenko Government, was arrested on politically-motivated charges of "abuse of power of official position" related to the privatization of a ship and mechanical plant. Ivashchenko has been detained since his initial arrest on August 21, 2010.  *See* **Exhibit 3**.

177.     On December 24, 2010, former Dnipropetrovsk Governor, Minister for Transport and Communications, and Deputy Head of the State Customs Service, Viktor Bondar, was arrested for allegedly aiding the deliberate demolition of the Teremky bus station.  Five days later, a travel ban was issued for Bondar, restricting him from leaving Ukraine.  As noted by the Khrakiv Human Rights Protection Group, Bondar openly supported Tymoshenko during the

2010 presidential elections, shortly thereafter being dismissed from his post as Dnipropetrovsk Governor.  *See* **Exhibit 83**.

178.     On January 31, 2011, the PGO placed Mykhailo Pozhyvanoy on Ukraine's "Most Wanted" list for allegedly misappropriating and embezzling state public funds. Pozhyvanoy had served in the Tymoshenko Government as Ukraine's Chairman of the State Committee of State Material Reserves and Deputy Economy Minister.  The PGO has issued an arrest warrant for Pozhyvano, who has announced that he plans to seek political asylum in Austria.

179.     On January 31, 2011 Shevchenkivsky District Court of Kyiv ordered Vitaliy Nikitin, who served as Acting Head of the State Committee of State Material Reserves under the Tymoshenko Government, to be taken into custody in connection with politically-motivated charges of misappropriation or embezzlement of public funds.  *See* **Exhibit 84**.

180.     Other leading Tymoshenko administration officials who have been charged with such nebulous and politically-motivated crimes as "abuse of power" or "exceeding authority" include Tetyana Slyuz, former head of the State Treasury of Ukraine; Tetyana Grytsun, former First Deputy Head of the State Treasury; Victor Kolbun, former Deputy Pension Fund Board Chairman; and Oleksandr Danyevych, former State Treasury Deputy Head.

### 3.     Other Procedural Abuses and Human Rights Violations Attendant to Political Persecution of Plaintiffs

181.     Systematic violations of Ukrainian and international law have been rampant in the investigations, prosecutions, arrests, detentions, and trials of political opposition members, further underscoring the arbitrary nature of these proceedings.

(1)  *Arbitrary Arrests and Detentions*

182.      The arbitrary arrests and detentions of political opposition members, including

the use of travel restrictions and onerous interrogation sessions, have violated the legal rights of

Tymoshenko and many of her allies and have prevented them from participating in Ukraine's

political life as party leaders or working to earn a livelihood in another capacity.  The conditions

of confinement to which political opposition members have been subjected have caused

Plaintiffs' personal physical injury as well.

(a)      <u>Yulia Tymoshenko</u>

183.      Since the launch of the criminal investigation against Tymoshenko, she has

been detained for interrogation on approximately 44 occasions for periods lasting from 20

minutes to 10 hours, including interrogations on the following dates:

- December 2, 2010, *see* **Exhibit 85**;

- December 15, 2010, *see* **Exhibit 86**;

- December 20, 2010:  After interrogating Tymoshenko, the PGO formally brought

  criminal charges against her, *see* **Exhibit 87;**

- December 22, 2010, *see* **Exhibit 88**;

- December 24, 2010, *see* **Exhibit 89;**

- December 27, 2010, *see* **Exhibit 90**;

- December 29, 2010:  Tymoshenko was brought in for a round of questioning that

  lasted over 6 hours, *see* **Exhibit 91**;

- December 30, 2010:  The PGO questioned Tymoshenko for more than 10 hours,

  with the interrogations concluding around midnight, *see* **Exhibit 92;**

- December 31, 2010, *see* **Exhibit 93**;

- January 5, 2011, *see* **Exhibit 94**;

- January 17, 2011, *see* **Exhibit 95;**

- January 18, 2011, *see* **Exhibit 96**;

- February 2, 2011:  The PGO interrogated Tymoshenko before she was scheduled to meet with EU Parliament President, Jerzy Buzek, *see* **Exhibit 97**;

- February 4, 2011, *see* **Exhibit 98**;

- February 16, 2011:  Tymoshenko's interrogation lasted for over four hours, *see* **Exhibit 99**;

- February 21, 2011:  After again interrogating Tymoshenko, the PGO consolidated the Kyoto and Opel Combo charges against Tymoshenko and deemed its investigation completed, *see* **Exhibit 100**; and

- May 24, 2011:  After the PGO interrogated Tymoshenko for approximately 7 hours, Renat Kuzmin, Deputy Prosecutor General, publicly stated that Tymoshenko would be released, but noted the possibility of arresting her in the future if "she continues to take unacceptably long to familiarize herself with the case documents," *see* **Exhibit 101**.

184.     During this period of incessant interrogations, Tymoshenko effectively was required to remain on standby at the discretion of the PGO.   She often received summons to appear for interrogations with only a few hours' notice.  These interrogations are compulsory and, as recognized by the Danish Helsinki Committee for Human Rights, can be a powerful political weapon.  *See* **Exhibit 3**.

185.     In addition to being required to appear continuously for interrogations on short notice, Tymoshenko was restricted from traveling outside Kyiv without the PGO's express permission, which was generally denied.

186.     As evidenced by the oppressive number and duration of the PGO's interrogations, as well as the travel ban, the purpose of the PGO's investigation into Tymoshenko has been to harass her and prevent her from participating in political opposition activities that threaten the Yanukovych Administration and, as a result, Defendants' financial interests.  The investigation and trial of Tymoshenko has further impaired her ability to earn a livelihood, causing financial injury.

187.     Notwithstanding Tymoshenko's efforts to cooperate with Ukraine's PGO despite the burdensome demands placed on her time, on May 23, 2011, the Pechersk District Court issued a decree for Tymoshenko's arrest, purportedly as a result of her "continuing to evade pretrial investigation intentionally to prevent the execution of procedural decision in the case" and "deliberate prevention of the establishment of the truth."

188.     The decision, however, did not cite to any factual support for these conclusory statements, for which there was none.  Tymoshenko had, with limited exception, gone out of her way to cooperate with the PGO in order to demonstrate her innocence of the charges with which she had been accused.  Tymoshenko had not once violated her travel ban and at the time, she had been unable to attend only four interrogation sessions due to illness or unavailability of legal counsel.  On each of these four occasions, she had provided the PGO with either advance notice or proof of the reasons for her absence.

189.     Nevertheless, on or about May 24, 2011, upon Tymoshenko's voluntary arrival at the office of the prosecutor, she was immediately surrounded by 25 to 30 "militia"

guards wearing face masks and black uniforms.  They blocked all corridors and entrances to the building, refused to allow Tymoshenko's defense counsel to leave the building, and detained Tymoshenko for nearly eight hours of interrogation.

190.     Upon information and belief, Tymoshenko was released only as a result of significant international pressure applied to the Yanukovych Administration.  When announcing her release, however, the Deputy Prosecutor General, Renat Kuzmin, publicly warned Tymoshenko of a future arrest if "she continues to take unacceptably long to familiarize herself with the case documents."  *See* **Exhibit 101**.

191.     The arrest of Tymoshenko on May 24, 2011 was unjustified, politically motivated, and arbitrary.  Although Tymoshenko appeared for repeated, prolonged interrogations at the convenience of the PGO, as the Danish Helsinki Committee for Human Rights has explained, a criminal defendant "does not have the obligation to cooperate with the investigator or to show proper behavior to him" under Ukrainian law, and "to draw negative consequences [from a refusal to cooperate] can be a violation of the right to personal liberty and security and the right not to self-incriminate."  *See* **Exhibit 3**.

192.     On August 5, 2011, in the midst of her trial on the Gas Charges, Tymoshenko was again subjected to an unjustified and politically-motivated arrest ordered by the Pechersky District Court at the request of the prosecutor.  In violation of Ukrainian law, the prosecutor, Defendant Lilia Frolova, submitted an application for Tymoshenko's arrest in the midst of Tymoshenko questioning Ukraine's current Prime Minister, Mykola Azarov, who was testifying at her trial as a witness for the prosecution.  The prosecutor claimed that Tymoshenko had been disrespectful while examining the Prime Minister.  *See* **Exhibit 102**.

193.     Judge Kireyev granted the prosecutor's request, finding that "the accused systematically takes actions in the court by which she in fact obstructs establishing the truth in the case, treats disrespectfully the court and trial participants, violates the order of the court consideration of the case, refused to mention her place of residence, refuses to give a written confirmation that she was notified of the date, time and place of the next court hearing, failed to appear in the court at hour set by the court and refused to give reasons for that." *See* **Exhibit 3**.

194.     However, Judge Kireyev again did not indicate what actions Tymoshenko had taken that could be considered obstruction of justice or a violation of a court order sufficient to support detention.  Under the European Convention on Human Rights and thus, Ukrainian law, a defendant cannot be detained for treating the court and trial participants disrespectfully. Moreover, at the time of her arrest, Tymoshenko had arrived to court late only once and by only seven minutes.  Finally, refusing to mention her place of residence or give written confirmation of the date, time, and place of the next court hearing (which had been decided on a day to day basis up to that point) cannot by itself justify prolonged detention under Ukrainian law.

195.     Judge Kireyev's factually and legally unsupported reasons for detaining Tymoshenko belie the political motivations behind his decision.  Two weeks prior to her arrest, Tymoshenko's attorney, Sergiy Vlasenko, cited information from a source that a member of the Yanukovych Administration had instructed Judge Kireyev to arrest Tymoshenko.  *See* **Exhibit 103**.

196.     Tymoshenko has been arbitrarily detained in the notorious Lukyanivska prison since her arrest despite widespread calls for her immediate release by international leaders, who have been widely condemned Tymoshenko's imprisonment as disproportionate and politically-motivated.

197.     The United States Department of State has demanded Tymoshenko's immediate release, stating that her incarceration "raises concerns internationally about the application of the rule of law in Ukraine."  *See* **Exhibit 104**.  Senator John McCain stated that Tymoshenko's arrest "is clearly a violation of the basic rights that should be protected for every citizen in a democracy.  The implications of this detention go far beyond the fate of one person.  Ultimately, what is at stake is the future of freedom and democracy in Ukraine.  Unfortunately, today's action by the Ukrainian government calls into question its commitment to the fundamentals of democracy. . . . I urge the leadership in Kyiv to release Prime Minister Tymoshenko immediately and guarantee the rights of all Ukrainians, regardless of their political beliefs."  *See* **Exhibit 105**.  Senator Dick Lugar likewise stated that "[t]he arrest of former Ukrainian Prime Minister Yulia Tymoshenko further contributes to the perception that this case has been pursued to settle old political scores."  *See* **Exhibit 106**.

198.     Top officials at the EU—Parliament President Jerzy Buzek, Foreign Policy Chief Catherine Ashton, and Enlargement Commissioner Stefan Fule—have also voiced deep concerns about Tymoshenko's "politically motivated" arrest.  *See* **Exhibits 107-108**.  The governments of the Czech Republic, Hungary, Poland, and Slovakia, among others, have likewise criticized Tymoshenko's imprisonment as disproportionate to the charges.  *See* **Exhibit 109**.  In addition, the first President of Ukraine, Leonid Kravchuk, issued a statement criticizing the reasons cited for arresting Tymoshenko as insufficient "grounds for remanding a person in custody."  *See* **Exhibit 110**.  Co-rapporteurs for the monitoring of Ukraine by the Parliamentary Assembly of the Council of Europe (PACE) have also called for Tymoshenko's release, as have other prominent leaders, such as the Dalai Lama, and South African Archbishop and Nobel Peace Prize laureate Desmond Tutu.  *See* **Exhibit 111, 112**.

199.     Judge Kireyev has rejected over 20 petitions to change the measure of restraint against Tymoshenko, including petitions from prominent religious, political, and cultural leaders.  Judge Kireyev is purportedly basing his refusal to release Tymoshenko on her "continuing to make insulting statements against the court" and "not respond[ing] to the remarks of the presiding judge," which are insufficient grounds under Ukrainian law to detain her.  *See* **Exhibit 113, 114**.  On August 12, 2011, Ukraine's Court of Appeals declined to hear Tymoshenko's appeal challenging her arrest on the ground that preventive measures cannot be challenged under Ukrainian law.  As a result, Tymoshenko is left without a domestic legal remedy to challenge her arbitrary and politically-motivated detention.

(b)     Yuriy Lutsenko

200.     Lutsenko has been arbitrarily detained in prison since his arrest almost a year ago on or about December 27, 2010, a measure the European Parliament has described as "extremely disproportionate."  *See* **Exhibit 2**.  At the time of his arrest, Lutsenko was not informed of the reasons for his arrest and the government investigator refused to give him a copy of the charge sheet against him.  *See* **Exhibit 82**.  Lutsenko's trial did not commence until May 23, 2011.

201.     On or about December 27, 2010, at the request of the PGO, the Pechersky District Court modified the preventive measures that were being taken in Lutensko's case from a travel ban to incarceration.  Lutsenko's attorneys were only given 20 minutes advance notice of the Court's hearing on this matter and they were not apprised of its purpose before arriving.  Lutsenko's defense team thus had no time to prepare arguments or gather evidence in his defense to present at this hearing.  *See* **Exhibit 82**.

202.     In ordering Lutsenko's imprisonment, the Pechersky District Court found that Lutsenko had attempted to evade the PGO's investigation and that no personal circumstances

prevented him from being held in custody.  In addition, the Court cited the fact that Lutsenko had not admitted his guilt as a justification for his imprisonment, which is a violation of the right against self-incrimination.

203.    The Court's finding that Lutsenko had attempted to evade the PGO's investigation was based on representations by the PGO that Lutsenko had taken too long to familiarize himself with his case file.  Under Ukrainian law, however, a defendant is entitled, but not required, to review his case file.  Moreover, the PGO had imposed arbitrary limitations on Lutsenko's ability to review his case file following the completion of its investigation.

204.    Lutsenko's case file was completed on or about December 13, 2010 and consisted of 24 volumes totaling approximately 7,000 pages.  The case investigator allowed Lutsenko to review only certain volumes on set dates, with no possibility to compare information reviewed on different days.  In addition, Lutsenko was not permitted to make any copies of the documents contained in his case file.  On or about December 22, 2010, the government investigator further informed Lutsenko that he would be given one volume of the file at a time, with subsequent volumes provided only after his defense team had completed their review of earlier volumes, and a list of the materials contained in each volume would only be given to the defense team after its review of the materials was complete.

205.    On multiple occasions, the PGO further restricted Lutsenko and his defense team's access to his case file, even after he appeared when requested to review it.  On or about December 15, 2010, for example, Lutsenko was allowed to review only a portion of his file due to the remaining materials having been submitted to the Pechersky District Court for its review of Lutsenko's appeal regarding the PGO's decision to institute criminal proceedings against him. When Lutsenko and his attorney appeared at the PGO two days later, the investigator again

contended that many of the materials remained unavailable, even though the Court had denied Lutsenko's appeal the day before.  On or about December 20 and 21, 2010, Lutsenko again appeared at the PGO to review his case file, but the files were still purportedly not ready for his review.

206.     Disregarding the facts above, the Kyiv Court of Appeals affirmed the Pechersky District Court's decision to detain Lutsenko.  The PGO has since repeatedly refused to release Lutsenko on bail, citing an alleged flight risk.  Upon information and belief, however, at a meeting with EU ambassadors on May 24, 2011, Prosecutor General Pshonka stated that Lutsenko was being detained for being impolite to the investigator, which is not a lawful reason for detaining a criminal defendant.

(c)     Other Plaintiffs and Political Opposition Members

207.     Other Plaintiffs and political opposition members, listed below, have also been arbitrarily detained for prolonged periods, without cause or justification.  As a result of their detentions, Plaintiffs have been precluded from participating in political activities in Ukraine and otherwise denied the ability to earn a livelihood.

a)     Valeriy Ivashchenko has been arbitrarily detained since his arrest over a year ago on or about August 21, 2010 after being summoned by the PGO as a witness without being informed that an investigation had been opened against him.  In violation of Ukrainian law, the court ruling detaining Ivashchenko did not provide any individual justification for its decision.  *See* **Exhibit 3**.

b)     Mykola Petrenko has been arbitrarily detained without trial since his arrest almost a year ago in December 2010.

c)     Ihor Didenko has been arbitrarily detained since his arrest over a year ago on July 9, 2010.  *See* **Exhibit 4**.  Didenko received a three year suspended sentence as a result of an agreement to provide favorable testimony for the prosecution in Tymoshenko's trial.

d)     Anatoly Makarenko was arbitrarily detained without trial since his arrest over a year ago in July 2010, having only recently been released on July 5, 2011 by

the Kyiv Court of Appeals.  Makarenko was not formally charged until August 30, 2010, after his initial arrest in July 2010.  *See* **Exhibit 6**.

e)     Taras Shepitko was arbitrarily detained without trial for almost a year since his initial arrest on July 21, 2010, having only recently been released on July 5, 2011 by the Kyiv Court of Appeals.

f)     Yevhen Korniychuk was arrested on December 22, 2010 by a team of masked police officers a few hours after his wife gave birth and thereafter arbitrarily detained for two months.  Korniychuk was released to house arrest the day after his father-in-law, Supreme Court President Onopenko (a long-time ally of Tymoshenko and vocal critic of the current regime), met with President Yanukovych, after which Onopenko gave a conciliatory statement to the press acknowledging the President's expressed commitment to European standards of justice.  *See* **Exhibit 5**.

g)     Heorhiy Filipchuk has been arbitrarily detained without trial since his arrest despite Defendant prosecutor Renat Kuzmin's statement that a decision had been made on his case and the fact that Ukraine's PGO completed its investigation against Filipchuk on February 4, 2011.

(2)     *Arbitrary Travel Bans*

208.     Yanukovych Administration officials, with the support and assistance of Defendants, have also been pursuing a practice and policy of imposing arbitrary travel bans on Tymoshenko and other Plaintiffs and political opposition members in violation of Ukrainian and international law.

209.     From December 2010 until the date of her August 2011 arrest, Tymoshenko was barred from leaving her residence without the PGO's permission.  *See* **Exhibit 3**.  Senator John McCain and EPP President Wilfried Mertens have jointly and repeatedly called on Ukrainian authorities to lift the travel ban on Tymoshenko.  *See* **Exhibit 115**.  With only two exceptions, however, the PGO refused Tymoshenko's applications to lift her travel ban, even on weekends and holidays.  *See* **Exhibit 116**.  Tymoshenko was thus unable to fulfill her functions as head of the Batkivshchyna Party.  She was not permitted to visit Ukraine's regions to meet with voters or travel abroad at the invitation of officials from foreign countries.

210.     In violation of Ukrainian law, the Pechersky District Court also twice rejected Tymoshenko's motions to lift her travel ban without independently considering the reasonableness of the restrictive measure notwithstanding the fact that Tymoshenko had in good faith cooperated with the PGO throughout the course of its investigation.

211.     Prior to his arrest on or about December 26, 2010, Lutsenko was also the subject of a travel ban, imposed on or about November 2, 2010.  In addition, travel bans were issued for former First Deputy Justice Minister Yevhen Korniychuk, former Transport Minister Viktor Bondar, and former Head of the State Treasury Tetyana Slyuz.  *See* **Exhibit 117.**

212.     Article 148 of Ukraine's Code of Criminal Procedure provides that any preventative measures, including custody, may only be applied "if there are sufficient grounds to believe that the suspect, accused, defendant, convict can avoid investigation and trial or execution of procedural decisions, can obstruct establishing the truth in a criminal case or continue criminal activity."

213.     In addition, under the European Convention of Human Rights, and thus Ukrainian law, travel restrictions imposed on a criminal defendant must be necessary "for the maintenance of public order, for the prevention of a crime, for the protection of heath or morals, or for the protection of the rights and freedoms of others."  *See* **Exhibit 118**.

214.     The travel restrictions imposed upon Tymoshenko, Lutsenko, and other political opposition members were unwarranted and violated Ukrainian law.  The Danish Human Rights Report called the travel restrictions against Tymoshenko and Lutsenko, in particular, a "coercive measure imposed by the authorities."  *See* **Exhibit 3**.

(3)    *Denial of Access to Legal Counsel and Adequate Time to Prepare a Defense*

215.     Ukraine's PGO and the Judges presiding over the criminal charges of Tymoshenko and other political opposition members have also consistently violated Plaintiffs' right to counsel due under Ukrainian law. These violations have taken the form of, *inter alia*, requiring political opposition members to attend interrogation sessions or trial without their lawyers present, providing insufficient time for counsel to adequately prepare and mount a defense, and pressuring defense counsel with disciplinary proceedings as a result of their participation in Plaintiffs' case.

216.     Ukraine's PGO took the position that former Prime Minister Tymoshenko was required to attend interrogation sessions even when her counsel was unavailable, in direct violation of Article 107 of Ukraine's Code of Criminal Procedure.  *See* **Exhibit 119**.  Although Tymoshenko nonetheless refused to attend only a few of the over 40 interrogation sessions due to unavailability of legal counsel, the PGO released a statement on April 28, 2011 accusing her of dragging out the investigation by not wanting to take part in any investigative actions without her lawyer being present, despite the fact that it was her legal right to do so.

217.     The presiding judge in Tymoshenko's trial on the Gas Charges, Rodion Kireyev, likewise has repeatedly violated Tymoshenko's right to counsel, and the pace set by Judge Kireyev appears to be directed towards the quickest possible resolution in a guilty verdict against her.  As the Danish Helsinki Committee for Human Rights has noted, "[t]he urgency of the judge to press for a rapid trial has been remarkable and has led him to only allow the newly appointed defense counsel [a] few days to acquaintance themselves with the case files of several thousand pages."  *See* **Exhibit 3**.

218.     From the start of her trial, Tymoshenko and her defense counsel have been denied adequate time to prepare and mount a defense in violation of Articles 48 and 289 of Ukraine's Code of Criminal Procedure.  Judge Kireyev has repeatedly denied counsel's requests for additional time to review the case materials, which at the time of the June 24, 2011 preliminary hearings on the Gas Charges ran to 11 volumes and over 5,000 pages.  Although the prosecution generated these voluminous materials by subjecting Tymoshenko to lengthy and almost daily interrogations during the months leading up to trial, Judge Kireyev has required Tymoshenko's attorneys to review these files and prepare for trial in a matter of days.  *See* **Exhibit 120, 121**.

219.     On Wednesday, June 29, 2011, the prosecution conceded that Tymoshenko had not even received the indictment against her, but Judge Kireyev agreed to adjourn trial only until Monday, July 4, 2011, which violated the three day minimum period of notice required by Ukrainian law.

220.     As Tymoshenko's trial progressed, additional volumes of materials were added to the case file, yet her defense attorneys again were not given sufficient time to familiarize themselves with these documents.  For example, on August 31, 2011, Judge Kireyev refused Tymoshenko's request for a mere half hour to study the newly formed 22nd volume of materials related to the Gas Charges, the existence of which defense counsel learned of only that day.  *See* **Exhibit 122**.

221.     Only at the conclusion of witness testimony and under immense international pressure did Judge Kireyev relent and allow Tymoshenko two weeks to prepare for closing arguments.  Judge Kireyev's decision came on the heels of his ruling the prior court day that defense counsel would have only a day to prepare for closing arguments, rejecting counsel's

request for additional time.  *See* **Exhibit 123**.  Judge Kireyev's unexpected about-face is yet another clear indication of political influence affecting every aspect of Tymoshenko's trial, arrest, and detention.

222.     For no stated reasons, daily hearings throughout the course of Tymoshenko's trial have also regularly exceeded the working schedule of the court, lasting 9 to 12 hours a day with few, if any, breaks.  This has forced defense counsel to work through the night, in excess of the standard eight-hour working day.  Such a condensed trial schedule has also made it impossible for defense counsel to meet with Tymoshenko privately and adequately prepare for the next trial day, especially following her August 5th arrest as Tymoshenko's defense team is not allowed to visit her pre-trial detention center on weekends.

223.     Judge Kireyev, however, rejected Tymoshenko's request to hold trial every other day in order to allow her to communicate with her lawyers, which effectively deprived her of her right to an attorney due under Ukrainian law.  In addition, when Tymoshenko's attorney, Yuriy Sukhov, requested Judge Kireyev to abide by the regular schedule of the court, allow a lunch break, and provide time for him to rest given that he had already worked a 40-hour work week and was undergoing out-patient medical treatment, Judge Kireyev likewise refused, stating that the court would adjourn only after the witnesses were questioned.

224.     In the midst of Tymoshenko's trial, on or about July 8, 2011, defense counsel Mykola Tytarenko suffered a heart attack and was hospitalized after describing the pace of the court proceedings as "torture" and explaining that he was "completely exhausted," "cannot work effectively," and "[b]ecause of [his] physical condition, [] cannot serve as a defender."  *See* **Exhibit 124, 125**.  When trial resumed on July 11, 2011, Judge Kireyev initially rejected Tymoshenko's request to postpone the hearing for an additional four days despite the fact that

Tytarenko was still in the hospital and her remaining defense attorney, Sergiy Vlasenko, was abroad on business.

225.     Although the judge ultimately granted her request, he did so only because Tymoshenko was forced to dismiss the hospitalized Tytarenko as her attorney in order to invoke her right to postpone the proceedings for three days to retain new counsel pursuant to Article 46 of Ukraine's Code of Criminal Procedure.  *See* **Exhibit 126**.

226.     When trial thereafter resumed on July 18, 2011, the number of police officers in the courtroom had doubled, with the officers preventing Tymoshenko's lawyers from moving around in the courtroom.  Judge Kireyev then ruled that Sergiy Vlasenko, one of Tymoshenko's original defense attorneys, could no longer defend her at trial, reasoning that he had disturbed the order in court, was in contempt of court, and obstructed the establishment of justice.  *See* **Exhibit 127**.  Yet the judge did not substantiate these conclusory statements with any examples of Vlasenko's purportedly questionable behavior.  Police officers also forcefully removed Tymoshenko's other lawyer, Oleksandr Plakhotnyuk, from the courtroom.

227.     At the same hearing, the judge attempted to resume trial immediately without offering any time for Tymoshenko's newly-appointed lawyers to acquaint themselves with the case file, in violation of Article 289 of Ukraine's Code of Criminal Procedure.  Once again, Tymoshenko had to remind the judge of the applicable procedural law, which provides, as a matter of right, that newly appointed counsel be granted adequate time to review a defendant's case file.  Upon such reminder, Judge Kireyev determined that three days would be sufficient for Tymoshenko's new lawyers to review the extensive case file, which then consisted of more than 16 volumes of documents.

228.     Judge Kireye**v** thereafter retaliated against Tymoshenko's attorneys by issuing rulings requesting Ukraine's Parliament and regional legal disciplinary committees investigate Sergiy Vlasenko and Mykola Tytarenko for allegedly improper behavior.  *See* **Exhibit 126-127.** Specifically with respect to Vlasenko, who is a Member of Ukraine's Parliament ("MP"), Judge Kireyev appealed to a parliamentary committee to "draw attention to the improper behavior of MP Vlasenko," with a request to respond in one month's time.  In a separate ruling, Judge Kireyev also appealed to the Lviv regional disciplinary commission to respond "to Vlasenko's improper behavior."  *See* **Exhibit 126-127**.

229.     On or about July 26, 2011, Judge Kireyev also referred Tymoshenko's defense lawyers Mykola Siryi and Oleksandr Plakhotnyuk to the Kyiv City Bar Association Disciplinary and Qualification Committee as a means of intimidating them.  Upon information and belief, another Tymoshenko attorney, Mykola Siry, is now under investigation by the Yanukovych Administration on false and trumped-up charges of  "plagiarism" related to his 1991 dissertation.  *See* **Exhibit 128**.

(4)     *Falsified and Missing Evidence*

230.     On July 28, 2011, Tatiana Kornjakova, a deputy energy minister and former deputy prosecutor general, testified in Tymoshenko's trial.  Kornjakova's testimony was highly damaging to the PGO's case in that it supported the defense's argument that the directives issued by Tymoshenko in the midst of the 2009 gas crisis were not unlawful, contrary to the PGO's assertion that the directives in question were outside Tymoshenko's powers as Prime Minister. After reporting on Kornjakova's testimony, the online newspaper Ukrayinska Pravda received an e-mail with an attached Microsoft Word document, purportedly from Kornjakova, denying the media's characterization of her testimony and demanding a retraction.  An electronic inspection of this document revealed, however, that it had originated from the Secretariat of the President of

Ukraine, demonstrating that the Yanukovych Administration has been heavily involved in orchestrating the claims and testimony against Tymoshenko.  **Exhibits 129-130.**

231.     Reporter Serhiy Leschenko prepared an investigative report detailing the role of the Presidential Administration in influencing Kornjakova and in requesting the retraction at issue.  Judge Kireyev, however, refused Tymoshenko's request to allow Leshchenko to testify. Judge Kireyev also refused defense counsel requests to obtain from the PGO sixteen volumes of attachments to a letter instructing Ukraine's security service (SBU) to investigate the Gas Charges against Tymoshenko, which, upon information and belief, would have shown that the case was orchestrated by Defendant Khoroshkovsky, Firtash's close business associate and head of Ukraine's SBU.  *See* **Exhibit 131**.

232.     Other requests by Tymoshenko's defense counsel to obtain and attach highly relevant evidence has been denied by Judge Kireyev.  In addition, Tymoshenko has complained of missing evidence as Judge Kireyev has referred at trial to materials that her defense counsel has never seen.  Upon information and belief, some 213 pages have disappeared from Tymoshenko's case file in connection with the text of a natural gas contract.  *See* **Exhibit 132,** *see also* **Exhibit 133-134**.   Certain documents added to Tymoshenko's case file were also dated April 31st, a day that doesn't exist.

(5)     *Denial of Right to Independent and Impartial Judicial Tribunal*

233.     Plaintiffs have repeatedly protested with little success against the various violations of their procedural and substantive rights.  These complaints have been met with hostility by the judges presiding over their cases, whose actions demonstrate a total lack of judicial independence and impartiality and a willingness to return guilty verdicts at all costs.

234.     Diplomats from the United States, Great Britain, France, Spain, and Austria have attended Tymoshenko's trial out of concerns over its fairness and her imprisonment.  *See* **Exhibit 111 and 135**.  The Danish Helsinki Committee for Human Rights has also been monitoring the criminal cases against Tymoshenko, Lutsenko, Korniychuk, and Ivashchenko, which the organization stated "left the impression of prosecutors and judges with limited understanding for the presumption of innocence and equality of the parties during the trial."  *See* **Exhibit 3**.  United States District Court Judge Bohdan Futey has called the trial of Yulia Tymoshenko a "circus," opining that the proceedings are not in line with U.S. or EU standards. *See* **Exhibit 136.**

235.     Upon information and belief, Ukraine's computerized random process for selecting judges has not been followed in the cases of Tymoshenko and other political opposition members, which is a violation of Article 54 of Ukraine's Criminal Procedure Code.  Judge Kireyev, for example, was purposely transferred by Presidential Decree to the Pechersky District Court mere months before the start of Tymoshenko's trial in order to ensure the outcome expected by Defendants.  *See* **Exhibit 3**.

236.     Institutional pressures further undermine the independence of the judges presiding over the trials of Tymoshenko and other opposition members.  Judges in Ukraine are only eligible for lifetime appointment after they have served 5 years in office.  In addition, officials involved in the investigation and prosecution of opposition political members, including First Deputy Prosecutor General Renat Kuzmin, who is overseeing Tymoshenko's case, sit on the body responsible for the appointment of judges, the High Council of Justice.

237.     Judge Kireyev is only 2 years into his initial 5-year term and has not been permanently appointed.  Judge Oksana Tsarevych—who is the presiding judge in the

Korniychuk case, one of a three judge panel in the Ivashchenko and Lutsenko cases, and sat on the panel of judges in the cases of Didenko, Makarenko, and Shepitko—was appointed to the bench less than a year ago.  Judge Medushevska, who is on the Lutsenko judicial panel, is also in her first year on the bench.  These judges are thus "exposed and vulnerable to political pressure," which, upon information and belief, is being applied by the Yanukovych Administration.  *See* **Exhibit 3**.

238.      Ukraine's PGO has a control function over the discipline of judges as well, which it has demonstrated it will use against those judges who do not support the political persecution of Plaintiffs and other opposition members.  For example, Deputy Prosecutor General M. Havrylyuk, who is also a member of the High Council of Justice, initiated disciplinary proceedings against three judges of the Kyiv Court of Appeals who had overturned a lower court decision ordering the initial arrest of Tymoshenko on May 24, 2011.  The prosecutor demanded the dismissal of the judges "for having ignored the opinion of the prosecutor, unreasonably interfered with the course of pretrial investigation and taken one-sided position in favor of the defendant."  *See* **Exhibit 3.**

239.      Both Tymoshenko and Lutsenko requested trial by jury, which was denied. They also both filed motions seeking the recusal of their respective judges, which likewise were denied.

240.      Judge Serhiy Vovk, one of the presiding judges in Lutsenko's trial, has a direct personal interest in finding Lutsenko guilty.  Judge Vovk is the subject of an open government investigation into forging court rulings and fraudulently appropriating land. Lutsenko initiated this investigation when he headed the Ministry of Interior under the Tymoshenko Government.  Despite this obvious conflict of interest, Judge Vovk has found that

he can be unbiased and objective, a ruling that under Ukrainian law cannot be appealed.  The ruling also violates Articles 54 and 56 of Ukraine's Code of Criminal Procedure, which require a judge to recuse himself upon the request of a defendant where circumstances "raise doubts as to the objectivity of the judge."

241.       The presiding judge in Tymoshenko's trial on the Gas Charges, Judge Kireyev, has shown favoritism toward the prosecution by repeatedly ignoring defense motions, including motions to admit exculpatory evidence, refusing to allow critical witnesses to testify in Tymoshenko's defense, and impeding the defense's questioning of prosecution witnesses.  These are gross violations of Article 16-1 of Ukraine's Code of Criminal Procedure, which states that courts must "try cases on the basis of adversariality of proceedings" and that the prosecution and defense should "enjoy equal rights and freedom in producing evidence, examining it and proving its validity before court."

242.        Of the 32 witnesses the defense sought to examine, Judge Kireyev permitted only two witnesses to testify, despite not having similarly limited the number of witnesses the prosecution was able to present.  *See* **Exhibit 137**.  For example, Judge Kireyev forced certain witnesses to attend trial at the request of the prosecution, including former President Yushchenko and former Presidential Representative for International Energy Security, Bohad Sokolovsky.  *See* **Exhibit 138-139.**  By contrast, Judge Kireyev denied Tymoshenko's request to question Yuriy Maslak, head of the Kyiv Forensic Research Institute, which prepared an expert report for the GPO on the damages Ukraine allegedly sustained as a result of the 2009 gas contract.  *See* **Exhibit 140**.

243.       Judge Kireyev also unreasonably curtailed Tymoshenko's questioning of prosecution witnesses.  For example, during Tymoshenko's questioning of Prime Minister

Azarov, Judge Kireyev frequently interrupted Tymoshenko and disallowed nearly every one of her questions irrespective of their relevance.  Judge Kireyev then cited her disrespect for witnesses (presumably Azarov) as one of the reasons for her August 5th arrest.  When trial resumed the following Monday, Judge Kireyev again disallowed numerous questions by Tymoshenko, but permitted the prosecution's witness, Foreign Minister Kostyantyn Hryshchenko, to speak rudely toward Tymoshenko and to provide testimony in whatever format he wished.

244.     Tymoshenko's trial thus became a "show trial," during which only witnesses favorable to the prosecution were permitted to testify and these witnesses, by and large, were not required to answer any questions that would have been detrimental to the prosecution.  Indeed, Judge Kireyev has demonstrated his willingness to proceed with trial regardless of whether Tymoshenko has counsel present or is even present herself.  He has interrogated witnesses without Tymoshenko present, and read her indictment in absentia, in violation of Article 262 of Ukraine's Criminal Procedure Code, which requires the presence of a defendant at trial absent exceptional circumstances not relevant here.

245.     Judge Kireyev has also repeatedly ignored, refused to entertain, or denied the majority of defense counsel's other motions.  For example, Judge Kireyev refused to consider any of the 30 petitions filed by Tymoshenko during pre-trial investigation and later determined that he would no longer accept any motions whatsoever filed by Tymoshenko in open court because she refused to stand in his presence.  When Tymoshenko then began filing her motions with the office of the court, Judge Kireyev further instructed the court office to refuse to accept any motions from her.

246.     Of particular concern, Judge Kireyev has refused defense counsel's requests to obtain and/or admit highly relevant and exculpatory evidence, including Ukraine's 2006-2009 natural gas contracts showing RUE as an intermediary, Naftogaz accounting records and contracts related to the price and supply of technical gas in 2008 and 2009, a 2009 Ernst & Young audit of Naftogaz, and Naftogaz board meeting minutes regarding the 2009 gas contracts, *See* **Exhibit 131 and 141**.  These documents are relevant to whether Ukraine suffered any state losses as a result of the 2009 gas contracts, which is a required element of the crime for which Tymoshenko is standing trial.  Inexplicably, Judge Kireyev granted the prosecution's request to admit Ernst & Young's 2009 audit of Naftogaz after having repeatedly rejected the same request made by defense counsel.  *See* **Exhibit 142.**

247.     When Tymoshenko or other political opposition members protest these and other violations of their rights at trial, the presiding judges have removed them from the courtroom or even, in the case of Tymoshenko, arrested her.  On July 15, 2011, Tymoshenko filed a series of objections to prior procedural violations committed by Judge Kireyev, while refusing to stand before the court as a form of protest in exercise of her fundamental freedom of speech.  *See* **Exhibit 143-144**.  In response, Judge Kireyev barred Tymoshenko and her defense team from attending trial for what the judge described as a "disrespectful" attitude toward the court.  *See* **Exhibit 145**.  The expulsion of Tymoshenko and her defense counsel was a violation of Article 262 of Ukraine's Code of Criminal Procedure.  Tymoshenko's arrest on August 5, 2011 was another glaring example of Judge Kireyev disproportionately sanctioning Tymoshenko for refusing to accept the Kangaroo court proceedings to which she has been subjected.

248.     Judge Kireyev has also removed Members of Parliament ("MPs") and journalists from the courtroom when they show disapproval for the ongoing violations of

defendants' rights during trial.  For example, after expelling Tymoshenko and her defense

counsel from the courtroom on July 15, 2011, Judge Kireyev then ordered the removal of MPs

who were attending trial in support of Tymoshenko and had shown indignation that the

proceedings were continuing without Tymoshenko or her defense counsel present.  This was then

followed by the forceful removal of photographers, cameramen, and, finally, all members of the

press.  Trial thereafter resumed in secret, with Tymoshenko formally indicted on the Gas

Charges in abstentia.  At the next court session, police forcefully prevented journalists from

entering the courtroom and Judge Kireyev refused to resume live coverage of Tymoshenko's

trial.

249.     The presiding judge in Lutsenko's trial, Judge Vovk, likewise removed

Lutsenko from court proceedings for disrespecting the court.  Judge Vovk took this action during

a court session that journalists were not permitted to attend and thereafter banned all, photo,

video, and audio recordings of Lutsenko's trial.  *See* **Exhibit 146-147**.

(6)     *Inhumane Conditions of Court Proceedings and
Confinement*

250.     Plaintiffs have been subjected to inhumane treatment both inside the

courtroom and while in detention.  Lutsenko, Ivashchenko, and Korniychuk have been forced to

arrive in court wearing handcuffs and to sit in caged docks for the entire duration of court

proceedings.  As a result, all communications with the judge or their defense counsel during

court sessions must be made through bars.  This measure of restraint is clearly inappropriate as

none of these men have been charged with a violent offense, have exhibited any indication of

violent behavior in the courtroom, or have a relevant criminal record that would justify such

severe precautions.

251.     During the investigation of Lutsenko's case, he was likewise guarded by 7 policemen and constantly handcuffed to a policeman during interrogation sessions.  Such practices undermine the presumption of innocence and violate Article 3 of the European Convention on Human Rights and thus, Ukrainian law.  *See* **Exhibit 3**.

252.     Small courtrooms crowded with 50 to 75 people, high temperatures, lack of ventilation making it difficult to breathe, and lengthy proceedings have made it even more difficult for Plaintiffs Tymoshenko and Lutsenko and their defense counsel to concentrate and present a defense at trial.  EU Ambassador to Ukraine Jose Manuel Pinton Teixeira referred to the courtroom conditions at Tymoshenko's trial as "horrendous" and "inhumane."  *See* **Exhibit 148**.

253.     The conditions under which Plaintiffs have been confined are likewise inhumane.  Most of the Plaintiffs and other political prisoners are jailed at the overcrowded Lukyanivska prison in Kyiv, which houses almost 50% more men that it was designed to accommodate.  The average space for a detainee held in a pretrial detention center is 27 square feet.  The U.S. State Department has described Ukraine's "temporary holding facilities and . . . pretrial detention facilities [as] harsher than in low and medium security prisons."  **Exhibit 30**.

254.     Prison officials and presiding judges have also denied or delayed medical examination and treatment of Tymoshenko, Lutsenko, Ivashchenko and others who have suffered a deterioration of their health while confined at the Lukyanivska prison.  In addition, family members and personal physicians have been denied meaningful access to Plaintiffs and other political prisoners.

255.     Ivashchenko, for example, was allowed only one visit per month with a family member between August 2010 and January 2011, with no family visits at all for 4 months prior

to June 2010. As the Danish Helsinki Committee for Human Rights recognized, "the restrictions on [Ivashchenko's] contacts with family members appear not to be necessary and are excessive and disproportionate."

256.    Since being in jail, broken blood vessels have appeared on Tymoshenko's body, and she is running a fever and can barely speak due to throat problems.  Residing in cells near Tymoshenko are inmates in the infectious phase of tuberculosis, and a young woman with tuberculosis recently died in the same detention center where Tymoshenko is being held.  *See* **Exhibit 149-150**.  Ukraine's State Penitentiary Directorate has acknowledged that "tuberculosis [is] a major communicable disease in [Ukraine's] prison facilities because of poor conditions and inadequate medical resources for examining and treating tuberculosis-infected persons in pretrial detention facilities."  *See* **Exhibit 30**.

257.    Notwithstanding her condition and in violation of Article 284 of Ukraine's Civil Code, Judge Kireyev has repeatedly denied requests to allow Tymoshenko's personal physician to conduct a physical examination of her, including a request by the Ukrainian Parliament's Human Rights Commissioner.  *See* **Exhibit 150**.  International leaders and organizations, including Senator McCain and EPP President Wilfriend Martens, have jointly urged authorities "to allow Yulia Tymoshenko to exercise her constitutional right to be examined by the doctor of her choice."  *See* **Exhibit 151**.

258.    Given past "accidents" that have befallen political leaders imprisoned in Ukraine, Tymoshenko naturally fears for her life and does not trust prison authorities to examine her.

**4.    Defendant Government Officials Operated Outside the Proper Scope of Their Positions in Advancing Firtash and RUE's Financial Interests at the Expense of Ukraine and Arbitrarily Prosecuting and Detaining Political Opposition Members**

259.     Defendant government officials operated under color of law, but outside the proper scope of their official positions in bringing politically-motivated charges against Plaintiffs and in arbitrarily detaining them for prolonged periods.  Because Defendant government officials flagrantly violated Ukrainian law and peremptory human rights norms in doing so, they could not have been operating within the legitimate scope of their public positions.

260.     Defendant government officials also operated outside the proper scope of their official positions in participating in the Racketeering Enterprise, as discussed further below.

## CLAIMS FOR RELIEF

### COUNT I

### Arbitrary Detentions in Violation of the Alien Torts Statute, 28 U.S.C. § 1350

261.     Plaintiffs repeat and reallege the paragraphs of this Complaint as though fully set forth herein.

262.     The systematic state-supported suppression of the political opposition in Ukraine by means of politically-motivated investigations and criminal prosecutions, leading to arbitrary arrests and prolonged detentions of Plaintiffs, executed by Defendant government officials operating outside the scope of their proper official roles, in active concert and participation with the remaining Defendants, violates specific, universal, and obligatory human rights norms protected under both international law and the laws of the United States and Ukraine.

263.     The international community has universally decried arbitrary detention in numerous international treaties, agreements, and conventions, thus incorporating this offense into the law of nations.  The overwhelming international condemnation to the politically-motivated

charges and prolonged arbitrary detentions of Plaintiffs further confirms that Defendants' actions indeed violated the law of nations.

264.     The International Covenant on Civil and Political Rights ("ICCPR") guarantees a right to liberty that cannot be denied through arbitrary arrest or detention.  *See* Art. 9 ("No one shall be subjected to arbitrary arrest or detention. . . .  Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release.").  The ICCPR has been adopted by all United Nations member states, including Ukraine and the United States.

265.     The Universal Declaration of Human Rights ("UDHR")  also recognizes that there are certain fundamental and inalienable human rights to which the citizens of all nations are entitled, including, among others, the right not to be subjected to arbitrary arrest or detention. *See* Art. 9 ("No one shall be subjected to arbitrary arrest, detention or exile.").  The UDHR elaborates the obligations of all United Nations members as embodied in the United Nations Charter, indicating that rights embodied therein have been incorporated into the law of nations.

266.     The following additional international conventions confirm that the prohibition against arbitrary detention is incorporated into the law of nations:

> (a)  The European Convention on Human Rights, art. 5 ("No one shall be deprived of his liberty save in the following cases and in accordance with a procedure prescribed by law: . . . (c) the lawful arrest or detention of a person effected for the purpose of bringing him before the competent legal authority of reasonable suspicion of having committed and offence. . . .  Everyone arrested or detained in accordance with the provisions of paragraph 1(c) of this article shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time.");
>
> (b)  The Charter of Fundamental Rights of the European Union, art. 47 ("Everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal previously established by law.")

(c) The American Declaration of the Rights and Duties of Man, art. 25 ("No person may be deprived of his liberty except in the cases and according to the procedures established by pre-existing law. . . .  Every individual who has been deprived of his liberty has the right to have the legality of his detention ascertained without delay by a court, and the right to be tried without undue delay or, otherwise, to be released.  He also has the right to humane treatment during the time he is in custody.")

(d) The American Convention on Human Rights, art. 7 ("No one shall be subject to arbitrary arrest or imprisonment. . . .  Any person detained shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to be released without prejudice to the continuation of the proceedings.")

(e) African Charter on Human and Peoples' Rights, art. 6 ("No one may be deprived of his freedom except for reasons and conditions previously laid down by law. In particular, no one may be arbitrarily arrested or detained.").

267.	Ukraine's Parliament (the Verkhovna Rada) has ratified the ICCPR and the European Convention on Human Rights, making the provisions therein part of Ukrainian law.  As recognized by Ukraine's PGO, "[a]ccording to Part 1, Article 9 of Ukraine's Constitution and Part 1, Article 19 of Ukraine's Law 'On International Agreements,' current international agreements of Ukraine, the binding nature of which has been ratified by the Verkhovna Rada of Ukraine, are a part of the national legislation of Ukraine."

268.	Arbitrary detention is also a specific violation of Ukraine's national law.  In particular, Article 29 of the Ukrainian Constitution guarantees:

No one shall be arrested or held in custody except under a substantiated court decision and on the grounds and in accordance with the procedure established by law. . . .

Every person, arrested or detained, shall be informed without delay of the reasons for his arrest or detention, apprised of his rights, and from the moment of detention, shall be given an opportunity to personally defend himself/herself or to receive legal assistance from a defender.

Every person detained shall have the right to challenge his detention in court at any time.

269.	Article 121 of the Ukrainian Constitution further requires that Ukraine's PGO be "entrusted with supervision over the observance of human and civil rights and freedoms and

over the observance of laws regulating these issues by executive power bodies, by local self-government bodies, their officials, and officers

270.     The United States Supreme Court has recognized that a "state violates international law if, as a matter of state policy, it practices, encourages, or condones . . . prolonged arbitrary detention."  Sosa v. Alvarez-Machain, 542 U.S. 692, 737 (2004) (quoting Restatement (Third) of Foreign Relations Law of the United States § 702 [hereinafter Restatement]); see also Martinez v. City of Los Angeles, 141 F. 3d 1373, 1384 (9th Cir. 1998) ("[T]here is a clear international prohibition against arbitrary arrest and detention."); De Sanchez v. Banco Central De Nicaragua, 770 F. 2d 1385, 1397 (5th Cir. 1985) ("[T]he standards of human rights that have been generally accepted - and hence incorporated in the law of nations - … encompass … such basic rights as … the right not to be arbitrarily detained."); Rodriguez-Fernandez v. Wilkinson, 654 F. 2d 1382, 1388 (10th Cir. 1981) ("No principle of international law is more fundamental than the concept that human beings should be free from arbitrary imprisonment.").

271.     Arbitrary detention thus is also a violation of the Alien Tort Statute, 18 U.S.C. § 1350, which grants aliens (non-U.S citizens) the right to seek recourse and judicial relief in United States courts for violations of international law.  See id.; Wiwa v. Royal Dutch Petroleum Co., 626 F. Supp. 2d 377, 382 n.4 (S.D.N.Y 2009) (denying post-Sosa defendants' motion to dismiss plaintiffs' arbitrary detention claims under the ATS); Kiobel v. Royal Dutch Petroleum Co., 456 F. Supp. 2d 457, 466 (S.D.N.Y. 2006) (recognizing post-Sosa that a state policy of prolonged arbitrary detention states a cause of action under the ATS).

272.     The Restatement (Third) of Foreign Relations Law likewise affirms that "arbitrary detention violates customary law if it is prolonged and practiced as state policy."  Id. §

702.  Arbitrary detention is defined in the Restatement (Third) of the Law of Foreign Relations

as detention that is "not pursuant to law" or is "incompatible with the principles of justice or with

the dignity of the human person."  Id. § 702 cmt. h.

273.     The motive for a particular detention, the circumstances under which it was

procured, and the attendant conditions of confinement are factors that may inform whether a

detention is arbitrary.  See, e.g., Eastman Kodak Co. v. Kavlin, 978 F. Supp. 1078, 1094 (S.D.

Fla. 1997) (determining that detention was arbitrary when it "was not a standard pre-trial

incarceration, but a calculated, extortionate imprisonment motivated solely by a desire for

economic gain"); Doe v. Qi, 349 F. Supp. 2d 1258, 1326 (N.D. Cal. 2004) (considering a

detainee's conditions of confinement when determining whether his detention was arbitrary);

Restatement § 702 cmt. h (noting that detention may be arbitrary when "it is supported only by a

general warrant, or is not accompanied by notice of charges; if the person detained is not given

early opportunity to communicate with family or to consult counsel; or is not brought to trial

within a reasonable time").

274.     The Yanukovych administration's practice and policy of arresting and

detaining Plaintiffs for prolonged periods of time on unfounded politically-motivated charges

violates Ukrainian law and is incompatible with principles of justice and the dignity of the

human person.  Plaintiffs' arrests and detentions were not standard pre-trial incarcerations;

instead, they were arrested and detained because Plaintiffs were and continue to be political

opponents and vocal critics of the current Ukrainian administration and because they pose

financial threats to certain Defendants.  By repeatedly subjecting Plaintiffs, as members of

Yanukovych's political opposition, to arbitrary arrests and detentions, while simultaneously

violating Plaintiffs' procedural due process rights and subjecting them to inhumane conditions of confinement, Defendants violated customary international law and thus 28 U.S.C. § 1350.

275.     Defendants Viktor Pshonka, Renat Kuzmin, Oleksandr Nechvoglod, and Lilia Frolova operated outside the scope of their legitimate public authority as state prosecutors in arbitrarily detaining and otherwise violating the fundamental human rights of Plaintiffs. Pshonka,  Kuzmin, Hechvoglod, and Frolova directed, ordered, confirmed, ratified, and/or conspired with the remaining Defendants, who provided substantial assistance in bringing about the arbitrary arrests and detentions of Plaintiffs.

276.     As a proximate result of Defendants' unlawful arbitrary detention and violation of Plaintiffs' rights, Plaintiffs have suffered serious injuries.  Plaintiffs have been denied liberty, for extended periods, without due process of law.  This has resulted in financial harm to Plaintiffs as they have not been able to earn a livelihood.  Certain plaintiffs also have been subjected to inhumane, overcrowded conditions of detention, resulting in physical injury as well.

## COUNT II

### Racketeering Activity in Violation of the Racketeering Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.*

277.     Plaintiffs repeat and reallege the paragraphs of this Complaint as though fully set forth herein.

278.     Over a number of years and continuing to the present, Defendants and their agents and co-conspirators have participated in an association in fact engaged in foreign and interstate commerce that constitutes a racketeering "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The instant "Racketeering Enterprise" is an association of persons, both inside and outside of the United States, who have worked both inside and outside of Ukrainian government

channels to facilitate the laundering of illegally obtained funds through the United States and elsewhere in order to conceal the profits obtained by Defendants and other members of the Racketeering Enterprise, including illegal government kickbacks paid to Ukrainian officials for protecting the financial interests of Firtash, RUE, and their affiliates and associates.

279.     Among other things, the kickbacks paid by the Racketeering Enterprise to government officials were intended to be used for and resulted in, convincing government officials, including Defendant prosecutors Victor Pshonka, Renat Kuzmin, Oleksandr Nechvoglod, Lilia Frolova, and Defendant SBU Head Valeriy Khoroshkovsky to selectively target Plaintiffs for criminal investigation, incarceration, and/or prosecution on baseless, politically-motivated charges.  Such politically-motivated criminal prosecutions suppressed opposition to the Ukrainian government's change of position in the Stockholm arbitration, the financial and political corruption of the Yanukovych Administration, and Defendants' financial interests.

280.     At all times relevant to this Complaint, Defendants and their agents and co-conspirators have, as part of the Racketeering Enterprise, conducted, directly and indirectly participated in, and conspired in a pattern of racketeering activity, including money laundering and mail and wire fraud that took place in New York and elsewhere in the United States, in violation of 18 U.S.C. §§ 1962(c) and (d).  Each defendant subscribed to and endorsed the unlawful purposes of the Racketeering Enterprise, and either participated in, facilitated and/or aided and abetted at least two of the predicate acts that had sufficient relatedness and continuity to form a pattern of racketeering activity that continues to the present.

281.     Defendants' pattern of racketeering activity included the unlawful actions and activities of defendants and their co-conspirators identified in this Amended Complaint and in

the Exhibits attached thereto, including but not limited to, the money wire transfers, faxes and email communications between Stockholm and Kyiv, and between other international locations, including New York and Kyiv constituting wire fraud in violation of 18 U.S.C. § 1343, the use of the mails for purposes of mail fraud in violation of 18 U.S.C. § 1341, and money laundering activities in violation of 18 U.S.C. § 1956.

282.     Since approximately 2007 and continuing to the present, Defendants and their agents and co-conspirators have invested their racketeering proceeds in real estate and other financial investments in New York and elsewhere in the United States, in violation of 18 U.S.C. § 1962(a).  These investments have enabled the Racketeering Enterprise to operate under the cover of legitimacy when paying illegal government kickbacks, funding political campaigns, or otherwise distributing its profits.

283.     Since approximately 2007 and continuing to the present, Defendants and their agents and co-conspirators have also acquired and maintained control of and interests in various companies and enterprises operating in interstate and foreign commerce in New York and elsewhere in the United States, as well as abroad, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).  Defendants' Racketeering Enterprise thus set up a complicated web of shell companies, including a number of American companies, which engaged in interstate commerce and over which Firtash and his agents had total dominion and control.  These acquisitions and maintenance of interests have enabled Defendants to operate under the cover of legitimacy when paying illegal government kickbacks, funding political campaigns, or otherwise distributing the profits of the Racketeering Enterprise.

284.     As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1962(a)-(d), Plaintiffs have been injured in their business and property within the meaning of the

civil RICO statute, by among, other things (a) being prevented from pursuing their careers,
businesses and/or professions by which they support themselves and their families, and (b) being
forced to pay for legal representation in order to defend themselves against politically-motivated
charges and malicious prosecutions that would not otherwise have been brought against them but
for the current administration's selective prosecution scheme.

285.    The injuries each Plaintiff suffered were reasonably foreseeable, and, in fact,
anticipated and intended by Defendants as the natural consequence of their acts.

## COUNT III

### Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

286.    Plaintiffs repeat and reallege the paragraphs of this Complaint as though fully
set forth herein.

287.    Ukrainian government officials charged with representing Ukrainian citizens'
interests in the Russia-Ukraine gas trade and Stockholm arbitration, including Yuriy Boyko and
other relevant Naftogaz management officials, had and continue to have a duty to act for the
benefit of Ukrainian citizens given that Naftogaz is an entirely state-owned company.  In effect,
Ukrainian taxpayers are Naftogaz's stockholders.  Thus, the Ukrainian government and Naftogaz
officials owe Ukrainian citizens a higher level of trust than is normally present in the
marketplace between individuals involved in an arms-length business transaction.

288.    Ukrainian government officials, including Naftogaz management officials,
involved in the Russia-Ukraine gas trade and Stockholm arbitration, breached their fiduciary
duty to represent and protect the financial interests of Ukrainian citizens, by securing a favored

position for RUE in the Russia-Ukraine gas trade and not challenging Firtash and RUE's Stockholm arbitration claims. Firtash and his affiliates, agents, and co-conspirators not only had actual knowledge of the officials' breach of their fiduciary duty to Ukrainian citizens, but also actively facilitated and enabled the breach by, among other things, paying substantial kickbacks to these officials for their assistance.

289.     Defendants' actions resulted in financial loss and physical injury to Plaintiffs in that these breaches were inextricably intertwined with the political persecution and arbitrary detentions to which they were subjected, as well as significant financial loss to Ukrainian citizens as a whole in the form of increased gas prices and loss of state revenues.


### COUNT IV

### Malicious Prosecution

290.     Plaintiffs repeat and reallege the paragraphs of this Complaint as though fully set forth herein.

291.     Defendant prosecutors Pshonka, Kuzmin, Nechvoglod, and Frolova selectively and maliciously prosecuted Plaintiffs on politically-motivated and false charges, with the purpose of intimidating and diminishing meaningful political opposition to the Yanukovych Administration. The remaining Defendants directed, conspired with, and/or facilitated, aided, and abetted these government officials' selective and malicious prosecution of Plaintiffs.

292.     At the time the prosecutions were initiated against Plaintiffs, Defendants did not have probable cause to believe that Plaintiffs were guilty of any criminal offenses. Rather, the prosecutions were brought maliciously and/or in reckless disregard of Plaintiffs' rights as an attempt to intimidate, suppress, and retaliate against Plaintiffs for their participation in opposition political activities that threaten the financial and political interests of Defendants.

293.     In bringing these political prosecutions against Plaintiffs, Defendant government officials cannot be considered to have been acting in their official capacity, although they were operating under the color of law.

294.     As a result of Defendants' malicious prosecutions, Plaintiffs have suffered damage to their reputation, as well as financial and physical harm.

## JURY TRIAL DEMAND

295.     Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, by and through their attorneys, demand judgment against each of the Defendants, as follows:

a.     Enter judgment in favor of Plaintiffs;

b.     Award Plaintiffs compensatory and punitive damages on Counts I, III, and IV;

c.     Award Plaintiffs treble damages on Count II;

d.     Award Plaintiffs their attorneys' fees and costs of pursuing this action;

e.     Declare that the state practice of arbitrarily detaining Plaintiffs for prolonged periods is a violation of international law; and

f.     Grant such other and further relief as this Court deems just and proper.

Dated:  New York, New York
       December 19, 2011

McCALLION & ASSOCIATES LLP

_K. F. McCallion_

Kenneth F. McCallion (Bar # KFM-1591)
100 Park Ave, 16th floor
New York, NY 10017-5538
(646) 366-0880

*Attorney for Plaintiffs*

**VERIFICATION**

Yulia Tymoshenko, hereby affirms that she has read the foregoing amended complaint and knows the contents of the same to be true of her own personal knowledge and belief, except as to those matters affirmed on information and belief, and as to those matters, she believes them to be true.

Dated: Kyiv, Ukraine
     Dec., 13, 2011

Yulia Tymoshenko

[