# Exhibit 1

Last Updated: Friday, 16 December 2011, 15:33 GMT    unhcr.org | Partners | Help | Contact | Site Map

# Refworld
### The Leader in Refugee Decision Support

Search
Enter a word or phrase
Advanced Search  Search Tips

Text size A A A    Email this document    Printable version

Regions

Africa
Americas
Asia
Europe
Oceania

Countries
- Select a country -

Categories
Country Information
Legal Information
Policy Documents
Reference Documents

Browse by
A-Z Index
Topics
Publishers
Document Types

Resources
Special Features
Standards and Training
Information Alerts
Protection Starter Kit
Library
News
Refworld Personalization
External Links

| | |
|---|---|
| **Title** | U.S., EU condemn Tymoshenko trial |
| **Publisher** | Radio Free Europe/Radio Liberty |
| **Country** | Ukraine |
| **Publication Date** | 26 June 2011 |
| **Cite as** | Radio Free Europe/Radio Liberty, *U.S., EU condemn Tymoshenko trial*, 26 June 2011, available at: http://www.unhcr.org/refworld/docid/4e0b2e342d.html [accessed 18 December 2011] |
| **Disclaimer** | This is not a UNHCR publication. UNHCR is not responsible for, nor does it endorse, its content. Any views expressed are solely those of the author or publisher. |

## U.S., EU condemn Tymoshenko trial

**Last updated (GMT/UTC): 26.06.2011 09:33**

The United States and the European Union have condemned the upcoming trial of former Ukrainian Prime Minister Yulia Tymoshenko for alleged abuse of power.

U.S. State Department spokeswoman Victoria Nuland said there are concerns that the trial – due to begin on June 29 – appears to be a "politically motivated" prosecution of an opposition figure.

"I'd like to take this opportunity to reiterate the United States' concern about the appearance of politically motivated prosecutions of opposition figures in Ukraine," Nuland said. "When the senior leadership of an opposition party is the focus of prosecutions out of proportion with other political figures, this does create the appearance of a political motive."

Jose Manuel Pinton Teixeira, the EU's ambassador to Ukraine, who attended a pre-trial hearing on June 24, criticized the crowded and stiflingly hot courtroom in Kyiv, saying "the conditions of this trial are inhumane."

Tymoshenko has been charged with abuse of office for signing a deal in 2009 to buy Russian natural gas at prices investigators said were too high, and without authorization to sign the deal.

Tymoshenko denies the charges, saying they are orchestrated by President Viktor Yanukovych to block her participation in upcoming parliamentary and presidential elections.

The charges carry a sentence of between seven and 10 years. A conviction would jeopardize her ability to take part in parliamentary elections next year and the next presidential election due in 2015.

Tymoshenko, one of the leaders of Ukraine's Orange Revolution in 2004, narrowly lost to Yanukovych in presidential elections last year.



The defiant Tymoshenko also described the judge, Rodion Kireyev, as the "presidential administration's puppet," according to RFE/RL's Ukrainian Service.

"No one has doubts that the Prosecutor's Office is privatized," she said. "The courts are privatized. There is no justice. That's why what is going on today is the personal responsibility and personal revenge of Yanukovych against his main political opponent."

**'Inhuman' Courtroom Conditions**

Yulia Tymoshenko makes the sign of the cross at the beginning of her court hearing.

Thousands of Tymoshenko's supporters rallied outside the courtroom ahead of the pretrial hearing, chanting her name to show their support.

Tymoshenko arrived in the courtroom holding a pink rose. Known to have a penchant for theatrics, she crossed herself using the sign of her Ukrainian Orthodox Christian faith, then took a copy of the Ukrainian Constitution from her handbag and put it on the desk beside her.

Sitting next to her was an aide who wore a white T-shirt emblazoned with the words "Freedom For Political Prisoners."

**'Selective Prosecution'**

Tymoshenko is now the target of several investigations, including the charge of abusing her authority, which allegedly caused severe financial losses for Ukraine after the country's dispute with Moscow over Russian natural gas deliveries.

Tymoshenko has signed a pledge not to leave Kyiv but has not been detained so far in the investigation.

However, several of her former top allies, including ex-Interior Minister Yury Lutsenko, have been imprisoned in other investigations, prompting the United States to raise concerns about "selective prosecution" in Ukraine.

Link to original story on RFE/RL website

Copyright notice: Copyright (c) 2007-2009. RFE/RL, Inc. Reprinted with the permission of Radio Free Europe/Radio Liberty, 1201 Connecticut Ave., N.W. Washington DC 20036

# Exhibit 2

**P7_TA-PROV(2011)0272**

## Ukraine: the cases of Yulia Tymoshenko and other members of the former government

**European Parliament resolution of 9 June 2011 on Ukraine: the cases of Yulia Tymoshenko and other members of the former government**

*The European Parliament,*

– having regard to its previous resolutions on Ukraine, in particular its resolution of 25 November 2010[1],

– having regard to the Partnership and Cooperation Agreement (PCA) between the European Union and Ukraine, which entered into force on 1 March 1998, and to the ongoing negotiations on the association agreement designed to replace the PCA,

– having regard to the EU-Ukraine Association Agenda, which replaces the Action Plan and was endorsed by the EU-Ukraine Cooperation Council in June 2009,

– having regard to the Commission communication of 12 May 2010 entitled 'Taking stock of the European Neighbourhood Policy' (COM(2010)0207) and to the progress report of 25 May 2011 on implementation of the European Neighbourhood Policy,

– having regard to the statement made by its President on the detention of Yulia Tymoshenko on 24 May 2011,

– having regard to the statement made on 26 May 2011 by the spokesperson of EU High Representative Catherine Ashton on the case of Yulia Tymoshenko,

– having regard to the statement made by Commissioner Štefan Füle on 24 March 2011, following his meeting with Yulia Tymoshenko,

– having regard to the bill on preventing and tackling corruption that was adopted by the Verkhovna Rada on 7 April 2011 and will come into effect on 1 July 2011,

– having regard to Rule 122(5) of its Rules of Procedure,

A. whereas the EU favours a stable and democratic Ukraine that respects the principles of a social market economy, the rule of law, human rights and the protection of minorities and that guarantees fundamental rights; whereas domestic political stability, a focus on internal reform and respect for the rule of law, incorporating fair, impartial and independent legal processes, in Ukraine are prerequisites for the further development of relations between the EU and Ukraine; whereas the Eastern Partnership encompasses all these principles,

B. whereas a comprehensive reform of the judiciary and measures to ensure respect for the rule of law in criminal investigations and prosecutions, including the principle of fair, impartial and independent judicial proceedings, has not yet been implemented in Ukraine,

C. whereas corruption and abuse of power remain widespread in Ukraine and require an unequivocal response by the authorities in bringing those responsible to justice; whereas prosecutions and investigations must be impartial and independent and must not be used for political ends,

---

[1]    Texts adopted, P7_TA(2010)0444.

D.  whereas on 24 May 2011 the Prosecutor General's Office in Ukraine completed the investigation into the case against Yulia Tymoshenko, former Prime Minister of Ukraine, and brought charges of abuse of power in connection with the conclusion of gas contracts with the Russian Federation in 2009,

E.  whereas on 21 February 2011 two criminal proceedings against Yulia Tymoshenko were combined into one case in which she is accused of embezzling funds from the sale of greenhouse-gas emission quotas under the Kyoto Protocol and of misappropriating UAH 67 million that has been allocated from Ukraine's State budget, under a government guarantee to the Austrian Government, for the purchase and import of 1 000 Opel Combo vehicles ostensibly to be used for medical purposes in rural areas while she was prime minister,

F.  whereas, since the launch of the investigations on 15 December 2010, Yulia Tymoshenko has been interrogated 44 times, a travel ban has been imposed on her, both domestically and internationally, for nearly six months, she has been prevented by the Ukrainian authorities from travelling inside Ukraine on four occasions, as well as from travelling to Brussels in February and in June, and she was summoned and questioned on 25 May 2011 for several hours before being released,

G.  whereas 12 former high-ranking officials from the Tymoshenko government are in pre-trial detention, including the former Interior Minister, Yuri Lutsenko, one of the leaders of the People's Self-Defence Party, who has been charged with abuse of office and misappropriation of funds and was arrested on 26 December 2010 for alleged non-cooperation with the prosecution, and the former First Deputy Minister of Justice, Yevhen Korniychuk, who was arrested on 22 December 2010 on charges of breaking the law in connection with public procurement procedures for legal services,

H.  whereas Mr Lutsenko was not released from pre-trial detention when his trial opened on 23 May 2011, despite the fact that detention for alleged non-cooperation in the investigation of his case is an extremely disproportionate measure,

I.  whereas a preliminary report of the Danish Helsinki Committee for Human Rights on the Lutsenko and Korniychuk trials has listed massive violations of the European Convention on Human Rights,

J.  whereas criminal proceedings have been started against the former Economy Minister, Bohdan Danylyshin, who fled Ukraine and has been granted political asylum in the Czech Republic; whereas the former Environment Minister, Georgy Filipchuk, and the former Acting Defence Minister, Valery Ivashchenko, also face criminal charges,

K.  whereas the former speaker of the Crimean Parliament, Anatoliy Grytsenko (Party of Regions), was detained on 24 January 2011 and accused of an abuse of power involving the giving away of 4800 hectares of land illegally; whereas another criminal case was later opened, involving land fraud in connection with resort land in Yalta,

L.  whereas the Prosecutor General's Office has also opened a criminal investigation for abuse of power against the former President of Ukraine, Leonid Kuchma,

M.  whereas the Constitution of Ukraine provides for collective responsibility for the decisions that the Ukrainian Government makes,

N.  whereas the EU continues to emphasise the need for respect to be shown for the rule of law, incorporating fair, impartial and independent legal processes, while avoiding the danger of giving rise to any perception that judicial measures are being used selectively; whereas the EU considers these principles especially important in a country which aspires to enter into a deeper contractual relationship based on a political association,

1.  Stresses the importance of ensuring the utmost transparency in investigations, prosecutions and trials, and warns against any use of criminal law as a tool to achieve political ends;

2.  Is concerned about the increase in selective prosecution of figures from the political opposition in Ukraine as well as the disproportionality of measures applied, particularly in the cases of Ms Tymoshenko and Mr Lutsenko, former Interior Minister, and notes that Mr Lutsenko has been in custody since 26 December 2010; expresses its support for the Ukrainian Human Rights Commissioner, Nina Karpachova, who has asked the Ukrainian Prosecutor General to consider the possibility of applying preventive measures that do not involve detention;

3.  Reminds the Ukrainian authorities that the principle of collective responsibility for the decisions of the government does not permit the prosecution of individual members of the government for decisions that were taken collegially;

4.  Stresses that ongoing investigations of prominent Ukrainian political leaders should not preclude them from actively participating in the political life of the country, meeting voters and travelling to international meetings; calls, therefore, on the Ukrainian authorities to lift the travel ban, both domestically and internationally, on Yulia Tymoshenko and other key political figures;

5.  Underlines the fact that strengthening of the rule of law and a credible fight against corruption are essential not only for the conclusion of the Association Agreement and the deepening of EU-Ukraine relations in general, but also for the consolidation of democracy in Ukraine;

6.  Calls on the Commission to assist the reform of the judiciary in Ukraine by making better use of the EU capacity building programme and to consider the creation of a High Level EU Advisory Group to Ukraine to assist the country in its efforts to come into line with EU legislation, including as regards the judiciary;

7.  Instructs its President to forward this resolution to the Council, the Commission, the EEAS, the Member States, the President, Government and Parliament of Ukraine and the Parliamentary Assemblies of the Council of Europe and of the OSCE.

# Exhibit 3

# Legal Monitoring in Ukraine II

Second Preliminary Report based on the investigations and trials against former Prime Minister Yulia Tymoshenko, former acting Minister of Defence Valeriy Ivashchenko, former Minister of Interior Yurij Lutsenko and former First Deputy Minister of Justice Yevhen Korniychuk

**The Danish Helsinki Committee for Human Rights**

Bredgade 36 B,
DK 1260 Copenhagen K.
Tel. +45 3391 8118
main@helsinki-komiteen.dk
www.helsinki-komiteen.dk



## Contents:

Foreword... p. 3
The case against Yulia Tymoshenko…p. 5
The case against Yurij Lutsenko…p. 5
The case against Valeriy Ivashchenko…p. 7
The case against Yevhen Korniychuk…p. 7

1.  Charges are criminalizing normal political decisions with which the present government disagrees; investigation and prosecution in the Criminal Justice System requires a reasonable suspicion of an offence having been committed and that it does not serve a political purpose…p. 8

2.  The courts and the prosecution must be independent and impartial…s.11

3.  The selection of the judges has probably violated both Ukrainian and international law…p. 13

4.  The arrest and detention of Mr. Ivashchenko, Mr. Lutsenko and Mr. Korniychuk was a violation of their rights as the need to restrict their rights to liberty and security was not justified by the court. The extension of the detention of Mr. Lutsenko and Mr. Ivashchenko violated their rights as it was not justified by the court and did not set a time limit. In general the widespread use of detention in Ukraine is a concern.…p. 14

5.  The arrest of Mrs. Tymoshenko on 24.5.2011 was unjustified by the court. The arrest and detention on 5.8.2011 was disproportionate and unjustified by the court…p. 17

6.  The arrest of Mr. Ivashchenko was a violation of his right to freedom and security as he was summoned as a witness although the decision to open an investigation had already been taken..p. 18

7.  The use of travel restrictions against Mrs. Tymoshenko and Mr. Lutsenko violated their rights to freedom of movement. It was probaly also a violation that the decision was taken by an investigator, who is not a judicial authority and whose decision can not be challenged in court. In general the widespread and indiscriminate use of travel restrictions is a serious concern…p. 19

8.  Handcuffing and caging in the court room is inhuman and degrading treatment…p. 20

9.  Mrs. Tymoshenko´s right to defence has been violated by the very short periods her defence counsels have had to prepare the defence..p. 20

10. The right to have adequate facilities for the preparation of one´s defence may have been violated by the conditions granted for Mr. Lutsenko´s defence...p. 21

11. On Mrs.Tymoshenko and Mr. Lutsenko being removed from the court room..p. 22

12. Unclear indictments might have violated the right to a fair trial and the right to defence…p. 23

13. It was not a violation of the rights of the defendants to refuse them a jury…p. 23

14. There is at this stage insufficient information to conclude whether the rights of Mrs. Tymoshenko and Mr. Lutsenko were violated when the judges refused their motions for recusal…p. 23

15. Postponement of proper medical examination and treatment may be a violation of Mr. Ivashchenko rights not to be inhumanely treated…p. 23

16. If the judge, the defendants and the lawyers were not able to perform due to the conditions in the court room it may have been a violation of the right to a fair trial and to defence…p. 26

17. The compulsory duty to appear before the investigator during pretrial investigation may violate the right not to self incriminate and the right to freedom and security…p. 28

18. A defendant does not have the obligation to cooperate with the investigator or to show proper behavior to him; to draw negative consequences can be a violation of the right to personal liberty and security and the right not to self-incriminate…p. 28

19. Restrictions on Mr. Ivashchenko`s visits in detention violated his rights to family life...p. 30

## Foreword

This second preliminary report describes and assesses the legality of the investigation, detention and trials in Ukraine against former Prime Minister Yulia Tymoshenko, former Minister of Interior Yurij Lutsenko, former acting Minister of Defence Valeriy Ivashchenko and former First Deputy Minister of Justice Yevhen Korniychuk until the beginning of August 2011.

These four cases have been selected among numerous pending cases against senior public officials from the former government. The intention is through these cases to describe relevant sides of the human rights status of the present legislation and criminal justice system of Ukraine. Most of the observations will probably be valid for other similar cases. The preliminary report does not have the ambition of being a fully-fledged legal analysis although it is to judge the described activities by recognized international law (especially The European Conventions on Human Rights) and European standards; it is rather to be considered as a practitioner´s on-the-spot observations at the current stage of the trials.

A first preliminary report was issued on 28.4.2011. The present report includes some of the observations made in that report; if that is not the case it may be the result of prioritization but can also be the result of a changed assessment. It is the intention to follow up with later reports on other aspects of these cases.

It is not the purpose of the monitoring to establish whether the defendants are guilty or innocent. Human Rights are rights for the guilty as well as for the innocent. Ukraine ranks very high on international lists of corruption and any honest attempt to fight it will be welcomed by the international community, even if it should be against politicians from the former regime. Smooth transfer of power from one government to the next is, however, so important an element in a functioning democracy and prosecution against so many members of a former government so seldom seen that the present government must understand international skepticism as to its motives. Especially as the present government generally is considered to have a poor record in fighting corruption and could have an evident interest in removing prominent political opponents from future elections.

Ukraine has been monitored by the Council of Europe as to the implementation of the commitments and obligations undertaken when joining that organization, for which it since May this year holds the chairmanship. The President of Ukraine issued on 10.1.2011 a decree according to which Ukraine is to fulfill its obligations towards the CoE and established a mechanism to oversee it. This process should not be solely focused on the legislative reform. The main problems have been found to be the culture and tradition of the Criminal Justice System itself and in the relationship between the executive power and the criminal justice system. Based on the outcome of this monitoring it would not be advisable to stop the CoE monitoring at this time.

The report is produced for the Danish Helsinki Committee on Human Rights as part of its Legal Monitoring program by Mikael Lyngbo, who has many years of experience as a public prosecutor, chief of police and deputy chief of the Danish Security Service. He has also worked for the EU and other international organizations as Chief Advisor in Albania, Political Advisor in the Sudan, Rule of Law Expert in Iraq and Head of Evaluation Team in South Africa. It is based on observations during his presence in court and

meetings with legal experts, Ukrainian officials, civil society organizations and political and diplomatic representatives.

This report also takes into account comments by the defence counsels in the monitored cases and by the Ukrainian Prosecutor General´s Office who were given an opportunity to provide their comments on the draft text of the report. The responsibility for the report and its conclusions is however still entirely the author´s.

Copenhagen, 12th August 2011.

**The case against Yuliya Tymoshenko**

Mrs. Tymoshenko is the leader of the political party "Batkivshchyna" which is the biggest opposition party in the Parliament. She was Prime Minister in 2005 and from 2007 to 2010. She ran against the present President in the last presidential election 2010 and lost by a narrow margin. The next parliamentary election is scheduled for October 2012 and the next presidential election for 2015.

Since December 2010 there have been investigations pending against her. She signed on 15.12.2010 (in the Kyoto and the Ambulance cases) and again on 20.4.2011 (in the Gas case) undertakings not to abscond, which has prevented her from leaving her place of residence and travel abroad and within Ukraine without the consent of the investigator, which has generally been refused. She has appeared (which in Ukraine is obligatory) for questioning by the investigator in the Kyoto and the Ambulance cases no less than 42 times between December 2010 and May 2011.

On 24.5.2011 she was arrested at 10 am, based on a ruling of the court from the previous day, but was released later that day at 6 pm. She was again arrested on 5.8.2011 and has since been in detention.

Mrs. Tymoshenko is presently charged in 3 criminal cases for violation of mainly Articles 364 and 365 of the Ukrainian Criminal Code for:

1. ordering the conversion of 380 million € from the sale of greenhouse gas quota according to the Kyoto agreement through the National Bank of Ukraine to Hrivnas and to deposit them in an integrated account in the State Treasury, although the money was earmarked for environmental purposes and the exchange caused a loss due to the commission paid to the National Bank of Ukraine of about 2 mill. Hrivnas.
2. having caused a delay in payment of customs of around 37 mill. Hrivnas for 1000 ambulances to be used for rural medical establishments
3. having ordered on her own without the approval of the Cabinet of Ministers the negotiator of the state owned joint-stock company Naftogaz to sign an agreement with Russian Gazprom on delivery of gas at an unfavorable price, causing a loss of around 194 mill. S.

She has presently only been indicted in the Gas case. The trial is pending in the Pechersky District Court under Judge Rodion Kyreyev.

Mrs. Tymoshenko has on 21.6.2011 complained to the European Court on Human Rights about violation of
–   Article 5 §1 (c), arrest and detention not based on reasonable suspicion as her acts do not constitute a criminal offence
–   Article 2 of the Protocol no. 4 to the Convention, travel restrictions not in accordance with the law, not necessary and not subject to an independent judicial review.

She has requested the Court to give the case a priority status. The Court has not yet made a decision on whether to accept the complaint.

**The case against Yurij Lutsenko**

Yurij Lutsenko belonged to the Socialist Party during 1991-2006, when he established the People´s Self-Defense Party. In 2007, he headed a block of political parties "Our Ukraine- People's Union" at the parliamentary elections, which ranked No. 3 and together with BYuT formed a parliamentary majority. He

was Minister of Interior in 2005-2006 and again in 2007-2010. He was at the time of his arrest Deputy Editor-in-Chief of the newspaper "Silski Visti".

Investigation against Mr. Lutsenko under Article 191 §3 was opened on 2.11.2010. On the same day he accepted an undertaking not to abscond. A further charge under Article 365 §3 was added on 11.12.2010 and the pre-trial investigation declared finished on the 13.12.2010, resulting in 47 volumes of case-file which he was summoned to review. On 24.12.2010 the investigation was reopened and finally finished 21.1.2011.

Mr. Lutsenko was arrested on 26.12.2010 by masked Special Service police officers for having violated Article 218 of the Criminal Procedure Code by having avoided to acquaint himself with the materials of the case at the time and under the circumstances prescribed by the investigator. Since then Mr. Lutsenko has been in detention and his release has been denied several times, including after the pre-trial investigation has been finished and the trial started.

The indictment claims the following violations of the Criminal Code:
1. Articles 185.4, 191.5 and 365.3, excess of authority with grave consequences for in the period from 2005 to 2010 with the intention to inflict extra costs and losses to the State and in agreement with his driver to have facilitated the driver's promotion to a series of police functions, respectively Operational Attorney, Police Captain and later Police Major and Minister Counselor, without the driver meeting the employment conditions or fulfilling these functions, and later to have prompted him awarded early enhanced pension, extension of pension seniority and assigned an official apartment which was reserved for other staff groups, by which he inflicted the state a total loss of approx. UAH 600,000.
2. Article 364.3, abuse of office with grave consequences for in the period from August 2009 to January 2010 with personal motive as Minister of Interior illegally to have allowed continued covert surveillance of a person, who had since 2007 unsuccessfully been under surveillance on suspicion of involvement in the poisoning of the then presidential candidate Yushchenko, but against whom the investigation at that time had finally been closed by a competent authority
3. Articles 191.5, 365.3 and 364.3, abuse of office with grave consequences for in December 2008 and December 2009 with personal motive to have authorized and be responsible for the Ministry of Interior having incurred expenditure for the celebration of Militia Day and thereby caused the State losses of 609.720 UAH in violation of a decision of 22.10.2008 by the Cabinet of Ministers not to use funds for events other than central activities of the Ministry of Culture and Tourism, to which these events did not qualify.

The trial started 23.5.2011 and is presently pending in the Pechersky District Court with Judges Serhiy Vovk (presiding), Oksana Tsarevych and Anna Medushevska.

Mr. Lutsenko has complained to The European Court of Human Rights about violation of
- Article 5, the arrest and detention were arbitrary and not in accordance with law
- Article 5, not having been informed about the reasons for his arrest
- Article 5, the decision on his detention was not substantiated and he was punished for exercising his constitutional rights not to make self-incriminating statements, to be considered innocent until proven guilty and to hold an opinion
- Article 6, not being informed in advance about the subject of the court hearing concerning the preventive measure applied to him and not been given time and facilities to prepare his defence

6

The European Court has accepted the application and has given it a priority status. The Court has on its own initiative, when communicating the decision to the Government, added a question to the parties on whether the applicant's detention was applied for a purpose other than those envisaged by Article 5 contrary to Article 18 of the Convention, given the applicant's active participation in the political life in Ukraine and his opposition to the Government. The Ukrainian government has contested the claims.

**The case against Valeriy Ivashchenko**

Mr. Ivashchenko has had a military career. He was Deputy Minister of Defence in 2007-09 and First Deputy Minister of Defence and Acting Minister of Defence from June 2009 to March 2010.

Investigation was opened on 20.8.2010. He was summoned as a witness on 21.8.2010 and arrested the same day. On 27.8.2010 he was indicted under Article 364.2 (abuse of office with grave consequences). A new investigation, based on the same facts, was opened on 29.10.2010 under Article 27.5 and Article 365.3 (complicity in excess of authority with grave consequences) and declared finished already on 01.11.2010, thus excluding the possibility to complaint to the court. The case was with the indictment sent to court the same day.

According to the indictment he in his capacity as Acting Minister of Defence abused his office by 18.11.2009 having signed a preliminary plan for the reorganization of the Feodosia Ship Repair Plant in the Crimea, which due to debt was to be reorganized and for which the court had appointed a reorganization manager, and thereby creating the conditions for an unlawful sale of state property, and for complicity in the activities of the reorganization manager.

Mr. Ivashchenko has been detained since his arrest on 21.8.2010. A number of motions for his release or change to less severe restrictive measures have been refused.

The trial is pending in the Pechersky District Court with a panel of 3 judges (Serhiy Vovk (presiding), Volodymyr Karaban and Oksana Tsarevych).

Mr. Ivashchenko has complained to the European Court on Human Rights on violation of
   – Article 3, inhuman treatment by refusing him medical treatment
   – Article 3, inhuman and degrading treatment by being behind bars in the court room
   – Article 5, unlawful arrest
   – Article 5, unlawful detention
The Court has not yet decided on the acceptance of the complaint.

**The case against Yevhen Korniychuk**

Yevhen Korniychuk is a lawyer by profession, specializing in international finance and business law. He was elected to Parliament and became in 2006 chairman of the Ukrainian Social Democratic Party after his father-in-law Vasyl Onopenko, a judge by profession, who at that time was elected president of the Ukrainian Supreme Court. From 2007 -2010 Mr. Korniychuk was First Deputy Minister of Justice in the Yulia Timoshenko government.

On 22.12.2010 an investigation was opened against him. The very same day he was arrested. His arrest was upheld on 24.12.2010 and on 30.12.2010 he was detained for 2 months. This decision was upheld by the Court of Appeal on 13.1.2011. On 14.2.2011 Supreme Court President Onopenko met with the President of Ukraine Mr. Yanukovitch and discussed the judicial reform and the work of the Supreme Court as well as the pending cases against his family. The next day Mr. Korniychuk was released from detention.

An investigation was also opened against the daughter of the Supreme Court President. The daughter was charged with the failure to repay on time a private loan regulated under civil law. As part of that investigation the home of Supreme Court President Vasyl Onopenko was searched. That charge was dismissed after the meeting between Mr. Yanukovitch and Mr. Onopenko.

Media has recently reported on a possible further investigation against Mr. Onopenko and Mr. Korniychuk for abuse of authority. A recent decision by Judge Rodion Kyreyev has apparently ordered an investigation into a case which had been dismissed by the prosecution as unfounded.

Mr. Korniychuk is indicted with
1. violation of Article 365.3 of the Ukrainian Criminal Code, excess of authority or official powers that caused grave consequences for as First Deputy Minister of Justice to have issued a legal opinion or law interpretation about the possibility for Naftogaz to use a single-source tender procedure to procure legal assistance from the legal firm Magisters, of which Mr. Korniychuk had earlier been a senior partner but with which he at that time had no longer any financial or business contact. The formal permission to use this procedure was given by the Ministry of Economy and the contract was signed by Naftogaz. His actions are claimed to have brought losses to the state as other legal firms could have supplied the legal assistance at a lower cost.
2. violation of Article 366.2, forgery in office that caused grave consequences as the mentioned legal document was not properly filed in the Ministry of Justice.

Mr. Korniychuk has complained to The European Court on Human Rights that
- his arrest and custody was unlawful, arbitrary and disregarded earlier findings by the courts that the alleged facts could not give rise to a criminal prosecution.
- he was not informed of the grounds for his arrest.
- the courts failed to give relevant and sufficient reasons for his detention and to examine alternative preventive measures
- the courts did not reply to his arguments concerning the unlawfulness and unreasonableness of his arrest and pre-trial detention.
- his criminal prosecution and detention have been politically motivated.

He has requested priority treatment of the case. The Court has not yet decided on the acceptance of the complaint.

The trial against Mr. Korniychuk started in court on 18.3.2011 and is still pending. Judge is Oksana Tsarevych.

8

# Observations

1. **Charges are criminalizing normal political decisions with which the present government disagrees; investigation and prosecution in the Criminal Justice System requires a reasonable suspicion of an offence having been committed and that it does not serve a political purpose**

   All defendants have been significant members of the former government of Ukraine and at least some of them will want to continue their political career. Although by the present Government labeled "Fight against Corruption" most of the charges against the four former government officials seem to relate to normal political or administrative decisions with which the present government disagrees.

   This monitoring can not and can not be expected to answer with absolute certainty the question of whether these cases are the result of abuse of the legal system for a political purpose, and cannot without access to the case files and before the end of the trials decide whether the evidence is sufficient to establish a reasonable suspicion that an offence has been committed.

   However most of the charges are of a character which would never be considered a criminal offence in countries with a different legal tradition and would not be dealt with in the Criminal Justice System. Such activities might potentially draw political consequences for politicians or disciplinary consequences for public servants but not criminal. Most of the charges concern violations of Articles 364[1] ("abuse of authority or office") and 365[2] ("excess of authority or official powers") which are vaguely worded flexible articles open to interpretation. Already these fact gives grounds for strong suspicion.

   The suspicion that these cases were politically inspired and are selective justice, abusing the Criminal Justice System as part of the political struggle has also forcefully been voiced in the Ukrainian public and among other international observers. They have commented that
   - political decisions are being considered criminal offences
   - mainly politicians belonging to potential powerful political opposition groups have being targeted
   - the present administration has an evident interest in incapacitating leading opposition politicians before the upcoming elections
   - Mrs. Tymoshenko and Mr. Lutsenko were obstructed from exercising their role as party leaders through the use of and administration of detention, travel restrictions, numerous inquiries, demands to daily reviewing case files in the office of the investigator even if in possession of a full copy etc.
   - members of the present administration through years in opposition attacked the former governments for abuse of the Criminal Justice System, thus creating a public distrust that the system is corrupted

---

[1] "...willful use of authority or official position contrary to the official interests by an official for mercenary motives or other personal benefit or benefit of any third persons, where it caused any substantial damage to legally protected rights, freedoms and interests of individual citizens, or state and public interests, or interests of legal entities... The same act that caused any grave consequences shall be punishable by imprisonment for a term of three to six years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years."

[2] "...Excess of authority or official powers, that is a willful commission of acts, by an official, which patently exceed the rights and powers vested in him/her, where it caused any substantial damage to the legally protected rights and interest of individual citizens, or state and public interests, or interests of legal entities...Any such actions as provided for by paragraph 1 or 2 of this Article, if they caused any grave consequences, -
shall be punishable by imprisonment for a term of seven to ten years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years."

and can be and is abused; this opinion is now being reinforced by some of the defendants´ statements and behavior

- Mr. Nemyria, the former Deputy Prime Minister and confidant of Mrs. Tymoshenko was called as a witness by the court exactly at the time which would prevent him from going to Strasbourg at the time when President Yanukovitch was talking to the Parliamentary Assembly of the Council of Europe, Mrs. Tymoshenko herself also being prevented from going by the travel restrictions and the ongoing trial
- the Supreme Court President described the case against his son-in-law Mr. Korniychuk and daughter as an attempt to put pressure on himself
- Mr. Korniychuk was released and the investigation against the daughter of the Supreme Court President cancelled immediately after Mr. Onopenko's meeting with the President
- Mr. Lutsenko in his time as Minister of Interior was attacked for being harsh to some of the persons who have now come to power
- Mrs. Tymoshenko´s gas deal with Russia went against the interest of some persons close to the present government
- the investigation and detention regime is administered surprisingly severely and have violated human rights
- the Prosecutor General Viktor Pshonka on his appointment in the media was quoted for saying that he considered himself to be a member of the team of the President and would fulfill his orders

etc.

In the case against Mrs. Tymoshenko the political nature of the Kyoto case is seen in the description of the consequences[3] and of the motivation[4]. It also seems difficult to recognize a criminal offence in Mr. Korniychuk´s writing a legal opinion, Mr. Lutsenko´s exceeding the budget etc. These acts would in other countries be considered normal political activities for a prime minister or a minister and should not constitute criminal offences as described in Articles 364 and 365 of the Ukrainian Criminal Code.

Article 5 of the European Convention of Human Rights demands as a minimum requirement for any limitation to the personal freedom a reasonable suspicion that an offence has been committed. If the purpose of the investigations is to serve a different purpose than those for which it has been prescribed, i.e. promote a political aim not protected by the law by prosecuting opposition politicians for acts for which others are not being prosecuted and thus not to treat everybody equally according to the law, the justice is selective and unfair and violates Article 18 of the Convention.

In the national Criminal Justice System it is the task of the Government to prove the guilt of the defendant, including that there is a reasonable suspicion of having committed a criminal offence. In the European Court of Human Rights it is however the obligation of the applicant / defendant to prove beyond reasonable doubt that the investigation and prosecution is an abuse by the national authorities based on political motivation and that there is no cause for suspicion. That will most often be impossible

---

[3] «…undermining of international reputation of Ukraine in the eyes of the Kyoto member states…"
[4] «…for her own interest…to avoid detrimental consequences for herself as the Head of Government in case of failing to perform the state obligations…" and "…to ensure financing of the state budget expenditures…in unfavorable situation…to perform state obligations…"

to lift that burden of proof. In the Khodorkovskiy case[5] a similar motion according to Article 18 of the European Convention on Human Rights was answered negatively.[6]

## 2. The courts and the prosecution must be independent and impartial

Among the interlocutors it has been a widespread opinion that the Ukrainian courts cannot be considered independent and impartial at least in cases related to politics. National surveys confirm that impression with more than 2/3 expressing distrust in the prosecution and the judiciary. Corruption and problems with lack of independence in the judiciary of Ukraine has been a concern of international observers, also mentioned in resolutions of the Council of Europe and the European Parliament, by European Commissioners and confirmed in corruption indexes.

There are both structural and traditional reasons for this situation. According to the European Convention on Human Rights Article 6.2, anyone who is charged with a violation of the law must be considered innocent until his guilt has been proven. However only 0.2 % of the indicted persons are acquitted by the courts of Ukraine against around 10 % in other countries. Courts in Ukraine granted 88% of the requests (2010) to remand in custody as a precautionary measure. Such figures are strong indicators of a judiciary much too willing to follow the claims of the prosecution and much too afraid to confront it. The success rate of the investigation is a worrying 90 %, which is far above what you see and can expect in countries with a tradition of respect for the rights of the defendant. No wonder that anyone who is under investigation or has been indicted consider themselves as already sentenced in the legal system and fight for their freedom also through non-judicial means, and that public officials can be tempted to give public statements as if the defendant is already convicted. That was the tradition in which many have grown up in Soviet times..

The monitoring of the four cases has left the impression of prosecutors and judges with limited understanding for the presumption of innocence and equality of the parties during the trial. This attitude has invited confrontations with the defence, which giving up on a fair legal process tends to try to influence the development through media and politics. In the court room politicians have been seen to abuse their parliamentarian immunity by insulting and threatening the judges and not respecting his decisions.

---

[5] Khodorkovskiy vs. Russia (31.5.2011)

[6] " The travaux preparatoires for Article 18 indicates that the drafters of this provision were concerned to ensure that an individual was thereby protected from the impositions arising from a desire of the State to protect itself according "to the political tendency which it represents" and the desire of the State to act "against an opposition which it considers dangerous"... An applicant alleging that his rights and freedoms were limited for an improper reason must convincingly show that the real aim of the authorities was not the same as that proclaimed (or as can be reasonably inferred from the context). A mere suspicion that the authorities used their powers for some other purpose than those defined in the Convention is not sufficient to prove that Article 18 was breached...

When an allegation under Article 18 is made the Court applies a very exacting standard of proof; as a consequence, there are only few cases where the breach of Convention provision has been found. Thus, in Gusinsky vs. Russia ...the Court accepted that the applicant's liberty was restricted, inter alia, for a purpose other than those mentioned in Article 5... In Cebotari vs. Moldova...the Court found a violation of Article 18... However such cases remain rare ... Particularly, the Court notes that there is nothing in the Court's case-law to support the applicant's suggestion that, where a prima facie case of improper motive is established, the burden of proof shifts to the respondent Government. The Court considers that the burden of proof in such a context should rest with the applicant....

The applicant strongly relies on those opinions; in particular, he relies on resolutions of political institutions, NGOs, statements of various public figures, etc. The Court took note of those opinions. However, it must recall that political process and adjudicative process are fundamentally different. It is often much easier for a politician to take a stand than for a judge, since the judge must base his decision only on evidence in the legal sense....

It is not sufficient for this Court to conclude that the whole legal machinery of the respondent State in the present case was ab initio misused, that from the beginning to the end the authorities were acting with bad faith and in blatant disregard of the Convention. This is a very serious claim which requires an incontrovertible and direct proof. Such proof, in contrast to the Gusinsky case, cited above, is absent from the case under examination"

Several interlocutors have mentioned a legal possibility and wide spread practice of the courts to remit cases back to the prosecution for further investigation, adaption or correction of the indictment, where the evidence does not sufficiently support the indictment. Remittal of cases to the prosecution for additional investigation is unacceptable and can violate principles of presumption of innocence, equality of arms and reasonable time of the trial. The court should not try to correct the prosecutor's mistakes; if the evidence is not sufficient to make a conviction or even to proceed with a trial the defendant should be acquitted.

There is also a strong tradition of politicians not respecting the independence of the judiciary. A revealing example was recently seen, when a press release explaining the proper understanding of the statement given by one of the witnesses in the Tymoshenko case was proven to be written in the predidential administration although it appeared to be issued by the witness herself. Also statements and interviews by leading officials, including the President and the Prime Minister, have commented on the trials in such a way that it clearly sends a signal to the judges about the desired and expected outcome of the trial. That is illustrated in an interview on 28.6.2011in which President Yanukovych described his meeting with the chairman of the Constitutional Court concerning one of the politically controversial issues under consideration at that moment in the Court, a law adopted by the parliament and signed by the President but now challenged as unconstitutional in the Constitutional Court. At the meeting Mr. Yanukovych expressed his concern with the possibility of declaring the law he signed as unconstitutional and asked the chairman of the Court to relay his position to the Justices of the Court.

A judicial reform was implemented in the summer of 2010, which although in some ways improving the conditions of the legal system as a whole was criticized by the Council of Europe's Venice Commission. Unacceptable decisive influence on the appointment of, the disciplinary measures against and the dismissal of judges attributed to the Higher Council of Justice has been seen as a major factor that has increased the dependence of the judiciary from the executive power. The Higher Council of Justice has a heavy political bias and has membership of the Prosecutor General and 2 of his deputies etc.

Ukraine committed itself to reforming the Prosecutor's Office when joining the Council of Europe, but nothing has been done in that respect. The effect is that the Ukrainian General Prosecutor holds an immensely powerful function not much different from the Prokuratura of Soviet times. His tasks are not only to deal with traditional prosecution but also to have a general oversight and legality control function, which in most other European countries is to be found in an Ombudsman institution. Ukraine does have an Ombudsman, but with different functions.

Additionally the Prosecutor General has a control function towards the Judiciary. The prosecution last year initiated 600 disciplinary cases against judges according to a public statement by the Deputy Prosecutor General and information indicates that at least 38 judges have been dismissed against an average of 6½ in the previous years. If the background is the fight against corruption it is remarkable that only few of the dismissals follow a criminal conviction against the judge. The judges must feel their independence under strong pressure from a dominating influence of the prosecution on their future. Whatever the need to discipline the judges, prosecutors should definitely not be responsible for it; that disturbs the point of balance between prosecution and judiciary. Especially with a prosecution which apparently has not yet understood that its role must change. A remarkable example to demonstrate the point is a disciplinary case with demand of dismissal raised against 3 judges of the Kyiv Court of Appeal

for having on 24.5.2011 quashed a decision by the Pechersky District Court on continued detention and replaced it by undertaking not to abscond. On 7.6.2011 Deputy Prosecutor General M.Havrylyuk, who is also a member of the Higher Council of Justice, initiated disciplinary proceedings in the Higher Council of Justice against the 3 appeal court judges for having ignored the opinion of the prosecutor, unreasonably interfered with the course of pretrial investigation and taken one-sided position in favor of the defendant. He found the findings by the judges of appeal to be "biased and untrue". So when judges of the Court of Appeal takes Ukrainian law and the European Convention on Human Rights serious and demand that the investigator document the presence of specific information to support the risk of escape, influencing the investigation etc. a disciplinary case is opened and their dismissal demanded by the prosecution!

Problems of the judicial reform are also illustrated by the fate of the Supreme Court which had its power and number of judges cut. It was seen by many as a move to limit the power of an institution whose president was assessed to have an incorrect political attitude.

A comprehensive reform of the Criminal Justice System is required in order to secure its independence and impartiality in accordance with European standards, especially to ensure its compliance with the requirements of the European Convention on Human Rights. Composition of the Higher Council of Judges and the role of political bodies of Parliament and President in the appointment and dismissal of judges is a particular concern. A reform of the judicial system must secure the effective independence of the judiciary from the oversight and control of the prosecution and the executive.

3. **The selection of the judges has probably violated both Ukrainian and international law.**
Judges are in Ukraine not appointed for an unlimited time until they have served for five years. Their first appointment is made by the President of Ukraine upon proposal of the Higher Council of Justice. After that period their permanent appointment is to be approved by the Parliament where one would fear political and not necessarily professional assessments to be predominant. That gives judges little room for independence of the political executive power especially during those initial 5 years in the office.

Judge Oksana Tsarevych is the judge in the Korniychuk case and one of the three judges in the Ivashchenko and Lutsenko cases. She has only recently (19.11.2010) been appointed to her first temporary 5 years term as a judge and her permanent appointment as a judge is later to be confirmed by the Parliament. Judge Tsarevych was also sitting on the panel of judges (with presiding Judge Vovk – see below) hearing the joined case against other former senior officials from the Tymoshenko government – Didenko, Makarenko, Shepitko and others.

Judge Serhiy Vovk is the chairman of the panel of judges in the Ivashchenko case and the judge in the Lutsenko case. He was also the judge who made the decision on the initial detention of Mr. Korniychuk, as well as for the preliminary hearing on the cases of Mr. Makarenko, Mr. Didenko and Mr. Shepitko, who are all related to the former government. He was approved by Parliament as a permanent judge as recently as 13.2.2011. Last year he was twice under investigation conducted by the Higher Council of Justice, last time by the HCJ member Mr. Portnov, who is a senior official in the Presidential Administration responsible for judiciary-related powers (first appointments and dismissal of judges, creation and liquidation of courts etc.). In neither case were reasons to dismiss Judge Vovk found.

Judge Rodion Kyriyev in the Tymoshenko case is two years into his initial 5-years term (appointed 13.5.2009) and not been permanently appointed. He was by presidential decree of 20.4.2011 transferred to the Pechersky District Court from Beresan.

Judge Medushevska in the Lutsenko case is also in her initial 5 years term, having been appointed 14.02.2011.

Judge Karaban in the Ivashchenko case is a permanent judge, having been elected by the Parliament on 21.05.2009

According to article 16-2 in the Criminal Procedure Code of Ukraine a court shall have an automated case management system which shall provide for an objective and unbiased assignment of cases among the judges. The purpose is to have the judge in a criminal trial selected by random procedure in order to avoid "forum shopping" among the judges, selecting special judges who are not unbiased or independent. According to the reply by the Pechersky District Court to the Parliament no records of the automated case assignments are kept in the court. It is unclear how one can then ensure and control the integrity of the automated case assignments.

The Pechersky District Court, which is the forum for most of the cases against the politicians from former governments, has 35 judges. Although some may be disqualified due to earlier decisions in the cases during the investigation and although some may not be security cleared for classified information the concentration of the cases against opposition politicians on so few judges strongly indicates that the computerized random procedure has not been followed and raises the question on the reason for that. One can wonder that the judges selected for such spectacular and political loaded cases are so young, inexperienced, exposed and vulnerable to political pressure.

Article 54 of the Criminal Procedure Code prescribes that a judge may not participate in the trial of a criminal case if the procedure for assigning him has not been followed. It is a violation of Ukrainian national law if the judges have not been selected by the computerized random procedure and the consequence the disqualification of the judge.

The European Court on Human Rights does not demand such a computerized random procedure, but underlines the requirement that judges must be independent and impartial. It has strong reservations against, but does not totally exclude the possibility of this being the case even if the appointment of the judge is not permanent. The Court has not considered it to be a violation of the Convention in cases where the judge for a case is selected by for instance the President of the Court, if only he has respected the demand for objective independence and impartiality. In the case *Salov vs. Ukraine* (6.9.2005) the Court however pointed at the importance to independence of inter alia the manner of appointment of the judges and their term in office, the existence of safeguards against outside pressures and the question whether it presents an appearance of independence. That was not found to be the case and Ukraine was subsequently in that case found to have violated the Convention.

**4.** **The arrest and detention of Mr. Ivashchenko, Mr. Lutsenko and Mr. Korniychuk was a violation of their rights as the need to restrict their rights to liberty and security was not justified by the court.**

**The extension of the detention of Mr. Lutsenko and Mr. Ivashchenko violated their rights as it was not justified by the court and did not set a time limit.**
**In general the widespread use of detention in Ukraine is a concern.**

On arrest and detention

In the Ivashchenko case the ruling of the court of 24.8.2010 detaining Mr. Ivashchenko is nothing but a standard repetition of the words of the law with no individual assessment of and justification for the presence of individual circumstances required by the law[7]. That is also the case in the Korniychuk case and the Lutsenko case[8], in which the court stated that the applicant had sought to evade the investigative actions and decisions of the investigator, that he was accused of a crime punishable by imprisonment from 3 to 7 years, that he had not admitted his guilt and had refused to testify, and that he was capable of influencing the investigation and putting pressure on the witnesses, either personally or through others. Reference in the Lutsenko case to non-admission of guilt and refusal to testify violates his fundamental right not to self-incriminate. Similarly non-cooperation with the investigation is not a valid ground for detention.

In neither of these cases have the courts "…examined all the facts arguing for or against the existence of a genuine requirement of public interest justifying, with due regard to the principle of the presumption of innocence, a departure from the rule for individual liberty and set them out in their decisions on the applications for release[9]". It is not sufficient to have "…cited the relevant law, without showing the reasons why they considered to be well-founded the allegations that the applicant could obstruct the proceedings, abscond or re-offend[10]". The decisions on detention failed to provide individual justification for the legality of the use of detention with regard to the specific facts of the case, as required by the European Court on Human Rights.

On extension of detention

The detention of Mr. Ivashchenko has been extended several times since August 2010 and of Mr. Lutsenko since December 2010, also after the start of the trials. Motions for release have been refused generally with short statements that the judge has found the motions for release "unfounded".

A person charged with an offence must however always be released pending trial unless the State can show that there are "relevant and sufficient" reasons to justify the continued detention[11]. The presumption is therefore in favor of release unless the State can convince that the accused will fail to appear, will take action to prejudice the administration of justice, commit further offences or cause public disorder. It is not up to the defendant to prove that he will not, the burden of proof is on the State. The Court must examine all the facts arguing for or against the existence of a genuine requirement of public interest justifying, with due regard to the principle of presumption of innocence, a departure from the rule of respect for individual liberty and must set them out in their decisions. Arguments for and

---

[7] "…taking into account severity, the nature and circumstances of the crime, in committing of which Ivashchenko is suspected, his marital and financial status, state of his health and other circumstances that characterize him, and also the investigator gave sufficient evidence that the suspect Ivashchenko, being at liberty can evade the investigation and liberty can prevent establishment of the truth in the case, came to the conclusion that there are sufficient grounds for the applying…remand in custody as a preventive measure".
[8] "the case materials have data that indicate a possibility by Yurij Lutsenko personally and through others in the future to hamper the exercise of procedural decision in the case and the effect on witnesses".
[9] Letellier vs. France (26.6.1991)
[10] Boicenco vs. Moldova (11.7.2006)
[11] Wemhof vs. Germany (27.6.1968) and Yagci and Sargin vs. Turkey (8.6.1995)

against release must not be "general and abstract", but contain references to the specific facts and the applicant's personal circumstances justifying his detention[12].

Even if there is a risk it does not necessarily mean that the defendant must continue to be detained. It is an obligation for the court to explain in their decisions why alternatives would not ensure that the trial would follow its proper course. The domestic court ought to have considered whether other less intrusive preventive measures could have been applied, and whether they were capable of reducing or removing completely the risk [13].

The Ukrainian Criminal Procedure Code fails to regulate properly the continuation of detention when the court trial starts. In the Kharchenko case[14] the European Court on Human Rights found that the absence of any precise provisions laying down whether, and under what conditions, detention ordered for a limited period at the investigation stage can properly be extended at the stage of the court proceedings, does not satisfy the test of "foresee-ability" of a law for the purposes of Article 5.1 of the Convention. It also found that the Ukrainian practice which had developed in response to the statutory lacuna (whereby a person may be detained for an unlimited and unpredictable time without the detention being based on a specific legal provision or on any judicial decision) is in itself contrary to the principle of legal certainty, a principle which is implied in the Convention and which constitutes one of the basic elements of the rule of law. The Court has also found that the absence of any grounds given by the judicial authorities in their decisions authorising detention for a prolonged period of time is incompatible with the principle of protection from arbitrariness in Article 5.1[15]

The decisions to extend the detention in the cases of Mr. Ivashchenko and Mr. Lutsenko failed to satisfy requirements of the European Convention of Human Rights as did the extended detention without set limits during the trial stage.

<u>The widespread use of detention</u>
According to the Ukrainian Criminal Procedure Code any preventive measures, including detention are applied when there are grounds to believe that a person will try to abscond or avoid carrying out procedural decisions, impede the course of justice or continue their criminal activities, as well as to ensure the enforcement of procedural decisions[16].

The law itself is not that different from the legislation of other countries. What is different is however the widespread and indiscriminate use of detention, as also seen by the detention of Mr. Ivashchenko, Mrs. Tymoshenko, Mr. Lutsenko and Mr. Korniychuk, neither of whom would probably have been detained in countries with another legal tradition. Contributing to the problem is the tradition of not justifying the decisions described above, but also the evident compliance of the courts to the demands of the prosecution, reflecting the lack of independence of the judiciary.

It is the court's responsibility to carefully review the reasons for detention adduced by the prosecution and make a grounded decision. The court must also consider the possibility of replacing detention with

---

[12] Khodorkovskij vs. Russia (31.5.2011)
[13] Khodorkovskij vs. Russia (31.5.2011).
[14] Kharchenko v. Ukraine (10.2.2011)
[15] Solovey and Zozulya v. Ukraine.
[16] Article 148 §1

an alternative. It is however a widespread practice in Ukraine only to give general reasons for detention of the person by just repeating the provisions of the Criminal Procedure Code without assessing whether the actual facts corroborates the grounds for detention. Some Criminal Procedure Code provisions are even favouring continued detention to alternatives. For example, Article 165-3 on the procedure for extending terms of detention starts as following: "In the absence of grounds for changing the precautionary measure...", meaning that the investigator should not prove the existence of grounds for continued detention, but just needs to show that there are no grounds for a change.

A pending amendment to Art. 155 of the Criminal Procedure Code will allow detention only in cases with a minimum penalty of 5 years against now 3 years. That amendment will in itself not change the tradition of too widespread and indiscriminate use of detention.

5. **The arrest of Mrs. Tymoshenko on 24.5.2011 was unjustified by the court.**
   **The arrest and detention on 5.8.2011 was disproportionate and unjustified by the court**

Mrs. Tymoshenko was arrested on the 24.5.2011 but was released later that day. The court in its ruling of 23.5.2011 quoted the prosecution, but the court did not carefully review and assess how that information satisfied the conditions of the law as described above[17]. On 27.7.2011 the prosecution again motioned for detention, but was rejected by the judge.

On the 5.8.2011 Mrs. Tymoshenko was detained by Judge Kyreyev, based on her behavior during the trial[18]. The court concluded that if she stayed at large she could evade the court and execution of procedural decisions, would obstruct establishment of the truth in the case, why the court deemed it necessary to change the precautionary measure from undertaking not to abscond to detention.

The relevant national legislation is Articles 274[19] and 148[20] of the Criminal Procedure Code. It allows for detention (custody) during the trial if the defendant tries to avoid trial or to obstruct establishing the truth and to ensure the execution of the procedural decisions of the court. Judge Kyreyev has apparently based his decision on that being the purpose of and the result of Mrs. Tymoshenko´s behavior in court.

---

[17] ""Prosecutor stated that Mrs. Tymoshenko deliberately avoided investigative actions. Chosen undertaking not to leave the area for Mrs. Tymoshenko does not ensure her proper behaviour and execution of procedural decisions of the investigator. Mrs. Tymoshenko systematically ignores lawful demands of the investigator, obstructs establishment of the truth in the case, avoids pre-trial investigation and thus impedes realisation of the tasks of criminal justice as stated in Article 2 of the CPC. Taking into account that Mrs. Tymoshenko is at liberty I consider that the motion should be upheld partly and the PGO should be allowed to apprehend Mrs. Tymoshenko and bring her to court under guard with a view to decide on choosing taking into custody as a restrictive measure. The court resolves:
  - the motion to be satisfied in part
  - to agree to the apprehension and bringing to court of Mrs. Tymoshenko…for deciding on the matter of possible choosing of a restrictive measure in the form of taking into custody.
  - instruct the PGO to enforce the decision
The decision is not subject to appeal."
[18] "So the accused systematically takes actions in the court by which she in fact obstructs establishing the truth in the case, treats disrespectfully the court and trial participants, violates the order of the court consideration of the case, refused to mention her place of residence, refuses to give a written confirmation that she was notified of the date, time and place of the next court hearing, failed to appear in the court at hour set by the court and refused to give reasons for that..."
[19] Article 274. Imposing, revoking, or altering a measure of restraint in court: During trial, the court, with grounds present, may, by its ruling, alter, revoke or impose a measure of restraint in respect of the defendant. The court decides on the measure of restraint in the form of custody in accordance with appropriate Articles of chapter 13 of the present Code.
[20] Article 148. Objective of, and grounds for, imposing a measure of restraint: Measures of restraint are imposed on the suspect, accused, defendant, convict with a view to preventing his/her attempts to avoid inquiry, pre-trial investigation, or trial, obstruct establishing the truth in a criminal case, or continue criminal activity, as well as to ensuring execution of procedural decisions.

The decision however fails to mention which actions of Mrs. Tymoshenko "in fact obstructs the establishing of the truth". Neither does it identify which orders she has violated ("violates the order of the court consideration of the case"). This omission is important because the European Court on Human Rights requires that the "non-compliance with the lawful order of a court or in order to secure the fulfilment of any obligation prescribed by law" (as is the wording of Article 5 of the Convention) must be of a nature which the defendant has the obligation to follow, not just any order by the judge. Several arguments between the judge and Mrs. Tymoshenko have for instance been on issues whether she was obliged to rise in court and to address him "Your Honour".

That she "treats disrespectfully the court and trial participants" is not among the legal reasons for detention according to Article 5 of the European Convention on Human Rights.

The fact that she "refused to mention her place of residence" or "refuses to give a written confirmation that she was notified of the date, time and place of the next court hearing" should not in itself lead to deprivation of liberty, as long as she turns up in court, which she actually has done day after day with the only exception of one day, where she was 7 minutes late (which is what is refered to as "failed to appear in the court at hour set by the court and refused to give reasons for that"). In itself an accomplishment taking into consideration that the court decides the sessions on a day to day basis and has not established a scedule for the future sessions, which is standard practice in other countries and would allow for the parties to plan their life and their defence.

The decision on detention therefore seems disproportionate. Neither does it seem appropriate to prevent Mrs. Tymoshenko from continuing her in the eyes of the judge disturbing and offensive behavior, which must be an absolute demand if you go to the extreme of detaining a defendant who should be presumed innocent. If that is not the case you leave the impression that the purpose of the detention is different from what is stated in the decision. To try to force a defendant into cooperation through detention is obviously abuse and a violation of her rights.

The decision to detain Mrs. Tymoshenko during the trial is as is normal in Ukraine and in accordance with Ukrainian law without a time limit (see above) and cannot be appealed, as is confirmed by the Court of Appeal ruling of 12.8.2011. The lack of time limit is an evident violation of the European Convention on Human Rights and was one of the main points being critizised and found to be a violation by the European Court on Human Rights in the Kharchenko case[21].

6.  **The arrest of Mr. Ivashchenko was a violation of his right to freedom and security as he was summoned as a witness although the decision to open an investigation had already been taken.**

Mr. Ivashchenko was summoned to the investigators office on the 21.8.2010 as a witness although at that time a decision to open an investigation against him must already have been taken. Only after his arrival to the investigators office was he informed about the investigation and was arrested and later detained.

---

[21] Kharchenko v. Ukraine  (10.2.2011)

18

Similar situations have in the Khodorkovskij case[22], the Ramishvili and Kokhreidze[23] case and the Bozano case[24] been found to be violations of Article 5.1.b of the European Convention on Human Rights.  An arrest is unlawful if its outer purpose differs from the real one, i.e. if someone is apprehended as a witness but the real intend is to charge him as a defendant.

7.  **The use of travel restrictions against Mrs. Tymoshenko and Mr. Lutsenko violated their rights to freedom of movement.**
    **It was probaly also a violation that the decision was taken by an investigator, who is not a judicial authority and whose decision can not be challenged in court.**
    **In general the widespread and indiscriminate use of travel restrictions is a serious concern.**

The defendants Lutsenko and Tymoshenko both accepted travel restrictions when the investigations against them were opened, Mr. Lutsenko on 5.11.2010 and Mrs. Tymoshenko on 15.12.2010. When travel restrictions were applied they were not allowed to leave their residence (effectively meaning city of Kyiv) without the permission of the investigator. Mrs. Tymoshenko asked in numerous situations for permission to travel abroad and within Ukraine, but that has with few exceptions been refused even in weekends and on holidays. The fact that the restrictions formally were accepted and signed by the defendants obviously cannot hide the fact that it was in reality a coercive measure imposed by the authorities, because the alternative was the defendants being detained.

None of the reasons mentioned in Article 2.3[25] of the 4th Protocol to the European Convention on Human Rights seem to have been substantiated in the cases of Mr. Lutsenko and Mrs. Tymoshenko at the time the travel restrictions were introduced, as indeed does not even appear to have been invoked by the investigator. The restrictions have therefore not been proven to be necessary as is required. Restrictions in movement of a defendant may not be imposed by the authorities merely because it is convenient for the investigator to have the accused in the vicinity, to obstruct the defendant´s other undesirable activities or to put pressure on the defendant.

The decision to apply undertaking not to abscond in the cases of Mr. Lutsenko and Mrs. Tymoshenko was taken by an investigator as is generally the case in Ukraine and there is in the Criminal Procedure Code no possibility to challenge the decision in court. Undertaking not to abscond is however according to Article 149 of the Criminal Procedure Code an "alternative restrictive measure" and Rule 13 of the Council of Europe Recommendation on the use of remand in custody reads: *"The responsibility for remanding someone in custody, authorizing its continuation and imposing alternative measures shall be discharged by a judicial authority"*. A Ukrainian investigator is not a "judicial authority".

---

[22] In Khodorkovskiy vs. Russia 31.5.2011 the Court rules that as
  –    ...only hours after the start of his questioning as a witness on 25 October 2005, Mr. Khodorkovskij had become an accused when 35-page-long charges of criminal offences had been brought against him and a 9-page-long request for his detention had been filed with the court.
  –  The speed with which the investigating authorities had acted suggested that they had been prepared for such a development and had wanted Mr. Khodorkovskiy as a defendant and not as a simple witness. Therefore, his apprehension had been unlawful as it had been made with a purpose different from the one expressed.
[23] Ramishvili and Kokhreidze vs. Georgia (27.1.2009)
[24] Bozano vs. France (18.12.1986)
[25] 3. No restrictions shall be placed on the exercise of these rights other than such as are in accordance with law and are necessary in a democratic society in the interests of national security or public safety, for the maintenance of ordre public, for the prevention of crime, for the protection of health or morals, or for the protection of the rights and freedoms of others.

Travel restrictions are generally applied whenever an investigation is opened. Ukrainian law with its indiscriminate use of travel restrictions is violating the purpose of the 4th Protocol to the European Convention on Human Rights of protecting the freedom of movement unless the conditions mentioned are met.

**8.** **Handcuffing and caging in the court room is inhuman and degrading treatment**

Mr. Lutsenko, Mr. Ivashchenko and Mr. Korniychuk were all seen to be handcuffed when they arrived in court during their detention and were installed in a caged dock in the court room, where they remained during the entire court sessions. All communication with the judge and with their defence counsels was through the bars. This apparently is the general practice in Ukraine for defendants in detention, although exceptions have been seen[26].

Mr. Lutsenko was both during examinations in the General Prosecutor's Office and during the period of preliminary investigation guarded by 7 policemen and during examinations he was constantly handcuffed to a policeman.

In a recent judgment in the Khodorkovskiy case[27] the European Court on Human Rights found it to be a violation of Article 3 of the European Convention on Human Rights as Mr. Khodorkovskiy had been humiliated by the security arrangements in the court room during the hearings. He had been accused of non-violent crimes, had no criminal record, and there had been no evidence that he was predisposed to violence. Despite that, he had been kept in the cage throughout the trial, exposed to the public at large, which had humiliated him, at least in his own eyes, and aroused in him feelings of inferiority.

The same was the outcome in the Ramishvili and Kokhreidze case[28], where the European Court on Human Rights found it to be undermining the principle of presumption of innocence and a humiliation of the defendant that he as a public figure, not earlier convicted and behaving orderly during the criminal proceedings were placed in a caged dock during the public hearings.

In the Gorodnitchev case[29] it was stated to be a violation that a detained defendant was presented in court in handcuffs although there was no reason to presume that he presented a risk to others or the trial.

None of the defendants in the monitored cases are charged with violent crimes, they have no relevant criminal records and there is no information about them being prone to violence in the court room. The court sessions have been broadcasted on TV and there have been media and audience present. The similarity between the cases leave little doubt that also the handcuffing and caging of the defendants Lutsenko, Ivashchenko and Korniychuk is a violation of Article 3 of the European Convention on Human Rights on inhuman and degrading treatment as it would be in other cases in Ukraine with a similar background.

---

[26] Mrs. Tymoshenko was hand cuffed when taken away after her arrest on 5.8.2011 but has not been caged during the court sessions since. The former external surveillance chief in the Interior Ministry, Oleksiy Pukach, who is in detention and charged with the murder of journalist Georgy Gongadze is neither handcuffed nor caged during the trial against him.
[27] Khodorkovskyj vs. Russia (31.5.2011)
[28] Ramishvili and Kokhreidze vs. Georgia (27.1.2009)
[29] Gorodnitchev vs. Russia (24.5.2007)

9. **Mrs. Tymoshenko´s right to defence  has been violated by the very short periods her defence counsels have had to prepare the defence**

Mrs. Tymoshenko has already at the present  stage of the trial been represented by a number of defence counsels, one of whom (Mr. Vlasenko) has been dismissed by the court and some of the later defence counsels have either themselves withdrawn or have been dismissed by Mrs. Tymoshenko. That has raised a common problem of the necessary time for the new defence counsels to prepare the defence through review of the case files. The urgency of the judge to press for a rapid trial has been remarkable and has led him to only allow the newly appointed defence counsels few days to acquaintance themselves with the case files of several thousand pages. There have been almost daily sessions in court, normally only announced by the judge at the end of the day before, making it impossible for the defence to meet with their client and prepare the defence, not to say for a new lawyer to get the time to review the case files. The defence has constantly complained about the conditions and in vain requested postponement of the case allowing them to prepare the defence.

The European Court on Human Rights has in its case law underlined the ultimate demand for a defendant to have a proper and well prepared defence present in the court room. A recent example is the Huseyn case[30], where it was found to violate the right to defence that the lawyers were given in one situation less than 100 hours and in another less than one working day to study the case file of thousands of documents. The Court states that "…an accused is entitled to legal assistance which is practical and effective and not theoretical or illusory… where it is clear that the lawyer representing the accused … has not had the time and facilities to organise a proper defence, the court should take measure of a positive nature to ensure that the lawyer is given an opportunity to fulfil his obligations in the best possible conditions… Should the …Court have concluded that there had indeed been obstacles preventing the lawyers from doing their work properly, it should have attempted to remedy the situation by removing those obstacles. For example it could have adjourned the hearings for a certain period in order or allow the lawyers to familiarise themselves with the case file to a sufficient extent".

The fact that Mrs. Tymoshenko has contributed to the situation by changing lawyers or sending them abroad can indeed frustrate a judge but does not allow for the trial to continue without the presence of a proper defence. That is an ultimate demand; If not that violates Article 6 on the right to defence.

10. **The right to have adequate facilities for the preparation of one´s defence may have been violated by the conditions granted for Mr. Lutsenko´s defence.**

In the Lutsenko case the investigator on the 13.12.2010 finished the pretrial investigation and summoned the defendant and his defence councel to review the case files of 24 volumes, each of about 300 pages, a total of about 7000 pages. The investigator prescribed the dates and which volumes they were to read on each day and they only got access to the files they were to review on that very day. They therefore had no possibility to compare with information contained in other files. The defence counsel did not get his own copy of the files, and the defence was not allowed to photograph or photocopy the files or parts thereof. During the trial they would only have their own personal notes to support their memory. The investigator considered the decision about the conditions for the preparation of the defence to be his procedural decision, and as he after 13 days found the preparations of the defence to advance too slowly Mr. Lutsenko was arrested on the 26.12.2010 and later detained, justified by the slow reading of the files

---

[30] Huseyn and others vs. Azerbaijan

and thus not adhering to the procedural decision of the investigator. The investigation was reopened on 24.12. and again finished on 21.1.2011, this time resulting in a total of 47 volumes of case file.

It is however the duty of the investigator and the prosecution to facilitate such conditions of familiarizing with the case that equality of arms and fairness of the criminal procedure in general is ensured. In this regard arbitrary limitations on the duration, dictating specific time and place or specific materials which the defendant and his counsel must respect or prohibition to make copies of the case-file could be a violation of the fair trial requirements of the European Convention on Human Rights Article 6. It is also up to the defendant to waive the right to familiarize with the case and then face consequences during the trial for not knowing details of the charges and evidence leveled by the prosecutor. However such waiver should not result in any procedural sanctions, as one should not be held liable for not exploiting ones legal rights.

In April 2011 the parliament of Ukraine passed a law which granted the courts the right to establish a time-limit for the defence to familiarize with the case-file. This law appears to target specifically the on-going cases against former government officials. From what has been seen in the pending cases it only set time limits (which as mentioned elsewhere in this report has been extremely short) but does not alter the other mentioned problems.

## 11. On Mrs.Tymoshenko and Mr. Lutsenko being removed from the court room

On occasions during the trials against Mrs. Tymoshenko and Mr. Lutsenko the judges have ruled to remove them from the court room for disturbing or offensive behavior. This is also the only remedy the judge has according to Article 272 of the Criminal Procedure Code[31].

The presence of the accused during a hearing is normally an integrated part of the right to a "fair hearing" in the European Convention on Human Rights Article 6. It is also implicit in the right to "participate effectively" in the hearing[32], the right to an adversarial trial[33] and the rights in Article 6.3.c, d and e[34].

In the Baader Meinhof case[35] the European Court on Human Rights however decided on a situation where the defendant was only able to attend the hearing for a few hours each day because of hunger strike. The Commission found no violation in the fact that the case continued partly without the presence of the defendant, due to the need for the proceedings not to stop altogether and taking into account the presence of the applicants' lawyers at the hearings and their unrestricted opportunities to consult with their clients.

In another case[36] the defendant was excluded from the courtroom for making threats against persons present in court. At that point of the proceedings the defendant was not represented by a lawyer whose

---

[31] "If the defendant breaks order in court session or disobeys requests of the presiding judge, the latter warns the defendant that, if he/she continues in the same way, he/she will be removed from the courtroom. If the defendant repeats his/her undue behavior in court session, he/she can be removed from the courtroom temporarily or for the whole trial upon court's decision. In such a case, the judgment pronounced is immediately read out to the defendant."
[32] Stanford v. UK
[33] Ziliberberg v. Moldova
[34] Colozza v. Italy; Sejdovic v. Italy, 2006
[35] Ensslin, Baader and Raspe v. FRG (decision on inadmissibility of 08/07/1978)
[36] Ananyev v. Russia, 30/07/2009

22

services he had previously waived. As a result all the evidence, including the testimony of the witnesses, was examined in his absence. The defendant was brought back to the courtroom at the end of the trial to make his final submissions. The European Court remarked that it is essential for the proper administration of justice that dignity and order in the courtroom be the hallmarks of judicial proceedings. The flagrant disregard by the defendant of elementary standards of proper conduct neither could nor should have been tolerated. However it was a precondition that the defendant could reasonably foresee that the proceedings would continue also without a defence counsel and that the judge had informed the defendant of the consequences of his conduct.

Applied to the present cases the removal from the courtroom as such for a limited time is not a violation of the right to be present, if only Mrs. Tymoshenko and Mr. Lutsenko were properly represented by a defence counsel. If that was not the case the judge should make the consequences of no lawyer being present very clear to the defendant before removing him/her from the courtroom.

## 12.  Unclear indictments might have violated the right to a fair trial and the right to defence

The indictment is the most central document in any criminal proceeding. It is supposed to describe both the cause (the criminal act or omission) and the nature (the violated articles of the law) and be sufficiently clear and detailed to allow the defendant to prepare his defence. If that is not the case the trial is not fair.[37]

The indictment in Ukraine is normally identical to the summary written by the investigator, certified by the prosecutor. The problem of the Ukrainian tradition of writing an indictment is not that it does not describe cause and nature. It certainly does but contains much, much more. It is a broad narrative of the entire result of the investigation, a mixture of statements, allegations and evidence, including resume of the statement of witnesses and prosecutor´s actions. It however does not clearly identify the criminal acts as separate from other non-criminal acts and it does not clearly connect cause to nature. The indictment in the Korniychuk case is 45 pages, in the Lutsenko case 320 pages, in the Ivashchenko case 85 pages and in the "Gas case" against Tymoshenko 73 pages. It must be almost impossible for the defense to defend his client if the criminal acts are not sufficiently clearly identified and connected to the relevant law. It also influences the court with information and evidence not necessarily to be presented during the trial. This fact might also contribute to the very high rate of convictions typical for Ukraine in general.

## 13.  It was not a violation of the rights of the defendants to refuse them a jury.

Mr. Lutsenko requested to be judged by a jury referring to Articles 124, 127 and 129 [38]of the Constitution of Ukraine. The request was dismissed by the court[39]. A similar motion was made by Mrs. Tymoshenko and was rejected as well.

---

[37] Pelissier and Sassi vs. France (25.3.1999) and Mattoccia vs. Italy (25.7.2000): " The Court considers that in criminal matters the provision of full, detailed information concerning the charges against a defendant is an essential prerequisite for ensuring that the proceedings are fair"

[38] Article 124: "…The people directly participate in the administration of justice through people's assessors and jurors.... "
Article 127: "…Justice is administered by professional judges and, in cases determined by law, people's assessors and jurors. …"
Article 129: "…Judicial proceedings are conducted by a single judge, by a panel of judges, or by a court of the jury…."

[39] Court record of 23.5.2011 in the Lutsenko case: "In the absence of legislation on the regulation of jury trials the case will be heard by a college of 3 judges".

A jury trial in criminal cases is not as such required by Article 6 of the European Convention on Human Rights[40] (14 of the Council of Europe member states have no jury system), it is up to the national law to decide whether to introduce one. The lay element mentioned in the Ukrainian Constitution has never been implemented in Ukraine by law. Under these circumstances it is hardly unexpected and does not violate the Convention that the courts dismissed the requests, for how should the courts select jury members, what should be the weight of their votes compared to the judges, should they decide the question of guilt or also of the sentence etc.? All such questions can only be decided by law and not by a court in a specific case.

According to information by the Prosecutor General to the EU ambassadors the new Criminal Procedure Code will introduce a jury system.

### 14. There is at this stage insufficient information to conclude whether the rights of Mrs. Tymoshenko and Mr. Lutsenko were violated when the judges refused their motions for recusal.

Both Mr. Lutsenko and Mrs. Tymoshenko have brought numerous motions to have judges replaced based on a number of arguments. All motions have been rejected by the judge according to the procedure prescribed in the law.

The issue of recusal of a judge is regulated on the national level by Articles 54-57[41] of the Ukrainian Criminal Procedure Code. They leave it to the judge himself to make a ruling on his own ability to be

---

[40] Callaghan vs. UK

[41] Article 54. Circumstances precluding judge's participation in the trial

1)   A judge or people's assessor may not participate in the trial of a criminal case:
  1)   if he/she is a victim, civil plaintiff, civil defendant, or a relative of any one of them, as well a relative of the investigator, inquirer, prosecutor or the accused;
  2)   if he/she has participated in the case concerned as a witness, expert, specialist, translator, inquirer, investigator, prosecutor, defense counsel, or representative of the victim or civil plaintiff or civil defendant's interests;
  2-1)   if he/she, at the stage of pre-trial investigation of the case, decided on the search, removal, inspection, imposition or alteration of measures of restraint, extension of custody or considered challenges against apprehension or decisions to deny instituting criminal proceedings or to close the case;
  2-2) if he/she, at the stage of pre-trial investigation of the case, considered the removal of a defense counsel from the case as prescribed in Article 61-1 of the present Code;
  3)   if he/she personally or his/her relatives are personally interested in the results of the case;
  4)   with other circumstances present, which raise doubts as to the objectivity of the judge or people's assessor;
  5)   in the event of violation of the procedure for assigning a judge to hear a case set forth by paragraph three of Article 16-2 of this Code";
      Persons who are relatives may not be on the panel which tries a case.
Article 56. Disqualifying a judge
With circumstances referred to in Articles 54 and 55 of the Code present, the judge and people's assessor are required to disqualify [recuse] themselves. On the same grounds, disqualification of the judge or people's assessor may be proposed by the prosecutor, defendant, defense counsel, victim and his/her representative, civil plaintiff and civil defendant and their representatives.
Disqualifications are submitted before the beginning of the trial. Thereafter, disqualification is permitted if a ground for disqualification came to the knowledge after the beginning of the trial.
Article 57. The way in which a disqualification is considered
When disqualification of a judge or people's assessor is sought, the court must hear the person whose disqualification is sought, if the latter wishes to provide a clarification, as well as the opinion of the participants in the trial.
The decision on an application for disqualification shall be adopted in the deliberation room, by an order of the court hearing the case. The decision on an application for disqualification of several judges or of the entire composition of the court shall be adopted by a simple majority of the votes.
In the event of satisfaction of an application for disqualification of a judge hearing a case alone, the case shall be heard in the same court by another judge, to be determined in accordance with the procedure established by paragraph three of Article 16-2 of this Code.
In the event of satisfaction of an application for disqualification of one of the judges or of the entire composition of the court, if the case is heard by a panel of judges, the case shall be heard in the same court by a panel of the same quantitative composition of judges without the participation of the disqualified judge or by a different panel of judges, to be determined in accordance with the procedure established by paragraph three of Article 16-2 of this Code.
Should it prove to be impossible to form a new composition of the court as a result of satisfaction of the applications for disqualification (self-disqualification) or on grounds specified in Article 55 of this Code, the court shall decide on referring the case to another court in accordance with the procedure established by this Code.
In the event of disqualification of a people's assessor, the latter shall be replaced with another people's assessor.

unbiased and objective. He is even to raise the issue on his own initiative also without a motion if he feels there is a problem. His ruling can not be appealed.

The Ukrainian law as such is not different from that of most other countries. The risk of another procedure is that it would kick open a door for any defendant or his lawyer to effectively stop a trial by repeated postponements through motions for recusal. In the monitored cases the defendants and their lawyers certainly have not held themselves back from forwarding motions on recusal whenever a decision by the judge went against them. For instance a motion by Mrs. Tymoshenko for recusal of the judge was based on his refusal to move to another and bigger court room which should allegedly have demonstrated his partisanship.

Some motions have however been more specific in their claims that the judges are not impartial and independent.

Mr. Lutsenko has i.a. argued that Judge Serhiy Vovk has a direct personal interest in finding him guilty. When he headed the Ministry of Interior, a criminal investigation was initiated against Judge Vovk for forging a court ruling, stealing civil cases and fraudulent appropriation of land. Mr. Lutsenko argues that this investigation has not been definitively closed and the judge is therefore alledgedly susceptible to influence from the prosecution. According to the Prosecutor's General Office a criminal case against Judge Vovk was closed in February 2010 and there is no legal posibility for the Supreme Court to change that decision. Mr. Lutsenko has however presented copies of a submission by the Deputy Prosecutor General dated 20.4.2010 requesting the Supreme Court to quash the ruling of the local court whereby the criminal case against Judge Vovk was closed and of a resolution by the Supreme Court of 9.9.2010 ordering a joint meeting of the two Supreme Court chambers to consider the application by the Deputy Prosecutor General. If Judge Vovk is under any kind of risk of having the criminal case against him reinstated he must be disqualified.

Mrs. Tymoshenko has i.a. argued that Judge Rodion Kyriyev is not impartial and is dependent on the First Deputy Prosecutor General Renat Kuzmin, who is a member of the Higher Council of Justice which considers complaints and decides on the disciplinary liability of judges. Mr. Kuzmin is also in charge of the investigatory department of the Prosecutor General's Office and has as such approved the indictment in the case of Mrs. Tymoshenko. The motion was refused by the court, referring to the Higher Council of Justice being a collective organ where no member has decisive influence. The argument that Judge Kyreyev is to be excluded because of the role and the composition of the Higher Council of Justice will disqualify any Ukrainian judge, although this fact indeed does attest to the general problem of judicial independence in Ukraine and for example explains the strong criticism from the Council of Europe's Venice Commission against the composition and role of the Higher Council of Justice.

The case law of the European Court on Human Rights requires that the applicant's motion to replace the judge for fear of lack of impartiality and independence must be substantiated and objectively justified by specific prior activities of the judge or by his conduct in or outside the court. The personal impartiality and independence of a judge must be presumed until there is proof to the contrary.

Taking into account that the judiciary has so little public trust it might however be considered to open up for some possibility for appeal against the recusal decision or other measures in order to increase confidence in the decision, if it could be done without preventing the trial from moving forward.

15. **Postponement of proper medical examination and treatment may be a violation of Mr. Ivashchenko rights not to be inhumanely treated.**

Mr. Ivashchenko complained about health problems during his detention and was seen by doctors attached to the detention center. Following a deterioration of his health the court on 27.4.2011 decided to have him examined at the Military Hospital, where he had been observed and treated since 1995. The prosecutor protested against the use of the Military Hospital, as the relevant regulation instructs normal hospitals to be used and also found the Military Hospital biased because the doctors there had been subordinate to Mr. Ivashchenko. Because of the protest the Escort Department of the Militsia refused to transport Mr. Ivashchenko to the hospital. The decision of the court was therefore not implemented. Only 20.5.2011 after another decision by the court was he was finally taken to the Kyiv Hospital of Emergency Aid and examined from 20. to 24.5.2011. The medical certificate described a number of problems, i.e. autoimmune thyroiditis (reduced function of the thyroid gland) and prescribed additional examinations by specialists, including an oncologist. Mr. Ivashchenko was not until 10 days later informed about the results of the examination and was not he given any relevant treatment, nor was he given the possibility to discuss his medical problems with a doctor.

Not until 18.07.2011 was Mr. Ivashchenko examined by doctors of the Kyiv Center of Endocrinology. The examination confirmed the necessity of hospital treatment in a neurological department. There were also recommendations about diet due to liver disease (reduced blood protein and excessive rate (more than twice) of cholesterol).

To establish this diagnosis took almost 3 months from the first complaint in court. The state has an obligation to take care of the health of detained persons. This includes both examination and treatment without delay, also by specialists not available in the prison. This has been stated in a number of cases on Article 3 of the European Convention on Human Rights on inhuman treatment. Article 37 §2 of the Council of Europe "Recommendation on the Use of Remand in Custody" reads: *"Remand prisoners shall be given the opportunity to consult and be treated by their own doctor... if a medical ... necessity so requires...".* Thus the interest of the detained client in his own health can not be ignored by the authorities. Unless other interests (security etc.) dictate otherwise the wishes of the detainee must be taken into consideration.

16. **If the judge, the defendants and the lawyers were not able to perform due to the conditions in the court room it may have been a violation of the right to a fair trial and to defence.**

The temperatures in the small court room during the first trial days in the Lutsenko case (23.5.2011) and the Tymoshenko case (24.- 25.6.2011) were extremely high and the ventilation non existing or very limited partly due to avoid noise from outside. The 24.6. session in the Tymoshenko case lasted from 10 am to after 18 pm with only two short breaks of less than ½ hour each. The next day (25.6.) the judge only allowed breaks of 10 and 25 minutes respectively between 10 am and 1630 pm.

The size of the court room was insufficient to accommodate the large number of people who were allowed access. 50-75 persons were sitting all over on benches and tables and were standing shoulder by

shoulder making it difficult to breathe. 10-15 TV cameras were present in the court room with cameramen and journalists. The noise from all these people whispering, talking, telephoning and loudly commenting was extremely disturbing to the judge and the defendants and their lawyers. The audience could only with difficulty hear part of what was said and due to the massive wall of TV cameras and their photographers it was impossible for many to see. The presence of TV and media had the effect that the participants acted towards the TV cameras and less towards the judge. Everybody in the court room were soaking wet with sweat and their concentration clearly limited.

The key provision of the European Convention on Human Rights in this respect is the right to a "fair and public hearing". The main purpose is to avoid the administration of justice in secret and to allow the public the possibility to control the authorities. This does not require access to the court by everyone. One would rather argue that the problem in these cases has been that by far too many people have been allowed into the room; the judge must choose either to limit the number of audience or to move the trial to another room. However the persons allowed access to the court room must be able to hear and follow the proceedings. The physical conditions in the court room and the by far too few and short breaks made it impossible for the participants to concentrate sufficiently on the case as it is the purpose of the trial. It has by the European Court on Human Rights been considered a violation if a defence counsel due to fatigue is unable to follow the proceedings, for instance because of long court sessions without breaks, and it can also be a violation of the European Convention on Human Rights if the judge does not have the full capacity to concentrate and be attentive so he can follow the proceedings and make an informed decision[42].

In general TV cameras can play a role in the public control, but if it changes the trial to a TV performance the whole purpose of the trial is endangered. This is also the position of the Council of Europe[43] and of the Consultative Council of European Judges[44]

---

[42] Makhfi vs. France. 19.10.2004

[43] Recommendation of the Committee of Ministers to member states on the provision of information through the media in relation to criminal proceedings: "Live reporting or recordings by the media in court rooms should not be possible unless and as far as expressly permitted by law or the competent judicial authorities. Such reporting should be authorized only where it does not bear a serious risk of undue influence on victims, witnesses, parties to criminal proceedings, juries or judges"

[44] "Opinion no 7 (2005) of the Consultative Council of European Judges (CCJE) to the attention of the Committee of Ministers on justice and society":

44. The question of whether TV cameras should be allowed into courtrooms for other than purely procedural purposes has been the subject of wide-ranging discussions, both at the 2nd Conference of European Judges …and at meetings of the CCJE. Some members of the CCJE have expressed serious reservations about this new form of public exposure of the work of the courts.

45. The public nature of court hearings is one of the fundamental procedural guarantees in democratic societies. While international law and national legislation allow exceptions to the principle that judicial proceedings should be conducted in public, it is important that these exceptions should be restricted to those permitted under article 6.1. of the ECHR.

46. The principle of public proceedings implies that citizens and media professionals should be allowed access to the courtrooms in which trials take place, but the latest audiovisual reporting equipment gives the events related such a broad impact that they entirely transform the notion of public hearings. This may have advantages in terms of raising public awareness of how judicial proceedings are conducted and improving the image of the justice system, but there is also a risk that the presence of TV cameras in court may disturb the proceedings and alter the behavior of those involved in the trial (judges, prosecutors, lawyers, parties, witnesses, etc.).

47. Where television recording of judicial proceedings occurs, fixed cameras should be used and it should be possible for the presiding judge both to decide on filming conditions and to interrupt filming broadcasting at any time. These and any other necessary measures should protect the rights of the persons involved and ensure that the hearing is properly conducted.

48. The opinion of the persons involved in the proceedings should also be taken into account, in particular for certain types of trial concerning people's private affairs.

49. In view of the particularly strong impact of television broadcasts and the risk of a tendency towards unhealthy curiosity, the CCJE encourages the media to develop their own professional codes of conduct aimed at ensuring balanced coverage of the proceedings they are filming, so that their account is objective.

51. While the media plays a crucial role in securing the public's right to information, and acts, in the words of the European Court of Human Rights, as " democracy's watchdog", the media can sometimes intrude on people's privacy, damaging their reputation or undermining the presumption of their innocence, acts for which individuals can legitimately seek redress in court. The quest for sensational stories and commercial competition between the media carry a risk of excess and error. In criminal cases, defendants are sometimes publicly described or assumed by the media as guilty of offences before the court has established their guilt. In the event of a subsequent acquittal, the media reports may already have caused irremediable harm to their reputation, and this will not be erased by the judgment.

27

**17. The compulsory duty to appear before the investigator during pre-trial investigation may violate the right not to self incriminate and the right to freedom and security.**

Between December 2010 and May 2011 Mrs. Tymoshenko was questioned at least 42 times by the investigator. Some of these meetings only lasted 20 minutes (4.5.2011), 22 minutes (29.4.2011) or 30 minutes (3.5.2011). Often she only received the summons the very same day or the day before, and thus had to cancel other commitments on a short notice. Non availability of her defence councel was not considered a valid reason for postponement. Her obligation to appear when summoned prevented her from traveling in Ukraine and to have meetings abroad because of sceduled investigative actions, even if she had not been under travel restrictions.

According to the Ukrainian Criminal Procedure Code Article 135 the appearance of the accused before the investigator is compulsory[45] even though he/she is not obliged to give a statement or participate in any other investigative activity. The accused can be taken in by force if he/she does not respect the summons.

Prosecution has explained the duty to appear through the requirements of the criminal procedure legislation of Ukraine, in particular Art. 84, 85, according to which the investigator must take the appropriate protocols for each investigative action during the investigation, as well as to present and explain the nature and significance of the documents drawn up and the procedural rights of the suspect or the accused, even in cases where the latter refuses to testify against himself. The number of calls has by the prosecution been explained by the fact that Mrs. Tymoshenko repeatedly came to participate in the investigation and legal proceedings without her lawyer, forcing the investigator to carry them out on other dates.

Mrs. Timoshenko´s obligation to appear under threat of being taken in forcefully involves a risk of improper compulsion, coercion and oppression and may be a violation of her right not to self incriminate. Other countries can manage such problems without the presence of the defendant. The European Court has in the Shannon case[46] found it to be a violation that a defendant was fined for not appearing before an investigator.

In the case against Mrs. Tymoshenko the investigator has failed to organize the investigation in such a manner that it causes as little disturbance in the life and work of the defendant as possible, considering the presumption of innocence. The number of summons gives reason to the suspicion that the purpose of the investigator has rather been to harass her into cooperation or to prevent her from her functions as a politician and party leader. This case demonstrates that the obligation to appear can be a potentially powerful weapon for that purpose.

---

52. Courts need therefore to accomplish their duty, according to the case-law of the European Court of Human Rights, to strike a balance between conflicting values of protection of human dignity, privacy, reputation and the presumption of innocence on the one hand, and freedom of information on the other.

[45] In case of non-appearance without valid reasons, the accused is subject to compulsory appearance under law, meaning that he/she will be taken in by the militsia. Valid reasons for non-appearance of the accused are only untimely receipt of the notice paper, illness and other circumstances which do make it impossible for him/her to appear before the investigator in the time fixed.

[46] Shannon vs. UK (4.10.2005)

18. **A defendant does not have the obligation to cooperate with the investigator or to show proper behavior to him; to draw negative consequences can be a violation of the right to personal liberty and security and the right not to self-incriminate.**

A number of events in the monitored cases cast doubt as to the proper understanding by the Criminal Justice System of the rights of the defendant according to the European Convention on Human Rights and European standards.

An example is a letter from the Party of Regions to the EU ambassador in which the First Deputy Chairman of the "Parliamentary Committee on Legislative Support of Law Enforcement" Mr. Oliynyk, who is a former judge, is quoted: *"...the preventive measure that was applied to Yulia Timoshenko - recognizance not to leave - involves several conditions. One of them is the cooperation with the investigation. That means that person can not admit guilt, refuse to compensate losses and protect herself in accordance with the law. However, she has to cooperate with the investigation".* Mr. Oliynyk's statement is not a correct description of the legal situation. To expect the defendant to cooperate with the investigation would be a violation of the fundamental right not to self-incriminate. It is up to the prosecution to prove the guilt of the defendant and she is under no obligation to assist or cooperate with the prosecutor in this regard.

Another example is a statement issued on 28.4.2011 by the Prosecutor General's Office in which it accused Mrs. Tymoshenko of dragging out the investigation by not wanting to take part in any investigative actions without her lawyer being present. It warned that this could lead to the use of a stricter preventive measure, probably meaning detention as she was already under travel restrictions. A defendant is however under no obligation to "take part in any investigative action". She is according to the law obliged to appear when summoned, but is fully entitled not to give a statement or participate in any other activity which could contribute to her being sentenced. It is the obligation of the prosecution to prove her guilt without her assistance.

It also gives cause for concern that the prosecutor's office on 24.5.2011, the day of the arrest of Mrs. Tymoshenko, stated that if she cooperates with the investigation during that day the court order on her detention would not be effected. That could be considered a threat and coercion in order to obtain evidence which would also violate her right not to self-incriminate. The prosecution must not use its powers to force a testimony out of the defendant or seek any other "cooperation" from him/her. Obligations of the accused should not extend beyond duties explicitly provided in the law, that is not to actively obstruct the course of investigation e.g. by intimidating witnesses. A person cannot be blamed for taking full advantage of the resources afforded to the defence by national law[47].

A similar problem appears when the defendant is rude or misbehaves. The Prosecutor General Mr. Pshonka said at a meeting with the EU ambassadors on 24.5.2011 that the decision to detain Mrs. Tymoshenko was due to her conflicts with the prosecutor (not reacting to summons, not appearing and her refusal to receive summons) and that both Mrs. Tymoshenko and Mr. Lutsenko first acted as they should, but then Mr. Lutsenko started to ignore the summons of the investigator, not to appear and

---

[47] Kobtsev vs. Ukraine ( 4.4.2006).

29

answer the investigator in impolite and rude terms, "…which subsequently caused his detention". When authorizing the arrest of Mrs. Tymoshenko on 23.5.2011 the judge referred to Mrs. Tymoshenko's improper behaviour (Ms.Tymoshenko "defiantly threw out the summons" in the courtroom). However regrettable bad behavior may be it is not among the obligations of a defendant to be polite or to demonstrate proper behavior towards the investigator and the prosecutor. The sanction for not doing so can be a criminal prosecution for insulting an official according to the Criminal Code, but it can not take the form of a more restrictive measure.

**19. <u>Restrictions on Mr. Ivashchenko`s visits in detention violated his rights to family life</u>**

From his detention in August 2010 until January 2011 Mr. Ivashchenko was allowed one visit per month of one or more family members. In August by his wife, September by his daughter and son, October 2010 by his wife, November by his wife and brother, December by his wife, son and daughter and in January by his wife, brother and daughter. In February 2011 the family members were summoned as witnesses in the trial and were not allowed to visit him. He had therefore no family visits at all for 4 months until 10.6, but had an extra visit 23.6 upon special permission due to his hunger strike. Visits took place in a special room where Mr. Ivashchenko and his family members communicated through a glass partition by phone. Visits lasted on average 1 hour and not more than 2 hours.

According to the case law of the European Court of Human Rights any detention entails by its nature a limitation on private and family life and that some measure of control over prisoners' contacts with the outside world is called for. That is in itself not incompatible with the Convention. However, prisoners "continue to enjoy all the fundamental rights and freedoms guaranteed under the Convention save for the right to liberty"[48]. It is moreover an essential part of a prisoner's right to respect for family life that the prison authorities assist him in maintaining contact with his close family. The Court has in another case found the use of glass partitions and the allowed number of two family visits per month to be proportionate measures, but those were Italian cases where applicants were former mafia members who have already been convicted of numerous crimes[49].

The Ukrainian Law on Detention appears to be out of line with European standards as it is too restrictive, lacks precision in the rules governing meetings of the detainee with family members and other persons and gives an unfettered discretion to the detention centre administration and investigator on this issue.

In its 2000 and 2002 reports on Ukraine the "European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment" regretted the fact that visits generally took place in glass booths and prisoners and visitors had to use a phone. The Committee called on the Ukrainian authorities to review the conditions under which visits took place in order to ensure that as far as possible both sentenced and remand prisoners received visits in more open conditions. When reviewing relevant provisions of the Ukrainian law the CPT recognised that it may sometimes be necessary in the interests of justice to place certain restrictions on visits for particular remand prisoners. However, these restrictions should be strictly limited to the requirements of the case and should apply for the shortest possible period. On no account should visits between a remand prisoner and his/her family be banned for a prolonged period. If there was considered to be risk of collusion, it was preferable to authorise visits under strict supervision.

[48] (Hirst vs. the United Kingdom no.2  (6.10.2005)
[49] E.g. Messina vs. Italy no. 2 (28.9.2000)

In the case of Mr. Ivashchenko it should be noted that he is accused of non-violent crime, not involving organized crime, etc. The restrictions on his contacts with family members appear not to be necessary and are excessive and disproportionate. There seem to be no valid reason in general to restrict visitation rights to once a month and not to allow any physical contact with his visitors and establish physical barriers to free discussion. The prohibition of family visits for 4 months due to their status as witnesses is unacceptable. Risk of influencing the investigation could have been compensated by the attendance of prison or police officials, as is general practice in most countries. Therefore there appears to be a violation of Article 8 of the Convention on Mr. Ivashchenko´s right to private and family life.