# Exhibit 11

Printing sponsored by:

**Kodak**
All-in-One Printers



theguardian

```
The US embassy cables:
The documents
```

# US embassy cables: Gas supplies linked to Russian mafia

guardian.co.uk, Wednesday 1 December 2010 16.30 EST

A larger | smaller

Wednesday, 10 December 2008, 07:52
S E C R E T KYIV 002414
SIPDIS
DEPT FOR EUR/UMB
EEB/ESC/IEC FOR SGALLOGLY AND LWRIGHT
DOE FOR LEKIMOFF, CCALIENDO, RBOUDREAU
USDOC FOR 4231/ITA/OEENIS/NISD/CLUCYK
**EO 12958** DECL: 12/10/2018
**TAGS** EINV, ENRG, EPET, PINR, PREL, POL, UP
**SUBJECT: UKRAINE: FIRTASH MAKES HIS CASE TO THE USG**
REF: A. KYIV 2383 B. KYIV 2294
Classified By: Ambassador for reasons 1.4 (b) and (d)

**Summary**

A Ukrainian
businessman who
nominally owns the
company that
distributes gas to
the EU admits to
the US ambassador
that Russian
crime don Semyon
Mogilevich is the
real power behind
the business. He
said without
approval from the
crime boss, the
company could not
operate. Key
sections
highlighted in
yellow
Read related article

1. (S) Summary and Comment: Controversial Ukrainian oligarch Dmytro Firtash, best known as co-owner of gas intermediary RosUkrEnergo (RUE), called upon the Ambassador on December 8. Firtash did not explicitly state why he requested the meeting, nor did he ask the USG for anything, but he spoke at length about his business and politics in a visible effort to improve his image with the USG. The soft-spoken billionaire, arguably one of Ukraine's most powerful people, expressed strong support for President Yushchenko and equally strong contempt for Prime Minister Tymoshenko. He claimed that he had thwarted a coalition between BYuT and the Party of Regions (PoR) at the last minute, and was now working to build a coalition between Yushchenko's supporters and the PoR. In a lengthy monolog, Firtash described his evolution as a businessman from his beginnings as a food trader to the creation of RUE. Firtash claimed that Tymoshenko was working with Russia to eliminate RUE, and cited examples meant to prove that she was making political concessions to Russia to gain its support to do so. *He acknowledged ties to Russian organized crime figure Seymon Mogilevich, stating he needed Mogilevich's approval to get into business in the first place. He was adamant that he had not committed a single crime when building his business empire, and argued that outsiders still failed to understand the period of lawlessness that reigned in Ukraine after the collapse of the Soviet Union.* He said he cared truly about Ukraine, and saw Russian business interests overtaking the economy as the biggest threat to the country's security. Comment: Firtash's arguments and allegations are clearly self-interested; he sees Tymoshenko as a clear threat to his business. End summary and comment.

Firtash Seeks to Improve His Image

--------------------------------

2. (C) Ukrainian billionaire Dmytro Firtash, best known as co-owner of controversial gas intermediary RUE, sought a meeting with the Ambassador on December 8. Accompanying Firtash to the meeting was political consultant and AmCit Zev Furst, and Andras Knopp, the Hungarian-born number two at RUE. Firtash never specifically stated why he had sought the meeting, nor did he extend any specific requests to the Ambassador, but in the course of the conversation it was clear he tried to use the meeting to portray a positive image of himself. Furst said he was attending as a "friend and advisor" to Firtash and during the course of the meeting stated that the USG might have misperceptions about Firtash. At one point during the meeting, Firtash began to talk about "mistakes he might have made," but diverted the conversation when Furst waved him off.

Firtash's Support for President Yushchenko...

--------------------------------------

3. (C) In the meeting, which lasted two and a half hours, Firtash told the Ambassador that he was not a public person, but had recently been pulled deeper into Ukrainian politics. He admitted that he has "loyally served" as an unofficial advisor to President Yushchenko during tense gas negotiations with Russia and political crises dating back to the Orange Revolution in 2004. He reported that he met with the Yushchenko at his dacha (cottage residence) three times in the last week at the President's request. He described himself as a close friend and confidante of the President -- someone the President can trust totally. In his view, Yushchenko made a possibly fatal political error during the Orange Revolution in that he and Tymoshenko propagated the concept of two Ukraines -- an orange, more democratic Ukraine, and a blue Ukraine represented by the Party of Regions (PoR) and more focused towards the status quo. He added that this divisiveness throughout Ukraine is exactly what Russia hoped to cultivate in order to control Ukraine. Firtash felt the only way to unify Ukraine during the current political and economic crises was to form a coalition between the President's supporters and the

PoR in order to stop what he termed, "Tymoshenko's plans to offer up the country to Russia on a silver platter." (Note: On the evening of December 9, BYuT, Our Ukraine/People's Self Defense Party, and the Lytvyn Block formed a coalition, keeping Tymoshenko in power and rebuffing Firtash's hopes for a coalition between the President's supporters and the PoR. End note.)

...And Contempt for Tymoshenko

--------------------------

4. (C) Firtash defined Tymoshenko as an accomplished oligarch who had made deals with Moscow that would leave Ukraine vulnerable to Russian oligarchs in the future -- something neither he nor Ukrainian billionaire and PoR backer Rinat Akhmetov could stand by and watch happen. Firtash referred to Tymoshenko's title of "gas princess" as a misnomer; he explained that Tymoshenko did make lots of money off of a corrupt, perpetual gas debt scheme during the 1990s, but she knew nothing about the gas business. XXXXXXXXXXXX to give the false impression that she was not actively involved in business. He believed that Tymoshenko's hatred for him stems from Tymoshenko's missed opportunity to develop her own RUE back in 2005, when she was Prime Minister for the first time.

5. (C) Firtash stated that he felt Russia was strongly supporting a BYuT and PoR coalition and that such a coalition was about to be finalized on December 7, with only Regions leader Viktor Yanukovych needing to sign. He claimed that he torpedoed the coalition at the last moment by convincing Yanukovych that an alliance with Tymoshenko would never last. Firtash recounted that on December 6, Tymoshenko was on nearly every Ukrainian TV channel and in every newspaper, prophesying that a BYuT and PoR coalition agreement would be signed on the evening of December 7. Firtash was visibly delighted as he recounted how he used his television station INTER to air an interview in which Yanukovych refuted Tymoshenko's claim that a BYuT and PoR coalition was a done deal (Ref A). Responding to a question by the Ambassador on whether he worked with Akhmetov to derail a BYuT/PoR coalition, Firtash said that they had worked separately, even if they were pursuing the same goal.

6. (C) Firtash said he and Akhmetov both wanted a coalition between the President's supporters and the PoR. He claimed that he had brokered a subsequent meeting between Yanukovych and Yushchenko for the evening of December 8. He was not sure if Yanukovych and Yushchenko could form a new coalition, but saw it as the only way out of Ukraine's prolonged political strife.

From Humble Beginnings...

--------------------------

7. (C) Firtash described himself as a simple person who grew up in the village of Synkiv in the Ternopil oblast in Western Ukraine. Firtash explained he had very humble beginnings -- his father taught driver education and his mother worked in a sugar factory. He added that since his parents hated communism, they did not benefit from valuable contacts that could have helped him get into a university, which was his childhood dream. Firtash said he shared his parents' disdain for the Communist party and only agreed to join the Communist youth movement Komsomol after being locked in a party member's office for two days without food or water.

8. (C) Firtash told the Ambassador he attended an occupational institute before be drafted into the army in 1986 and studied to become a fireman after completing his military service. In 1991, when the Soviet Union collapsed, Firtash stated his parents thought it was the end of the world and he was concerned about making a living during unpredictable times. He added that he felt he was "between two countries -- one that had ended and one that was beginning." He described his future as unknown, stating he

was "living in a country with no laws and no taxes." Firtash also described himself as a "natural businessman" without a university education who "had a nose" for business opportunities, and who would make the best of the uncertainty.

9. (C) (Note: The Ukrainian newspaper "Ukrainska Pravda" researched Firtash's life and reported that Firtash was not highly educated, but was a highly decorated soldier who had used his contacts to build a canned goods and dry milk business which shipped goods first to Uzbekistan. According to press reports, Firtash's first wife and business partner Mariya Kalinovska was given credit for Firtash's first business success. This business then turned into a profitable canned goods production factory and a transportation company registered in Germany. Firtash and Kalinovska were married from 2002-2005, with Kalinovska reportedly receiving a large divorce settlement, despite efforts by former Fuel and Energy Minister Yuriy Boyko to misrepresent the true scale of Firtash's wealth. End note.)

...To Powerful Oligarch

-----------------------

10. (C) Firtash gave a detailed account of how he got into the gas business. Firtash explained that his food and commodities business, which he started in Chernivtsi in Western Ukraine with his wife Mariya, was first called KMIL, and later expanded into High Rock Holdings. Due to his commodities business, he became acquainted with several powerful business figures from the former Soviet Union. Firtash said he met Ukrainian businessman Igor Bakai in Turkmenistan who was selling cars in Ashgabat, but had bigger plans. According to Firtash, Bakai convinced then Ukrainian President Kravchuk to give him permission to buy gas exclusively for the Ukrainian market in Turkmenistan. Firtash noted that Bakai's success also sparked Firtash's interest in the gas business. (Note: In 1993 Bakai then formed the Respublika company, which later became Intergas, which set the precedent for profitable gas trading between Turkmenistan and Ukraine. Bakai would go on to be the first Head of Ukraine's state oil and gas company Naftohaz from 1998-2001. End note.)

11. (S) Firtash also described the gas business in Ukraine during the mid 1990s as particularly dangerous. Firtash said that then Prime Minister Pavel Lazarenko had hired criminals to run the Ukrainian government and used his position as Prime Minister for corruption. He added that Tymoshenko headed Ukrainian Energy Systems, where she earned her fortune. Firtash claimed that Lazarenko, Tymoshenko, and Lazarenko's Assistant Igor Fisherman divided and conquered the Ukrainian gas market. He stated that Lazarenko ordered the killings of Donetsk Governor Yevgen Scherban in 1996 and the head of Itera in Kyiv for not sharing Lazarenko's gas business philosophy. (Note: Igor Fisherman was known in the Ukrainian press as Mogilevich's right hand man who was also High Rock Holding's financial director during the late 1990s. End note.)

12. (C) Another such businessman was Igor Makarov, who founded the Itera gas trading company in 1992, which provided Turkmen gas to former Soviet republics. Firtash claimed that Makarov hired a former KGB head as his security chief to direct Makarov's gas trading empire in Central Asia. Firtash recounted that he gave Itera food commodities through High Rock Holdings, which Itera used to buy gas in-kind from Turkmenistan. Makarov then paid Firtash in cash with the proceeds of his gas sales. According to Firtash, Makarov refused to pay Firtash $50 million in 2001, which drove Firtash to explore his own gas trading business, ousting Makarov at the same time.

13. (C) According to Firtash, he hired Hungarian-born businessman Andras Knopp to negotiate new gas trading deals with Kazakhstan, Turkmenistan and Uzbekistan. Since these Central Asian countries trusted Firtash as a reputable businessman, they agreed to sign with Firtash's EuroTransGas (ETG) company, leaving Makarov's business in ruins.

14. (S) Firtash also recounted that Makarov invited him to dinner in Kyiv in January 2002, shortly after Firtash had signed the gas deals with Central Asia. Firtash added he went to that dinner not knowing if he would be beaten up or even killed for having taken Makarov's business from him. According to Firtash, Makarov was there with his head of security, Semyon Mogilevich, Sergei Mikhas, from the Solnstevo Brotherhood, and a Mr. Overin when Makarov told Firtash he would regain his gas business as easily as Firtash had taken it away. Firtash walked away from the meeting alive, and credited his ability to keep his life and his gas business to his good reputation among Central Asian leaders.

15. (C) According to Firtash, by 2002, ETG was the sole transporter of Turkmen gas to Ukraine. (Note: According to media reports, by 2005 Firtash had already created a gas trading empire that allowed him to easily transition into RUE. In addition, Firtash owns majority shares in companies in Ukraine, Estonia, Russia, Germany, Switzerland, Italy, Tajikistan, and Austria all under the umbrella of the Group DF which he formed in 2007 (Ref B). He also owns 61% of the Ukrainian Inter Media Group which owns or co-owns 7 television channels and the Ukrainian News Agency. By 2006, Firtash's estimated worth was over $5 billion, but most experts believe that Firtash had low-balled his true worth and estimated it was in the tens of billions. In his conversation with the Ambassador, Firtash gave no indication of the scope of his wealth. End note).

The Future of RosUkrEnergo (RUE)

-------------------------------

16. (C) When asked about Tymoshenko's promise to rid Ukraine of RUE, Firtash responded by making a link between Tymoshenko and Russia. He argued that the Prime Minister was seeking Russian support to get rid of RUE, and was making concessions to Russia to accomplish this goal. He specifically cited what he said was her silence on the August events in Georgia, her avoidance of a stand on the Holodomor and the issue of the Black Sea Fleet in Crimea, as examples of the political concessions she was making to Moscow. Firtash acknowledged that he was having more and more problems with Russia. He alleged that the Russians had already excused a $600 million debt that she owed from her previous gas business that could be used as pressure to get concessions from her. If Moscow really wanted to get rid of RUE, Firtash added, it could do so as long as Tymoshenko was at the helm.

17. (C) Responding to the Ambassador's question, Firtash said Ukraine's current gas debt to RUE was near $3 billion, adding that the debt was owed directly to RUE and not to Gazprom. In his view, Ukraine could only clear the debt to RUE in gas since it didn't have enough cash to pay outright. He added that according to the RUE charter with Gazprom, any shipments or supplies of gas to RUE must be confirmed by two signatures on a gas transfer document -- one signature from Gazprom -- the other from RUE (Firtash). Firtash argued that if he does not sign the gas transfer document, then legally there is no proof that gas has been supplied to RUE or Ukraine, so Gazprom forfeits its ability to demand payment from RUE, thus keeping RUE in the gas arrangement for some time. He estimated that Ukraine would have to pay RUE 12 billion cubic meters (bcm) of gas to settle the debt. This could be done by transferring Ukrainian gas already in storage to RUE, bringing RUE's reserves in storage in Ukraine up to 23.5 bcm, since RUE already has 11.5 bcm in storage (Ukraine's maximum storage capacity is 34 bcm). The gas would normally be exported to Europe at market prices, which despite falling world gas prices would still be very profitable. Firtash hinted that if RUE was removed with Russian approval, Ukraine would most likely attempt to take or steal all of RUE's gas in storage.

Ties to Russian Organized Crime

-------------------------------

18. (S) *The Ambassador asked Firtash to address his alleged ties to Russian organized crime bosses like Semyon Mogilievich. Firtash answered that many Westerners do not understand what Ukraine was like after the break up of the Soviet Union, adding that when a government cannot rule effectively, the country is ruled by "the laws of the streets." He noted that it was impossible to approach a government official for any reason without also meeting with an organized crime member at the same time. Firtash acknowledged that he needed, and received, permission from Mogilievich when he established various businesses, but he denied any close relationship to him.*

19. (S) *Firtash's bottom line was that he did not deny having links to those associated with organized crime. Instead, he argued that he was forced into dealing with organized crime members including Mogilevich or he would never have been able to build a business. If he needed a permit from the government, for example, he would invariably need permission from the appropriate "businessman" who worked with the government official who issued that particular permit. He also claimed that although he knows several businessmen who are linked to organized crime, including members of the Solntsevo Brotherhood, he was not implicated in their alleged illegal dealings. He maintained that the era of the "law of the street" had passed and businesses could now be run legitimately in Ukraine. He underscored the importance of unifying Ukraine politically in order to reduce the influence of Russian organized crime bosses on Ukrainian businesses.*

TAYLOR

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

# Exhibit 12

## Rosukrenergo AG

Postal Address: Augeristrasse 44, CH-6308 Zug, Switzerland

### Minutes of a General Meeting of

### ROSUKRENERGO AG

held July, 29 2004, at 11.00 a.m.
at the domicile of Rosukrenergo (hereinafter – " the Company")

Present:

Mr. Konstantin Schmelev, representative of Arosgas AG,
shareholder of the Company

Mr.Wolfgang Putscheck, representative of Centragas AG,
shareholder of the Company

Secretary

Mr Schmelev opened the meeting and explained that the purpose of this meeting was to form and appoint the members of Coordination Committee, corporate body of the Company which shall meet from time to time and which shall be responsible for supervision of the operation of business of the Company by the Managing Directors and Board of Directors and shall serve the forum for the ultimate shareholders of the Company to discuss about and resolve on the business of the Company outside the General Meetings. It is hereby approved that the Coordination Committee is hereby formed and shall consist of following members nominated by Arosgas AG:

Mr.Yury A. Komarov

Mr.Andrey L. Akimov

Mr.Alexander I. Madvedev

Mr.Alexander N. Ryazanov

and of following members nominated by Centragas AG:

Mr. Yuri A.Boyko

Mr.Igor P. Voronin

Mr.Wolfgang Putscheck

Mr. Robert Shetler – Jones.

Додаток 11

# Склад засновників РосУкрЕнерго



**РосУкрЕнерго**
**Rosukrenergo Aktiengesellschaft,**
**Aegeristrsse 66, CH-6300 Zug,**
**Switzerland**

**Raiffeisen Investment**
**Aktiengesellschaft,**
**Tegetthoffstrasse, 1, 1015 Wien, Österreich**

**Arosgas Holding**
**Aktiengesellschaft,**
**Tegetthoffstrasse, 1, 1015 Wien, Österreich**

500 акцій:  ?
            ?
            ?
            ?

**Centragas Holding**
**Aktiengesellschaft,**
**Tegetthoffstrasse, 1, 1015 Wien, Österreich**

498 акцій: Ю.Бойко
           І. Вороніна
           В. Путчек
           Р.Шеглер-Джонс
1 акція:   Путчек Вольфганг
1 акція:   Винльбіхлер Йорг

CHB

# Exhibit 13

# FINANCIAL TIMES

April 28, 2006 3:00 am

# Gazprom's secretive Ukrainian partner tells of lone struggle to build business

By Stefan Wagstyl and Tom Warner in London

Dmytro Firtash, the secretive 40-year-o
-billion dollar European gas market, is nervous at the
start of his first-ever media interview. He says: "I feel I am losing my virginity."

But there is nothing bashful about the way Mr Firtash explains his business and defends
himself against allegations - aired in the Ukrainian parliament - that he had links with
Semyon Mogilevich, an alleged Russian crime lord, w                    I's most
wanted list. The claims were investigated by Ukrainian law enforcement officials in a
probe that was later dropped.

"I have met Mogilevich a few times. But I have never been in any partnership with him
and have never done any business with him," says Mr Firtash, speaking in a sleek office
in Knightsbridge, central London. Dressed in a pale pin-stripe suit, Mr Firtash is
surrounded by bankers, aides and associates. But in two and a half hours, they barely
say a word. It is his story to tell, and he tells it well.

Mr Firtash has reluctantly gone public after it was disclosed this week that he is the
main partner of Gazprom, the Russian gas giant, in RosUkrEnergo, a joint venture
trading company, that earlier this year won a big contract to supply gas from central
Asia, principally Turkmenistan, to Ukraine and other European states. Gazprom owns
50 per cent of RosUkrEnergo. The other 50 per cent is controlled by Centragas Holding,
a company in which Mr Firtash has a 90 per cent stake.

It is all a far cry from Mr Firtash's humble origins in Bohdanovka, a west Ukrainian
village near the city of Chernivtsy. His father was a driver and his mother a clerk. Aged
17, he left home to study in a railway college. He worked briefly as an apprentice train
driver before serving two years in the Soviet army. When he returned from military
service in 1986, he failed to secure the necessary approvals to enter university and
moved to Chernivtsy where he got married and worked as a fireman. But with wages
unpaid and the Soviet Union crumbling, he decided to quit and strike out on his own.
"The country was in chaos, so I decided to act," he says.

Case 1:11-cv-02794-KMW    Document 23-4    Filed 12/19/11    Page 14 of 34

12/18/11                Gazprom's secretive Ukrainian partner tells of lone struggle to build busin...

He started trading, specialising in meat, butter and other foods, as well as second-hand cars. By 1990, he earned $100,000 - a huge sum by Soviet standards - and moved to Moscow in search of bigger fish to fry. But the young Ukrainian found the competition tough. In 1993, he persuaded associates to back him in a deal supplying meat on credit to Turkmenistan. When the buyer, a state company, failed to pay he travelled to Turkmenistan in pursuit of his $3m debt. The government had no cash, but the economy minister offered to pay in natural gas, of which Turkmenistan has huge reserves. The minister introduced Mr Firtash to a Ukrainian gas trader called Igor Bakai who was buying gas on behalf of energy-short U        . "He said he could buy as much gas as I wanted to sell," says Mr Firtash.

The deal became the foundation of Mr Firtash's fortune. He imported food into Turkmenistan and bartered it for gas which was sold to Ukraine where he was paid in cash with which he financed shipments of food and other goods. "This developed very quickly," says Mr Firtash, w                    1990s living in Ashgabad.

It was not easy. He was caught up in furious gas supply battles in Ukraine in which Mr Bakai fought for market share with rivals, including with Pavel Lazarenko, the prime minister at the time, and Yulia Tymoshenko, a gas trader linked to Mr Lazarenko who was later to become prime minister. The 1990s ended with the emergence of Itera, a gas trader run by Igor Makarov, w                    lies. Mr Firtash says he stuck to his side of the business - supplying goods to Turkmenistan.

Mr Firtash says, in 2000, Mr Makarov proposed teaming up with Mr Firtash to take over the entire goods-for-gas business. Mr Firtash agreed and worked through a company called Highrock Holdings.

But the market was becoming unpredictable with the Turkmenistan government demanding to be paid in cash as well as imported goods. Amid the tensions, the partnership between Mr Firtash and Mr Makarov broke and Mr Firtash set up on his own again, capitalising, he says, on his close ties with Ashgabad.

Meanwhile, following Russia's President Vladimir Putin's election in 2000, new managers were brought into Gazprom, who insisted on securing better control of its operations, including the central Asian transit trade. Gazprom squeezed out Itera. But Mr Firtash survived the change by presenting himself as an experienced trader, now with a new company called Eural Trans Gas that later hired as its non-executive chairman Cedric Brown, a former chairman of British Gas.

By 2004, Gazprom wanted a more direct stake in the transit trade. With its huge clout, it secured a new arrangement with Mr Firtash in the form of RosUkrEnergo, which began operating in 2005 and expanded its role, amid great controversy, with the signing of a new Russia-U          l in January 2006.

Mr Firtash says he secured his fortune through his     r trading strategies

Turkmenistan, his knowledge of the gas business and his sheer hard work. "I work 24 hours a day. No days off. Nobody knows this business as I do."

He insists he has worked largely on his own except in the partnership with Mr Makarov and never had any business dealings with Mr Mogilevich. Mr Firtash's background was probed by Austria's Raiffeisen Bank, w                    the RosUkrEnergo shares owned by Mr Firtash and a minor Ukrainian partner, Ivan Fursin.

Wolfgang Putschek, a Raiffeisen executive, says: "There were three questions our compliance department had to answer. First, did the client have any links to criminal activities. Second, did the client have any links to known criminals. The answer to both was a clear 'no'.

"The third question was, did the client have any links to known criminals in the past. In the course of answering that question, some issues came up. But they were explained. That is they were cleared off."

Mr Firtash is well aware that as he now prepares his company for the stock market, outside scrutiny will become more intense. But he is ready for it. "I have nothing to hide."

**Printed from:** http://www.ft.com/cms/s/0/c22fd5b4-d653-11da-8b3a-0000779e2340.html

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© **THE FINANCIAL TIMES LTD 2011** FT and 'Financial Times' are trademarks of The Financial Times Ltd.

 

# Thank you for visiting FT.com
### You qualify for a 25% standard subscription discount

- Lionel Barber, Editor, Financial Tim

t $3.69 a week for standard access to the world's leading trusted source of global business

Full digital access: online, mobile & apps.

5 year company financials archive

The 6am Cut

Save 25% now

# Exhibit 14

[illegible/ unknown handwritten notes]

**CONTRACT No.** *14/935 – 1/04*
**For Sale and Purchase of Natural Gas in 2005 – 2028**

City of Kyiv                                                                                   *July 29*, 2004

**Naftogaz Ukrainy National Joint-Stock Company**, a legal entity incorporated under the laws of Ukraine, hereinafter referred to as the Buyer, represented by Yuri Anatolievich Boiko, its Chairman of the Board, acting pursuant to the Company's Bylaws, on one part,
and
**ROSUKRENERGO AG**, a legal entity incorporated under the laws of Switzerland, hereinafter referred to as the Seller, represented by Wolgang Putschek, its authorized representative, acting pursuant to the Power of Attorney issued on July 21, 2004, on the other part,
hereinafter jointly referred to as the Parties, have entered into the present Contract on the following:

## ARTICLE 1
### Terms and Definitions

The Parties under the present Contract have agreed that the following terms and definitions will be interpreted as follows:

1.1.    "Contract" refers to the present Contract, along with any annexes thereof, incorporated by way of reference into the present document, and in consideration of possible amendments, additions, and changes therein, introduced in accordance with the provisions specified in the present Contract.

1.2.    "Party" refers either to the Seller or to the Buyer, individually, and "Parties" refers to the Seller and the Buyer jointly.

1.3.    "Natural gas" or "gas" refers to the natural gas of Turkmen and (or) Uzbek and (or) Kazakh origin as described in Article 3, and supplied by the Seller and received by the Buyer in accordance with the terms and conditions of the present Contract.

1.4.    "Cubic m" or "$m^3$" refers to the amount of dry gas which takes up the space with the volume of one cubic meter at the temperature of 20 degrees Centigrade, and at the absolute pressure of 0.101325 mPa.

1.5.    "Dew point" refers to the temperature at which condensation of water or other components of natural gas begins.

1.6.    "Pressure" refers to the gas pressure in gas transport system. Pressure is measured in mega Pascal (MPa) and may be also expressed in Bars and $kgf/cm^2$:
    1 MPA = 10 Bar = 10.1972 $kgf/cm^2$; 1 $kgf/cm^2$ = 0.98067 Bar = 0.098067 MPa

1.7.    "Day" refers to the 24-hour interval in time, beginning at 10:00 am Moscow time, and ending at 10:00 am Moscow time the following calendar day. At the summer time change, the Day lasts for 23 hours, and at the winter time change, the Day lasts for 25 hours.

1.8.    "Month of Delivery" refers to the interval in time which begins on the first day of the month under consideration at 10:00 am Moscow time, and ends at 10:00 am Moscow time on the first day of the following month.

1.9.    "Quarter of Delivery" refers to any of the periods listed below, lasting three consecutive months, and beginning on the first day of any Quarter at 10:00 am Moscow time, and ending at 10:00 am Moscow time on the first day of the following Quarter.

[stamp:] NAFTOGAZ UKRAINY NJSC
TRUE TO THE ORIGINAL
Head of the Legal Department
*January 31, 2006* [signature]

I – January – March; II – April – June; III – July – September; IV – October – December

1.10.    "Year of Delivery" refers to any of the 12-month interval of time beginning on January 1 at 10:00 am Moscow time, and ending at 10:00 am Moscow time on January 1 of the following year under consideration.

1.11.    "Monthly Volume of Delivery" refers to the volume of gas supplies calculated based on the quarterly volumes divided by three. Monthly volumes of delivery may be adjusted by the Parties in accordance with the procedure specified in the present Contract and in consideration of seasonal consumption fluctuations.

1.12.    "Average Daily Norm of Delivery" refers to the volume of gas supplies calculated based on the monthly volume of delivery divided by the number of days in the corresponding month of delivery.

1.13.    "Delivery Point" refers to the point where the right of ownership, responsibility and all of its costs and risks associated with the gas delivery shall transfer from the Seller to the Buyer. The natural gas delivery point is the point in the area of the corresponding gas measurement station where the gas transport system crosses the border of the Russian Federation and Ukraine.

1.14.    "Gas Measurement Station (GMS)" refers to the station where amount of gas and its quality parameters are measured. Results of these measurements performed at the Gas Measurement Station shall be valid for the Delivery Point.

1.15.    "Gas Measurement Stations": GMS Sokhranovka, GMS Serebryanka, GMS Prokhorovka, GMS Valuyki, and GMS Platovo.

### ARTICLE 2
### Subject of the Contract

2.1.    The subject of the present Contract includes sale and purchase of natural gas.

2.2.    The Seller hereby agreed to deliver, and the Buyer hereby agrees to receive and to pay in the period of January 1, 2005 through December 31, 2028, natural gas on terms DAF border of the Russian Federation/ Ukraine – Delivery Point, pursuant to Incoterms – 2000, in the following volumes (hereinafter referred to as the Annual Contractual Volume):

2005 – Up to 7.0 bln cu. m;
2006 – Up to 10.0 bln cu. m;
2007-2028 – Up to 60 bln cu. m.

2.2.1. The Annual Contractual Volume supplied under the present Contract in 2005 shall constitute up to seven billion cubic m (7,000,000,000) including the quarterly volumes as follows:

| | |
|---|---|
| Quarter I – | up to 1.75 bln cu. m |
| Quarter II – | up to 1.75 bln cu. m |
| Quarter III – | up to 1.75 bln cu. m |
| Quarter IV – | up to 1.75 bln cu. m |

2.3. Breakdowns of the Annual Contractual Volume supplied in the period from 2006 to 2028 shall be finalized in annual Supplements to the present Contract. The said Supplements shall be signed by the Parties no later than 3 months prior to the start of the corresponding Year of Delivery.

2.4. The Annual Contractual Volume of gas as provisioned in this Article may be adjusted based on the written agreement between the Parties, but no more than by 5% 2 months prior to the start of the corresponding Year of Delivery.

NAFTOGAZ UKRAINY NJSC
TRUE TO THE ORIGINAL
Head of the Legal Department
*January 31, 2006*

*USA, New York*
*SWIFT: BKTR US 33*
*Acc: 04-182-382*

**Multicurrency a/c:**
No. 26009001037661
in the JS Commercial Bank Ukrsotsbank, Kiev
SWIFT: UKRS UA UX
OPERU Branch
*Corresponding bank: Bank of New York*
*USA, New York*
*SWIFT: IRVT US 3N*
*Acc: 890-0260-947*
*Deutsche Bank Trust Company Americas*
*USA, New York*
*SWIFT: BKTR US 33*
*Acc: 04-094-040*

**Signatures of the Parties**

**On the part of the Buyer:**

**Yu. A. Boiko**
**Chairman of the Board of the Naftogaz Ukrainy NJSC**

[seal:] Ukraine – Kyiv – Naftogaz Ukrainy National Joint-Stock Company – Identification No. 20077720

**On the part of the Seller:**

**Wolgang Putschek**
**Representative of ROSUKRENERGO AG**

[stamp:] RosUkrEnergo AG
         Ageristrasse 66
         CH-6300 Zug
         Switzerland

[stamp:] NAFTOGAZ UKRAINY NJSC
TRUE TO THE ORIGINAL
Head of the Legal Department
*January 31, 2006* [signature]

# Exhibit 15

[stamp illegible]

**CONTRACT No.** *14/935 – 3/04*
**On Volumes and Terms of Pumping Natural Gas into Underground Gas Storage Facilities, and Terms for its Storage, Withdrawal, and Transport**
**In 2005 – 2030**

City of Kyiv                                                                                                          *July 29*, 2004

      **Naftogaz Ukrainy National Joint-Stock Company**, a legal entity incorporated under the laws of Ukraine, hereinafter referred to as the Contractor, represented by Yuri Anatolievich Boiko, its Chairman of the Board, acting pursuant to the Company's Bylaws, on one part, and

      **ROSUKRENERGO AG**, a legal entity incorporated under the laws of Switzerland, hereinafter referred to as the Client, represented by Wolgang Putschek, its authorized representative, acting pursuant to the Power of Attorney issued on July 21, 2004, on the other part, and hereinafter jointly referred to as the Parties, have entered into the present Contract on the following:

**ARTICLE 1**
**Subject of the Contract**

      1.1.      The subject of the present Contract includes services provided by the Contractor and directed at pumping of the natural gas owned by the Client (hereinafter referred to as gas) into underground gas storage facilities (hereinafter referred to as GSF) of the Contractor, along with the terms for its storage, withdrawal from GSF, and transport of gas in the period of April 15, 2005 through April 15, 2030 – in order to ensure gas supply of customers in Ukraine and export supplies of the Client's gas to European countries.
      1.2.      The Client shall compensate to the Contractor the cost of services associated with pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas in accordance with the terms specified in Article 5 of the present Contract.

**ARTICLE 2**
**Volumes and conditions of pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas**

      2.1.      The contractual volume of pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas, constitutes up to two hundred fifty bln (250,000,000,000) cu. m. Annual volumes of pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas constitute up to ten bln (10,000,000,000) cu. m.
      2.2.      The Client shall annually supply to the border of the Russian Federation/ Ukraine and (or) the Republic of Belarus/ Ukraine, and the Customer shall receive natural gas in the volume of up to ten bln (10,000,000,000) cu. m with the objective of pumping into GSF, storage, withdrawal from GSF, and transport of gas.
      Monthly volumes of pumping of the natural gas shall be specified based on requests submitted by the Client to the Contractor no later than within 10 days prior to the start of the corresponding month for supply of gas into the Contractor's gas transport system.
      2.3.      The supply of gas by the Client in volumes specified in Clause 2.1 of the present Article, for its subsequent transit across the territory of Ukraine from the gas delivery/handover stations at the border of the Russian Federation/ Ukraine and (or) the Republic of Belarus/ Ukraine to stations of its pumping into GSF shall be performed as a part of the general supply of gas incoming into the Contractor's gas transport system, via Gazprom OJSC or any other authorized gas transport company.

[text cut off] as close as possible to economic outcome of an invalid/ non-effective provision.

    9.8.    In the event of changes in corporate and legal form and (or) merger and (or) another restructuring of either Party, and as a result of it, transfer of rights and obligations under the present Contract to the appropriate structure, the said Party agrees to duly ensure the legal succession.

    9.9.    The present Contract may be terminated upon the agreement between the Parties by way of signing of the corresponding supplemental agreement to the present Contract.

## ARTICLE 10
### Effective Term of the Contract

    10.1. The present Contract shall become effective on the time of its signing and shall remain in effect till April 15, 2030, in the part related to services, and until its complete and final settlement – in the part related to payments.

    10.2. The present Contract may be extended upon the agreement between the Parties by way of signing of the corresponding supplemental agreement to the present Contract.

    10.3. The present Contact is executed in Russian, in two counterparts of identical legal value, one copy for each Party.

## ARTICLE 11
### Legal Addresses and Banking Details

| CONTRACTOR | CLIENT |
|---|---|
| **Naftogaz Ukrainy National Joint-Stock Company** | **ROSUKRENERGO AG** |
| Legal and mailing address: 6, B. Khmelnitsky Street, Kiev, Ukraine 01001 | Legal and mailing address: |
| OKPO Code 20077720 | **Aegeristrasse 66** |
| Legal and mailing address: 6, B. Khmelnitsky Street, Kiev, Ukraine 01001 | **CH-6300 Zug** |
|  | **Switzerland** |
| *OKPO Code 20077720* |  |
|  | Bank account: |
| Account information: | **Bank: Julius BAER Co. AG** |
| **Multicurrency a/c: 260053012609** in the Municipal Operational Division of Prominvestbank, Kiev | **Banhofstrasse, 38** |
| MFO 300012, Bank code 00039002 | **CH-8010 Zurich** |
| SWIFT: UPIB UA UX | **Switzerland** |
| *Corresponding bank:* |  |
| *Bank of New York* | **Account Number: 302.1627** |
| *USA, New York* | **SWIFT code: BAERCHZZ** |
| *SWIFT: IRVT US 3N* |  |
| *Acc: 890-0060-077* |  |
| *Deutsche Bank Trust Company Americas* |  |
| *USA, New York* |  |
| *SWIFT: BKTR US 33* |  |
| *Acc: 04-182-382* |  |
|  |  |
| **Multicurrency a/c:** |  |
| **No. 26009001037661** |  |
| in the JS Commercial Bank Ukrsotsbank, Kiev |  |

SWIFT: UKRS UA UX
OPERU Branch
*Corresponding bank: Bank of New York*
*USA, New York*
*SWIFT: IRVT US 3N*
*Acc: 890-0260-947*
*Deutsche Bank Trust Company Americas*
*USA, New York*
*SWIFT: BKTR US 33*
*Acc: 04-094-040*

**Signatures of the Parties**

**On the part of the Contractor:**

**On the part of the Client:**

**Yu. A. Boiko**
**Chairman of the Board of the Naftogaz Ukrainy NJSC**

[seal:] Ukraine – Kyiv – Naftogaz Ukrainy National Joint-Stock Company – Identification No. 20077720

**Wolgang Putschek**
**Representative of ROSUKRENERGO AG**

[stamp:] RosUkrEnergo AG
          Ageristrasse 66
          CH-6300 Zug
          Switzerland



# Exhibit 16

# AGREEMENT
## On Development of Relations in Gas Sector

City of Moscow                                        January 4, 2006

**Gazprom Open Joint-Stock Company (Russian Federation)**, hereinafter referred to as Gazprom, represented by A. B. Miller, its Chairman of the Board, acting pursuant to the Company's Bylaws, on one part,

**Naftogaz Ukrainy National Joint-Stock Company (Ukraine)**, hereinafter referred to Naftogaz Ukrainy, represented by A. G. Ivchenko, its Chairman of the Board, acting pursuant to the Company's Bylaws, on the other part,

and

With participation of **RosUkrEnergo AG (Switzerland)**, hereinafter referred to as RosUkrEnergo, represented by O. A. Palchikov and K. A. Chuichenko, its Executive Directors, acting pursuant to the Company's Articles of Association,

Hereinafter jointly referred to as the Parties,

Seeking to develop relations in gas sector on a mutually beneficial basis, have entered into the present Agreement, having decided on the following:

1. In order to ensure the transit of natural gas belonging to Gazprom (Gazexport LLC) and RosUkrEnergo across the territory of Ukraine and the Russian Federation, the Parties have reached an agreement on the transit rate in the amount of US$1.60 per 1,000 cu. m per 100 km of transit effective for the period till January 1, 2011.

2. In order to ensure supplies of natural gas to Ukraine, the Parties have agreed on RosUkrEnergo acting as a supplier. Effective on January 1, 2006, Gazprom shall no longer engage in supplies of the Russian natural gas to Ukraine, while Naftogaz Ukrainy shall no longer export natural gas supplied from the Russian Federation from the territory of Ukraine.

3. In order to sell natural gas supplied from the territory of the Russian Federation in Ukraine's domestic market, Naftogaz Ukrainy and RosUkrEnergo shall establish a joint venture as soon as possible, and no later than February 1, 2006, with its charter capital formed by monetary contributions and other assets.

4. The Parties shall execute appropriate agreements/ contracts (shall ensure the execution of appropriate agreements/ contracts) with the objective to ensure availability of an annual trade balance of gas inventory at RosUkrEnergo effective as of January 1, 2006, with the following volumes:



[stamp illegible] *November 13, 2006*

*For purchase:*

- 41 bln cu. m of Central Asia (Turkmen) gas, to be purchased from the Gazexport LLC and Naftogaz Ukrainy from volumes available at their disposal;

-Up to 7 bln cu. m of Central Asia (Uzbek) gas, to be purchased from the Gazexport LLC with the objective of, specifically, swapping with gas supplies in the Trans-Caucasus region;

-Up to 8 bln cu. m of Central Asia (Kazakh) gas, to be purchased from the Gazexport LLC with the objective of, specifically, swapping with gas supplies in the Trans-Caucasus region;

-Up to 7 bln cu. m of Russian gas, to be purchased from the Gazprom OJSC at price calculated using the formula and basis gas prices ($P_0$=US$230 per 1,000 cu. m)

*For sale:*

In 2006 – 34 bln cu. m of gas to be sold at US$90 per 1,000 cu. m of gas effective during the first six months of 2006, to the joint venture established pursuant to Clause 3 of the present Agreement (prior to the joint venture established, until February 1, 2006, to be sold to Naftogaz) with its subsequent sale in Ukraine's domestic market, without the right to re-export;

Effective in 2007 – up to 58 bln cu. m of gas to be sold to the joint venture established pursuant to Clause 3 of the present Agreement with its subsequent sale in Ukraine's domestic market, without the right to re-export;

15 bln cu. m of gas to be allocated for export pursuant to programs run jointly with the Gazexport LLC.

5.      The transit rate and the price for natural gas specified in the present Agreement may be modified only based on the mutual agreement between the Parties.

6.      Addresses of the Parties:

Gazprom OJSC                16, Nametkin Street, Moscow, Russia 117997

Naftogaz Ukrainy NJSC       6, B. Khmelnitsky Street, Kyiv, Ukraine 01001

RosUkrEnergo AG             7, Banhofstrasse, Zug, Switzerland

On behalf of Gazprom:  On behalf of Naftogaz Ukrainy: On behalf of RosUkrEnergo:

A. B. Miller          A. G. Ivchenko                    O. A. Palchikov  K. A. Chuichenko

[stamp illegible]      *November 13, 2006*

*По закупкам:*

- 41 млрд. куб.м. туркменского газа, подлежащего закупке у ООО «Газэкспорт» и Нафтогаз Украины в имеющихся в их распоряжении объемах;
- до 7 млрд. куб.м. узбекского газа, подлежащего закупке у ООО «Газэкспорт» с целью, в частности, свопирования с поставками газа в Закавказье;
- до 8 млрд. куб.м. казахского газа, подлежащего закупке у ООО «Газэкспорт» с целью, в частности, свопирования с поставками газа в Закавказье;
- до 17 млрд.куб.м. российского газа, подлежащего закупке у ОАО «Газпром» по цене, определяемой по формуле, исходя из базисной цены газа ($P_0$=230 долл. США за 1000 куб. м).

*По продажам:*

В 2006 году - 34 млрд. куб.м. газа, подлежащего продаже по цене 95 долл. США за 1000 куб.м газа, действующей в первом полугодии 2006 года, созданному в соответствии с п.3 настоящего Соглашения совместному предприятию (до создания совместного предприятия, до 01.02.06 продается Нафтогазу) для последующей реализации на внутреннем рынке Украины без права его реэкспорта;

с 2007 года – до 58 млрд. куб.м. газа, подлежащего продаже созданному в соответствии с п.3 настоящего Соглашения совместному предприятию для последующей реализации на внутреннем рынке Украины без права его реэкспорта;

15 млрд. куб.м. газа, подлежащего направлению на экспорт по совместным с ООО «Газэкспорт» программам.

5. Ставка платы за транзит и цена природного газа, определенные в настоящем Соглашении, могут изменяться только по взаимному согласию Сторон.

6. Адреса Сторон:

ОАО «Газпром»:                117997, Россия, Москва, ул. Наметкина, д.16

НАК «Нафтогаз Украины»:        01001, Украина, г. Киев, ул.Б.Хмельницкого, д.6

Компания «РосУкрЭнерго АГ»:    Швейцария, г. Цуг, Банхофштрассе, д.7

За ОАО «Газпром»:    За НАК «Нафтогаз Украины»:    За компанию «РосУкрЭнерго АГ»:

_____    _____    _____    _____
А.Б. Миллер          А.Г. Ивченко          О.А. Пальчиков    К.А. Чуйченко

# СОГЛАШЕНИЕ
## об урегулировании отношений в газовой сфере

г. Москва                                        04 января 2006г.

**Открытое акционерное общество «Газпром» (Российская Федерация)**, именуемое в дальнейшем Газпром, в лице Председателя Правления А.Б.Миллера, действующего на основании Устава, с одной стороны,

**Национальная акционерная компания «Нафтогаз Украины» (Украина)**, именуемое в дальнейшем Нафтогаз Украины, в лице Председателя Правления А.Г.Ивченко, действующего на основании Устава, с другой стороны,

а также

**Компания «РосУкрЭнерго АГ» (Швейцария)**, именуемое в дальнейшем РосУкрЭнерго, в лице Исполнительных директоров О.А. Пальчикова и К.А.Чуйченко, действующих на основании Учредительного договора.

именуемые вместе Стороны,

стремясь на взаимовыгодной основе урегулировать взаимные отношения в газовой сфере, заключили настоящее Соглашение, договорившись о следующем:

1. В области обеспечения транзита принадлежащего Газпром (ООО «Газэкспорт») и РосУкрЭнерго природного газа через территорию Украины и Российской Федерации Стороны согласовали на срок до 01.01.2011 года ставку платы за транзит в размере 1,60 долларов США за 1000 куб.м. на 100 км расстояния.

2. В области поставок природного газа в Украину Стороны согласовывают в качестве поставщика компанию РосУкрЭнерго. С 01 января 2006 г. Газпром не производит поставку российского природного газа в Украину, а Нафтогаз Украины не экспортирует с территорию Украины поступивший из Российской Федерации природный газ.

3. Для реализации на внутреннем рынке Украины природного газа, поступающего с территории Российской Федерации, Нафтогаз Украины и РосУкрЭнерго в максимально короткие сроки, не позднее 01.02.06 г., создадут совместное предприятие, уставный капитал которого будет сформирован путем внесения денежных средств и других активов.

4. Стороны заключат соответствующие договора/контракты (обеспечат заключение соответствующих договоров/контрактов) с целью формирования, начиная с 01 января 2006 г., годового товарного баланса газа компании РосУкрЭнерго в следующих объемах:

# Exhibit 17

## PRELIMINARY TERM SHEET

This Preliminary Term Sheet serves to outline the general terms and conditions under which **Barbara Ann Holdings LLC ("BAH";** which is 90-% owned by Brad Zackson) and **Vulcan Properties, Inc. ("Vulcan";** which is wholly-owned by Karen B. Cohen, the spouse of Arthur G. Cohen, and represented by Arthur G. Cohen) and XXX LLC (which is majority-owned by Paul J. Manafort) will enter into a Delaware registered limited liability company known as **"CMZ Ventures, LLC" (the "Company",** which was organized in the State of Delaware on June 9, 2008), for the purpose of, directly or through affiliated entities, **(1)** establishing, promoting, raising capital for, investing in, managing and maintaining a real estate investment fund **(the "Fund"),** the purpose of which shall be to invest in both US domestic and international properties that possess inherent unrealized values where investment returns can be enhanced through efficiency, pricing through portfolio acquisitions, repositioning and redevelopment or new development, and **(2)** acquiring, financing, developing, owning, managing and disposing of, on a project-by-project basis, interests in real property of any type or description (whether located in the United States or overseas). To the extent expressly provided herein, this Preliminary Term Sheet shall not constitute a binding agreement among the parties hereto unless and until a definitive operating agreement of the Company and other appropriate agreements **(collectively, the "Definitive Agreements")** have been entered into among the parties hereto.

**Company Structure:**    BAH, Vulcan and XXX (Manafort) will enter into a limited liability company operating agreement for the Company, containing, among other customary provisions which are consistent with the terms set forth below in this Preliminary Term Sheet, the following:

1. BAH, Vulcan and Manafort shall each own an equal membership interest in the Company of 33 and 1/3%.

2. BAH, Vulcan and Manafort (or their respective affiliated entities) shall act as the Board of Managers of the Company, with unanimous approval or consent of such Managers required for major decisions, such as decisions to proceed with specific projects, budget approvals, acquisitions, financings, refinancings, construction contracts, asset sales, amendments to the operating agreement and the admission of new members.

3. BAH and Vulcan shall be responsible for the day-to-day development, management and operation of the Company's properties and will work in conjunction with Manafort on deal origination, strategic direction of the fund, capital formation and deal development.

4. Although the term of the Company shall be perpetual, any of BAH, Vulcan and Manafort deals shall (subject to any restrictions in the Company's financing agreements or the

constituent documents or financing agreements of the Fund) have the right to call for a sale of any or all of the Company's property interests at any time after four (4) years from the acquisition of the Company's first property interest.

**Distributions:**

Cash flow of the Company available for distribution after payment of project costs (including the payment of property-level and mezzanine-level debt service and operating expenses and the establishment of appropriate reserves) shall be distributed as follows:

1.      Firstly, BAH, Vulcan and Manafort, as to their 10% aggregate investment, and their equity partner in each project, as to its 90% investment, shall receive pro rata an accruable priority return (expected to be 10%-12%, compounded annually) on their respective cash investments.

2.      Secondly, BAH, Vulcan and Manafort, as to 10%, and their equity partner in each project, as to 90%, shall receive pro rata 100% of distributable cash until each has received an amount equal to its cash investment.

3.      Thereafter, cash flow in each project shall be distributed 50% to BAH, Vulcan and Manafort (collectively), and the remaining 50% to their equity partner in such project. BAH, Vulcan and Manafort shall divide equally the distributed 50% from the proceeds of each deal transacted.

**Cash Capital Contributions:**

Except for the pro rata contributions of BAH, Vulcan and Manafort as required for the Company's 10% equity participations in the deals, and contributions for the Company's working capital as referred to below in the budget, no capital contributions are expected or required of the Company's members.

**Financing Arrangements:**

BAH, Vulcan and Manafort (and/or their respective affiliates) shall arrange all financings for the Company (i.e., land, development and construction loans and also mezzanine and preferred equity financings). In doing so, they may retain the services of financing advisors and/or mortgage brokers to facilitate financings. Financing fees shall be shared equally among BAH, Vulcan and Manafort.

The members of the Company understand that, in connection with the Company's obtaining financing for its projects, their membership interests and equity in the Company may be diluted.

**Fundraising :**    While proceeding with its efforts to consummate potential deals, the Company expects to pursue its capital-raising efforts with respect to the Fund and to conclude the arrangements necessary in order for the Fund to be established and operative (with the Company or a subsidiary or affiliate of the Company as the Fund's manager and asset manager) upon the successful completion of the Fund's minimum capital requirement.

**Company Budget:**    In order for the Company to proceed with pursuing business opportunties, BAH, Vulcan and Manafort have reviewed and approved a proposed preliminary budget for the 12-month period which began on June 1, 2008 (a copy of which is attached hereto). It is understood that monthly reconciliations of actual expenses to such budget will be provided by BAH to the members of the Company promptly following the end of each month during the period covered by the budget.

During the fourth month covered by the budget (i.e., September 2008), the members of the Company will evaluate the Company's progress. Any member of the Company which is unsatisfied for any reason (in its sole discretion) with such progress shall be permitted to withdraw from the Company and shall thereafter have no further obligations, financial or otherwise, to the Company (provided, however, that such withdrawal shall have no effect upon any other contractual obligations that such withdrawing member may have to, or be owed by, any other member of the Company or any of its affiliated or related persons or entities).

It is understood and agreed that any member of the Company which shall withdraw from the Company as provided above or at any time thereafter shall retain its one-third equity interest in all projects consummated prior thereto or remaining pending (and which shall be consummated thereafter), but such member shall have no interest in any project of the Company which shall first be initiated subsequent to such member's withdrawal.

**Operating Expenses:**

In order to fund the operating expenses of the Company reflected in the approved budget referred to above, each of BAH, Vulcan and Manafort has agreed (subject to the execution and delivery of the Definitive Agreements on or before June 30, 2008) to contribute to the working capital of the Company, for application as contemplated by such approved budget, an amount equal to one-third of each month's budget for the months of June – September 2008. Notwithstanding such

3

agreement, for each of such four (4) months (during which the budget is approximately $100,000 per month), such budgeted monthly amount of $100,000 shall be funded 50% by Vulcan and 50% by Manafort, each of which shall deposit $50,000 per month in a segregated bank account of the Company, with all disbursements there from to require two signatures, one of which shall be designated by BAH and one of which shall be designated by Vulcan. Such account shall be used for all receipts and disbursements of the Company, unless BAH, Vulcan and Manafort shall otherwise unanimously agree.

As soon as prior capital contributions from the initial projects described above have been refunded to BAH or its affiliates, BAH shall apply, to the extent necessary, all or part of such refunded contributions to equalize its capital contributions (and funded operating expenses) in the Company with Vulcan and Manafort, it being understood that such equalization shall return to Vulcan and Manafort their respective prior capital contributions and funded operating expenditures which are in excess of their respective one-third interests in the equity of the Company. If no such refund of prior capital contributions shall be available to BAH, then BAH (and its principal, Brad Zackson) shall nevertheless be liable to Vulcan and Manafort, on a demand basis, for the excess amounts funded by them for the account of BAH.

It is further understood and agreed that, when the cash is available from a specific project, capital contributions and advances made prior to the date hereof by any of the members of the Company with respect to such project (all such capital contributions and advances being identified on a schedule attached hereto) shall be repaid and/or refunded from such available cash to the extent necessary to equalize the capital contributions of the three members with respect to such project.

**Exclusivity:**    Until the first to occur of (a) the failure of BAH, Vulcan and Manafort to have entered into the Definitive Agreements by July 31, 2008 (or such later date as shall have been agreed to by all of the parties hereto), (b) December 31, 2008, (c) the abandonment of capital-raising efforts for the Fund and the failure of the Company to have consummated at least one of the five (5) projects described above or another substantial project submitted to and approved by the members of the Company, or (d) a determination by all the members of the Company to terminate their pursuit of the transactions contemplated herein, BAH, Vulcan and Manafort agree that they will become

involved in any transaction relating to any project contemplated herein (including any investment fund similar to the Fund and any project not specifically referred to herein but subsequently submitted to and approved by the members of the Company) only in partnership with each other as contemplated herein or as they all may otherwise hereafter agree.

The foregoing is approved by the undersigned as of June 9, 2008:

BARBARA ANN HOLDINGS LLC

By: _____
    Brad Zackson, Manager

VULCAN PROPERTIES, INC.

By: _____
    Arthur G. Cohen, Vice Pres.

_____
Paul Manafort

_____
Brad Zackson