economic output had shrunk to 40% of its 1991 level.[126] Corruption was rife in most areas of Ukrainian life. In a review, completed in May 2000 by the Economist Intelligence Unit, which ranked the quality of the business environment of sixty countries, Ukraine was placed fourth bottom with only Iraq, Iran and Nigeria ranked worse.[127] Without legislative norms and their enforcement to protect property, and with one of the weakest anti-money laundering and anti-corruption systems in the world, foreign investors stayed away. World Bank president James Wolfensohn even sent a letter to the then-Ukrainian president Leonid Kuchma in early 1997, criticising corruption within the government.[128] Much corruption seemed centred around the energy sector, a fact confirmed by former President Kuchma, who stated on television in 2000 that the 'key sector' of fuel and energy was 'the most criminalised, according to the opinion of all experts. It is also too politicised.'[129]

This is the legacy of endemic corruption inherited by Viktor Yushchenko following his election as Ukrainian president after the Orange Revolution in 2005. This section of the report highlights how, under Yushchenko's predecessor Leonid Kuchma, political power in Ukraine in the mid-1990s became centred around its energy sector, leading to opaque and incestuous relations between government officials and gas companies. This created a predatory and unaccountable operating environment in which Turkmen gas deals were struck. There is an examination later in this section on how the gas industry's reliance on barter schemes allowed individuals to profit while the state's debt multiplied. These effects are still being felt today.

The first part of this section examines the rise and fall of Pavlo Lazarenko, a former minister in charge of the oil and gas sector, who became Kuchma's prime minister in 1996. A year later, he was fired and formed his own rival political party. With many business interests Lazarenko had become a rich and powerful man, yet his eventual arrest in America ended his hopes of challenging Kuchma for the presidency. A long court case in the US found Lazarenko guilty on 14 counts of money laundering, wire fraud and interstate transportation of stolen property in 2005, though he is yet to be sentenced.

Following Lazarenko's defection in 1997, President Kuchma seemed to consolidate his own power-base with the formation of the state oil and gas company NAK Naftohaz Ukrainy. Hair-raising details of Naftohaz's accounting practices detailed below suggest that the company, run by Ihor Bakai and his successors, including Yuri Boiko (who will reappear later in this report), was a financial black hole run more for

## The case of Pavlo Lazarenko



In a country whose power was very much focused on regional clans, Pavlo Lazarenko, a former governor of Dnipropetrovsk – where Leonid Kuchma had headed a nuclear missile design factory – was well placed to further his political career in the newly-independent Ukraine. His story is a prime example of a Ukrainian politician using his position to gain huge sums of money from questionable business practices which he then held in offshore accounts.

In September 1995, Lazarenko was appointed by President Kuchma as the Ukrainian first deputy prime minister in charge of the energy sector, and was responsible for allocating quotas to private companies. A previous attempt to use a third party to supply Turkmen gas to Ukraine had not helped his country's spiralling gas debt (see section: *Respublika*).

These private companies were entitled by the state to import foreign gas (of mainly Turkmen and Russian origin) and sell it to state-owned factories in particular regions. A company's profit therefore depended in part on the volume of gas it was allowed to supply. In early 1996, before he became prime minister in May, Lazarenko restructured the scheme to allow a company named Itera to supply around 18 billion $m^3$ of gas from Turkmenistan. Itera had supplied Turkmen gas to Ukraine in 1994/5, though it is not clear what volume of gas was involved.[130] The other major quota allocation was given to United Energy Systems, headed by Yulia Tymoshenko (Ukraine's prime minister from January 2004 to September 2005), which was allowed to continue supplying around 25 billion $m^3$ to various factories. Lazarenko has stated in an interview with a journalist that his allocations were fair, based on the amounts of gas that each company was able to buy.[131]

Lazarenko was sacked by Kuchma in the summer of 1997; some put his dismissal down to Kuchma's fear of a political rival, others considered it a result of mounting dissatisfaction with the restructured gas scheme. Later that year Lazarenko formed a political party with the intention of challenging Kuchma for the presidency. The subsequent formation of Naftohaz Ukrainy allowed President Kuchma to reclaim power over the energy sector, along with Naftohaz's newly-appointed head, Ihor Bakai, a businessman whose company, Interhaz, had seen its quota reduced by

In 1998, Ukrainian officials accused Lazarenko of siphoning state money into Swiss bank accounts and called on Switzerland to begin an investigation. Lazarenko was arrested, crossing by car with a Panamanian passport from France to Switzerland, in December 1998.[132] He posted bail, returned to Ukraine, but later fled, fearing for his safety. He was arrested again in America in February 1999 and charged with laundering US$114 million[133] that, according to the US Justice Department, had been diverted to institutions in California's Bay Area, including Commercial Bank, Pacific Bank, and the Bank of America[134] from accounts in Switzerland and Antigua.[135] A US grand jury alleged that while Lazarenko was a public official, he unlawfully received over US$200 million from various Ukrainian businesses and had thus defrauded the people of Ukraine of 'money and property and his honest services'.[136]

The indictment alleged that Lazarenko had announced in 1997 that his income for 1996 was 9,397 hryvnia (approx US$5,040) and that he had no income from business activities, and no money in financial institutions 'when in fact he had ownership interests in companies doing business in Ukraine and in 1996 received more than US$165,000,000 into bank accounts he controlled.'[137]

The Justice Department revealed that he had previously bought a mansion in California for over US$6 million.[138] Press reports describe the property as having 41 rooms including a ballroom, five swimming pools, five dog kennels, nine bathrooms and two helicopter landing pads.[139] Lazarenko maintained that he earned the money legitimately and that he moved large tranches to foreign banks to prevent Kuchma from confiscating funds of a political opponent.[140]

In 2000, a Swiss court sentenced him to an 18-month suspended sentence in absentia for laundering US$6.6 million.[141] The American trial was severely delayed but finally took place in 2004 in San Francisco. Lazarenko originally faced a total of 53 charges in the United States, but the judge dismissed 24 of them, mostly charges involving Lazarenko making huge profits improperly through the gas industry. The charges were thrown out by the judge due to the prosecution's failure to prove that Lazarenko's actions had violated both Ukrainian and American law at the time the acts were committed. He was thus found not guilty of any charges connected with Itera and other gas companies.

However, the court proceedings revealed interesting information about Lazarenko's relationship with Itera, the company to which he had awarded a major franchise in early 1996.

Theodoros Kavalieros, currently vice-president of Itera International Energy Corporation, was questioned by Martha Boersch, a US government lawyer working on the Lazarenko case. He testified that he transferred millions of dollars through Itera's Cypriot affiliate Omrania to a company named Bainfield Ltd, an offshore company controlled by Lazarenko (see box: *Kavalieros' testimony*).[142]

The following day Itera issued a press release stating that it had nothing to do with the crimes Lazarenko was charged with, that it had no idea Lazarenko was behind Bainfield Ltd and that the payment given to this company was one of dozens of barter deals.[144]

However, a Moscow Interfax report stated: 'Lazarenko's lawyers say that their client was an Itera shareholder and the money he received [via Bainfield Ltd] was part of the company's profits'. This was denied by Ted Kavalieros in his testimony, who said that Lazarenko was not a shareholder in the main Itera holding company, though it is unclear which particular branch of Itera Lazarenko's lawyers were referring to, and Kavalieros said in his testimony that he did not know who was a shareholder in other companies, such as Itera-Ukraine.

Global Witness wrote to Lazarenko's lawyer, Doron Weinberg, and to Itera's Igor Makarov for clarification on the reasons behind Itera's payment to Bainfield Ltd. Both parties have yet to reply.

Lazarenko's actions as prime minister may well have not violated Ukrainian law, such as it was at the time. Yet receiving money from Itera for whatever reason, whether Itera knew of Lazarenko's involvement in Bainfield Ltd or not, was a clear conflict of interest for Pavlo Lazarenko, the man in charge of allocating gas quotas in 1996/7 to private companies.

The jury found Lazarenko guilty of 29 charges in April 2004. The judge then threw out 15 of the convictions due to lack of evidence, but upheld the remaining 14 and dismissed the motion for a new trial.[145] The government is seeking forfeiture of the defendant's ill-gotten gains, including US$21,696,000, which may be imposed at sentencing.[146] Lazarenko was due to be sentenced in early 2005, but this was postponed to July, and then to December, and once more to March 2006 – seven years after Lazarenko's arrest in America. At the time this report went

## Kavalieros' testimony

*The following excerpts[143] are from Kavalieros' testimony. In it he claims that he as the vice-president of Itera International Energy did not know why money was being transferred to Lazarenko's company. This was known, Kavalieros said, by Itera's president Igor Makarov.*

**Martha Boersch**, *a US government lawyer*: And what does this particular instruction [on an Omrania document signed by Kavalieros] refer to? What does it request?

**Ted Kavalieros**: It is a request to transfer to the company named Bainfield Company, Limited, the amount of US$400,000.

**MB**: And on what date?

**TK**: The date is January 31st 1996.

**MB**: Now, were you familiar with a company called Bainfield?

**TK**: No.

**MB**: Do you have any idea where that company is located?

**TK**: No.

**MB**: Do you – when the instructions came in to you to transfer money, would you – did you know anything about the purpose for the transfer of the money?

**TK**: No, because this activity was done in Russia, and the contracts were signed there [...]

**MB**: Did you ever see any contracts between Bainfield and Itera?

**TK**: No.

**MB**: Do you have any idea whether or not there ever were any contracts between Bainfield and Itera, based on your personal knowledge?

**TK**: I cannot answer the question. I have to guess again that there be [sic] the contracts.

**MB**: But you don't know?

**TK**: No.

**MB**: That was not part of your job to know what was happening on the other end?

**TK**: No.

**MB**: Do you recall how much money total was transferred from Itera to Bainfield?

**TK**: Approximately 25 million [US dollars].

**MB**: And when these other requests came in for – to transfer the money again, did you have any personal knowledge of what the basis was for the transfer?

**TK**: No.

*This seemed to be common practice within the company, as confirmed by the following testimony excerpt, when Kavalieros was cross-examined by Lazarenko's lawyer, Doron Weinberg:*

**Doron Weinberg**: And with respect to those transactions [to buy products], were you informed about why you were transferring money?

**Ted Kavalieros**: No.

**DW**: That's not true only of these Bainfield transactions, is it? It was generally the case that you were asked to send money to places without being told why, correct?

**TK**: Yes.

**DW**: And roughly how much money went through the Itera International Energy Corporation account in a given year; say, for example, 1996?

**TK**: I cannot answer. I have to check into that. I don't have the – that off my head.

**DW**: Do you have any estimate?

**TK**: It could have been more than US$200 million.

**DW**: And that money – it was no longer coming from the sale of foodstuffs by 1996, was it?

**TK**: No. That was money from the sale of gas.

**DW**: In Russia?

**TK**: In the ex-Soviet Union.

**DW**: All around the ex-Soviet Union?

**TK**: Yes.

> Bakai is a talented manager, but he, how can I say, sometimes does not know when to apply the brakes.
> *Leonid Kuchma, September 2005*


Bakai (left) with Kuchma (extreme right). *Kommersant*

## Naftohaz Ukrainy under Ihor Bakai

Following the dismissal of Lazarenko, in 1998, President Kuchma created the Ukrainian state oil and gas company, NAK Naftohaz Ukrainy. In part, this was to regain control over his country's lucrative energy sector, previously controlled by Lazarenko. Ihor Bakai, a wealthy gas trader, was chosen by the cabinet ministers of Ukraine as its first chairman.

Although a Kuchma-led commission had investigated Bakai in 1994 (see section: *Respublika*), they appear to have become very close associates; Bakai was also an unofficial advisor to Kuchma during his time as Naftohaz chairman. Some reports state that he could enter the presidential office at any time, although this was denied by Kuchma in an interview in 2005.[148] Even after Bakai left Naftohaz amid rumours of corruption and mismanagement, Kuchma employed him again in his administration in late 2003 before the presidential election in 2004. Bakai is now living in Russia, wanted in Ukraine on charges relating to various crimes allegedly committed while working in this capacity.

Under Bakai, no audits of Naftohaz were carried out, nor was the accounting chamber of Ukraine allowed to investigate or audit it. In 1997, Kuchma twice vetoed a law that would have given the chamber the right to look at the state's energy accounts.[149] In fact, no audits by international companies were carried out on the state oil and gas company until 2001. In an interview in 2005 with *InvestGazeta*, a Ukrainian financial newspaper, the head of Ukraine's main auditing directorate, Mykola Syvulsky (a close associate of then-prime minister Tymoshenko), stated that: 'The work of Naftohaz was completely ineffective, but we were unable to check all the company's areas of activity … Naftohaz, back from the times of Ihor Bakai, built up a structure that made it impossible to carry out a high quality check. The company's internal security service does not allow auditors to talk directly with executives and get information from them.'[150]

During the 1990s, certain common practices allowed certain individuals in Ukraine to amass large fortunes. Firstly, gas was illegally siphoned from Russian pipelines, a practice which was finally stopped in May 2000. Secondly, companies avoided cash payments and taxes through the arrangement of complex barter deals. Finally, gas was imported from Russia and other countries and sold to consumers, while passing on the costs to the Ukrainian state. Bakai was the chairman of Naftohaz when all three of these practices were rife.

Although Naftohaz under Bakai monopolised the country's internal gas trade, supplying an estimated 85% of the market,[151] with 300 of the top state companies buying more than half their gas from Naftohaz,[152] it also ran up huge debts. In early 2000, Bakai himself estimated this debt at US$760 million.[153] At a press conference in March 2000 he stated: 'My greatest mistake and problem is that I let our debt to Gazprom grow by US$500 million over the three months of 2000.'[154]

These debts seem to have been accrued through the use of various opaque barter schemes and 'gas trading houses'. Former deputy minister in charge of the fuel and energy sector Yulia Tymoshenko spoke about the latter in 2000:

[Gas trading houses] paid anything but cash to those extracting or importing gas. For example, they paid by devalued promissory notes, trade liabilities et cetera. The real value of all these securities was much less than it had been declared: they bought them for 10-15% of their face value and sold them at 100% to energy producers who simply had no choice. Before the appointment of the Yushchenko government [who became Ukrainian prime minister under Kuchma in 2000] Naftohaz Ukrainy headed by Ihor Bakai simply gave away billions of hryvnas worth of gas to commercial companies. And nobody received anything at all. It was a free gift.[155]

In August 2000, then-Ukrainian prime minister (and current president) Viktor Yushchenko admitted that Ukraine had illegally siphoned off Russian gas from pipelines, but stated that it was stolen without the government's knowledge.[156] An international tribunal of arbitration found that Russian gas had gone missing in Ukraine in 1999.[157] This took place when Bakai was chairman of Naftohaz and therefore in theoretical control of Ukraine's gas transport infrastructure

## Barter madness: 12 million galoshes for 4 million people in a 40°C heat


Kelly Jones

After the fall of the Soviet Union, high inflation rates and scarce hard currency made cash transactions unattractive in countries such as Ukraine. Instead, resources such as oil and gas were often swapped for other items which the country was in short supply of – food products, fertiliser, metal, equipment. Before the Russian financial crash of August 1998 this trade in barter dominated Ukraine's energy sector; it has been estimated by one commentator in the *Financial Times* that 90% of all energy commodities in Ukraine in the mid to late 1990s was paid for in barter.[158]

The system is open to a wide range of misuse; many aspects of barter can be exploited, which, when combined, produced an opaque and chaotic system of payments for gas and other natural resources. For example, instead of tangible products, construction contracts and services such as technical assistance are often rendered as part of barter deals. The value of such work is hard to quantify, and construction contracts are open to inflated pricing.

For tangible goods, the complex system of barter arrangements revolves around manufacturers pricing their products at 'coefficients' – a multiple of the production price, usually between one-and-a-half and three times the factory price of the goods.[159] For example, for a product costing US$1 per item, a coefficient of one would mean that the buyer receives 10 items for US$10, a coefficient of two would mean the buyer receives five items for US$10, and so forth. By manipulating the coefficients, large profits can be generated and either the buyer or seller can benefit. As the IMF states, 'the use of barter to pay for gas imports has meant that transactions are largely nontransparent and as such have contributed to price discrimination and created opportunities for corruption and tax evasion.'[160]

Up until 2005, virtually all of the gas contracts signed by the government of Turkmenistan stipulated that part was to be paid in hard currency and the rest in barter (sometimes 50%, at other times 60%). For example, from 2003 to 2005, Turkmenistan's gas contract with Russia was worth US$44 per 1000 m³, with 50% to be paid in barter. An expert familiar with the deal told Global Witness that the contract was worth only US$33 per 1000 m³ – the value of the barter portion halved due to the true value of the goods being less.[161] With so much gas being sold, the barter portions are worth a great deal: a contract signed in 2002 between the Turkmen and Ukrainian state oil and gas companies seen by Global Witness states that US$840 million worth of barter goods would be supplied yearly to Ukraine.[162]

The goods themselves can be resold, often abroad, and the profits retained offshore. These revenues are not registered as being earned by the company selling the gas and as a result are not liable for tax. Though arguably not illegal at the time, this practice stripped the Ukrainian economy of enormous amounts of money, resulting in higher energy prices for the ordinary citizen. One commentator in the *Financial Times* went so far as to characterise the Ukrainian energy sector in the 1990s as 'a scheme of monopolies, transfer pricing and barter which [was] designed to suck all the profits from the Ukrainian economy into foreign bank accounts.'[163]



Furthermore, the goods that are often given in exchange for gas are sometimes of questionable quality, or even plainly absurd. Ihor Sharov, who worked with Ihor Bakai at Respublika (see section: *Respublika*), joked openly in an interview with a newspaper about some of these deals: 'Respublika brought a huge income to the [Ukrainian] state by exporting domestic TV sets at a price of US$1,000 per item and we were able to trade with Turkmenistan, with its 4 million population, who bought 12 million pairs of galoshes from us!'[164] Concerning the Ukrainian bomber aircraft that Bakai gave to Russia to settle part of Ukraine's gas debt, according to a Russian newspaper, over half were 'incapable of performing combat missions' with the others needing a major overhaul.[165] Russia may have been, in effect, paying over US$300 million for scrap metal. Recently Ukraine gave Turkmenistan 3,000 spruce trees[166] as partial repayment for its gas debts.

A journalist back in 1994, reporting on the then-French president François Mitterrand's official visit to Turkmenistan, witnessed a fleet of black Mercedes 600 limousines and brand-new Volvos driven by the Turkmen authorities. When asked why Turkmenistan had so many luxury cars, an aide to the Turkmen president told him: 'Moscow is paying for our gas with them. They got them in barter deals from Sweden. We also have 600 Russian warplanes, including the modern MiG-29s in exchange for gas. We only have seven pilots, although the French have offered to train more for us.'[167]

On 1st January 2005, Turkmenistan stopped scheduled gas supplies to Ukraine, after Niyazov expressed concern about the high price of barter goods coming from Ukraine. The price of the gas was raised (from US$44 to US$58 per 1000 $m^3$) but the barter portion retained. A few months later, the Turkmen foreign office asserted that Ukraine had failed to supply items worth about US$600 million for the barter portion of the gas contract, with most of the debt accumulated during the first five months of 2005. Niyazov called Ukrainian barter schemes 'a mechanism for swindling'.[168] Commentators believed that this was due to Ukrainian price rises for commodities such as steel, or a rise in the coefficient. Therefore, Turkmenistan would have been receiving a lesser quantity of goods. With such large quantities of gas sold – 36 billion $m^3$ – Turkmenistan experienced huge losses.

In July 2005, the new head of Naftohaz Ukrainy following the Orange Revolution, Oleksei Ivchenko, stated that the new contract with Turkmenistan (active from 1st July 2005 but renegotiated in early 2006) would bring an end to barter transactions: 'It's been my opinion from the first ... that we should get out of barterisation, especially in respect of the Turkmen contract. Neither Naftohaz Ukrainy nor the Ukrainian budget benefit in any way from this scheme. Benefits were accrued only to some unclear commercial structures that worked in this area.'[169]

Russia's gas dispute with Ukraine at the beginning of 2006 saw an end, for now, to deals involving barter trading, with Gazexport buying gas from Turkmenistan and selling it on to Swiss intermediary RosUkrEnergo in cash. However, as Global Witness goes to press, the Ukrainian parliament had asked for more information concerning this intermediary which could ultimately see the contract being renegotiated again, with the possible reintroduction of barter deals.

### Bugged: Kuchma and 'Tapegate'

Allegations abound that under President Kuchma, the state oil and gas company Naftohaz Ukrainy was being used for private political patronage, but these allegations have not been fully and publicly investigated.

These allegations stem in part from secretly recorded conversations purporting to be from the presidential office made by one of his bodyguards, Major Mykola Melnychenko. Ukraine was rocked by the revelation of these tapes in November 2000, which led to the so-called 'Tapegate' scandal and to major demonstrations against President Kuchma the following year.

Though acknowledging his office had been bugged, Kuchma maintained that certain portions of these tapes, recorded between October 1999 and September 2000, were carefully constructed fakes using sections of speech taken from different times and sources.[170]

Controversy over the tapes was heightened not least because a voice broadly recognised to be that of Kuchma is heard to order that a journalist, Georgiy Gongadze, should be seized and dumped in Chechnya as punishment for publishing defamatory articles on the internet and for openly challenging him on television about his ineffectiveness in fighting corruption. Gongadze was abducted in September 2000 by persons unknown and his headless body found buried in a forest that November.

Experts disagree about the authenticity of the extracts, in part because the original recordings are digital, which means that they are easier to manipulate than analogue tapes. A test made on several samples by a former FBI agent working for US company BEK-TEK Corp at the behest of the Ukrainian parliamentary committee on Gongadze, a specialist who has analysed audio material in both the Watergate affair and the Kennedy assassination, showed that 'based on the flow of the speech in the five designated portions, no phraseology or sentence structure was pieced together by using individual phonemes, words or abort phrases ... though the existence of digital manipulation is highly improbable if it did occur, without now being obvious, then the most probable scenario would be a loss of data, and not additions or editing of content.'[171] Ukraine's National Institute of Court Experts found the portions of the recordings that they tested might not be genuine.[172]

Part of the problem of establishing the tapes' authenticity is that only copies and excerpts of the original recordings have



*Kommersant*

logue of his recordings (over 1,000 hours), which he says he will not do because they contain state secrets. Clearly, the only way to assess the authenticity of the tapes is for a full open and public inquiry using independent international experts.

Various sources have confirmed to Global Witness a transcript of one portion of the recordings which apparently features a voice alleged to be Kuchma's berating Ihor Bakai for not providing enough funds: 'I looked you in the eye, and you said that you would provide 250 million [US] dollars for the election campaign.'[173] Another purported conversation with one of Kuchma's election fundraisers covers a similar theme. A voice similar to Kuchma asks: 'And where is Bakai? ... I need to discuss something with him. He has transferred 10 million. But what is 10 million if 20 million dollars is needed till the end of the month. Well, give the account number where to transfer, I will think who to give it to.'[174]

Allegedly on 10th February 2000, after the presidential elec-

fice, Mykola Azarov, discusses Bakai with someone whose voice sounds similar to that of President Kuchma: 'Well about this Naftohaz. I invited Bakai, as we agreed and showed him everything. My people worked on that and I trust them ... And I literally told him, "Well, Ihor, you have put at least a hundred million in your pocket, at least. I understand that, of course, I will not set them up. I give you two weeks, a month at the most. Destroy them, these, so to say, your papers, which prove directly or indirectly all of your – you did it foolishly and stupidly". And I showed him that he did everything foolishly and stupidly" [...] Well, he could have done it in a smart way. But, no, he did it so that any stupid inspector could see his false schemes. Even a stupid one.'[175] Global Witness wrote to Azarov in April 2006 to confirm whether he had said these words and to get his opinion, as the former head of the tax administration, on Bakai's time as Naftohaz chairman. As this report went to press, Azarov's press secretary told Global Witness that Azarov had wanted to respond but had not had time because of the recent Ukrainian parliamentary elections. However, the press secretary stated that Azarov had launched a criminal investigation concerning Naftohaz's management when he was head of the tax office.

The Melnychenko recordings, if genuine, imply that Naftohaz was being manipulated and its funds raided for private political patronage. As mentioned, investigators do not agree on their authenticity and Kuchma has said certain portions of the tapes are cleverly constructed fakes; therefore, a full, open public inquiry into these allegations is necessary.

In an interview with a Ukrainian website, Bakai said he had sent smaller sums (between US$2–5 million) at the request of regional governors who had received orders from Kuchma, saying that he had to comply because Naftohaz was a state structure.[176]

Global Witness has tried to contact Ihor Bakai concerning these allegations but has been unable to reach him since his relocation to Russia. His response in clarifying the matters outlined above would be gratefully received.

## Wanted: Ihor Bakai

Bakai's position at Naftohaz was weakened following a state visit by President Kuchma to America in December 1999. Bakai, who was to accompany Kuchma on the trip, was refused a visa by the United States amid allegations of corruption.[177] Bakai has since maintained his visa refusal was because of confusion concerning his family's American properties (see section: *Respublik*a) and the fact he had sold

In March 2000, Bakai resigned from his position at Naftohaz, saying that he did not want his name to be used in blackmailing Ukraine's highest-ranking officials,[179] though it is unclear what he meant exactly. It is impossible to document Naftohaz's business practices under the chairmanship of Ihor Bakai because no reliable financial information was released by the company and no audits were published. However, in late 2002, Ukraine's Supreme Court pushed for an investigation into alleged misappropriation of US$42 million by senior Naftohaz managers during payment transactions for gas supplies but like so many other investigations in Ukraine, it appears to be on hold.[180]

Oleksiy Donskiy worked on this case until April 2004 as a senior investigator of Kyiv's prosecutor's office. In an interview with Global Witness, Donskiy spoke more about the details of the investigation. The investigation sought to trace payments allegedly made by Naftohaz to a Latvian account of a now defunct company named Fahr European Ltd, which had been registered in the American state of Oregon in late March 2000.[181] Oregon state law does not require a company to name its directors, shareholders or officials. In March 2000, Bakai was no longer head of Naftohaz: the acting head of the company was a man named Ihor Didenko. According to Donskiy, Didenko was a close associate of Bakai's, dating back to the latter's time at Respublika.[182]

Donskiy told Global Witness that money had been moved out of Naftohaz's accounts through a series of contracts with fictitious companies through UkrGazBank, a Kyiv investment bank which dealt with Naftohaz's accounts.[183] In a Ukrainian television interview, Vasyl Horbal, the chairman of UkrGazBank, stated that Bakai was a shareholder of this private bank until 2000 – when Bakai was still head of Naftohaz.[184] This was confirmed by Donskiy, speaking to Global Witness.

A source familiar with Fahr European, who asked not to be named, told Global Witness that the FBI enquired about this company in June 2002, at the request of the Ukrainian government.[185] Donskiy also stated that the case was being stalled by higher-ranking officials because of its political sensitivity and that he had been sacked because of his close involvement in the case.[186]

Bakai returned to government work in 2003; in July he was appointed, by presidential decree, the chairman of the state committee for water resources.[187] Then in October Bakai became, again by presidential decree, the director of the president's state affairs.[188] New allegations concerning

ITAR-TASS, quoting the Ukrainian interior ministry's public relations department, stated that Kyiv's Pechery district court issued a warrant for Bakai's arrest on seven charges relating to his time in the presidential administrative department concerning 'the abuse of occupational duties' (Article 365 of the Ukrainian criminal code) and 'perpetrating a crime or supervising its preparation and execution' (Article 27).[189] According to Ukraine's department for auditing, cited by ITAR-TASS, the charges were based on allegation that the presidential administrative department and its central staff misspent US$156 million.[190]

Sometime during 2004, Bakai moved to Russia. He was then granted Russian citizenship by a special presidential decree signed by Vladimir Putin. The decree states that citizenship was granted for Bakai's contributions 'on behalf of Russian culture and art.'[191] The Ukrainians have asked for Bakai to be extradited, and have placed him on Interpol's wanted list,[192] to little response from the Russians. The current Ukrainian authorities certainly suspect Bakai of wrongdoing, having presented the Russian prosecutor general with information concerning Bakai and his activities totalling one hundred volumes.[193] In March 2006, Ukrainian interior minister Yury Lutsenko stated in a television interview: 'There are 15 criminal cases [concerning Bakai] which were opened by the prosecutors … based on materials obtained by the department for fighting organised crime and the department for fighting economic crime'.[194] In recent television interviews, Bakai denied the allegations made by Lutsenko[195] and even stated that unnamed top Ukrainian officials had consulted with him in early 2006 in Moscow about Russian-Ukrainian gas issues.[196]

It is unclear why the Russians are not cooperating with Ukrainian authorities, especially since Bakai was in charge of Naftohaz when Gazprom's gas was being siphoned illegally, as acknowledged by the then Ukrainian government. Global Witness has been unable to contact Ihor Bakai concerning these allegations since his relocation to Russia. We would welcome Ihor Bakai's response in clarifying his role in the matters outlined above.

### Naftohaz Ukrainy's chairmanship: from Ihor Bakai to Yuri Boiko

Following Bakai's resignation in early 2000, Ihor Didenko became the acting head of Naftohaz. His tenure lasted only three months. He was later arrested in Germany in July 2001 and charged with embezzling US$38 million that Germany had disbursed to Ukraine to compensate victims of Nazi slave labour camps.[197] He was sentenced to four years

ment was Vadim Kopylov, whose tenure lasted from July 2000 until February 2002 when he was fired by President Kuchma.

Kopylov's successor, Yuri Boiko, appointed by presidential decree, occupied the post until just after the Orange Revolution. He was even awarded the title of 'Hero of Ukraine', Ukraine's highest state decoration, by President Kuchma in August 2004.[199] Yet investigations carried out under the premiership of Yulia Tymoshenko suggest that Boiko did little to improve the lack of transparency and mismanagement that were associated with Bakai and Didenko.

In 2004, Yuri Boiko stated he wanted to obtain an international credit rating for the release of Eurobonds, for which retrospective audits of the company from 2001 to 2003 were needed.[200] The audit from 2003 proved interesting reading. The accounting chamber of Ukraine, a statutory agency, now allowed to examine Naftohaz audits, stated that: 'the profit received by Naftohaz Ukrainy … decreased almost threefold, whereas the Company's sales revenues increased nearly twofold.' Though Naftohaz disagreed with the accounting chamber's conclusion that this decrease in profit was down to inefficient management of state corporate rights, the data was not refuted by Naftohaz, according to the accounting chamber.[201]



Yuri Boiko in the news again: it was Naftohaz, now it's politics and