Kiev's approach to the dispute must also be put in the context of Ukraine's most serious financial and economic crisis since independence. Ukraine's economy went into recession in the fourth quarter of 2008 and is expected to contract by 3–5 per cent in 2009. The year-on-year fall in industrial production to December was 26.6 per cent. The steel industry, which accounts for more than 40 per cent of Ukraine's export revenues, has contracted sharply, and steel producers cut production by up to 50 per cent in the second half of 2008. Ukraine's terms of trade have abruptly worsened, as international steel prices have fallen sharply, while gas import prices rise. Ukraine's financial system was more vulnerable to the credit crunch than any other in Europe, and the $16.5 billion loan made by the IMF in October, the largest in the fund's history as a proportion of a country's share of the fund, reflected concerns about a possible collapse.[79]

This deep economic crisis seems to have made politicians more willing to prolong the dispute with Russia because:

(i) they gambled that industry could survive for longer with less gas, and

(ii) the need to postpone price increases became more desperate.

However, in the second week in January, there were clear signs that the dispute with Russia would impact on Ukrainian consumption much sooner. Although the amount in storage at the start of the dispute was equal to two months' supply, the technical difficulties of transporting it had led to industrial enterprises being cut off, for example from 9 January in the Odessa region. A combination of lack of gas availability and the uncertainty surrounding prices, also led Naftogaz, in agreement with the minister of industrial policy, to cut the supply of gas to chemical fertilizer producers by 75–85 per cent. These are the most gas-dependent enterprises, since they use gas as a raw material. The minister stated that whether production restarted would depend on gas prices since, if they are above $200, most of the production would be loss-making. Naftogaz reported on 9 January that industrial consumption had fallen from 65–70 mmcm/day in December to 45 mmcm/day during the dispute.[80]

---

[79] 'Rost VVP v Ukraine v 2008 g. sostavil 2.1%', RBK–Ukraina, 15 January 2008; Wagstyl, Stefan and Roman Olearchyk, 'Divided stand', *Financial Times*, 3 December 2008; World Bank, *Ukraine Economic Update*, December 2008; Fitch Ratings, *Ukraine: Risks Mounting for External Finances*, 29 September 2008.

[80] Polityuk, Pavel and Guy Faulconbridge, 'Gas row cuts Ukraine industry gas use by a third', Reuters, 9 January; 'V Odesskoi obl. nachalos' otkliuchenie', RBK–Ukraina 9 January 2009; Paxton, Robin and Sabina Zawadzki, 'Ukraine draws on gas reserves in prolonged row', Reuters 13 January 2009; Chernovalov, Aleksandr, 'Gaz iskliuchili iz kursa khimii', *Kommersant*, 14 January 2009.

# 7 The influence of business groups in the dispute

On 14 January Ukrainian politicians accused each other of aggravating the dispute with Russia on behalf of business groups with interests in the gas sector. Prime Minister Timoshenko said that an agreement with Russia, based on import prices of $235/mcm and transit tariffs of $1.70–$1.80/mcm/100km had nearly been achieved, but had broken down. She claimed that the blame lay with RUE's part owner, Dmitry Firtash, former energy minister Yuri Boiko, and former head of the presidential administration Sergei Levochkin, who had lobbied against it, and suggested that President Yushchenko had been complicit. The implication, presumably, was that Firtash and his friends had disrupted the deal in the hope of RUE retaining the shipping contract, which it stood to lose if the direct contracts envisaged in the Putin–Timoshenko October memorandum were put in place. Shortly afterwards Boiko responded that Timoshenko was herself lobbying in the interests of businesses owned by Igor Bakai, who played a major role in the Russo–Ukrainian gas trade in the 1990s, and Viktor Medvedchuk, a senior politician under former President Kuchma. Boiko claimed that Timoshenko had delayed payment of Ukraine's gas debts while attempting to arrange for a company owned by Medvedchuk and Bakai to export substantial volumes of Russian gas (4.5 bcm in the first quarter).[81]

It is difficult to comment on specific allegations, since business groups' influence on politicians in Ukraine is by its nature opaque. It may be that such lobbying contributed to Ukraine's slowness in negotiations. However, the idea that this lobbying was the main cause of the dispute, or the cause of it expanding into a crisis for gas transit to Europe, flies in the face of economic realities. There is no evidence that Gazprom would have tolerated a two-week disruption of its sales to Europe, its most important source of revenue, from which it earns tens of billions of dollars a year, for the sake of changes to its relationship either with Firtash or with other players such as those mentioned in the Ukrainian parliament. We therefore dispute the interpretation of the gas conflict, offered in a comment contributed to the *Financial Times*, that while public attention focuses on the governments, 'the real fight

---

[81] 'Timoshenko obvinila Firtasha, Boiko i Iushenko', *Ukrainska Pravda*, 14 January 2009; 'Boiko: Timoshenko lobbirovala gazovyi biznes Bakaia i Medvedchuka', *Ukrainska Pravda*, 14 January 2009

over the share-out [of gas revenues] is taking place more discreetly between a few oligarchs in Moscow and Kiev. This is perhaps the whole purpose of the noisy puppet show.'[82]

In the case of Firtash, who has profited most successfully in recent years from the Russo–Ukrainian gas trade, if the agreements of 19 January stand, his companies will lose their 45 per cent share of RUE's profits from the Turkmen–Ukrainian shipping contract. The future of other aspects of his business – in particular, RUE's very profitable resale of central Asian gas in central Europe, as well as gas and electricity trading in central Europe – is not known. Firtash companies have been acquiring stakes in the Ukrainian gas distribution sector, and Firtash recently claimed that RUE controls 75 per cent of it[83] – but, again, it simply defies logic that a dispute on the scale of January 2009 could be triggered for the sake of this. It should be borne in mind that:

(a) at present the Ukrainian gas distribution sector is inherently loss-making, and

(b) if Firtash's stake in it is exercised through RUE rather than other vehicles, then it is a shared venture with Gazprom.

The settlement of the crisis appears to leave Firtash at a major disadvantage. Gazprom has reportedly agreed on the transfer of RUE's stored gas to Naftogaz as part of the $1.7bn advance payment package, and Gazprom Deputy CEO Medvedev has claimed that: 'It is clear that after the signing of contracts, there will be no sources of gas for RUE in Russia, Central Asia, or Kazakhstan'.[84] This may account for the problems that Poland has experienced due to RUE failing to deliver gas under its contract with PGNiG, as a result of which the Polish prime minister is seeking to negotiate directly with Gazprom, in addition to seeking alternative supplies.[85] But even if Firtash knew that his central European business was in danger, we doubt that he or his business competitors had the economic and political clout to cause a dispute on this scale. They were very much a secondary element.

---

[82] Guillet, Jerome, and John Evans, 'The battle of the oligarchs behind the gas dispute', *Financial Times*, 6 January 2009.

[83] Reznik, Irina, 'RUE uzhe kontroliruet 75 pert cent prodazh gaza na Ukraine', *Vedomosti*, 11 January 2009.

[84] *Interfax*, 22–8 January 2009, pp. 20–1. However it is not clear where this leaves RUE's long term contract with Gazprom.

[85] 'Polish flows dip to 76 per cent of normal', and 'Polish imports still down', Platts *European Gas Daily*, 27 January 2009, p.3 and 5 February 2009, p.2; 'Poland looking at alternative suppliers following gas dispute', *Interfax*, 29 January–4 February 2009, pp. 13–14.

# 8 Major Points of Dispute between Russia and Ukraine: the 2002 transit contract

We have set out what we understand to have been the basic points of contention between the parties during 6–19 January which were that:

- according to the Russian side, Ukraine was blocking the pipelines and
- according to the Ukrainian side, Russia failed to deliver gas.

We have covered the question of Russian allegations of gas theft and the Ukrainian response that they were entitled, in the absence of a transit contract, to take the 'technical gas' necessary to operate the transit network. We have also shown that the public Ukrainian position was that transit could not be restarted until (at least temporary) technical and transit agreements were signed by the parties, but in reality, resumption of transit required a resolution of the supply contract with Russia. Much of this pre-supposes that the existing transit contract between the parties was no longer valid. Such was the Ukrainian position, contested by Gazprom. Whether the 2002 transit contract remained valid post-2008 is therefore crucial. If it did not remain valid then Russia was in breach of its obligations to European customers. If it did remain valid then Ukraine was in breach of transit obligations by taking technical gas.[86]

The major message that the January 2009 gas crisis sent is that a transit contract – the cornerstone of any transit relationship – is not necessarily a guarantee of secure transit. Although we are not in a position to provide a legal opinion on the contractual position of Gazprom and Naftogaz in the run-up to the crisis (not least because the relevant contracts are not all in the public domain) our understanding is that the contract concluded between Gazprom and Naftogaz in 2002, on the basis of which Ukraine transited Russian gas to Europe, was not due to expire until 1 January 2014.[87] Reportedly, according to this contract, the minimum annual volume of gas to be transited across Ukraine was 110 bcm.[88] The Naftogaz letter to Gazprom claims that the contract envisages that transit volumes must be

---

[86] Either way, it seems to us that Ukraine was not entitled to take the 140 mmcm of linepack which appears to have disappeared during the crisis.

[87] *Kontrakt* 'Ob ob"emakh i usloviakh tranzita rossiskogo gaza cherez territorii Ukrainy na period s 2003 po 2013 gody', 21 June 2002, http://pravda.com.ua/news/2005/12/22/36934.htm (not available in full).

[88] Article 3.1, which reportedly stipulates this, is not available in public domain. See *Naftogaz i Gazprom: perepiska* on www.echo.msk.ru/blog/echomsk/563350-echo.phtml

agreed on the basis of annual intergovernmental protocols and stated in annual addendums to the contract.[89] Therefore citing the lack of agreement on many 'significant conditions' of the contract, such as transit volumes and transit fees in 2009, as well as the absence of annual technical agreement, Naftogaz claimed that it did not have legitimate reasons to accept Russian gas through customs. What seems crucial is that both parties *referred to the 2002 contract* as the *existing* basis of their transit relationship, having cited obligations and disagreements arising *from this particular contract*. This suggests that the transit contract remained applicable and, as subsequent events showed, did not prove to be a guarantee of security when transit was shut down with no gas flowing out of Ukraine for two weeks.

An addendum to the 2002 contract was signed on 20 April 2007, which stipulated transit conditions until the end of 2009, including a transit rate of $1.6/mcm/100km.[90] The text of this addendum is not available, at least to us. Nonetheless, assuming this addendum was signed, it must have been concluded in accordance with the principles laid down by the January 2006 Russia–Ukraine Agreement, which fixed a transit tariff for both Gazprom and RUE at $1.60/mcm until 1 January 2011, but envisaged a possibility of re-negotiating it provided that all parties concerned agreed.[91] In fact, the transit tariff was re-negotiated and increased to $1.70/mcm/100km in 2008.

The fact that the 2006 January agreement remained valid is indirectly confirmed by the October 2008 Gazprom–Naftogaz agreement, which states that the January 2006 Agreement is to be annulled only after a new contract based on the October 2008 Agreement is signed.[92] Thus whereas the 2006 January Agreement established new supply provisions (introducing RUE as the sole supplier to Ukraine), transit provisions continued to be governed by the June 2002 contract. This is because the latter includes an article 'Other Conditions' which stipulates that irrespective of annulment of any provision of the contract, the rest of the contract remains valid.[93]

---

[89] *Ibid.*
[90] A press conference by A. Medvedev and S. Kuprianov, www.vesti.ru, 31.12.2008 and *Naftogaz i Gazprom: perepiska* on www.echo.msk.ru/blog/echomsk/563350-echo.phtml
[91] 'Ob uregulirovanii otnoshenii v gazovoi sfere', *Soglashenie*, 4.01.2006. http://pravda.com.ua/news/2006/1/5/37345.htm. For a detailed analysis of the January 2006 agreement see Stern 2006.
[92] 'O printsipakh dolgosrochnogo sotrudnichestva v gazovoi sfere', *Soglashenie* October, 2008, http://www.zn.ua/img/st_img/2008/718/718-sogl.gif
[93] *Kontrakt 'Ob ob"emakh i usloviakh transita...', op.cit.*

It is important to note that while Article 13.1 of the January 2009 transit contract says that the June 2002 contract ceased to apply on 1 January 2009, Article 14.1 says that it covers the relations between the parties taking place beginning from 1 January 2009. This suggests that although the international arbitration clause may no longer apply to Ukraine under the June 2002 contract, it would apply under the January 2009 contract, as the latter also envisages an international arbitration clause. Therefore it could be argued that if Ukraine does not pay – whatever sum has been agreed – for fuel gas and linepack appropriated in January 2009, the case could be brought to Stockholm on the basis of the 2009 contract.

# 9 The role of the European Union, Energy Charter Secretariat, and Member States

## *The European Commission*

In contrast to the 2006 crisis, when European Commission officials were severely criticized for only returning from holiday in time to welcome the end of the crisis, this time Brussels was much better prepared. Nevertheless, during the first few days, before European supplies were affected, the Commission did not intervene, 'watched' developments and called repeatedly for a rapid conclusion to the dispute. On 5 January, an energy spokesman for the European Commission called the dispute 'a "purely commercial" conflict which should be resolved bilaterally'.[94] The Czech presidency – for fairly obvious historical reasons – was not keen to make any attempt to mediate between the two sides. At the same time, it acknowledged its determination to continue to bear 'pressure' on both sides, to bring them to the negotiating table.[95] On the 5th, a 'fact finding mission' was sent to Moscow and Kiev and the following day, EC President Jose Manuel Barroso spoke to both the Russian and Ukrainian prime ministers by phone and:[96]

> urged them to restore full gas supplies to the EU immediately. [He] [...] made clear that it was unacceptable that the EU's gas supply security was taken hostage to negotiations between Russia and Ukraine. He warned that reputation as reliable partners [...] was at stake [and] insisted that Ukraine and Russia had to find a stable and long-term solution to guarantee reliable gas supplies to the EU...In a new series of telephone conversations [on 9–10 January] President Barroso and [energy] Commissioner Piebalgs got assurances from both sides that if an international monitoring mission was deployed to control the flows of gas would be fully restored.

---

[94] Bennhold, Katrin, 'EU tries to stay neutral as Russia reduces gas flow to Ukraine', *International Herald Tribune*, 5 January 2009

[95] www.interfax.ru, 5 January 2009.

[96] 'Statement from President Barroso and Commissioner Piebalgs on the agreement for the gas monitoring', Commission Press Release, IP/09/33, Brussels, 11 January 2009.

On 7 January, German Chancellor Angel Merkel telephoned both prime ministers and reached agreement with them that 'experts from the European gas industry and the EU be sent quickly to determine on both sides of the Russia–Ukraine border..the cause of the transmission problems'.[97] From that date onwards the Commission then focussed on getting the terms of reference for the monitoring agreement signed by all parties. On 9 January, the Gas Coordination Group met and discussed a variety of measures including: temporary increases in production, increasing storage withdrawal, fuel switching, and increased LNG imports.[98] And on the 11th, the Monitoring Agreement was signed and monitors from the Commission, gas companies, and gas transmission operators began to deploy at the agreed entry and exit points of the network in Russia and Ukraine.[99] On the 19th (when, as it turned out, the crisis was nearly over) the Gas Coordination Group issued another press release in which it explained some of the impacts on different countries and the measures which had been taken. Interestingly the Group thanked Norway, Algeria, and Libya for providing '..a steady and even increasing supply of gas..in this time of crisis.'[100]

### European gas and utility companies

When it became clear on 13 January, that the monitoring mission would have nothing to monitor because gas was still not flowing, European gas and utility companies – which had up to this point contributed most of the monitors but done little else – began to play a more active role. Some of these companies, Gazprom's main European customers, began to suggest that the Russian company needed to make greater efforts towards a resolution.

---

[97] www.germany.info/Vertretung/usa/en/__PR/P__Wash/2009/01/07__NaturalGas__PR,archiveCtx=2028290.html

[98] Measures discussed at the Gas Coordination Group, MEMO/09/4, Brussels 9 January 2009. On the same day the Group had a meeting with Gazprom, Naftogaz, and the Ukrainian Administration to 'discuss the current crisis and reach a common understanding between experts of the main elements of the dispute…'. 'Monitoring team starts work in Kiev and Gas Coordination Group urges Naftgaz and Gazprom to resume deliveries immediately', IP/09/24, Brussels 9 January 2009. The Group was set up in the wake of the 2006 crisis, under provisions in the Security of Gas Supply Directive 2004/67. It is composed of representatives of member state governments, gas company representatives, and consumers. It meets four times a year to exchange information and develop and coordinate gas security measures.

[99] Statement from the President Barroso, *op cit*; It is also worth noting another press release the same day which makes reference to the Ukrainian declaration to which Moscow took great exception and which may or may not have delayed the implementation of the monitoring mission. IP/09/34, Brussels 11 January 2009.

[100] 'Gas Coordination Group: Solidarity works and the EU's gas market adapts to challenges of gas crisis', IP/09/75, Brussels, 19 January 2009.

Following Naftogaz's declaration to Gazprom that 140 mmcm of linepack and 21 mmcm/day of technical (fuel) gas would be needed before transit to Europe could be restarted, a group of companies set about creating a vehicle to provide the finance for such gas. The idea of a consortium to provide this finance was announced by Prime Minister Putin on 15 January at a meeting with Paolo Scaroni, CEO of ENI.[101] In 36 hours, a consortium was created consisting of: ENI, Gdf/Suez, E.ON/Ruhrgas, RWE, Wingas, OMV, and Gazprom. Legal documentation was signed whereby the consortium would provide the finance for gas to restart and to operate the transit network until the two sides had reached a long term settlement, after which a mechanism in the agreement provided for repayment of funds to the companies involved. While the consortium agreement was not needed (having been overtaken by a resolution of the dispute) it seems likely that it helped to speed up the process by removing the final Ukrainian objection – that it was not prepared to pay for linepack and fuel gas to restart the transit network. The consortium was set up by gas companies, backed by national leaders – Prime Minister Silvio Berlusconi of Italy and Chancellor Angela Merkel of Germany, together with Prime Minister Putin are said to have been particularly influential – but there is no suggestion that the Commission played any role.[102]

On 20 January, the EC president issued a statement giving his interpretation of the Commission's contribution to the resolution of the crisis:[103]

> We have worked night and day for three weeks to get to this point. I have spoken in considerable detail and with great regularity to [the Russian and Ukrainian presidents and prime ministers]. I have made it very clear throughout that we insisted on the immediate resumption of deliveries. […]We set up a monitoring team […] which was vital for confidence building. But when it was clear that this was not enough, the Commission then sponsored the agreement on the Terms of Reference for the monitoring mission. [...] And finally when it was clear that agreement on the whole contract was going to be necessary in order for gas transit to be resumed, [Energy Commissioner Piebalgs] and I pushed hard for direct, substantial talks between the parties at a high political level. This has now led directly to settlement of the dispute

---

[101] 'Innovative solution to allow gas transit to resume', *Ukrainefacts*, 15 January 2009
[102] We are not aware of any publicly available information about the consortium; this account is the result of personal contact with some of the companies involved.
[103] 'Statement of President Barroso on the resolution of the Ukraine–Russia gas dispute', SPEECH/09/12, Brussels, 20 January 2009.

[…] But at the same time, it is difficult to welcome something that should not have happened in the first place. It was utterly unacceptable that European gas consumers were held hostage to this dispute between Russia and Ukraine.

But in contrast to this interpretation, it is difficult to escape the conclusion that the Commission, played a rather minor role in the settlement of the dispute. Having set up the monitoring mission – with the assistance of European utility companies which provided most of the monitors – and finding that this did not result in a resumption of gas flows, it was reduced to the role of urging both sides to cooperate. It was left to European gas companies (with the backing of national governments) to raise the finance needed to restart the network, which arguably gave the signal for the two sides to come together to thrash out a solution. The overall impression from the crisis was that in this situation, the Commission:

- had little technical capability and needs to rely on the industry for monitoring capability;
- had little political credibility or political leverage with either Ukraine or Russia;
- was unable or unwilling to provide the financial resources to resolve the crisis.

This calls into question the usefulness of documents such as the Commission's 2nd Strategic Energy Review with its concept of solidarity between member states. This was a situation in which south east Europe and the Energy Community Treaty countries needed a tangible demonstration of the Commission's ability to assist in an energy security crisis, and could not have been greatly reassured by its performance.[104]

## *The ECT, the Energy Charter Secretariat and the consequences for gas transit*

Prior to the crisis, the Secretary General of the Energy Charter Secretariat issued a press release on the impending dispute warning that, regardless of whether it was receiving gas for itself, Ukraine had to ensure transit was not interrupted. The treaty obliges signatories to 'secure established flows of Energy Materials and Products to, from or between the Areas of other contracting parties', and a core element of this principle is 'to prevent non-transit-

---

[104] Article 45 of the Energy Community Treaty envisages a mutual assistance mechanism, according to which the ministerial council meets upon the request of the affected party and decides on response to disruption. We do not know whether any affected party made a request and if not, why not.

related issues from having a negative impact on transit volumes'.[105] On 9 January, the Secretary General repeated the terms of Article 7.5; reminded the parties of the dispute resolution procedure, and offered the services of former president of the International Gas Union (and former CEO of the Dutch company Gasunie) George Verberg to lead conciliation efforts.[106] On 14 January, the Secretary General repeated that Mr Verberg was willing to conciliate, and drew attention to the scale of gas losses being suffered as a result of the crisis.[107]

Thus, despite the best efforts of the Charter Secretariat, the existence of the Energy Charter Treaty,[108] and the fact that Ukraine has signed and ratified it, Ukraine nevertheless failed to interpret correctly its transit provisions on non-interruption and non-reduction of transit flows. Given that the Treaty is, in our view, an instrument of prevention rather than resolution of transit disputes, it is of secondary importance that Russia had signed but not ratified the Treaty, and hence could not invoke its transit dispute conciliation procedure against Ukraine. Indeed Russian ratification of the Treaty might not have changed the fact that Ukraine failed to fulfil its commitments, although it would have greatly strengthened the Russian position. Moreover, in view of Ukraine's disregard of its Treaty obligations, even if conciliation had been invoked, there is no guarantee that the resulting (supposedly legally binding) decisions would have been honoured. But, again, had the Russian Federation ratified the treaty, responsibility for the outcome would not have been in doubt.

This crisis provided the ECT with the potential to raise its profile and prove that it could serve as an important instrument to manage transit relationships; unfortunately that opportunity was missed. The task was not easy, however. During the first 11 days of the crisis, the absence of an independent monitoring mission on both sides of the Ukrainian pipeline system meant it was impossible to tell whether Ukraine was taking gas out of transit pipelines, or whether Russia was failing to deliver gas into the system. Therefore it was impossible to claim with any certainty which party was responsible for reducing and/or interrupting transit volumes, and hence violating ECT principles. Arguably the monitoring

---

[105] Article 7.5 of the Treaty; 'Secretary General Issues Statement on Russia–Ukraine Gas Dispute', Energy Charter Secretariat press release, 23 December 2008.
[106] 'Statement of the Secretary General on the recent developments in the Russia–Ukraine gas dispute', Energy Charter Secretariat press release, 9 January 2009.
[107] 'Russia–Ukraine gas dispute: Secretary General appeals for conciliation efforts', Energy Charter Secretariat press release, 14 January 2009.
[108] To which Ukraine, Russia, European Communities and its Member States are all parties. Full list of ECT members can be found on its website www.encharter.org

initiative, eventually put in place by the Commission (see above) could have come from the ECT Secretariat, which could have attempted to put it in place *before* the crisis, especially as both Russian and Ukrainian representatives were warning Europe of imminent difficulties, but this would have been an extremely difficult diplomatic task.

Following the crisis, when the monitoring group was in place, the ECT secretariat could have attempted (and could still attempt) to institutionalize this arrangement within the Treaty framework. Thus this group could acquire a semi-permanent status which would allow its presence at *both* borders – Russia/Ukraine and Ukraine/European countries – following a request or a warning from either party about any potential transit difficulties in the future.[109] Even in the absence of independent verification of transit flows, there was an opportunity for the ECT secretariat to raise the Treaty's profile. Ukraine's own admissions – first on the taking of technical gas, and more conclusively its refusal to restart transit in the absence of a new agreement providing linepack and technical gas – were sufficient to conclude that the ECT had been violated. Had the Energy Charter Secretariat, or the European Commission, or any of the Member States (all of which have ratified the Treaty) stated publicly at any stage of the crisis that Ukraine was not acting in accordance with its obligations under the Treaty, it could have sent an important signal to Ukraine.[110] At the same time, such a step could have sent Russia a signal that the key European players took extremely seriously a violation of the ECT by a ratified party, and that the Treaty could perform a valuable function in resolving transit crises. It could also have gone some way towards responding to the cynicism of both Gazprom and much of the Russian political establishment, which was already evident during the 2006 crisis, that European calls for Russian ratification are aimed at holding Russia – but no other parties – accountable to the terms of the Treaty.[111]

Given that the 2006 Russia–Ukraine gas crisis (and the less well-known but nonetheless important 2004 Russia–Belarus gas crisis) had already provided serious warnings about potential future transit problems, certain steps could have been taken within the ECT framework. First and foremost this refers to improving transparency in relation both to flows

---

[109] Shortly after the restart of deliveries, the Secretary General issued a document which contains similar suggestions. 'A Word from the Secretary General on the Energy Crisis of Early 2009', February 6, 2009, www.encharter.org/index.php?id=21&id_article=171&L=0

[110] This follows the argument of Stevens that the consequences of violating an international agreement are much more serious than those resulting from abrogation of a bilateral agreement. P. Stevens, *Cross border oil and gas pipelines: problems and prospects*, ESMAP technical paper, UNDP/World Bank, Washington DC, 2003.

[111] See Mitrova, Pirani and Stern in Pirani 2009, pp. 394–440, for Gazprom's reaction to the Energy Charter Treaty after the 2006 crisis.

and supply and transit contracts between Russia and Ukraine (and other CIS transit countries).[112] The 2009 January crisis highlighted these problems.

In the immediate aftermath of the crisis, both Gazprom management and Prime Minister Putin began to talk about creating a new transit framework to replace the Energy Charter Treaty. In his January 2009 speech at the World Economic Forum in Davos, Prime Minister Putin said:[113]

> Unfortunately, the existing Energy Charter has failed to become a working instrument able to regulate emerging problems. Even countries that have signed and ratified it turn a blind eye to it just when it should be implemented. I propose we start laying down a new international legal framework for energy security. Guaranteeing the transit of energy resources remains a challenge. There are several ways of tackling it, and all must be used. The first is to adopt generally recognized market principles of fixing tariffs on transit services. They can be recorded in international legal documents. The second is to develop and diversify the routes of energy transportation.

This is a predictably harsh judgement from the Russian side. One could take the view that, had Russia ratified the Charter Treaty, it would have been able to invoke its dispute resolution procedure, thereby placing the Ukrainian side at an immediate and considerable international legal disadvantage. The fact that none of the European companies used the Treaty only reflected the fact that they had supply contracts with Gazprom, not transit contracts (or indeed any contracts) with Ukraine.[114] However, it did not excuse the general European silence on public identification of the Ukrainian failure to live up to its Treaty obligations.

The ECT has taken more than a decade to gain ratification by more than 50 countries. Whatever instrument Russia may now propose is likely to take at least as long to put in place, and may be resisted by those countries not predisposed to accept a Russian initiative. Whatever its faults, the ECT is the only existing international transit regime, and is likely to

---

[112] Stern 2006.

[113] http://premier.gov.ru/eng/visits/world/95/1921.html

[114] However, arguably, contracting parties to the ECT could have invoked dispute resolution under Article 27 of the ECT. Also a party to the Energy Community Treaty directly affected by the disruption could have made a request for a Ministerial Council to meet in order to consider the necessary measures in response to the disruption (Article 45 of the Energy Community Treaty).

remain so for many years. However, this does not mean that it cannot be adapted using the lessons from this dispute, and particularly the need for monitors at all entry and exit points on a transit network in the event of a crisis. But this crisis has serious consequences for all energy transit relationships, as it suggests an inherent instability which cannot be completely eliminated because of the difficulties of monitoring energy flows. The crisis may constitute a paradigm shift for the way in which energy, and specifically gas, transit relationships may be viewed in relation to verification of obligations, and a more difficult future both for transit projects and any regime which seeks to regulate them.

## The impact on European gas consumers

This study, completed only a few weeks after the conclusion of the crisis, cannot attempt a detailed account of the impact on European countries. Without wishing to minimize the inconvenience caused elsewhere (notably in Slovakia), by far the most severe consequences were in south-east Europe, specifically: Moldova, Bulgaria, Romania, Serbia, Bosnia-Herzegovina, and Croatia, and we are publishing a companion note on these consequences along with this study.[115] In the Balkans, there were significant humanitarian consequences, especially during the second week of the crisis.

---

[115] Aleksandar Kovacevic, *The Impact of the Russia–Ukraine Gas Crisis in South Eastern Europe*, OIES, forthcoming 2009.

*Table 4. The Position of European Countries Affected by Interruption of Russian Supply*

| Country | Cut | Diversification | Gas storage | Alternative fuel |
|---|---|---|---|---|
| Bulgaria | 100% | No diversification | Gas storage for 2–3 days, covering 35% of gas demand | Alternative fuel for 20 days |
| Slovakia | 97% | No diversification | Gas storage for several weeks, covering 76% of gas demand | Alternative fuel for one month |
| Greece | 80% BD and TR | Only LNG terminal, fully capable, booked more ships | Only in LNG terminal | One gas power plant switched to oil, sufficient till end of January |
| Austria | 66% | Increased import from Norway and Germany | Gas in storage for several weeks | Yes |
| Czech Republic | 71% | Increased import by 8 mmcm/day from Norway, and via Yamal/Germany | Gas from storage 40 days, 15% increase of domestic production | Not used now, could be coal and oil |
| Slovenia | 50% | Gas from Algeria via Italy, and from Austria but not increased amount | Gas from storage in Austria till Monday then possible decrease of supply by another 20% | Yes |
| Hungary | 45% | Increased gas from Norway by 5% | Gas storage for 45 days | Alternative fuel – crude 90 days, fuel oil 30 days |
| Poland | 33% | Half of the cut covered by Yamal, more gas from Norway | Gas storage for several weeks | Yes |
| Romania | 34% | No diversification | Increased domestic production (60%) and withdrawal from storage | Yes |

| Germany | 60% cut in Southern Germany, 10% total | +20 mmcm receiving from Yamal, more from Norway and Netherlands | Gas storage for several weeks | Not used now |
|---|---|---|---|---|
| Italy | 25% | Increased import from Libya, Norway, and Netherlands | 79% full, covers 50% of demand | Not used now |
| France | 15% | Industry covered | 80% full | Not used now |
| Serbia | 100% | 12% renegotiated with HU | 1 mmcm, less than one day, 8% covered by production | 3 weeks of fuel oil |
| Bosnia and Herzegovina | 40% | No diversification | No storage | Fuel oil only for 20 days |
| FYROM | 100% | No diversification | No storage | Fuel oil stocks need only for industry |
| Croatia | 40% | Diversification to Italy, but not used, negotiations ongoing | Increased domestic production (43%) and storage withdrawal, 500 mmcm stored | Fuel oil for industry |
| Moldova (observer) | 100% | No diversification | No storage | No alternative |

Source: Gas Coordination Group, *Member State General Situation According to Significance of Impact*, Memo 09/3, Brussels, 9 January 2009.

Table 4 is from the EU Gas Coordination Group and sets out the immediately available gas and other fuel alternatives. North-west Europe was not much inconvenienced by the crisis, and none of the continent's major markets came close to cutting off – even interruptible – customers, although reduced industrial demand resulting from deepening economic recession was a factor in this relatively comfortable position. Spot gas prices at the UK's national balancing point rose substantially for a few days and the interconnector pipeline switched to export mode on 6 January.[116]

---

[116] The impact of the crisis was slightly difficult to disentangle from other factors such as cold weather and the loss of a major Norwegian field during the same period. For details see *International Gas Report*, 19 January 2009, pp. 38–9.

A number of countries had made investments since the 2006 crisis and were therefore in a much better position, but this did not apply to south-eastern Europe. The Gas Coordination Group emphasized that the industry did all it could to help those affected:[117]

- for Slovakia, the east–west flow was reversed and gas flowed from Germany through the Czech Republic. German gas companies also supplied additional gas to Hungary, Slovenia, Croatia, Serbia, and Bosnia-Herzegovina
- Hungary provided some of its strategic stocks to Serbia
- Domestic gas and LNG supplies were increased where possible.

Here was solidarity in action. However, it was perhaps fortunate that many of the 'old' member states had ample gas in storage that they would perhaps not need because the impact of economic recession meant that gas demand was at lower levels than would normally have been the case.[118]

---

[117] Gas Coordination Group: solidarity works and the EU's gas market adapts to challenges of gas crisis. IP09/75, Brussels, 19 January 2009.

[118] It has been suggested that this may have been rather profitable solidarity for European companies as they were selling gas out of their storages at high prices that they were fairly certain they would not need, and fairly certain they would be able to buy it back more cheaply – given falling gas prices – later in the year. Westphal, Kirsten, 'Europe Held Hostage?' *Russian Analytical Digest*, 53/09, pp. 15–18.

# 10 Consequences for Russia, Ukraine and Europe

It is too early to suggest even the short, let alone the long, term consequences of this crisis for European gas and energy policies and balances. What we set out here is an outline of immediately available information, some early reactions of European stakeholders, and some of our own thoughts on likely long term consequences.

*Gazprom's* reputation for reliability of supply has been damaged, perhaps irreparably. This is not just because many were always predisposed, for ideological reasons, to believe that Gazprom was not a secure supplier, but because the majority of ordinary European citizens and politicians will not be interested in detailed legal/commercial arguments about which side was to blame for this crisis. From the point of view of the Czech foreign minister, 'The main lesson learned from this crisis is that Russia and Ukraine aren't reliable suppliers. Europe must think about alternative sources and pipelines.'[119] Others have expressed the – completely understandable – view that their contracts are with Gazprom which, irrespective of the difficulties of managing its Ukrainian relationship, is legally obliged to deliver gas and failed to do so, resulting in loss and suffering, with no guarantee that events will not be repeated. Gazprom's credibility as a reliable supplier in the future will, to a considerable extent, rest on being able to demonstrate that it will not be dependent on its relationship with Ukraine as a transit route. In order to do this, it must either ensure that the Ukrainian network will henceforth be owned and operated by a European consortium involving Ukrainian, Russian, and EU companies, or it must press ahead as fast as possible with bypass pipelines. Both of these options are likely to require several years and billions of Euros to implement.

For *Ukraine*, in the short term, the agreements of 20 January highlight two problems:
(i) the difficulty that Ukraine will have – due to its broader economic and fiscal problems – in paying for gas imported at high prices, and
(ii) the political divisions in Kiev, which have resulted in the Ukrainian president raising the issue of renegotiating the agreements in the week after they were signed.

A further likely consequence of the dispute, as we have argued above, is that transit diversification projects to bring Russian gas to Europe without going through Ukraine will be accelerated. If it is accepted that, in the last resort, Ukraine's position as the dominant

---

[119] *Interfax*, 22–9 January 2009, p.5.

transporter of Russian gas to Europe can be, and is, used as a powerful weapon in negotiations over prices, then transit diversification will mean that that weapon will be blunted or lost altogether. Furthermore, Ukraine will face a reduction of valuable transit revenue income.

These immediate and medium-term concerns often obscure a more obvious, but salient, issue: that Ukraine's dependence on imported Russian gas is, strictly in energy terms, a consequence of its very high gas demand. This in turn results from it having the most energy-inefficient economy in the world. Gas is used in unusually large quantities: for example the heavily subsidized Ukrainian district heating system uses more gas than the entire Czech Republic. Ukrainian politicians constantly argue about the extent to which this or that clause in a contract, or a particular level of gas prices or transit tariffs, reflects the national interest – but only rarely is the obvious point made that Ukraine's national interest would be best served by reducing dependence on imported gas, which would in turn reduce the relevance of arguments about prices, transit tariffs, and contracts. Ukraine can only really reduce its dependence on imported gas in two ways:

(i) by reducing consumption via energy-saving measures, and

(ii) by increasing its own gas production.

While Ukrainian governments in the 1990s were arguably too financially and economically weak to attempt such a long-term strategy, those of the 2000s have also failed to pay serious attention to these issues, despite the opportunity provided by a decade of economic growth. Now, with Ukraine moving back into recession, consideration of such a long-term outlook becomes simultaneously more urgent and more difficult.

*European* impacts need to be carefully classified into short, medium, and long term.

- In the short term, the next one to two years, the focus needs to be on central and particularly south-east Europe, in relation to additional interconnection with neighbouring countries, north-west Europe and southern European countries with the capacity to import additional LNG supplies from existing terminals, plus additional storage close to these markets.[120]

---

[120] A simple example is the lack of interconnection between Bulgaria and Turkey where lack of reverse flow capability meant that Bulgaria could not receive any gas from Turkey; this could be resolved relatively easily and cheaply.

- In the medium term 2011–15, Ukraine bypass pipelines could resolve the security situation, but only if the problem is perceived to be Ukraine – or the Russia–Ukraine relationship. If the Nord Stream and South Stream had been in place on 1 January, the consequences of this dispute would barely have registered in the majority of European countries.[121] But if, as some will believe, the problem lies not with Ukraine but with Russia, then the routes by which Russian gas reaches Europe are much less relevant. Towards the end of this period, new LNG receiving terminals could have been built (notably in Poland and Croatia where plans are well-advanced) but their sponsors need to pay attention to the likely state of global LNG supply and demand, as price competition with the established Pacific and Atlantic Basin LNG buyers could become an important factor.

- In the longer term, post-2015 and particularly post-2020, large scale Caspian and Middle East pipelines such as Nabucco are possible, and are now being intensively studied, in the immediate aftermath of the crisis. However, we do not believe that sufficient gas can be made available to fill a 30 bcm pipeline from these countries to Europe before the late 2010s at the very earliest.[122]

Finally, it needs to be remembered that European countries have long term contracts to import 180–200 bcm of gas from Gazprom, most of which stretch out to beyond 2025 and some beyond 2030. This crisis has not changed European obligations under these contracts. Moreover, as the current global economic crisis engulfs Europe, gas (and general energy) demand is falling rapidly and (in most countries) dramatically. In these uncertain times it will be difficult for companies to sign up new supplies merely for reasons of diversification and security of supply. Indeed, if their demand falls too far and too quickly, they may have problems meeting the take or pay obligations in their existing long term contracts.

---

[121] Mikhail Korchemkin has disputed this conclusion and shown that even with Nord and South Stream, Ukraine would still have had to transit 18 mmcm/day to fully meet Russian demand in Europe. While we are happy to accept that conclusion, replacing (or doing without) 18 mmcm/day seems to us a much easier task than replacing 250–350 mmcm/day. See Mikhail Korchemkin, *Wall St Journal*, 12 January 2009
[122] Pirani 2009, pp. 403–8.

# 11 Conclusions

The 2009 Russia–Ukraine crisis was a landmark event in Russian gas relations with CIS countries and Europe; for Europe it was also a landmark gas and energy security event which will probably have far-reaching policy consequences. A crisis in Russia–Ukraine bilateral gas relations was not in itself a surprise. Many, including ourselves, had seen it coming as long ago as the summer of 2008.[123] The surprise, indeed the shock, was that both sides allowed the dispute to escalate from disagreements about debts, prices, and transit tariffs to the point where supplies to Europe were completely cut off; and then allowed this situation to continue for two weeks in the middle of winter, with serious adverse humanitarian consequences for (especially) south-east European countries.

We do not believe that the often-cited desire of the Russian government to use energy as an economic or political 'weapon' *against European countries* played any part in this crisis. Russia's relationship with Europe in the gas sphere is and will remain one of mutual dependence: while Europe depends heavily on Russian gas supplies, Russia – which here means both Gazprom and the Russian state – relies heavily on the revenues generated from European sales.

By contrast, the critical Russian decision to cut back deliveries on 5 January was an unnecessarily risky and commercially irrational action at that stage of the dispute. That decision may have reflected Prime Minister Putin's anger and frustration, and been aimed at punishing Ukraine for its repeated threats to disrupt transit. These emotions may have been personalized to President Yushchenko, given the historical animosity of Russia towards the Orange Revolution and towards Yushchenko's subsequent policy orientation away from Russia. Another motive may have been to bring Europe into the intractable dispute over the Ukrainian transit network, with a view to changing future transit arrangements.

We do not believe that 'oligarchs' were a decisive influence on either the cause or the outcome of the crisis – despite the role alleged to have been played by RUE's part-owner

---

[123] Tom Miles, 'Europe faces fresh New Year Russian gas crisis', Reuters, July 8, 2008.

Dmitry Firtash – although they were probably a complicating factor and may have delayed its resolution.

Did either of the two sides bear more responsibility for gas supply being disrupted? From the evidence available to us, we conclude that, while there is room for debate on the facts and the legal basis of the actions of both sides, Gazprom's legal and contractual arguments appear to be much the strongest. However, we have been unable to make a forensic examination of the contractual documentation, or to have access to records of all of the gas flow data into and out of Ukraine during the crisis, which would be needed to confirm that conclusion. But we also believe that both responsibility for, and the longer term consequences of, this dispute go far beyond narrow judgements about legal and contractual responsibilities, which form only a part of the picture and not the most important part, except possibly for lawyers in any future arbitration proceedings. Irrespective of the origins of the dispute, once it had gone into its second phase, i.e. after Russian deliveries to Europe were stopped completely on 7 January, neither side demonstrated the required level of concern for the damage it was causing to both customers in, and long term relationships with, Europe. This crisis had no 'winners' only losers, and – with the exception of European energy utility companies and some European heads of state – none of the parties involved have emerged from it with any great credit.

Even if our conclusion on the legal and contractual arguments is accepted, the much bigger question is why both sides allowed this dispute to escalate to the point where 20 per cent of Europe's gas was cut off for two weeks in the middle of winter.[124] In so doing, Gazprom lost around \$1.5bn of revenues due to lack of sales, plus whatever penalties its European customers may be due under their contracts and possible additional damages claims. Immeasurably more seriously, 40 years of Russia's reputation as a secure gas supplier, and Ukraine's reputation as a secure transit country, have been damaged, probably irreparably. The Russian government – almost certainly personalized to Prime Minister Putin – which took the decisions which eventually led, on 7 January, to the complete interruption of European supplies through the Ukrainian transit network, should have recognized these consequences and had the option of stepping back. In the short term, this would have

---

[124] 20 per cent is the rough share of Europe's gas demand, on an annual basis, delivered via the Ukrainian corridor. However, the EU Gas Coordination Group refers to the European market having lost 30 per cent of its gas imports, which would be a slightly smaller share of total demand. 'Monitoring team starts work in Kiev and Gas Coordination Group urges Naftgaz and Gazprom to resume deliveries immediately', IP/09/24, Brussels 9 January 2009.

involved a loss of revenue (through conceding a lower price/higher transit tariff) and loss of political 'face' but could have avoided anything more profound. Russia decided to pursue the dispute nonetheless.

The Ukrainian position was characterized by desperation, engendered by Ukraine's serious economic crisis that rising gas prices will aggravate, and by divisions in the political leadership that were prioritized over any larger strategic aims. Ukrainian President Yushchenko and Prime Minister Timoshenko's divergent views on a variety of issues played an important part in causing the crisis. This division also played its part in prolonging the dispute for at least a week longer than necessary, when it became clear – following the deployment of EU monitors – that Ukraine had no intention of allowing supplies to Europe to resume in the absence of new bilateral supply and transit contracts.

This crisis demonstrates that the two sides lost control of their bilateral gas relationship, and that neither the European Union nor the Energy Charter Treaty was decisive in its resolution. In the final analysis, it was European energy and utility companies (prompted in part by their governments) – by providing both technical expertise through monitors, and offering financial resources for replacement linepack gas and technical (fuel) gas – creating the conditions for new contracts to be signed, which led to resumption of gas flows. Given the positions taken by both sides, it was impossible for Russian gas to continue to transit to Europe in the absence of a Russian supply contract with Ukraine. In such circumstances, even had Russia ratified the Energy Charter Treaty and its Transit Protocol, the outcome of the crisis in terms of gas flows might not have been different, although responsibilities would have been easier to identify. As such, there must be significant doubt that a key provision of the Charter Treaty – that in the event of a transit dispute, energy supplies must continue to flow pending dispute resolution – is, *in the specific case of Russian–Ukrainian gas relations,* workable in practice.

European, and particularly Central and East European, countries which suffered economic and humanitarian damage from this crisis, were principally concerned about the consequences of the failure to deliver gas for their economies and their citizens. As such, it does not matter very much to Europe which side was 'at fault' for this crisis. The issue for the future is that since Russian gas supplies through Ukraine have been cut off once, they could be cut off again. Thus the problem for both sides is one of credibility in relation to future

supplies and transit. The problem for the Ukrainian side is that this crisis will have hardened Russian determination to greatly reduce its transit dependence by building the Nord Stream and South Stream pipelines; a development with serious financial consequences for a country in an already difficult economic situation. But for at least the next three – and probably the next five – years, the current level of European dependence on the Russia–Ukraine relationship will continue, and this is a serious concern given the strong likelihood of a further breakdown of commercial and political relations.

Specific consequences of this crisis cannot be foreseen less than three weeks after its (initial) resolution, and in any case are beyond the scope of this paper. However, some generalizations are possible. European companies have long term contracts for the import of Russian gas, most of which stretch 15–25 years into the future; there is no legal scope for significantly reducing volumes under these contracts. Whatever may be desired by European stakeholders, little can be achieved in terms of diversification away from Russian gas over the next few years. What could be achieved is a diversification of delivery routes away from Ukraine via Nord Stream and South Stream which, by 2015 (and perhaps earlier) could very substantially reduce the significance of Russia–Ukraine relations for European gas customers. Therefore if, as we suggest here, the central causes of this crisis were Ukrainian actions and the inability of both sides to manage their bilateral relationship, then these transit avoidance pipelines could be a large part of the solution. If, on the other hand, Russian actions – and particularly the political elements in Russian decision making – are judged to be the major problem, then the route(s) of the gas to Europe is irrelevant. From the actions of various stakeholders during the dispute, it appears that European political leaderships are much more likely than energy companies to place the emphasis on diversifying away from Russian gas supplies.

Over the next 10–20 years, European companies and governments will have options in relation to decisions from where their additional gas supplies should be sourced; and options to reorient energy balances away from gas towards other sources of energy, particularly for power generation. It is certainly possible that choices will include non-gas alternatives, and non-Russian gas supplies reaching Europe via non-Russian routes. The extent and speed with which such alternatives may be realized in the 2020s will tell us how much damage this crisis has caused in Europe to the image of gas in general, and to Russian gas in particular.

# BIBLIOGRAPHY

Gazprom website: www.gazprom.com

Global Witness, 'It's a Gas – Funny Business in Turkmen–Ukraine Gas Trade', April 2006.
Available at:
www.globalwitness.org/media_library_detail.php/479/en/its_a_gas._funny_business_in_the_t
urkmen_ukraine_g

Interfax: *Interfax Russian and CIS Oil and Gas Weekly*, various issues.

Naftogaz Ukrainy website. Available at: www.naftogaz.com/

Pirani, Simon, (2007), 'Ukraine's Gas Sector', Oxford: OIES. Available at:
www.oxfordenergy.org/pdfs/NG21.pdf

Pirani, Simon, (ed.), (2009), *Russian and CIS Gas Markets and Their Impact on Europe*
(OIES, Oxford University Press, Forthcoming February 2009).

Stern, Jonathan, (2005), *The Future of Russian Gas and Gazprom* (OIES, Oxford University
Press: 2005)

Stern, Jonathan, (2006), *The Russian–Ukrainian Gas Crisis of 2006* (Oxford, OIES, January
2006). Available at: www.oxfordenergy.org/pdfs/comment_0106.pdf

Stern, Jonathan, (2009), *Resumption of Russian gas deliveries to central and east European
countries on humanitarian grounds: a proposal*, January 2009, Oxford: OIES. Available at:
www.oxfordenergy.org/pdfs/comment_0109-1.pdf

Ukrainefacts website. Available at: www.gazpromukrainefacts.com

Ukraine-Russia Supply Contract: Kontrakt ot 19 ianvaria 2009 g. mezhdu Otkrytym
Aktsionernym Obshchestvom "Gazprom", Moskva, Rossiiskaia Federatsiia, i Natsional'noi

Aktsionernoi Kompaniei "Naftogaz Ukrainy", Kiev, Ukraina, o kupli-prodazhi prirodnogo gaza v 2009-2019 godakh. Published at www2.pravda.com.ua/ru/news/2009/1/22/87168.htm

Ukraine-Russia Transit Contract: Kontrakt mezhdu Natsional'noi Aktsionernoi Kompaniei "Naftogaz Ukrainy" Kiev, Ukraina, i Otkrytym Aktsionernym Obshchestvom "Gazprom", Moskva, Rossiiskaia Federatsiia, ob ob"emakh i usloviiakh transita prirodnogo gaza cherez territoriiu Ukrainy na period s 2009 po 2019 godi." Published at www2.pravda.com.ua/ru/news/2009/1/22/87178.htm.
An English translation is published at www.kyivpost.com/business/34679 and www.kyivpost.com/business/34682

Yafimava, Katja and Jonathan Stern, (2007), *The 2007 Russia-Belarus Gas Agreement, Oxford Energy Comment*, (OIES, January 2007). Available at: www.oxfordenergy.org/pdfs/comment_0107-3.pdf

Yafimava, Katja, (2007), *Post-Soviet Russian-Belarussian Relationships: the role of gas transit pipelines*, Ibidem-Verlag: Stuttgart.

## UNITS OF MEASUREMENT

The abbreviations used for units of measurement in this study are:

bcm: billion (thousand million) cubic metres

mmcm: million cubic metres

mcm: thousand cubic metres