# Exhibit 21

**The Danish Helsinki Committee**
**for Human Rights**

Brødgade 36 B, 1260 Copenhagen K.
Tel. +45 3391 8110
Mail: main@helsinki-komiteen.dk

# Legal Monitoring in Ukraine

## Preliminary Report on the trials against
## former Minister of Interior Yurij Lutsenko and
## former First Deputy Minister of Justice Yevhen Korniychuk

This report describes and assesses the facts and the legal situation around the investigation and detention of former Minister of Interior Yurij Lutsenko and former Deputy Minister of Justice Yevhen Korniychuk.

These two cases have been selected among the numerous cases pending against leading politicians from the former government. The ambition is through these cases to be able to describe relevant sides of the human rights status of the present legislation and legal system of Ukraine. Most of the observations will probably be valid for other similar cases too. The preliminary report does not have the ambition of being a fully fledged legal analysis; it is rather to be considered as a practitioner's spot observations at this stage of the trials. It is the intention to follow up with reports on other aspects of these cases and of other cases as well.

It is not the purpose of the monitoring of the criminal cases to establish whether the defendants are guilty or innocent. Ukraine ranks very high on international lists of corruption and any honest attempt to fight it will be welcomed by the international community, even if it should be against politicians from the former regime. Smooth transfer of power from one government to the next is however so important an element in a functioning democracy and prosecution against so many members of a former government so seldomly seen, even in that part of the world, that the present government must understand and accept international skepticism as to its motives. Especially as the present government generally is considered to have a poor record in fighting corruption and could have an evident interest in removing prominent political opponents from future elections.

The report is produced for the Danish Helsinki Committee on Human Rights as part of its Legal Monitoring program by Mikael Lyngbo, who has many years of experience as a public prosecutor, chief of police and deputy chief of the Danish Security Service. He has also worked for the EU and other international organizations as Chief Advisor in Albania, Political Advisor in the Sudan, Rule of Law Expert in Iraq and Head of Evaluation Team in South Africa. It is based on observations during his presence in court and meetings with legal experts, Ukrainian officials, civil society organizations and political and diplomatic representatives.

Copenhagen, 28th of April 2011

## The case against Yevhen Korniychuk

Yevhen Korniychuk is a lawyer by profession, specializing in international finance and business law. He was elected to Parliament and became in 2006 chairman of the Ukrainian Social Democratic Party, following his father in law Vasyl Onopenko, a judge by profession who was elected president of the Ukrainian Supreme Court. From 2007 -2010 he was First Deputy Minister of Justice in the Yulia Timoshenko government.

He is charged with violation of art. 365, paragraph 3, of the Ukrainian Criminal Code (excess of authority or official powers that caused grave consequences) for in his capacity of First Deputy Minister of Justice having issued a legal opinion or law interpretation about the possible use of a single-source public procurement procedure. It concerned the procurement by the National Joint Venture Company "Naftogaz" of legal assistance to be provided by the legal firm Magisters, at which Mr. Korniychuk used to be a senior partner, however at that time had no longer financial or business contact. The formal permission to use this procedure was given by the Ministry of Economy and the contract was signed by Naftogaz. He is also charged with having violated Article 366, paragraph 2 (forgery in office that caused grave consequences) as the mentioned document was not properly filed in the Ministry of Justice. His actions are claimed to have brought losses to the state as other legal firms could have supplied the legal assistance at a lower cost.

The facts on which the present charges are based were also investigated in 2009, although at that time Mr. Korniychuk was not charged. The Supreme Court decided in a finding in 2010 that there were no sufficient grounds to believe a violation of the Criminal Code had been committed.

On 22.12.2010 Mr. Korniychuk was informed about the opening of an investigation against him. The very same day, few hours after his wife had given birth, he was arrested by a team of masked police officers. His arrest was upheld on 24.12.2010 and on 30.12.2010 he was detained for 2 months. This decision was upheld by the Court of Appeal on 13.1.2011. On 15.2.2011 the detention was extended for 2 further months.

An investigation was also opened against the daughter of the Supreme Court President who was charged with the failure to repay on time a private loan regulated under civil law. As part of that investigation the home of Supreme Court President Onopenko was searched.

On 14.2.2011 Supreme Court President Mr. Onopenko met with the President of Ukraine Mr. Yanukovych. During that meeting the judicial reform and the work of the Supreme Court were discussed as well as the pending cases against the family. Next day Mr. Korniychuk was released from detention and the charges against Mr. Onopenko's daughter were dropped.

The trial against Mr. Korniychuk started in court on 18.3.2011 and is still pending.

## The case against Yurij Lutsenko

Yurij Lutsenko belonged to the Socialist Party during 1991-2006, when he established the People's Self-Defense Party. He was Minister of Interior in 2005-2006 and again in 2007-2010. He is now Deputy Editor-in-Chief of the newspaper "Silski Visti".

During Mr. Lutsenko's work in the ministry at that time opposition politicians, among others the present Vice Prime Minister Borys Kolesnikov and the late ex-governor of Kharkiv Oblast Yevhen Kushnariov, were investigated and detained, and the office of the oligarch and member of the parliament from the Party of Regions Rinat Akhmetov was searched.

Investigation against Mr. Lutsenko was opened on 2.11.2010. On 5 November 2010 he accepted a decision by the investigator of a preventive measure in the form of prohibition against leaving his registered residence.

The charges were changed on 13.12.2010 and the pre-trial investigation declared finished on the same day, resulting in 47 volumes of case-file. The final charges concerned violation of Art. 191, para. 5, (misappropriation of state property in especially gross amount through abuse of office by an organized group) and Art. 365, para. 3 (excess of official powers that caused grave consequences), for the following alleged actions:
1. unlawful promotion of Mr. Lutsenko's driver to the rank of police officer, leading to losses caused to the state because of increased salary and payment of other benefits.
2. allowing expenses for the organization of the annual Militsia's Day festivities in 2009 in violation of a resolution of the government to halt such expenses.
3. having exceeded his power as Minister in connection with the police monitoring of a driver of the former head of the Security Service, who was suspected of complicity in the poisoning of former President of Ukraine Mr. Yushchenko.

On 24.12.2010 the investigation was reopened.

Lutsenko was arrested on 26 December 2010 for having violated Article 135 of the Criminal Procedure Code of Ukraine by having avoided to acquaint himself with the materials of the case at the time dictated by the investigator. On several days Mr. Lutsenko had failed to appear citing his attorney's involvement in another criminal case, and on the days where he actually did turn up, he was found to have deliberately drawn out this process. Additionally he had allegedly disclosed via the mass media information gathered by pre-trial investigation in his criminal case.

On 21.4.2011 the Kyiv City Court of Appeal extended the detention of Mr. Lutsenko for another month till 27th of May. Few days before the court hearing Mr. Lutsenko finished reviewing the case-file. The prosecution, however, requested further extension due to the fact that legal representatives of Mr. Lutsenko failed to finalize their familiarizing with the case-file against Mr. Lutsenko.

## Observations, discussions and conclusions:

1. The defendants Lutsenko and Korniychuk both accepted <u>travel restrictions</u> when the investigations were opened. This seems generally to be standard procedure in Ukraine when an investigation has been initiated. When travel restrictions are applied you are not allowed to leave your residence without the permission of the prosecutor. The fact that the restrictions formally are being accepted by the defendant obviously cannot hide the fact that it is in reality a coercive measure imposed by the authorities, because the alternative is the defendant being detained. These restrictions in the two cases can hardly be in line with the 4th Protocol to the European Convention on Human Rights, since none of the reasons mentioned in paragraph 3 of its Article 2 seem to have been present at the time they were introduced, as indeed does not even appear to be invoked by the investigator. Restrictions in movement of a defendant may not be imposed by the authorities merely because it is convenient for the investigator to have the accused in the vicinity.

2. According to the Ukrainian Criminal Procedure Code, any preventive measures, including custody, are applied when there are grounds to believe that a person will try to abscond or avoid carrying out procedural decisions, impede the course of justice or continue their criminal activities, as well as to ensure the enforcement of procedural decisions.

   The law itself is not that different from the legislation of other countries. What is different is however the <u>widespread use of pre-trial detention,</u> as also seen by the detention of Mr. Lutsenko and Mr. Korniychuk, neither of whom would probably have been detained in countries with another legal tradition. A total figure of about 40.000 detained at any time has been mentioned.

   The European Court of Human Rights dealt in its judgment of 10.2.2011 in the case of *Kharchenko vs. Ukraine* with the excessive use of detention in Ukraine.

   The problems of the use of detention in general and in these two cases seem to have been more generally recognized also by authorities in Ukraine. The Monitor learned that the Ombudsman personally has intervened in both cases and informed the courts and the President of Ukraine that the use of detention in general and in these individual cases in her opinion was a violation of their human rights. In most countries such an intervention in a pending case from an ombudsman to the President on activities of the judiciary would probably lead to raised eyebrows; it is mentioned here only to demonstrate the point on violation of human rights.

   A pending amendment to Art. 155 of the Criminal Procedure Code will allow detention only in cases of crimes with a minimum penalty of 5 years against 3 years now. That amendment will in itself not change the tradition of widespread use of pre-trial detention.

3. In neither of the monitored cases have <u>individual reasons to support the need of pre-trial detention</u> been given by the court. In the Lutsenko case the court only refers that: *"the case materials have data that indicate a possibility by Yurij Lutsenko personally and*

*through others in the future to hamper the exercise of procedural decision in the case and the effect on witnesses"*. This clearly is not an individual justification for the legality of the use of detention with regard to the specific facts of the case, as required by the European Court on Human Rights.

4.  In the Lutsenko case the investigator gave him and his lawyer a "schedule" dictating which pages of the files they were to read every day in preparation of his defense, and only gave them access to the files they were instructed to review on that very day. The investigator did not take into consideration whether the defense lawyer had other obligations, which could keep him from preparing this case within the dictated time frame. The defense did not get his own copy of the files, and in neither the Lutsenko nor the Korniychuk cases were the defense allowed by the investigator to photograph or photocopy the files or parts thereof. The defense lawyer during his preparations and during the trial will only have his personal handwritten notes to support his memory.

    As seen from point 3 above, the court even justified the detention of Lutsenko by the fact that he and his defense lawyer were too slow in reading through the files, thus delaying the trial and not respecting a procedural decision of the investigator.

    It is unheard of and must be a violation of the European Convention Article 6, paragraph 3.b) that it is up to the <u>decision of the investigator how and when the defendant and his lawyer are to prepare themselves</u> for the upcoming trial. That can not be a procedural decision in the hands of the investigator or the prosecutor, but a right of the defendant and his lawyer.

    It does not allow fair working conditions or equality of arms that the defense lawyer does not have his own copy of the file and access to all of the files simultaneously.

5.  The defense in the Korniychuk case has argued that the <u>charges against him have already been dismissed by the Supreme Court</u> in a ruling of 15.7.2010.

    It is a fact that the Supreme Court has upheld decisions by the City Court and the Court of Appeal that there were insufficient reasons to open an investigation for violation of Art. 366 of the CPC by persons serving in the Ukrainian Ministry of Justice having falsified an expert legal opinion, which led Naftogaz to sign a contract with the law firm Magisters, which caused a loss to the state and Naftogaz. The Supreme Court added that it found no support to the claim of the investigator that Magisters had not produced legal assistance for the money they have received; thus the state and Naftogaz have not suffered losses.

    Mr. Korniychuk was however not charged during that investigation. It is indeed an important principle of the Rule of Law that a final decision by a court cannot be called into question. The authorities are not entitled to seek review only because they do not agree with the decision. In the case *Sergey Zolotukhin vs. Russia* the ECHR stated that prosecution or trial for a second offence is not permitted if it is based on identical facts or facts which are substantially the same.

The wording of the 7th Protocol to the ECHR Article 4, paragraph 2, is that "No one shall be liable to be tried or punished again in criminal proceedings under the jurisdiction of the same State for an offence for which he has already been finally acquitted or convicted in accordance with the law and penal procedure of that State". This might indicate that Res Judicata is applied only when an individual has already been acquitted for the offence.

6. During the court session in the Lutsenko case on 25.2.2011 the chairman of the Court of Appeal informed the audience that he had received a written note from Mr. Lutsenko through his lawyer requesting that Mr. Lutsenko be present in the court room. The judge however turned this request down as the note was not "certified by the prison director". The court therefore had not requested Mr. Lutsenko to be brought from the Detention Center to the court building and the court session took place without defendant.

   The court can have had no doubt that Mr. Lutsenko wanted to be present nor that the note, which it had received from the defendant's lawyer, was written by Mr. Lutsenko.

   The decision indicates a biased attitude in the judiciary against granting the accused person his legal rights and letting him benefit from the assumption of innocence. That also seems to indicate a lack of understanding of or respect for one of the basic principles of human rights: Justice must not only be done but must also be seen to be done.

7. In the Lutsenko case the defense lawyer complained about having only received from the court a notice of the session, in which the question of extension of the detention was to be dealt with, 15 minutes before the meeting. With such a short notice he was unable to meet. The prosecutor claimed that the defense lawyer had been informed 1 hour before the meeting and that he himself had not known of the session earlier. In any case this is not a fair way for the court to inform the parties to the trial about a session, for which they need to prepare themselves and where it is essential that the persons with specific knowledge of the case can meet.

8. According to the ECHR Article 6, paragraph 2, anyone who is charged with a violation of the law must be considered innocent until his guilt has been proven. However apparently only 0.2 % of the accused persons are acquitted by the courts of Ukraine. That might have been explained by an extremely cautious prosecution, granting the accused all the benefit of the doubt, but it is certainly more likely the result of a judiciary much too willing to follow the claims of the prosecution and too afraid to confront it. The success rate of the investigation is a worrying 90 %, which is far above what you see and can expect in countries with a tradition of respect for the rights of the accused.

   Several interlocutors mentioned a legal possibility and wide spread practice of the courts sending cases back to prosecution for further investigation or adaption and even correction of the indictment, or of giving a low sentence in cases where the evidence does not sufficiently support the indictment. That of course is unacceptable and violates ECHR principles of equality of arms and right not to be tried twice for the same offence.

9. <u>An indictment</u> is the central document in criminal proceedings. It is supposed to describe the criminal act and identify time and place, the subject of the criminal act and the method as well as to mention the articles which have been violated. It is the basis for the evidence presented to the court by the prosecutor and the defense of the defense lawyer.

   An indictment in the Ukrainian criminal justice system certainly does all this and much, much more. It is a broad narrative of the entire result of the investigation, a mixture of indictment and evidence, including resume of the statement of witnesses, and prosecutor's actions. But it does not clearly separate the criminal actions from other actions and it influences the court with information and evidence not necessarily to be presented during the trial. The indictment in the Korniychuk case is 45 pages! It must be almost impossible for the defense to defend his client when the criminal acts are not clearly identified. This fact might also contribute to the very high rate of convictions, mentioned in point 8.

10. The Monitor was impressed by the widespread opinion that the Ukrainian <u>courts cannot be considered independent</u> at least in cases related to politics. The judiciary certainly has a problem with its credibility in the public. As the decisive factor of such situation the composition of the Higher Council of Justice was pointed at with its heavy bias in favour of the representation from the President of Ukraine or his affiliated party and the membership of the Prosecutor General and his 2 deputies, the Head of the Security Service etc. after the Judicial Reform in the summer of 2010. The judicial reform has in other ways improved the conditions of the legal system, but the Higher Council of Justice has obtained an unacceptable decisive influence on the appointment of, the disciplinary measures against and the dismissal of judges. The judicial reform law was criticized by the Council of Europe's Venice Commission.

11. According to a public statement by the Deputy Prosecutor General the <u>prosecution last year initiated 600 disciplinary cases against judges</u> and information indicates that at least 38 judges have been dismissed against an average of 6½ the former years. This is a strong indication that the independence of judges is under strong pressure and that the prosecution has a dominating influence on the future of judges. Prosecutors should not be responsible for disciplining judges; that disturbs the point of balance between prosecution and judiciary.

12. It has also been mentioned that judges are <u>not appointed for an unlimited time until they have served for five years.</u> Their first appointment is made by the President of Ukraine upon proposal of the Higher Council of Justice. After that period their permanent appointment is to be approved by the Parliament where one party and its allies hold a solid majority. That gives judges little room for political independence especially during those initial 5 years in the office.

13. One can therefore wonder that the judge appointed to a spectacular and political trial as that of Mr. Korniychuk is but <u>25 years old and has only been appointed to the 5 years' initial "test period" a few months ago.</u> Her qualifications aside (and the Monitor has no

objections to that) she must be in an extremely vulnerable position in such an exposed case, taking into consideration that the Parliament in 5 years will decide her future as a permanent judge.

14. The Monitor has been surprised to see a statement by the newly appointed Prosecutor General Viktor Pshonka that he considers himself to be a member of the <u>team of the President and will fulfill his orders</u>. One would rather expect him to express his loyalty to the law and his independence from the political life.

15. This corresponds to many statements about a history of <u>political influence on the prosecution and the courts</u>. Reportedly one of the main reasons for launching the case against Mr. Lutsenko is to pay back for his actions as Minister of Interior against some of the persons who have now come to power. On the case of Mr. Korniychuk case see point 16.

    In the pending case against former Prime Minister Mrs. Yulia Timoshenko, , President Yanukovych expressed his opinion in the media as to the use of travel restrictions against her, and the Monitor experienced personally the judges verbally being threatened by parliamentarians from Lutsenko´s party present in the court room and being dissatisfied with the decision. The fact that the Ombudsman turns to the President also seems to indicate that she expects him to be able to influence the procedure of and the outcome of the trial.

16. Additionally there seems to be a practice of exercising pressure on the defendant in order to obtain confessions, cooperation, avoid complaints, etc. through <u>threats to him and his family, business associates, etc.</u>

    The Supreme Court President has himself described the case against Mr. Korniychuk as an attempt to put pressure on himself and there can hardly be any other explanation to the investigation in a purely civil case against his daughter and the search of his house. The political level in fact seems to have done little to hide that fact, probably expecting the signal to reach other potential opponents as well. The suspicion is further confirmed by the surprising sequence of events: Mr. Onopenko's meeting with the President, the release of Mr. Korniychuk and the cancellation of the investigation against the daughter.

17. It has also been mentioned by several persons that there is a tradition of <u>leaving political investigations open and unconcluded</u> for long periods, sometimes years. This practice can keep the defendants well occupied with meetings with the investigator, keeping them from other activities, and also serves as a Damocles sword to the defendants, knowing that the investigator or the prosecutor at any time can forward cases against them with grave consequences.

If the purpose of the investigation is to promote a political aim not protected by the law by prosecuting somebody for acts for which others are not being prosecuted, and thus not treat

everybody equally according to the law, the <u>justice is selective and therefore unfair</u>. The charges raised against the former ministers seem to the experienced eye somewhat far-fetched and one would rather expect them to result in a political than a criminal responsibility, if any at all. This monitoring can not and can not be expected to answer with certainty the question of whether these cases are the result of selective justice. If so it however tells about the legal system and tradition of a country, not about the guilt or innocence of an individual. Selective justice and abuse of criminal justice system is a violation of Article 6 on Fair Trial of the European Convention on Human Rights and falls short of the country's international obligations to ensure respect for the rule of law principles.

Ukraine has been monitored by the Council of Europe as to the implementation of the commitments and obligations undertaken when joining that organization. The President of Ukraine issued on 10.1.2011 a decree according to which Ukraine is to fulfill its obligations towards CoE and established a mechanism to oversee it. This process should not be solely focused on the legislative reform. The main problems have been in the culture, tradition and implementation, on top of the outdated and deficient legislation itself (*e.g.* Ukrainian Criminal Procedure Code dates back to 1961 and its reform is long overdue).

Based on the above observations of the monitoring of the cases against Mr. Korniychuk and Mr. Lutsenko it can be concluded that it would be unwise to stop that monitoring now.

## Ukrainian Criminal Code (extracts)

*Article 191. Misappropriation, embezzlement or conversion or property by malversation*

*1. Misappropriation or embezzlement of somebody else's property by a person to whom it was entrusted shall be punishable by a fine up to 50 tax-free minimum incomes, or correctional labor for a term up to two years, or restraint of liberty for a term up to four years, or imprisonment for a term up to four years, with or without the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*2. Misappropriation, embezzlement or conversion of property by malversation shall be punishable by restraint of liberty for a term up to five years, or imprisonment for the same term, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*3. Any such actions as provided for by paragraph 1 or 2 of this Article, if repeated or committed by a group of person upon their prior conspiracy, shall be punishable by restraint of liberty for a term of three to five years, or imprisonment for a term of three to eight years, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*4. Any such actions as provided for by paragraphs 1, 2 or 3 of this Article, if committed in respect of a gross amount, shall be punishable by imprisonment for a term of five to eight years, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*5. Any such actions as provided for by paragraphs 1, 2, 3 or 4 of this Article, if committed in respect of an especially gross amount, or by an organized group, shall be punishable by imprisonment for a term of seven to twelve years, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years and forfeiture of property.*

*Article 364. Abuse of authority or office*

*1. Abuse of authority or office, that is a willful use of authority or official position contrary to the official interests by an official for mercenary motives or other personal benefit or benefit of any third persons, where it caused any substantial damage to legally protected rights, freedoms and interests of individual citizens, or state and public interests, or interests of legal entities, shall be punishable by correctional labor for a term up to two years, or arrest for a term up to six months, or restraint of liberty for a term up to three years, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*2. The same act that caused any grave consequences, shall be punishable by imprisonment for a term of five to eight years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*3. Any such actions as provided for by paragraph 1 or 2 of this Article, of committed by a law enforcement officer, shall be punishable by imprisonment for a term of five to twelve years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years and forfeiture of property.*

*Article 365. Excess of authority or official powers*

*1. Excess of authority or official powers, that is a willful commission of acts, by an official, which patently exceed the rights and powers vested in him/her, where it caused any substantial damage to the legally protected rights and interest of individual citizens, or state and public interests, or interests of legal entities, shall be punishable by the correctional labor for a term up to two years, or restraint of liberty for a term up to five years, or imprisonment for a term of two to five years, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*2. Excess of authority or official powers accompanied with violence, use of weapons, or actions that caused pain or were derogatory to the victim's personal dignity, if there are no signs of torture shall be punishable by imprisonment for a term of three to eight years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*3. Any such actions as provided for by paragraph 1 or 2 of this Article, if they caused any grave consequences, shall be punishable by imprisonment for a term of seven to ten years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

*Article 366. Forgery in office*

*1. Forgery in office, that is putting any knowingly false information in any official documents, any other fabrication of documents, and also making and issuing knowingly false documents by an official, -*

*shall punishable by a fine up to 50 tax-free minimum incomes, or restraint of liberty for a term up to three years, with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*
*2. The same act that caused any grave consequences, shall be punishable by the imprisonment for a term of two to five years with the deprivation of the right to occupy certain positions or engage in certain activities for a term up to three years.*

## The Ukrainian Criminal Procedure Code (explanations and extracts)

According to Ukraine's Criminal Procedure Code, the investigator may detain a suspect for three days without a warrant, after which an arrest order must be issued. Ukraine's courts may extend detention without an arrest warrant for an additional 10 days and thereafter grant extensions in increments of two months for a maximum of 18 months.

*Article 135. Appearance of the accused is compulsory*
*The accused is required to appear upon investigator's summon in the time fixed.*
*In case of non-appearance without valid reasons, the accused is subject to compulsory appearance under law.*
*Valid reasons for non-appearance of the accused are untimely receipt of the notice paper, illness and other circumstances which do make it impossible for him to appear before investigator in the time fixed.*

*Article 148. Objective of, and grounds for, imposing a measure of restraint*
*Measures of restraint are imposed on the suspect, accused, defendant, convict with a view to preventing his/her attempts to avoid inquiry, pre-trial investigation, or trial, obstruct establishing the truth in a criminal case, or continue criminal activity, as well as to ensuring execution of procedural decisions.*
*Measures of restraint are imposed if there are sufficient grounds to believe that the suspect, accused, defendant, convict can avoid investigation and trial or execution of procedural decisions, can obstruct establishing the truth in a criminal case or continue criminal activity.*
*If there are no sufficient grounds for imposing a measure of restraint, the suspect, accused, or defendant is asked to give a written obligation to appear upon the summons of the inquirer, investigator, prosecutor or court, as well as to inform on the place of his/her staying if the latter has been changed.*
*Whenever a measure of restraint is impose on the suspect, charges should be brought against him/her within 10 days after such measure of restraint has been ordered. If charges are not brought within this time-limit, the measure of restraint should be revoked.*

*Article 149. Measures of restraint*
*The following are measures of restraint:*
  *1)   recognizance not to leave the jurisdiction;*
  *2)   personal surety;*
  *3)   guarantee of a civil society organization or labor collective;*
  *3-1)    bail;*
  *4) taking in custody;*
  *5) delivery under military command's supervision.*

*Article 150. Circumstances to be taken into account when imposing a measure of restraint*
*When deciding on the imposition of a measure of restraint, in addition to circumstances referred to in Article 148 of the present Code, there should be taken into account the severity of crime of which a person is suspected, charged, his/her age, state of health, family and property status, occupation, place of residence, and other circumstances characteristic of him/her.*

*Article 151. Recognizance not to leave the jurisdiction*
*Recognizance not to leave the jurisdiction consists in that a suspect or accused gives a written obligation not to leave his/her registered place of residence or stay or temporary place of residence without permission of the investigator.*

*If a suspect or accused ignores his/her recognizance not to leave the jurisdiction, the latter may be replaced with more severe measure of restraint; the suspect or accused should be told this when giving obligation not to leave the jurisdiction.*

### Article 155. Taking in custody

*Taking in custody as a measure of restraint is imposed in cases related to crimes punishable with deprivation of liberty for more than three years. In exceptional cases, this measure of restraint may by ordered in cases related to crimes punishable with deprivation of liberty for less than three years.*

### Article 218. Informing the accused on the completion of investigation and presenting him/her records of the case

*Having found collected proofs sufficient as to indictment and having complied with Article 217 of the present Code, investigator is required to announce to the accused that investigation in his/her case has been completed and that he/she has the right to review all records [materials] of the case personally and with assistance of a defense counsel and may file petition to supplement records of pre-trial investigation. Investigator shall have the duty to advise the accused of his/her right to file a petition for his/her case to be heard in trial court by a single judge or collegially by a panel of three persons in cases provided for by law.*

*If the accused was not interested in reviewing records of the case together with defense counsel, all records of the case are presented to the accused for review. When reviewing records of the case, the accused may take notes from records of the case and file petitions. Whenever several persons are prosecuted in the case, investigator produces all records of the case to each of them.*

*The fact that completion of the investigation has been announced to the accused and that records of the case have been produced for his/her review is reflected in the appropriate record.*

*If a defense counsel is involved in the case, investigator gives him/her the possibility to review all records of the case either and draws up an appropriate record thereon. In such a case, producing records of the case should be postponed till defense counsel's appearance but not more than for three days. If defense counsel employed by the accused is unable to appear within this time-limit, investigator takes measures referred to in Article 47, fourth and sixth paragraphs, of the present Code.*

*Records of pre-trial investigation which are produced for review should be filed and numbered. During production for review of pre-trial investigation records the investigator, upon demand of the accused, is obliged to provide him/her with a verified copy of the description of the pre-trial investigation records; relevant note is made in the record of announcing to the accused about completion of the investigation and production of the records for review. Records relating to protective measures in respect of participants to criminal proceedings are not presented for review and are kept separately from records of the criminal case.*

*The accused and his/her defense counsel may not be limited in time they need to review all records of the case.*

# Exhibit 22





**Council of Europe**
**Conseil de l'Europe**

**European Union**
**Union européenne**

Strasbourg, 18 October 2010

CDL-AD(2010)026
Or. Engl.

**Opinion No. 588 / 2010**

## EUROPEAN COMMISSION FOR DEMOCRACY THROUGH LAW

### (VENICE COMMISSION)

## JOINT OPINION

## ON THE LAW ON THE JUDICIAL
## SYSTEM AND THE STATUS OF JUDGES
## OF UKRAINE

**by**
**the Venice Commission**
**and**
**the Directorate of Co-operation within the Directorate General of**
**Human Rights and Legal Affairs of the Council of Europe**

**Adopted by the Venice Commission**
**at its 84th Plenary Session**
**(Venice, 15-16 October 2010)**

**on the basis of comments by**

**Mr Stephan GASS (Expert, Directorate of Co-operation)**
**Mr James HAMILTON (Substitute Member, Ireland)**
**Mr Paul LEMMENS (Expert, Directorate of Co-operation)**
**Ms Hanna SUCHOCHA (Member, Poland)**

CDL-AD(2010)026                              - 2 -

## TABLE OF CONTENTS

1.   Introduction ................................................................................................................ 3
2.   General remarks ......................................................................................................... 3
3.   Fundamentals of Organisation of Judicial Power (Section I, Articles 1 to 16)............................ 4
4.   The System of Courts ................................................................................................ 5
     4.1.   Courts of General Jurisdiction (Section II, Articles 17 to 46)............................................ 5
          4.1.1.   Level of courts ..................................................................................................... 5
          4.1.2.   Creation and abolition of courts........................................................................ 5
          4.1.3.   Appointment and dismissal ("removal") from administrative positions ...................... 5
          4.1.4.   The Supreme Court............................................................................................ 6
     4.2.   Status of Judges, People's Assessors and Jurors (Section III, Articles 47 to 63)............ 9
     4.3.   Procedure for Assuming the Office of a Professional Judge of a Court of General Jurisdiction (Section IV, Articles 64 to 80).............................................................................. 10
          4.3.1.   Authorities involved in the appointment and election processes ........................... 10
          4.3.2.   Initial appointment of judges (Articles 64 to 73)............................................... 10
          4.3.3.   Election of Judges to a Permanent Judicial Position (Articles 74 to 80)................... 13
5.   Promotion - Ensuring the Appropriate Qualification Level of a Judge (Section V, Articles 81 and 82)........................................................................................................................... 15
6.   Disciplinary Liability of a Judge (Section VI, Articles 83 to 99) ............................................. 15
     6.1.   Disciplinary Liability........................................................................................... 15
     6.2.   The High Qualifications Commission of Judges and the High Council of Justice ............ 17
7.   Removal from Office of a Judge (Section VII, Articles 100 to 112) ......................................... 17
8.   Judicial Self-Government (Section VIII, Articles 113 to 128) ................................................ 18
9.   Support for the Professional Judge (Section IX, Articles 129-135) ......................................... 20
10.  Status of a retired Judge (Section X, Articles 136-139) ....................................................... 20
11.  Organisational Support for the Operation of Courts (Section XI, Articles 140-154) ............ 20
12.  Amendments to Other Laws (Section XII)........................................................................ 22
     12.1.   Length of proceedings.......................................................................................... 22
     12.2.   Non-execution of decisions .................................................................................. 23
13.  Transitional Provisions (Section XIII) .............................................................................. 24
14.  Conclusion ................................................................................................................ 24

## 1. Introduction

1.     By letter dated 15 June 2010, the Deputy Minister of Justice of Ukraine, Mr Prytyka, requested the Venice Commission for an opinion on the draft Law of Ukraine on the Judiciary and the Status of Judges (CDL(2010)064). This Law is a revised version of the draft Law on the Judicial System and the Status of Judges of Ukraine (CDL(2009)111), prepared and approved by the *Verkhovna Rada's* Judiciary Committee in June 2008, which was the subject of a joint opinion of the Venice Commission adopted at its 82nd Plenary Session on 12-13 March 2010 (CDL-AD(2010)003).

2.  By letter of 28 June 2010, the Chair of the Monitoring Committee of the Parliamentary Assembly of the Council of Europe, Mr Marty, requested the opinion of the Venice Commission on the draft Law on the Judicial System and the Status of Judges of Ukraine, as well as Law No 2181-VI on Amendments to Legislative Acts concerning "Prevention of Abuse of the Right to Appeal" (see separate opinion on that Law CDL-AD(2010)029).

3.  The Venice Commission invited Mr Hamilton and Mrs Suchocka to act as rapporteurs for both opinions. In the framework of the programme of the European Union and the Council of Europe entitled "Transparency and Efficiency of the Judicial System of Ukraine" (TEJSU Project)[1], the Directorate of Co-operation within the Directorate General of Human Rights and Legal Affairs of the Council of Europe invited Messrs Gass and Lemmens to act as their rapporteurs for the present joint opinion (DGHL(2010)18).

4.     On 30 June 2010, the Venice Commission transmitted to Deputy Minister Prytyka, preliminary comments by Mr. Hamilton and Ms Suchocka (CDL(2010)063 and 065), as well as the comments of Mr Gass on behalf of the Directorate of Co-operation within the Directorate General of Human Rights and Legal Affairs (DGHL(2010)13). The Law on the Judicial System and the Status of Judges was adopted on 7 July 2010 by the *Verkhovna Rada* and signed by President Yanukovych on 27 July 2010.

5.     The Venice Commission is grateful to USAID in Kiev for their help with translating both the draft law and the final text.

6.     On 4 and 5 October 2010, the TEJSU Project Office in Kyiv and the Venice Commission organised meetings with the different authorities concerned, as well as with the civil society. The present opinion is based on the comments by the members and experts as well as on the results of those meetings.

7.     The present opinion was adopted by the Venice Commission at its 84th plenary session (Venice, 15-16 October 2010).

## 2. General remarks

8.     The new Law submitted for opinion follows the general structure of the earlier draft (CDL(2009)111), but has introduced a number of changes prepared by the working group set up by the President and headed by the Minister of Justice. Many of the remarks made by the Venice Commission in its earlier opinion are still relevant to the new Law. The Commission was critical of the degree of detail of the earlier draft Law which it described as "quite voluminous" and as containing elements which were perhaps not necessary, or which could be delegated to subordinate legislation, as a result of which some of the rules were difficult to find and to know. The new text for the most part continues this detailed approach to lawmaking. There are in addition a

[1] This document has been produced with the financial assistance of the European Union. The views expressed herein reflect the opinion of the Venice Commission but can in no way be taken to reflect the official opinion of the European Union. It may not under any circumstances be used as a basis for any official interpretation that may be used, in the light of the legal instruments mentioned, in proceedings against the governments of the member states, the statutory organs of the European Union, the Council of Europe or any other body set up under the European Convention on Human Rights.

CDL-AD(2010)026                                - 4 -

number of examples of duplication where the same rule is to be found in more than one part of the text.

9.      On 1 October 2010, the Constitutional Court annulled constitutional amendments adopted in 2004. While this decision results in a major shift of power between President and Parliament, it does not affect the judicial power, subject of the present joint opinion.

## 3.  Fundamentals of Organisation of Judicial Power (Section I, Articles 1 to 16)

10. These provisions are largely unchanged from the earlier text and were previously described by the Venice Commission as being for the most part unexceptionable and indeed admirable.

11.    Article 2, which states the court objectives in terms of upholding everyone's right to a fair trial and respect for other rights and basic freedoms, refers to the rights guaranteed not only in the Constitution and the laws of Ukraine, but also in international treaties recognised as binding by the *Verkhovna Rada*. On this point the Law has followed a suggestion made in the Joint Opinion of March 2010.[2]

12.    Article 6.2 provides that "petitions filed with a court (in connection with the consideration of specific cases) by citizens, organisations, or officials who in legal terms are not participants in the court proceedings shall not be considered by the court, unless otherwise specified by law". Presumably this provision establishes that it is unlawful for third parties to try to influence the court in its consideration of a given case (see Article 6.1). One wonders, however, what could justify an exception to that rule at all ("unless otherwise specified by law"). Exceptions should in any event be of such a nature that they do not undermine the principle.

13.    There have been some changes in relation to the provisions for the automatic assignment of cases on a random basis which have been moved from Article 8 to Article 15. **The Venice Commission already generally welcomed the introduction of automatic case-assignment.** According to Article 15.4, the assignment of cases shall be based on, among other things, the workload and the specialisation of judges. The Commission considers that the workload is a relevant criterion. It notes, however, that in the procedural laws amended by the Law under consideration the provisions relating to the assignment of cases use the terms "caseload" and "number of cases", not the term "workload".[3] The Commission suggests amending these procedural laws by replacing the word "caseload" each time by "workload". It is indeed clear that cases may have a very different degree of complexity. Using the "caseload" as a criterion will place a very different burden on the judges, depending on the type of cases they are dealing with. This issue has also something to do with the specialisation of judges in particular categories of cases, provided by Articles 18.2, 26.5 and 31.4. In this respect, **it should be made sure that specialisation of judges cannot be used to circumvent the system of random case assignment.** Finally, the provision in the earlier draft, making the president of each court personally responsible for ensuring the observation of the procedure of case assignment, has unfortunately been dropped and replaced by a provision requiring the regulation on automated case management to be approved by the Council of Judges of Ukraine upon agreeing it with the State Judicial Administration.

14.    Some changes have been made to the provisions relating to the language of legal proceedings. There appears to be some lack of clarity in the provisions. The basic provision is that legal proceedings and court records in Ukraine are to be conducted in the state language (Article 12.1). However, courts are to ensure the equality of citizen's rights in terms of language (Article 12.2). There is also a general prohibition of discrimination on the basis of language (Article 9). The

---

[2] Joint Opinion of March 2010, at § 13.

[3] See Article 162, first paragraph, point 1, and third paragraph of the Code of Criminal Procedure of Ukraine (inserted by Article 3.1, point 1, of Section XII of the Law), Article 2¹, first paragraph, point 1, and third paragraph of the Commercial Procedure Code of Ukraine (inserted by Article 3.3, point 1, of Section XII of the Law), Article 11¹, first paragraph, point 1, and third paragraph of the Civil Procedural Code of Ukraine (inserted by Article 3.6, point 1, of Section XII of the Law).

Law now includes a provision permitting the use of other regional languages or minority languages in accordance with the Law of Ukraine "On Ratification of the European Charter for Regional or Minority Languages" (Article 12.4). There is a right of persons to speak their native language or the language they speak (Article 12.3), and the requirement of the former draft that the person concerned must have no command of Ukrainian at all has been eliminated, which is to be welcomed.

## 4.    The System of Courts

### 4.1.   Courts of General Jurisdiction (Section II, Articles 17 to 46)

#### 4.1.1. Level of courts

15.   Section II, in particular Articles 17 and 18, deals with courts of general jurisdiction, and sets out the institutional framework, with detailed provisions for the four levels of courts, local courts, courts of appeal, high specialised courts and the Supreme Court. The earlier opinions of the Venice Commission question the need for four levels of court, but it is accepted that this cannot be changed without a constitutional amendment. The existence of so many levels leads to over-complexity and delay.

#### 4.1.2. Creation and abolition of courts

16.   There are a number of changes in these provisions from the earlier draft: while the creation and abolition of courts of general jurisdiction remains a function of the President of Ukraine, this function is now exercised upon the proposal of the Minister of Justice rather than the head of the State Judicial Administration and that proposal has in turn to be based upon a proposal from the President of the relevant High Specialised Court. The number of judges in a court is no longer to be determined by the President of Ukraine on the basis of a motion by the Head of the State Judicial Administration, but is now to be determined by the Minister of Justice upon the proposal of the State Judicial Administration, which in turn must be based on a proposal from the head of the relevant high specialised court (Article 19.4). The same concerns expressed in the joint opinion of March 2010 remain valid, as the President can still decide on the creation and abolition of a court to ensure that other judges deal with a specific case. **It would be preferable that the courts were established by laws adopted by the Verkhovna Rada, which rank above in the hierarchy of norms than Presidential decrees, and that the President became an "executor" of such laws.**

#### 4.1.3. Appointment and dismissal ("removal") from administrative positions

17.   There are significant changes in the procedure for appointment and dismissal of the presidents of the four levels of courts (including the President of the Supreme Court). Appointment to these administrative positions is now for a five year term rather than a three year term.

18.   Another change concerns the appointment procedure. The earlier draft provided for appointment by the President of Ukraine on the proposal of the High Council of Justice. Under the new Law, the appointment to administrative positions of all courts, except the Supreme Court, is to be made by the High Council of Justice upon the submission of the respective council of judges. This would appear to strengthen judicial independence. Concerning the Supreme Court, there is no indication of the period of appointment of the President of the Supreme Court and his or her deputy. This appointment remains a decision for the Supreme Court as in the earlier draft but the terms of office should be specified for the sake of clarity.

19.   However, whereas in the earlier draft removal of a judge from an administrative position was to be made by the President of Ukraine on the basis of a motion by the High Council of Justice, which was to be based on a decision by the Disciplinary Commission of Judges stating that the judge had unduly exercised his or her administrative powers, or, in the case of judges of High Specialised Courts, on the basis of a decision by the High Council of Justice themselves to that effect, the new provision allows for removal from administrative office by the High Council of Justice upon the

CDL-AD(2010)026                                - 6 -

proposal of the relevant council of judges (except for the Supreme Court, in which it is the Court itself which decides to do so). However, **the basis for a proposal for removal is not specified in the legislation** (see Article 20) and this would appear to be **a step backwards**. Nevertheless, the procedure for appointment and dismissal is the object of new Articles 29 and 32 of the Law on the High Council of Justice following the reform by Law No 2181-VI (see in this respect the opinion on that Law). The fact that the appointment and removal of court presidents and their deputies (other than the President of the Supreme Court and his or her Deputy) is granted to a separate body can be acceptable provided this body is shielded from political influence. This is however not the case for the High Council of Justice, as has been explained in the opinion on Law No 2181-VI, and as will be repeated below.

20.    The function of president of the different courts (including the President of the Supreme Court) has also been altered from the earlier draft. They are no longer given the function of providing organisational management of the courts' operation. However, they still have the function of defining the administrative powers of their deputies. It seems to be envisaged that day-to-day administration and management is to be in the hands of the deputy subject to this definition of powers. It is difficult to understand what is intended here or why this change has been made. In addition, instead of having the function of supervising the efficiency of the activities of the court staff and to be able to take measures him- or herself, the court president has to call upon the Head of the Territorial Office of the State Judicial Administration to act. It seems, therefore, that the control of the  president is to be indirectly exercised through the State Judicial Administration. Again, it is not clear in practice what the intention behind these arrangements is.

### 4.1.4.  The Supreme Court

21.    The Law provides for a drastic reduction in size of the Supreme Court (Article 39), which will lose its jurisdiction in civil and criminal matters in favour of a new specialised high court (Article 31). According to the Constitution, the Supreme Court is "the highest judicial body in the system of courts of general jurisdiction" (Article 125.2) and "the respective high courts are the highest judicial bodies of specialised courts" (Article 125.3). Until the enactment of the new Law, the Supreme Court acted as the cassation court in civil and criminal matters, whereas high specialised courts existed only in limited areas, such as in commercial and administrative matters.

22.    The Law now places the high specialised courts within the system of courts of general jurisdiction (Article 17.2). Moreover, a new High Specialised Court for Civil and Criminal Cases is established, which is added to the existing two high courts on commercial viz. administrative cases. In effect, there are no "specialised" courts anymore, in the sense of Article 125.3 of the Constitution, but only courts of "general" jurisdiction, each with their own specialisation.

23.    Current judges of the Supreme Court have an option to request a transfer to the specialised high courts (transitional provision no. 4). This arrangement constitutes a dramatic change, which requires in-depth consideration. According to Article 38.2 of the Law, the new (small) Supreme Court will have only the following jurisdiction:

> "1) review cases under unequal application by courts (a court) of cassation of the same rule of substantive law in similar legal relations in the manner prescribed by the procedural law;
> 2) review cases when an international judicial institution the jurisdiction of which is recognised by Ukraine has established the violation of international obligations by Ukraine when deciding a case in court;
> 3) provide an opinion on whether or not the actions of which the President of Ukraine is accused contain elements of state treason or other crime; submit, upon request of the Verkhovna Rada of Ukraine, a written motion stating that the President of Ukraine is incapable of exercising his/her powers for health reasons;
> 4) apply to the Constitutional Court of Ukraine for the constitutionality of laws or other legal acts as well as for the official interpretation of the Constitution and laws of Ukraine."

24.   The jurisdiction that the Supreme Court retains relates therefore to issues of a very exceptional nature (Article 38.2). Although the Supreme Court continues to be the highest judicial body in the system of courts of general jurisdiction, its general competence to supervise the interpretation and the application of the law by the lower courts is transferred to the three high specialised courts. The latter courts not only act as cassation courts, but they can also provide methodological assistance to the lower courts and provide them with advisory interpretations on issues of application of the law with respect to cases that fall under their jurisdiction (Articles 32.1 point 4, and 36.2 point 6). By contrast, the only possibility for the Supreme Court to intervene in the process of adjudication of cases is through the review of a decision of a high specialised court in the event of an alleged contradiction between the application of a rule of substantive law by that decision and applications of the same rule in the existing case law of that court or another high specialised court (Article 38.2 point 1).

25.   The previous situation where all cases could be reviewed in the Supreme Court was unsustainable and led to the Court being swamped by trivial cases. The authorities explained that the purpose of the drastic reduction of the jurisdiction of the Supreme Court was to reduce the number of instances in the field of administrative and commercial law from four to three by avoiding what was called a "double cassation" by the specialised high courts and the Supreme Court, and, in addition, to relieve the Supreme Court of "simple" cases, which included not only cassation questions on points of law but also issues of fact, in order to speed up proceedings in civil and criminal matters. However, in order to meet these goals it would be sufficient to limit the jurisdiction of Supreme Court to cases where the law is uncertain or where an issue of major importance exists.

26.   While the flow of cases to the Supreme Courts has been drastically reduced, the Court has to deal with its existing case-load of some 20,000 cases. Unfortunately, the Law deprived the Court of the possibility to deal with these cases in chambers so that they have to be handled in the plenary of all remaining - now 79 - judges. Obviously, this is not helpful for dealing with this backlog. A transitional provision could have provided for chambers in dealing with 'old' cases. **The Venice Commission recommends preparing the 'old' cases informally in chambers and to have only a final vote in the plenary on decisions already accepted in the chambers, at least in uncontroversial cases.**

27.   According to the Law, the Supreme Court, in its new composition of 20 justices, should be composed of judges representing the three specialised branches (10 civil and criminal, 5 commercial and 5 administrative judges, Article 39.1 of the Law). Apart from the problem that the number of civil and criminal cases is far higher in proportion than the 10 judges from that branch, there seems to be also a problem to reach this composition through the gradual or 'evolutionary' process foreseen to bring the number of judges down to 20. Current Supreme Court judges can request to be transferred to the new High Specialised Court on Civil and Criminal Matters (or any other court). Those judges who do not make such a request remain in the Supreme Court until retirement.[4] Due to retirements and resignations, the total number of Supreme Court Judges has come down from 94 to 79. This method of gradual shrinking of the Supreme Court is unlikely to bring about the desired result of 5 administrative, 5 commercial and 10 civil and criminal judges. It could very well be that the much smaller numbers of administrative and commercial judges would fall below the requirement of 5 judges and that the Supreme Court will be left without such 'specialists'. **A transitional provision should allow the appointment of specialised judges even before the total number of 20 judges is reached if the number of specialised judges falls below the respective quota.**

28.   Creating three different orders of jurisdiction, topped by three courts of cassation that are independent of each other, may well lead to numerous and often complex conflicts of jurisdiction. The least that one would expect in such a situation, is that there would be an efficient system for the solution of such conflicts, *e.g.* through a special "conflicts" court. However, there seems to be no such system in place which would be effective. The Supreme Court should fit that purpose[5], but under the

---

[4] It seems that by 4 October 2010 no judge made a request for transfer to the High Specialised Civil and Criminal Court.
[5] Especially since the Supreme Court, in its new composition of 20 justices, will be composed of five justices per jurisdiction (civil /criminal, commercial and administrative, Article 39.1 of the Law), thus allowing for a balanced examination of issues relating to two or more jurisdictions.

new Law it cannot be called upon to act as an arbitrator in procedural questions, since its jurisdiction as a review court is limited to questions relating to the application of substantive law.

29.    The new review competence of the Supreme Court deserves an analysis on its own. Article 38.2 point 1 of the Law provides that the Supreme Court shall review cases regarding unequal application by courts of cassation of the same rule of substantive law in similar legal relations, in the manner prescribed by the procedural law. This provision is further worked out in provisions that are inserted in the various procedural laws by amending provisions of Section XII of the Law.[6] There seems to be a clear inconsistency in this respect. As it has already been observed above, **the competence of the Supreme Court relates to issues of substantive law only. It is not clear what is the justification to deny the Supreme Court a competence in relation to issues of procedural law**, especially as most fair trial issues (Article 6 ECHR) are related to procedural questions. Discrepancies in the case-law of the high specialised courts are likely to arise also with respect to provisions of procedural law, and it would be essential to have effective means of assuring a uniform interpretation in that respect too.

30.    One can foresee difficult questions of interpretation of the new provisions: what constitutes "substantive law", and what constitutes "procedural law"? Such problems **should be avoided by lifting the restriction on the competence of the Supreme Court to substantive issues**.

31.    Moreover, the competence of the Supreme Court is limited to cases where there is an alleged contradiction between various decisions of the same high specialised court, or between decisions of various high specialised courts. The fact that, in order for the Supreme Court to have jurisdiction there must be an alleged conflict between decisions, means that the Supreme Court can only act in a reactive way, i.e. to intervene when contradictions have actually manifested themselves. This is far from the idea of a supreme court generally interpreting the law in an authoritative way and thus paving the way for a uniform interpretation of the law by all courts, even before contradictions have arisen.

32.    Parties do not have direct access to the Supreme Court. The result of the relevant provisions of the procedural laws is that an application for review must be filed through the high specialised court that has handed down the decision complained of, and that it is for that same high specialised court to decide whether or not to admit the application. Only if the case is declared admissible will the case be sent to the Supreme Court. This system means, in fact, that the high specialised court is asked to check itself whether there is reason to think that it has misinterpreted the law. It is true that the relevant laws provide that the judges who adopted the decision complained about of cannot participate in the examination of the admissibility of the application for review, thus shielding the system to some extent from criticisms relating to the impartiality of the court.[7] Even after discussions in Kiev, it remains unclear what legal justification exists for refusing to give the Supreme Court the power to assess the admissibility of the application.

33.    The conditions for the admissibility of an application are formulated in such a way that one can only wonder how often the Supreme Court will be able to effectively exercise its review competence. **The Supreme Court should be allowed to decide itself on the admissibility of cases concerning the conflicts of interpretation between the high specialised courts.** The solution chosen unduly restricts the functions of the Supreme Court and will prevent it from fulfilling its constitutional position as the highest judicial body. In practice, the new arrangement will set the high specialised courts above it in that they alone will be able to decide what cases can be referred to it.

34.    As indicated above, Article 38.2 of the Law further provides for the possibility of the Supreme Court to review cases when an international judicial institution establishes that there has been a

---

[6] See Chapter 32 (Articles 400-11 to 400-25) of the Code of Criminal Procedure of Ukraine (inserted by Article 3.1, point 58, of Section XII of the Law), Section XII-2 (Articles 111-14 to 111-28) of the Commercial Procedure Code of Ukraine (inserted by Article 3.3, point 51, of Section XII of the Law), Chapter 3 (Articles 353 to 360[7]) of the Civil Procedural Code of Ukraine (inserted by Article 3.6, point 86, of Section XII of the Law), and Section IV, Chapter 3 (Articles 235 to 244[2]) of the Code of Administrative Procedure of Ukraine (inserted by Article 3.7, point 92, of Section XII of the Law).

[7] Compare ECtHR, *San Leonard Band Club v. Malta*, no. 77562/01, judgment of 29 July 2004, *ECHR*, 2004-IX, § 63; ECtHR, *Driza v. Albania*, no. 33771/02, judgment of 13 November 2007, § 81.

violation of international law. This is especially important in the context of the execution of judgments of the European Court of Human Rights. The possibility already existed in the former draft of the Law. However, according to the new Law, even an application for review on the basis of a decision by an international court is subject to a declaration of admissibility of the relevant high specialised court. It is a step backwards to establish that the application for review has to go through the high specialised court of the relevant jurisdiction. This complicates the procedure without there being a need for it. **The system should be simplified by providing a direct access to the Supreme Court.**

35.    During the discussions in Kiev it became obvious that there is a degree of tension between the Supreme Court and the current executive. It is hard to avoid the conclusion that there is a deliberate intention to reduce the power of the Supreme Court which goes far beyond the desire to create a more efficient judicial system. Conflict between the executive and the judiciary may be normal and even healthy but only where an atmosphere of mutual respect prevails. The absence of such respect creates a threat to the continued existence of a society based on the rule of law.

## 4.2.    Status of Judges, People's Assessors and Jurors (Section III, Articles 47 to 63)

36. Section III deals with the status of judges, judicial independence, judicial immunity, rights and responsibilities, judicial ethics, as well as the status of, requirements for, engagement of and grounds and procedure for relieving of the duty to act as a people's assessor. These provisions are almost identical to those in the earlier draft.

37.    Therefore the questions and criticism concerning Article 47.2, which provides that a judge shall not be obliged "to provide any explanations regarding the merits of cases under his/her consideration, except when required by law", remain the same, as it is not clear what kind of situations would allow to ask a judge for explanations.

38.    The provisions in relation to judicial immunity, which were criticised in the earlier opinion for submitting the possibility of detention of judges to the *Verkhovna Rada* and not to an independent judiciary body, also remain unchanged.

39.    Article 48.7 provides, as did the former draft, that liability for court induced damages shall be borne by the State. However, compared to earlier drafts, an immunity of the judge from civil suits in relation to damages caused by his or her decision, action or inaction, related to the administration of justice is no longer mentioned.[8] Presumably the civil liability is covered by the general liability clause of Article 48.1. While this certainly represents a valuable protection, that provision may go too far in giving the judge immunity for such serious matters as failure to give judgment at all, or improper conduct such as giving a judgment as a result of an inducement or bribe, which would be dealt with in criminal and disciplinary proceedings. **It is recommended that provision be made for a number of strictly circumscribed exceptions to the system of immunity of judges from liability actions.**

40.    Article 54.7 of the Law sets out that judges may be rewarded with awards, decorations or letters of commendation, except for awards in connection with their administration of justice. The Law thus rejects the idea of inadmissibility of *any* awards, which was quite rightly incorporated into the draft submitted by the President to the *Verkhovna Rada*. The provision is questionable from the point of view of the independence of judges, even if the only awards considered lawful are those that are based on other reasons than a judge's professional record. As the provision now stands, it still gives an opportunity to "thank" the necessary people. **It is thus recommended to extend the prohibition of Article 54.7 to all sorts of awards.**

41.    The judicial oath is somewhat changed and is now longer and more elaborate (Article 55). This has a knock-on effect on the power to dismiss a judge since one of the grounds of dismissal is violation of the oath. However, the Venice Commission does not see any difficulties with the contents of the oath, which seems appropriate.

---

[8] See, *e.g.*, Article 49.7 of the draft Law on the Judicial System and the Status of Judges of Ukraine.

42.  Finally, the more detailed provisions in relation to jurors have now been replaced by a very brief Article 63. The effect of this is to transfer detailed provisions in relation to jurors to the procedural law.

## 4.3.    Procedure for Assuming the Office of a Professional Judge of a Court of General Jurisdiction (Section IV, Articles 64 to 80)

### 4.3.1.  Authorities involved in the appointment and election processes

43. Section IV deals with the selection of judicial candidates and the procedures for appointing them to a judicial position - both the first appointment and the lifetime election. In this respect, the Constitution contains problematic provisions, as Article 128.1 of the Constitution designates the President and the *Verkhovna Rada* as authorities competent to appoint viz. elect judges. Appointment of judges by the executive (President, Government) is, as stated in the Joint Opinion of March 2010, "acceptable and, indeed, normal" (paragraph 35). However, to the extent that the Constitution provides for the appointment or election by political organs, special precautions are needed to guarantee that in such appointment or election procedures the merit of the person is decisive, not political or similar considerations. The analysis of whether the Law provides enough protection against undue political influences will be dealt with when analysing the role of the High Qualification Commission and the High Council of Justice (see Section VI of the Law, discussed below).

### 4.3.2.  Initial appointment of judges (Articles 64 to 73)

44. The Law contains similar provisions regarding the probationary period, provisions which are based on the Constitution. As already recommended in the Joint Opinion of March 2010, the existence of a five-year probationary period established in Article 126 of the Constitution should be eliminated or at least reduced, for example, to no more than two years. The Constitution should therefore be amended in this regard.

45. Concerning the provisions in the new Law on the procedure for initial appointment as a judge, some changes have been introduced. The eligibility conditions (Article 64) require a candidate to be a citizen of Ukraine, to be §at least 25 years of age, to have higher legal education, and a record of at least three years of service in the legal profession, to have resided in Ukraine for at least 10 years, and to speak Ukrainian. It is a barrier to appointment if a person has been found by a court to have limited legal capacity or legal incapacity, is suffering from chronic mental or other diseases which prevent him or her from performing judicial duties, or has an outstanding or unquashed conviction. It is no longer a barrier that a person is under investigation or awaiting a trial.

46. The procedure for initial appointment starts with the High Qualifications Commission of Judges, in two steps. The first step opens with the announcement of a competition for placement on a list of successful candidates based on the estimated number of judicial vacancies (Article 66.1, point 1). Persons wishing to become a judge can apply. Their application must be accompanied by a number of documents. These include copies of the passport, personal data sheet and *curriculum vitae*, relevant academic certificates and degrees, an extract from the work record book certifying the record of service, a certificate of health, and consent to the collection, storage and use of information for the purpose of evaluating his or her fitness for judicial work and to be subjected to a background check. A welcome addition to the last draft Law is that the contents of the information requested from the candidate must be approved by the High Qualifications Commission of Judges of Ukraine and published on its official website. Another welcome change is that the High Qualifications Commission is not entitled to demand documents other than those specified in the new draft (Article 67.7, final paragraph).

47. The High Qualifications Commission then reviews the eligibility of the candidates, conducts a background check on them (Articles 66.1 point 3, 68.2 and 68.3), and submits the admitted candidates to an examination of general knowledge (Articles 66.1 point 4 and 68.4). It sends the candidates who have passed this first examination to special trainings of a practical nature at the National School of Judges (Articles 66.1 points 5-6 and 69). After having successfully passed the training, the candidates take part in a qualification examination organised by the High Qualifications

Commission (Articles 66.1 point 7 and 70.1 to 70.7 and 70.10)[9]. On the basis of the results in the qualification examination, the High Qualifications Commission ranks the candidates and draws up a "reserve list" of candidates (Articles 66.1 point 8, 70.8 and 70.9). The second stage opens with the announcement of vacant positions, as well as with a competition between the candidates on the list (Articles 66.1, point 9, 71.1 and 71.2). Candidates can apply, presumably for one or more positions (Article 71.3). For each position, the High Qualifications Commission recommends a candidate based on the place of the candidate on the list and, in case of an equal score[10], on the number of years of service in the field of law (Articles 66.1 point 10, 71.4 and 71.5). The recommendations are sent to the High Council of Justice. The latter reviews each recommendation and, in case of a positive decision, submits a motion to the President (Articles 66.1 point 11 and 71.6). The President of Ukraine makes the final decision on the appointment (Articles 66.1 point 12 and 72).

48. **This procedure generally allows for a transparent and fair appointment process.** In particular, the fact that recommendations for the appointment of judges are to be based on objective criteria is much welcomed. There are nevertheless a few aspects that raise concerns.

49. Article 66.1 point 5 states that "candidates who passed an examination and required inspections/checks successfully shall be sent to take special training at a specialized higher law school of fourth level of accreditation" and only afterwards "the High Qualifications Commission of Judges of Ukraine shall send the candidates to take special training at the National School of Judges of Ukraine" (Article 66.1.6). The training is split between "theoretical training delivered by a specialised higher law school of fourth level of accreditation and practical training delivered by the National School of Judges of Ukraine" (Article 69.1). Articles 80 and 81 establish this National School of Judges as an institution of the judiciary under the control the High Qualifications Commission. The problem in the training system relates to the "specialised higher law schools of fourth level of accreditation". It seems that this "accreditation" is under the control of the Ministry of Education and that the latter may have a restrictive and possibly unbalanced practice for such accreditation. Already in its Joint Opinion of March 2010 the Commission pointed out that **"the State Judicial Administration and judicial training must be part of the judicial branch".[11] This relates to all judicial training and not only to "practical training".**

50. It is unclear what the role of the High Council of Justice is when considering the recommendations of the High Qualifications Commission at a meeting. It is difficult to understand why the High Council of Justice and the President of Ukraine must approve the appointment unless the criteria on which a negative decision might be given were to be set forth in the Law. The criteria for appointment should be absolutely clear and, as far as the process up to the decision of the High Qualifications Commission is concerned, the Law seems quite clear that it is to be based on an initial assessment of suitability taking into account the various documents which have to be supplied and on the results in the examination. However, no criteria on which the High Council of Justice or the President of Ukraine might second guess the decisions of the High Qualifications Commission are set out. This is unsatisfactory. Article 71.6 simply states that the High Council of Justice shall "review" the issue of appointing the candidate to a judicial position and, "if the decision is positive", shall submit a motion for appointment to the President. Article 29 of the Law on the High Council of Justice, which concerns the initial appointment of judges, does not mention such criteria either. What is more, it results from this provision that a report on each nominee is made by a member of the High Council of Justice and that the nominee is heard by the High Council of Justice. This seems to imply that the High Council of Justice may reassess the candidature, and come to a different conclusion than the High Qualifications Commission. It is striking that, while the recommendation by the High Qualifications Commission is to be based exclusively on objective criteria, the High Council of Justice

---

[9] Article 70.10 provides that the results of the qualification examination may be appealed against to the High Council of Justice. The latter can reverse the decision of the High Qualifications Commission, and oblige it to organise a second exam in respect of that candidate. The procedure is regulated in Article 29[5] of the Law on the High Council of Justice, inserted by Article 3.11, point 12, of the Law under consideration.

[10] Since the results of a qualification examination remain valid for three years (Article 70.6), it is possible that candidates from more than one list apply for a given position.

[11] Joint opinion of March 2010, § 123.15.

CDL-AD(2010)026                          - 12 -

can apparently disagree with a recommendation for reasons that are not determined by the law.[12] This opens the door to arbitrary decisions. **It is strongly recommended to circumscribe the role of the High Council of Justice in a much more transparent way.** Taking into account the characteristics of the decision-making process before the High Qualifications Commission and the composition of the High Council of Justice, **the role of the High Council of Justice should be made of a marginal nature, short of being removed.**

51.    It should be noted that the Law is equally unclear about the role of the President of Ukraine. Article 72 simply provides that an appointment to a judicial position shall be made by the President, on the basis of a motion by the High Council of Justice. A previous draft of the Law envisaged the possibility of a rejection by the President of the motion by the High Council of Justice.[13] In the Joint Opinion of March 2010, it was recommended that the discretionary power of the President be curbed by limiting him or her to verify whether the procedure for selection and appointment had been followed by the High Qualifications Commission and the High Council of Justice. The President should, in other words, act only as a "notary".[14] Since the provision that was incompatible with the President's role as described in the Joint Opinion of March 2010 is left out of the Law as adopted, it seems that the recommendation has been followed but this could be done in more explicit terms.

52.    Another concern relates to Article 68 of the Law, which provides that the selection of candidates (this refers to the initial examination on general theoretical knowledge) is to be anonymous. However, following this, **the High Qualifications Commission is to carry out a background check** and has the right to collect information about the candidate, and make enquiries to enterprises, institutions and organisations in order to receive information. Organisations and citizens have the right to present to the High Qualifications Commission information they may have about a candidate (Article 68.3). This seems to be somewhat at odds with the anonymous testing. These provisions are not clear as they do not set out what information is sought here. What kind of information can be collected and received? What kind of procedure regulates the collection of this kind of information? What is the state of knowledge of the candidate about this information? Does the candidate have the right to contest this information? **Without further clarification, these provisions are not in line with European standards and go against the transparency of the process of selection of judges.** There would seem to be little point in having an anonymous examination if it can then be overridden by some unspecified information, in order to deprive a person of the opportunity to participate further in the process.

53.    It is also to be noted that this Chapter is confusing in its arrangement, as reference is frequently made to something and then details concerning this appear only later (for example, the examination on general theoretical knowledge, which is referred to in Article 66.1 point 4 and then two articles later, in Article 68, after the Law has gone on to deal with other matters).

54.    Article 70 then deals with the qualification examination. The written element of this examination is to be anonymous. According to Article 70.10, the results of the examination may be appealed to the High Council of Justice. It is not clear on what basis such an appeal can be made or by whom (presumably only by the candidate).

55.    Following the qualification examination, there is a competition for a judicial position. Article 71 deals with this in detail, but to some extent repeats material which is previously set out in Article 66 (this is, again, an example of the same provisions appearing more than once in this text). It is not clear

---

[12] Other provisions of Article 29 of the Law on the High Council of Justice also raise questions. According to the second paragraph the file sent by the High Qualifications Commission should contain a copy of an essay on legal matters, written by the candidate, and a review of the essay, as well as a copy of the income declaration for the past year. Such documents are not mentioned in the provisions of the Law under consideration, although one could perhaps interpret the "essay" as the written test and the case study that are part of the qualification examination (Article 70.3 of the Law). It is also unclear what purpose an income declaration can serve. Moreover, Article 29.4 provides for the decision to be taken by the High Council of Justice "by show of hands". Such a voting procedure is generally not appropriate when it comes to taking decisions on individuals.
[13] Article 81.3 of the draft Law on the Judicial System and the Status of Judges of Ukraine.
[14] Joint Opinion of March 2010, at § 38.

what the purpose of the competition is in addition to the qualification examination. Finally, Article 71.6 refers to the High Qualifications Commission making a recommendation to the High Council of Justice, which in turn makes a recommendation to the President of Ukraine for appointment. Again, this repeats provisions contained in earlier Article 66.

### 4.3.3. Election of Judges to a Permanent Judicial Position (Articles 74 to 80)

56.   Articles 74-80 deal with the permanent appointment of judges. As indicated above, after having gone through a five-year probation period, judges can be elected to a permanent or lifetime judicial position.

57.   The procedure leading to the election to a permanent position can be summarised as follows. A judge whose five-year term comes to an end, can apply to the High Qualifications Commission for election to a lifetime position (Articles 74.3 point 1, and 75). The High Qualifications Commission then publishes information relating to the application on its official website and in the local media (Articles 74.3 point 2, and 76.1). The High Qualifications Commission examines the application, in the light of the "case consideration rates" of the candidate and the information received from external sources (Articles 74.3 point 3 and 76.2-76.4). It decides to recommend or to refuse to recommend the candidate to be elected, and its decision, in either sense, is forwarded to the *Verkhovna Rada* (Articles 74.3 point 4, 77.1 and 78). If the High Qualifications Commission recommends the candidate for election, the *Verkhovna Rada* decides on the election of the candidate (Articles 74.3 point 5 and 79). If the High Qualifications Commission refuses to recommend the candidate, it shall submit to the President of Ukraine a motion for the removal of the candidate from his or her office; in that case there is no procedure before the *Verkhovna Rada*.[15]

58.   Given the criticism related to the probation system (see above), and pending amendment of Articles 126 and 128 of the Constitution, it was recommended in the Joint Opinion of March 2010 to formulate the election to a permanent position upon the expiry of the five-year period as a main rule[6], from which derogation would be possible only on conditions similar to those which allow for the dismissal of a permanent judge.[17] Article 74.2 of the Law now provides that **the candidate "has to be" recommended by the High Qualifications Commission, provided there are no circumstances preventing this. According to this provision, the election to a lifetime position clearly is the principle, and the termination of judicial office the exception. In that sense, the provision follows the recommendation. However, the provision does not indicate the "circumstances" that would allow the High Qualifications Commission to refuse to recommend a candidate. The provision therefore leaves a too wide discretion to the High Qualifications Commission.**

59.   Again there is a provision requiring the applicant's written consent to the collection, storage and use of information about him or her (Article 75.4, first paragraph, point 8), although there is also a provision prohibiting requesting other documents than those that are prescribed (Article 75.5). One of the matters which is to be taken into account are case consideration rates of the candidate (Article 74.3, point 3). This is indeed a relevant piece of information, but the figures will have to be put in their context (complexity of the cases, etc), so that proper weight is given to the judge's effective workload.

60.   A worrying feature of the procedure is that the High Qualifications Commission shall publish information relating to the application on its website and in the local media (Articles 74.3 point 2 and 76.1), thus in fact inviting the general public to comment on the application. And indeed, Article 76.3 further provides that the High Qualifications Commission shall consider the petitions received from

---

[15] Article 77.2 provides that a decision to refuse to recommend a candidate for a lifetime position may be appealed against to the High Council of Justice. The procedure is regulated in Article 29² of the Law on the High Council of Justice, inserted by Article 3.11, point 12, of the Law under consideration. Article 77.3 of the Law under consideration provides that, if the High Council of Justice confirms the decision of the High Qualifications Commission, it shall submit to the President of Ukraine a motion for the removal of the candidate from his or her office. There is then no procedure before the *Verkhovna Rada*.

[16] The Joint Opinion of March 2010 referred to ECommHR, *Stieringer v. Germany*, at § 3. That decision concerned the German system then in force, under which probationary judges in general were appointed as permanent judges after three years and in any event after five years of service, unless they were dismissed on specified grounds.

[17] Joint Opinion of March 2010, at § 40.

citizens, public organisations, enterprises, institutions, and central and local government bodies, regarding the candidate's judicial performance. **Submitting a candidate's performance as a judge to scrutiny by the general public,** *i.e.* including by those who have been the object of unfavourable rulings, **constitutes a threat to the candidate's independence as a judge and a real risk of politicisation**. Judges must feel free to render decisions that are sometimes unpopular with politicians or which certain persons do not like. In the minds of some judges the prospect of being subjected to a campaign of "petitions" by citizens and others who feel disgruntled by their decisions may have a "chilling" effect and impact their independence. Even in case of those judges who uphold their integrity the outside appearances may be such as to put in question their objective independence. The system of petitions moreover raises the fear that extraordinary and improper interventions could take place in the process of consideration of the application by the High Qualifications Commission. It could therefore amount to a serious interference with the independence of judges in their first five years, before they receive permanent appointment.

61.    This highly questionable feature is not compensated for by the fact that the candidate will have the right to have access to the information received by the High Qualifications Commission and to comment on it (Article 76.4), although this right in itself is a good thing.

62.    With respect to the procedure before the *Verkhovna Rada*, it is useful to recall what was stated in the Joint Opinion of March 2010 on the role of Parliament in the election of judges: "(T)he parliament is undoubtedly much more engrossed in political games and the appointments of judges could result in political bargaining in the parliament in which every member of Parliament coming from one district or another will want to have his or her own judge [...]. Appointments of judges of ordinary (non-constitutional) courts are not an appropriate subject for a vote by Parliament because the danger that political considerations prevail over the objective merits of a candidate cannot be excluded. Admittedly, in order to avoid the involvement of Parliament in the appointment of judges, it would be necessary to change Article 128 of the Constitution."[18]

63.    Since the provisions on the involvement of the *Verkhovna Rada* have a constitutional origin, they remain in the new Law. However, to a certain extent, the drafters of the Law seem to have taken this comment into account. Article 79.2 of the Law provides that the issue concerning **the election of a candidate to a lifetime judicial position will be considered at once at a plenary meeting, without preliminary discussions and investigations by a committee of the *Verkhovna Rada*. This provision is clearly aimed at reducing the role of the *Verkhovna Rada* in the election process. As such it enhances the independence of the judges, and is therefore welcomed.**

64.    Despite this reduced role of the *Verkhovna Rada*, the election process is still susceptible to being politicised. The aim should be to remove the involvement of the *Verkhovna Rada* altogether by way of constitutional amendment. What is more, in the new Law there appears to be no limitation on the power of the *Verkhovna Rada* to accept or refuse a candidate, and it is not required to have any reason for rejecting a candidate, much less a good one.

65.    Finally, the votes required for the election of a candidate are unclear. Article 79.4 of the Law provides that the decision on electing a candidate to a permanent position shall be taken by a majority of the constitutional composition of the *Verkhovna Rada*. This is a kind of qualified majority. Article 79.6 further provides that in case a candidate does not receive the number of votes thus required, re-voting shall be conducted. It seems that if a candidate obtains a majority of votes in his favour, but not the qualified majority, re-voting should take place. The same seems to be true if a majority, but not the qualified majority, votes against the election. What happens if, even after a second round, there is no qualified majority in one or the other sense? At the meetings in Kiev, it was pointed out that the voting process would be repeated until the candidate was elected but that seems hardly conceivable.

---

[18] Joint Opinion of March 2010, at § 44.

66.    Moreover, requiring a qualified majority for the election of a judge, after a probation period, is not in line with the idea that the election should be the principle and the non-election the exception (see above, paragraph 58). It would be better if the Law could provide that the recommendation by the High Qualifications Commission to elect the candidate is followed unless a qualified majority of the *Verkhovna Rada* rejects it.

## 5.  Promotion - Ensuring the Appropriate Qualification Level of a Judge (Section V, Articles 81 and 82)

67.    Section V consists of two articles and establishes the National School of Judges of the Ukraine under the control of the High Qualifications Commission of Judges.

68.    However, the Law leaves the door open to political considerations in the promotion of judges in Ukraine. It is striking that the question of promotion is hardly regulated at all. It seems that only some parts of Article 80 of the Law deal with it. This is not the case with paragraph 1, which concerns the transfer of a judge elected to a lifetime position to another court (of the same level) within the same specialisation. Promotion by contrast seems to be the object of paragraph 2, which concerns the transfer of a judge elected to a lifetime position to a court of a different level within the same specialisation. Paragraph 3, which regulates the transfer of a judge elected to a lifetime position to a court of another specialisation, again seems to concern the transfer to a court of the same level[19], and therefore does not seem to deal with promotion.

69.    The above-mentioned Article 80.2 simply states that the transfer of a judge elected to a lifetime position to a court of a different level within the same specialisation shall be performed by the *Verkhovna Rada*, according to the procedure set forth by this Law and the *Verkhovna Rada* Standing Rules for judicial selection. There is no mention of any criteria, or of any role to be played by the High Qualifications Commission. This seems to turn promotions into purely political issues, to be decided exclusively by the *Verkhovna Rada*, an organ that is not fit for evaluating the "qualifications, integrity, ability and efficiency" of judges.

70.    It is **recommended to amend the Law on this point, by providing criteria for the promotion of judges and involving the High Qualifications Commission to a considerable extent in the promotion process**.

## 6.  Disciplinary Liability of a Judge (Section VI, Articles 83 to 99)

71.    Section VI deals with disciplinary liability of a judge and also makes provisions concerning the High Qualifications Commission of Judges of Ukraine. In the earlier draft there was a provision for a separate disciplinary commission as well as the High Qualifications Commission, but the functions of these two bodies have now been merged into a single body in the new draft. This represents a welcome simplification of the procedures.

### 6.1.    Disciplinary Liability

72.    Article 83 deals with the grounds for disciplinary action. These are a little more tightly defined than in the earlier drafts. Disciplinary proceedings on the grounds of violation of norms of procedural law is now qualified to refer only to "essential" violation and it is specified that this relates in particular to denying a person access to justice on grounds not stipulated by law, violation of requirements for case assignment etc. These grounds do not give rise to critical comments, but much will depend of course on the interpretation of these grounds in practice. It will be for the competent disciplinary body, *i.e.* the High Qualifications Commission or the High Council of Justice (Article 85), to apply the Law in a reasonable way.

---

[19] If this were not the case, it is hard to understand how the motion of the High Qualifications Commission could be based on the result of the qualification examination taken by the judge.

73.    A complaint in a disciplinary matter may be made by anyone who is aware of facts that can give rise to disciplinary liability (Article 84.1 and 84.2). The proceedings may not be initiated on the basis of an application containing no evidence or on the basis of an anonymous application or report. When the complaint is made, the High Qualifications Commission of Judges appoints one of its members to verify the information contained in it. He or she is entitled to demand information and, based on the results of the verification, writes an opinion presenting the facts and circumstances which have been found and a proposal either to open or dismiss a disciplinary case. The High Qualifications Commission then decides whether to do so. A copy of that decision is sent to the judge against whom the complaint is made. If it is decided to open disciplinary proceedings, the judge is invited to the meeting of the High Qualifications Commission, at which the disciplinary case is to be considered, and is entitled to give written explanations. The judge or his or her representative is entitled to give explanations, put questions to participants in the proceedings, express objections, file motions, and seek disqualification. **The Law does not, however, specify whether the judge is entitled to call witnesses in his support or to examine witnesses, or indeed whether such witnesses are to be called or whether the Commission relies solely on the report from its member who conducted the verification. These matters should be clarified.** The High Qualifications Commission can then make a decision imposing a disciplinary sanction. If it thinks that the judge should be removed, it can send a recommendation to the High Council of Justice. The decision of the High Qualifications Commission must be given in writing and must state the reasons for its decision.

74.    **It is recommended that the specific rights of defence granted to the judge should be detailed. The reporting member of the High Qualifications Commission, whose position is similar to that of a prosecutor, should be excluded from the deliberations and the vote.**

75.    With respect to judges of a local court or a court of appeal, over whom the High Qualifications Commission has disciplinary jurisdiction[20], the procedure is further described in Article 86.2-86.13 of the Law. With respect to judges of the high specialised courts and justices of the Supreme Court, over whom the High Council of Justice has disciplinary jurisdiction, pursuant to Article 131.1, point 3, of the Constitution, Article 86.14 of the Law refers to the procedure described in the Law on the High Council of Justice[21]. These provisions do not call for further comments.

76.    According to Article 88.1, of the Law, the disciplinary sanction can consist of a censure or reprimand.[22] This is as such not a severe sanction. It should be noted, however, that on the basis of the results of the disciplinary proceedings, the High Qualifications Commission may decide to send a recommendation to the High Council of Justice to submit a motion for the removal of the judge, "if there are grounds for doing so" (Article 87.5 of the Law). The High Council of Justice, for its part, can also on its own initiative adopt a motion for removal of a judge from office (Article 31.1 of the Law on the High Council of Justice). The removal from office will be discussed below.

77.    **The judge concerned may appeal against the decision to the High Council of Justice or the High Administrative Court of Ukraine** (Article 89.1). It is not clear from the text in what circumstances one appeal mechanism rather than the other should be used, but it appears from Article 89.4 and 89.5 that this is dealt with in the Law on the High Council of Justice and the Code of Administrative Procedure. **The text is very imprecise** and the level of generality as regards this important issue is striking in view of the very detailed nature of many other parts of the Law.

---

[20] It is welcomed that the drafters of the Law have abandoned the idea of setting up a separate body, such as a "Disciplinary Commission of Judges of Ukraine" (see Articles 117-127 of the Draft Law on the Judicial System and the Status of Judges of Ukraine).
[21] See Articles 37-44 of the Law on the High Council of Justice, slightly amended by Article 3.11, points 16-17, of the Law under consideration.
[22] A similar provision can be found in Article 37 of the Law on the High Council of Justice, amended by Article 3.11, point 16, of the Law under consideration.

## 6.2.    The High Qualifications Commission of Judges and the High Council of Justice

78.    Articles 90-99 deal with the High Qualifications Commission of Judges. Both this body and the High Council of Justice are intended to ensure that there are no undue or improper influences in the appointment of judges. The compositions of both organs deserve a closer look.

79.    The High Qualifications Commission of Judges is composed of 11 members of whom 6 are judges appointed by the Congress of Judges, two are persons appointed by the Higher Law Schools and Scientific Institutions, one person is appointed by the Minister for Justice, one by the Ombudsman and one by the Head of the State Judicial Administration (Article 92.1 of the Law). The term of office is three years.

80.    The High Qualifications Commission is assisted by disciplinary inspectors to enable them to conduct a proper verification of the grounds for disciplinary action. Under Article 98.2 there are to be 33 disciplinary inspectors. This seems to be a rather large number and it is unclear why it is necessary to specify in the legislation how many inspectors there should be. Presumably the number of inspectors should depend on the need for them, which in turn should depend on the extent to which members of the judiciary in Ukraine are misbehaving.

81.    While the majority of the High Qualifications Commission are judges, the question remains whether it is wise and necessary that one of the members is appointed by the executive branch. **The presence in the Commission of a member representing the Minister of Justice with a right to vote** indeed may cast doubts, at least on the level of appearances, on the independence of the High Qualifications Commission, and **does not respect the separation of powers.**

82.    Apart from that, it is also of the utmost importance that the other ten members of the Commission, including the six judges, are not appointed on the basis of affiliation to a given political party. If that were the case, the risk of considerations based on the candidates' merits being influenced by political considerations, already present with the participation of a representative of the Minister of Justice, appears obvious. The Commission would then become an instrument of party politics, despite its appearance to the contrary.

83.    Concerning the High Council of Justice, its composition and the risk of politicisation, reference is made to the opinion on the Law on the prevention of the abuse of the right to appeal (see CDL(2010)098).

## 7.    Removal from Office of a Judge (Section VII, Articles 100 to 112)

84.    Articles 100 to 112 deal with the removal from office of a professional judge of a court of general jurisdiction. The provisions of this section are the same as in the earlier draft, except for the section dealing with the removal of a judge by the *Verkhovna Rada* of Ukraine.

85.    Indeed, the Law includes the nine constitutional grounds for the removal of a judge from office (following Article 125.5 of the Constitution, Article 100 of the Law). The constitutional grounds seem to include both reasons based on the judge's culpable behaviour, such as his or her conviction for a criminal offence (Article 126.5 point 6, of the Constitution and Article 106 of the Law), and circumstances in connection with which no condemnable behaviour needs to be attributed to the judge, such as reaching the retirement age (Article 126.5 point 2 of the Constitution and Article 102 of the Law). The Joint Opinion of March 2010 recommended clarifying in what is now Section VII the distinction between the two kinds of situations, which arguably should have different types of proceedings.[23] This recommendation has not been followed. It appears, for instance, that a permanent judge who wishes to resign on the basis of duly certified health problems (Article 103 of

---

[23] Joint Opinion of March 2010, at § 60. It is to be noted that different types of proceedings, based on the nature of the various grounds for removal from office, are provided for in the chapter of the Law on the High Council of Justice relating to the removal of judges from their office: Article 31 of that Law relates to removal "on general grounds" (mentioned in Article 126.5 points 1-3 and 7-9 of the Constitution), while Article 32 relates to removal "on special grounds" (mentioned in Article 126.5 points 4-6 of the Constitution).

the Law) is subjected to the same kind of proceedings as his or her colleague who has been convicted of a criminal offence (Article 106 of the Law).

86.    As in the former draft, some of the grounds relating to culpable behaviour seem to be very vaguely or widely defined (see criticism addressed in the previous Joint Opinion, paragraphs 66-68) and the same recommendation stands. Indeed, it seems as if the Law tries to avoid at this point going any further than the provisions already contained in Article 126 of the Constitution of Ukraine. Those provisions include the violation by the judge of requirements concerning incompatibility and the breach of oath by the judge. **The grounds for removal from office should be set out in a more precise and narrow way.**

87.    In any event, **there should be provisions which should set forth what is to happen in relation to such procedural matters as the right to be present at the hearing, the right to be assisted or represented the right to call witnesses, and how to challenge the findings of the High Council of Justice.**

88.    It may be added that Article 126.5 of the Constitution provides that the body that elects or appoints judges is also the body that dismisses judges. Since Article 128.1 of the Constitution provides for the first appointment by the President of Ukraine and for the election to a lifetime position by the *Verkhovna Rada*, it is not possible to take the power to dismiss judges away from the *Verkhovna Rada* without an amendment to the Constitution. Nonetheless, the conferring of this power on the *Verkhovna Rada*, taken with the failure to provide for procedural safeguards, risks to politicise the method of dismissal of judges (just like this risk exists for the election of judges). **Article 126 of the Constitution should therefore be amended in order to exclude the possibility that judges can be removed by the *Verkhovna Rada*.**

89.    Concerning the procedure to be followed for the removal of judges by the *Verkhovna Rada*, in the place of the very elaborate provisions which were contained in the earlier draft, there is now merely a provision which states that the procedure for considering issues and making a decision on removal of a judge elected for a lifetime position shall be set out in this Law and the procedural rules of the *Verkhovna Rada* (Article 111). The *Verkhovna Rada* has to act in plenary session, without preliminary discussions and investigations by a committee of it. As indicated above, with respect to a similar arrangement concerning the election of judges, this provision is clearly aimed at **reducing the involvement of the *Verkhovna Rada* in the election process, and is welcomed.** The discussion of the motion begins with a report by the Head of the High Council of Justice or another member of that body. The decision to remove a judge is to be taken by a majority of the *Verkhovna Rada*. This is a kind of **qualified majority**, which is **also welcomed.** However, if the removal of a judge does not receive the necessary majority of deputies, a second vote is to be conducted. This seems a strange provision as it seems that if there is no majority to remove the judge, the motion should fail. **Once it appears that there is no qualified majority to remove an accused person from office, that should be the end of the matter.**

90.    Another problem concerns the possibility to appeal against a dismissal. It seems that in practice, a decision of the High Council of Justice on the dismissal of a judge goes immediately to the *Verkhovna Rada*, which decides, and only after a decision by the *Verkhovna Rada* is taken both the decisions of the High Council of Justice and of Parliament can be appealed against to the High Administrative Court. This seems odd; **the appeal to the High Administrative Court should come before the start of the procedure in the *Verkhovna Rada*.**

## 8.  Judicial Self-Government (Section VIII, Articles 113 to 128)

91.    Many of the provisions in Section VIII are the same as in the earlier draft and consequently the recommendations made in the earlier opinion remain applicable as in the earlier draft (see paragraphs 71 to 109 of the Joint Opinion of March 2010). A major change is the removal of self-government bodies at the regional level.

92.    Indeed, the Law continues to attach a great importance to judicial self-government. According to Article 113.1 of the Law, judicial self-government is qualified as an independent collective resolution of internal court activity issues by judges. According to Article 113.2, judicial self-government is one of the most important guarantees of the autonomy of courts and the independence of judges. Activities of bodies of judicial self-government must promote the establishment of appropriate organisational and other conditions to provide courts and judges with normal operation, strengthen and assert the independence of the courts and judges, ensure protection of judges from interference into their activity and also raise the level of quality of staff management in the system of courts.

93.    The organisation of judicial self-government, as laid down in the Law, is highly complex, sometimes even confusing. In respect of some of the functions in question there are three sorts of bodies, the meetings, the conferences and the councils of judges, which are conferred with similar or even identical functions. The decisions of these bodies are all binding.[24] Furthermore, while *prima facie* the whole system appears to be democratic, the existence of a number of bodies all exercising similar if not identical functions may dilute the authority of any one of them. What has been said in the Joint Opinion of March 2010 is still valid: "There are substantial doubts about the effectiveness of a procedure which establishes judicial self-government bodies on so many levels. The scope for 'judicial politics' seems rather big. While important functions are conferred on the bodies of judicial self-government the dispersal of these powers through many bodies seems to lead to a potentially confusing situation where different bodies would exercise the same powers. In this regard the effectiveness of any of the bodies may be called into question."[25] During the meetings in Kiev, various interlocutors raised the issue of an imbalanced representation of the various branches of the judiciary in the self-government bodies, which **give the commercial and administrative branches a representation out of proportion with the number of judges working in these areas.**

94.    Furthermore, although the Law establishes a whole structure of judicial self-government bodies, it is not certain that it actually provides these bodies with effective powers regarding the resolution of issues of internal organisation of court activities. The bodies of self-government can discuss issues and appoint delegates, but it seems that they often will depend on other bodies of state power or local self-government (to which they can address proposals). There is a risk that the declared objectives of judicial self-government and the declared functions of the bodies of judicial self-government may become a dead letter. All in all, as already concluded in the Joint Opinion of March 2010, one can still argue whether it would not be more reasonable to revise the whole system of self-government and to consider establishing a truly independent High Council of Justice, pluralistically composed, with a substantial part if not the majority of the members being judges elected by their peers, as the single organ of self-government. There could be sub-committees for specialised functions. The best protection for judicial independence, both "internal" and "external", might be assured by such a High Council of Justice, as is recognised by the main international documents on the subject of judicial independence. Such a High Council of Justice could also be in charge of judicial training.[26] Of course, such a solution would require an amendment to the Constitution.

95.    Finally, there are a number of specific matters relating to the system of judicial self-administration: The Law provides that **delegates to participate in a conference of judges** be selected on the basis of "longer record of service on the position of a judge and their reputation/authority" (Articles 115.5.4 and 122.6.4 of the Law). Such criteria do not seem very democratic and would probably completely exclude younger judges. The criterion of "reputation/authority" is a very vague one. This system **should be brought more in line with the democratic principle.**

96.    Article 124.3, of the Law, according to which a number of people not belonging to the judiciary may attend the Congress of Judges of Ukraine, should be interpreted in such a way that these other persons have only an observer status unless on specific request for some specific purpose. Article 125.1 of the Law provides that delegates to the Congress of Judges of Ukraine shall be elected

---

[24] Compare, for instance, Article 115.1 (meetings of judges) with Article 118.1 (conferences of judges) and Article 122.6 point 1 (councils of judges), all dealing with the "operation of courts".
[25] Joint Opinion of March 2010, at § 105.
[26] Joint Opinion of March 2010, at §§ 99 and 108.

CDL-AD(2010)026                            - 20 -

"on the basis of equal representation of each judicial jurisdiction". It is recommended to provide for a more proportionate representation, in order to bring the composition of the Congress in conformity with the principle of equality. It results from Article 127.2 of the Law that the Council of Judges comprises an equal number of representatives from each of the three conferences of judges. It is recommended to provide for a **more proportionate representation**, in order to bring the composition of the Council in conformity with the principle of equality.

97.    The **Minister of Justice and the Minister of Finance should not be invited to attend meetings of the Council of Judges** of Ukraine in order to avoid influencing this body (Article 127.7 and 127.8), of the Law).

## 9.  Support for the Professional Judge (Section IX, Articles 129-135)

98.    This section deals with judicial remuneration, vacation, calculation of the judge's length of service, provision of housing, provision for needs relating to professional activity and social insurance. It seems that salaries have been reduced substantially for new Supreme Court judges. At the meetings in Kiev, this was raised as a problem of equality between 'old' and 'new' judges. Apart from this issue, these provisions are essentially the same as in the earlier draft and therefore there are no further specific comments.

## 10. Status of a retired Judge (Section X, Articles 136-139)

99.    The provisions have not substantially changed since the earlier draft. The earlier comments therefore remain valid.

## 11. Organisational Support for the Operation of Courts (Section XI, Articles 140-154)

100. Judicial self-government is not viable without self-administration. Section XI of the Law, which deals with organisational support for the operation of courts, has to be examined from that point of view. This Section is divided into two chapters: one on "General Issues of Support for the Operation of Courts" (Articles 140-144), the other one on the State Judicial Administration of Ukraine (Articles 145-154).

101. The Law provides that funding of the activities of the courts and judges shall be provided by the State (Article 140.1). The actual level of support is to be determined annually by the State Budget of Ukraine (Articles 140.2 and 142). Funds will be distributed by the courts of general jurisdiction, the Constitutional Court and the State Judicial Administration, the latter as regards the operation of the High Qualifications Commission, the bodies of judicial self-government and the National School of Judges (Article 142.2). Once allocations have been made in the State Budget, they cannot be reduced in the relevant fiscal year (Article 142.4).

102. It is not clear to what extent demands by the judiciary, presumably through its bodies of self-government, have to be met by the State authorities. On this point more clarity in the Law would be welcome. Of course, it remains to be seen whether sufficient means will in fact be made available for the courts, so that they can perform their functions effectively.

103. The State Judicial Administration is entrusted with the task of providing organisational support for the operation of judicial bodies (Article 145.1). Elsewhere in the Law it is stated that the State Judicial Administration provides support for the work of the Congress of Judges and for the operation of the Council of Judges of Ukraine, the conferences of judges and the councils of judges, at the expense of the State Budget of Ukraine (Article 128). The State Judicial Administration is set up as a body subordinated to the Congress of Judges of Ukraine (Article 145.2). A concrete example of this supervision by the Congress of Judges is that the Regulations on the State Judicial Administration shall be approved by the Council of Judges of Ukraine (Article 145.6). The State Judicial Administration has decentralised "territorial offices" in the oblasts, in the Autonomous Republic of Crimea and in the cities of Kiev and Sevastopol (Article 145.3).

104. The competences of the State Judicial Administration are far reaching (Article 146): among others, it represents courts in relations with the Cabinet of Ministers and the *Verkhovna Rada* during the preparation of the draft Law on the State budget of Ukraine (point 1); it ensures adequate conditions for the operation of courts of general jurisdiction, the High Qualifications Commission, the National School of Judges and the bodies of judicial self-government (point 2); it ensures the necessary conditions for raising the professional level (continuous training) of judges and court staff (point 5); it organises computerisation of courts for purposes of administration of justice, case management, etc. (point 8); it provides for the functioning of an automated case management system in courts (point 9); etc.

105. The State Judicial Administration is directed by a Head who is appointed and can be removed from office by the Council of Judges of Ukraine (Article 147.1 and 147.2). The specific competences of the Head of the State Judicial Administration are of a diverse nature (Article 147.4): for instance, he or she appoints and dismisses employees of his or her own administration and staff managers of courts (point 3), appoints one of the members of the High Qualifications Commission (point 4), applies incentives or imposes disciplinary penalties to staff managers of courts and court staff (point 5), assigns ranks of public servants to staff managers of courts and court staff (point 6), etc. He or she also reports to the Congress of Judges of Ukraine on the activity of the State Judicial Administration, and informs the Council of Judges of Ukraine and the conferences of judges about its activities (point 9), and takes part in the preparation of proposals for the draft State budget of Ukraine regarding the judiciary (point 10).

106. Commenting on a previous draft Law, the Joint Opinion of March 2010 criticised the fact that the State Judicial Administration was an executive body with far reaching competences, which was not compatible with the idea of judicial self-government. It was **recommended to bring the State Judicial Administration under the control of an independent body of judicial self-government**.[27]

107. **To a large extent this recommendation has been followed**. As indicated above, the State Judicial Administration is under the authority of the Congress of Judges of Ukraine, its regulations have to be approved by the Council of Judges of Ukraine, and the Head of the State Judicial Administration is appointed and removed from office by the Council of Judges of Ukraine. All this represents a significant improvement from the point of view of judicial independence compared to the previous draft (where appointment and dismissal fell into the competence of the Cabinet of Ministers upon a motion submitted by the Prime Minister on the basis of a recommendation from the Council of Judges of Ukraine[28]).

108. The competences of the State Judicial Administration of Ukraine are quite extended. It is for example the Head of the State Judicial Administration who appoints and dismisses the staff managers of the courts. He or she seems to have much individual power over the operative side of the administration of the courts. It is obvious that the exercise of such competences could interfere with the principle of judicial independence in a way which would contradict international standards. The officials of the State Judicial Administration are public servants (Article 145.4). It is a legal entity and it maintains an independent balance sheet and accounts in the institutions of the State Treasury of Ukraine (Article 145.5).

109. It is **recommended that the judiciary is made competent to take final decisions over major operative activities as regards court administration**. Only then will judicial administration become a part of the judiciary's responsibility, as a fundamental element of judicial self-government and therefore of judicial independence.

---

[27] Joint Opinion of March 2010, at § 103.
[28] Article 179.2 of the draft Law on the Judicial System and the Status of Judges of Ukraine.

## 12. Amendments to Other Laws (Section XII)

110. Article 3 of Section XII ("Final Provisions") of the Law brings a considerable number of amendments to various other laws. Some of these amendments, in particular those relating to the new competence of the Supreme Court to review judgments of the high specialised courts and to the organisation of the High Council of Justice, have been discussed above, together with the provisions of other sections of the Law to which they relate. For the most part, however, the amendments have little or nothing to do with the preceding sections of the Law. Their primary aim seems to be to accelerate and simplify the procedure before the courts of general jurisdiction.[29]

111. With respect to court proceedings in Ukraine, it results from the case-law of the European Court of Human Rights that there are two major problems, which give rise to a high number of repetitive applications: on the one hand, the length of civil and criminal proceedings and the lack of effective remedies in this respect, and on the other hand, non-enforcement of the domestic courts' decisions and the lack of effective remedies in this respect. The drafters of the Law have used the opportunity to deal with the two problems thus identified. In what follows, the relevant provisions of the "Final Provisions" will be briefly examined.

### 12.1.  Length of proceedings

112. As regards the length of proceedings, the Law sets time-limits for a number of acts to be performed by the parties and the courts. Some of these time-limits appear to be very short. For instance, parties have ten days to file an appeal[30] and ten or twenty days to file a cassation appeal[31]. The consideration of cases by the courts of appeal may not take longer than one or two months from the date of the opening of the trial[32], and the consideration of cases by the high specialised courts not longer than one month from the date of the receipt of the file[33]. Moreover, a high specialised court must decide within 15 days whether an application for review to the Supreme Court is admissible[34], and if the review has been declared admissible the Supreme Court itself has one month from the date of the opening of the proceedings to consider the case[35].

---

[29] In the explanatory note to the draft Law submitted to the *Verkhovna Rada*, it was stated that the proposed amendments aimed, among other things, at considerably reducing the timeframes for consideration of cases in appeal and cassation proceedings, prohibiting the courts of appeal from returning cases for new hearings, implementing the possibility to send subpoenas in administrative cases via e-mail and fax, and introducing the right to file an appeal in administrative and civil cases without having to file a preliminary application about the intent to appeal.

[30] See Article 93 of the Commercial Procedure Code of Ukraine (inserted by Article 3.3, point 24, of Section XII of the Law), Article 294 of the Civil Procedural Code of Ukraine (replaced by Article 3.6, point 63, of Section XII of the Law), and Article 186 of the Code of Administrative Procedure of Ukraine (replaced by Article 3.7, point 66, of Section XII of the Law).

[31] See Article 110 of the Commercial Procedure Code of Ukraine (amended by Article 3.3, point 39, of Section XII of the Law), Articles 325 of the Civil Procedural Code of Ukraine (amended by Article 3.6, point 77, of Section XII of the Law), and Article 212 of the Code of Administrative Procedure of Ukraine (amended by Article 3.7, point 83, of Section XII of the Law).

[32] See Article 102 of the Commercial Procedure Code of Ukraine (inserted by Article 3.3, point 33, of Section XII of the Law), Article 303[1] of the Civil Procedural Code of Ukraine (inserted by Article 3.6, point 69, of Section XII of the Law), and Article 195[1] of the Code of Administrative Procedure of Ukraine (inserted by Article 3.7, point 72, of Section XII of the Law).

[33] See Article 111-8 of the Commercial Procedure Code of Ukraine (replaced by Article 3.3, point 47, of Section XII of the Law), Article 330[1] of the Civil Procedural Code of Ukraine (inserted by Article 3.6, point 81, of Section XII of the Law), and Article 214[1] of the Code of Administrative Procedure of Ukraine (inserted by Article 3.7, point 85, of Section XII of the Law).

[34] See Article 400-18 of the Code of Criminal Procedure of Ukraine (inserted by Article 3.1, point 58, of Section XII of the Law), Article 111-21 of the Commercial Procedure Code of Ukraine (inserted by Article 3.3, point 51, of Section XII of the Law), Article 360 of the Civil Procedural Code of Ukraine (inserted by Article 3.6, point 86, of Section XII of the Law), and Article 240, § 2, of the Code of Administrative Procedure of Ukraine (inserted by Article 3.7, point 92, of Section XII of the Law).

[35] See Article 400-20 of the Code of Criminal Procedure of Ukraine (inserted by Article 3.1, point 58, of Section XII of the Law), Articles 111-23 of the Commercial Procedure Code of Ukraine (inserted by Article 3.3, point 51, of Section XII of the Law), Article 360[2] of the Civil Procedural Code of Ukraine (inserted by Article 3.6, point 86, of Section XII of the Law), and Article 241, § 8, of the Code of Administrative Procedure of Ukraine (inserted by Article 3.7, point 92, of Section XII of the Law).

113. Setting time-limits may in principle seem be a good idea, but in practice may create difficulties. The short time-limits for filing appeals may have adverse effects on the right of access to higher courts. The short time-limits for the consideration of cases may prove to be unrealistic, thus creating expectations that cannot be fulfilled by the courts. Furthermore, according to the results of the discussions at the meetings in Kiev, it seems that no objective assessment of whether these targets can be achieved has been carried out.

114. It is moreover troubling that, together with the shortening of the periods for consideration of cases, the Law makes any failure to take action regarding the consideration of an application, a complaint or a case "within the term established by law" a ground for disciplinary action against the judge (Article 83.1 point 2 of the Law). Anyone who is aware of such failure has the right to file a disciplinary complaint (Article 84.2 of the Law). Several interlocutors at the meetings in Kiev warned that in practice nearly all judges would violate these short deadlines and they feared that disciplinary proceedings could be brought selectively against 'non-compliant' judges, especially as also the quorum for decisions in the High Council of Justice has been lowered. The High Council of Justice replied to these fears that they would only punish judges for systematic violations, fully taking into account the complexity of the cases before the judges on an individual basis. **Unfortunately, such criteria are not part of the Law and it can only be hoped that these provisions will be applied in a fair way, and not used inappropriately, to punish judges for other reasons than the ones officially disclosed.** In this respect, it should also be noted that bringing a judge to disciplinary liability cannot be considered an effective remedy with respect to a claim relating to the duration of the proceedings, as there will not be any direct and immediate consequence for the proceedings which have given rise to the complaint.[36]

## 12.2. Non-execution of decisions

115. It should be recalled that in its judgment of 15 October 2009 in the case of *Nikolayevich Ivanov* the European Court of Human Rights ascertained that the issues of the prolonged non-enforcement of final decisions and of the lack of effective domestic remedies in the Ukrainian legal system remained without a solution, despite the fact that there was clear case-law urging the government to take appropriate measures to resolve those issues. The Court therefore decided to apply the pilot-judgment procedure, and held that the State had to set up without delay, and at the latest within one year from the date on which the judgment would become final[37], an effective domestic remedy or combination of such remedies capable of securing adequate and sufficient redress for the non-enforcement or delayed enforcement of domestic decisions, in line with the Convention principles as established in the Court's case-law.[38]

116. The Law replaces Article 382 of the Criminal Code, providing for an increased responsibility for deliberate non-execution of court decisions. This happens by way of making it a crime, not only for public officials, but also for private individuals, to wilfully fail to execute a court ruling.[39] The wisdom of this provision can be questioned. It is the State's duty to provide means for the execution of judgments. Where a debtor does not execute a judgment that condemns him or her, it is important to find means so as to assure execution. Imposing a penalty on the debtor will often not remedy the situation as there will not be any direct and immediate consequence for the creditor: neither will the execution of the court's decision at issue be expedited, nor will the creditor be provided with adequate redress for delays that have already occurred.

117. The Law also provides for amendments to Article 267 of the Code of Administrative Procedure.[40] This provision relates to judicial control over the execution of judgments in administrative cases. According to the amended provision, in case of non-execution of an administrative court's order a fine

---

[36] ECtHR, *Kormacheva v. Russia*, no. 53084/99, judgment of 29 January 2004, § 62; ECtHR, *Olshannikova v. Russia*, no. 77089/01, judgment of 29 June 2006, § 44.
[37] The judgment has become final on 15 January 2010.
[38] ECtHR, *Yuriy Nikolayevich Ivanov v. Ukraine*, no. 40450/04, judgment of 15 October 2009.
[39] Article 382 of the Criminal Code of Ukraine, replaced by Article 3.4 of Section XII of the Law.
[40] Article 267 of the Code of Administrative Procedure of Ukraine, amended by Article 3.7, point 99, of Section XII of the Law.

CDL-AD(2010)026                          - 24 -

can be imposed on the official or the head of the collegial body that is in charge of the execution of the order. Half of the fine is for the plaintiff, the other half goes to the State Budget of Ukraine. It should be noted that such fine can be imposed only in cases before the administrative courts. One of the categories of cases where there are very many complaints of non-execution of judgments is that of social welfare payments by the State. The jurisdiction over these cases has recently been transferred from the administrative courts to the general courts (courts dealing with civil matters). Plaintiffs should be able to obtain relief in such cases a well.[41]

118. It is not excluded that the aforementioned measures may contribute to changing the attitude of those who unacceptably delay judicial proceedings and the execution of judgments. However, it is clear from the judgments of the European Court of Human rights that the problems of excessive length of proceedings and delays in enforcement are mainly due to the structural problems related to the organisation of the judiciary.

119. In this context, it is observed that the aforementioned measures place a particular emphasis on the personal responsibility of various civil servants and judges, as well as on the parties. It is doubtful that they will effectively contribute to solving the problems underlying the repetitive violations of the Convention.

120. Also, no acceleratory or compensatory remedy is provided by the Law in cases of lengthy court or enforcement proceedings. Unless such remedy, which has to be effective both in theory and in practice, is provided for, the flow of applications to the European Court of Human Rights may well continue.

## 13. Transitional Provisions (Section XIII)

121. Section XIII provides for a number of deadlines to be met in the transition from the old system to the new system. One may wonder whether the authorities will be able to meet all these deadlines.

122. For instance, the new High Specialised Court for Civil and Criminal Cases should start its activities on 1 November 2010 (Article 1). The State authorities should make sure that appropriate means are foreseen in the State Budget.

123. According to the transitional provisions **the military courts should be disbanded from 15 September 2010 (Article 4). This is a positive change**. The existing military courts represent a certain atavistic tendency of the Soviet judicial system.

## 14. Conclusion

124. While there have been a number of improvements in the text compared with the preceding draft, in particular the strengthening of judicial independence in a number of areas, some of the main criticisms made in the earlier opinion remain valid for the new text. The two main problems relate to the drastically reduced role of the Supreme Court and the increased role of the High Council of Justice in judges' appointment, discipline and dismissal.

125. The Law in fact deprives the Supreme Court of the opportunity to influence the practice of these courts. Indeed, it loses the authority to give explanations to the courts on the interpretation and application of the legislation, although the high specialised courts preserve such powers. Furthermore, the Court may revise the decisions of the high specialised courts only in case of different application of norms of substantive law, but not of procedural law. The Supreme Court's jurisdiction should be extended, so that it reflects its constitutional status as the highest judicial body in the system of courts of general jurisdiction. If the creation of three different orders of jurisdiction, topped by three courts of cassation, is maintained, the law should at least provide for an efficient system for the solution of conflicts of competence between the three orders.

---

[41] Law No. 1691-VI of 18 February 2010 on amendments to certain legal acts as to the jurisdiction to consider cases regarding social payments,

126. Another important feature of the Law is the important role attributed to the High Qualifications Commission of Judges and the High Council of Justice. While the former presents characteristics that seem compatible with European standards, the latter definitely is not compatible with these standards. It is recommended to amend the Constitution, so as to bring the composition of the High Council of Justice in line with the European standards. The Commission wishes to point out that it does not criticise the present members of the High Council of Justice but insists that in the absence of constitutional guarantees for a balanced composition of the High Council of Justice, the powers of the latter should be reduced rather than increased. In view of this problem of the constitutional composition strict rules of incompatibility of the Council's members should be followed.

127. There are still fundamental problems in the system envisaged for the appointment and removal of judges, notwithstanding the fact that improvements have been made. In particular the role of the *Verkhovna Rada* is deeply problematical. The system of judicial self-government is too complicated and there are too many institutions.

128. As positive elements of the reform, the Venice Commission welcomes in particular:

1. The introduction of an automatic case-flow and case-assignment system (however it should be made sure that specialisation of judges cannot be used to circumvent this system).
2. The election of a judge after the probationary period for a lifetime position has been made standard and only in exceptional cases can judges not be appointed to a permanent position.
3. The State Judicial Administration has been brought under the control of the judiciary but it should be ensured that the Head of this administration has to seek approval for his decisions in major cases.
4. The dissolution of military courts.

129. Recommendations for improvement of the Law include *inter alia*:

1. The new Supreme Court should deal with its 'old' case-load in chambers and, if needed, it should be possible to appoint specialised judges to the Supreme Court even before the total number of 20 judges is reached.
2. The Supreme Court should be allowed to exercise its jurisdiction to resolve conflicts between the high specialised courts also in matters of procedural law and the Court should be able to decide itself on the admissibility of cases involving a conflict in the interpretation of the law. It should also be made competent to resolve conflicts of jurisdiction between the three sorts of jurisdiction (civil and criminal, commercial and administrative).
3. Direct access to the Supreme Court should be provided in cases of violations of international obligations of Ukraine.
4. All types of awards to judges should be prohibited.
5. As long as the High Council of Justice is not a body composed according to European standards, it should not have the competence to appoint the court presidents and their deputies.
6. Submitting a candidate's performance as a judge to scrutiny by the general public constitutes a threat to the candidate's independence.
7. In disciplinary matters, the rights of defence need to be specified more clearly.
8. The reporting member of the High Qualifications Commission, whose position is nearly similar to that of a prosecutor, should be excluded from the deliberations and the vote.
9. The grounds for removal from office should be set out in a more precise and narrow way.
10. The meaning of Article 47.2 of the Law, providing that a judge shall not be obliged "to provide any explanations regarding the merits of cases under his/her consideration, except when required by law", should be clarified.
11. It is recommended to provide for some strictly circumscribed exceptions to the system of immunity of judges from liability actions (Article 48.1).
12. Article 68.2 and 68.3 of the Law, allowing for the High Qualifications Commission to collect information about the candidates and to make inquiries to enterprises, institutions and

organisations of all form of ownership, and allowing for organisations and citizens to submit any information they may have about a candidate, should be clarified. There should be a procedure regulating the collecting and receiving of this kind of information, and the candidate should be made aware of the information and have the right to contest it.

13. The whole judicial training, and not only the practical part of it, should be under the control of the judiciary (Article 69.1).

14. It is strongly recommended to circumscribe the role of the High Council of Justice in the process of initial appointment of judges in a much more transparent way. Taking into account the characteristics of the decision-making process before the High Qualifications Commission, the role of the High Council of Justice should moreover be of a marginal nature.

15. Article 74.2 of the Law should indicate the "circumstances" that would allow the High Qualifications Commission to refuse to recommend a candidate.

16. Article 79.4 of the Law provides that the decision on electing a candidate to a permanent position shall be taken by a majority of the constitutional composition of the *Verkhovna Rada*. Article 79.6, further provides that in case a candidate does not receive the number of votes thus required, re-voting shall be conducted. It would be better if the Law would provide that the recommendation by the High Qualifications Commission to elect the candidate is followed unless a qualified majority of the *Verkhovna Rada* rejects it. In any event, the above-mentioned provisions need to be clarified.

17. It is recommended to amend Article 80 of the Law, by providing criteria for the promotion of judges and involving the High Qualifications Commission to a considerable extent in the promotion process.

18. Article 89 of the Law provides for an appeal against the decision of the High Qualifications Commission to the High Council of Justice and to the High Administrative Court. The text should clarify when one or another of these avenues lies open.

19. It is recommended to reassess whether it is wise and necessary to have on the High Qualifications Commission a member representing the Minister of Justice. Especially in disciplinary proceedings, the presence of such a member may cast doubts on the independence of the High Qualifications Commission and does not respect the separation of powers.

20. In Section VII of the Law a clearer distinction should be made between removal from office based on the judge's culpable behaviour and removal from office based on circumstances in connection of which no condemnable behaviour needs to be attributed to the judge. Arguably, the different grounds should merit different types of proceedings.

21. Article 111.4 of the Law provides that the decision to remove a judge shall be taken by a majority of the constitutional composition of the *Verkhovna Rada*. Article 111.5 further provides that in case the number of votes thus required is not received, re-voting shall be conducted. The latter provision should be amended. Once it appears that there is no qualified majority to remove an accused person from office, that should be the end of the matter.

22. Article 125.1 of the Law provides that delegates to the Congress of Judges of Ukraine shall be elected "on the basis of equal representation of each judicial jurisdiction". It is recommended to provide for a more proportionate representation, in order to bring the composition of the Congress in conformity with the principle of equality.

23. It results from Article 127.2 of the Law that the Council of Judges comprises an equal number of representatives from each of the three conferences of judges. It is recommended to provide for a more proportionate representation, in order to bring the composition of the Council in conformity with the principle of equality.

24. It is recommended to clarify the extent to which demands by the judiciary, presumably through its bodies of self-government, have to be met by the State authorities.

25. It is desirable that the State Judicial Administration is unmistakably declared a body of self-administration of the judiciary (see Article 145 of the Law).

26. In order to avoid that the exercise of the competences of the State Judicial Administration of Ukraine interfere with the principle of judicial independence, the Law should be amended so as to ensure that the overall direction of the administration of the courts lies within the judiciary.

27. The members of the High Qualifications Commission of Judges, apart from the representative of the Minister of Justice, including the six judges, should not be appointed on the basis of affiliation to a given political party.

28. It will be for the competent disciplinary body, *i.e.* the High Qualifications Commission or the High Council of Justice, to apply the legal grounds for disciplinary action (Article 83) in a reasonable way. For instance, the Law makes any failure to take action regarding the consideration of an application, a complaint or a case "within the term established by law" a ground for disciplinary action against the judge. This provision should be applied in a fair way, and not used inappropriately, to punish judges for other reasons than the ones officially disclosed.

130. As pointed out in previous opinions, the Constitution should be amended in several respects, in particular:

1. The Constitution should provide that courts are established and removed by laws adopted by the *Verkhovna Rada*, which have a higher rank than decrees of the President. Article 19.1 of the Law should already be amended in that sense.

2. The role of the *Verkhovna Rada* in relation to the appointment and removal of judges should be excluded

3. The composition of the High Council of Justice should be changed, providing that a majority or at least a substantial part of the members are judges elected by their peers.

4. Guarantees for a pluralistic composition of the High Council of Justice, in particular with respect to the members not elected by the judiciary, should be introduced.

5. The Constitution should also provide that judges' immunity be lifted not by the *Verkhovna Rada* but by a truly independent judicial authority.

6. If probationary periods are considered indispensable, they should not exceed a relatively short period, *e.g.* of two years.

131. The Venice Commission welcomes the intention of the Ukrainian authorities to take further steps for the improvement of the judicial laws, as expressed during the meetings in Kiev and at the plenary session in Venice, and remains ready to assist in this respect.