# Exhibit 23

Text size

Print E-mail to a friend Share on Facebook Share on Twitter



The President of the European Parliament Jerzy Buzek on the occasion of Ukraine's 20th Independence Day released a statement where he paid attention to the necessity to respect the law of democracy for Kyiv.

**President of the European Parliament calls on Ukraine to respect law of democracy**

Aug 24 at 16:46 | Interfax-Ukraine

The President of the European Parliament Jerzy Buzek on the occasion of Ukraine's 20th Independence Day released a statement where he paid attention to the necessity to respect the law of democracy for Kyiv.

"On this day, my thoughts are with our neighbors in the East. Twenty years ago Ukraine courageously took ownership of its future, and refused to be dragged back into a totalitarian past. The self-determination of the Ukrainian people was a turning point in bringing down the Soviet Union," reads the Buzek's statement, a copy of which has been forwarded to Interfax-Ukraine.

Buzek said that seven years ago, during the Orange revolution, he personally witnessed in Maidan Square in Kyiv the strength of the Ukrainian people's commitment to a free, independent and democratic Ukraine in a moving example of civic activism.

"But democracy can be fragile and needs to be cultivated everyday," he said.

Buzek said that recent developments in Ukraine highlight the need to consolidate and reinforce past achievements through strong accountability of the political class, free and independent media, and a vibrant civil society.

"Recent events, unfortunately, also remind us of the importance of an independent judicial system free of any political influence," he said.

The European Parliament considers Ukraine a country of strategic importance to the EU; its size, resources, population and geographical location make it a key regional actor. If Ukraine wishes to continue on its European path, the EU strongly encourages it to remain committed to our common goal of an open, transparent and deep-rooted democracy based on the respect for the rule of law, he said.

The statement says that The EU remains as ever engaged to support Ukraine's democracy and prosperity through assistance in market reforms, implementation of the Visa Facilitation Agreement, in concluding the talks on the Association Agreement and the Deep and Comprehensive Free Trade Area.

"However, we will not have a true and strong cooperation between the EU and Ukraine without a Ukrainian commitment to respect the rule of law and democracy. We will not have compatibility of our systems, if first and foremost we do not have compatibility in our values," Buzek said.

## related news

Yanukovych: Judicial reform important for Ukraine's modernization Sep 22 at 17:54
Yanukovych signs pension reform law Sep 9 at 21:30
Court announces break in Tymoshenko case until Sept. 12 to prepare for judicial debate Sep 8 at 20:08
Kireyev sees Tymoshenko court outburst as attempt to discredit judicial system Sep 8 at 18:03
ForUm: Yanukovych says reforms have been successfully launched Sep 6 at 17:53
US Ambassador John F. Tefft congratulates Ukraine Aug 24 at 09:10

# Exhibit 24

**Ukraine Travel Information**
Experience the Mediterranean aboard a luxury ship. Learn more today.
Seabourn.com/Mediterranean

**Chapter 7 Means Test**
Determine If Chapter 7 Is an Option for You, Complete a Free Evaluation
www.Chapter7.com
AdChoices

Text size
Print E-mail to a friend Share on Facebook Share on Twitter



U.S. judge Bohdan Futey

**Futey: Independence of Ukrainian courts in danger**

Aug 22 at 22:13 | Interfax-Ukraine

The independence of the Ukrainian courts is in danger, Judge of the United States Court of Federal Claims Bohdan Futey has said.

"While analyzing what I saw, judicial independence is in great danger," he told journalists on Monday in the courtyard of the Pechersky District Court of Kyiv, which is considering a criminal case against former Prime Minister Yulia Tymoshenko.

The judge arrived in Kyiv to attend the 5th World Forum of Ukrainians, which was held on August 19-21.

The Kyiv Post is hosting comments and forums to foster lively debate. Criticism is fine, but stick to the issues. Comments that include profanity or personal attacks will be removed from the site. If you think that a posted comment violates these standards, please flag it and alert us. We will take steps to block violators.

Comments (13) Show Add a comment

## Add your comment

Name:
Guest

E-Mail:

Comment:

Type the characters you see in the picture below:

Add Cancel

- Per page: 1020304050

**Guest**, Guest | Aug 23 at 18:03

# Exhibit 25

Text size
Print E-mail to a friend Share on Facebook Share on Twitter



President Viktor Yanukovych on Nov. 4 appointed Viktor Pshonka to become the nation's Prosecutor General.

**Viktor Pshonka: 'I'm a member of the president's team'**

Nov 8, 2010 at 08:51 | Staff reports
Prosecutor General Viktor Pshonka gave his first television interview since his appointment as Prosecutor General of Ukraine on Nov. 4.

Speaking on the pro-Presidential Inter TV channel, Pshkonka said his appointment and the promotion of Renat Kuzmin and Mikhail Havrilyuk to first deputy and deputy, repesecitively, would give "a new impulse" to the prosecutor's office.

Pshkonka said there would be personnel changes at various levels of the government agency, including the prosecutor's head office in Kyiv.

"High moral standards and ethical behavior, professionalism and the ability to take responsibility and fulfill the tasks of the prosecutor's office remain the key qualities [for prosecutors]," Pshkonka said, adding that as a member of President Viktor Yanukovych's team, he will work closely with the chiefs of other law-enforcement agencies.

"The president is an objective man. His slogan: 'Everyone is equal before the law,'" Pshonka said.

## related news

Prosecutor: Gongadze case to go to court in January 2011 Nov 9, 2010 at 15:41
Parliament confirms Pshonka as prosecutor general Nov 4, 2010 at 11:43
Parliament to consider Pshonka on Nov. 4 Nov 3, 2010 at 16:28
Parliamentary committee proposes Pshonka as prosecutor general Nov 3, 2010 at 16:14
Yanukovych proposes Pshonka as new prosecutor general (VIDEO) Nov 3, 2010 at 12:58

The Kyiv Post is hosting comments and forums to foster lively debate. Criticism is fine, but stick to the issues. Comments that include profanity or personal attacks will be removed from the site. If you think that a posted comment violates these standards, please flag it and alert us. We will take steps to block violators.

Comments (11) Show Add a comment

## Add your comment

Name:
Guest

E-Mail:

# Exhibit 26






# 2010 Human Rights Reports: Ukraine

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR
**2010 Country Reports on Human Rights Practices**
Report
**April 8, 2011**

---

Ukraine, with a population of 45.4 million, is a multiparty, democratic republic with a presidential-parliamentary system of government. The country is governed by a directly elected president, a prime minister who heads the Cabinet of Ministers, and a unicameral parliament (Verkhovna Rada). Two rounds of presidential elections held in January and February were assessed by international and domestic observers as having met most standards for openness and fairness. The winner, former prime minister Viktor Yanukovych, was inaugurated on February 25. On October 1, the Constitutional Court reinstated the 1996 constitution, a ruling that considerably strengthened the powers of the president, including authority to dismiss unilaterally the prime minister and other government ministers. In its ruling the court stated that amendments to the 1996 constitution, which were passed in 2004 as part of a compromise to end the mass protests of the Orange Revolution, were unconstitutional because they were improperly adopted. Security forces generally reported to civilian authorities.

Human rights problems included reports of serious police abuse and deaths in custody, beatings, and torture of detainees and prisoners, harsh conditions in prisons and detention facilities, arbitrary and lengthy pretrial detention, and an inefficient and corrupt judicial system. During the year there were reports of increased government pressure on independent media outlets, limitations on freedom of assembly, and the appearance of politically motivated prosecution of opposition politicians. Corruption in government and society was widespread. There were reports that the government's security service harassed and intimidated civil society organizations. There was some violence and discrimination against women and children, and reports of nonviolent incidents of anti-Semitism. Trafficking in persons continued to be a serious problem. Societal discrimination and violence against Roma, Crimean Tatars, and persons of non-Slavic appearance were reported. There were reports of police harassment of the gay community. Workers faced limitations on organizing and joining unions and on their ability to bargain collectively.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports that the government or its agents committed any politically motivated killings; however, two persons died in police custody after allegedly being abused.

On May 18, college student Ihor Indylo died in police custody at the Shevchenkivsky District police station in Kyiv. Police representatives claimed that Indylo fell on the floor and sustained lethal head injuries because he was drunk. Indylo's relatives claimed that he was beaten by police. In October prosecutors charged officers Serhiy Prykhodko and Serhiy Kovalenko with negligence and abuse of office, including failure to determine if Indylo's detention was legal and to arrange surveillance while in custody. According to Idylo's mother and attorney, the charges against the police officers do not address how Ihor sustained the injuries which they claim led to his death. The case continued at year's end.

On September 10, the media reported that detainee Mykhaylo Stadnyk died at a district police department in Lviv. Stadnyk's relatives described multiple bruises on his body, which they asserted were a clear sign that he was tortured by police. Police representatives denied the claim, suggesting that Stadnyk was drunk and injured himself prior to his detention. The Lviv Oblast Prosecutor's Office ordered an additional forensic examination of the body to ascertain the cause of his death. The results of the investigation were pending at year's end.

On December 23, the trial of Viktor Lozynskiy began at Dniprovsky District Court in Kyiv. Lozynskiy, a former member of parliament, was charged in connection with the June 2009 death of Valeriy Oliynyk of Kirovohrad Oblast. According to police reports at the time, Lozynskiy and two other local officials pursued Oliynyk into a wooded area where they assaulted him, broke his leg, and shot him multiple times. The two officials were arrested and dismissed from their posts.

There were few developments in the government's ongoing investigation of the 2004 dioxin poisoning of then opposition presidential candidate Viktor Yushchenko. In a December 10 interview with the *Segodnya* newspaper, Prosecutor General Viktor Pshonka stated that his office had requested new blood samples from Yushchenko because the original ones were improperly secured prior to expert examination and could not be used as credible evidence. Pshonka claimed he could not rule out that there was no poisoning. On April 13, parliament terminated the authority of a commission investigating the poisoning for failing to meet reporting deadlines. Yushchenko's spokeswoman described the move as a "natural step," adding that the commission, chaired by Party of Regions member of parliament Volodymyr Sivkovych, had spread false information about the poisoning. On April 15, then prosecutor general Oleksandr Medvedko told the *Kommersant-Ukrayina* newspaper that, without identifying those who poisoned Yushchenko, one could not determine whether the poisoning was deliberate or not.

On September 13, the Prosecutor General's Office (PGO) announced its finding that the killing of investigative journalist Heorhiy Gongadze in 2000 was ordered by Yuriy Kravchenko, the late interior minister who died in 2005 under suspicious circumstances from two gunshots to the head. Kravchenko's death was labeled a suicide. In July 2009 authorities arrested Oleksiy Pukach, a former senior ministry of internal affairs official, in connection with the Gongadze killing. Prosecutors alleged that Pukach led a group of police officers who abducted and killed Gongadze. At year's end prosecutors stated they had completed a pretrial investigation of the charges against Pukach and would deliver their findings to a court. Valentyna Telychenko, an attorney for Myroslava Gongadze, the widow of the slain journalist, stated the PGO had not allowed her to review the Pukach case files before they were sent to court. The PGO denied the claim, stating that Telychenko had ignored an invitation to review the materials. Pukach's trial had not started at year's end.

In 2008 three police officers were convicted and sentenced to long prison terms for Gongadze's killing. However, members of his family and journalists who investigated the killing continued to maintain that Kravchenko and Pukach acted on

orders from senior government officials in the administration of former president Kuchma who wanted to silence the outspoken journalist.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution and the law prohibit such practices; however, there were reports that police continued to abuse and torture persons in custody.

For example, the Ukrainian Helsinki Human Rights Union (UHHRU), a nonprofit coalition of human rights organizations, reported that during the year it had received 172 complaints of torture and abuse. Of that number, 90 complaints pertained to torture and abuse committed by police.

On August 16, Yakov Strogan was arrested by police in Kharkiv following an argument with his neighbor. He was detained for four days during which he alleged he was tortured. He appealed his detention to the prosecutor's office, held a press conference, and participated in hearings on his allegations. On December 9, Strogan was summoned to the Prosecutor's Office and arrested again. According to the local Kharkiv Human Rights Group, Strogan was brought to court the following day with signs that he had been beaten. The judge ruled to remand Strogan to custody, where he remains. Human rights groups and Strogan's wife called for his immediate release and an investigation into his treatment while in custody.

On December 16, Human Rights Watch (HRW) issued a report stating that asylum seekers and migrants in the country "risk abusive treatment and arbitrary detention." Although torture was "not systemic," the testimonies of refugees, migrants and asylum seekers indicated that it did sporadically occur. While conditions in some migration detention facilities improved, detainees alleged that inhuman or degrading treatment, including beatings, kicking, and food deprivation occurred. "All of these abuses took place in a climate of impunity, with victims fearful of reporting the abuse and perpetrators not held to account," the report stated.

Police officers were often poorly trained or equipped to gather evidence through investigations and depended on confessions to solve cases. The law does not clearly prohibit confessions or other statements made under duress from being introduced as evidence in court proceedings. Efforts to check these practices were made more difficult by an ineffective system for investigating allegations of abuse and by detainees' lack of access to defense lawyers and doctors.

In a February 2009 report, the UN Working Group on Arbitrary Detention cited multiple concerns based on a monitoring visit in 2008 to 21 facilities in eight cities. Among them were "numerous, consistent, and often credible allegations from various sources...of confessions obtained under torture from detainees of the militsia, the Ukrainian police force." The working group also noted that there was a low acquittal rate by the PGO when it was presented with well-founded accusations that incriminating evidence was obtained by methods that violated proper criminal procedures. For example, of some 100,000 such complaints registered in 2008, the prosecutor general considered 30 to be violations. According to the working group, "impunity for perpetrators of ill-treatment largely prevails."

During the year the European Court of Human Rights (ECHR) issued 11 decisions against the country for violation of Article 3 (inhuman or degrading treatment) of the European Convention of Human Rights. This compared with nine violations in 2009 and four in 2008.

During the year the media reported several cases of police abuse. For example, on April 1, UNIAN reported that the Odesa Oblast Prosecutor's Office and the State Security Service of Ukraine (SBU) detained five police officers in the Rozdilna District after examining a complaint that two local residents had been detained on suspicion of theft and tortured.

The ( Affai the U Exter consi polici

According to the report, the prosecutor established that the victims had been beaten and electrocuted and opened a criminal case to investigate the torture allegations.

On December 21, UNIAN reported that the Lviv Oblast Prosecutor's Office completed its investigation and forwarded to court a criminal case against two police officers of the Sambir District police department who beat three detainees in an attempt to extract confessions from them.

During the year authorities prosecuted police officers who had allegedly abused persons in detention.

According to the Prosecutor's General Office, during the first nine months of the year, 39 criminal cases of police torture or inhuman and degrading treatment and were opened, and 28 cases involving 68 law enforcement officers were sent to court.

According to the Ministry of Internal Affairs, during the first nine months of the year, 520 criminal cases were opened against police officers. Of them, 418 were linked to abuse of office, of which 91 involved abuse of power. The other charges included 98 cases of exceeding authority, 101 cases of forgery, 16 cases of negligence, and 112 cases of bribery. According to the PGO, 26 law enforcement personnel were convicted of torture or inhuman treatment during the first nine months of the year.

According to Semen Gluzman of the Ukrainian Psychiatric Association (UAHRB), patients in mental health facilities remained at risk for abuse, and many psychiatric hospitals continued to use outdated methods and medicines. According to the UAHRB, insufficient funding, the absence of public watchdog councils at psychiatric hospitals, patients' lack of access to legal counsel, and poor enforcement of legal protections deprived patients with disabilities of their right to adequate medical care.

In April, Andriy Fedosov reported that an investigation by his group, Uzer (Ukrainian Organization of Users of Psychiatric Care), had uncovered poor living conditions and physical abuse in psychiatric hospitals in Crimea. Following the release of his findings, Fedosov received threatening phone calls and was beaten. According to human rights groups, police failed to investigate the threats and attack on Fedosov.

In December, Amnesty International highlighted the case of trade unionist Andriy Bondarenko, who was ordered to undergo a psychiatric examination despite no history of mental illness. Human rights groups claimed that Bondarenko was targeted for his trade union and human rights work. Investigators closed the case against Bondarenko without bringing charges but the court order to undergo an examination had not been rescinded at year's end.

There were reports of military hazing violence against conscripts in the armed forces. On January 28, a military court in Sevastopol handed down suspended prison sentences to two soldiers who beat a conscript in December 2009. According to the State Judicial Administration, 76 hazing-related guilty verdicts were issued in the first six months of the year. The PGO confirmed that in the first nine months of the year, 151 servicemen were convicted of hazing, and 115 hazing-related criminal cases involving 127 servicemen were forwarded to the courts.

Prison and Detention Center Conditions

Prison and detention center conditions remained poor and generally did not meet international standards. Overcrowding; abuse; inadequate sanitation; and lack of light, food, water, and medical care were persistent problems. The government permitted monitoring visits by independent human rights observers, and such visits occurred during the year.

During the year human rights groups continued to call for full civilian oversight of the State Penitentiary Directorate by subordinating it to the Ministry of Justice. According to the UHHRU, the absence of rigorous and impartial public oversight in facilities controlled by the penitentiary directorate allowed for abuse of prisoners and poor conditions.

On January 21, the parliament amended the penal code, prohibiting racial, ethnic, religious, and other types of discrimination against inmates at penitentiary institutions. It added additional groups to a list of individuals authorized to visit penitentiary institutions without special permission, including the justice minister, members of the Council of Europe's *Committee* for the Prevention of *Torture (CPT)*, and members of civic commissions monitoring prison conditions. The legislation also eased restrictions for prisoners serving life sentence and inmates of correctional centers. According to the amendments, which are scheduled to go into effect in 2012, the minimum living area per inmate at penitentiary facilities shall be increased from 32 square feet to 43 square feet.

As of October 1, according to the latest available statistics from the State Penitentiary Directorate, 152,315 persons were being held in facilities under its control; of these 39,137 were in pretrial detention facilities. During the first nine months of the year, 584 individuals died in custody, of which 33 were suicides and one a homicide.

According to the Ministry of Internal Affairs, approximately 198,400 persons were held in police-controlled temporary holding facilities during the first nine months of the year. The ministry confirmed 14 deaths in these facilities; 10 were reported to be by suicide and four due to illness.

On May 20, the government's human rights ombudsman, Nina Karpachopva, expressed concern over the increasing number of detainees in pretrial detention facilities controlled by the State Penitentiary Directorate in Kyiv, Simferopol, Donetsk, Kharkiv, and Odesa. For example, 3,900 persons were held at Kyiv's Lukyanivsky detention center, which has capacity for 2,850. As a result, 2,100 detainees were forced to rotate their sleeping places with cellmates. Karpachova emphasized the need to amend government regulations to comply with the penal code by increasing the minimum living area per inmate at penitentiary facilities from 32 square feet to 43 square feet. Average space for a detainee at pretrial detention facilities was 27 square feet. Karpachopva cited a number of additional problems including old facilities that lacked ventilation, insufficient water supply, adequate lighting, and proper sewage and sanitary systems. These facilities frequently violated regulations limiting the length of detention and did not guard against the spread of tuberculosis and other infectious diseases.

On December 16, the PGO published a report about overcrowding of pretrial detention facilities of the State Penitentiary Service. According to the report, the situations at detention facilities in the Crimea, Donets, Luhansk, Kharkiv, and Kherson Oblasts, and in Kyiv, were described as "especially difficult."

According to the State Penitentiary Directorate (SPD), an estimated 659 persons in custody had HIV-associated tuberculosis. In tuberculosis hospitals controlled by the prison department, 42 percent of patients were terminally ill with tuberculosis, and 44 percent were terminally ill with AIDS. The State Penitentiary Directorate acknowledged that tuberculosis was a major communicable disease in its facilities because of poor conditions and inadequate medical resources for examining and treating tuberculosis-infected persons in pretrial detention facilities.

During the period from January to September, the number of prison inmates with tuberculosis declined by 5 percent compared to the same period in 2009 (from 747.6 per 100,000 inmates in 2009 to 709.7 in 2010). However, during the same time period, the number of such inmates at SPD pretrial detention facilities grew by 8 percent compared to the January-September period in 2009 (from 730.2 per 100,000 inmates in 2009 to 789.3)

Authorities stated that mandatory screening of all new inmates for tuberculosis helped to reduce infection rates; human rights organizations stated the presence of X-ray machines in several prison facilities was a positive development.

Conditions in police temporary holding facilities and SPD pretrial detention facilities were harsher than in low- and medium -security prisons. The former were often overcrowded and lacked adequate sanitation and medical facilities. As of October 1, according to the SPD, more than 309 individuals serving life sentences were held in pretrial detention facilities.

There were occasional media reports of self-inflicted injuries and violent incidents in prisons and detention centers to protest poor conditions. For example, on May 11, the Vinnytsya Human Rights Group reported that five inmates at the Kuryazh correctional institution for minors in the Kharkiv Oblast cut their veins to protest abuse by administration of the facility.

Prisoners generally had access to visitors and were permitted religious observance, although those facing disciplinary actions were barred from receiving visitors. Prisoners and detainees were also allowed to file complaints with the ombudsman about conditions in custody, but human rights organizations noted that prison officials continued to censor or discourage complaints. By law the prosecutor and ombudsman were obliged to disclose the names of inmates who filed complaints to prison and police authorities.

The government allowed independent monitoring of prison conditions and detention centers by local and international human rights groups. However, according to local human rights activists, mobile monitoring groups made only a few visits during first three months of the year because newly appointed police chiefs impeded their work by refusing to grant permissions for site visits.

In September 2009 a delegation of the CPT carried out a two-week visit to the country. It was the CPT's fifth visit since 1998. At year's end, the CPT did not yet release a report of its findings during the 2009 visit.

On March 18, the new minister of internal affairs, Anatoliy Mohylyov, reduced the ministry's Human Rights Monitoring Department from 31 positions to five. On March 29, President Yanukovych called the reduction "ill-considered" and called on Mohylyov to rescind it. On June 17, in a letter to UHHRU, Mohylyov described his decision as internal restructuring to improve police response to human rights violations and stated the move would reduce government expenditures and avoid a duplication of efforts. Monitoring would be conducted by freelance advisers and consultants who would assume some of the duties of dismissed personnel. However, according to UHHRU, none of its 29 member nongovernmental organizations (NGOs) were invited to consult with the new minister on the restructuring, and the minister of internal affair's civic advisory council did not meet during the year, despite numerous calls by its members to do so. All 26 regional human rights assistants that conducted mobile monitoring of human rights conditions were fired.

On December 9, the president issued a decree to reorganize the State Penitentiary Service within the State Penal Department. However, as of year's end, it was too early to assess whether the reorganization would have any impact on conditions in prison and detention centers.

d. Arbitrary Arrest or Detention

The constitution and the law prohibit arbitrary arrest and detention; however, in practice problems remained.

There was a sharp increase in charges brought against opposition politicians after the appointment of a new prosecutor general on November 4, giving rise to the appearance of selective and politically motivated prosecution by the Yanukovych government. Between November 1 and December 31, prosecutors brought charges against former prime minister Yulia Tymoshenko and more than eight high-level members of her government for abuse of office and/or misuse of state funds during their tenure. The questioning of accused individuals by government prosecutors, which often lasted for hours at a time over a period of several days, and the denial of bail in certain cases further exacerbated the perception of politically motivated prosecution (see section 4). The government contended that the prosecutions were not targeting the opposition, and that there were many ongoing investigations of members of the governing party; however, with only a few exceptions these were low-level, career officials.

On December 12, the UHHRU and the Kharkiv Human Rights Group issued a statement that the government's criminal prosecutions were only aimed at members of the opposition. As a result, the government's actions "spell the effective use of criminal court proceedings for political ends... and run counter to democratic values based on equality of all before the law and undermines the foundations of criminal justice," the statement said.

On December 26, police detained former interior minister Yuriy Lutsenko in Kyiv on allegations of embezzlement, abuse of office, and forgery. The appeals court denied his petition for bail and approved the prosecutor general's request for a two-month detention. Local human rights observers and opposition commentators described Lutsenko's arrest as politically motivated, given the administrative nature of his alleged offenses. Lutsenko alleged that the prosecutor's office ignored his constitutional rights throughout the investigation, in particular, delaying access to and denying time to review case materials and creating other "artificial barriers" to his right to become acquainted with the case. Lutsenko remained in jail at year's end, and his attorney filed a case with the ECHR.

Police also questioned several civil society activists following the tax protests in November in Kyiv in which small-business owners protested outside the parliament against tax reforms proposed by the government. At year's end at least three protesters remained in custody on charges of damaging public property on Independence Square, where the demonstrators had erected tents. Other protest leaders remained free but were subject to travel restrictions (see section 2.b).

Role of the Police and Security Apparatus

The Ministry of Internal Affairs is responsible for maintaining internal security and order; it oversees the police (militsia) and its own armed troops. The SBU, which is responsible for internal intelligence and protecting state security, reports directly to the president. The State Tax Administration, which exercises law enforcement powers through the tax police, is accountable to both the president and the cabinet.

The law provides for civilian control of the army and law enforcement agencies and authorizes members of parliament to conduct investigations and public hearings into national security and defense issues. The human rights ombudsman is also authorized to initiate investigations into the relevant activities of security forces.

On September 24, the NGO Democratic Alliance issued a statement chronicling what it described as "pressure and intimidation" at its district branches by the SBU and the Ministry of Internal Affairs. On June 12, an SBU officer approached the chairman of the organization's Mykolayiv Oblast branch, Yuliya Hrechka, seeking information about its activities. Three days later, SBU and Ministry of Internal Affairs representatives met with Tayisiya Plakhuta, the head of the Democratic Alliance's Cherkasy Oblast branch, to ask about the organization's future plans, its national leaders, and implied that she should cancel future activities. In late July the leader of the Democratic Alliance in Chernihiv, Ihor Andriychenko, received a telephone call from a person who introduced himself as an SBU officer and asked about the activities of the local Democratic Alliance branch, including the number of its registered members.

On October 4, following a visit to the country, corapporteurs Renate Wohlwend and Mailis Reps of the Parliamentary Assembly of the Council of Europe (PACE) expressed concern about the role of the SBU in monitoring civil society. In an addendum to a September 9 PACE report on the functioning of democratic institutions in the country, they wrote: "The role of the Security Services of Ukraine and its apparent involvement in the domestic political environment has become increasingly problematic and a matter of concern. We have received numerous, often substantiated and credible, reports of pressure by the SBU on journalists, politicians, and civil society activists or on people or businesses close to them. This is not acceptable in a democratic society."

On December 23, the coordinator of the Vinnytsya Human Rights Group (VHRG), Dmytro Groisman, was charged with desecration of state symbols and disseminating pornography. Human rights groups labeled the charges as politically motivated and harassment of Groisman for his group's work to protect refugees. The charges followed the October search of the VHRG's offices, during which police confiscated financial documents and other material relating to refugees the group was assisting. The police also confiscated correspondence between the group and the ECHR.

Arrest Procedures and Treatment While in Detention

By law authorities may detain a suspect for three days without a warrant, after which an arrest order must be issued. The courts may extend detention without an arrest warrant for an additional 10 days and thereafter grant extensions for a maximum of 18 months. The law permits citizens to contest an arrest in court or appeal it to the prosecutor. The law requires that detained persons be informed of their rights and that officials notify family members immediately concerning an arrest; however, in practice police did not follow the procedures required by law.

Lengthy pretrial detention was a serious a problem. Individuals often remained in pretrial detention for months or, in some cases, years. There were unsanctioned arrests, and investigative police at times failed to keep records or register detained suspects. According to domestic human rights organizations, the investigation process took four to five months on average.

Human rights organizations reported that police continued to use detention arbitrarily to extract evidence that could be used against detainees. Courts often extended detention to 10 days or more to allow police more time to obtain confessions. In October 2009, in a speech at a conference on police violence sponsored by the Kharkiv Human Rights Group (KHRG), Denys Kobzin, director of the Kharkiv Institute of Sociological research, reported that approximately 40 percent of detainees were held longer than the legally allowed three days.

The February 2009 report by the UN Working Group on Arbitrary Detention noted the following problems: the continued practice of detaining until trial persons suspected of minor crimes; a perceived lack of independent and effective control by the judiciary over the detention process; and unlawful restrictions on pretrial detainees, such as denying them contact with their families before court trials.

The law stipulates that a defense attorney must be provided without charge to indigent detainees from either the time of detention or the filing of charges. However, in practice this often did not occur. There were insufficient defense attorneys to protect suspects from unlawful and lengthy detention. Attorneys often refused to defend indigents for the low payment the government provided.

The law provides for bail, but it was rarely used. Many defendants could not pay imposed bail amounts. Courts sometimes imposed travel restrictions as an alternative to pretrial confinement. However, they generally opted to place individuals in detention.

Amnesty

Before leaving office in February former president Yushchenko pardoned 130 persons. There was no information about amnesty or pardons that President Yanukovych may have granted during the year.

e. Denial of Fair Public Trial

The constitution and law provide for an independent judiciary; however, in practice the judiciary remained subject to political pressure, suffered from corruption and inefficiency, and lacked public confidence.

The right to a fair trial was limited by lengthy court proceedings, particularly in administrative courts, and by political pressure on judges, inadequate court funding, a shortage of qualified legal assistance for defendants, and the inability of courts to enforce their rulings. Judges also continued to complain about pressure from high-ranking politicians seeking improper resolution of cases.

The president has the authority, with the agreement of the Minister of Justice and the chair of a corresponding higher court, to establish and abolish courts of general jurisdiction, and establishes appellate commercial and appellate administrative courts. Until August, the president also determined the number of judges in the court system, and appointed and removed chairpersons and deputy chairpersons of courts.

During the year the ECHR issued 15 judgments that found the country in violation of Article 6 (right to a fair trial) of the European Convention on Human Rights. This compared with 69 judgments issued during 2009 and 61 judgments in 2008. In addition, the ECHR issued judgments that found 60 violations regarding length of proceedings and 43 violations regarding the right to liberty and personal security, compared with 35 and 27 judgments, respectively, in 2009, and 32 and 14 in 2008.

All courts, except for the Supreme Court, were funded through the State Judicial Administration, which was also responsible for staffing. The Ministries of Justice and Education were responsible for training judges. The judiciary's lack of adequate staff and funds contributed to inefficiency and corruption and increased its dependence on the executive branch.

On May 31, President Yanukovych issued a decree appointing SBU Chief Valeriy Khoroshkovsky as a member of the High Council of Justice, a move that was widely criticized by legal experts and civil society leaders. On December 16, following months of criticism about the apparent conflict of interest, the president issued a follow-up decree dismissing Khoroshkovsky from the council, stating that he did so at Khoroshkovsky's request.

On July 7, parliament adopted a new Law on the Judicial System and Status of Judges. Under the law a new High Specialized Court for Examination of Civil and Criminal cases was established, which greatly reducing the powers of the Supreme Court and the number of Supreme Court justices. The legislation also gave the 20-member High Council of Justice a more prominent role in nominating and dismissing judges, chairpersons and deputy chairpersons of courts except for the Supreme Court. Under the law the number of judges in a court is determined by the Minister of Justice upon the proposal of the State Judicial Administration.

In their addendum to the PACE report on October 4, corapporteurs Wohlwend and Reps highlighted concerns expressed by the opposition and other interlocutors over the enlarged powers of the High Council of Justice. They noted the Venice Commission's statement that the legislation creates "an evident danger of politically motivated nominations to the High Council of Justice guided by political considerations."

Human rights activists and legal experts criticized the legislation for undermining the independence of the judiciary. On July 12, in an open letter to the president, Supreme Court Chairman Vasyl Onopenko warned that the new legislation would increase political pressure on judges.

On September 14, the president signed a decree abolishing appellate military courts and local military courts. Legal experts welcomed the abolition.

On September 21, four new justices appointed by President Yanukovych to the 18-member Constitutional Court were sworn in to begin nine-year terms, a move that legal observers noted gave the president a majority of loyal judges who would be more sympathetic to his proposals. The appointments followed the resignation of four Constitutional Court justices days earlier, at least one of whom stated that he was put under pressure to resign.

On October 1, the Constitutional Court in a closed-door ruling announced that amendments adopted during the 2004 Orange Revolution to the 1996 constitution were unconstitutional because procedures used to adopt them violated the constitution. The court reinstated the 1996 constitution, which granted greater powers to the presidency.

In their October 4 report addendum, PACE corapporteurs Wohlwend and Reps stated: "The fact that these four newly appointed judges reportedly tipped the decision in favor of Mr. Yanukovych will only add to the controversy surrounding this (Constitutional Court) decision and allegations that the current authorities intend at all cost to monopolize power in the country. "

Trial Procedures

The constitution includes provisions for a fair trial, including the right of suspects or witnesses to refuse to testify against themselves or their relatives; however, these rights were limited by the absence of implementing legislation, which left a largely Soviet-era criminal justice system in place. Defendants are presumed innocent; however, high conviction rates called that assumption into question.

The constitution provides for juries, but a jury system has not been implemented. Most cases are decided by judges who sit alone, although trials on charges carrying a maximum sentence of life imprisonment, the highest penalty in the criminal justice system, were heard by two judges and three public assessors who have some legal training.

By law a trial must begin no later than three weeks after criminal charges are filed with the court; however, this requirement was rarely met by the overburdened court system. Months could pass before a defendant was brought to trial. Complicated cases could take years to go to trial.

The law specifies that a defendant may consult a lawyer in private; however, human rights groups reported that officials occasionally denied this attorney-client privilege. The law also requires free legal counsel for all defendants, but free counsel was often unavailable.

To protect defendants, investigative files must contain signed documents attesting that defendants were informed of the charges against them, of their right to an attorney at public expense, and of their right not to give evidence against themselves or their relatives. Appeals courts may dismiss convictions or order new trials if these signed documents are missing; however, officials sometimes verbally and physically abused defendants to obtain their signatures.

By law trials are held in public, and defendants have the right to confront witnesses. However, courtroom space was often limited, and media personnel were at times not able to attend and report on court proceedings.

The law permits the names and addresses of victims and witnesses to be kept confidential if they were at risk of being intimidated into withdrawing or changing their testimony. The law requires that a special police unit protect judges, witnesses, defendants, and their relatives, but human rights organizations claimed that this system continued to be ineffective.

Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

Regional Human Rights Court Decisions

Once they have exhausted domestic legal remedies, citizens may apply to the ECHR for the redress of grievances involving an alleged infringement of rights under the European Convention on Human Rights.

During the year the ECHR handed down 107 judgments against the country, and a reported 10,800 applications from the country remained pending before the court at year's end. Most of the judgments involved violations of the right to a fair trial, violation of property rights, and unduly lengthy proceedings. In 2009 the ECHR issued 126 decisions against the country, all of which found at least one violation of the European Convention on Human Rights.

According to the government's ECHR commissioner, Yuriy Zaitsev, during the first 11 months of year, the ECHR issued 68 rulings in cases involving the country. The government enforced 76 of the rulings involving prohibition of torture, the right to liberty and security of person, the right to a fair trial, the right to respect for private and family life, and the right to an effective remedy. Some of the enforced rulings covered 2009 court decisions.

Independent observers noted that, while the government paid damages to those who won ECHR cases involving financial issues, it failed to institute reforms to address the root causes of many of the cases brought before the court.

Civil Judicial Procedures and Remedies

The constitution and laws give citizens the right to challenge any decisions, actions, or omissions of national and local government officials that violate their human rights. However, the right of redress was limited by an inefficient and corrupt judicial system.

Potential victims may also file a collective legal challenge to legislation that they believe may violate basic rights and freedoms. Citizens may appeal to the human rights ombudsman and may take cases to international bodies, such as the ECHR.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The constitution prohibits such actions; however, in practice authorities generally did not respect these prohibitions.

By law the SBU may not conduct surveillance and searches without a court-issued warrant. The PGO has the constitutional responsibility to ensure that all law enforcement agencies observe the law. Citizens have the legal right to examine any dossier concerning them in the possession of the SBU and the legal right to recover losses resulting from an investigation. However, authorities generally did not respect these rights in practice because implementing legislation had not been enacted, and many citizens were not aware of their rights or that their privacy had been violated by authorities.

On March 13, UNIAN reported that, during a meeting of the interagency coordinating council to combat corruption and organized crime, SBU chief Valeriy Khoroshkovsky requested the Supreme Court to allow courts to sanction with one approval the monitoring of all telephone numbers rather than one telephone number of a suspect. The Supreme Court approved the request on June 4. Supreme Court Chairman Vasyl Onopenko stated that, on average, courts issue 20,000 such approvals every year. However, despite increased surveillance activity, he stated there was no discernible improvement in the number of solved criminal cases or their quality. Human rights groups expressed concern that the SBU may abuse such court approvals to intercept telephone conversations of the government's critics.

On July 5, the Lviv-based newspaper *Vysokyi Zamok* quoted its sources as stating that district state administrations in the Lviv Oblast were gathering information about political affiliation of local business managers and self-government representatives, the "degree of their influence on voters, " and their preferred candidate in the recent presidential election.

In 2009 there were some media reports of allegations of privacy interference and illegal surveillance by government authorities. For example, the weekly newspaper *Dzerkalo Tyznia* reported in April 2009 that appeals courts reviewed 25,086 requests by law enforcement agencies (mostly by the SBU, the Ministry of Internal Affairs, and tax police) for

permission to intercept information, seize correspondence, or use other technical means to obtain information. According to newspaper, these types of requests amounted to restrictions of the constitutional rights of citizens.

During the year the ECHR issued six judgments that found violations by the country of the right to respect for family and private life under Article 8 of the European Convention on Human Rights, compared with four in 2009, and one in 2008.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The constitution and laws provide for freedom of speech and of the press; however in practice government pressure on the media intimidated journalists and media owners in some cases into practicing self-censorship. Following changes in government leadership after the presidential elections, there were numerous reports that central authorities attempted to direct media content. There were also reports of intimidation and violence against journalists by national and local officials.

Individuals could criticize the government publicly and privately, and independent and international media were active and expressed a wide variety of opinions.

Private media outlets generally operated free of direct state control or interference; however, both independent and state-owned media increasingly demonstrated a tendency toward self-censorship on matters that the government deemed sensitive. Although private newspapers operated on a commercial basis, they often depended on their owners (political patrons or wealthy businessmen with government connections) for revenue and did not enjoy editorial independence.

According to the Ukrainian Association of Press Publications, in 2009 approximately 4,200 print publications were regularly published in the country. Among them were 2,400 newspapers (including 52 dailies) and 1,700 magazines, with 1,550 having primarily nationwide distribution.

On March 11, President Yanukovych appointed Valeriy Khoroshkovsky as head of the SBU. Khoroshkovsky was also the de facto owner of Inter Media Group, the parent company of Inter TV, the most popular news and entertainment channel in the country. According to Khoroshkovsky, his wife controlled the company and its operations.

On April 2, President Yanukovych disbanded the national free speech commission that had been an official part of the Office of the President. On April 20, the commission decided to continue as a self-governed and independent expert body with the purpose of implementing European media standards in the country.

Beginning in April, international observers and media watchdog groups issued a range of statements expressing concern about the deterioration of media freedom. For example, on April 15, Reporters without Borders expressed "dismay and alarm" over the status of press freedom since the January-February presidential elections. On April 29, the EU released a statement on media freedom in the country that voiced concern over cases of harassment and violence against journalists.

According to the Institute for Mass Information (IMI), a local, nonprofit media-watchdog, at least 33 journalists and publications were subjected to physical attacks or intimidation during the first nine months of the year, compared with 31 incidents reported in 2009. As in the previous year most cases occurred at the local level and were often attributed to individual politicians, businessmen, or organized criminal groups.

On March 23, unknown assailants severely beat Vasyl Demyaniv, chief editor of the *Kolomyiskyi Visnyk* newspaper in Kolomyia. Demyaniv stated he believed the attack was related to his media activities.

On April 8, police officers ejected television reporter Serhiy Kutrakov of Novyi Kanal from an exhibition at the Ukraine House in Kyiv. Kutrakov filed a legal complaint, but a Kyiv court on July 12 rejected it. Kutrakov appealed the court decision, which was pending at year's end.

On April 12, an unidentified man beat Boris Braginskyi, a reporter for 9 Telekanal in Dnipropetrovsk, outside of his apartment. Braginskyi stated he believed the attack was related to his work because the assailant did not take any of his belongings.

On June 15, there was a scuffle between STB television journalist Serhiy Andrushko and President Yanukovych's security detail at the Agro 2010 exhibition. The guards did not admit Andrushko to the exhibition. When he asked for their names, and stated he would record them with his mobile phone, the guards twisted his hands behind his back and threw him onto the ground. The State Guard Directorate later apologized to Andrushko for unwarranted use of force. He filed a complaint over the incident, but it was denied.

On August 11, Vasyl Klymentyev editor in chief of the newspaper *Novy Styl*, disappeared in Kharkiv and was presumed dead. The paper had written about corruption among law enforcement officers and others in the Kharkiv region. On August 20, President Yanukovych took personal control of the case and ordered top law enforcement officials to make every effort to find him. However, at year's end little progress on the case was reported.

There also were numerous expressions of concern and public protests by local activists, journalists, and NGOs against what they characterized as a return to censorship.

On May 21, over 200 media representatives and community activists meeting in Kyiv launched the "Stop Censorship!" movement to resist all efforts at censorship, including self-censorship, by media owners. In the weeks leading up to "Stop Censorship!" protests, journalists at two popular television stations, 1+1 and STB, released letters protesting censorship by station management, claiming that management either blocked or interfered with reports about the political opposition as well as news critical of the Yanukovych administration.

On May 27, the news Web site Forum proUA reported that 41 percent of newspaper publishers interviewed by the Association of Independent Regional Publishers stated the publishing business had become more difficult in April due to government interference, pressure on journalists and editors, and vendors refusing to disseminate publications critical of the authorities.

On June 4, visiting PACE Monitoring Committee corapporteurs Wohlwend and Reps stated that they had received reports of an increasing number of violations of human rights and the right of freedom of speech.

On June 8, a Kyiv court ruled in a case brought by the Inter Media Group that broadcast licenses had been improperly awarded in January to independent stations TVi and Channel 5. The channels accused SBU Chief Khoroshkovsky, the de facto owner of Inter Media Group and Inter TV, of using his position to influence the court's decision. There were counter allegations that TVi and Channel 5 had paid bribes to receive the additional licenses. On August 30, an appeals court upheld the decision and went beyond the original ruling by stripping TVi of all its broadcast licenses, which it had renewed along with the new licenses in January.

On July 27, Walid Arfush, the deputy head of UT-1, the national state television company, stated in an interview that the channel had a duty to report on the activities of the government in a positive light. "There is a lot of talk about creating a public television station, and some say that UT-1 should not be connected with the authorities. But I think UT-1 should be partisan in favor of the authorities," Arfush was quoted as telling UNIAN.

On August 18, the state tax administration in Crimea froze the bank accounts of Chernomorskaya TV for alleged financial violations involving barter deals. Chernomorskaya TV is an independent, opposition-owned station known for its criticism of local and national authorities. The station was previously in conflict with local authorities in 2006 and 1999.

On September 1, Reporters without Borders released a report based on a three-day fact-finding mission to the country in July. The report, *Temptation to Control*, described numerous incidents of violence and harassment against journalists and media companies. The report also emphasized the conflict of interest between Khoroshkhovsky's status as both SBU chief and media owner.

On September 9, the Council of Europe's PACE report on the *Functioning of Democratic Institutions in Ukraine* also expressed concern about developments that could undermine media freedom and pluralism and called on authorities to "refrain from any attempts to control directly or indirectly the content of reporting in national media."

On October 13, following a two-day visit to the country, Dunja Mijatovic, the media freedom representative of the Organization for Security and Cooperation in Europe (OSCE), noted public assurances by the authorities to preserve media freedom, but cautioned that results were lacking. She stated that recent cases of violence and intimidation of journalists, including the August 11 disappearance of *Novy Styl* reporter Vasyl Klymentyev and physical attacks against journalists had a "chilling effect on the media climate."

According to local media NGO IMI, private agreements exist between the authorities and media owners to restrict media content. For example, to preserve their business assets owners instruct their television channels and publications to avoid criticism of the president and his administration. The IMI also stated that communal and municipal state-funded media are under huge pressure. Print materials have to praise local governors, and often the articles must be approved by the corresponding local headquarters of the ruling Party of Regions.

The IMI also emphasized that political parties frequently ordered placement of stories in regional print media while law enforcement agencies did not investigate this breach of law. Some journalists maintained that low salaries encouraged some reporters to supplement their incomes with undocumented payments from benefactors seeking to influence news reporting.

Inadequate media access to government-held information was a problem, particularly outside of the capital. The IMI, the UHHRU, and the Committee for Monitoring Freedom of Press in Crimea asserted that most government agencies regularly denied requests by journalists and NGOs for basic public interest information.

Libel is considered a civil offense, and the law limits the amount of damages that may be claimed in libel lawsuits; the press can publish inoffensive, nonfactual judgments, including criticism, without penalty. In February 2009, the Supreme Court adopted a resolution on judicial practice in defamation cases, reiterating that public officials enjoy less protection from criticism than average individuals, emphasizing the importance of distinguishing between factual information and value judgments, and encouraging courts to refer to the ECHR's practices.

On June 26, the president signed a privacy law, scheduled to enter into force in January 2011, which could significantly complicate the work of journalists and expose them to criminal prosecution. According to the IMI, the law would require journalists to request permission before publishing virtually any information about a person other than his or her name. High-level politicians and officials are exempted, but other public figures are not.

Local media observers continued to express concern over high monetary damages that were demanded, and sometimes awarded, for alleged libel. Government entities and public figures in particular continued to use the threat of civil suits

based on alleged damage to a "person's honor and integrity" to influence or intimidate the press and investigative journalists.

For example, on October 5, the Kyiv Circuit Court of Appeals upheld a lower-court ruling that Olha Snitsarchuk and Channel 5 should pay member of parliament Yuriy But 20,000 hryvnias ($2,500) for pain and suffering. But had sued Snitsarchuk for 100,000 hryvnias ($12,500), claiming he suffered severe psychological shock and had been in treatment because Snitsarchuk referred to him as a deserter or renegade in a December 2009 report. But was one of the first members of parliament to quit Tymoshenko's party in 2008. However, But declined to accept the court ruling for damages after widespread criticism and ridicule of his claim.

Internet Freedom

There were no government restrictions on access to the Internet. Individuals and groups could engage in the peaceful expression of views via the Internet, including by e-mail; however, law enforcement bodies engaged in Internet monitoring.

On March 27, police in Kyiv questioned blogger Olena Bilozerska about her coverage of demonstrations by opposition activists the previous month. Police searched her apartment and computer. Bilozerska asserted that she was a registered journalist and therefore the search was illegal; her attempt to file a legal complaint was denied.

On July 30, the SBU summoned blogger Oleg Shynkarenko to discuss statements on his blog that could be interpreted as a threat to the life of President Yanukovych. Shynkarenko apologized on his blog and stated he had not meant to issue a "call to kill the president." The SBU compelled Shynkarenko to sign a pledge that he would not write similar statements in the future.

According to International Telecommunication Union statistics for the year, 34 percent of the country's inhabitants had access to the Internet.

Academic Freedom and Cultural Events

There was at least one case of government restrictions on academic freedom.

On September 8 in Lviv, the SBU detained the head of the museum "Prison at Lontskoho Street," Ruslan Zabily, alleging that he intended to give away state secrets. The museum is dedicated to victims of Soviet and Nazi rule. According to Zabily, his laptop and two hard discs were confiscated, he was questioned about his contacts with foreign academics, and he was advised to find new employment. Zabily, who is a historian, stated the confiscated data included declassified information about activities of the Ukrainian Insurgent Army, a partisan militia that fought against both Soviet and German forces in World War II, and about the Soviet-era dissident movement. The status of the case against Zabily was pending at year's end due in part to national and international criticism about the SBU's handling of the incident.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The constitution provides for freedom of assembly, but in some instances regional governments infringed on these rights. Since there is no national law governing freedom of assembly, the Code of Administrative Justice and case law prevailed. Local authorities sometimes invoked a Soviet-era decree on freedom of assembly that was more restrictive than the constitution.

The constitution requires that organizers inform authorities in advance of planned demonstrations. In compliance with the Soviet-era decree, authorities at times stipulated that organizations must apply for permission at least 10 days beforehand.

In most cases permits were granted, and in practice unlicensed demonstrations were common and generally occurred without police interference, fines, or detention, although there were several notable exceptions.

On May 19, the rector of the Lviv-based Ukrainian Catholic University, Borys Gudziak, publicized a meeting with an SBU officer. According to Gudziak, the security official recommended that the university warn students that they would be prosecuted for involvement in any "illegal activities." According to the rector, such illegal activities included "not only violent acts but also, for example, pickets blocking access to the work place of government officials or any protests not sanctioned by authorities."

On May 28, Kharkiv police detained 10 to 12 environmental activists who were protesting the city's decision to cut down trees in a central park. Two of the activists, Andrei Yevarnitsky and Denis Chernega, were sentenced to 15 days of detention for disobeying police orders. The sentence was subsequently reduced to nine days. Amnesty International declared the two activists to be "prisoners of conscience," asserting that their rights to freedom of expression and assembly were curtailed.

On August 2, the KHRG stated that there had been more violations of freedom of peaceful assembly during the year under the Yanukovych administration than during the entire 2007-09 period. The KHRG estimated that during the first 100 days of the new government the oblast-level and national media alone released more than 350 reports criticizing police for such violations that occurred during that period.

On October 14, Oleksiy Verentsov and Ihor Tanichkevych were detained after taking part in an approved protest rally near the Lviv Oblast Prosecutor's Office. The two were released after several days of detention. The prosecutor subsequently filed charges against Tanichkevych, which carry a prison sentence, after he challenged the legality of the detention. The case was pending at year's end.

In December two organizers of huge demonstrations against the government's proposed changes to the tax code, Oleksandr Danylyuk and Serhiy Melnychenko, were questioned by police about their role in the protests. Media reports quoted Danylyuk as stating that law enforcement bodies, through their investigations and questioning, were attempting to "terrorize" activists and society at large.

Investigators questioned at least four additional protesters, two of whom remained subject to travel bans at the year's end. At least three protesters remained in custody on charges of damaging public property on Independence Square, where the demonstrators had erected tents. In addition, employees of the Pact Office in Simferopol, a local civil society organization, were questioned as to whether their civic engagement activities were training participants to organize protests.

Freedom of Association

The constitution and the law provide for freedom of association; while the government generally respected this right in practice, some restrictions remained. There were extensive registration requirements for organizations; however, there were no reports that the government used them during the year to disband existing organizations or to prevent new ones from being formed.

The law places restrictions on organizations that advocate violence or racial and religious hatred or that threaten public order or health. In January 2009 SBU spokesperson Maryna Ostapenko confirmed that the security service had completed a pretrial investigation in the criminal case against a separatist organization, the Popular Front Sevastopol-Crimea-Russia, and forwarded it to the court. In December 2009 the Crimean Appellate Court handed down a four-year suspended prison sentence to Semen Klyuyev, a Popular Front member. On March 4, the Supreme Court overturned the December ruling, returning the case to the Appellate Court for review.

c. Freedom of Religion

For a complete description of religious freedom, see the *2010 International Religious Freedom Report* at www.state.gov/g/drl/irf/rpt/.

d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The constitution and the law provide for freedom of movement within the country, foreign travel, emigration, and repatriation, and the government generally respected these rights. The government worked with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations to provide protection to asylum seekers, stateless persons, and other persons of concern.

Citizens who wished to travel abroad were able to do so freely. Exit visas were not required. The government could deny passports to individuals in possession of state secrets, but denials were rare and could be appealed.

The law prohibits forced exile, and the government did not employ it.

Protection of Refugees

The laws provide for granting of asylum or refugee status, and the government has established a system for providing protection to refugees; however, in practice authorities failed to provide effective protection for refugees.

The constitution provides for asylum; however, there were no laws to implement the granting of asylum. Refugees residing in the country for three years may apply for citizenship. In 2009, 52 refugees acquired citizenship.

On July 7, the government abolished the State Migration Service (SMS). It was established in June 2009 on the basis of the Ministry of Internal Affairs' Citizenship and Immigration Department and the State Committee on Nationalities and Religions (SCNR).

The SCNR retained authority for citizenship, immigration, asylum, and refugee procedures, while the Ministry of Internal Affairs and the State Border Guard Service (SBGS) continued to combat illegal migration. However, on December 9, the president abolished the SCNR and re-instated the SMS as part of wide-ranging administrative reforms to reduce the size of government.

Before it was abolished in July, the SMS received 524 asylum claims during the first seven months of the year; however, no asylum decisions were issued from mid-2009 through July. Some human rights activists had welcomed the decision to close the SMS, stating that it could help revitalize procedures to review more than 1,000 pending refugee cases.

In December, Human Rights Watch described the country's asylum system as "dysfunctional." Administrative courts responsible for reviewing appeals of denied asylum applications were overwhelmed by a backlog of cases, while the Kyiv Administrative Court of Appeal postponed its review of deportation appeals until 2012. According to HRW, 5,397 asylum applications were filed between 2007 and 2009. Of that number, only 284 were granted asylum.

The government provided some protection against the expulsion or return of refugees to a country where there is reason to believe their lives or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group and political opinion. However, there were some exceptions.

In May an Afghan family requesting asylum in the country was denied entry at Boryspil Airport. In June and July, following a request by the Uzbek government, the authorities detained Uzbek citizens Umid Khamroyev, Kosim Dadakhanov,

Shodilbek Soibzhonov, and Utkir Akramov, who were seeking political asylum. On July 26, the ECHR ordered the government not to return the four asylum seekers. The government complied with the order.

In 2009 the UNHCR recorded 16 incidents of refugee expulsion, compared to 12 in 2008. Incidents included cases in which individuals were denied access to the territory of the country.

In August 2009 new regulations initiated by the SBGS took effect that require foreign nationals transiting the country to Western Europe and stateless persons to have in their possession no less than "70 subsistence levels" (12,620 hryvnia or $1,570) to sustain their stay in the country. On September 2, the UNHCR stated that this change "should not affect access to the asylum procedure and undermine the nonrefoulement principle."

Human rights groups noted that the current law on refugees does not provide protection for war refugees, victims of indiscriminate violence, or failed asylum seekers who could face the threat of torture or loss of life or freedom if deported. According to informed observers, several allegedly failed Chechen asylum seekers were kept in pretrial detention facilities, at least two were recognized as refugees under the UNHCR's mandate. In one case the individual had been accepted for resettlement in an EU member state. Despite numerous demarches by the resettlement country and the UNHCR, the individual has remained in detention for more than two years.

According to the UNHCR and local human rights groups, the complicated and burdensome registration system often left asylum seekers without documents during the protracted review of their cases and the appeal process. This left them vulnerable to frequent police stops, detention, and fines. Refugees and asylum seekers, who frequently came from Africa and Asia, were at times victims of xenophobic attacks. Asylum seekers in detention centers were sometimes unable to apply for refugee status within prescribed time limits and had limited access to legal and other assistance. The problem was further complicated by the lack of access to qualified interpreters to complete registration documents.

During the year the UNHCR and local NGOs worked with approximately 100 unaccompanied children seeking asylum. The majority were not registered with asylum authorities and were unable to access appropriate services and care, leaving them vulnerable to exploitation and abuse.

According to the UNHCR, there were 2,334 refugees in the country as of July 1. Of these, 53 percent were from Afghanistan, 27 percent from the former Soviet Union, and 11percent from African countries.

The country remained a destination and transit country for migrants. According to the SBGS, 15,667 irregular migrants were identified in the first nine months of the year, an 18 percent drop compared with the same period in 2009. Of that number, 13,576 were not allowed into the country, and 1,260 were apprehended when illegally crossing the border. According to the SBGS, 13 Chechens, 16 Uzbeks, and two Belarusians were also apprehended in the first nine months of the year.

According to the Ministry of Internal Affairs, 350 detained irregular migrants were held in two new facilities in Chernihiv and Volyn oblasts, compared with 751 in 2009. According to the SCNR, two temporary holding facilities for refugees, in Odesa and Zakarpattia oblast, were not sufficient for providing temporary housing to refugees.

There are no legal provisions for voluntary return. However, the local office of the International Organization for Migration (IOM), in cooperation with the SBGS and the Ministry of Internal Affairs, continued to operate a Program on Assisted Voluntary Return to help stranded migrants and failed asylum seekers to repatriate to their countries of origin. Five local NGOs in the Mukachevo, Chernihiv, Odesa, Kharkiv, and Volyn oblasts participated in the voluntary return program. In 2009, 11 persons of concern to the UNHCR voluntarily departed the country.

Stateless Persons

According to the law citizenship is derived by birth, territorial origin, naturalization, restored citizenship, and adoption. Dual citizenship is not allowed.

According to UNHCR estimates, there were approximately 52,000 stateless persons in the country. In addition, there were an estimated 4,500 formerly deported Crimean Tatars who returned to Crimea but had not registered as citizens, as well as smaller numbers from the separatist region of Abkhazia and Georgia.

Stateless persons also included an unknown number of persons who either lived in the country for decades but failed to clarify their citizenship status after the collapse of the Soviet Union in 1991 or who arrived in the country as students or visitors both before and after 1991. Many did not obtain residency documents or take other steps to register according to the regulations of their country of origin.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The constitution and the law provide citizens the right to change their government peacefully, and citizens exercised this right in practice through periodic, free, and fair elections based on universal suffrage.

Elections and Political Participation

On January 17, the first round of presidential elections took place. International and domestic observers assessed the vote as having met most international standards. As no candidate received 50 percent of the vote, the two candidates with the most votes--Viktor Yanukovych and Prime Minister Yulia Tymoshenko--faced each other in a runoff election on February 7. Observers again assessed the run-off election as largely free and fair. Yanukovych was inaugurated president on February 25.

On March 11, the president's Party of Regions, together with two other parties and 16 nonaligned members of parliament (MPs) established the "Stability and Reform" governing coalition composed of 235 MPs to replace the coalition led by Tymoshenko. Opposition MPs and independent observers asserted that the new majority had been formed illegally in violation of established rules and procedures because a coalition could only be composed of factions, not individuals.

On April 8, the Constitutional Court ruled that the procedures used to form the Party of Regions-led coalition was constitutional, stating that individual MPs have the right to take part in forming parliamentary coalitions.

On October 1, the Constitutional Court ruled that the changes to the constitution enacted following the Orange Revolution violated the procedures for amending the constitution, thereby reinstating the 1996 constitution, which granted greater powers to the presidency (see section 1.e).

On July 10, parliament adopted a new law for the conduct of the elections on October 31 for local councils and mayors of cities, towns, and villages. Election observers and international experts cited the law as a source of problems on election day. In September President Yanukovych ordered revisions to the law that lessened or eliminated some of the problems such as, blocking the participation of new parties, were lessened or eliminated by the revisions ordered by President Yanukovych in September. However, other aspects of the election law and regulations challenged the placement of names of some candidates on ballots, allowed for reported cases of improper use of administrative resources during the electoral campaign, established an unbalanced membership in the electoral commission, and created complicated registration and voting procedures.

While international and local election observers recognized some improvements in the conduct of the October 31 local elections compared to previous local elections, they concluded that overall it did not meet standards for openness and fairness set by the presidential elections earlier in the year.

Observers noted shortcomings such as, insufficient training for electoral commission members, which contributed to procedural violations and organizational problems. In particular, the registration of fraudulent Batkivshchyna Party candidate lists led to the disqualification of all Batkivshchyna Party candidates in the Kyiv and Lviv oblast council elections, preventing the main opposition party from running for election in regions where it had considerable support. Election observers also reported incidences of law enforcement authorities' pressuring monitors and candidates, and election officials selectively barring or removing candidates from ballots.

There were 36 female members of the 450-seat parliament, and a woman held the post of secretary of the National Security and Defense Council. The 18-member Constitutional Court included one female justice.

The exact number of minorities in parliament and the cabinet was not available due to privacy laws.

Crimean Tatar leaders continued to call for changes in the electoral law that would give them greater representation in the Crimean and national parliaments. The law does not allow for the creation of regional political parties, and Crimean Tatars had to join national political parties or blocs. Only one Crimean Tatar was a member of the national parliament.

According to Refat Chubarov, the deputy leader of the Crimean Tatar Mejlis (governing body), Crimean Tatars, who make up 13 percent of the population of Crimea, occupied eight seats in the 100-member Crimean Mejlis, and had approximately 1,000 members in city, district, and rural councils in Crimea. The Mejlis was not legally recognized by national authorities.

Section 4 Official Corruption and Government Transparency

The law provides criminal penalties for official corruption; however, corruption was ineffectively prosecuted, and penalties were rarely imposed. Corruption remained a pervasive problem and was widespread in the executive, legislative, and judicial branches of government and in society.

Officials, including high-ranking officials, often engaged in corrupt practices with impunity. On October 5, at a meeting with foreign investors in Kyiv, Drago Kos, the president of the Group of States against Corruption (GRECO), stated he saw no improvements in the country's anticorruption efforts since the Yanukovych government took office.

On April 22, the president announced that the PGO had opened more than 30 criminal cases on charges of embezzlement of state funds by members of the previous government. Opposition politicians claimed the charges were politically motivated.

On June 24, the SBU detained the former head of the Customs Service, Anatoliy Makarenko, as a suspect in a criminal case related to damages allegedly caused to the country in connection with the seizure of 11 billion cubic meters of gas by former prime minister Tymoshenko's government from gas intermediary RosUkrEnergo in 2009.

On July 12, the Interfax Ukraine news agency reported that the Pechersk District Court in Kyiv had approved the arrest of Ihor Didenko, the former first deputy head of national oil and gas company Naftohaz Ukrayiny, on suspicion of misappropriation or embezzlement through abuse of office also related to the seizure of 11 billion cubic meters of gas by former prime minister Tymoshenko's government from gas intermediary RosUkrEnergo in 2009.

On October 18, former economy minister Bohdan Danylyshyn was detained in the Czech Republic after the country's prosecutor general opened a case against him for abuse of office in connection with procurement procedures at Boryspil Airport. As of year's end, Czech authorities had not made a determination on whether to deport Danylyshyn.

In December prosecutors arrested a number of former senior government officials with ties to opposition leader and former prime minister Tymoshenko, including Georgy Filipchuk, Yevhen Korniychuk, Mykola Petrenko, and Yuriy Lutsenko (see section 1.d.).

Tymoshenko herself was called in for questioning by authorities on at least nine occasions in December over charges that she misused funds from the sale of carbon credits and that there were irregularities in the her government's purchase of vehicles subsequently used for her presidential campaign. Former First Deputy Prime Oleksandr Turchynov was also called in for questioning at least six times in the last four months of the year.

Numerous domestic and international observers also raised concerns that, while the government had a right and a duty to investigate corruption, prosecution should not be selective or politically motivated. These observers noted that the government's targeting, with few exceptions, of senior officials connected with the previous government gave the appearance of politically motivated prosecution of political opponents.

In response the government noted that Bohdan Presner, a former deputy environment minister in the Azarov government, was also under arrest for bribery. His case remained ongoing at year's end.

On April 14, the Kyiv Appeals Court upheld a March ruling by a lower court to close criminal corruption cases against Ihor Bakai, former head of the State Management of Affairs Department and Naftohaz, the state gas and oil company. The cases were opened in 1998 and 2000. Observers attributed the dismissal of the cases to Bakai's political connections with the new administration.

Police corruption remained a problem. The PGO reported that in the first nine months of the year 609 criminal cases of corruption were opened against law enforcement officers. Criminal cases involving 10 prosecutors and 318 police officers were forwarded to court.

According to the PGO, in the first nine months of the year, 71 appointed and elected officials and civil servants at all levels of government were found guilty of criminal offenses related to corruption and bribery.

Judges are immune from prosecution and may not be detained or arrested unless parliament rescinds their immunity. During the first nine months of the year, the PGO confirmed that it had initiated 22 corruption cases against judges, and forwarded 25 corruption cases against judges to court. During the year 14 judges were found guilty of wrongdoing; eight were convicted of bribery; three of knowingly issuing an unjust decision; and three of abuse of power or office. Of these, four were sentenced to prison and seven were placed on probation.

During the first nine months of the year, military prosecutors opened 119 criminal cases for corruption, of which 21 involved law enforcement personnel and 98 involved other officials.

A June 2009 survey by the PACE project, "Promoting Active Citizen Engagement to Combat Corruption in Ukraine," found that almost 63 percent of respondents stated they had been involved in corrupt transactions with government officials in the previous 12 months. The survey also found increased public support for more active anticorruption programs and increasing criminal charges for corrupt government employees.

On June 21, the PGO approved an indictment of Ihor Zvarych, the former head of the Lviv Administrative Court of Appeals. The ruling was forwarded to the Supreme Court to determine jurisdiction for a trial. Parliament stripped Zvarych of immunity in 2008 after an investigation found evidence that he accepted a bribe of 800,000 hryvnia ($100,000) and discovered eight million hryvnias ($1 million) at his home. He was arrested in March 2009 on charges of abuse of office, bribery and fraud, and remains in pretrial detention.

The constitution and the law authorize public access to government information unless it pertains to national security. Government bodies are required to respond to requests within 10 days and to provide information within 30 days. Denials can be appealed to a higher level at the agency concerned and then to a court. However, it remained difficult to gain access to official information. Government officials often did not understand the law and at times created bureaucratic procedures to withhold information.

Section 5 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases; however, unlike in previous years, there were numerous complaints of government pressure and intimidation. Government officials were not uniformly cooperative or responsive to their views.

During the year the SBU discontinued meetings of its advisory council consisting of political leaders, NGO activists, and independent experts which had aimed to provide civilian oversight and increase the transparency of SBU activities. While the council continued to exist in principle, as of the end of the year, it had not met since February.

On June 26, Niko Lange, the local representative of the Konrad Adenauer Foundation, was detained at Boryspil airport upon his arrival in the country and held without explanation for 10 hours before being allowed entry. On July 30, UNIAN reported that the PGO had announced that the State Border Guard Service had detained Lange on SBU instructions because of his alleged interference in the country's internal affairs.

On September 6, the International Renaissance Foundation (IRF) issued a statement that several NGOs it supported had received requests for information from the SBU. The foundation appealed to the authorities, emphasizing that it did not support any political party or political activities, only initiatives aimed at electoral processes to ensure fairness. On September 8, the head of the Presidential Administration, Sergiy Lyovochkin, told the media that the SBU's interest in IRF's activities was not part of a large-scale investigation into NGOs, but a one-time inquiry. However, despite increased attention by the SBU, domestic NGOs continued to criticize openly the government's human rights performance.

The government generally cooperated with international organizations, including the UN, the OSCE, and the Parliamentary Assembly of the Council of Europe. For example, PACE rappporteurs visited the country several times during the year, as did the OSCE's representative on media freedom, among others.

The constitution provides for a human rights ombudsman, officially designated as the parliamentary commissioner on human rights. On June 29, the parliament amended the ombudsman's term in office from five to seven years. However, the change did not apply to term of the current ombudsman. In June 2009 Commissioner Nina Karpachova presented a constitutionally mandated report to parliament on the human rights situation in the country in 2006 and 2007. The report is required annually but has only been produced five times since the office was established in 1998.

Human rights groups criticized the report for being outdated, and the ombudsman for poor cooperation with human rights organizations and for not opening regional offices. They also expressed concern that government bodies failed to provide proper responses to the ombudsman's requests. Nevertheless, they also noted that the ombudsman's office became more transparent by increasing media coverage of its activities and by updating information on its Web site on a more regular basis.

According to the Office of the Human Rights Ombudsman, 75,386 persons filed 32,884 complaints with the office in the first 11 months of the year. Of that number, approximately 45 percent related to civil rights, in particular the right to a fair

trial, abuse by law enforcement personnel, and timely implementation of court rulings. The remainder involved social rights (13.2 percent); economic rights (23.9 percent); individual rights (10.8 percent) including right to life, respect for personal integrity, and prohibition of torture in detention; and religious rights (10.9 percent).

A parliamentary committee on human rights, national minorities, and interethnic relations continued to operate during the year, but its activities were not publicized. The committee's subcommittees work on issues such as interethnic relations, gender policy, indigenous peoples, national minorities and ethnic groups, deported persons, victims of political repression, ethnic policy, prevention of domestic conflict, refugees, and migration.

Section 6 Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, gender, language, social status, or other circumstances; however, both governmental and societal discrimination persisted, and the government did not effectively enforce the prohibitions.

Women

The law prohibits rape but does not explicitly address spousal rape. A law against "forced sex with a materially dependent person" may allow prosecution for spousal rape. According to the Ministry of Internal Affairs, during the first nine months of the year, police recorded 516 incidents of rape or attempted rape, a decrease of 13.7 percent compared with the same period in 2009.

Domestic violence against women remained a serious problem. Spousal abuse is illegal but was common. Advocacy groups asserted that the percentage of women subjected to physical violence or psychological abuse at home remained high. According to Donetsk Regional League of Business and Professional Women, domestic violence annually resulted in 100,000 days of care at in-patient hospital facilities, 30,000 trauma unit cases, and 40,000 doctor visits; up to 40 percent of calls to police involved complaints about domestic violence.

The law permits the administrative arrest of a person for up to five days for - offenses related to domestic violence. On December 2, parliament adopted amendments to the Code of Administrative Offenses introducing community work of 40-60 hours as a possible punishment for domestic violence.

According to women's NGO La Strada-Ukraine, the Ministry for Family, Youth, and Sports continued to work with NGOs and civil society. However, on December 9 the president merged the Ministry for Family, Youth, and Sports with the Ministry of Science and Education to form a new Ministry of Education, Youth, and Sports. It was unclear at year's end what impact the reorganization would have on women's issues.

Persistent gender stereotypes continued. For example, on March 19, replying to a question about the lack of women in new Cabinet of Ministers, Prime Minister Azarov stated that "carrying out reforms in Ukraine is not a women's business." On March 22, leaders of six women's and gender rights advocacy groups sent a letter to Human Rights Commissioner Karpachova expressing concern over Prime Minister Azarov's comments. The women asserted that the statement was discriminatory under the Law on Equal Opportunities of Men and Women and ran counter to article 38 of the constitution because it restricted the right of women to participate in politics and governance.

On March 9, Kateryna Levchenko of La Strada-Ukraine and Olena Suslova of Women's Information Center filed a lawsuit against the prime minister at the Pechersky District Court in Kyiv accusing him of making a statement that violated gender equality. In June the court rejected the case, stating that the prime minister's comments were protected under freedom of speech. Levchenko filed an appeal in December.

During the first six months of the year, the Ministry of Family, Youth, and Sports, the Ministry of Internal Affairs, and their regional offices recorded 53,785 complaints of domestic violence, including 48,097 allegations of violence against women, and 5,265 reported incidents of violence against men.

As of July 1, according to the Ministry of Internal Affairs and the Ministry for Family, Youth, and Sports, 70,473 persons were under police supervision for domestic violence, compared with 65,684 in 2009.

Police issued 2,085 warnings and 3,724 injunctions for protection related to domestic violence in the first six months of the year. The Ministry of Internal Affairs also reported that in the first eight months of the year 4,622 families were put under supervision for domestic violence. During the same period of time, administrative charges were brought against 2,555 individuals for domestic violence and for disobeying injunctions of protection.

The law requires the government to operate a shelter in every major city, but in practice it did not, in part due to the lack of municipal funding.

According to the Ministry for Family, Youth and Sports there were 21 centers for social-psychological assistance and nine centers for medical and social rehabilitation in 19 oblasts, Crimea, and the cities of Kyiv and Sevastopol, which had capacity for 342 persons. During the first nine months of the year, these centers provided assistance to 1,194 persons, of whom 91 adults and 96 children had been victims of domestic violence. NGOs operated additional centers for domestic violence victims in Vinnytsia, Donetsk, Zhytomyr, Odesa, Chernihiv, Poltava, Sumy and Khmelnytskiy oblasts.

According to women's advocacy groups, private and municipally funded shelters were not always accessible. Some did not function throughout the year, and shelters in Kyiv did not admit women who were not registered as Kyiv residents. Government centers offered only limited legal and psychological assistance to victims of domestic violence.

Sex tourism remained a problem; however, there were no official statistics on its extent. During the year a local feminist group, FEMEN, held demonstrations against the increase of sex tourism in the country. In February 2009 then interior minister Yuriy Lutsenko stated in an interview with *Segodnya* that "Ukraine is becoming a paradise for sex tourism."

The law on equal rights and opportunities qualifies sexual harassment as discrimination; however, women's rights groups asserted that it does not contain an effective mechanism to protect against sexual harassment. Women's groups reported that there was continuing, widespread sexual harassment in the workplace, including coerced sex.

While the law prohibits forced sex with a "materially dependent person," which includes employees, legal experts regarded the safeguards against harassment as inadequate. La Strada-Ukraine operated a national hotline for victims of violence and sexual harassment.

The government recognized the basic right of couples and individuals to decide freely and responsibly the number, spacing, and timing of their children. Health clinics and local health NGOs were permitted to operate freely in disseminating information on family planning under the guidance of the Ministry of Health. There are no restrictions on the right to access contraceptives.

Quality prenatal and postnatal care remained inaccessible to many women because state-funded clinics were underfunded and lacked quality equipment, and services in private clinics were expensive. However, according to data from the Population Reference Bureau (PRB), 99 percent of births occurred in the presence of skilled personnel. PRB's data indicated that the maternal mortality rate was 19 per 100,000 births. Some of the reproductive health concerns affecting the system included rapidly growing rates of sexually transmitted infections including HIV/AIDS, poor quality sexual and reproductive health services in state-funded hospitals, low awareness of modern contraceptives, and the expense of high-priced medical services in private clinics that made them inaccessible to large groups of local residents.

Romani rights groups reported that Romani women experienced racial discrimination in standards of medical care and lacked access to information on health matters.

Men and women received equal access to diagnosis and treatment for sexually transmitted infections, including HIV, but local health NGOs and clinics reported that women were more likely than men to seek treatment and refer their partners.

Under the law women enjoyed the same rights as men, including equal pay for equal work, a principle that generally was observed. However, industries dominated by female workers had the lowest relative wages. The labor code sets the retirement age for women at 55 and for men at 60. Women received lower salaries due to limited opportunities for advancement and the types of industries in which women were employed.

Children

Citizenship is determined by birthplace or by parentage. A child born on the territory of the country in a family of stateless persons residing permanently in the country is a citizen. The law requires that parents register a child within a month of birth.

While education was free, universal, and compulsory until age 15, the public education system continued to suffer from chronic underfunding, and children from poor families continued to drop out of school before turning 15.

More than 20,000 children did not attend school, according to a 2009 report by a coalition of 14 children's rights NGOs. The report, which covered the period 2002-08, was presented to the UN Committee on the Rights of the Child. Many children were employed in agriculture and illegal coalmines or, in some cases, forced by their parents to beg. NGOs reported that a lack of schooling remained a significant problem among the rural population and within the Romani community. In some cases rural schools were closed due to the small number of school-age children, forcing children to travel long distances, often at personal expense, to attend schools in other villages.

Children continued to be victims of violence and abuse. According to the Ministry of Internal Affairs, in the first eight months of the year, 8,156 minors were victims of crime, including 45 of intentionally inflicted bodily injury. The PGO confirmed that, in the first nine months of the year, 52 crimes involving child rape and attempted rape were recorded; 87 minors were raped, compared with 110 during the same period in 2009.

In January 2009 the parliament adopted amendments to the criminal and criminal procedural codes that established criminal liability of up to three years in custody for forcing children into begging.

Romani rights groups reported that early marriages involving girls under 18 were common within the Romani community.

Commercial sexual exploitation of children remained a serious problem. Domestic and foreign law enforcement officials reported that a significant portion of Internet child pornography continued to originate in the country.

On January 20, parliament adopted amendments to prevent the spread of child pornography. The amendments introduced an internationally recognized definition of child pornography, which allowed law enforcement agencies to identify relevant evidence. In addition, the amendments allowed courts to limit access to Web sites that disseminate child pornography and increased financial penalties and prison sentences for offenders.

On June 1, the parliament amended the Criminal Code to increase from eight to 10 years the minimum imprisonment term for child rape. The amendment also increased to 15 years the maximum prison term for persons "satisfying sexual passion in perverted forms." Molesting children under 16 is punishable by imprisonment for up to five years. The same offense committed against a child under 14 is punishable by imprisonment for a term of five to eight years.

According to the Ministry for Family, Youth and Sports, the number of street children dropped from 42,000 in 2005 to approximately 22,000 in 2009 and 14,720 during the first nine months of this year as a result of government efforts. The ministry reported that as of September there were 88 children shelters across the country in all oblasts and the cities of Kyiv and Sevastopol. The shelters have a capacity for 3,370 children; during the first six months of the year, 6,977 children came to these shelters.

The country is party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. For information on international parental child abduction, please see the Department of State's annual report on compliance at http://travel.state.gov/abduction/resources/congressreport/congressreport_4308.html.

Anti-Semitism

An estimated 103,600 Jews lived in the country, comprising approximately 0.2 percent of the population, according to government census data and international Jewish groups. Local Jewish leaders estimated the number of persons with an ethnic Jewish heritage to be as high as 370,000.

There were a number of acts of anti-Semitism, some involving vandalism of Jewish property. According to the Association of Jewish Organizations and Communities of Ukraine's (VAAD) there were nine incidents of vandalism during the year compared with 19 incidents in 2009, and 13 in 2008. There were no reports of violent incidents of anti-Semitism.

In April a Jewish cemetery in Ternopil was desecrated. Other vandalism included the August 12 desecration of a Jewish cemetery in Pavlohrad, paint thrown on a Jewish community building in Sumy on October 12, the November 17 and November 19 desecrations of Holocaust monuments in Kirovograd and in Sevastopol, and paint thrown on the walls of a synagogue on December 9 in Sumy.

As of year's end there were no reports that authorities had identified suspects or made arrests in cases of vandalism against Jewish property in 2009, including swastikas on the walls of Jewish Charity Center in Melitopol, Nazi symbols on the front door of the Kyiv office of the Hebrew Immigrant Aid Society, and paint splashed on the monument marking the birthplace of Rabbi Menachem Schneerson in Mykolayiv.

During the year members of marginal populist and nationalist parties and organizations continued to make occasional extremist, intolerant, and anti-Semitic statements.

In January unidentified individuals in Sudak, Crimea were reported to have passed out leaflets calling for genocide against Jews in the country. As of the end of the year, there had been no further developments in the incident.

On September 10, the Prosecutor's Office in Zakarpattia closed an investigation into charges of hate speech against Serhiy Ratushnyak, the former mayor of Uzhhorod. Citing findings by legal and linguistic experts, the prosecutor stated Ratushnyak's comments made in 2009 reflected his opinion about Jews and could not be described as hate speech. Ratushnyak was charged in August 2009 with inciting ethnic hatred, hooliganism, and abuse of office after he allegedly used anti-Semitic rhetoric and attacked a campaign worker for a rival presidential candidate. Ratushnyak, who was known for making racist and intolerant comments, ran as a marginal candidate in the presidential elections.

On November 10, the National Television and Radio Broadcasting Council issued a warning to the Kherson Television and Radio Company about racist and anti-Semitic remarks made by former city councilman Serhiy Kyrychenko in 2009 on a local radio show, *Vik*. In frequent appearances on the program Kyrychenko accused Jews of robbing the country's people and plotting to enslave Ukrainians and exterminate Slavs. The Kherson Oblast Prosecutor's Office also opened a criminal case against Kyrychenko on charges of inciting interethnic hatred. In December the prosecutor completed a pretrial investigation and sent the case to court.

Anti-Semitic articles continued to appear in small publications, although their number and circulation continued to decline. According to VAAD, 46 anti-Semitic articles were published in major print media outlets in 2009, compared with 54 in 2008 and 542 in 2007.

VAAD said the sharp decrease in anti-Semitic publications was due primarily to concerted political and social pressure by NGOs, the government and the Jewish community on the Academy of Personnel Management (MAUP). In previous years, MAUP, a private higher-education institution, accounted for nearly 90 percent of all anti-Semitic material, but has now ceased the publications.

In November 2009 according to media reports, self-described "writer and philosopher" Vyacheslav Gudin told a group of 300 persons that 15 Ukrainian children who had been adopted in Israel were taken to Israeli medical centers and used for "spare parts." He further asserted that 25,000 Ukrainian children had been taken to Israel over the previous two years to harvest their organs. His allegations, which mirrored past anti-Semitic "blood libel" claims, were circulated on the Internet by radical right-wing groups. Members of the Odesa Jewish community called on the prosecutor's office to investigate the ZaZUBR group, which had published Gudin's materials in its newspaper, *ZaZUBRina*, and on its Web site. Prosecutors opened a case but did not bring charges against anyone involved. In addition, the government reportedly opened an investigation into the validity of Gudin's remarks; however, at year's end no further information was available about the details of the investigation.

Senior government officials and politicians from various political parties continued efforts to combat anti-Semitism by speaking out against extremism and social intolerance, and by criticizing anti-Semitic acts.

The SCNR, together with the Ministry of Foreign Affairs, Ministry of Internal Affairs, State Border Guard Committee, State Customs Service, State Committee for Tourism, and other agencies, cooperated to support Jewish pilgrimages to the burial site in Uman of Rabbi Nakhman, founder of the Bratslav Hasidic movement. According to Jewish leaders approximately 23,000 pilgrims traveled to Uman in September. Growing numbers of Jewish pilgrims have been visiting burial sites of prominent spiritual leaders in Medzhybizh, Berdychiv, and Hadyach.

According to the government the SBU acted to prevent at least six hate crimes in 2009 and 2010, including illegal activities by skinhead groups in Cherkassy and Dnepropetrovsk and an attack on the cultural center Hesed Haim in Sumy.

Trafficking In Persons

For information on trafficking in persons, please see the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip.

Persons with Disabilities

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment, education, access to health care, and other state services; however, the government generally did not enforce these laws.

The government estimated the number of persons with disabilities at between 2.4 and 2.7 million; however, NGOs working on disability rights asserted that the real number of disabled was twice the government's estimate. The government did not track the number of children with disabilities. NGOs complained that the lack official data limited their ability to lobby for more government assistance to children with disabilities.

According to the law employers must allocate 4 percent of employment opportunities to persons with disabilities. NGOs noted that many of those employed to fill these positions received a nominal salary to meet the requirement but did not really work at their companies. During the first six months of the year, 4,233 persons with disabilities received jobs through

government employment-placement services, according to the Ministry of Labor and Social Policy. The Ministry of Education confirmed that there were 398 specialized secondary schools and boarding schools with a total of 46,480 children, including 54 specialized secondary schools in which 5,608 children with disabilities studied while staying with their families. In addition the Ministry of Education confirmed that there were 484 classes for children with disabilities in general secondary schools. These classes served 5,652 children.

Advocacy groups maintained that, despite existing legal guarantees, most public buildings remained inaccessible to persons with disabilities. As a result, access to essential services and activities such as employment, education, health care, transportation, and financial services remained difficult. NGOs expressed concern over the lack of programs to promote the integration of students with disabilities into the general student population and noted that the lack of needs assessment programs by state-funded employment centers led to the placement of graduates with disabilities in inappropriate jobs.

National/Racial/Ethnic Minorities

The constitution and law prohibit discrimination based on race, skin color, and ethnic and social origin. Mistreatment of minority groups and harassment of foreigners of non-Slavic appearance remained a problem, although NGO monitors reported that hate crime incidents continued to decrease.

Incitement to ethnic or religious hatred is a criminal offense; however, human rights organizations stated the requirement to prove actual intent, including proof of premeditation and intent to incite hatred, made its legal application difficult. Police and prosecutors generally prosecuted racially motivated crimes under legal provisions dealing with hooliganism or related offenses. Article 161 of the criminal code criminalizes deliberate actions to incite hatred or discrimination based on nationality, race, or religion, including insulting the national honor or dignity of citizens in connection with their religious and political beliefs, race, or skin color.

The government acknowledged that racism and ethnically motivated attacks were a problem; however, some officials continued to minimize its seriousness, maintaining that xenophobia was not a problem and that violent attacks were isolated incidents.

No official statistics were available on the number of racially motivated attacks. However, the Diversity Initiative monitoring group, a coalition of international and local NGOs headed by the IOM mission in Kyiv, reported four attacks involving four victims during the first nine months of the year. This number compared with 26 attacks during 2009 and 63 in 2008. The attacks involved a Kuwaiti and three African asylum seekers and foreign students. The attacks occurred in Kyiv, Simferopol, and Odesa; none was fatal.

According to the Diversity Initiative, police did not initiate criminal cases in any of the four attacks they documented during the year.

According to the PGO, during the year prosecutors forwarded to court two criminal cases based on Article 161. SBU investigators continued pretrial investigation in one case. During the first nine months of the year, two persons were found guilty of violating Article 161, compared with four in 2009 and three in 2008.

In December 2009 then president Yushchenko signed into law amendments to the criminal code that increased penalties for hate crimes. Accordingly, premeditated killing on grounds of racial, ethnic, or religious hatred carries a 10- to 15-year prison sentence. Parliament also established a fine from 3,400 to 8,500 hryvnias ($425 to $1,060) or up to five years in prison for hate crimes.

Advocacy groups asserted that police occasionally detained dark-skinned persons and subjected them to far more frequent and arbitrary document checks; at times victims of xenophobic attacks were prosecuted for acting in self-defense.

On December 13, the media reported that Berkut police officers detained journalist Mustafa Nayem on suspicion that he was a Caucasus national. According to the reports, police confiscated Nayem's mobile phone and took him to a local precinct. He was released with an apology from the head of the precinct. Two investigations into the incident continued at year's end.

Some of the most active xenophobic groups were the unregistered Ukrainian National-Labor Party, the Patriot of Ukraine organization, the Ukrainian Movement against Illegal Immigration, White Power-Skinhead Spektrum, the country's branch of Blood and Honor, and the World Church of the Creator Ruthenia. Such groups appeared to be marginal and poorly organized.

Roma continued to face governmental and societal discrimination. Romani rights groups estimated the country's Romani population to be between 200,000 and 400,000; however, official census data placed the number at 47,600. The discrepancy was due in part by lack of legal documentation and poor record keeping in the Romani community. According to SCNR, there were 88 Romani NGOs, of which three were national.

A 2008 study by Chirikli Roma Women Foundation indicated that almost 70 percent of Roma had experienced a violation of their rights and that the majority did not know how to defend their rights or with whom to lodge complaints. According to Romani rights groups, two-thirds of Roma were illiterate, 15 percent were infected with tuberculosis, and 60 percent of Romani children in Zakarpattia were infected with tuberculosis. One-third of Roma had no funds to pay for medicine and doctors' services.

Representatives of Romani and other minority groups claimed that police officials routinely ignored and sometimes abetted violence against them and referred to Romani ethnicity in crime reports. However, the Roma Congress of Ukraine noted diminished ethnic profiling by police as a result of involvement of Romani rights groups.

There were fewer reports of government cooperation with the Romani community than in 2009. The chairman of the Roma Congress of Ukraine, Petro Hryhorychenko, was formerly a member of the presidential council on ethnic-national policy and a member of the NGO advisory council with the State Committee on Nationalities and Religions (SCNR). On April 2, President Yanukovych abolished the council as part of his effort to cut bureaucracy. On December 9, the president also abolished the SCNR as part of broad administrative reforms and reassigned its duties to the Ministry of Culture.

The constitution provides for the free development, use, and protection of Russian and other minority languages. According to the Ministry of Education, 2,217 educational facilities used Russian as the main language of instruction, serving nearly one million schoolchildren. According to ministry figures, 1.3 million students studied Russian as a separate subject in secondary schools, and more than 165,000 secondary school students studied Russian as an extracurricular course.

Ukrainian and Crimean Tatar minorities in Crimea continued to complain of discrimination by the ethnic Russian majority on the peninsula and in Sevastopol. They urged that the Ukrainian and the Crimean Tatar languages be given a status equal to Russian. In 2009 the head of the Crimean Republican Committee for Nationalities and Deported Citizens reported approximately 264,500 registered Crimean Tatars in the country. The SCNR reported 260,873 Tatars living in Crimea, Kherson Oblast, and Sevastopol.

In November 2009 the SCNR reported that the government had allocated 28,276 million hryvnias (approximately $3.5 million) for the resettlement and integration of Crimean Tatars, including housing construction. According to Crimean Tatar

Mejlis, Crimean Tatars resided in 300 settlements on the Crimean peninsula, and authorities allocated 53 million hryvnias ($6.6 million) for their integration. According to the Ministry of Education, 439 children studied the Crimean Tatar language in separate groups in preschool facilities. There were 15 secondary schools with Crimean Tatar as the main language of instruction; 17,725 students studied Crimean Tatar as a separate subject in secondary schools; 5,153 secondary school students studied Crimean Tatar as an extracurricular course.

Crimean Tatars asserted that discrimination by local officials deprived them of equal opportunities for employment in local administrations and that propaganda campaigns, particularly by pro-Russian groups, promoted hostility against them. On August 28, in a speech to the Qurultai (a Crimean Tatar national convention) Mustafa Jemilev, the chairman of the Crimean Tatar Mejlis, claimed there had been a significant increase in discrimination against Crimean Tatars since the presidential election.

In December, Radio Liberty reported that the Crimean Prosecutor's Office accused the head of Mejlis's Secretariat, Zair Smedlyaev, of organizing mass disorders and refusing to comply with police orders. The case was initiated in 2006 but only sent to court in December. Smedlyaev claimed that the prosecutor's actions were "an attempt to intimidate the Crimean Tatar people."

On December 25, the Spiritual Directorate of Muslims in Crimea stated that a fire at a mosque under construction in Myrne village in Crimea may have been attempted arson. According to the group the fire was "a deliberate attempt to destabilize interfaith peace in Crimea." The local fire department opened an investigation in the incident.

Societal Abuses, Discrimination, and Acts of Violence Based on Sexual Orientation and Gender Identity

The lesbian, gay, bisexual, and transgender (LGBT) community continued to suffer societal stigma and discrimination. Those who openly declared their sexual orientation experienced discrimination in education, the workplace, and access to medical treatment and to information on the prevention of HIV/AIDS.

According to the registered LGBT rights group Nash Mir (Our World), law-enforcement representatives were involved in 35 of 79 identified instances of discrimination against gays during the year. The group also maintained that police mistreated and collected personal data on gays, while the Ministry of Internal Affairs ignored homophobic attitudes among its personnel.

Among the incidents documented by Nash Mir was the illegal detention by police of a man in Chernivtsi who was accused of frequenting a gay meeting place. Police photographed the man and took his fingerprints.

In another incident police in Mykolayiv interrogated a gay man as part of an investigation into the killing of a gay man. The police insulted him and threatened to expose his sexual orientation if he did not provide contact information of other homosexual persons he knew.

On November 20, according to the LGBT group Insight, approximately 10 men broke into a movie screening organized by the group on the Transgender Day of Remembrance and attacked the audience with teargas. One of the organizers who attempted to block the attackers was beaten. Police investigated the incident as hooliganism, while members of the LGBT community urged the police to open a hate-crime investigation. The case remained open at year's end.

Other Societal Violence or Discrimination

Persons with HIV/AIDS faced discrimination and at times lacked access to treatment. In a 2008 study, the Joint United Nations Program on HIV/AIDS estimated that 1.6 percent of Ukrainians between the ages of 15 and 49 were HIV positive. The Ministry of Health estimated the number of HIV-positive persons to be approximately 156,000, of whom 30,000 were diagnosed with AIDS.

According to a country report by HRW, the Ukrainian National AIDS Center reported 13,039 newly registered cases of HIV infection in the first eight months of 2009, nearly half among intravenous-drug users.

The All-Ukrainian Network of Persons Living with HIV continued to note that persons with HIV/AIDS faced discrimination in the workplace, job loss without legal recourse, harassment by law enforcement officials and prosecutors, social isolation, and stigmatization.

In July an HRW researcher published an op-ed in the British newspaper *The Guardian* in which he reported that under President Yanukovych there had been "an increasing number of law enforcement attacks on [drug] substitution treatment programs" that jeopardized the country's progress to limit the spread of HIV among the intravenous drug-user population. Local NGOs echoed these complaints and asserted that law enforcement officials were illegally collecting information on drug treatment patients to determine their HIV status.

Section 7 Worker Rights

a. The Right of Association

The law provides workers with the right to form and join unions without previous authorization or excessive requirements, and this right was generally respected in practice. There were no reliable estimates of the percentage of the workforce that belonged to a trade union.

To function, a union must be registered by the government. Unions reported that the registration process was extremely burdensome, entailing visits to as many as 10 different offices and payments of fees. The International Trade Union Confederation characterized the registration requirement as "a restriction unacceptable by international labor standards."

While by law the registration process did not change, unions reported an increasingly restrictive implementation of the process. Unions reported that during the year authorities denied the registration of several regional confederations without merit and questioned the legitimacy of another regional confederation that had successfully registered three years previously.

By law all trade unions have equal status, and the establishment of a trade union does not require government permission. However, unions affiliated with the Federation of Trade Unions (FPU), which inherited assets from Soviet-era unions, have enjoyed an advantage in organizing workers.

Unions not affiliated with the FPU, including the Confederation of Free Trade Unions of Ukraine (CFTU), continued to be denied a share of the former Soviet trade unions' real estate and financial holdings. These included social insurance benefit funds, which gave the FPU a benefit that independent unions could not offer. Leaders of non-FPU trade unions and some government officials claimed that the FPU improperly sold some Soviet-era assets to thwart their future distribution. While a 2007 parliamentary moratorium on the FPU's sale of property remained in place, a commission formed during the previous administration to inventory union assets was dissolved by the current government in June.

In August police arrested four union leaders of the Ilyich Iron and Steel Works of Mariupol, seized union materials, and locked the union's office, charging them with fraud and other offenses. Union representatives claimed that the company's management orchestrated the arrests to block a planned rally by the union.

In March 2009 the administration of the Sumy customs office seized the offices of the independent trade union Spravedlyvist, which represented customs personnel, and illegally took possession of their stamp, seal, and official documents. The administration claimed that the local trade union office was illegally located in the Sumy customs offices.

The union leader was fired following this incident. Following her appeal, a court ruled that she should be reinstated; however, the decision reportedly has not been enforced.

In 2009 the FPU and the regional department of the Ministry of Health withheld bonuses and used tactics such as increased scrutiny by tax and labor inspectors to pressure members of a new trade union at a clinic in Chernihiv to join the FPU instead. Although the union leader was reinstated after being fired, the deputy leader's case for reinstatement after dismissal was still pending in court.

The law provides for the right of workers to strike on condition that a strike does not jeopardize national security, public health, or the rights and liberties of others. The right was generally respected in practice. The right to strike does not apply to personnel of the PGO, the judiciary, the armed forces, the security services, law enforcement agencies, the transportation sector, or public servants. Personnel from these entities may seek redress through the judicial system. Federations and confederations are not entitled to strike. A strike may be organized only if two-thirds of the workers of an enterprise vote for it, which trade unions considered to be an unfairly high threshold.

b. The Right to Organize and Bargain Collectively

The law permits trade unions to organize and participate in collective bargaining, but these rights were not always respected in practice.

There were no reliable statistics on the percentage of workers covered by collective agreements.

Union representatives reported that an independent health care union attempted to join a branch collective bargaining agreement concluded with an FPU affiliate but in June was denied without justification.

Members of CFTU-affiliated unions claimed that management sometimes forced them to carry out additional assignments without compensation or threatened them with dismissal if they refused to leave their unions. There were continuing complaints that FPU-affiliated unions deducted union dues from the salaries of workers who had chosen to join a different union.

During the year unions reported that Epicenter, a home improvement chain, harassed persons attempting to engage in union activities. According to representatives, the head of the union was arrested under false pretenses. When the police dropped the case for lack of evidence, the union leader tried to return to work but was told that he had been fired. While he subsequently won his court case against dismissal, Epicenter ignored the decision. Although the union continued to exist, representatives reported that Epicenter management refused to recognize the union or agree to begin collective bargaining.

The law calls for joint worker-management commissions to resolve differences over wages, working conditions, and the rights and duties of management at the enterprise level. However, the commissions were not always effective in practice and sometimes were dominated by management and union representatives co-opted by management. Although the law provides the right to collective bargaining, the manner in which the law was applied prejudiced the bargaining process against newer unions and favored FPU-affiliated unions.

Renouncing membership in an FPU-affiliated union and joining a new union was bureaucratically onerous and typically discouraged by management.

In 2009 an employer reportedly refused to recognize a newly established trade union at an agricultural company. Reports indicated that the company continued to refuse to begin collective bargaining and that the union's leader suffered harassment, including lawsuits filed by the company against him and visits from police demanding to examine the union's financial and other documents.

The law provides for the National Mediation and Reconciliation Service to mediate labor disputes.

There were no exemptions from labor laws in export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor, including by children; however, there were reports that women, men, and children were trafficked for labor. Also see the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip.

Trafficked women were used as housekeepers, seamstresses, dishwashers, or workers at small and large manufacturing plants. Some women with small children and persons with disabilities were trafficked abroad for begging. The International Organization for Migration identified 442 cases of men and women exploited for their labor during the first nine months of the year.

d. Prohibition of Child Labor and Minimum Age for Employment

The law protects children from exploitation in the workplace, but the government did not always effectively enforce the law.

The labor code sets 16 as the minimum age for most employment. Children 15 years of age may with a parent's consent perform "light work," but the law does not clearly define the term. Children can legally do some forms of work beginning at age 14 as part of an apprenticeship in the context of vocational educational training.

The Child Labor Division of the State Labor Inspectorate under the Ministry of Labor and Social Policy is responsible for enforcing child labor laws. The Department of Children's Affairs in the Ministry of Family, Youth, and Sport, and the Police Department for Children's Affairs in the Ministry of Internal Affairs have the responsibility of identifying children in the informal sector involved in the worst forms of child labor. The ministry's Antitrafficking Department is responsible for the enforcement of laws against child trafficking.

The worst forms of child labor were found primarily in the informal sectors, including on family farms and at open-air markets.

Children also were used for commercial sexual exploitation, including production of pornography. Also see the Department of State's annual *Trafficking in Persons Report* at www.state.gov/g/tip/.

Enforcement remained inadequate to deter violations. The State Labor Inspectorate reported it monitored 447 enterprises in August and September. During the inspections it identified 140 working children who were 14 or 15 years of age and 39 who were under 14. Almost all cases of labor involving children under the age of 14 were in the agricultural sector. The inspectorate found approximately the same number of children under the age of 14 involved in child labor as in 2009.

On August 13, the newspaper *Novosti* reported that police arrested a resident from the Odesa Oblast for organizing the production of charcoal using child labor. Police found three children, age 13 to 17 years, working in an indoor plant. Police opened a criminal case.

Police brought trafficking charges (as opposed to less severe child labor charges) in the February 2009 case of a man from Kherson Oblast who forced nine teenagers from Zakarpattia to work on his farm 10 to 16 hours a day without pay while housing them in a poultry barn. NGOs successfully lobbied to have the case tried in Zakarpattia so that the children could testify, despite efforts of the defendant to keep the case in Kherson.

There were no reported developments regarding labor violations discovered by inspectors in Chernivtsi Oblast or regarding cases noted in 2008. One NGO reported is the difficulty for persons not party to a criminal or administrative case to find information regarding its disposition.

e. Acceptable Conditions of Work

On December 1, the government increased the monthly minimum wage to 992 hryvnias ($124). The minimum wage did not provide a decent standard of living for a worker and family. The State Labor Inspectorate is responsible for enforcing the minimum wage but was unable to monitor all employers. Many workers, particularly in the informal sector, received wages far below the established minimum.

During the year wage arrears increased in the first half of the year but decreased in July. According to the State Statistics Committee, arrears stood at 1.8 billion hryvnias ($228 million) at the end of June but had decreased to 1.34 billion hryvnias ($169 million) by December. Most arrears accumulated in industry, but also significantly accrued in construction, transport, communications, and agricultural enterprises.

The law provides for a maximum 40-hour workweek, a 24-hour period of rest per week, and at least 24 days of paid vacation per year. The law provides for double pay for overtime work and regulates the number of overtime hours allowed. However, regulations covering rest periods, maximum hours, and overtime were not always effectively enforced.

Although the law contains occupational safety and health standards, the standards were frequently ignored in practice. Lax safety standards and aging equipment caused many injuries on the job. During the year 11,698 workplace injuries were reported, as compared with 12,370 in 2009; these included 644 job-related fatalities, compared with 675 in 2009.

There were 131 mining fatalities during the year, compared with 151 in 2009. There were 4,888 coalminers reported injured during the year, compared with 5,251 during the same period in 2009.

The law provides workers the right to remove themselves from dangerous work without jeopardizing their continued employment; however, trade unions reported that in practice asserting this right would result in retaliation or perhaps dismissal. Some unions reported good cooperation with government labor inspectors.

For example, the CFTU signed a memorandum of understanding (MOU) with the Labor Inspectorate to cooperate more closely. The MOU gave local union leaders and health and safety specialists the right to inspect places of work jointly with labor inspectors. Unions report that these joint inspections have proved especially important in the mining sector.

Back to Top