# Exhibit 27



Text size ▭ ▭
Print E-mail to a friend Share on Facebook Share on Twitter



Leading Ukrainian intellectuals have signed a letter urging President Viktor Yanukovych to stop persecuting Yulia Tymoshenko and other political opponents.

**Ukrainian intellectuals to Yanukovych: Take your hands off Tymoshenko!**

Jan 5 at 14:54
**Editor's Note:** *The following is an English language translation of an open letter to President Viktor Yanukovych signed and made public late in December by leading Ukrainian intellectuals. In the letter, the signees (listed below) urged Ukraine's president to bring Ukraine back on a path towards democracy and end political oppression of oppositionists, starting with former Prime Minister Yulia Tymoshenko.*

On Dec. 15, 2010 democracy in Ukraine suffered a cruel blow. This is the date when political persecution reached new and dangerous heights. Democracy was trampled upon and the Party of Regions dictatorship showed its true face.

President Viktor Yanukovych's team has showed that it continues to intimidate the opposition and civil society through repression and arrests. On Dec. 15, the Prosecutor General's Office presented charges against Batkivshchyna Party leader Yulia Tymoshenko. By banning this politician who received 12 million votes in the presidential election from traveling abroad, the authorities have demonstrated their audacious intentions to permanently destroy the opposition and introduce authoritarian rule.

The authorities have demonstrated their audacious intentions to permanently destroy the opposition and introduce authoritarian rule.

It is clear that the accusations against the former prime minister are absurd and politically motivated.The criminal case against Yulia Tymoshenko is built on allegations that she used money from the sale of greenhouse gas emission quotas to pay pensions in the midst of the economic crisis. And despite the fact that the State Treasury confirms that all this money, down to the last kopeck, is still in these accounts, the authorities are threatening to put Tymoshenko in jail for 7-10 years.

It is understandable that Yanukovych ordered Viktor Pshonka, his crony and at the same time the Prosecutor General, to open a criminal case against Tymoshenko so as to remove the Batkivshchyna party leader from political activity and destroy the opposition. Yanukovych understands that it is Yulia Tymoshenko who will be his main competitor in future parliamentary and presidential elections, that it is Tymoshenko who personifies real resistance to anti-Ukrainian and anti-democratic policy that is being realized by the current regime.

The Ukrainian people have a bitter and tragic experience of being oppressed during the Lenin and Stalin regimes. We remember that, for the people, destroying freedom and alternatives in politics resulted in disfranchisement, poverty, famine, humiliation of dignity and spirituality and russification.

Take your hands off Yulia Tymoshenko!

Today we are on the eve of yet another era in which all that we survived in the 20th Century is starting to repeat. One party rules again. Political pressure is being put on civil society and the mass media. The opposition is being persecuted. Lawlessness and corruption are flourishing. Those in power are ceding national interests and ruining the grounds for both Ukrainian identity and independence of the state of Ukraine. A vicious attack in the parliament by lawmakers of the Party of Regions against lawmakers of the Batkivshchyna party illustrates again that members of the Party of Regions are acting as though they are occupiers of Ukrainian land.

Advertisement



We urge Ukraine's President to stop political repressions, to get rid of the thugs from his inner circle, to preserve democracy and human rights in the country. We demand a stop to the political persecution of the opposition leader Yulia Tymoshenko, the head of the Batkivshchyna party.

Take your hands off Yulia Tymoshenko!

Signed by:

Yuri ANDRUKHOVYCH – writer, poet;

Ivan DZYUBA – former dissident, member of the National Academy of Sciences;

Irena KARPA – writer;

Myroslav POPOVYCH – member of the National Academy of Sciences, Director, Institute of Philosophy;

Dmytro PAVLYCHKO – poet, writer;

Bohdan HORYN – former political prisoner;

Vasyl OVSIENKO - former political prisoner;

Levko LUKIANENKO – former political prisoner;

Volodymyr VASYLENKO – professor, Doctor of Law, Ambassador Extraordinary and Plenipotentiary of Ukraine;

Yuri SHCHERBAK – writer, Ambassador Extraordinary and Plenipotentiary of Ukraine;

Ihor YUKHNOVSKIY – member of the National Academy of Sciences;

Maria MATIOS – writer, laureate of the Shevchenko National Prize;

Mykola ZHULYNSKY – member of the NASU, laureate of the Shevchenko National Prize;

Dmytro HNATYUK – opera singer;

Valeriy SHEVCHUK – writer, laureate of the Shevchenko National Prize;

Yuri MUSHKETYK – writer, laureate of the Shevchenko National Prize;

Volodymyr YAVORIVSKIY – writer, Head of the National Writers' Union;

Pavlo MOVCHAN - writer, Head of Taras Shevchenko Ukrainian Union "Prosvita";

Hrihoriy HALYMONENKO – professor, Doctor of Philology;

Volodymyr SERGIYCHUK - professor, Doctor of History, Head of International platform "Dialogue-Eurasia";

Vasyl SHKLYAR – writer;

Vasyl HERASYMYUK - writer, laureate of the Shevchenko National Prize;

Larysa DENYSENKO – writer, lawyer;

Oleksandr SKIPALSKIY – public and political figure;

Mykhaylo RATUSHNIY - public and political figure;

Yevhen LUPAKOV - Deputy Head of Ukraine's Officers' Unit;

Volodymyr PYLYPCHUK – professor, member of the National Academy of Sciences;

Natalia OSMAK - public and political figure;

Vasyl TURKEVYCH – writer;

Volodymyr HARBUZ – artist, member of National Union of Painters;

Andriy TKACHUK – public and political figure;

Yuriy DOROSHENKO – publicist.

## related news

People First: The latest in the watch on Ukrainian democracy Dec 28, 2010 at 04:52
People First: The latest in the watch on Ukrainian democracy Dec 15, 2010 at 22:12
People First: The latest in the watch on Ukrainian democracy Dec 7, 2010 at 13:42
People First: The latest in the watch on Ukrainian democracy Dec 6, 2010 at 20:35
People First: The latest in the watch on Ukrainian democracy Nov 15, 2010 at 21:14
People First: The latest in the watch on Ukrainian democracy Nov 8, 2010 at 19:21

The Kyiv Post is hosting comments and forums to foster lively debate. Criticism is fine, but stick to the issues. Comments that include profanity or personal attacks will be removed from the site. If you think that a posted comment violates these standards, please flag it and alert us. We will take steps to block violators.

Comments (35) Show Add a comment

## Add your comment

Name:
Guest

E-Mail:

# Exhibit 28

# UKRAINIANJOURNAL.com



SUNDAY, NOVEMBER 6, 2011                                Make Homepage / Add Bookmark

| | |
|---|---|
| **Front Page** | Protestors demand resignation of Azarov ... Opposition lawmakers demand explanation on ruble natural gas payments |
| Nation | |
| **Business** | **Nation** |
| Search | **McCain, Martens urge travel OK for Yulia** |
| Subscription | Journal Staff Report |
| Advertising | |
| About us | NEW YORK, March 7 — US Senator John McCain and European People's Party President Wilfried Martens jointly urged the Ukrainian authorities to let former Prime Minister Yulia Tymoshenko leave the country for a political meeting in Brussels. |
| Copyright | |
| Contact | "We jointly call on the Ukrainian authorities to allow Yulia Tymoshenko to attend the EPP (European People's Party) Summit in Brussels on March 24, 2011," they said in a joint statement on Monday. |

Username:

Password:

[Enter]

Registration



The statement comes days after US Vice President Joe Biden, in a phone call with President Viktor Yanukovych, voiced concerns over "selective prosecution" of opposition politicians and warned against legislation that may undermine foreign investment.

Tymoshenko, the leader of the largest opposition party in Ukraine, was twice denied by the authorities the right to visit Brussels after prosecutors imposed travel restrictions on her.

But on March 1, however, the prosecutors suddenly allowed Tymoshenko to visit her mother in Dnipropetrovsk on March 8, potentially indicating that international travel restrictions may also be eased.

Tymoshenko, who lost the presidential election to Yanukovych in February 2010, is charged with abuse of power while prime minister in 2009. In particular, the authorities accuse her of diverting some environmental funds towards payment of pensions in 2009, while other charges allege her government had ordered the purchase of ill-equipped ambulances.

Tymoshenko denied the charges as politically motivated. Two ministers from her government have been arrested on similar charges and now awaiting court rulings, while one minister has been granted an asylum in the Czech Republic amid concerns the authorities have been resorting to political persecution.

McCain and Martens echoed those concerns in the statement.

"We also call on the authorities to reconsider what could be viewed as selective prosecution of members of the opposition in Ukraine," they said.

Tymoshenko was invited to join a summit of the European People's Party in Brussels on March 23-24, during which she will be able to meet a number of European Union leaders.

The pressure on Tymoshenko intensified late last year after she had repeatedly traveled to Brussels to criticize Yanukovych on international arena.

After one such trip last year, an anonymous caller phoned Tymoshenko and told her that she will "cough up blood" unless she stops criticizing Yanukovych internationally.

A criminal investigation was opened shortly afterwards, and her travel restrictions had been imposed. (UJ/oz)

Log in

Print article                                    E-mail article

### Currencies (in hryvnias)

| | 03.11.2011 | prev |
|---|---|---|
| USD | 7.980 | 7.980 |
| RUR | 0.260 | 0.260 |
| EUR | 11.02 | 10.87 |

### Stock Market

| | 03.11.2011 | prev |
|---|---|---|
| PFTS | 548.7 | 535.4 |

source: PFTS

### OTHER NEWS

▶ President may visit Brussels before Dec. 19 summit, official says

**NEWS**

**DIPLOMATS**

**RELY ON**

front page • nation • business • editorial • feature • subscription • advertising • search • about us • copyright • contact •

Copyright 2005 Ukrainian Journal. All rights reserved

Programmed by TAC webstudio

# Exhibit 29

# Embassy of the United States Kyiv, Ukraine

**Statement by Victoria Nuland, Spokesperson on Prosecution of Ukrainian Opposition Leaders**

**June 24, 2011**

The United States is aware of the opening of the trial against former Prime Minister Yulia Tymoshenko and reiterates its concern about the appearance of politically-motivated prosecutions of opposition figures in Ukraine. When the senior leadership of an opposition party is the focus of prosecutions, out of proportion with other political figures, this creates the appearance of a political motive. We urge the Government of Ukraine to refrain from actions that create such an appearance and undermine the rule of law in Ukraine. We will closely monitor the legal proceedings against Yulia Tymoshenko and other opposition figures.

# Exhibit 30

# SAME AS
# EXHIBIT 26

# Exhibit 31



United States    Login

Front Page | Arts | Business | Education | Environment | Government | Industry | Lifestyle | Sports | Tech | Other

Sunday, November 6, 2011

RSS | E-mail Newsletters | Put PRWeb on your site

## Humanitad Says Tymoshenko Trial Could Be One Of The Worst Miscarriages Of Justice Of A Political Leader Anywhere In The World

London, United Kingdom, 8 September, 2011: Humanitad, an international non-profit organisation dedicated to promoting peace, justice, human rights and good governance, today warned that the trial of former Prime Minister Yulia Tymoshenko bore all the hallmarks of a gross miscarriage of justice. Professor Paul Wilson, a criminologist and Forensic Psychologist attached to NGO Humanitad's team observing the trial went as far as saying that if she is convicted, the case could go down in history as one of the worst cases of a miscarriage of justice inflicted upon a political leader anywhere in the world.

(PRWEB) September 08, 2011

ShareThis | Email | PDF | Print

Paul Wilson is a Research Fellow and Honorary Professor at Bond University in Queensland, Australia. He is a recognized international expert on miscarriages of justice and has researched, written and been actively engaged in exposing wrongful convictions.

"From the information so far available to Humanitad it looks very much as though not only is the Tymoshenko trial a breach of International Human Rights Conventions but it is also a gross miscarriage of justice," said Professor Wilson. "It remains to be seen as to whether the investigative phase of the prosecution was carried out fairly or not, but it appears reasonably clear that there are some major problems with the adjudicative phase of the proceedings against the former Prime Minister."



Yulia Tymoshenko at her trial

He noted the observations of the Danish Helsinki Committee for Human Rights, which monitored four cases including the Tymoshenko trial. He said that they had been left with the impression that prosecutors and judges had limited understanding for the presumption of innocence and equality of the parties during the trial.

"The Helsinki committee's report appears to confirm Humanitad delegation leader and former senior UK crown prosecutor Jerry Prus-Butwilowicz's observations about the proceedings so far," said Professor Wilson. "On the surface a Judge disallowing the vast majority of witnesses called by the defence to give evidence is a major miscarriage of justice in itself," he commented. "Unless there were clear legal reasons to exclude them then how can it be called a fair trial?"

Professor Wilson added: "The indecent haste of the trial coupled with what appears to be an inadequate time for Tymoshenko's legal team to be able to research and respond to the allegations both before the trial began and during the trial itself, simply reinforces the view that justice has not occurred in her case.

"If these allegations are confirmed by a thorough analysis of the transcripts of her trial then it is hard to see, if she is convicted, why this will not go down historically as one of the worst cases of a miscarriage of justice inflicted upon a political leader anywhere in the world. Indeed, it is hard to imagine any appeal court in industrialised countries not exonerating a person charged with these offences based on the gross inadequacies of the trial process."

HUMANITAD

Notes to Editors:
Established in 1999, Humanitad is an international non-profit organisation dedicated to promoting peace, justice, human rights and good governance. It is Executive Producer of the Millennium Development Goals Awards which launched at the UN General Assembly Hall in 2009. It is also founding organisation of the Exemplar-Zero Initiative. Humanitad works with religious and political leaders across the globe and develops intergovernmental initiatives which serve human and planetary betterment. It recently advocated in the release of Indonesian spiritual leader Anand Krishna from hunger strike whilst detained in unlawful imprisonment. The Humanitad law delegation to the Ukraine as international observers of the Yulia Tymoshenko trial include: Former UK Senior Crown Prosecutor Jerry Prus-Butwilowicz LLB, Sir John Walsh, Professor Paul Wilson, Secretary-General Lewis Montague (Natural World Organisation) and Mike Upstone (Humanitad Director of Law and Administration).

Press release available at Democracy4us.org

# # #

Share: [icons]

### Contact

**Mike Upstone**
Humanitad
+44 7947 349 223
Email

**Matt**
Democracy4us.org
(866)880-2211
Email

### Attachments



Protesters Resisting the Forced Closure of Their Camp

Tymoshenko is arrested, hand-cuffed, and taken to detention.

Yulia Tymoshenko, Former Prime Minister of Ukraine is arrested, hand-cuffed, and taken to prison

# Exhibit 32



Former Prime Minister Yulia Tymoshenko

**Tymoshenko: Pre-trial investigation complete**

Feb 21 at 14:17 | Interfax-Ukraine
Leader of the All-Ukrainian Union Batkivschyna and former Prime Minister Yulia Tymoshenko said that the Prosecutor General's Office of Ukraine has merged two criminal cases against her into one, brought new charges against her and completed the pre-trial investigation.

Tymoshenko talked to journalists in Kyiv on Monday after questioning at the Prosecutor General's Office.

"Over two hours, they presented new charges... merged everything they had on the payment of pensions, on the Kyoto money, and the specialized vehicles for the countryside into one case, and for the third time presented me the charge for pensions and for the second time that on the vehicles...," Tymoshenko said adding that after that she was shown results of examinations, questions and then told that the pre-trial investigation was closed.

Web links to Kyiv Post material are allowed provided that they contain a URL hyperlink to the www.kyivpost.com material and a maximum 500-character extract of the story. Otherwise, all materials contained on this site are protected by copyright law and may not be reproduced without the prior written permission of Public Media at news@kyivpost.com

All information of the Interfax-Ukraine news agency placed on this web site is designed for internal use only. Its reproduction or distribution in any form is prohibited without a written permission of Interfax-Ukraine.

Design & Development by MEMO.UA

# Exhibit 33

**The Blanch Law Firm, P.C.**
White Collar Criminal Defense.
Dedicated Lawyers. Proven Results.
www.WhiteCollarFirm.com

**Securities Attorney**
Brenda Lee Hamilton, Attorney
Transactional and Going Public
www.Securitieslawyer101.com AdChoices ▷

Text size ⌐ ⌐
Print E-mail to a friend Share on Facebook Share on Twitter



The Main Investigatory Department of the Prosecutor General's Office of Ukraine has said it has completed its pre-trial investigation into a criminal case on abuse of power against Former Prime Minister of Ukraine Yulia Tymoshenko.

### Prosecutor confirms completion of investigation into case against Tymoshenko

Feb 21 at 17:17 | Interfax-Ukraine

The Main Investigatory Department of the Prosecutor General's Office of Ukraine has said it has completed its pre-trial investigation into a criminal case on abuse of power against Former Prime Minister of Ukraine Yulia Tymoshenko.

The department's press service reported that two criminal cases against Tymoshenko (under Part 3 of Article 365, Part 2 of Article 364 and Part 2 of Article 210 of the Criminal Code of Ukraine) were merged into one, and the pre-trial investigation was completed.

Tymoshenko is accused of abuse of office and power that resulted in grave consequences, as well as the violation of the legislation on budget.

"Today [on Monday] the investigator presented the final charges and announced that the pre-trial investigation was over," reads the statement.

The department also stressed that, according to the current legislation, Tymoshenko and her lawyer have to examine the materials of the criminal case, after which it will be sent to court.

On Monday, after an interrogation, Tymoshenko said that the Prosecutor General's Office of Ukraine had merged two criminal cases against her into one and completed the pre-trial investigation.

As reported, the Prosecutor General's Office opened criminal proceedings against Tymoshenko regarding the misuse of funds received by Ukraine under the Kyoto Protocol, and abuse of office while purchasing Opel Combo vehicles against government guarantees.

Tymoshenko cannot currently leave Kyiv due to a travel ban.

## related news

Tymoshenko: Pre-trial investigation complete Feb 21 at 14:17
SBU says it still has no information from Tymoshenko about phone threats Feb 21 at 12:12
Tymoshenko claims government 'terrorizing' relatives of opposition politicians Feb 21 at 12:04
Tymoshenko summoned to Prosecutor General's Office on Feb. 21 Feb 19 at 12:42

The Kyiv Post is hosting comments and forums to foster lively debate. Criticism is fine, but stick to the issues. Comments that include profanity or personal attacks will be removed from the site. If you think that a posted comment violates these standards, please flag it and alert us. We will take steps to block violators.

Comments (0) Add a comment

# Exhibit 34

Text size 

Print E-mail to a friend Share on Facebook Share on Twitter



Ukraine's state prosecutor's office has launched a new criminal case against former prime minister Yulia Tymoshenko. Joseph Sywenkyj

### Ukraine investigates Tymoshenko over Russia gas deal (updated)

Apr 11 at 19:24 | Reuters
Ukraine's state prosecutor's office has launched a criminal case against former prime minister Yulia Tymoshenko over a gas deal she reached with Russia in 2009, a senior prosecutor said on Monday.

Tymoshenko, who has already been accused in two other separate criminal cases since her rival, President Viktor Yanukovich, came to power, hit back immediately.

"They are launching new cases (against me) every day," she posted in a Twitter message.

"They are going to run out of criminal code articles soon."

First Deputy Prosecutor General Renat Kuzmin linked the case against Tymoshenko, who served twice as prime minister for relatively short periods, to a deal she reached in January 2009 with Russian Prime Minister Vladimir Putin on supplies of Russian gas.

"A criminal case has been launched against the former prime minister over abuse of power linked to the signing of gas contracts in 2009," Kuzmin told reporters

That agreement ended a stand-off that had briefly disrupted Russian gas flows to Europe. It tied the price of gas from Russia's Gazprom to spot oil prices.

As a result, Ukraine's gas bill has since been steadily rising.

Yanukovich's government has urged Russia to review the pricing formula but talks have not been successful up to now.

Tymoshenko, who accused the Yanukovich camp of using fraud to secure his election in February 2010, remains his main political rival, although she has failed to marshal other opposition parties behind her.

She says the criminal cases opened against her are politically motivated and she and her allies, some of whom have been arrested, are being victimised by Yanukovich.

Tymoshenko has been previously accused of misusing 380 million euros from the sale of carbon emission rights under the Kyoto Protocol and spending state money on vehicles that were then used in her presidential campaign.

The new criminal case was announced on the eve of a visit by Putin, whose talks with Ukrainian officials on April 12 are likely to involve energy issues.

"There is an eye-catching link between the launch of the criminal case against Tymoshenko and Putin's visit tomorrow," said Volodymyr Fesenko, an analyst at Ukrainian think tank Penta.

"(Also) it looks like there is not enough evidence in the previous cases for anything other than character attacks on Tymoshenko so they are looking for more potential charges," said Fesenko. Former president Leonid Kuchma stole the spotlight from Tymoshenko last month when prosecutors charged him over the murder of opposition journalist Georgiy Gongadze in 2000.

Exhibit 35

**COUNCIL OF SICENTIFIC AND LEGAL APPRAISAL**
**toV.M.KORETSKIY INSTITUTE of STATE AND LAW**
**of THE NATIONAL ACADEMY OF SCIENCE OF UKRAINE**

Kiev, 0601, Ukraine
art.223, h4, Triohsviatitelska
tel.278-80-46, 278-80-24, 278-81-27

**Ref. No.126/49-e**
**of March 23, 2011**

**APPROVED BY**

**V.I.Semchyk**
*signed*

Chair of the Council of
scientific and legal appraisal
to the National Academy of Science of Ukraine
doctor of law, professor, Associate member
of the National Academy of Science of Ukraine,
academician, National Academy of Legal sciences
March 29, 2011

**CONCLUSION**

of the scientific and legal appraisal concerning doctrinal interpretation and application of the respective provisions of the Constitution and legislative acts of Ukraine, regulating the activity of the Cabinet of Ministers of Ukraine, and determine the legal status of Prime Minister of Ukraine as well as certain provisions of the budget legislation of Ukraine. The appraisal has been conducted following inquiry made by Mr. B.Ye.Nechyporenko, the attorney, based on laws of Ukraine "On Advocacy", "On Scientific and Scientific and Technical Activity", and "On Scientific and Scientific and Technical Appraisal"

**I.** **The essence of the attorney's query. Matters submitted for consideration of the scientific and legal appraisal.**

On February 23, 2011, based on Law of Ukraine "On Advocacy" (Article 6), Mr. Borys Y. Nechyporenko (hereinafter referred to as the Customer or Applicant) submitted to the Council of Scientific and Legal Appraisal to V.M. Koretskiy Institute of State and Law of the National Academy of Science of Ukraine the attorney's query. In his query,the attorney stated that in the process of fulfillment of the advocatory powers he faced a need for competent explanation of certain legal provisions concerning the powers of the Cabinetof Ministers of Ukraine and Prime Minister of Ukraine, which had been in force until the Constitutional Court of Ukraine recognized as unconstitutional theLaw of Ukraine No.2222-IV of December 8, 2004concerning amendments to the Constitution of Ukraine.

In view of the foregoing, the Applicant requests to conduct a respective research and provide conclusions of the scientific and legal appraisal as to:

1) whether Prime Minister is obliged to sign the document adopted collectively at the session of the Cabinet of Ministers of Ukraine;

2) whether Prime Minister of Ukraine is (personally) legally (including criminally) responsible for signing of the document adopted collectively at the session of the Cabinet of Minister of Ukraine;

3) whether Prime Minister of Ukraine is obliged to sign the act adopted at the session of the Cabinet of Ministers of Ukraine by the majority vote of Cabinetmembersin the event such document was adopted in violation of the order or certain provisions of the legislation of Ukraine in force;

TYM_ECOV_000033

4) whether Prime Minister of Ukraine is (personally) legally (including criminally) responsible for signing of the act of the Cabinet of Ministers of Ukraine adopted collectively at the session of the Cabinet of Ministers of Ukraine by a majority vote of the Cabinet in case such document was adopted in violation of the order orlegislation of Ukraine in force;

5) considering the powers of the Prime Minister of Ukraine determined by the Constitution of Ukraine (read with Law of Ukraine No.2222-IV of December 8, 2004) and Law of Ukraine "On the Cabinet of Ministers of Ukraine" (read with Law of Ukraine of May 16, 2008):

5.1) does Prime Minister sign the acts of the Cabinet of Ministers of Ukraine or issues acts of the Cabinet of Ministers of Ukraine?

5.2) is Prime Minister entitled to instruct a Cabinet member or other head of the central executive institution or local state administration to work on and commit certain actions as to his/her field of activity in office?

6) is instruction of the Prime Minister of Ukraine mandatory for the Cabinet member or the official of the central executive body or local state administration?

7) whether a Cabinet member, head of the central executive authority or local state administration is obliged to be guided by the provisions of the legislation of Ukraine in force in making decision on executing of the order of the Prime Minister of Ukraine.

8) whether a Cabinet member, top official of the central executive body or local state administration has the right not to execute order of the Prime Minister of Ukraine if it is in conflict with the legislation of Ukraine in force;

9) whether Prime Minister of Ukraine or the Cabinet of Ministers of Ukraine was entitled or obliged to decide on exchanging foreign currency,which arrived in Ukraine under international treaties as budget revenues, into the national currency and deposit such facilities in the single treasury account of the State Treasury of Ukraine.

10) whether legislation of Ukraine in force provides for depositing of facilities arriving in Ukraine as budget revenues in the foreign currency in the single treasury account of the State Treasury of Ukraine. Whether it is permitted to keep foreign currency in the single treasury account of the State Treasury of Ukraine.

11) what is considered to be spending of funds of the special account of the State Treasury of Ukraine?

12) can an amount of money deposited with the single treasury account in certain periods be less than the amount booked in special accounts of the State Treasury of Ukraine?

II.    Legal grounds for scientific and legal appraisal:

- Query filed by attorney B.Ye.Nechyporenko on February 23, 2011.
- Law of Ukraine "On advocacy" (Article 6)
- Statute of V.M.Koretskiy Institute of State and Law of the National Academy of Sciences of Ukraine (as regards powers to conduct scientific and legal appraisals);
- Law of Ukraine of December 13, 1991, No. 1977-XII "On scientific and research-and-engineering activity (as amended);
- Law of Ukraine of February 10, 1995, No.51/95-BP "On scientific and research-and-engineering appraisal (as amended);
- Order of the Cabinet of Ministers of Ukraine No.1180 of July 2003 "On approval of the list of the fee-based services which can be rendered by state-financedscientific institutions";
- Order of the Ministry of Education and Science of Ukraine "On state accreditation of physical persons and legal entities for conducting scientific and scientific and technical appraisal" No.12 of January 12, 2004, (registered with the Ministry of Justice of Ukraine on January 26, 2004 under No.110/8709) (as amended) (paragraph 3.2 as regards powers of institutions and organizations of the national and sectoral academies of sciences of Ukraine to conduct specialized appraisal of the activity without additional accreditation based on the statutory provisions envisaging such activity.

TYM_ECOV_000033

- Resolution of the Cabinet of Ministers of Ukraine "On approval of the list of the fee-based services which can be rendered by the state-financed scientific institutions" No.1180 of July 29,2003.

III.  The scientific and legal appraisal analyzed respective provisions of the Constitution and other legislative acts of Ukraine, referred to in the following conclusion as well as scientific sources in the matter in question.

IV.  **Description of expert research, results and conclusions of the scientific and legal appraisal.**

Systemic analysis of the following provisions of the Constitution of Ukraine and other legislative acts of Ukraine, specialized legal literature, materials which accompanies the Applicant's query, as well as application of usual procedures and techniques for doctrinal interpretation of legal acts and legal rules, afford grounds for further conclusions in essence of the issued raised.

*Regarding the first, the second, the third and the fourth questions:*

*1)*  *whether Prime Minister is obliged to sign the document adopted collectively at the meeting of the Cabinet of ministers of Ukraine*

*2)*  *whether Prime Minister of Ukraine is (personally) legally (including criminally) liable for signing of the document adopted collectively at the meeting of the Cabinet of minister of Ukraine*

*3)*  *whether Prime Minister of Ukraine is obliged to sign the act adopted at the meeting of the Cabinet of ministers of Ukraine by the Cabinet of Ministers of Ukraine by majority of votes of the Cabinet in the event such document is adopted in violation of the procedure or certain provisions of the legislation of Ukraine in force.*

*4)*  *whether Prime Minister of Ukraine is (personally) legally (including criminally) liable for signing of the act of the Cabinet of Ministers of Ukraine adopted collectively at the meeting of the Cabinet of Ministers of Ukraine by a majority vote of the Cabinet in case such document was adopted in violation of the procedure or legislation of Ukraine in force.*

According to Article 113(I) of the Constitution of Ukraine, the Cabinet of Ministers of Ukraine is the superior authority in the executive power system. This means that the Cabinet of Ministers of Ukraine (the Government) heads the system of executive authorities. Thus, all other executive authorities are subordinate to, under control of and report to the Cabinet of Ministers. Article 116 (I) (9) of the Constitution, according to which the Cabinet of Ministers of Ukraine directs and coordinates the work of ministries and other executive authorities, confirms the status of the Cabinet of Ministers of Ukraine also.

The functions of the Government include the following groups.

1)  Functions of the Cabinet of Ministers of Ukraine as a collective body which are fulfilled by way of government sessions: elaboration, adoption and implementation of the national programs for economic, scientific and technical, social and cultural development of the country; formulation and realization of government policy, adoption of acts (resolutions, orders) of the Cabinet of Ministers of Ukraine; exercising the right of legislative initiative; discussion of vital issues of the life of the country and the society as well as the activity of the government itself; listening to reports of the Cabinet members and heads of other executive authorities.

Whereas the Cabinet of Ministers of Ukraine is a collective executive body, the main organizational form of its activity is the session. Prime Minister of Ukraine determines periodicity of sessions taking into account proposals of other Cabinet members. A session of the Cabinet of Ministers of Ukraine can consider any matter within the Government's competence. Prime Minister of Ukraine acts as the chair at the sessions.

2)  Functions of the Cabinet of Ministers of Ukraine performed by each Cabinet member in accordance with legal requirements or specific order of the Cabinet. Those functions includePrime Minister's direction of the work of the Cabinet and its personnel; guidance,

TYM_ECOV_000033

coordination and control of activity of ministries and other executive bodies subordinate to the Cabinet; negotiating and signing of agreements on behalf of the Government.

As stated earlier, according to Article 117 of the Constitution of Ukraine, the Cabinet of Ministers of Ukraine within its competence passes mandatory resolutions and orders. Part II of the abovementioned Article envisages that Prime Minister of Ukraine signs the acts of the Cabinet of Ministers of Ukraine.

According to Article 54(I) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine", resolutions and orders of the Cabinet of Ministers of Ukraine are passed during the Cabinet's sessions through voting by the majority of the Cabinet staff.

Article 44(7) of the Law of Ukraine «On theCabinet of Ministers of Ukraine" sets forth that Prime Minister signs the acts of the Cabinet of Ministers of Ukraine.

Therefore, Article 117(II) of the Constitution of Ukraine and Article 44(I)(7) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine" must be considered in comparison with and close connection to other legislative rules, specifically, Article 88 of the Constitution of Ukraine, whereof paragraph 3 sets forth that acts adopted by the Verkhovna Rada of Ukraine, shall be signed by the Chairman of the Verkhovna Rada.

The analysis of legal norms contained in Article 88(II)(3) of the Constitution of Ukraine, Article 117(II) of the Constitution of Ukraine and Article 44(I)(7) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine"suggest that signing by the Chairman of the Verkhovna Rada of acts passed by the Verkhovna Rada of Ukraine, and signing by the Prime Minister of Ukraine of acts passed by the Cabinet of Ministers of Ukraine is **not the right but the constitutional obligation** respectively of the Chairman of the Verkhovna Rada and Prime Minister of Ukraine. Such statement rests upon the legal nature of the Verkhovna Rada and the Cabinet of Ministers of Ukraine, which are state collective bodies. Collective form of activity and decision making of the Government result from Article 117 of the Constitution of Ukraine and are directly provided by Article 3(III) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine" according to which the Cabinet of Ministers of Ukraine is a collective body. The Cabinet of Ministers of Ukraine passes its decisions after discussion of issues during its sessions.

Thus, Prime Minister's refusal to sign an act of the Cabinet of Ministers of Ukraine passed at its session through the majority vote of the Cabinet members would mean **Prime Minister's default on its constitutional obligations, neutralize constitutional status of the Government of Ukraine as the superior executive authority and make impossible fulfillment by the Cabinet of Ministers of Ukraine of its powers.** That is why such omission by the Prime Minister would be **illegal,** whereas signing by the Prime Minister of acts passed by the Cabinet of Ministers is the **constitutional obligation of the Prime Minister of Ukraine.**

Constitution of Ukraine, Law of Ukraine "On theCabinet of Ministers of Ukraine" and other legislative acts **do not and cannot provide** for personal legal (including criminal) liability of the Prime Minister of Ukraine for signing of an act passed collectively at the Cabinet's sessions, otherwise it would contradict the legal nature of this authority and legal status of its top official. Meanwhile, Prime Minister of Ukraine can bear constitutional and legal responsibility for violation of constitutional rules.

As it is known, national legal doctrine and practice include the principle of presumption of lawful origin of the legislative act. It means that any act is in line with the legislation of Ukraine in force unless otherwise established in a proper legal manner.

As previously mentioned, the Cabinet of Ministers of Ukraine, within its competence, issues resolutions and orders referred to bylaws. They are mandatory and must correspond to the Constitution, laws of Ukraine and acts of the President of Ukraine.

The Cabinet of Ministers of Ukraine ensures and controls implementation of its acts either directly or through central executive bodies, local state administrations and other subordinate authorities.

According to the 1996 Constitution of Ukraine, acts of the Cabinet of Ministers may be cancelled by the President of Ukraine (which had been true until Law of Ukraine of

December 8, 2004, No.2222-IV was recognized unconstitutional). As for amendments to the Constitution of Ukraine, there was a rule according to which the President of Ukraine **had the right** to suspend the acts of the Government on grounds of inconformity with the Constitution with the request filed simultaneously to the Constitutional Court of Ukraine concerning their constitutionality.

Constitutional Court of Ukraine can recognize as unconstitutional the acts of the Cabinet of Ministers of Ukraine in their entirety, or their individual provisions. Such acts or their individual provisions lose effect as of the day of delivery by the Constitutional Court of Ukraine of judgment as to their unconstitutionality. Acts of the Cabinet of Ministers or their individual provisions may be also challenged in court as applicable if they violate the rights and freedoms of an individual and a citizen and do not conform to the laws of Ukraine.

Neither Constitution, nor laws of Ukraine envisage recognizing of the acts of the Cabinet of Ministers of Ukraine as illegal on the grounds of violation of the order of the Cabinet of Ministers of Ukraine.

The abovementioned suggests that Prime Minister of Ukraine **cannot** bear personal legal responsibility (including criminal) for signing of the act of the Cabinet of Ministers of Ukraine which was passed collectively at the Cabinet's session by the majority vote of the Cabinet members even if this act was passed in violation of the order or (where it is lawfully established), is in conflict with individual provisions of the Constitution and laws of Ukraine.Prime Minister of Ukraine cannot bear any other legal responsibility for fulfillment of its constitutional obligation, which is signing of the act of the Cabinet of Ministers of Ukraine passed collectively at the Cabinet's session by the majority vote of the Cabinet members.

As the function of adoption of the legislative acts if performed by the Cabinet of Ministers of Ukraine collectively during its sessions, all Cabinet members including the Prime Minister bear shared responsibility as provided by Article 47(1) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine" (as in force on February 4, 2009). In such a case,shared responsibility means equal responsibility.

According to the Constitution of Ukraine and Law of Ukraine "On the Cabinet of Ministers of Ukraine"shared responsibility of the Cabinet members is of the political nature only and shall be realized through the mechanism of passing by the Verkhovna Rada of the vote of censure resulting in dismissal of the Government.

As an element of political responsibility of such collective authority as Government, one can consider losing by the political power, which formed the Government, of voters' support at the regular parliamentary elections.

*As regards question five: Considering the powers of the Prime Minister of Ukraine determined by the constitution of Ukraine (read with Law of Ukraine No.2222-IV of December 8, 2004) and Law of Ukraine "On the Cabinet of Ministers of Ukraine" (read with Law of Ukraine of May 16, 2008):*

> *5.1) signs the acts of the Cabinet of Ministers of Ukraine or issues acts of the Cabinet of Ministers of Ukraine?*
> *5.2) does the Prime Minister have the right to instruct a Cabinet member or other authority of the central executive institution or local state administration to work on and commit certain actions as to his/her field of activity in office?*

5.1. According to the provisions of Article 117 (I) of the Constitution of Ukraine, the Cabinet of Ministers of Ukraine within its competence issues mandatory resolutions and orders. The Prime Minister shall sign part two of the abovementioned Article sets forth that acts of the Cabinet of Ministers of Ukraine.

Subject to Article 54 (I) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine", resolutions and order of the Cabinet of Ministers shall be passed at the Cabinet sessions through the majority vote of the Cabinet members. Article 44 (I)(7) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine" also sets forth that the Prime Minister signs the acts of the Cabinet of Ministers.

According to the Constitution of Ukraine and Law of Ukraine "On the Cabinet of Ministers of Ukraine", resolutions and orders of the Cabinet of Ministers of Ukraine are the acts of the collective authority approved in proper legal manner and subject to signing by the Prime Minister. That means that the Government is the agent of the issue (adoption, approval) of the acts of the Cabinet of Ministers which, according to Article 114 (I) of the Constitution of Ukraine consists of: the Prime Minister, first vice-Prime Minister, vice Prime Ministers and ministers.

The notion of issue (adoption, approval) of the act implies the process comprising the report on the draft act at the Cabinet's session, deliberations on it and voting for it by the members of the Government. Note that all Cabinet members are the participants in this process bearing shared responsibility (political and moral) for decisions made. It results from the collective nature of the Government's activity and legal rules envisaged by Article 3(I) and Article 47(I) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine".

Signing by the Prime Minister of the act passed by the Cabinet of Ministers cannot be regarded as its issuing but only as act aimed at its legal registration. Signature of the Prime Minister on the act passed by the Cabinet of ministers shall be regarded as one of mandatory elements of the legislative acts.

Thus, the powers of the Prime Minister of Ukraine include only signing of acts (resolutions and orders) passed by the Cabinet of Ministers of Ukraine. The party passing (issuing and approving) such acts, is the collective body – the Cabinet of Ministers of Ukraine, which is directly provided by Article 117 of the Constitution of Ukraine.

5.2. In accordance with Article 19 of the Constitution of Ukraine, state authorities and local government bodies and their officials are obliged to act only on the basis, within powers and in a manner envisaged by the Constitution and laws of Ukraine.

Article 114(V) of the Constitution of Ukraine (read with Law of Ukraine of December 8, 2004, No.2222-IV) sets forth that the Prime Minister manages the work of the Cabinet of Ministers of Ukraine, directs it toward implementation of the activity program of the Cabinet of Ministers approved by the Verkhovna Rada.

Subject to Article 44(I)(1) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine" (valid as of May 16, 2008, No.279-IV), the Prime Minister manages the work of the Cabinet of Ministers, directs the activity of the Cabinet of Ministers toward implementation of the domestic and foreign policy of the state, implementation of the activity program of the Cabinet of Ministers of Ukraine, approved by the Verkhovna Rada of Ukraine, and exercising of other powers of the Cabinet of Ministers of Ukraine.

Article 44 (I)(6) of the Law of Ukraine "On the Cabinet of Ministers of Ukraine", the powers of the Prime Minister of Ukraine include convocation of and chairing the sessions of the Cabinet of Ministers of Ukraine.

Thus, the law clearly divides and distinguishes the powers of the Prime Minister of Ukraine concerning management of the work of the Cabinet of Ministers of Ukraine, directing its activities and chairing its sessions.

If the Prime Minister's powers in respect of chairing of the Government's sessions raiseno questions and are evident in the essence, the powers concerning management of the work and directing of the activities of the Cabinet of Ministers deserve a deeper analysis of the legal contents of those notions.

It is necessary to point out that the active legislation of Ukraine **does not** define any forms, means or methods, which the Prime Minister can use to exercise powers in respect of management of work and directing of the activities of the Cabinet of Ministers of Ukraine. Meanwhile, it is commonly known that management and direction represent natural components of the management process, the aggregate of the focused actions and means conditioning the tasks and goals, that is, the mechanisms inherent in any system of exercise of power.

Management and direction includes situation assessment, choosing optimal management models and their implementation, etc.

Thus, in order to ensure management of the Cabinet's work and its direction toward implementation of the activity program of the Government, one needs a sufficient number of respective instruments, means and methods of approval by the Prime Minister of a managerial solution which in form and in content must be adequate for the efficient exercise of powers.

According to the generally accepted practice (managerial tradition) established since the adoption of the Constitution of Ukraine, the Prime Minister exercises the powers he/she is vested with, in the context of managing and directing of the Cabinet's work by way of:

    a) holding of sessions with the heads of central and local executive authorities with the decisions made at such sessions recorded in the minutes;

    b) issue of written orverbal instructions and directives;

    c) holding of consultations, listening to the information on settlement of certain urgent issues;

    d) decision making in respect of issues raised in the documents in the form of resolutions, etc.

The abovementioned time- and field-proven organizational forms and means of exercising of the Prime Minister's powers enable proper level of their exercising. The specified forms and means of exercising of the Prime Minister's powers correspond to his/her constitutional status, properly reflect the Prime Minister's role as the first person in the Cabinet of Ministers, that is,Chief Executive.

In fact, the abovementioned arguments were taken into account by Paragraph 9(2) of the Order of the Cabinet of Ministers of Ukraine approved by resolution of the Cabinet of Ministers of Ukraine No.950 of July 18, 2007, which sets forth that the Prime Minister, in order to direct, coordinate and control the activity of the Cabinet members, heads of other central executive authorities, Council of Ministers of the Autonomous Republic of Crimea and local state administrations, issues instructions mandatory for those authorities and officials. Prime Minister's instruction is registered as an official document of administrative regulatory nature on a special letterhead, and is not related to consideration of regular mail.

Such documents are accepted, considered and registered on the basis of Sample record keeping instruction in the ministries, other central executive authorities, Council of Ministers of the Autonomous Republic of Crimea, local executive bodies approved by resolution of the Cabinet of Ministers of Ukraine No.1153 of October 17, 1997 (as amended).

*Regarding questions six, seven and eight:*
*is instruction of the Prime Minister of Ukraine mandatory for the Cabinet member or the official of the central executive body or local state administration?*
*Whether a Cabinet member, top official of the central executive authority or local state administration is obliged to be guided by the provisions of the legislation of Ukraine in force in making decision on executing of the order of the Prime Minister of Ukraine.*
*Whether a Cabinet member, top official of the central executive body or local state administration not to execute order of the Prime Minister of Ukraine if it is in conflict with the legislation of Ukraine in force.*

It was mentioned previously, that major functions of the Cabinet of Ministers of Ukraine performed by each Cabinet member in accordance with the requirements of the law or concrete instruction of the Cabinet of Ministers of Ukraine include: a) management by the Prime Minister of the work of the Cabinet of Ministers of Ukraine and its staff; b) direction, coordination and control of activity of the ministries and other subordinate executive authorities.

Therefore, in view of constitutional and legal status of the Prime Minister as the head of the Cabinet of Ministers of Ukraine, which is the superior executive body, Prime Minister's instructions within the scope of tasks and functions are mandatory for the Cabinet members, heads of central executive authorities and heads of local state administrations.

Certainly, when making decision as to execution of the Prime Minister's order, a Cabinet member, head of central executive authority and head of local state administration **must be guided by the provisions (requirements) of the legislation of Ukraine in force.**

Article 19 of the Constitution of Ukraine says that legal order in Ukraine is based on the principles according to which **no one shall be forced to do what is not envisaged by legislation.** Article

60(I) of the Constitution of Ukraine sets forth that **no one is obliged to execute rulings or orders that are manifestly criminal.**

**Thus,** proceeding form the abovementioned provisions of the Constitution of Ukraine, a Cabinet member, head of central executive authority or head of local state administration have the right not to execute Prime Minister's rulings only if they are manifestly criminal.

**As for** incompliance of any act or document (including Prime Minister's instructions) with the legislation of Ukraine in force, such incompliance **must be established in a proper procedural manner.**

*Regarding question nine: Whether Prime Minister of Ukraine or the Cabinet of Ministers of Ukraine was entitled or obliged to adopt decisions on exchange of foreign currency arrived in Ukraine in accordance with the international treaties as budget revenues into the national currency and deposit such facilities in the uniform treasury account of the State Treasury of Ukraine.*

Article 29 (I)(1) of the Budget Code of Ukraine sets forth that budget revenues shall include other legal sources including proceeds from sale of the state-owned assets.

According to Article 13 (I) of the Budget Code of Ukraine, the budget may consist of the general and special purpose funds.

In the context of attorney's query, it necessary to note that according to Article 6(38) of the Law of Ukraine "On the State Budget of Ukraine for 2009" the sources of formation of the special purpose fund of the state budget of Ukraine for 2009 in terms of revenues shall be funds derived from the sale of the portion of the greenhouse gas quota envisaged by Article 17 of Kyoto protocol to the UNO Framework Convention on Climate Change.

Article 50(IV) of the Budget Code of Ukraine sets forth that tax, duties (compulsory payments) and other state budget revenues shall be **credited directly to the single treasury account** of the state budget and cannot accumulate in the accounts of collecting authorities. Chapter V of the same Article sets forth,that tax, duties (compulsory payments) and other budget revenues **shall be deemed to be paid to the budget as of the moment of crediting to the single treasury account of the state budget.**

Law of Ukraine "On the State budget for 2009" provided for the budget program under #2402020 "Implementation of projects, aimed at reduction of emissions or increased absorption of greenhouse gases" under which the main spending unit (Ministry of Environmental Protection) was intended to receive budget funds for UAH 50 million.

According to Article 51(V) of the Budget Code of Ukraine, administrators of the budget funds undertake obligations and make expenditures only within budget appropriations set by the cost estimate.

Meanwhile, chapter VI of this Article of the Code states that obligations without appropriation shall not be considered as budgetary, with no budget expenditures permitted to meet such obligations.

Whereas (according to Applicant's information) during 2009, the passport of budget program 2402020"Implementation of projects, aimed at reduction of emissions or increased absorption of greenhouse gases" did not arrive to the State Treasury of Ukraine, budget appropriations for the main administrator of the budget funds were not initiated. That is why the administrator of budget funds in 2009 did not register obligations under this program with the State Treasury bodies, and respectively did not submit any payment order.

Thus, funds derived from the sale of a portion of the greenhouse gases quota envisaged by Article 17 of Kyoto protocol to the UNO Framework Convention on Climate Change: a) are not state budget revenues; b) served as the source for the formation of special purpose fund of the state budget of Ukraine for 2009; c) must be credited directly to the single treasury account of the state budget of Ukraine; d) shall be deemed to be paid to the budget as of the moment of crediting to the single treasury account of the state budget of Ukraine.

The balance of funds derived in 2009 from sale of the portion of the greenhouse gas quota envisaged by Article 17 of Kyoto protocol to the UNO Framework Convention on Climate Change was deemed temporarily idle whereas the main administrator of budget funds did not demand it

under the respective program. At the same time, the abovementioned funds were not used and were supposed to remain in the respective bank accounts and accounting records.

Translation into the national currency of a portion of funds derived in 2009 from sale of the portion of the greenhouse gas quota envisaged by Article 17 of Kyoto protocol to the UNO Framework Convention on Climate Change and crediting to the special purpose accounts of the State Treasury of Ukraine and single treasury account of the state budget of Ukraine represent **execution of imperative legislative instructions envisaged by Article 50 (IV)(V) of the Budget Code of Ukraine.** Compliance with the abovementioned instructions by the Ministry of Finance of Ukraine andState Treasury of Ukraine is mandatory.

*Regarding question ten: Whether legislation of Ukraine in force provides for depositing of facilities arriving in Ukraine as budget revenues in the foreign currency in the uniform treasury account of the State Treasury of Ukraine. Whether it is permitted to keep money in the uniform treasury account of the State Treasury of Ukraine in the foreign currency.*

Article99 of the Constitution of Ukraine establishes hryvna as the monetary unit of Ukraine. Proceeding from this constitutional provision, revenues and expenditures, the deficit and other indicators of the main financial plan of the state, the State budget, shall be denoted in hryvna. This provision is axiomatical, and results from the content of the law "On the State Budget of Ukraine" for the respective current year since 1997.

According to the regulation for the single treasury account approved by Order of the State Treasury of Ukraine No.122 of June 26. 2002, single treasury account is the main account of the state.

New version of the Regulation for single treasury account approved by joint order of the Ministry of Finance of Ukraine and the State Treasury of Ukraine No.449 of November 30, 2010, adjusted definition of single treasury account, namely: "Single treasury account is the consolidated account opened for the State Treasury of Ukraine with the National Bank of Ukraine to record funds and make settlements in the electronic payment system (hereinafter referred to as the EPS) of the National Bank of Ukraine.

Terms "EPS", "technical account limit", "initial turnover limit" and "technical account" (to reflect transactions through EPS) have the meanings provided in the Instruction for interbank fund transfer in Ukraine in the national currency approved by Resolution of the Board of the National Bank of Ukraine No.320 of August 16, 2006.

According to Article 48 of the Budget Code of Ukraine (the references above and hereinafter are to the Budget Code of Ukraine read with the Law of Ukraine No.2524-III of June 21, 2001) Ukraine uses treasury form of state budget servicing which implies conducting by the State Treasury of Ukraine of:

    a) transaction on the state budget funds;

    b) cash management services of administrators of the budget funds;

    c) control of budgetary powers at crediting of revenues, undertaking of obligations and conducting of payments;

    d) bookkeeping and preparation of reporting on execution of the state budget.

Bodies of the State Treasury of Ukraine keep records of all transactions on execution of the state budget. Such record keeping must reflect all assets and liabilities of the state. State Treasury of Ukraine sets uniform rules for keeping records on all financial transactions, assets and financial obligations of the state as agreed with the Ministry of Finance of Ukraine (Article 56 (1)(II) of the Budget Code of Ukraine).

Pursuant to the abovementioned provisions of the Budget Code of Ukraine, the State Treasury of Ukraine once issued a number of orders, including Order No.119 of November 28, 2000, which approved the Charter of accounts for execution of the national and local budgets. That act envisages active first class quartic synthetic balance account 1111 "Single treasury account" intended for accounting of funds in the corresponding account of the bodies of the State Treasury of Ukraine opened with the branches of the National Bank of Ukraine.

It is necessary to note that major rules (principles) of accounting in the state-financed institutions (organizations) are based on the provisions of the Law of Ukraine "On Accounting and Financial

TYM_ECOV_000033

Records" which determined legal grounds for book keeping regulation, organization and maintenance, as well as preparation of financial reporting in Ukraine. Article 5 of this Law sets forth, in particular, that accounting shall be maintained and financial reporting prepared in the monetary unit of Ukraine, i.e. hryvna.

Hryvna being the currency of the single treasury account is confirmed also by the procedure for recording in the accounting of foreign currency transactions, approved by order of the State Treasury of Ukraine No.126 of July 24, 2001, which sets forth that:

**a) Record keeping of operations in the foreign currency shall be reflected in the accounting registers in the national currency of Ukraine (paragraph 4);**

**b) initial recognition of transactions conducted in the foreign currency shall be converted in the national currency of Ukraine using the exchange rate as of the day of transactions (paragraph 5).**

Thus, the single treasury account of the state budget of Ukraine is simultaneously:

a) a consolidated account opened for the State Treasury of Ukraine with the National Bank of Ukraine to record funds and conduct settlements in the electronic payment system in the national currency;

b) synthetic balance account (1111), intended for recording of funds in the national currency in the correspondent accounts of the bodies of the State Treasury of Ukraine opened with the branches of the National Bank of Ukraine.

According to Article 50 (IV) of the Budget Code of Ukraine, the taxes, duties (mandatory payments) and other budget revenues shall be credited directly to the single treasury account of the state budget of Ukraine. Part V of this Article sets forth that taxes, duties (mandatory payments) and other state budget revenues are deemed to be paid to the budget as of the moment of crediting to the single treasury account of the state budget.

According to Instruction for application of the Charter of accounts for execution of the national and local budgets, approved by Order of the State Treasury of Ukraine No.119 of November 28, 2000, debit of synthetic balance account 1111 "Single treasury account" shall be used for funds arriving to the general and special purpose funds of the state budget, State Treasury, its clients including administrators of funds of the national and local budgets serviced by the treasury.

Thus, proceeding from the requirements of Article 50 of the Budget Code of Ukraine, Charter of accounts for execution of the national and local budgets, as well as Instruction for its application approved by Order of the State Treasury of Ukraine No.119 of November 28, all budget revenues in 2009 were subject to crediting to the single treasury account opened for the State Treasury with the National Bank of Ukraine and at the same time to recording in the synthetic balance account 1111 "Single treasury account".

The only exception to this rules are funds received from consular activities outside Ukraine in the foreign currency. The procedure of payment of such funds to the state budget, their use and reflection in the accounting and reporting on execution of the state budget is approved by joint order of the Ministry of Finance of Ukraine and the Ministry of Foreign Affairs of Ukraine no.1505/283 of December 23, 2009.

**Whereas** (according to the Applicant's information supported by the documents), the Ministry of Finance of Ukraine and State Treasury of Ukraine, in the Report on execution of the State budget of Ukraine for 2009, demonstrated as part of revenues under code 24062400 "Funds received from the sale of the portion of the greenhouse gas quota envisaged by Article 17 of Kyoto protocol to the UNO Framework Convention on Climate Change" the amount of UAH 3 300 528 843.52, which is equivalent to EUR 319 999 892.0 (at the rate of the National Bank of Ukraine as of the date of receipt), **they were obliged to represent the entire amount in the synthetic balance account 111** "Single treasury account" with simultaneous crediting of this amount in full scope to the single treasury account opened with the National Bank of Ukraine.

Otherwise, according to the legislation of Ukraine in force, State Treasury of Ukraine and Ministry of Finance of Ukraine **had no right** to represent them in the report on execution of the 2009 state budget funds of Ukraine.

As it was already mentioned, accounting and financial reporting in Ukraine are maintained and prepared exceptionally in the national currency of Ukraine – hryvna. Thus, the single treasury account as the main account of the state must keep the money of the state budget also exclusively in the monetary unit of Ukraine.

The regime of foreign currency transactions in the territory of Ukraine, general principles of currency regulation, powers of the state bodies and functions of banks and other financial institutions of Ukraine in respect of regulation of currency transactions, rights and obligations of foreign exchange agents, etc. are determined by Decree of the Cabinet of Ministers of Ukraine "On the System of Currency Regulation and Currency Control" No.15-93 of February 19, 1993.

Article 1 of this Decree sets forth that currency of Ukraine is the only legal payment means in the territory of Ukraine accepted without limitation for payment under any claims and obligations.

Article 4(4) of the Decree establishes that authorized banks are obliged to purchase foreign currency in the interbank currency market of Ukraine on behalf and at the expense of residents to secure fulfillment of residents' commitments.

In pursuance of requirements of the Constitution and respective laws of Ukraine, the State Treasury of Ukraine, by its order No.126 of July 24, 2001, approved the procedure for representing in the accounting of foreign currency transactions, according to which:

a) record keeping on the foreign currency transaction shall be represented in the accounting registers in the national currency of Ukraine by way of translation of the foreign currency amount at the exchange rate with simultaneous representation of the foreign currency transactions (paragraph 4).

b) initial recognition of transactions conducted in the foreign currency shall be translated in the national currency of Ukraineusing the exchange rate as of the day of transaction (paragraph 5).

That means that if for representation of funds received in the foreign currency, in the balance account 1111 "Single treasury account", it is enough to translate them into the national currency (hryvna) at the respective rate of the National Bank of Ukraine, payment of those funds to the single treasury account opened with the National Bank of Ukraine requires that the State Treasury of Ukraine exchanges them into the national currency.

Thus, the systemic analysis of a number of provisions of the abovementioned legislative acts of Ukraine suggests that the **single treasury account must be maintained exceptionally in the national currency of Ukraine, i.e. hryvna, and crediting of that account with** funds paid to the state budget of Ukraine in the foreign currency is only possible after their translation into the national currency of Ukraine, i.e. hryvna.

*Regarding question eleven: what is considered to be spending of funds of the State Treasury's special account?*

According to Article 51 (VIII) of the Budget Code of Ukraine (read with Law of Ukraine No.2542-III of June 21, 2001,) the State Treasury of Ukraine makes payments by order of the administrators of budget funds including in the event when administrators of budget funds have unused budget appropriations.

Organizational relations among State Treasury bodies, administrators and recipients of the budget funds are regulated by the procedure for servicing of the state budget on spending and transactions in extending and repayment of loans provided at the expense of the state budget funds, approved by Order of the State Treasury of Ukraine No.89 of May 25, 2004.

Mechanism of appropriations by the administrators of budget funds isdetermined by the abovementioned Procedure, which provides in particular that:

1) the bodies of State Treasury of Ukraine provide cash management service for administrators of the budget funds by settlement of payments from special purpose registry account of administrators of the budget funds opened with the State Treasury bodies according to cost estimates, plans of the special state budget fund or plans of utilization of the budget funds (paragraph 12.1);

2) bodies of the State Treasury of Ukraine make payments based on payment orders on behalf of administrators and recipients of the budget funds in case of existence in the records of the

respective budget obligation and financial commitment within the limits of account balances for recording of the open appropriations (paragraph 12.3);

3) the number of payment order counterparts submitted to the State Treasury bodies shall be as required by all non-cash settlements parties;

4) a payment order must have all essential elements specified as required by the form. Payment destination line in the payment order must be filled with due regard for the requirements of legislative acts and must contain full information about the payment and documents which serve as the basis for the transfer of funds to the recipient (12.6);

5) payment orders submitted by administrators and recipients of the budget funds shall be checked by the State Treasury bodies for all required elements (paragraph 12.7);

6) administrators and recipients of the budget funds shall be responsible for correct filling-in of the settlement document including account numbers and bank codes, tax amounts and budget classification codes, etc.;

7) all transactions of the State Treasury bodies must be reflected in the respective documents serving as grounds for their representation in the records, and contain precise information about the nature of the transaction (12.12);

8) bodies of the State Treasury of Ukraine providing cash management services for the administrators of budget funds by way of posting of payments from their accounts and the accounts of recipients of the budget funds shall provide the administrators with the statements of account on completed transactions at the conclusion of the previous operating day with the mark in the form of treasurer's stamp saying "Paid" (paragraph 12.14).

Summing up the above, it should the stated that:

a) legislation of Ukraine in force regulated the issue of spending exceptionally by main administrators of budget funds including from special purpose accounts;

b) funds in the special purpose registration accounts may be spent only by order of main administrators of the budget funds;

c) bodies of the State Treasury of Ukraine perform exceptionally the functions of control and servicing as regards spending transactions;

**Thus, spending of funds from the special purpose account of the State Treasury of Ukraine represents writing-off of moneys from special purpose registration accounts of the main administrators of the budget funds exceptionally by their order with those transactions reflected in the respective accounting records and in the financial reports.**

*Regarding question twelve: Can an amount of money deposited with the uniform treasury account in certain periods be less than the amount booked in special accounts of the State Treasury of Ukraine?*

According to the charter of accounts for execution of the national and local budgets approved by Order of the State Treasury of Ukraine No.119 of November 28, 2000, other first class second order accounts 12 "Budget funds in other banks" and 13 "Deposits placed" are envisaged in addition to first class quartic synthetic balance account 1111 "Single treasury account" (Chapter 11 "Budget funds in the National Bank ) which consolidates the funds of sub-accounts opened with the State Treasury by the directorate of the State Treasury of Ukraine.

So, those accounts book funds of the state budget (general and special purpose funds) not reflected in the first class quartic synthetic balance account 1111 "Single treasury account" and 1711 "Subaccounts of the single treasury account". Consequently, those funds cannot be placed in the single treasury account with the National Bank of Ukraine (as well as in technical accounts of the State Treasury and its territorial branches) in the electronic payment system of the National Bank of Ukraine whereas they are physical placed in other banking institutions.

On the other hand, the same funds can be booked in the first class tertiary synthetic accounts 312 "special purpose state budget funds appropriated for special purposes", whereas spending of those funds by the main administrators of budget funds did not take place and they did not change the owner (main administrator).

Substantive representation and booking entries of the respective transactions on the state budget funds are conducted in accordance with orders of the State Treasury of Ukraine No.119 of November 28, 2000, and No.23 of February 11, 2002.

TYM_ECOV_000033

According to paragraph 4.2. of the Procedure of payment to the state budget and use of funds received from consular activities outside Ukraine in the foreign currency, and their representation in the books and reposts on execution of the state budget approved by joint order of the ministry of finance of Ukraine and ministry of foreign affairs of Ukraine No.1505/283 of December 23, 2009, funds received from consular activities outside Ukraine in the context of special purpose fund of the state budget shall be regarded as the revenues of the special fund of the state budget without transfer from abroad to the foreign currency account of the State Treasury of Ukraine in the country.

Thus, proceeding from the aforementioned, the balance of funds in the single treasury account opened with the National Bank of Ukraine may be less than actual balance of the special fund of the state budget of Ukraine.

Overall conclusion:

1. Signing by the Prime Minister of acts adopted by the Cabinet of Ministers of Ukraine is the constitutional duty of the Prime Minister of Ukraine.

2. Prime Minister of Ukraine **is obliged** to sign the act of the Cabinet of Ministers of Ukraine even if during its adoption the requirements of the order were not met. The matter of principle is that the majority of votes of its members adopt the act collectively at the cabinet's session.

3. Prime Minister bears no other legal responsibility (including criminal) but constitutional and legal responsibility for signing of the act adopted collectively at the session of the Constitution of Ukraine.

4. Prime Minister cannot bear personal legal responsibility (including criminal) for signing of the act adopted collectively at the session of the Cabinet of Ministers of Ukraine even if the act was adopted in violation of the order or contradicts individual provisions of the Constitution and laws of Ukraine.

5. Prime Minister's powers include signing but not issuing of acts (resolutions and orders) adopted by the Cabinet of Ministers of Ukraine. Such acts shall be adopted, issued and approved by the collective body – the Cabinet of Ministers of Ukraine.

6. Prime Minister of Ukraine is entitled to give instructions to thesubordinate executive authorities and their officials. Such instructions are the form and the means of exercising of powers of the Prime Minister as the chief executive.

7. When executing the order of the Prime Minister, a Cabinet member, top official of the central executive authority or local state administration must be guided by the provisions (requirements) of the legislation of Ukraine in force.

8. A cabinet member, head of central executive authority or head of local state administration have the right not to execute Prime Minister's rulings only if they are manifestly criminal.

9. According to Article 50(IV-V) of the Budget Code of Ukraine, decision on conversion of the foreign currency which arrived in Ukraine as revenues of the state budget, into the national currency, and crediting of those funds to the single treasury account of the State Treasury if **mandatory**. In this case, the funds paid by the National Bank of Ukraine as commission for the abovementioned conversion are not losses of the state whereas they are still owned by the state.

10. Single treasury account must be maintained exceptionally in the national currency of Ukraine (hryvna), and crediting to such account of funds paid to the state budget of Ukraine in the foreign currency is possible only after their conversion into the national currency of Ukraine.

11. Spending of funds from the special purpose account of the State Treasury of Ukraine represents writing-off of moneys from special purpose registration accounts of the main administrators of the budget funds exceptionally by their order with those transactions reflected in the respective accounting records and in the financial reports.

12. The balance of funds in the single treasury account opened with the National Bank of Ukraine may be less than actual balance of funds of the special fund of the state budget of Ukraine.

**Experts in law sciences:**

V.P.Nagrebelnyji
*signed*
Director
Center for banking and finance law
to V.M.Korertskyi Institute of State and Law
of the National Academy of Sciences
Cand. Sc. {Law}
Associate member of the National Academy of Legal Sciences of Ukraine

O.V.Batanov
Cand. Sc. {Law}
Senior research fellow
Department of constitutional law and local government
V.M.Korertskyi Institute of State and Law
of the National Academy of Sciences of Ukraine

Kyiv
March 23, 2011

TYM_ECOV_000033

# Exhibit 36

June 17, 2011

## **Fact Findings: Kyoto/Opel**

**Background:** Former Prime Minister Yulia Tymoshenko has been charged in the Ukraine with abuse of power and improper use of budgetary funds related to the handling of revenues received in 2009 from the exchange of carbon emission credits under the Kyoto Protocol. *These charges are referred to below as the "Kyoto charges."*

Tymoshenko has also been charged with abuse of power related to Ukraine's purchase of 1000 Opel Combo vehicles and other medical equipment under a contract with Austrian company Vamed Engineering GmbH & Co KG. *These charges are referred to below as the "Opel Combo charges."*

Covington & Burling LLP and BDO USA have been asked by Yulia Tymoshenko and the Batkivschina Party to examine the validity of the charges brought against her as well as the validity of a report, funded by the Government of Ukraine, conducted by the American law firms Trout Cacheris and Akin Gump. Their report was presented on October 14, 2010 and served as the basis for the subsequent charges against Tymoshenko on February 21, 2011.

# **Overview of Facts:**

- The Government of Ukraine's American lawyers claim to have facts to support the allegations they made in their October 14, 2010, report. But, we have yet to be given access to supporting evidence. Aside from a handful of inconclusive documents, the government's American lawyers have refused to provide materials that they used to write their report about Tymoshenko. This directly contradicts their public offer "to study the documentary evidence to test the validity of [their] conclusions, professional opinions and the investigation as a whole." *It raises the question of the validity of their report if there is no supporting documentation to substantiate the charges.*

- In addition, the Ukrainian government has not responded to our request for these materials.

**Impact of Lack of Transparency:** This lack of transparency does not allow us to reach the principal conclusions set forth by the Government of Ukraine and its American lawyers with respect to the Kyoto and Opel Combo sections of the October 14, 2010 report and the corresponding charges that Covington & Burling and BDO USA are examining.

The publicly available documents do not allow us or anyone else to ferret out the truth or gain a full understanding of the investigation by the Government of Ukraine and its American lawyers. They do not allow anyone to understand the facts involved or test the validity of their conclusions, professional opinions, or investigation as a whole.

> **Finding:** *Unless this supporting evidence is provided, the Kyoto and Opel Combo Sections of the October 14, 2010 report are not worth the paper they are printed on.*

## Main Findings of Interim Report--Kyoto Charges:

What we have been able to independently uncover is striking enough to justify this interim report and to demand that the Government of Ukraine make available the documentation to support its prosecution of Tymoshenko. *At present, the allegations against the former prime minister appear to be political in nature because there does not appear to be facts to substantiate the charges.*

**With respect to the Kyoto charges, we are able to state the following:**

- First, in 2009, the National Environmental Investment Agency (NEIA) of Ukraine entered into four (4) agreements with various Japanese companies and one (1) agreement with Spain's Ministry of Environment for the exchange of carbon emission credits under

Article 17 of the Kyoto Protocol.  Under the Agreements, Ukraine received approximately €320 million in 2009 and €150 million in 2010 for a total of €470 million in exchange for 47 million carbon emission credits.  *The proceeds Ukraine received under these Agreements are referred to below as "Kyoto Revenues."*

- The €320 million of Kyoto Revenues received in 2009 was the equivalent of UAH 3,300,528,843.52 in Ukraine's local currency, the Hryvnia.  This amount was recorded as the 2009 balance of Ukraine's special fund account designated for use by the NEIA (under the Ministry of Environmental Protection) for implementing the environmental projects required by the Kyoto Agreements.  *This special fund account is referred to below as the "Kyoto Special Purpose Account."*

- The documentation we have been able to review makes clear that the Kyoto Special Purpose Account balance of approximately UAH 3.3 billion as of the date of receipt remained constant throughout the period at issue, with none of the Kyoto Revenues expended in 2009.  *Because this account balance remained the same as on the date of receipt, any allegation that Prime Minister Tymoshenko "used" these funds contrary to their target purpose is patently untrue.*

- Of course, like cash that Ukraine receives from any revenue source, whether taxes or other levies, the State Treasury managed the cash received from the Kyoto Revenues within its vested powers and according to the needs of the moment.  Just as it usually would be, some of the money was first converted into Ukraine's local currency.  Although this resulted in a small commission fee, Ukraine did not suffer any state loss as a result given that the fee was simply paid from one state agency to another and the National Bank returned more than this amount in profits to the state budget in 2009.

- Ukraine's State Treasury operates in a manner similar to the way banks operate.  As depositors make deposits into their savings and checking accounts, the bank records an obligation to each depositor.

The cash itself may be commingled with the cash of other depositors but the bank's obligation to each depositor remains intact until the depositor decides to use the funds available to it. The bank on the other hand takes the cash and uses the cash to make loans or investments with the understanding that the depositor could require the funds at any time. Through the use of asset and liability management techniques, a bank, like a state treasury, retains sufficient cash on hand or borrowing facilities available to meet its commitments to depositors. This is not only the way banks work, it is also the way countries' manage their finances, including Ukraine.

- In this context, cash is fungible and controlled by the Treasury. Thus, the movement of cash is not informative. Rather, what is significant are the books and records of the Treasury, which establish that from the date of receipt, the Kyoto Revenues were required to be used to fund greening measures. *Because this restricted use was properly accounted for, the movement of cash did not affect the Kyoto Special Purpose Account balance.*

- The first expenditure of Kyoto Revenues did not occur until December 2010 **(after former Prime Minister Tymoshenko left office)** in the amount of UAH 117,382,696.50. According to government documentation, it is clear that this amount was spent and that no other prior withdrawals to pay any state expenses were made. *Thus, as of December 29, 2010, the balance of the Kyoto Special Purpose Account essentially consisted of the original amount less this expenditure in 2010.*

- Consistent with our findings, the Government of Ukraine has been assuring Japan since May 2010 that all Kyoto Revenues were fully accounted for. *A June 2010 Government commissioned report by a large Ukrainian accounting firm also did not find any concerns with how the Kyoto Revenues had been handled.*

- Japanese officials are apparently content with how the Kyoto Revenues were used and transferred and have confirmed that the

country has no objection to purchasing carbon emission credits from Ukraine in the future as a result of the handling of these revenues under the Tymoshenko Government. Had any of the Japanese companies or Spain's Ministry of Environment considered Ukraine in breach of any obligation under the Kyoto Agreements, the Parties could have sent a notice of default to Ukraine and terminated the Agreement pursuant to the enforcement provisions therein.

- Instead, the New Energy and Industrial Technology Development Organization (NEDO) of Japan paid an additional €150 million to Ukraine for the exchange of carbon emission credits in 2010, with Spain's Ministry of Environment paying an additional €108. *These amounts were transferred to Ukraine following a reported investigation by the Japanese into the allegations of misuse by the Yanukovych Government, which is strong evidence that the Kyoto Revenues were handled in a manner consistent with the Parties understanding of the terms of the Kyoto Agreements and the Kyoto Protocol itself.*

**Conclusion:** The charges by Ukraine's Prosecutor General and the claims made in the report either ignore or do not adequately address the facts outlined above. They follow the cash. They do not look at or address the accounting records. They make conclusions that are not supported by the facts.

## Main Findings of Interim Report--Opel Combo Charges:

- With respect to the Opel Combo charges, there is no dispute that in early 2009, Ukraine's Ministry of Health determined that the country's regional health departments were in "urgent need" of specialized vehicles. The Ministry of Health found that the health of Ukraine's rural population at that time was "significantly worse than that of urban people," with rural health care service providers lacking "instruments required for performing the simplest diagnostic and

treatment procedures," such as ultrasound machines and infant incubators.

- To address this urgent need, state-owned enterprise Ukrmedpostach entered into a contract with Vamed for the provision of medical equipment, including 1,000 Opel Combo vehicles. The hope was that "[f]itting out primary medical and sanitary care institutions with modern medical equipment and means of transport [would] make it possible to render expert medical care and qualified emergency care to patients residing in [Ukraine's] distant and hard-to-reach areas."

- **The limited set of documents we have reviewed make clear that the Vamed contract was a direct commercial contract between Vamed and Ukrmedpostach, in which no other intermediaries were involved.**

- The financing arrangements for the first phase of the Vamed contract, including its reliance on guarantees and servicing from Ukrainian and Austrian governmental entities, follow well-established international practices for supporting a major export transaction.

- To finance the bulk of the Vamed contract, an Austrian private bank, Unicredit, furnished a €85 million loan to a Ukraine governmental entity, Ukrmedpostach, at an annual interest rate of 5.5%.

- This loan was guaranteed by the Ukraine Government acting through its Cabinet of Ministers and Ministry of Finance. This guarantee is expressly referenced in the financing agreement.

- In addition, the Austrian government operates through its official Export Credit Agency, OeKB, a program for financing Austrian value added exports, such as the Opel Combo vehicles sold to Ukraine. As mentioned in the Financing Agreement, OeKB furnished two types of coverage to Unicredit on behalf of Austria.

- Again, as typical in emerging markets, the Ukrainian Export-Import Bank, Ukreximbank, provided banking, foreign exchange, and other

related services for the loan. Since Ukreximbank is a Ukrainian state entity, Ukraine is essentially paying itself the commission fees associated with the loan servicing.

- As noted by the Government of Ukraine's American lawyers, Vamed initially offered to sell Opel Combos at €16,039 per vehicle. After further negotiation, Ukraine ultimately purchased a different model of Opel Combo vehicles at €12,500 per vehicle.

- Based on government documentation that we have reviewed, the price paid for the Opel Combo vehicles was at or below market price, with a Ukrainian Ministry of Economics Review specifically opining that the per vehicle manufacturer's price for the Opel Combo vehicles ranged between €16,000 - €18,000. Our own research confirms that the price Ukraine paid for the Opel Combo vehicles appears to be no worse than market price.

- Even the Government of Ukraine's American lawyers could not find that the Vamed contract involved any *quid pro quo* or other personal benefits to those negotiating it, including former Prime Minister Yulia Tymoshenko.

- On June 9, 2011, the European Parliament expressed concern regarding the "increase in selective prosecution of figures from the political opposition in Ukraine, . . . particularly in the case of Ms. Tymoshenko," and stressed "the importance of ensuring the utmost transparency in investigations, prosecutions and trials," warning "against any use of criminal law as a tool to achieve political ends." **Our review of the facts thus far fully justifies the European Parliament's concerns.**

**Conclusion:** The facts we have found appear to be a complete defense of the charges in the Ukraine or in another international forum if a fair trial cannot be had there.

   **Once our investigation is complete, we understand that our findings will be published on the official website of Yulia**

Tymoshenko and circulated by her and/or her party to
governmental entities in the European Union and other countries,
and international organizations.