# Exhibit 43





**Prosecutors detain yet another official in case against Tymoshenko**

Dec 29, 2010 at 17:09 | Interfax-Ukraine

The General Prosecutor's Office has launched a criminal case against the director of the state enterprise Ukrmedpostach Mykola Petrenko.

The criminal proceedings were launched on a charge of "violation of the current legislation by the officials of the Cabinet of Ministers in 2009 when purchasing 1,000 Opel Combo vans listed as ambulance cars," the press service of the Prosecutor General's Office reported on Wednesday.

Petrenko is charged with a criminal offence under part 5 of Article 191 of the Criminal Code, the large-scale embezzlement to the tune of half a million hryvnias.

Petrenko was detained on Dec. 28, 2010.

The pre-trial inquiry continues.



Web links to Kyiv Post material are allowed provided that they contain a URL hyperlink to the www.kyivpost.com material and a maximum 500-character extract of the story. Otherwise, all materials contained on this site are protected by copyright law and may not be reproduced without the prior written permission of Public Media at news@kyivpost.com

All information of the Interfax-Ukraine news agency placed on this web site is designed for internal use only. Its reproduction or distribution in any form is prohibited without a written permission of Interfax-Ukraine.

Design & Development by MEMO.UA

# Exhibit 44

1. U.S. INVESTIGATES CRITICAL SUPPLIER OF RUSSIAN GAS
RosUkrEnergo AG supplies billions of dollars of gas to Ukraine
Europe's Energy Security Is at Heart of Concerns; Opaque Ownership Queried

By Glenn R. Simpson and David Crawford
The Wall Street Journal, New York, NY, Friday, April 21, 2006

The Justice Department is investigating Rosukrenergo AG, the company that
supplies billions of dollars in Russian and Central Asian natural gas to
Ukraine, according to people in Europe and the U.S. with knowledge of the
inquiry.

Representatives of Swiss-registered Rosukrenergo and of Raiffeisen
Investment AG, a subsidiary of Vienna-based Raiffeisen Bank AG that holds
50% of Rosukrenergo's shares for undisclosed owners, met recently with
investigators from the department's organized-crime section at Justice
Department headquarters in Washington, these people said. They discussed
the company's opaque ownership, though further details of what has drawn
the attention of U.S. officials remain unclear.

Spokesmen for Raiffeisen and Rosukrenergo declined to comment. Drew
Wade, a Justice Department spokesman in Washington, said he couldn't
confirm or deny the existence of a criminal investigation.

Rosukrenergo, whose cloudy workings and ownership structure have been
attacked as a threat to Europe's energy security and Ukraine's political
stability, is now reconsidering plans for a public share offering that
would have required disclosure of the company's true owners, people close
to the company said.

The other half of Rosukrenergo is owned by OAO Gazprom, the state-
controlled Russian gas titan. Officials from Gazprom, Russia and Ukraine
have denied they know the identities of the shareholders behind the
Raiffeisen stake.

The latest developments for the company -- which has become a political
issue in Ukraine and has drawn concern from Western government officials --
are likely to heighten concerns among Western nations about the reliability
of Russian energy supplies amid high prices and growing tensions between
the West and the Kremlin.

The U.S. investigation is also likely to prove uncomfortable for Moscow
as it seeks to use its current Group of Eight presidency to champion energy
security, and could increase concerns in Western Europe over Gazprom's
efforts to buy energy assets there.

On Wednesday, Gazprom warned European Union diplomats at a meeting in
Moscow against thwarting its efforts to expand into Western Europe, saying
in a statement that it could sell its gas supplies to China and North
America instead of to EU countries, which now get a quarter of their gas
from Russia. About 80% of that gas moves through Ukraine.

Doubts about Rosukrenergo's ownership structure and affiliates prompted its
auditors to resign in November, according to a resignation letter from the
Vienna office of KPMG International that was obtained by Global Witness, a
London-based, left-leaning, privately funded nonprofit organization that
promotes the emerging world and investigates corruption, and that was
reviewed by The Wall Street Journal.

In the letter, KPMG said Rosukrenergo may be part of a larger undisclosed business group, presenting an unacceptable risk to KPMG's reputation. A KPMG spokesman said he was unable to comment.

Rosukrenergo is at the heart of a bitter political struggle in Ukraine, where President Viktor Yushchenko has come under attack for giving the company the central role in a deal with Gazprom to provide gas to Ukraine in January. Mr. Yushchenko has defended the arrangement as the only way to get an acceptable gas price for Ukraine, but opponents say it invites corruption and opens Ukraine to influence by Gazprom and unidentified businessmen.

In a lengthy forthcoming report, Global Witness provides new details about the origins of Rosukrenergo, and assembles a 15-year history of arbitrage by opaque middleman companies given the lucrative right to sell Central Asian gas to Ukraine via Gazprom's pipelines. people familiar with the matter corroborated key details of its account.

The report says two other little-known companies with ties to Gazprom received energy deals to convey gas to Ukraine, before Rosukrenergo. One of the firms, Hungarian-registered Eural Trans Gas, has numerous ties to Rosukrenergo, the group said. Among other things, Eural Trans Gas was part-owned by an investment company where a British businessman named Robert Shetler Jones served as a director. Mr. Jones was one of the primary founders of Rosukrenergo. Spokesmen for Eural Trans Gas and Mr. Jones had no comment.

Another Gazprom partner highlighted in the Global Witness report is Itera Group, which played a similar role in selling gas to Ukraine. Itera is a Russian company that has an affiliate in Florida. The company came under investigation by the Federal Bureau of Investigation in 2002, according to an article at the time in Barron's, which is published by Dow Jones & Co., publisher of the Journal.

The probe resulted in no charges, but the previous interest and the affiliate's presence in the U.S. could give the Justice Department jurisdiction to inquire into Rosukrenergo affairs. An Itera spokesman in Florida didn't return a call for comment. -30-

# Exhibit 45

Case 1:11-cv-02794-KMW   Document 23-19   Filed 12/19/11   Page 7 of 49

12/18/11                    The St. Petersburg Times - Local News - U.S. to Investigate Gazprom's ...

# The St·Petersburg Times

Issue #1164 (30)
Tuesday, April 25, 2006

## Local News

## U.S. to Investigate Gazprom's RosUkrEnergo

**By Catherine Belton**
Staff Writer

MOSCOW — The U.S. Justice Department is investigating RosUkrEnergo, the secretive gas trader that has a monopoly on billions of dollars in gas sales to Ukraine, people familiar with the situation say.

The Swiss-registered company, half owned by Gazprom and half by unidentified beneficiaries, has come under growing scrutiny after it landed a lucrative role as Ukraine's monopoly gas trader in a controversial Jan. 4 deal between Gazprom and its Ukrainian counterpart, Naftogaz Ukrainy.

Former Ukrainian Prime Minister Yulia Tymoshenko has branded the deal a threat to European and Ukrainian energy security, w le one of her top aides, Olexander Turchinov, has said he investigated the company for possible links with international organized crime when he headed Ukraine's security service, the SBU, last year.

One person familiar with the situation said RosUkrEnergo executives two months ago traveled to the United States, where "there was a conversation" with Justice Department officials about the group's structure.

While that source said there had been no follow-up since then, another person with knowledge of the situation said U.S. officials had recently requested information about RosUkrEnergo from the Austrian government.

Austria's Raiffeisen Bank holds the 50 percent of RosUkrEnergo not owned by Gazprom on behalf of the unknown beneficiaries.

Justice Department spokesman Drew Wade said he could not "confirm or deny the existence of criminal investigations." The Wall Street Journal reported Friday that investigations were under way.

The company is expected to come under new pressure following the publication Monday of a detailed report on Ukrainian gas deals by Global Witness, a highly respected London-based nongovernmental organization that investigates corruption in the natural resources sector. A Global Witness investigation into the role of so-called blood diamonds in funding armed conflicts in Africa helped kick-start the Kimberley Process for closer monitoring of the global diamond trade, and led to the group being nominated for a Nobel Peace Prize.

The report focuses on the new monopoly role taken by RosUkrEnergo and calls on Ukrainian President Viktor Yushchenko to clean up endemic corruption in the energy sector. It also urges Russia to use its presidency of the G8 this year to end the use of opaque intermediary companies in gas trading.

The Gazprom-Naftogaz Ukrainy deal highlights the threat posed to European energy security by putting middlemen with a murky ownership structure in control of supplies to Ukraine via Gazprom pipelines, the report says. Europe relies on Russia for about one-quarter of its gas imports, and 80 percent of Russian exports to Europe pass through Ukraine.

"Without transparency there cannot be predictability, and without predictability there cannot be security of energy supply," says the 64-page report, a copy of which was made available to The St. Petersburg Times.

European concerns about energy dependence on Russia reached new heights when Russia cut off supplies to Ukraine during a standoff over prices at the beginning of the year, which led to shortfalls to Europe. In the Jan. 4 deal, RosUkrEnergo — previously an intermediary in Turkmen-Ukrainian sales — gained a monopoly over all sales of Russian and Central A          to Ukraine.

Tymoshenko has criticized the deal, which almost doubled gas prices for Ukraine, as a way for Russia to win back control over the country.

The Global Witness report delves into more than a decade of gas deals between Turkmenistan and Ukraine involving intermediary gas traders with unclear ownership structures.

Starting with the notoriously opaque regime of Turkmen President Saparmurat Niyazov, Global Witness cites bank documents showing that the vast majority of the billions of dollars made by Turkmenistan in annual gas sales never made it to the poverty-stricken country's budget. Instead, it says, they are kept in Frankfurt, in a Deutsche Bank foreign currency fund. Sole control of the account rests with Niyazov.

From Turkmenistan, the report investigates a series of traders in Turkmen-Ukrainian gas deals starting with

President Leonid Kuchma. Respublika was followed by independent gas producer Itera, which had close ties to the Turkmen regime. Next was Eural Trans Gas, and finally RosUkrEnergo. Unclear ownership of these middlemen has led to billions of dollars in revenues being unaccounted for, the report says. RosUkrEnergo was set up in 2004 to replace its discredited predecessor Eural Trans Gas, but it has retained many of ETG's directors, including three British citizens, Robert Shetler-Jones, David Brown and Howard Wilson, the report says.

Concerns over RosUkrEnergo's ownership structure led KPMG to resign as the trader's auditor. Global Witness said Friday, citing a letter from KPMG to RosUkrEnergo. "The political situation in Ukraine and various allegations raised by the international press contain a risk of reputational damage to our company. … An adequate assessment of these risks is not possible," says the letter obtained by Global Witness, which is dated Oct. 17, 2005.

ETG was founded in 2002 in a Hungarian village by Zeev Gordon, an Israeli lawyer who for more than 20 years has represented Semyon Mogilevich, a Ukrainian-born suspected organized-crime boss wanted by the FBI.

Gordon told Global Witness that he had been asked to set up ETG by Ukrainian citizen Dmitry Firtash, the director of Highrock Holdings, a Cyprus-based holding company.

Global Witness said Firtash was also the chairman of Nitrofert, a fertilizer plant in Estonia, which shares the same trading company as Crimean Soda Plant, which is owned by Shetler-Jones. The trading company, ACI Trading, has the same Cyprus-based nominee shareholders as a series of investment vehicles that owned ETG in 2004. The investment vehicles were directed by Shetler-Jones and Brown, the report says.

When reached by telephone Friday, Shetler-Jones, who has held a position on the coordinating committee of RosUkrEnergo, refused to comment on the Global Witness and Wall Street Journal reports.

Turchinov said in an interview in Kiev last month that his investigations into RosUkrEnergo and ETG had uncovered the involvement of Mogilevich, Kuchma and Firtash. Turchinov has said the investigation was closed down after Tymoshenko was fired last September and he stepped down as SBU chief.

The current chief of the SBU, Igor Drizhchany, has denied there was ever any investigation into RosUkrEnergo by the SBU under Turchinov.

While Yushchenko has stood by the Jan. 4 gas deal, Tymoshenko has called for it to be canceled.

The rift between Yushchenko and Tymoshenko over the deal was a major campaign issue in last month's Ukrainian parliamentary elections and is hampering attempts to build a new government coalition out of the Western-leaning parties run by the two former leaders of the Orange Revolution. Tymoshenko's party came in second in the elections; she wants to be prime minister again.

Gazprom spokesman Sergei Kupriyanov said Friday that so far there was no alternative to retaining RosUkrEnergo as the broker in the Ukrainian gas deal. He said RosUkrEnergo's business was "transparent enough," while Gazprom's stake in the trader was transparent too. The ownership of the other 50 percent, he said, was a question for Ukraine.

"We clearly defined our position," he said, referring to Gazprom's calls earlier this year for Ukrainian gas monopoly Naftogaz Ukrainy to buy the stake.

Naftogaz has said, however, that it has not received any response to its proposals to buy the stake. Naftogaz president Oleksiy Ivchenko told a news conference in Kiev on Friday that his inquires into who was behind the stake had reached a dead end.

"Should Ukraine seek further explanations? Yes, we have made requests to various institutions, including Gazprom, one of RosUkrEnergo's owners," he said, Reuters reported.

When contacted by telephone Friday, Wolf        tschek, an executive at Raiffeisen Investment Group and a director of Centragas, the Vienna-based entity through which the unknown beneficiaries control half of RosUkrEnergo, declined to comment and referred all calls to Merlin, a London-based PR agency that represents Centragas.

Michael Rommel, a director at Merlin, refused to comment Friday.

© The St. Petersburg Times 1993 - 2011

# Exhibit 46

Case 1:11-cv-02794-KMW    Document 23-19    Filed 12/19/11    Page 10 of 49

12/18/11                    WikiLeaks cables link Russian mafia boss to EU gas supplies | World ne...

theguardian

Printing sponsored by:

Kodak
All-in-One Printers

The US embassy cables



# WikiLeaks cables link Russian mafia boss to EU gas supplies

Semyon Mogilevich, one of FBI's most wanted people, identified as real power behind billionaire owner of Ukrainian-based RUE

**Luke Harding**
guardian.co.uk, Wednesday 1 December 2010 16.30 EST

A larger | smaller




US embassy cables show the Russian mafia boss Semyon Mogilevich is linked to RosUkrEnergo gas company. Photograph: FBI/AFP/Getty Images

## We have received a legal complaint from lawyers acting for Dmitry Firtash about this article. Mr Firtash complains that the contents of the article are untrue.

Gas supplies to U_____ and EU states are linked to the Russian mafia, according to the US ambassador in Kiev.

H___le, released by WikiLeaks, followed statements by the then prime minister of Ukraine, Yulia Tymoshenko, to the BBC that she had "documented proof that some powerful criminal structures are behind the RosUkrEnergo (RUE) company".

Allegations have long swirled that the Russian crime don Semyon Mogilevich had covert i terests in Swiss-registered RUE, which distributes gas from central Asia.

12/18/11                    Case 1:11-cv-02794-KMW    Document 23-19    Filed 12/19/11    Page 11 of 49

WikiLeaks cables link Russian mafia boss to EU gas supplies | World ne...

A billionaire Ukrainian businessman, Dmitry Firtash, nominally owns nearly half the company. (The Russian state firm Gazprom owns the other half.) In a confidential meeting with the ambassador, Firtash admitted Mogilevich was the real power behind his own multibillion-dollar gas interests. He insisted it was impossible to do business in Ukraine in the 1990s without striking sleazy deals with organised criminals.

In a secret memo the ambassador, William Taylor, wrote: "He [Firtash] acknowledged ties to Russian organised crime figure Semyon Mogilevich, stating he had needed Mogilevich's approval to get into business in the first place." Taylor said the "softly spoken" Firtash had come to see him on 8 December 2008 and "spoke at length about his business and politics in a visible effort to improve his image with the USG [United States government]".

H                           ly "self-interested", Taylor said. "In a lengthy monologue Firtash described his evolution as a businessman from his beginnings as a food trader to the creation of RUE ... He was adamant that he had not committed a single crime when building his business empire and argued that outsiders still failed to understand the period of lawlessness that reigned in Ukraine after the collapse of the Soviet Union."

Taylor grilled the oligarch about his alleged ties to Russian organised crime. The Ukrainian press had widely reported that RUE's circle of true beneficiaries included Mogilevich. Firtash countered that it had been impossible to approach a government official for any reason "without also meeting an organised crime member".

The cable stated: "Firtash acknowledged that he needed, and received, permission from Mogilevich when he esta lished various businesses, but he denied any close relationship to him."

Other cables said the two men were closely linked through "joint holdings in offshore vehicles" and "mutual personal relationships". They also share the same la

[This update was inserted on 7 December 2010: Following publication of this cable, Dmitry Firtash issued a statement denying that Semyon Mogilevich had ever had any partnership or holding or other direct or indirect commercial associations or business interests with him. See footnote.]

During his frank conversation with the ambassador, Firtash launched an attack on Tymoshenko. A                    locked in a power struggle with her former Orange Revolution ally Viktor Yushchenko, who was president. Firtash called himself Yushchenko's "close friend" and confidant, and his anger was understandable. A month before he met the ambassador, Tymoshenko had reached a provisional agreement with the Russian prime minister, Vladimir Putin, to abolish all intermediaries in the murky gas trade with Russia. The deal – still unimplemented – was specifically drawn up to get rid of RosUkrEnergo.

The US says Mogilevich is one of the world's top mafia bosses, accusing him of creating eastern Europe's most powerful crime group in the 1990s. He is on the list of the FBI's 10 most wanted fugitives for his alleged part in a multimillion-dollar fraud involving a Pennsylvania-based company in the 90s.

The Russians arrested Mogilevich in 2008 over tax evasion at a cosmetics chain. But in 2009 he was mysteriously released. Russia's interior ministry described the charges against him as "not of a particularly grave nature". The cable is deeply embarrassing for Ukraine's new pro-Russian president, Viktor Yanukovych. Firtash, the founder and chairman of Group DF, is one of the main oli

real estate, and he owns an influential U                    tation.

In his cable Taylor noted that the gas trade had made Firtash staggeringly rich: "By 2006 Firtash's estimated worth was over $5bn, but most experts believed that Firtash had low-balled his true worth and estimated it was in the tens of billions. In his conversation with the ambassador Firtash gave no indication of the scope of his wealth."

• This article was amended on 7 December 2010 to update with a response issued by Dmitry Firtash. His full statement appears here http://www.groupdf.com/News_301.asp

© 2011 Guardian News and Media Limited or its affiliated companies. All rights reserved.

;

# Exhibit 47



Yulia Tymoshenko says court curtailing evidence linking Boyko, RosUkrEnergo.

**Tymoshenko, Boyko clash over gas deal**

Aug 16 at 19:23 | Staff and wire reports

Ex-Prime Minister Yulia Tymoshenko's press service claims that Pechersk District Court Judge Rodion Kireyev and state prosecutors are trying to restrict Tymoshenko's attempt to connection between Minister of Energy and Coal Industry Yuriy Boyko and RosUkrEnergo.

Boyko testified he has no connection with RosUkrEnergo.

According to the Party of Regions press service, Boyko also said that the main point for signing gas contracts with Russia in 2009 was the debt of industrial and financial corporation "United Energy Systems of Ukraine" (UESU) to the Ministry of Defense of Russian Federation. He said this during his speech in the court room of Kyiv Pechersk District Court on Aug. 16, where he arrived as a witness in the "gas case" of Tymoshenko.

"I believe that the main point, which forced to sign this agreement, was the debt of corporation UESU, headed by Yulia Tymoshenko," he said, according to Interfax-Ukraine. Boyko said that he considers the agreement of 2009 disadvantageous for Ukraine. "I consider that the contract was extremely disadvantageous for Ukraine... There were extremely tough sanctions," he stressed.

According to Boyko, the argument of Tymoshenko was the need to remove the intermediary. However, he said, under the intermediary, the gas price was $179 for 1,000 cubic meters, "and after it was removed by Tymoshenko decision, the price wasn't diminished, but it was doubled."

But Tymoshenko website states: "The court must establish the cause, nature and factors leading to losses at Naftogaz that are being attributed to our government. It is necessary to establish the corrupt relationship between Boyko and RosUkrEnergo. It must be proven that he works not in the interests of the state, but in the interests of the company RosUkrEnergo. Everyone knows, and by the way this is public information, provided by Dmytro Firtash himself, that he [Yuriy Boyko] is one of the founders of RosUkrEnergo."

Tymoshenko said that, during the questioning of witness Boyko, the court repeatedly disallowed Tymoshenko's questions to Boyko regarding his ties to RosUkrEnergo. After the minister finally said that he has no relation to RosUkrEnergo, Tymoshenko reminded him of the criminal responsibility for perjury.

"If Yuriy Boyko didn't want under oath to confirm his participation in the meeting of founders of RosUkrEnergo, which is obvious, then I will ask him a different question: does he know Dmytro Firtash and what is the nature of their relationship, in order to establish the connection between the minister and the criminal company RosUkrEnergo," Tymoshenko added.

Tymoshenko's defense lawyer Yuriy Sukhov then asked the court to add to the case record a copy of the signatures from the minutes of the meetings of founders of RosUkrEnergo, which purportedly include Boyko. "If the witness doesn't understand the 'paper,' we ask the court to give the witness this document for review. This is an excerpt from the inaugural meeting on the founding of RosUkrEnergo," Sukhov said.

Prosecutor Oleksandr Mykytenko objected to the document being added to the case file. "The defense must justify how this relates to the indictment. The defense has given no justification. Therefore, there is no reason to enter it," Mykytenko said.

Ultimately, the court refused to add the document to the case file and gave it to Boyko for review.

Web links to Kyiv Post material are allowed provided that they contain a URL hyperlink to the www.kyivpost.com material and a maximum 500-character extract of the story. Otherwise, all materials contained on this site are protected by copyright law and may not be reproduced without the prior written permission of Public Media at news@kyivpost.com

All information of the Interfax-Ukraine news agency placed on this web site is designed for internal use only. Its reproduction or distribution in any form is prohibited without a written permission of Interfax-Ukraine.

Exhibit 48

**PRICEWATERHOUSE COOPERS** 🄫

**Rosukrenergo AG**
**Zug**

**Report of the Statutory Auditors**
**to the General Meeting**
**on the Financial Statements for**
**the period from 22 July 2004**
**to 31 December 2005**

31 March 2006/00433888001/5/tk

PricewaterhouseCoopers is represented in about 148 countries worldwide and is Switzerland in Aarau, Basle, Berne, Chur, Geneva, Lausanne, Lucerne, Lugano, Neuchâtel, Sion, St. Gall, Thun, Winterthur, Zug and Zurich and offers Assurance, Tax & Legal and Advisory services.

Rosukrenergo AG, Zug

Notes to the financial statements 2006

**1.    Notes in accordance with Article 663b of the Swiss Code of Obligations**

| | | December 31, 2006 USD | December 31, 2006 CHF |
|---|---|---|---|
| 1.1 | Pledges on assets to secure bank loans | 527 722 294 | 665 485 212 |
| 1.2 | Fire insurance value of tangible fixed assets | 138 581 | 180 000 |
| 1.3 | Amounts due to pension funds | 21 805 | 26 737 |

**2.    Other disclosures**

**2.1    Business model**

The company operates as a gas trading company and as such purchases gas in Central Asia, from where the gas is transported towards Eastern Europe for sale to customers in Ukraine, Slovakia, Hungary, Poland and Estonia.

Both the purchase and sale as well as the transportation of the gas are based on long-term frame contracts, whereby most of the trading transactions are executed with JSC Naftogaz of Ukraine, the state-owned Ukrainian gas company. During the financial period under review the gross margin amounted to 38% before and 20% after transportation expenses.

**2.2    Ownership structure**

The company is jointly owned by two Austrian companies being Arosgas Holding AG and Centragas Holding AG.

The sole ultimate beneficial owner of Arosgas Holding AG is JSC Gazprom, whereas the ultimate beneficial owners of Centragas Holding AG are Messrs D Firtash (90%) and I Fursin (10%).

**2.3    Related parties**

The company has as part of its trading activities business relations with the following related parties (in alphabetical order):
- Emfesz Kft, Hungary
- Gazexport Ltd, Russia
- JSC Gazprom, Russia
- NitroFert JSC, Estonia
- ZMB GmbH, Germany
- ZMB (Schweiz) AG, Switzerland
- Zangas GmbH, Austria

Further, the company has granted loans to its two direct shareholders and has received loans from JSB Gazprombank.

Exhibit 49

Westlaw.

5/3/07 Reuters News 00:00:00

Reuters
Copyright 2007 NOVECON

**May 3, 2007**

**ROSUKRENERGO**: Net Profit Up 4.0%

In 2006, the **ROSUKRENERGO** gas trader saw its net profit grow by 4.0% year-on-year to $785 million.

Company receipts rose by 65% to $7.11 billion (with 50.1 billion cu m of gas supplied to Ukraine and 8.96 bcm to Europe. **ROSUKRENERGO** cited the falling profitability of gas supplies to Ukraine: in the first quarter of 2006 **ROSUKRENERGO** sold Russian gas, which cost higher than the price at which it was supplied to Ukraine; in the fourth quarter of 2006 the same happened when the price of Central Asian gas went up.

Source: VEDOMOSTI, May 3, 2007

---- INDEX REFERENCES ---

NEWS SUBJECT: (CIS (1CI65); World Organizations (1IN77); Corporate Financial Data (1XO59); Corporate Events (1CR05); Business Management (1BU42))

REGION: (Europe (1EU83); Ukraine (1UK09); CIS Countries (1CI64); Eastern Europe (1EA48))

Language: EN

OTHER INDEXING: (ROSUKRENERGO)

Word Count: 91
5/3/07 REUTERS 00:00:00
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 50

Text size

Print E-mail to a friend Share on Facebook Share on Twitter



Ukrainian billionaire Dmytro Firtash used to control the supply of natural gas to Ukraine.

### Gas man Firtash on rise again in Yanukovych era

Apr 9, 2010 at 00:22 | John Marone

One of Ukraine's more controversial tycoons is regaining influence in Kyiv and Europe. But it remains to be seen how high he will fly again.

Dmitry Firtash, whose lucrative gas-trading empire was dealt a death blow by former Ukrainian Prime Minister Yulia Tymoshenko in her last year of power, has returned to prominence under President Viktor Yanukovych.

Now Firtash appears to be more powerful than ever and eager to cash in on his alleged campaign support for Yanukovych. He refused to be interviewed for this story.

In Europe, Firtash is ahead in a legal battle that could cost the Ukrainian state – meaning its taxpayers – billions of dollars.

However, analysts and insiders say it's doubtful that Firtash will regain his position as a key intermediary in the lucrative gas trade in which Ukraine serves as a large consumer and a major transit nation.

This week, Ukraine's financially moribund state oil and gas company, Naftogaz, confirmed that it had lost the first leg of a legal battle with Firtash.

Swiss-registered RosUkrEnergo, which Firtash co-owns along with Russian state-controlled gas giant Gazprom, was cut out last year by Tymoshenko as the monopoly importer of gas from Russia.

And, after lengthy litigation, the Arbitration Institute of the Stockholm Chamber of Commerce ruled against Naftogaz, awarding RosUkrEnergo $197 million for breach of contractual obligations.

Naftogaz's press service said the award was only 9 percent of what RosUkrEnergo had asked for in damages, putting the total claim at more than $2 billion. However, another ruling by the Stockholm court is expected this summer and could amount to several billion dollars.

The case centers on 11 billion cubic meters of gas bought from Gazprom on privileged terms but allegedly expropriated from RosUkrEnergo by the government of Tymoshenko, who has publicly denounced both

RosUkrEnergo and Firtash as "criminal."

Losing control over this gas could spell more trouble for the already debt-laden Naftogaz, which has struggled to make monthly gas payments to Russia. And Ukraine's chances of winning this second ruling just got worse, after a team of Firtash confidantes filled the corridors of Yanukovych's presidential administration and new government.

Yuriy Boyko, dubbed by Tymoshenko as one of RosUkrEnergo's "godfathers" and a close Firtash associate, has regained his job as Ukraine's energy minister. In addition, two executives from a Firtash-owned chemical group, Ostchem, now head key subsidiaries of Naftogaz: Sergey Vinokurov for gas transporter UkrTransGaz and Yuriy Borisov for gas producer UkrGazVudobuvania.

Other reputedly Firtash-friendly administration officials include Serhiy Lyovochkin, who heads the presidential administration and Valery Khoroshkovsky, who heads the country's State Security Service, a spy agency known by the SBU acronym.

Khoroshkovsky was deputy head of the SBU last year, when the successor organization to the KGB raided the offices of Naftogaz, then under the control of Tymoshenko.

Many, in fact, fear that Firtash could regain his status as monopoly intermediary under Yanukovych.

"Is it really good for Europe to have these people in charge of energy policy in Ukraine?" asks Thomas Mayne of Global Witness, a London-based transparency watchdog.

Global Witness, funded by the European Union and other donors, released a report in 2006 called "It's a Gas: Funny Business in the Turkmen-Ukraine Gas Trade. It highlighted the energy security risk posed by companies such as RosUkrEnergo, by virtue of government decisions took on crucial yet "non-transparent" roles in a system that supplies Europe with a quarter of its gas.

Last year, Russian Prime Minister Vladimir Putin joined Tymoshenko and the European Union in questioning the transparency of intermediaries – even though Putin had previously sanctioned them.

After agreeing with Tymoshenko to cut RosUkrEnergo out, Putin said: "[The Ukrainians] had to have a middleman so they can receive dividends, and finance their political campaigns."

Putin added: "From our side, RosUkrEnergo is 50 per cent-owned directly by Gazprom, but from the Ukrainian side, there are some individuals. We don't know them. But they again are showing us this Mr. Firtash, with whom I have never met, never seen with my own eyes."

Some in Kyiv believe Moscow used the scheme to back Ukrainian politicians who spouted anti-Western foreign policies. But given the Kremlin's own recent criticism of RosUkrEnergo, as well as that of others, it is unclear whether Moscow is interested in resurrecting such schemes.

Vadym Karasiov, who served as political advisor to ex-president Viktor Yushchenko, attributes the return of the Firtash team to their political support for Yanukovych. Karasiov called the support of Firtash, who controls lucrative titanium, chemical and media assets, decisive in Yanukovych's victory over Tymoshenko.

"Without Dmitry Firtash there wouldn't have been a victory," he said.

A Firtash representative said the tycoon's holding company did not back Yanukovych's election bid. But Firtash was himself unavailable for comment to answer whether he, as a citizen, had done so.

The support came in the form of cash, air time on Inter TV channel, which Firtash's people admit he has an interest in, and contacts in Moscow, according to Karasiov.

"They gave him [Yanukovych] support, and more than that, they are now his favorites," Karasiov said.

However, the Firtash team is unlikely to win over Yanukovych completely, Karasiov said. "They will eventually fade … They want their gas back and a lower price on future gas sales," Karasiov said.

Additionally, Firtash and company would have to push out the likes of powerful Yanukovych supporter Rinat Akhmetov, Ukraine's richest billionaire.

In Europe, Firtash also may run into opposition. Analysts and insiders alike say it's unlikely that the new energy team in Kyiv will be able to justify the creation of an intermediary company like RosUkrEnergo in the future – now that Ukraine's international partners are alert to such schemes.

"We don't see that intermediaries in the current situation would in any way alter the fundamental challenge Ukraine faces in its gas sector, which is to adjust end-user as well as domestic producer prices to market levels," World Bank country director Martin Raiser said.

A European lawmaker with knowledge of Firtash's Group DF said the firm is rolling back its presence in London and Brussels, including a non-profit group called the British-Ukrainian Society.

On the website of the British-Ukrainian Society, Robert Shetler-Jones, a top executive at Firtash's Group DF, is listed as one of the society's directors.

The chairman of the society is listed as British Conservative MP Richard Spring. According to the European lawmaker contacted by the Kyiv Post, Firtash had been paying British Conservative MP Richard Spring tens of thousands of pounds in consultancy fees.

Spring could not be reached for comment when this edition of the Kyiv Post went to press.

*Kyiv Post staff writer John Marone can be reached at marone@kyivpost.com.*

## related news

Russian Refugees Apr 9, 2010 at 00:42
Throughout history, Russian leaders have sought to suppress dissent by driving critics into exile – or worse Apr 9, 2010 at 00:07
Constitutional Court reverses itself again, votes to legitimize Yanukovych's ruling force in parliament Apr 9, 2010 at 00:03
Will Obama meet with Yanukovych? Apr 8, 2010 at 23:56

The Kyiv Post is hosting comments and forums to foster lively debate. Criticism is fine, but stick to the issues. Comments that include profanity or personal attacks will be removed from the site. If you think that a posted comment violates these standards, please flag it and alert us. We will take steps to block violators.

Comments (9) Show Add a comment

## Add your comment

Name:
Guest

E-Mail:

Exhibit 51

**From:** Paul Manafort [mailto:pmanafort@davismanafort.com]
**Sent:** Monday, August 25, 2008 6:22 PM
**To:** Brad Zackson; Rick Gates
**Subject:** VISION STATEMENT

Rick and Brad

I have revised the Vision Statement. It was too wordy and self promting. Since our meeting created the strategy, this document is meant to be a summary and a prod to move now. We don't need to promote.

What I have not included is a recommendation on what the next steps are if approved. We should have a checklist organized for me to review this week of what would be the next steps if DF signs off on the Vision Statement. This checklist should include the following (I believe)

1. Amount of each Fund

2. Structure

3. Split between GP and LP

4. Date to commence each Fund

5. Other

1

## CMZ Ventures - Global Real Estate Funds

### Overview

The purpose of this document is to outline CMZ Venture's vision and plan with respect to the global real estate industry. We focus on the investment strategy and our vision for maximizing returns to our investors.

The foundation of the vision is to establish two separate real estate funds:

- One will focus on distressed real estate opportunities solely in the United States
- The second will focus on opportunities in Eastern Europe and the Caucuses

These funds will run in parallel but will focus on separate markets globally, and will have different objectives, strategies and ultimately exit opportunities.

### Investment Strategy

The vision of CMZ Ventures goes beyond a basic model of acquisition and disposal of an asset. The key aspects of our vision include:

#### Single Investor Funds
- CMZ is prepared to have a diversified group of shareholders or a single shareholder, depending on the interest of the main investor. The advantages of a single investor include less exposure, more flexibility, less reporting requirements and the ability to organize off-shore to maximize the return of the investor.

#### Property Asset Classes
- The capacity to operate the Funds as integrated real estate companies, covering management, development, leasing, finance, sales and marketing.
- Off market real estate opportunities with exclusive rights among multiple asset classes
- Asset turn-around and redevelopment where appropriate
- Targeting existing income producing property, repositioning and redeveloping existing property to enhance performance, more efficient leasing, management and operations, distressed and new property development.

#### Diversification
- Diversification through investing across asset classes and geographical areas
- Co-investing that will lead to investment in a much greater number of properties and its own equity in deals
- Not more than 15% of the Fund's capital can be invested in any one asset
- Acquisitions through individual purchases, portfolio acquisitions through REITs, public and private companies and institutions

#### Leverage

CMZ will use a leverage strategy that incorporates minimizing upfront equity in a deal, while maximizing its equity position through participation as a day-to-day operating partner and co-developer. This will enable CMZ to generate additional revenue in a transaction at different stages of the deal.

- In our model, CMZ will contribute 10% of the equity and we will source the remaining 90% through a third-party sponsor. The third party would have share control; however, CMZ would have management control of the opportunity.

- We are using a conservative debt/equity ratio of 66% of the value of a deal, which will allow for a tremendous increase in overall buying power available to CMZ. As an example, with a $500 million fund established by CMZ, we will be able leverage buying power to $15 billion.

- The leveraged equity will allow our funds to take full advantage of the current weakness in various global markets, by magnifying the amount of real estate we can acquire below replacement cost for as long as weak market conditions prevail.

CMZ's third party equity groups typically have a 3-5 year outlook for their investments. Therefore, CMZ will be prepared to restructure or take out its partners and hold the real estate for its long term income and appreciation.

## US Real Estate Fund

CMZ will establish a US real estate fund to take immediate advantage of the distressed nature of the US property market. Currently, the market has high value opportunities being sold at substantial discounts. However, many of these opportunities are not available to the general investor. Our personal and unique relationships afford us exclusive and first consideration of many select properties in the United States.

While other global markets have different factors impacting its development, there are several key drivers that will continue to affect the distressed nature of the US market.
- Though distress first appeared in residential sub-prime, it is now spreading to commercial real estate assets e.g. where sponsors are getting caught in the credit squeeze, creating a pressure to refinance or shed assets.

- The "distress" in many cases relates only to the financial health of a specific sponsor, while the real estate fundamentals are good. The "distress" is the opportunity.

- With the tightening of credit markets, there is great opportunity for players with equity, especially now that loan to value ratios have fallen

- In today's real estate investment climate, the driver of success will be players experienced in operations in different stages of the real estate cycle and long

term ROI growth strategies. Speculation will cease to be a viable strategy as it has been in the past.

- Interest rates remain at or near historical lows in the US, giving advantage to credit worthy buyers

These factors will greatly provide our team with several advantages in operating a US real estate fund.  At present, our team has already identified multiple real estate opportunities in the US that will provide significant revenue generation.

## International Real Estate Fund

Based on the meetings in Monte Carlo and the presentation of the vision by the principal as relates to the ultimate disposition of current real estate assets (and identified assets not yet ready for development) CMZ is prepared to establish an international real estate fund.

The purpose of this Fund is to immediately combine the strengths of the principal and his projects with the flexibility of a western partner with access to the commercial and financial marketplaces. Rather than wait until the projects are completed, CMZ believes the opportunity exists today to create the Fund to accelerate the realization of return on the projects of the principal. The developments can be specifically constructed with an eye on the financial markets and exit strategies that will allow the principal to benefit while still maintaining control over many of the assets.

## Future Positioning

Our vision to establish two real estate funds is based on providing the most flexible exit terms at the appropriate time. In addition to the reasons outlined above on the advantages of two separate funds given the diverse nature of real estate markets in various parts of the world, two separate funds will provide investors with flexible exit options.

Because some of the real estate projects can be treated in many ways over a longer period of time, some investors may want to exit in 3-5 years while others might prefer to take advantage of the longer term appreciation of the projects.  Other options include:

- Keeping each fund distinct allowing for two separate exit scenarios at different times.
- Consolidating both funds at a strategic time to maximize total value.
- Expanding one or both funds depending on the growth and returns of each fund
- Taking one or both of the funds public through an IPO process

Regardless of the ultimate exit strategy, the dual nature of our real estate vision and structure will provide optimal flexibility to our investors.

# Exhibit 52

CMZ VENTURES, LLC
ALATAU HOSPITALITY LIMITED
INOVALIS S.A.
c/o The Dynamic Group
1501 Broadway - 25th Floor
New York, NY 10036


July 16, 2008


440 Park Avenue Owner Associates LLC
Dakotah Travel Co. LLC
c/o Macklowe Properties
General Motors Building
767 Fifth Avenue
New York, NY 10153

RE:    Drake Hotel Site

Gentlemen:

This letter of intent sets forth the terms and conditions under which an affiliate of CMZ Ventures, LLC, Alatau Hospitality Limited and Inovalis S.A. (collectively, "CAI") will be prepared to enter into a purchase and sale agreement (the "Purchase Agreement") with 440 Park Avenue Owner Associates LLC and Dakotah Travel Co. LLC (collectively, "Joint Venture Partner") for the properties described below (the "Properties"). The terms are as follows:

| | |
|---|---|
| Properties: | Marketable fee simple interest in the properties whose addresses appear on Exhibit A annexed hereto, in the Borough of Manhattan, City, County and State of New York and the pending contract (the "Pending Contract") and development rights described on said Exhibit A. The Properties presently permit as of right development of one or more structures consisting of approximately 600,000 square feet above grade and an additional 120,000 square feet below grade. |
| Background: | The Properties were assembled by affiliates of the Macklowe Properties controlled by Harry and William Macklowe (collectively, "Macklowe"). On the date hereof, the sole tenant/occupant at the fee Properties is Audemars at 40 East 57th Street, as an occupant pursuant to a lease termination agreement with a warrant of eviction and stipulation. |

Page 2
July 16, 2008

Purchase Price:

$850,000,000.00 paid at the closing of the transaction (the "Closing"), less any previously funded deposit and any interest accrued thereon, and any additional amounts necessary to close under the Pending Contract. It is CAI's intention to fund the acquisition with approximately $224,000,000.00 of preferred equity, assuming the existing first mortgage held by Deutsche Bank in the approximate sum of $513,000,000.00 and by obtaining mezzanine financing of up to the maximum amount of $336,000,000.00. The Joint Venture Partner shall not be obligated to cause Deutsche Bank to permit the assumption, and the Closing shall not be conditioned on any assumption, of the existing first mortgage. Likewise, CAI may elect to place an alternative first mortgage on the Properties.

Deposit:

On or prior to the earlier of (i) ten (10) days after the full execution and delivery of this letter of intent or (ii) the execution and delivery of the Purchase Agreement, CAI will deliver an earnest money deposit of $10,000,000.00 (the "Initial Deposit") to the account of a mutually acceptable escrow agent (the "Escrow Agent"). If the parties are unable to agree on an acceptable Escrow Agent, this letter of intent shall automatically terminate and be of no further force or effect. The Initial Deposit shall be held in an interest bearing account and shall be fully refundable to CAI until the end of the Due Diligence Period (as hereinafter defined). The Initial Deposit shall be increased to $50,000,000.00 upon the expiration of Due Diligence Period (the "Additional Deposit") which, combined with the Initial Deposit, shall be non-refundable except as otherwise set forth in the Purchase Agreement. In the event CAI fails timely to make the Initial Deposit, this letter of intent shall automatically terminate and be of no further force or effect.

Purchase Agreement:

CAI and Joint Venture Partner shall proceed diligently toward the execution of a Purchase Agreement. The Purchase Agreement shall contain customary representations and warranties from Joint Venture Partner, provide for cooperation by Joint Venture Partner on tenant issues and on assistance with the intended development and provide for Joint Venture Partner to make the existing due diligence material (such as environmental reports, title reports, survey, leases, correspondence with existing tenants, architects' plans and other matters pertaining to the intended development of the Properties) in its possession available to CAI and its representatives.

Page 3
July 16, 2008

| | |
|---|---|
| Due Diligence: | CAI shall have forty (40) days after the execution and delivery of this letter of intent to perform due diligence (the "Due Diligence Period"). Joint Venture Partner shall provide CAI, its authorized agents and representatives with access during the Due Diligence Period to inspect the Properties and conduct such investigations as CAI deems appropriate including, without limitation, engineering studies, Phase I and Phase II environmental studies, lease reviews, tenant file reviews, architectural material review and such other matters requested by CAI to confirm its interest in the project. Joint Venture Partner also agrees to provide CAI, its authorized agents and representatives, true and complete copies of the due diligence items and documents described on Exhibit B annexed hereto. Joint Venture Partner shall provide such due diligence items and documents to CAI by no later than two (2) business days after the full execution and delivery of this letter of intent. |
| Survey/Title: | The Purchase Agreement shall specify the required state of title and permitted exceptions thereto. The title insurance policy shall be issued by Royal Abstract. |
| Confidentiality: | Neither Joint Venture Partner nor CAI shall make any public announcement with respect to the proposed purchase and sale of the Properties without the prior written consent of the other party. |
| Broker: | Each of the parties represents to the other that no broker has been involved in this transaction and agrees to indemnify the other from breach of the foregoing representation by the indemnifying party. |
| Closing: | Provided that CAI has not terminated the Purchase Agreement on or prior to the expiration of the Due Diligence Period, the Closing shall occur within sixty (60) days from the expiration of the Due Diligence Period, time being of the essence as to CAI's obligation to close on said date. Notwithstanding, upon increasing the deposit by $25,000,000.00 (to $75,000,000.00 in the aggregate) prior to the expiration of such 60-day period, CAI may extend the Closing date for one additional thirty (30) day period, which date shall be time of the essence as to CAI's obligation to close. |
| Closing Costs: | Joint Venture Partner will bear its specific costs associated with the transaction, including transfer taxes and its own legal costs. CAI will bear its specific costs associated with the transaction, including its due diligence and its own legal costs and all recording |

Page 4
July 16, 2008

fees, and all title and survey costs. All operating costs will be prorated at Closing, with the day of Closing belonging to CAI. CAI and Joint Venture Partner shall share the fees of the Escrow Agent, if any.

Assignment:    CAI, or its affiliated entity that executes the Purchase Agreement, shall have the right to assign the Purchase Agreement to a subsidiary or affiliated entity controlled and principally owned by CAI. No such assignment shall release the original purchasing entity in the Purchase Agreement from any liability or obligation under the Purchase Agreement.

Exclusivity:    Seller agrees that for twenty-one (21) days from the date hereof: (a) to discontinue active marketing of the Properties and any current negotiations for the sale of the Properties, (b) not to enter into any new negotiations with any third parties for the sale of the Properties, and (c) not to solicit purchase offers for the Properties from other parties, unless CAI does not proceed to Closing on or before the expiration of the Due Diligence Period. This paragraph constitutes the binding obligation of the Joint Venture Partner until this letter of intent terminates or expires or the Purchase Agreement has been executed and delivered by both parties or the expiration of the foregoing 21-day period, whichever is earliest. In the event CAI fails timely to make the Initial Deposit, this letter of intent and the exclusivity provided herein shall automatically terminate and be of no further force or effect.

Joinder by Joint
Venture Partner:    Joint Venture Partner acknowledges having reviewed the Restated Term Sheet dated July 3, 2008 among CMZ Ventures, LLC, Alatau Hospitality Limited and Inovalis S.A. (the "Joint Venture Agreement") as well as the letter among CMZ Ventures, LLC, Alatau Hospitality Limited and HP Luxembourg dated July 3, 2008 regarding, *inter alia*, the entity structure, management, capital, financing and fees agreed upon by the parties in connection with the acquisition of the Properties. At the election of Joint Venture Partner to be made prior to the execution of the Purchase Agreement, either Joint Venture Partner or an entity affiliated with Macklowe may acquire an interest in the project owner, subject in all respects to the Joint Venture Agreement, the nature and terms of which are to be negotiated between the parties and will be reflected in the Purchase Agreement. In the event Joint Venture Partner elects to acquire greater than a ten (10%) percent interest, the mezzanine lender shall receive an equity kicker of up to five

Page 5
July 16, 2008

(5%) percent (prorated to the extent of changes in equity or mezzanine debt, to insure the anticipated return of Inovalis S.A.). Joint Venture Partner shall not acquire more than twenty (20%) percent of the project owner. Joint Venture Partner will, at its election, be listed as a joint developer of the Properties, and shall participate in the day to day management of the project owner, but final decisions shall be made by the Board as described under "Management" in the Joint Venture Agreement. Development fees shall be divided: one-third (1/3) to CMZ; one-third (1/3) to Alatau; and one-third (1/3) to Joint Venture Partner. All of the fees shall be paid as provided in the Joint Venture Agreement, and Joint Venture Partner shall pay its proportionate share of fees due pursuant to the letter with HP Luxembourg.

Project Owner
Structure:

The parties shall explore alternative project owner structures intended to reduce transfer tax exposure. Seller shall be entitled to the benefit of any reduction in transfer tax by reason of an identity in interest (to the extent it participates in the purchasing entity) or otherwise. There shall be no obligation to proceed with any alternative structure, absent the consent of CAI and the Joint Venture Partner; provided that CAI shall make every effort to structure the transaction with reduced transfer tax exposure.

The purpose of this letter of intent is to set forth the mutual intent of CAI and Joint Venture Partner to negotiate and attempt to enter into a Purchase Agreement and an Operating Agreement (assuming Joint Venture Partner elects to participate in the project owner). Neither CAI nor Joint Venture Partner shall be legally bound to purchase or sell the Properties unless and until a Purchase Agreement containing terms, conditions and provisions satisfactory to both CAI and Joint Venture Partner has been executed and delivered by both parties. Notwithstanding the foregoing, the parties acknowledge and agree that the provisions of this paragraph and the paragraphs entitled "Exclusivity", "Broker" and "Closing Costs" will be binding and enforceable against the parties. The terms of a fully executed Purchase Agreement shall fully supersede the terms of this letter of intent. Notwithstanding that either or all parties may expend substantial efforts and sums in anticipation of entering into a Purchase Agreement (including the efforts and sums involved in CAI's due diligence), the parties acknowledge that in no event will this letter of intent be construed as an enforceable contract to sell or purchase the Properties and that each party accepts that risk.

[SIGNATURES ON THE FOLLOWING PAGE]

Page 6
July 16, 2008

If the foregoing accurately reflects our understanding, kindly execute a confirmatory copy in the lower lefthand corner.

Very truly yours,

CMZ Ventures, LLC

By: _____

Alatau Hospitality Limited

By: _____

Inovalis S.A.

By: _____

Agreed and Accepted:

440 Park Avenue Owner Associates LLC

By: _____

Dakotah Travel Co. LLC

By: _____

## EXHIBIT A

FEE PARCELS

| Owner | Property Address | Block / Lot |
|---|---|---|
| 440 Park Avenue Owner Associates LLC | 440 Park Avenue, New York, NY | 1292 / 33 |
| 440 Park Avenue Owner Associates LLC | 44 East 57th Street, New York, NY | 1292 / 44 |
| Dakotah Travel Co. LLC | 40 East 57th Street, New York, NY | 1292 / 145 |

PENDING CONTRACT (EXCHANGE AGREEMENT FOR FEE INTEREST)

| Current Owner | Property Address | Block / Lot |
|---|---|---|
| T&A Holdings, L.L.C. | 42 East 57th Street, New York, NY | 1292 / 45 |

DEVELOPMENT RIGHTS

| Property Address | Block / Lot |
|---|---|
| 38 East 57th Street, New York, NY | 1292 / 46 |
| 46 East 57th Street, New York, NY | 1292 / 43 |
| 48 East 57th Street, New York, NY | 1292 / 42 |
| 50 East 57th Street, New York, NY | 1292 / 41 |

I:\Users\ElizRR\Cohen A\Drake Site\Exhibit A.doc

## EXHIBIT B

### Due Diligence Items and Documents

1.     Copies of current property tax bills and statements of current assessed values.

2.     Statement of insurance coverage by policy type.

3.     Copies of "as built" plans and specifications, including the actual floor area, measurements and floor diagrams for the Properties only to the extent in Macklowe's possession.

4.     Most recent Seller's issued policy of title insurance.

5.     Most recent Seller's survey of the Properties only to the extent in Macklowe's possession.

6.     Copies of all leases, any amendments, guaranties, letters of credit, letter agreements, assignments and subleases relating thereto and all other agreements relating to occupancy of the Properties to the extent in Macklowe's possession.

7.     Engineering, environmental and physical inspection reports generated by third parties in Seller's possession or control regarding the Properties, including soil reports and maintenance records for mechanical equipment.

8.     Copies of all architectural plans prepared for or at the direction of Seller.

9.     Copies of existing loan documents with Deutsche Bank.

# Exhibit 53

To     David Brown
From:    Rick Gates
Subject:    Global Real Estate Fund - Next Steps
Date:    January 9, 2009

Following our conversation earlier this week in regards to your meeting with DF, please find below the immediate next steps required to establish and implement the Fund. This document reflects the agreements reached in Paul's last meeting in December with DF.

Action Item
Completion Date

1.    Finalize structural, tax, and legal issues pertaining to the Fund.        January 23

2.    Transfer the initial management fee of $1.5 million (which reflects 1.5% of the        January 23
initial capital commitments of $100 million).

3.    Finalize the timing of the capital investment s of the initial $100 million and        January 30
determine which assets in addition to the capital will be invested by Group DF.

4.    Complete and execute the Limited Partnership Agreement (LPA) and other        January 30
documents as necessary to incorporate and establish the Fund.

5.    Establish Fund offices in NY and secure space in Kyiv through Group DF.        February 15

After your meeting with DF we will plan to meet to review the items covered in your meeting and to implement the items above . I look forward to seeing you soon.

-----Original Message-----
From: zackson@aol.com [mailto:zackson@aol.com]
Sent: Sunday, January 11, 2009 9:43 AM
To: Rick Gates DM
Subject: Doc for brown

Hi rick I have not seen it please sent before it goes out thanks
Sent from my Verizon Wireless BlackBerry

---

2

Exhibit 54

RE: update on Kyiv
Brad Zackson

Sent:Monday, June 08, 2009 12:38 PM
To:  Paul Manafort [pmanafort@davismanafort.com]

Hi Paul, I have been reading what's going on .I'm glad he' s still on board, let me know if you
need me, keep me posted. Wife is due the 20 of this month so this would be great, it tuff now
 Regards Brad  regards 4tell going good should have deal out lined this week and the city is have
2 meeting the week of 15. want deal with 4tell before they have a deal with Louis Freed ex FBI
guy which would be like ours they are sending it to us do"nt you know him.

**From:** Paul Manafort [mailto:pmanafort@davismanafort.com]
**Sent:** Monday, June 08, 2009 12:16 PM
**To:** Brad Zackson
**Subject:** update on Kyiv

Brad
I had an excellent trip there and am going back tomorrow.
Bascially, DF is still totally on board and a wire will be forthcoming either the end of this week or
next week as a partial payment on the 1.5.
Brown is arriving in Kyiv on Weds when I get there and I have a meeting scheduled with DF, SL
and Brown to build out the next few months in detail.
Obviously, there is a lot going on over there, some with DF some on politics but affecting DF.
Things are moving in a forward direction but slowly.
The good news is that there is no change in commitment and the financial situation is improving.
I will get you more specific information from Kyiv later this week.
P

---

**From:** Brad Zackson [mailto:bz@dynamicworldwide.com]
**Sent:** Monday, June 08, 2009 10:57 AM
**To:** Paul Manafort
**Subject:** update

 Paul, not sure if your back or still there ,can you give me call to go over what happen Regards
Brad

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.339 / Virus Database: 270.12.56/2162 - Release Date: 06/08/09 06:01:00

# Exhibit 55

NYS DEPARTMENT OF LABOR
PO BOX 15130
ALBANY NY 12212-5130

**REQUEST FOR EMPLOYMENT
AND WAGE DATA**

| URGENT: RETURN TO US WITHIN 7 DAYS |
|---|

Determination Date:    07-27-2009
Local Office:    801
Claim Effective Date:    07-13-2009

**REPLY MAY BE FAXED TO:**
    (518) 457-9378

Social Security No.    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

IF YOU FAX, DO NOT MAIL ORIGINALS.

Employee Name:    SAMUEL S LEE

CMZ VENTURES
1501 BROADWAY 25TH FL
NEW YORK NY 10036

Other Name:

ENTER IF MISSING OR INCORRECT

EMPLOYER
REGISTRATION NO.    99-99999

LOCATION CODE
IF ANY

Employee's Work Location:
NYC NY

The above named employee has filed a claim for unemployment insurance and has indicated that we do not have a record of all wages paid by you during the base period. Please complete and return this report even if the employee did not work for you or you believe that the employee is not eligible. If we do not receive this report within 7 days of the mail date, we will use information from the employee. If benefits are paid erroneously based on the employee's records, you will be liable for the incorrect charges up to the time we receive the corrected information.

1. Earnings:
**For calendar quarters where some wages have already been reported for this employer account number:** The wages have already been entered in the "GROSS WAGES PAID" column below. If these amounts are incorrect, please cross off and enter the correct amounts.

**For quarters where no wages have previously been reported, make the following entries:** 1) Enter the **TOTAL GROSS WAGES PAID** in each quarter. 2) If the employee was not paid wages in the quarter, write **"NO WAGES PAID."** 3) If the employee was paid wages in the quarter but wages were for work performed in excluded employment, enter the wages and write **"EXCLUDED"** after the wage entry and provide a brief explanation. 4) If the employee was paid wages in the quarter but they were reported to a different state, enter the wages and write **"REPORTED TO (STATE)"** after the wage entry. 5) If the employee did not work for you, write **"NOT OUR EMPLOYEE."** 6) If the employee's wages were not reported to the Employer Registration number listed above, write " **WAGES REPORTED TO (CORRECT ACCT. #)."**

| BEGINNING | ENDING | GROSS WAGES PAID |
|---|---|---|
| 04-01-2009 | 06-30-2009 | |
| 01-01-2009 | 03-31-2009 | |
| 10-01-2008 | 12-31-2008 | |
| 07-01-2008 | 09-30-2008 | |
| 04-01-2008 | 06-30-2008 | |

2. When did the employee work for you? From _____ To_____
    Month/Day/Year    Month/Day/Year

3. The employee became unemployed because:

| | | |
|---|---|---|
| ☐ LEFT OF OWN ACCORD (Explain details) | ☐ LACK OF WORK | ☐ INDUSTRIAL CONTROVERSY (Explain details) |
| ☐ To accept other work | ☐ Indefinite (Permanent Lay-Off) | ☐ RETIREMENT |
| ☐ To get married | ☐ Temporary Lay-Off    Recall date _____ | ☐ Voluntary |
| ☐ Domestic responsibilities | ☐ DISCHARGED | ☐ Disability |
| ☐ Illness | ☐ Incompetence | ☐ Compulsory under company or union rules |
| ☐ To leave area | ☐ Misconduct (See Reverse) | ☐ OTHER (Explain) |
| ☐ Other | ☐ Other (Explain details) | |

Employer Name _____

Date_____

Authorized Signature: _____

Telephone No. ( )_____

LC 12 (6-05)

Exhibit 56



**1434 DOS 08**

STATE OF NEW YORK
DEPARTMENT OF STATE
OFFICE OF ADMINISTRATIVE HEARINGS
------------------------------------------X

In the Matter of the Complaint of

**DEPARTMENT OF STATE**
**DIVISION OF LICENSING SERVICES,**

                    Complainant,              **DECISION**

      -against-

**BRAD ZACKSON,**

                    Respondent.

------------------------------------------X

       The above matter was heard by the undersigned, Scott NeJame, on June 4, 2008 at the office of the Department of State located at 123 William Street, New York, New York.

       The respondent did not appear.

       The complainant was represented by David Mossberg, Esq.

### COMPLAINTS

       The complaint alleges that the respondent real estate broker, in his management of a property on behalf of his principal: failed to obtain an agency disclosure form; presented a check that was returned for insufficient funds; failed to comply with his principal's demand for an accounting; failed to remit income received pursuant to a management agreement; and failed to cooperate with a Department of State investigation.

### FINDINGS OF FACT

       1) The notice of hearing together with a copy of the complaint was served on the respondent by certified mail at his last known business and home address, both posted on March 27, 2008. No evidence was presented regarding the results of the mailing to the respondent's home address. Regarding the mailing to his last known business address, that mailing was returned by the Postal Service marked "return to sender" with two different addresses for respondent's company (Dynamic Worldwide Properties LLC, 1501 Broadway, Front 3, New York, New York, and 30 Broad Street, New York, New York 10004[1]). On April 15, 2008, the complainant served the respondent with the notice of hearing and complaint at the 1501 Broadway address. No evidence was presented regarding the results of this service. On or about May 20, 2008, the complainant served the respondent with the notice of hearing and complaint by regular mail at the respondent's original business address (681 5th Avenue, 9th Floor, New York, New York). No evidence was presented regarding the results of this service (State's Ex. 1).

       2) The respondent was licensed as a real estate broker representing a limited liability company named Dynamic Worldwide Properties LLC at 681 5th Avenue, 9th Floor, New York, New York for the periods of November 14, 2003 to November 14, 2005 and April 18, 2006 to April

18, 2008 (State's Ex. 2). The respondent was also licensed as a real estate broker representing a limited liability company named Hampton Retreats LLC at 425 County Road 39A, Suite 202, Southampton, New York for the period of March 17, 2003 to March 17, 2005 (State's Ex. 2). The tribunal takes official notice of the records of the Department of State and finds that the respondent was also licensed as a real estate broker representing a limited liability company named Balcott & Morgan Management LLC at the same address as Hampton Retreats LLC for the period of March 10, 2004 to March 10, 2006. The respondent is not presently licensed as a real estate broker or salesperson.

3) On or about April 1, 2004, Rina Anoussi executed a management agreement with Hampton Retreats LLC for Hampton Retreats LLC to manage Rina and Takis Anoussi's property located at 172 Mill Pond Lane, Water Mill, New York ("the property") (State's Ex. 3). The agreement was to run from April 1, 2004 to May 27, 2005 and provided, in part, for Hampton Retreats LLC to lease the property to qualified lessees, make minor repairs, clean the property between guests, and provide the Anoussis with monthly reports showing all income and expenditures. The Anoussis agreed to pay Hampton Retreats LLC pursuant to a pricing list attached to the agreement. Mrs. Anoussi claimed not to know the respondent, but stated that she dealt with the manager/president of the Hampton Retreats LLC, Anke Albert.

4) The respondent did not provide the Anoussis with an agency disclosure form pursuant to Real Property Law §443.

5) On or about July 29, 2004, Mr. Albert sent Mrs. Anoussi a letter enclosing a check for $4,104 which covered the rentals for the periods of June 25-27, 2004 and July 2-4, 2004 (State's Ex. 4). On August 9, 2004, that check was returned by the Bridgehampton National Bank for insufficient funds (State's Ex. 5).

6) On or about September 3, 2004, Hampton Retreats LLC sent an email to Mrs. Anoussi stating that there had been two more rentals of the property, from July 31 to August 7, 2004 and August 27 to 30, 2004, for which it owed the Anoussis $7,900 (State's Ex. 6). Although demanded, the Anoussis never received the $7,900 or the reimbursement for the bounced $4,104 check.

7) On October 29, 2004, the Anoussis' accountant, Steven Bond, sent a letter to Mr. Albert of Hampton Retreats LLC stating that, to date, Hampton Retreats LLC owed $17,104 to Mrs. Anoussi, which included the amount of the bounced check and the $7,900 owed (State's Ex. 7). To date, that amount remains unpaid.

8) The complainant's Senior License Investigator, Victoria Cline ("Inv. Cline"), conducted an investigation in this case, contacted the respondent and interviewed him. At that initial interview, the respondent did not have any records to present to her, so the interview was adjourned so that he could locate them (either in storage or with his accountant). The respondent did not appear for another interview and did not respond to Inv. Cline's further written attempts to contact him. One of Inv. Cline's letters was dated August 29, 2007, in which she requested certain documents and answers to questions, the response of which was required by September 6, 2007 (State's Ex. 8). That letter was sent to the respondent's business and home address by certified mail. The letter sent to the respondent's business address was delivered on August 30, 2007, but the respondent did not respond.

## OPINION AND CONCLUSIONS OF LAW

I- As the party which initiated the hearing, the burden is on the complainant to prove, by substantial evidence, the truth of the charges set forth in the complaint. State Administrative Procedure Act §306(1). Substantial evidence "means such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact... More than seeming or imaginary, it is less than a preponderance of the evidence, overwhelming evidence or evidence beyond a reasonable doubt (citations omitted)." *300 Gramatan Avenue Associates v. State Div. of Human Rights*, 45 NY2d 176, 408 NYS2d 54, 56-57 (1978); *Tutuianu v. New York State*, 22 AD3d 503, 802 NYS2d 465 (2nd Dept. 2005). "The question...is whether a 'conclusion

or ultimate fact may be extracted reasonably--probatively and logically'" *City of Utica Board of Water Supply v. New York State Health Department*, 96 AD2d 719, 465 NYS2d 365, 366 (1983), quoting *300 Gramatan Avenue Associates, supra*, 408 NYS2d at 57.

II- The Department of State retains jurisdiction to conduct this proceeding even though the respondent's licenses have expired. *Albert Mandel & Sons, Inc. v. NYS Department of Agriculture and Markets*, 90 AD2d 567, 455 NYS2d 867 (3ʳᵈ Dept. 1982); *Main Sugar of Montezuma, Inc. v. Wickham*, 37 AD2d 381, 325 NYS2d 858 (3ʳᵈ Dept. 1971). The respondent may renew his limited liability license as Dynamic Worldwide Properties LLC anytime before April 18, 2010 merely by submitting an application and the applicable fee. Real Property Law §441(2).

III- Being an artificial entity created by law, Hampton Retreats LLC can only act through its officers, agents, and employees, and it is, therefore, bound by the knowledge acquired by and is responsible for the acts committed by its representative broker, the respondent, within the actual or apparent scope of his authority. *Roberts Real Estate, Inc. v. Department of State*, 80 NY2d 116, 589 NYS2d 392 (1992); *A-1 Realty Corporation v. State Division of Human Rights*, 35 AD2d 843, 318 NYS2d 120 (2ⁿᵈ Dept. 1970); Real Property Law §442-c. Real Property Law §442-c provides that "No violation of a provision of this article by a real estate salesman or employee of a real estate broker shall be deemed to be cause for the revocation or suspension of the license of the broker, unless it shall appear that the broker had actual knowledge of such violation or retains the benefits, profits or proceeds of a transaction wrongfully negotiated by his salesman or employee after notice of the salesman's or employee's misconduct." In *Roberts*, the Court of Appeals held that "the purposes and limitations of the relevant statute can best be effectuated and harmonized by allowing a corporate broker to be charged with 'actual knowledge' only when its principals, i.e., representative brokers, directors or officers have actual knowledge of the pertinent violation or misrepresentation." 589 NYS2d at 395.

Hampton Retreats LLC, which is liable for the misconduct of its agents, officers and employees, has not been licensed by the Department of State since March 17, 2005 and therefore, the Department has no jurisdiction over it. The issue arises whether the respondent had actual knowledge of the wrongful conduct or whether he or Hampton Retreats LLC retained the benefits, profits or proceeds of the wrongful transaction after receiving notice of the employee's, agent's or officer's misconduct.

IV- In their management of the property, Hampton Retreats LLC served in the capacity of agent for the Anoussis, its principal. The relationship of agent and principal is fiduciary in nature, "...founded on trust or confidence reposed by one person in the integrity and fidelity of another." *Mobil Oil Corp. v. Rubenfeld*, 72 Misc.2d 392, 339 NYS2d 623, 632 (NY Civil Ct. 1972), aff'd 77 Misc.2d 962, 357 NYS2d 589, rev'd on other grounds 48 AD2d 428, 370 NYS2d 943; *Wende C. v. United Methodist Church*, 6 AD3d 1047, 776 NYS2d 390 (4ᵗʰ Dept. 2004). Included in the fundamental duties of such a fiduciary are reasonable care and skill, good faith, undivided loyalty, obedience, full and fair disclosure, and to account. Real Property Law §443; Restatement (Second) of Agency §379; *L.A. Grant Realty, Inc. v. Cuomo*, 58 AD2d 251, 396 NYS2d 524 (4ᵗʰ Dept. 1977); *Precision Glass Tinting, Inc. v. Long*, 293 AD2d 594, 740 NYS2d 138 (2ⁿᵈ Dept. 2002); *Re/Max All-Pro Realty, Inc. v. New York State Dept. of State*, 292 AD2d 831, 739 NYS2d 321 (4ᵗʰ Dept. 2002) (quoting *Stevens, Inc. v. Kings Vil. Corp.*, 234 AD2d 287, 288, 650 NYS2d 307 (2ⁿᵈ Dept. 1996)). Such duties are imposed upon real estate licensees by license law, rules and regulations, contract law, the principles of the law of agency, and tort law. The object of these rigorous standards of performance is to secure fidelity from the agent to the principal and to insure the transaction of the business of the agency to the best advantage of the principal. *Department of State v. Short Term Housing*, 31 DOS 90, conf'd. sub nom *Short Term Housing v. Department of State*, 176 AD2d 619, 575 NYS2d 61 (1991); *Department of State v. Goldstein*, 7 DOS 87, conf'd. Sub nom *Goldstein v. Department of State*, 144 AD2d 463, 533 NYS2d 1002 (2ⁿᵈ Dept. 1988); see also, *Coldwell Banker Residential Real Estate v. Berner*, 202 AD2d 949, 609 NYS2d 948 (3ʳᵈ Dept. 1994).

Hampton Retreats LLC breached its fiduciary duties to the Anoussis by failing to properly and fully account for the rents it collected from the tenants and failing to remit portions of those rents to its principals. By breaching its fiduciary duties, Hampton Retreat LLC demonstrated untrustworthiness in violation of Real Property Law §441-c and violated 19 NYCRR §175.2, which requires a real estate broker to render an account and remit monies collected to his client within a reasonable time.

There is no proof that the respondent had actual knowledge of this misconduct. While it can be argued that Hampton Retreats LLC retained the proceeds from the transaction, without evidence that the respondent received notice of the wrongful conduct, it is not permissible to hold him accountable. Even though the respondent was properly served with the notice of the hearing and complaint, which would put him on notice of the misconduct, it is not clear from State's Exhibit 1 that the respondent, in fact, received such notice (see paragraph 1 above). Therefore, these charges against the respondent are dismissed[2].

V- Hampton Retreats LLC further demonstrated untrustworthiness and incompetency by issuing a bad check to and failing to reimburse the Anoussis. *Division of Licensing Services v. Markland*, 1375 DOS 08 (2008). For the reasons stated above, these charges against the respondent are dismissed.

VI- Pursuant to Real Property Law §443(3)(a), "A listing agent shall provide the disclosure form set forth in subdivision four of this section to a seller or landlord prior to entering into a listing agreement with the seller or landlord and shall obtain a signed acknowledgment from the seller or landlord..."

Hampton Retreats LLC did not present or obtain the signature of the Anoussis on a disclosure form pursuant to the Real Property Law. Therefore, it violated Real Property Law §§443(3)(a) and thereby demonstrated incompetency in violation of Real Property Law §441-c. For the reasons stated earlier, those charges are dismissed against respondent.

VII- Real Property Law §442-e(5) states:

The secretary of state shall have the power to enforce the provisions of this article and upon complaint of any person, or on his own initiative, to investigate any violation thereof or to investigate the business, business practices and business methods of any person, firm or corporation applying for or holding a license as a real estate broker or salesman, if in the opinion of the secretary of state such investigation is warranted. Each such applicant or licensee shall be obliged, on request of the secretary of state, to supply such information as may be required concerning his or its business, business practices or business methods, or proposed business practices or methods.

Inv. Cline initially interviewed the respondent, but he did not have any records to present to her, so the interview was adjourned so that he could locate them. The respondent did not appear for another interview and did not respond to Inv. Cline's further written attempts to contact him.

Therefore, the respondent failed to cooperate with a Department of State investigation in violation of Real Property Law §442-e(5) and demonstrated untrustworthiness in violation of Real Property Law §441-c. The respondent's violation was particularly serious because it prevented the complainant from knowing whether the respondent had actual knowledge of the transaction, whether he received notice of the misconduct of Hampton Retreats LLC's employees, officers or agents, and whether the respondent or Hampton Retreats LLC retained the benefits of that transaction.

## DETERMINATION

**WHEREFORE, IT IS HEREBY DETERMINED THAT** respondent Brad Zackson has violated Real Property Law §442-e(5) and demonstrated untrustworthiness in violation of Real Property Law

§441-c. Accordingly, pursuant to Real Property Law §441-c, his license as a real estate broker is deemed revoked, effectively immediately.


Scott NeJame
Administrative Law Judge

Dated: November 3, 2008

---

[1]This latter address was the one used by the complainant's investigator in attempting to communicate with and interview the respondent.

[2]I have considered the fact that the respondent may be liable for the misconduct of Hampton Retreats LLC's agents, officers and employees based solely on the fact that he is the representative broker for that limited liability company, for which he may fined. However, since I have found the respondent to have committed misconduct personally (see Point VII below) and since he did not respond to Inv. Cline's repeated communications nor appear for the hearing, I find that a fine against him is not a sufficient sanction nor would it likely deter him from future misconduct.