UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                     :
YULIA TYMOSHENKO and JOHN DOES 1         :
through 50, on behalf of themselves and all those     :
similarly situated,                                    :
                                                     :
                              Plaintiffs,          :              11-CV-2794 (KMW)
                                                     :              OPINION & ORDER
              -against-                              :
                                                     :
DMYTRO FIRTASH, et al.,                         :
                                                     :
                              Defendants.          :
-------------------------------------------------------------X

WOOD, U.S.D.J.:

Former Ukrainian Prime Minister Yulia Tymoshenko ("Tymoshenko") brings this action

on behalf of herself and other former government officials (collectively, "Plaintiffs") for

arbitrary detention and political persecution, allegedly in violation of their human rights.

Plaintiffs' Amended Complaint ("AC") alleges claims under the Alien Tort Statute, 28 U.S.C.

§ 1350 ("ATS"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-

1968 ("RICO"), and state law for breach of fiduciary duty and malicious prosecution.  [Dkt. No.

23].  Defendants include Ukrainian government officials and corporations (collectively, "the

Ukrainian Defendants"), as well as individuals  and corporations based in the United States,

including CMZ Ventures, LLC ("CMZ"), the Dynamic Group ("Dynamic"), Barbara Ann

Holdings, LLC ("BAH"), Vulcan Properties, Inc. ("Vulcan"), and individuals Paul Manafort

("Manafort") and Brad Zackson ("Zackson") (collectively, the "U.S. Defendants").

Presently before the Court is the U.S. Defendants' motion to dismiss the AC pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  [Dkt. Nos. 44, 50].  For the following reasons, the U.S. Defendants' motion is GRANTED.

## I.    BACKGROUND

The AC alleges that Tymoshenko and other former government officials have been subjected to political persecution and arbitrary detention by the current Ukrainian government, headed by President Viktor Yanukovich.  This misconduct has been perpetrated by Ukrainian officials in the Yanukovich administration, and masterminded by Defendant Dmytro Firtash ("Firtash"), a Ukrainian billionaire and Yanukovich confidant.  The U.S. Defendants' alleged involvement stems from their participation in a "complex racketeering scheme," by which the Ukrainian Defendants laundered money through a series of U.S.-based "shell companies" to fund illegal kickbacks to Ukrainian officials.  The following factual allegations are accepted as true for the purpose of this motion to dismiss.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

### A.  Tymoshenko's Tenure as Prime Minister and the 2009 Gas Negotiations

Tymoshenko first served as Prime Minister from 2004 to 2005, and was appointed for a second term from 2007 to 2010.  (AC ¶ 50).  She is now the leader of the Batkivshchyna Party, Ukraine's largest opposition party.  (*Id.* ¶ 25).  Ukraine relies on natural gas as its principal source of energy, and purchases most of this gas from Gazprom, a Russian monopoly.  (*Id.* ¶ 82).  During her first term, Tymoshenko began investigating the structure of Ukraine's natural gas contracts with Gazprom, and specifically the intermediary role played by Defendant RosUkrEnergo AG ("RUE"), (*id.* ¶ 139), a Ukrainian company that Firtash allegedly controls.  (*Id.* ¶ 31).  When she resumed her position as Prime Minister in 2007, Tymoshenko pledged to

---

[1] Vulcan separately moved to dismiss the AC, but stated that it "joins, adopts and incorporates" the other Defendants' arguments by reference.  (Def. Vulcan's  Mem. in Supp. 3 [Dkt. No. 50-1]).  Consequently, the Court considers the motions together.

eliminate RUE from the Russia-Ukraine gas trade, from which RUE profited substantially: it reported profits of $755 million in 2005, and $785 million in 2006.  (*Id.* ¶¶ 92, 140).

In 2009, Tymoshenko negotiated new gas contracts with the Russian government. (*Id.* ¶ 141).  These new contracts eliminated RUE as an intermediary, providing instead for the direct sale of gas from Gazprom, the Russian monopoly, to Naftogaz, a Ukrainian gas monopoly.  (*Id.*).  These negotiations resulted in a significant financial loss for RUE and Firtash, who publicly denounced the new contract as "criminal and the most stupid contract in Ukraine's history."  (*Id.* ¶ 143; Ex. 75).  Firtash and his associates also filed an arbitration claim with the Stockholm Chamber of Commerce challenging the agreements as illegal.  (*Id.* ¶ 152).

Tymoshenko ran for President in 2009, but, in February of 2010, lost the election to current President Viktor Yanukovych.  (*Id.* ¶ 50).  She resigned as Prime Minister on March 4, 2010.  (*Id.* ¶ 51).  Once Yanukovych took power, the Ukrainian government—now allegedly comprised of allies of Firtash and RUE, (*id.* ¶¶ 147-48)—reversed its position in the Stockholm proceeding and conceded that the 2009 gas agreements were illegal.  (*Id.* ¶ 154).  In June 2010, the Stockholm tribunal held that some elements of the contracts were illegal, and that Naftogaz owed RUE $3.5 billion worth of natural gas.  (*Id.* ¶ 155).  Because Naftogaz is a public entity, the award will be paid by Ukrainian citizens.  (*Id.* ¶ 154).  Plaintiffs allege that Firtash and his allies distributed portions of their proceeds from the Stockholm award "to their associates and friendly corporations" in order to "curry favor with them and reward them for their loyalty."  (*Id.* ¶ 159).  Firtash and RUE subsequently reestablished their role in the natural gas trade.  (*Id.* ¶¶ 163-64).

### B.  **Reforms and Political Persecution Under the Yanukovych Regime**

Since his election, Yanukovych "has consolidated his power through far-reaching 'reforms' of the executive, legislative, and judicial branches and the use of politically-motivated criminal prosecutions" against his opponents—including Plaintiffs—in order to prevent them from regaining political power.  (*Id.* ¶ 52).  According to the AC, these reforms "effectively deprived Ukraine of any semblance of judicial independence and impartiality." (*Id.* ¶¶ 57-58).  International commentators have condemned these developments.  (*See id.* ¶¶ 59-60).

The criminal prosecutions against Tymoshenko and other former government officials relate to their conduct while in office, including charges related to the gas negotiations.  (*Id.* ¶ 78; *see also* ¶¶ 165-80 (detailing charges)).  According to the AC, these prosecutions were "both retribution" for damaging Firtash and RUE's financial interests, "as well as an effort by Defendants to eliminate Plaintiffs as political and financial threats in the future."  (*Id.* ¶ 162).  Plaintiffs detail numerous allegations regarding the lack of process afforded in these proceedings, including arbitrary travel bans, interference with access to legal counsel, falsified and missing evidence, denial of an impartial tribunal, and inhumane confinement, primarily with respect to violations of Ukrainian law.  (*See id.* ¶¶ 208-60).  Plaintiffs' ATS claim, however, focuses on their "arbitrary arrests and prolonged detentions."  (*Id.* ¶ 262).

### C.  **Plaintiffs' Prosecution, Trial, and Incarceration**

Tymoshenko has been charged with exceeding her powers as Prime Minister based on her role in negotiating the 2009 gas contracts with Russia.  (*Id.* ¶ 78).  The AC alleges that Tymoshenko was detained for interrogation on approximately forty-four occasions, for periods lasting from twenty minutes to ten hours, (*id.* ¶ 183), including one incident when Tymoshenko was surrounded by "25 to 30 militia guards wearing face masks and black uniforms," (*id.* ¶ 189).

Tymoshenko was arrested and released on May 24, 2011 for evading pretrial investigation and "deliberate prevention of the establishment of the truth." (*Id.* ¶¶ 187-91). On August 5, 2011, in the midst of Tymoshenko's trial on the gas charges, the prosecutor in the case—Defendant Lilia Frolova—submitted an application for Tymoshenko's arrest because she had been "disrespectful" while questioning a witness. (*Id.* ¶ 192). The presiding judge, Judge Kireyev, granted the prosecutor's request, and found that Tymoshenko was obstructing the truth in the case, treating the court and trial participants with disrespect, violating court orders, refusing to mention her place of residence, refusing to confirm in writing that she was notified of the next court hearing, and failing to appear at court on time. (*Id.* ¶ 193). Judge Kireyev has since rejected more than twenty petitions calling for Tymoshenko's release, "purportedly" because Tymoshenko continues "to make insulting statements to the court," and does "not respond to the remarks of the presiding judge." (*Id.* ¶ 199). According to Plaintiffs, all of Judge Kireyev's justifications are "insufficient" under Ukrainian law, (*id.*), and her detention is "politically-motivated," (*id.* ¶ 196).

The AC also contains allegations regarding the detention of former interior minister Yuriy Lutsenko, who was charged with improperly arranging various work-related benefits for his former official driver. (*Id.* ¶ 171). He has been detained since his arrest on December 27, 2010, when a district court approved the Ukrainian prosecutor's request to incarcerate Lutsenko as a preventive measure. (*Id.* ¶¶ 200-01). His detention was justified because Lutsenko "had attempted to evade the [prosecutor's] investigation," a statement which Plaintiffs contend was factually incorrect. (*Id.* ¶¶ 202-05). The Kyiv Court of Appeals, an intermediate appellate court, affirmed the decision to detain him, and the prosecutor has refused to release him on bail because he is an "alleged flight risk." (*Id.* ¶ 206).

Plaintiffs characterize the conditions of their confinement as "inhumane." (*Id.* ¶ 250). "Most of the Plaintiffs," including Tymoshenko, are being held at the "notorious," "overcrowded Lukyanivska prison in Kyiv, which houses almost 50% more [prisoners] than it was designed to accommodate." (*Id.* ¶¶ 196, 253). Tymoshenko has also become ill while incarcerated, but Judge Kireyev has "repeatedly denied requests to allow Tymoshenko's personal physician to conduct a physical examination," and Tymoshenko refuses to trust prison doctors because she fears for her life. (*Id.* ¶¶ 256-58).

Due to a host of alleged due process violations, Plaintiffs contend that Tymoshenko's trial has become a "show trial." (*Id.* ¶ 78). Various commentators, including American and foreign politicians, have condemned Tymoshenko's arrest and called for her immediate release. (*Id.* ¶¶ 197-98). Judge Kireyev has refused to release Tymoshenko, and the Ukrainian appellate court will not hear the appeal because "preventive measures cannot be challenged under Ukrainian law," leaving Tymoshenko "without a domestic legal remedy to challenge her arbitrary and politically-motivated detention." (*Id.* ¶ 199).

### D.  The U.S. Defendants' Role in the Alleged Scheme

The U.S. Defendants are a group of individuals and corporations which Firtash allegedly used to launder money through the United States to finance the Ukrainian Defendants' human rights violations abroad. The AC asserts that RUE invested "a sizable portion" of the billions it earned from natural gas transactions and the Stockholm arbitration "through various investment vehicles in the United States and elsewhere in Europe" in order to put these funds "outside the jurisdiction of Ukrainian courts." (*Id.* ¶ 95). These transactions were structured to "conceal illegal kickbacks" made to Ukrainian officials and others, enabling Defendants to "carry out their racketeering activity with the mask of legitimacy." (*Id.*). These investments were made through

a "labyrinth of shell companies," including Defendants BAH, CMZ, Dynamic, and Vulcan.[2]  (*Id.*

¶ 96).  Both Firtash and Defendant Semion Mogilevich have been investigated (and, in

Mogilevich's case, indicted) on racketeering charges in the United States.  (*Id.* ¶ 99).  Although

Firtash is not listed on any of the U.S. Defendants' corporate documents, Plaintiffs claim he was

an "undisclosed 'silent partner,'" and cite various communications between Firtash and

Manafort, also a Yanukovich political advisor, to evidence this relationship.  (*Id.* ¶¶ 101-05).

Plaintiffs allege that the U.S. Defendants were "never legitimate businesses," and

"operated interchangeably as agents under the control of Firtash in furthering his racketeering

scheme."  (*Id.* ¶ 109).  To support these allegations, Plaintiffs note that CMZ and Dynamic were

investigated by the New York State Department of Labor for failure to pay wages, and

investigated by the IRS for failure to issue tax forms.  (*Id.* ¶ 110-11).  According to the AC,

Firtash and Mogilevich wired money to the U.S. Defendants to invest in various real estate

projects, but the funding was withdrawn prior to closing the deals because the funds were

transferred only to shield them from the jurisdiction of Ukrainian courts.[3]  (*Id.* ¶¶ 113-14).

### E. Procedural History

Plaintiffs filed their Complaint in the Southern District of New York on April 26, 2011,

[Dkt. No. 11], and their Amended Complaint on December 19, 2011, [Dkt. No. 23].  The AC

---

[2] Defendant Zackson is involved through his ownership of BAH.  BAH is listed as a joint owner of CMZ (along with Vulcan and "XXX LLC," a company controlled by Manafort).  (*Id.* ¶ 34).
[3] Plaintiffs cite three specific instances of deals financed by Firtash that were never consummated.  First, in January 2009, CMZ made a formal offer (with $25 million of Firtash's money) to finance a remodel of New York's Drake Hotel, but never finalized the deal.  (*Id.* ¶¶ 116-20).  Second, Dynamic agreed to finance the acquisition of a waterfront property in New York in 2008, but never closed on the property. (*Id.* ¶¶ 121-23).  Finally, Firtash purportedly agreed to finance CMZ's acquisition and development of an island in the Bahamas.  (*Id.* ¶ 124).  Although CMZ compiled a detailed development plan, the project never closed.  (*Id.* ¶¶ 124-25).  Firtash, Mogilevich, and their associates also allegedly used Defendant Zackson to create a number of Panamanian corporations to transfer funds to bank accounts in New York. (*Id.* ¶ 129).

asserts federal claims for violations of the ATS and RICO, and state law claims for breach of

fiduciary duty and malicious prosecution.  Manafort, Zackson, CMZ, Dynamic, and BAH moved

to dismiss the AC on April 27, 2012, [Dkt. No. 44], and Vulcan moved to dismiss the AC for the

same reasons on April 27, 2012.  [Dkt. No. 50].

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient "to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  A claim is facially plausible when the factual allegations "allow[] the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S.

at 678.  Where a plaintiff has failed to "nudge" a claim "across the line from conceivable to

plausible," a district court must dismiss the complaint.  *Twombly*, 550 U.S. at 570.  This standard

is not a "probability requirement," but rather "calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegality."  *Ideal Steel Supply Corp. v. Anza*,

652 F.3d 310, 324 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).  The Court must accept as

true all well-pleaded factual allegations in the complaint, and "draw[] all inferences in the

plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal

quotations omitted).  By contrast, a court is "not bound to accept as true a legal conclusion

couched as a factual allegation."  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.

265, 286 (1986)).

## III.   PLAINTIFFS' ATS CLAIM

Plaintiffs claim that their "arbitrary arrests and prolonged detentions," perpetrated by

Defendant government officials and "in active concert and participation" with the other

Defendants, violates the ATS.  (AC ¶ 262).  The U.S. Defendants present two grounds for

dismissing this claim: (1) arbitrary detention is not actionable under the ATS, and (2) even if arbitrary detention were actionable, Plaintiffs' allegations do not sufficiently articulate such a claim.  Although the Court holds that arbitrary detention is actionable under the ATS, the Court nonetheless dismisses Plaintiffs' ATS claim because Plaintiffs' allegations are insufficient to show that they were subject to arbitrary detention or that the U.S. Defendants are subject to aiding and abetting liability for their alleged role in the scheme.

### A.   Arbitrary Detention is Actionable Under the ATS

Passed as part of the Judiciary Act of 1789, the ATS confers jurisdiction on federal courts for civil claims "by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  In 1980, the Second Circuit recognized that the ATS provides jurisdiction over tort actions brought by aliens for violations of customary international law, including war crimes and crimes against humanity.  *Filartiga v. Pena-Irala*, 630 F.2d 876, 887 (2d Cir. 1980).  Twenty-four years later, in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court clarified the scope of actionable torts under the ATS. Calling for a "restrained conception," the *Sosa* Court grounded its analysis in the meaning of the ATS at the time of its adoption, thus "enabl[ing] federal courts [to] hear claims in a very limited category defined by the law of nations and recognized at common law," such as "violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Id.* at 712, 715 (citing 4 W. Blackstone, *Commentaries on the Laws of England* 68 (1769)).

However, the Supreme Court did not "limit the jurisdiction of the federal courts under the ATS to those three offenses."  *Kiobel v. Royal Dutch Petroleum, Co.*, 621 F.3d 111, 125 (2d Cir. 2010), *cert. granted*, 132 S. Ct. 472 (2011).  The *Sosa* Court instead permitted federal courts to recognize claims "based on the present-day law of nations" if those claims rest on "norm[s] of

international character accepted by the civilized world  and defined with a specificity comparable to the features of the 18th-century paradigms" that the Court had recognized.  *Sosa*, 542 U.S. at 725.  This recognition "should (and, inevitably, must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."  *Id.* at 732-33.

Applying these principles, the *Sosa* Court held that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy."  *Id.* at 738.  The Second Circuit likewise has cautioned district courts "to exercise 'extraordinary care and restraint' in deciding whether an offense will violate a customary norm."  *Viet. Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 116 (2d Cir. 2008) (quoting *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 348 (2d Cir. 2003)). Such a norm "can form the basis of an ATS claim" only if "it is (1) defined with a specificity comparable to" the paradigms laid out by the *Sosa* Court, and "(2) based upon a norm of international character accepted by the civilized world."  *Id.* at 117; *see also id.* at 123 (applying this standard to hold that wartime use of Agent Orange was not cognizable under the ATS); *Kiobel*, 621 F.3d at 148-49 (holding ATS liability does not extend to corporate defendants).

Notwithstanding this restrained approach, since *Sosa*, the Second Circuit has extended ATS jurisdiction to the prohibition of medical experimentation on human subjects without their consent, *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 187 (2d Cir. 2009), and to aiding and abetting liability, *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam). In approving these extensions, the Second Circuit has emphasized that such "customary law

norms" must be sufficiently "(i) universal and obligatory, (ii) specific and definable, and (iii) of mutual concern." *Abdullahi*, 562 F.3d at 177.

Courts have likewise applied these principles to identify categories of customary law outside of the three paradigmatic examples, such as arbitrary detention. *See, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 n.4 (S.D.N.Y. 2009) (Wood, J.) (denying motions to dismiss plaintiffs' arbitrary detention claims under the ATS); *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 466 (S.D.N.Y. 2006) (Wood, J.) (determining that *Sosa* supported holding that arbitrary detention is actionable under the ATS where it is "both prolonged and a result of state policy"), *rev'd on other grounds*, 621 F.3d 11 (2d Cir. 2010);[4] *see also Martinez v. City of L. A.*, 141 F.3d 1373, 1384 (9th Cir. 1998) (finding that "there is a clear international prohibition against arbitrary arrest and detention" and holding such claims cognizable under the ATS; *Doe v. Qi*, 349 F. Supp. 2d 1258, 1325-26 (N.D. Cal. 2004) (determining, in light of *Sosa*, that prolonged arbitrary detention was actionable under the ATS and collecting similar cases).

Defendants argue that the Supreme Court's decision and reasoning in *Sosa* conclusively establish that arbitrary detention is outside the scope of actionable claims under the ATS. (*See* U.S. Defs.' Mem. in Supp. 11-13 [Dkt. No. 44]). Defendants mischaracterize the reach of *Sosa*'s

---

[4] The district court certified its order for interlocutory appellate review. *See Kiobel*, 621 F.3d at 124. Although the entire order was appealed, the Second Circuit's resulting opinion addressed only whether "jurisdiction under the ATS extends to civil actions against corporations." *Id.* After determining that jurisdiction does not extend to corporate defendants, the Second Circuit affirmed the portions of the order dismissing claims against the corporate defendants and reversed the portions of the order that declined to dismiss claims against corporate defendants. *Id.* at 149. The Supreme Court granted certiorari. 132 S. Ct. 472 (2011). The case was initially argued on February 28, 2012, but the Court subsequently ordered additional briefing regarding "whether and under what circumstances the Alien Tort Statute, 28 U.S.C. § 1350, allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (U.S. Mar. 5, 2012). The case was re-argued on October 1, 2012. Given the uncertainty in this area of law, the Court does not rely upon the *Kiobel* holding in this case.

narrow holding and fail to address subsequent precedent.  The *Sosa* Court held only that arbitrary detention of less than one day is not actionable under the ATS.  *Sosa*, 542 U.S. at 738. Accordingly, the Court confirms prior decisions in this district finding that the prohibition on prolonged arbitrary detention is sufficiently universal and obligatory, specific and definable, and of mutual concern to infer a cause of action under the ATS.  *See Kiobel*, 456 F. Supp. 2d at 466 (citing *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *7 (S.D.N.Y. Feb. 28, 2002)); *see also Martinez*, 141 F.3d at 1384 (performing comprehensive analysis of international sources, including the Universal Declaration of Human Rights ("UDHR"), the International Covenant on Civil and Political Rights ("ICCPR"), and national constitutions, to hold arbitrary detention falls within in the scope of the ATS); *cf. Liu Bo Shan v. China Const. Bank Corp.*, 421 F. App'x 89, 91-95 (2d Cir. 2011) (considering ATS claims for arbitrary detention on their merits and implicitly indicating it fell within the subject matter of the ATS).[5]

## B.  Sufficiency of Plaintiffs' Allegations

Although the Court finds that arbitrary detention is actionable under the ATS, Plaintiffs' ATS claim must nonetheless be dismissed against the U.S. Defendants.  First, the allegations in the AC are insufficient to support a claim that Plaintiffs' detention is arbitrary.  Second, even if their detention is arbitrary, the AC does not plead facts sufficient to support Plaintiffs' claim that the U.S. Defendants aided and abetted the Ukrainian Defendants' violations of the ATS.

---

[5] Defendants note correctly that the Supreme Court determined the UDHR and the ICCPR could not "establish the relevant and applicable rule of international law."  *Sosa*, 542 U.S. at 734-35.  However, although these documents are not determinative, they can provide some evidence of the substance of customary international law.  In addition to these sources, the prohibition of arbitrary detention is included in the Restatement (Third) of Foreign Relations Law of the United States, and the constitutions of at least 119 nations.  *Martinez*, 141 F.3d at 1384; *see also Sosa*, 542 U.S. at 747 (citing Restatement with approval).

1.  The AC Does Not Sufficiently Plead That Plaintiffs' Detention Was "Arbitrary" Under the ATS

"[U]nder international law, 'arbitrary detention' occurs when a person is detained without warrant or articulable suspicion, is not apprised of charges against him or her, and is not brought to trial." *Kiobel*, 456 F. Supp. 2d at 466 (quoting *Wiwa*, 2002 WL 319887, at *7).[6]

The Court agrees with the U.S. Defendants that Plaintiffs allege "not an 'arbitrary' detention, but rather a detention (with legal process) which [they] deem unjustified." (U.S. Defs.' Mem. in Supp. 13).  Viewing the allegations in the light most favorable to Plaintiffs, the AC credibly alleges that Tymoshenko is being prosecuted and incarcerated for actions she took while Prime Minister.  However, detention—even prolonged detention—is not actionable under the ATS if detainees have been afforded adequate process, such as apprisal of the charges against them and the opportunity to challenge those charges at trial.  *Kiobel*, 456 F. Supp. 2d at 466; *see also Chowdhury v. WorldTel Bangl. Holding, Inc.*, 588 F. Supp. 2d 375, 383-84 (E.D.N.Y. 2008) (finding no evidence to justify finding "that five months' detention," although perhaps "improper," "rises to [the] level" of "that narrow category of crimes where the jailer has become 'the enemy of all mankind'" (quoting *Filartiga*, 630 F.2d at 890)).

Here, Plaintiffs are being detained after arrest, indictment, trial, and appeal in Ukraine, all of which occurred while they were represented by counsel at public proceedings.  Plaintiffs do not complain that they were *not afforded* process, but rather that the process afforded *violates Ukrainian law* because it rests on factual inaccuracies and is legally insufficient.  (*See* AC ¶¶

---

[6] The Restatement (Third) of Foreign Relations Law incorporates a somewhat broader definition of arbitrary detention, including "if the person detained is not given early opportunity to communicate or consult counsel; or is not brought to trial within a reasonable time" and if it is "incompatible with the principles of justice or with the dignity of the human person."  Restatement (Third) of the Foreign Relations Law of the United States cmt. h (1987); *see also Martinez*, 141 F.3d at 1384 (citing this definition with approval).  The Court, relying on the *Sosa* Court's admonition to consider the practical effects of recognizing new categories of ATS violations, declines to adopt this broad definition and confines itself to the narrow definition articulated in prior cases.  *Sosa*, 542 U.S. at 732-33.

181-249 (detailing allegations regarding falsified evidence, access to legal counsel, and biased

adjudicators)).  Plaintiffs do not provide any authority for the proposition that these actions

violate a "specific, universal, and obligatory" international norm.  *Sosa*, 542 U.S. at 732; *see also*

*Kiobel*, 621 F.3d at 131-32 (describing the international law sources to which courts must look in

determining what acts are cognizable under the ATS).

      In support of their position, Plaintiffs argue that "the motive for a particular detention, the

circumstances under which it was procured, and the attendant conditions of confinement are

relevant factors in determining whether a particular detention is arbitrary and, thus, in violation

of customary international law norms."  (Pls.' Mem. in Opp'n 12 [Dkt. No. 52]).  Even accepting

this proposition, however, Plaintiffs still fail to state a claim.  Plaintiffs are confined pursuant to

a judicial order made in the course of a public, adversarial judicial proceeding.  (AC ¶¶ 192-94);

*see also Kiobel*, 456 F. Supp. 2d at 466 (noting that these are relevant factors).  Tymoshenko's

attorneys have challenged her confinement in a Ukrainian tribunal, and the circumstances of her

detention are public.  (AC ¶¶ 192-94 (detailing adverse public reaction to Tymoshenko's arrest

and detention)).  Although Plaintiffs allege that the conditions of their confinement are

"inhumane," the conditions at Lukyanivska prison do not approach the kind of mistreatment

courts have held to be cognizable under the ATS.  *See, e.g.*, *Doe*, 349 F. Supp. 2d at 1326-27

(finding detention arbitrary for various Falung Gong practitioners detained for long periods and

tortured by the Chinese government); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1349 (N.D.

Ga. 2002) (finding more than one month of detention where plaintiff was subject to repeated

beatings to be arbitrary); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1094 (S.D. Fla.

1997) (finding arbitrary detention where detainee was deprived of food, blankets, or protection

from fellow inmates committing murder in his presence).  Allegations of overcrowding and

restricted access to a preferred physician are not enough to raise a cognizable arbitrary detention claim.

The ATS is not a vehicle for foreign individuals to challenge foreign rulings with which they disagree.  The district court in *Chowdhury* refused to recognize a claim for arbitrary detention where the plaintiff had been held for five months in Bangladesh and denied bail. *Chowdhury*, 588 F. Supp. 2d at 385.  In determining that these allegations were not actionable under the ATS, the Court noted that "[e]ven if these actions were not in compliance with *U.S.* law, there is no showing that they violated *international* law."  *Id.* (emphasis added).  Indeed, "when compliance with arguably proper procedure" is at issue, "it is quite difficult to find a violation of a norm of international law…[because] it would effectively internationalize false arrest and malicious prosecution claims."  *Id.*  Plaintiffs complain about the procedures they were afforded in the Ukrainian justice system, but have articulated no grounds on which these alleged violations fit within the narrow set of violations warranting jurisdiction under the ATS.

The Court is also mindful of the Supreme Court's admonition in *Sosa* that courts must consider the real-world results of finding that a particular set of facts violates an existing but newly-discovered international law norm.  *Sosa*, 542 U.S. at 736.  Here, the court of international opinion is already putting pressure on the Ukrainian government to treat Tymoshenko and the other plaintiffs with impartiality and fairness.  (*See, e.g.*, AC ¶¶ 197-98 (citing condemnations of Tymoshenko's arrest from various international dignitaries); ¶¶ 64-65 (describing the "widespread international outcry" against the Yanukovych administration's practices)).  Given these developments, the "practical consequences of making a cause of action available to litigants in the federal courts" for individuals dissatisfied with their treatment in their own courts

would insert U.S. courts into matters over which they have no authority, and would intrude onto the province of legislative and executive power.  *Sosa*, 542 U.S. at 732.

> 2.  The AC Does Not Sufficiently Plead that the U.S. Defendants Aided and Abetted Plaintiffs' Arbitrary Detention

Plaintiffs do not allege that the U.S. Defendants directly violated the ATS.  Rather, Plaintiffs contend that the U.S. Defendants are liable for aiding and abetting the Ukrainian Defendants' violations of Plaintiffs' human rights.  (*See* Pls.' Mem. in Opp'n 13-15).  The AC does not allege a plausible claim that the U.S. Defendants are liable for aiding and abetting ATS violations.

In a per curiam opinion issued in 2007, the Second Circuit held that "in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the [ATS]."  *Khulumani*, 504 F.3d at 260.  Two years later, the Second Circuit reaffirmed this holding and decided, based on international law principles, that a defendant may be liable for aiding and abetting a violation of the ATS only "when the defendant (1) provides practical assistance to the principal which has *a substantial effect* on the perpetration of the crime, and (2) does so with the *purpose* of facilitating the commission of that crime."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (emphasis added) (citing *Khulumani*, 504 F.3d at 277 (Katzmann, J., concurring)).  The Second Circuit expressly rejected the proposition that knowledge alone could establish secondary liability, holding instead that "the *mens rea* standard for aiding and abetting liability in ATS action is purpose rather than knowledge alone."  *Id.*

Plaintiffs' substantive allegations regarding the U.S. Defendants do not suffice to permit the court to infer that they intended to facilitate the alleged offenses. Rather, the allegations support only the inference that the U.S. Defendants have been used by the Ukrainian Government to support the regime financially.  The AC claims that the corporate U.S.

Defendants are a group of shell companies used to conceal Firtash's illegal kickbacks, put these funds "outside the jurisdiction of Ukrainian courts," and enable the Ukrainian Defendants to "carry out their racketeering activities with the mask of legitimacy." (AC ¶ 95). The only allegation specifically referring to the U.S. Defendants' role in the alleged violations is that Manafort was a political advisor to Yanukovich, and "knew" that Firtash had obtained his money illegally, and bribed Ukrainian officials. (*Id.* ¶ 37). At most, these allegations suggest that Manafort knew that Firtash bribed Ukrainian officials; they do not suggest any knowledge— much less intent—regarding the arbitrary detention of Plaintiffs or the Ukrainian Defendants' role therein.

Although the Court acknowledges that "intent must often be demonstrated by the circumstances" in secondary liability cases, the circumstances alleged in the AC do not suggest that the U.S. Defendants acted with the purpose to aid or abet Plaintiffs' arbitrary detention. Moreover, even if such a purpose could somehow be inferred, Plaintiffs' allegations do not support an inference that the U.S. Defendants "substantially assisted" the Ukrainian officials who perpetrated the offenses. *Presbyterian Church of Sudan*, 582 F.3d at 259. To be actionable, such assistance "must be both 'practical' and have 'a substantial effect on the perpetration of the crime.'" *Liu Bo Shan*, 421 F. App'x at 94 (quoting *Presbyterian Church of Sudan*, 582 F.3d at 258). Taking all of the allegations in the AC as true, at most the U.S. Defendants assisted the perpetrators by laundering money and shielding it from the Ukrainian authorities. These actions fall far short of the "substantial assistance" that is required to support a claim of secondary liability under the ATS. *Id.* at 95 (determining affirmative steps taken by the defendant— including the falsification of evidence and a phone call to the police to arrest the plaintiff—were insufficient to state a claim for secondary liability on its ATS claim for police brutality).

Plaintiffs' reliance on *Lev v. Arab Bank, PLC*, No. 08 Civ. 3251, 2010 WL 623636 (E.D.N.Y. Jan. 29, 2010), is misplaced. In *Lev*, the district court found that the allegations regarding the defendant bank's secondary liability for various suicide bomb attacks to be sufficient where plaintiffs included specific, detailed factual allegations that the bank maintained accounts for Hamas and other terrorist organizations, "despite the illegality of providing such services." *Id.* at *2. The bank also "administered the financial structure" through which the families of Hamas "martyrs (suicide bombers and other terrorists killed or imprisoned as a result of their crimes)" received death benefits. *Id.* The bank was given a list of the "martyrs," their families applied to the bank, and the bank administered the families' receipt of compensation. *Id.* Plaintiffs in this case have provided no such specific allegations regarding the U.S. Defendants' purported money laundering; indeed, Plaintiffs' reliance on *Lev* "only serves to highlight the shortcomings of [their] thin allegations." *Liu Bo Shan*, 421 F. App'x at 95.

The Second Circuit has emphatically disapproved the imposition of secondary liability upon those who engage in commercial activity with entities they know have committed human rights abuses:

> [I]f ATS liability could be established by knowledge of those abuses coupled only with such commercial activities as resource development, the statute would act as a vehicle for private parties to impose embargos or international sanctions through civil actions in United States courts. Such measures are not the province of private parties but are, instead, properly reserved to governments and multinational organizations.

*Presbyterian Church of Sudan*, 582 F.3d at 264. For these reasons, defendants' alleged actions in the instant case—accepting investments that enabled a foreign government to perpetrate human rights abuses—are not actionable under the ATS. *Id.*

Consequently, the Court finds that Plaintiffs' allegations do not support a plausible inference that the U.S. Defendants aided and abetted Plaintiffs' alleged arbitrary detention.

## IV.    RICO DOES NOT APPLY TO EXTRATERRITORIAL VIOLATIONS AND PLAINTIFFS HAVE FAILED TO STATE A CLAIM FOR A DOMESTIC RICO VIOLATION

Plaintiffs allege that the U.S. Defendants laundered "illegally obtained funds through the United States and elsewhere in order to conceal" profits earned by Defendants, "including illegal government kickbacks paid to Ukrainian officials for protecting the financial interests of Firtash."  (AC ¶ 278).  These kickbacks were allegedly used to perpetrate Plaintiffs' "politically-motivated criminal prosecutions."  (*Id.* ¶ 279).  According to Plaintiffs, this conduct is a racketeering enterprise in violation of RICO, 18 U.S.C. §§ 1961-1968.  The focus of Plaintiffs' allegations is on a foreign enterprise and a pattern of racketeering activity that occurred abroad.  Because civil RICO does not provide a cause of action for extraterritorial offenses, the Court dismisses Plaintiffs' civil RICO claims against the U.S. Defendants.

The Second Circuit has held that RICO does not apply extraterritorially.  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (per curiam).  In reaching this holding, the Second Circuit applied the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), which established a "bright line rule: 'when a statute gives no clear indication of an extraterritorial application, it has none.'"  *Norex*, 631 F.3d at 32 (quoting *Morrison*, 130 S. Ct. at 2878).  The Second Circuit emphasized that "simply alleging that *some* domestic conduct occurred cannot support a claim of domestic application."  *Id.* at 33.  "Accordingly, peripheral contacts with the United States—up to and including the use of a domestic bank account—do not bring an otherwise foreign scheme within the reach of the RICO statutes."  *Republic of Iraq v. ABB AG*, No. 08 Civ. 5951, 2013 WL 441959, at *21 (S.D.N.Y. Feb. 6, 2013) (Stein, J.) (internal citations omitted).

19

Although the Second Circuit has held that RICO applies only domestically, it has not established a standard for courts to use in determining what domestic contacts are sufficient to justify the application of RICO to otherwise extraterritorial conduct.  *See Cedeño v. Castillo*, 457 F. App'x 35, 37 (2d Cir. 2012); *see also Morrison*, 130 S. Ct. at 2884-85 (analyzing whether plaintiff alleged domestic securities claim by looking to the purpose of the statute).  Accordingly, district courts have reached different conclusions regarding the appropriate standard, with some courts looking to the location of the alleged enterprise and others looking to the location of the alleged pattern of racketeering activity.  *Compare Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012) (Kaplan, J.) (finding application not to be extraterritorial "if there is a domestic pattern of racketeering activity aimed at or causing injury to a domestic plaintiff"), *with Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (Rakoff, J.), (determining that the statute seeks to regulate enterprises, and consequently that the focus should be "on how a pattern of racketeering affects an enterprise"), *aff'd sub nom*, *Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012); *see also Republic of Iraq*, 2012 WL 566298, at *21 (describing district courts' division over what standard to apply).  The Court takes no position on which standard is correct.  Applying Second Circuit precedent under any standard, Plaintiffs' allegations describe a foreign, and not a domestic, scheme.

In *Norex*, the Second Circuit determined that the plaintiff, Norex, had failed to state a claim for a domestic RICO violation for an alleged racketeering scheme aimed at seizing control over the Russian oil industry.  *Norex*, 631 F.3d at 31.  Although Norex's complaint alleged that the defendants "had committed numerous acts in the United States" to further the scheme, including money laundering, the Second Circuit nonetheless dismissed the claim.  *Id.*  Two years later, in *Cedeño v. Castillo*, the Second Circuit affirmed the district court's dismissal of

plaintiffs' claims for failure to state a domestic RICO claim.  457 F. App'x at 37-38.  Plaintiff Cedeño was a Venezuelan citizen suing a collection of individuals and entities associated with the government officials who had allegedly arranged to have him "unjustifiably imprisoned for almost three years in Venezuela." *Cedeño*, 733 F. Supp. 2d at 472.  The connection between the Venezuelan perpetrators and the United States was "limited to the movement of funds into and out of U.S.-based bank accounts." *Id.*  The Second Circuit held that this was insufficient to sustain a RICO claim under two alternative tests.  First, if "the locus of the enterprise" were determinative, the claim failed because the scheme at issue was based in Venezuela. *Cedeño*, 447 F. App'x at 37.  Second, if the Court were to look to the "pattern of racketeering," the claim would fail because "[t]he only connection between (1) the pattern of racketeering that Cedeño alleges occurred in the United States (money laundering) and (2) the injuries he sustained (imprisonment and interference with his assets) is that members of the Venezuelan Government used the Microstar Transaction as a pretext for his subsequent arrest." *Id.* at 37-38.

Key to the findings that Norex and Cedeño did not state a claim for a domestic RICO violation was the fact that "the actors, victims and conduct were foreign, and the connection to the United States was essentially incidental." *Chevron Corp.*, 871 F. Supp. 2d at 244 (quoting *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1210 (D. Colo. 2011)).  Indeed, in *Chevron Corp.*, where the court found the plaintiff had alleged a domestic scheme, the plaintiff presented significant evidence that the pattern of racketeering activity occurred in, and was aimed at, the United States.  *Id.* at 245 ("The scheme (1) allegedly was conceived and orchestrated in and from the United States (2) in order wrongfully to obtain money from a company organized under the laws of and headquartered in the United States…, and (3) acts in its furtherance were committed here by Americans and in Ecuador by both Americans and

Ecuadorians.").  Unlike the "incidental" connections in *Norex* and *Cedeño*, the court held that

that the "conduct of [this] enterprise within the United States was a key to its success."  *Id.*

The Court finds the scheme alleged by Plaintiffs to be foreign, and the connection to the

United States to be incidental.  The scheme (1) allegedly was conceived and orchestrated by

Ukrainian officials in Ukraine; (2) in order to wrongfully bribe Ukrainian officials to (3) engage

in politically-motivated trials and incarceration of Plaintiffs; and (4) the acts in furtherance

allegedly perpetrated in the United States involved only investing money in U.S.-based

corporations.  The Court concludes that this is a foreign enterprise and that all "key aspects of the

alleged scheme were focused abroad."  *See Republic of Iraq*, 2012 WL 566298, at *22

(dismissing for failure to state a claim where it was "implausible to accept that the thrust of the

pattern of racketeering activity" was directed at the United States).

The scheme alleged here—where both the victims and victimizers are foreign and the

alleged perpetrators committed no wrongdoing in the United States, but merely invested alleged

funds in U.S.-based corporations—is not sufficient to state a claim for a domestic RICO

violation.  *See, e.g.*, *Norex*, 631 F.3d at 33 (approving dismissal where plaintiffs alleged

"numerous acts in the United States…including mail and wire fraud [and] money laundering").

The "only connection" between the "pattern of racketeering that [Plaintiffs] allege occurred in

the United States (money laundering) and (2) the injuries [they] sustained" in Ukraine

(politically-motivated trial and imprisonment) is that the U.S. Defendants "laundered" illegally

obtained funds to shield them from the Ukrainian courts.  *Cedeño*, 457 F. App'x at 37-38.  This

tangential relationship is not sufficient to bring a wholly foreign enterprise within the ambit of a

federal court.  Accordingly, Plaintiffs' RICO claim is dismissed.

## V.      SUPPLEMENTAL JURISDICTION OVER REMAINING CLAIMS

The sole basis for subject matter jurisdiction in this case is 28 U.S.C. § 1331, which authorizes federal question jurisdiction for Plaintiffs' claims under the ATS and RICO.  (AC ¶ 46).  Now that the Court has dismissed Plaintiffs' federal law claims, however, it can no longer exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367; consequently, those claims are dismissed as well.

## VI.     LEAVE TO REPLEAD

In their brief, Plaintiffs "request leave to amend their pleadings to cure any deficiencies that this Court may find."[7]  (Pls.' Mem. in Opp'n 34).  Plaintiffs have already amended their complaint once as of right.  [Dkt. No. 23].  At a conference on March 30, 2012 and in a written order on April 2, 2012, Judge Nathan noted that "[i]f Plaintiffs wish to file a second amended complaint, [they] must do so on or before April 13, 2012."  [Dkt. No. 26].  Plaintiffs chose not to do so.  The U.S. Defendants filed their motion to dismiss on April 27, 2012.  [Dkt. No. 44].  The U.S. Defendants oppose Plaintiffs' request for leave to amend.  (U.S. Defs.' Reply Mem. in Supp. 19-20 [Dkt. No. 55]).

Under Federal Rule of Civil Procedure 15(a), "a party may amend the party's pleading…by leave of court…and leave shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  The issue of whether to allow Plaintiffs to replead is a matter of this Court's "sound discretion."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see*

---

[7] Plaintiffs also requested leave to seek jurisdictional discovery if the Court found "any jurisdictional deficiencies in plaintiffs' pleadings."  (Pls.' Mem. in Opp'n 34).  The briefing on this motion addressed two types of jurisdiction: (1) supplemental jurisdiction over Plaintiffs' state law claims, and (2) personal jurisdiction over Defendant Manafort.  Jurisdictional discovery is not warranted on either subject.  Discovery with respect to supplemental jurisdiction is not warranted because that portion of the Court's holding is predicated on its dismissal of Plaintiffs' federal claims, and jurisdictional discovery would be futile to cure that defect.  Because the Court dismisses Plaintiffs' claims on other grounds, it need not reach Manafort's personal jurisdiction argument.  Consequently, jurisdictional discovery on this ground is also inappropriate.  *See Jazini v. Nissan Motor Co., Ltd.*, 149 F.3d 181, 186 (2d Cir. 1998).

*also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").  However, the U.S. Defendants argue Plaintiffs' request should be denied because they did not file a formal motion requesting leave to amend.  *See Copeland ex rel. NBTY, Inc. v. Rudolph*, 160 F. App'x 56, 59 (2d Cir. 2005) (finding district court's denial of leave to amend proper where plaintiff raised it in a footnote in its brief and it went unnoticed); *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 404 (2d Cir. 2005) (same).  Defendants also contend that Plaintiffs have failed to explain how they would cure the defects of the AC.

Although the Court agrees that Plaintiffs have not filed a formal motion to amend and that it may be within the Court's discretion to refuse Plaintiffs such leave, the Court declines to do so in this case.  Once given the guidance of this Court's opinion, Plaintiffs may be able to supply additional facts to support their claims.  The Court finds that the circumstances do not justify departing from the "usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus.*, 949 F.2d at 48.  Consequently, Plaintiffs' request for leave to amend is GRANTED.

## VII.    CONCLUSION

For the foregoing reason, the U.S. Defendants motion to dismiss is GRANTED without prejudice.  This Opinion resolves Docket Entries 44 and 50.

SO ORDERED.

Dated: New York, New York
       March 26, 2013

/s/_____
Kimba M. Wood
United States District Judge