**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
_____

**YULIA TYMOSHENKO, SCOTT SNIZEK, CHRISTY**
**GREGORY RULLIS and JOHN DOES 1 through 50,**
on behalf of themselves and all of those similarly situated,

|  |  |
|---|---|
| *Plaintiffs,* | 11-CV-2794 (KMW) |
| v. | **SECOND AMENDED**<br>**COMPLAINT** |

**DMYTRO FIRTASH a/k/a DMITRY FIRTASH,**
**SEMYON MOGILEVICH, ARTHUR G. COHEN, KAREN**
**COHEN**; **BRAD S. ZACKSON, PAUL J. MANAFORT,**
**CMZ VENTURES, LLC,  KALLISTA INVESTMENTS**
**LLC a/k/a CALISTER INVESTMENTS LLC, THE**
**DYNAMIC GROUP a/k/a THE DYNAMIC FUND**,
**BARBARA ANN HOLDINGS LLC, VULCAN**
**PROPERTIES, INC., GROUP DF, GROUP DF LIMITED,**
**GROUP DF FINANCE LIMITED, GROUP DF REAL**
**ESTATE, and JOHN DOES 1 through 100,**
                                        *Defendants*.
_____

## SECOND AMENDED COMPLAINT

**I.    INTRODUCTION**

1.         This case concerns the unlawful operations of a Racketeering Enterprise

formed by the named defendants and their co-conspirators for the purpose of engaging in an

unlawful acts of racketeering within the United States.

2.         Upon the agreement of defendants **Dymtro Firtash** and **Semyon Mogilevich**

to provide the initial funding for the formation of defendants' U.S.-based Racketeering

Enterprise, the New York and Washington-based defendants **Arthur G. Cohen**, his wife, **Karen**

**Cohen, Brad S. Zackson** and **Paul J. Manafort**, and their various companies - **CMZ Ventures,**

**LLC,  Kallista Investments LLC a/k/a Calister Investments LLC, The Dynamic Group**

**a/k/a The Dynamic Fund**, **Barbara Ann Holdings LLC, and Vulcan Properties, Inc.**—all of whom were part of the Racketeering Enterprise, conducted a series and pattern of racketeering acts within the U.S., including the acquisition of various U.S. companies and businesses  in furtherance of their Racketeering Enterprise, in violation of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

3.      The initial funds for the operation of defendants' Racketeering Enterprise came from the unlawful profits that defendant Dmytro Firtash and others "skimmed" from RosUkrEnergo AG ("RUE") which, from 2004 to early 2009, served as a middleman in natural gas dealings between Naftogaz, a Ukrainian state-owned gas company, and Gazprom, a Russian company. Firtash, who largely controls RUE, was able to secure profits from various corrupt Russia-Ukraine gas deals due to his close relationship with, and payment of illegal kickbacks to, Ukrainian government officials, including then Naftogaz Chairman Yuriy Boyko and Deputy Chairman Ihor Voronin, both of whom were nominated to RUE's Coordination Committee after securing RUE's initial brokerage contract.

4.      Firtash and the U.S.-based defendants and co-conspirators, which together constitute a domestic U.S. racketeering enterprise, used the  proceeds from the Russia-Ukraine gas deals to acquire various U.S.-based companies and entities, which were then incorporated into defendants' racketeering enterprise and used to generate unlawful proceeds by means of a series of racketeering acts spanning over a period of several years and continuing to the present.

5.       Throughout the relevant time period, former Prime Minister Tymoshenko was a vocal critic of RUE's gas contracts and the government corruption that enabled RUE to secure these contracts.  Early in 2008, for example, during Tymoshenko's second term as Prime Minister, she revoked the authority of a RUE/Naftogaz joint venture to operate in Ukraine.

Thereafter, to end the European "gas crisis" in January 2009, Tymoshenko facilitated the negotiation of gas purchase and transit contracts with Gazprom (hereinafter referred to as Ukraine's "2009 gas contracts"), which eliminated RUE as a middleman, resulting in a significant loss of revenue to RUE, which was the primary source of the initial funding used by defendants to establish their U.S. based Racketeering Enterprise.

6.       Although defendants Firtash, and his agents and co-conspirators, attempted to sabotage the 2009 gas contracts during Tymoshenko's term as Prime Minister, they were unsuccessful in doing so at the time. Following the conclusion of the contracts and Naftogaz's confiscation of RUE's gas, Firtash and RUE developed a scheme and strategy to eliminate Tymoshenko and other leaders of the political opposition as a threat to their initial funding of the newly formed and U.S.-based racketeering enterprise they were building.

7.       When Yanukovych took office as the President of Ukraine in February 2011, several of Firtash's close allies were appointed to senior posts in the Yanukovych Administration and other positions of influence. For example, Yuriy Boyko, a close associate of Firtash who was instrumental in securing RUE's brokerage contracts in Ukraine's earlier Naftogaz-Gazprom gas deals, was appointed Minister for Fuel and Energy. Another close Firtash associate also replaced Naftogaz CEO Ihor Didenko, who has since been arrested for signing the 2009 gas contracts on behalf of Naftogaz.

8.       In order to recoup the monies that Firtash and his co-conspirators had "lost" when RUE was barred from acting as the broker in the natural gas contracts between Russia and Ukraine, the Yanukovych government essentially conceded RUE and Firtash's bogus claims and failed to defend Ukrainian citizens' financial interests in the Stockholm Arbitration brought by RUE and Firtash. As a result of this complete reversal of position in the Arbitration proceedings,

Firtash and RUE were awarded 12.1 billion cubic meters of gas, equal in value to $3.5 billion and exceeding half of Ukraine's domestic reserves at the time.[1]

9.        To ensure that the natural gas "commission" monies, which were being used as the initial financing of their U.S.-based Racketeering Enterprise, would never again be cut-off, Firtash, RUE and their co-conspirators targeted for elimination former Prime Minister Tymoshenko and other political opposition leaders who were outspoken critics of RUE's involvement in the Russia-Ukraine gas trade. These sham investigations and "show trials" were part of a widespread and systematic pattern of terror and intimidation carried out by the defendants and their co-conspirators within the Yanukovych Administration, against leaders of the political opposition who posed a threat to the uninterrupted flow of natural gas contract "commissions" being used to finance the start-up of defendants' U.S.-based Racketeering Enterprise.

II.      **PARTIES**

        A.        <u>**Plaintiff and Plaintiff Class Members**</u>

10.        Plaintiff **YULIA TYMOSHENKO** brings this civil RICO action individually and on behalf of the entire class of persons who have been damaged by defendants' acts of racketeering in furtherance of their scheme to establish and fund their U.S.-based Racketeering Enterprise. Tymoshenko was the Prime Minister of Ukraine for a period of time in 2005, and again from 2007 to 2010.  She has also served as the leader of the largest opposition party in Ukraine.  As part of a concerted attempt to protect the flow of gas contract-related "commissions" used to fund the expansion of defendants' racketeering enterprise based in the U.S., defendants and their co-conspirators have subjected Tymoshenko to a series of politically-

---

[1] Because Naftogaz is entirely state-owned, this colossal judgment is ultimately being paid by Ukrainian citizens.

motivated investigations and sham prosecutions, designed to neutralize and eliminate her outspoken opposition to defendants' corrupt practices. In the course of these "show trial" prosecutions, Tymoshenko has been unjustly incarcerated since August 5, 2011, and is gravely ill and in urgent need of medical attention that has been offered by Germany, but has been refused by the current Ukraine government.[2]

11.       Plaintiff **SCOTT SNIZEK**, a U.S. citizen and resident of New York, also brings this action individually and on behalf of others similarly situated who were damaged by defendants' Racketeering Enterprise. Mr. Snizek worked with the U.S.-based defendants from their offices at 1501 Broadway in Manhattan. He, like many others, was duped and deceived by the defendants into believing that defendants were engaged in legitimate business ventures in New York and elsewhere in the U.S., when in truth and in fact, defendants operated their various U.S.-based companies as part of their Racketeering Enterprise for various unlawful purposes,

---

[2] Other political opposition leaders who have been jailed and/or prosecuted for criticizing defendants and their co-conspirators for their "skimming" of gas contract monies under the guise of "commissions" are: **Yuriy Lutsenko**, an important ally of Tymoshenko during her second term as Prime Minister, who was jailed for "failing to cooperate with the prosecution; **Valeriy Ivashchenko**, another Plaintiff Class Member and former Acting Minister of Defense during Tymoshenko's premiership, was arrested on August 21, 2010 on politically-motivated charges of "abuse of power of official position;" **Ihor Didenko**, Naftogaz's former CEO who signed the 2009 gas contracts on behalf of Naftogaz, was arrested in July 2010 , **Yevhen Korniychuk**, the former First Deputy Minister of Justice in the Tymoshenko administration, was arrested and jailed on December 22, 2010 on politically-motivated charges that courts had twice concluded to be without merit; **Anatoly Makarenko,** the Customs Chief of Ukraine in the Tymoshenko administration; **Mykola Petrenko,** who was a member of Ukraine's executive administration during Tymoshenko's term as Prime Minister and Director of UkrMedPostach, the Ukrainian state-run enterprise through which Ukraine's Ministry of Health was attempting to improve the health of Ukraine's rural population; **Taras Shepitko,** who served as Deputy Head of the Kyiv Regional Customs Office in the Tymoshenko administration; **Mykola Synkovsky,** former Deputy Head of the State Committee of State Material Reserves under Tymoshenko; **Mykhailo Pozhyvanoy,** former Chairman of the State Committee of State Material Reserves and Deputy Economy Minister; **Bogtdan Danylyshyn,** the former Minister of the Economy under Tymoshenko; **Viktor Bondar,** former Minister for Transport and Communications and Deputy Head of the State Customs Service; **Vitaliy Nikitin**, who served as Acting Head of the State Committee of State Material Reserves under the Tymoshenko Government; **Tetyana Slyuz**, former head of the State Treasury of Ukraine; **Tetyana Grytsun**, former First Deputy Head of the State Treasury; **Victor Kolbun**, former Deputy Pension Fund Board Chairman; and **Oleksandr Danyevych,** former State Treasury Deputy Chief.

including violations of the U.S. and New York State Labor Laws requiring employers to properly compensate their employees and to keep accurate records of the payment of salaries, commissions and other compensation. Instead, defendants disguised certain payments to Snizek as "reimbursement of expenses," and completely failed to pay him for most of the services that he rendered. These unlawful practices are currently being investigated by the U.S. and New York State Departments of Labor.

12.      Plaintiff **CHRISTY GREGORY RULLIS**, a U.S. citizen, brings this action individually and on behalf of other persons who were damaged by defendants' racketeering acts in the U.S. Ms. Rullis worked for defendants' New York based operations at 1501 Broadway, New York, New York, and suffered monetary damages when defendants failed to pay her for her services and deceived her into thinking that the defendant companies she was working for were legitimate business enterprises, when in truth and in fact, they were part of defendants' Racketeering Enterprise engaged in a carefully and secretly planned pattern of racketeering activity.

13.      Plaintiff**s JOHN DOES # 1 through 50** are various individuals, companies and businesses in the United States who have been damaged as a result of the acts of racketeering engaged in by defendants and other participants in the Racketeering Enterprise.

## Defendants and their Co-Conspirators

14.      Defendant **DMYTRO FIRTASH** a/k/a Dmitry Firtash ("Firtash") is a Ukrainian billionaire and a close associate and advisor to the current Ukrainian President, Victor Yanukovych. Firtash is one of the principal co-conspirators of defendants' Racketeering Enterprise, exercising complete dominion and control over at least six of the following defendant companies, including a number of American companies, which he acquired and financed with

illegally-obtained funds:  Centragas Holding AG ("Centragas"); defendant CMZ Ventures, LLC;

the Dynamic Fund a/k/a The Dynamic Group; Kallista Investments LLC a/k/a/ Calister

Investments LLC, Group DF Limited (a/k/a Group of Dmitry Firtash), and its subsidiaries and

affiliates Group DF Finance Limited and Group DF Real Estate.

          15.        Defendants **GROUP DF LIMITED** (otherwise known as Group of Dmitry

Firtash), and its subsidiaries and affiliates **GROUP DF FINANCE LIMITED** and **GROUP DF**

**REAL ESTATE** (collectively, "**GROUP DF**") operate as Firtash's alter egos.  Group DF is

Firtash's international private holding company and identifies itself on its website as "The

Firtash Group of Companies" and "the international private holding company of prominent

Ukrainian businessman Dmitry Firtash."  *See* **Exhibit 1**.  Firtash and his silent partner, defendant

Semyon Mogilevich, own a controlling interest in Group DF, with Firtash serving as Group DF's

executive chairman.  Firtash has total control and dominion over Group DF, which he has used to

purchase and control interests in several U.S.-based companies comprising a significant part of

defendants' Racketeering Enterprise.

          16.        Defendant **SEMYON MOGILEVICH,** a leader of the most powerful

Russian organized crime syndicate, is on the FBI's "Most Wanted" list and has been described as

"the most dangerous mobster in the world."  *See* **Exhibit 2**.  Mogilevich was the subject of a 45-

count racketeering and money laundering indictment in the United States District Court for the

Eastern District of Pennsylvania, captioned *United States v. Mogilevich*, Crim. No. 02-157, in

which the U.S. Government alleges Mogilevich organized a sophisticated stock fraud and money

laundering scheme in the U.S., using complicated financial transactions made through shell

companies located in Europe.  *See* **Exhibit 3**.  Defendant Firtash has admitted that he got his

start in the gas trading business with Mogilevich's assistance.   *See* U.S. Embassy Cables: "Gas Supplies Linked to Russian Mafia." The Guardian (Dec. 1, 2010), **Exhibit 4.**

17.     Defendants **CMZ VENTURES, LLC**, **the DYNAMIC FUND** a/k/a The Dynamic Group, and **KALLISTA INVESTMENTS LLC** a/k/a/ Calister Investments LLC operate out of shared offices at 1501 Broadway, 25th floor, New York, New York 10036.  CMZ Ventures and Kallista Investments were incorporated in Delaware and do business in New York. The Dynamic Fund is an international investment fund established by Group DF and Firtash, through CMZ Ventures and Kallista Investments.  Although the three companies have different names, they have no meaningful corporate structure, but rather are  corporate "fronts" for the racketeering activities engaged in by Firtash and the other defendants in New York and elsewhere in the U.S. Among other things, these corporate defendants act as investment vehicles for Firtash and his associates to channel their illegal proceeds from the Naftogaz-Gazprom gas contracts into the U.S. to fund the start-up and continued operations of their racketeering activities in New York and elsewhere in the U.S. CMZ Ventures has an account at the Metropolitan National Bank in New York (Acct. No. 2000506) that it uses for various money laundering and other racketeering purposes.

18.     CMZ Ventures "Preliminary Term Sheet" lists as joint owners the following three corporations:  (1) Defendant **BARBARA ANN HOLDINGS, LLC**, a corporation registered in Delaware and 90% owned by Defendant **BRAD S. ZACKSON**; (2) Defendant **VULCAN PROPERTIES, INC.**, a corporation run and controlled by Defendant **ARTHUR G. COHEN**, although wholly owned by his wife, Defendant **KAREN COHEN**; and (3) a corporation described in the formation papers as "XXX LLC", controlled by defendant **PAUL MANAFORT.**  *See* **Exhibit 5**. Each of these corporations and their owners acted as agents for

8

Firtash and other participants in the Racketeering Enterprise by covertly investing their money through CMZ Ventures, Kallista Investments, and the Dynamic Fund.

19.     Defendant **PAUL J. MANAFORT** is a well-known Washington D.C. lobbyist and political consultant. He is the senior partner in the firm Davis, Manafort and Freedman. Manafort also worked in Ukraine on various political campaigns, including the successful 2010 presidential campaign of Victor Yanukovich, who is the President of Ukraine at present. Manafort played a key role in the defendants' conspiracy and racketeering enterprise by assisting Firtash to become a major "investor" and silent partner in defendants CMZ Ventures (sometimes referred to as "ZMC Investors"), Group DF and their affiliated companies, through which Firtash and his associates were able to money launder and invest in various U.S-based companies a large portion of the funds that Firtash, Group DF and RUE were skimming from numerous Gazpron/Naftogaz natural gas transactions, as well as the windfall payments and profits worth approximately $3.5 billion that they received as a result of the corrupt transactions and breaches of fiduciary duties that resulted in the Stockholm Arbitration award, as described below in greater detail.

20.     These monies were then funneled into various New York based bank accounts and used to finance the money laundering and other racketeering acts engaged in by defendants from their New York base under the guise of otherwise legitimate real estate deals and other investment activities in New York and elsewhere in the United States. The contracts, agreements, meetings, discussions and electronic communications (e.g., computer, email and fax transmissions) relating to said racketeering activities were primarily conducted through defendants' offices located at 1501 Broadway, 25th floor.

21.      Each of the defendants had substantial and purposeful contacts with New York in that the defendants either were based at the New York offices ("the New York defendants") or, as to the defendants who were based elsewhere, they had the New York defendants act as their agents with regard to all activities of their racketeering enterprise that were conducted from the New York offices.

22.      The money laundered funds of defendants' Racketeering Enterprise were either used to purchase and/or maintain an interest in the various defendant companies that comprised part of the Racketeering Enterprise engaged in a pattern of racketeering activity in New York and elsewhere in the United States. In addition, a portion of the money-laundered funds were then funneled back to Ukraine to provide the "financing" for the persecution and political suppression of Tymoshenko and other leaders of the political opposition in Ukraine who had vocally opposed the "skimming" of millions of dollars from the gas contracts by Firtash, RUE and their associates. The objective of this campaign of terror and intimidation was to eliminate Tymoshenko and her political allies as a threat to defendants' corrupt practices relating to the gas contracts, which generated a significant portion of the initial and ongoing financing for defendants' U.S.-based Racketeering Enterprise.

23.      Since defendant **Manafort** been a key advisor to President Yanukovich and other Ukraine political figures since 2003, he knew exactly how Firtash and his affiliated companies and associates were able to skim billions of dollars from the natural gas deals between Russia and Ukraine, and he knew that the monies were used to acquire ownership and control of various U.S.-based companies in furtherance of defendants' Racketeering Enterprise. By inviting Firtash (and his silent partner Mogilevich) to utilize various U.S. based companies to facilitate Firtash's money laundering and political corruption activities, Manafort gave Firtash

and his European-based co-conspirators the opportunity to participate with the U.S.-based defendants in a new Racketeering Enterprise focused on corporate acquisitions, money laundering and other racketeering activities in the United States, where it continues to operate.

24.      Non-Party Co-conspirator **CENTRAGAS HOLDING AG ("Centragas")** is a Firtash alter ego and holding company incorporated in Vienna, with offices in Austria. Centragas conducts a significant part of its business in the United States and is 90% owned by Group DF.  As such, Centragas is controlled by Firtash through Group DF and is essentially indistinct from Group DF and Firtash himself.  Centragas, in turn, has been used repeatedly by Firtash in the Racketeering Enterprise as an intermediary to purchase stock in and control various U.S.-based companies and other entities.

25.      Non-party co-conspirator **ROSUKRENERGO AG ("RUE")** was created to serve as a middleman in the transportation of natural gas from Turkmenistan through Russia to Ukraine.  Firtash owns 45% of RUE through his holding company, Centragas Holding AG. Ukrainian businessman and Firtash associate Ivan Fursin also owns a 5% share of RUE through Centragas, with Gazprom owning the remaining 50% of RUE through Arosgas Holding AG.  *See* Minutes from RUE Meeting (July 29, 2004).  Even though Firtash and his co-conspirators are not majority shareholders, they effectively control RUE's operations.

26.      From 2004 to 2009, RUE and Firtash, through Centragas, received huge "profits" through their unlawful manipulation, as the intermediary, of prices in natural gas deals between Gazprom, the Russian-owned natural gas company,  and Naftogaz Ukrainy National Joint-Stock Company ("Naftogaz"), a natural gas company owned solely by the Ukrainian state. For example, on July 29, 2004, Naftogaz and RUE entered into a contract (No. 14/935-1/4) for the sale and purchase of natural gas during the period from 2005-2028, which was signed by co-

conspiratorYuriy Boyko ("Boyko") as the Chairman of the Board of Naftogaz, and which designated two Naftogaz bank accounts in New York at the Bank of New York (Acct. 890-0260-947) and Deutsche Bank (Acct. 04-094-040) through which huge sums of money were transferred to the defendants and their co-conspirators in furtherance to their racketeering scheme and enterprise, for the primary purpose of funding their U.S.-based Racketeering Enterprise ("the Enterprise") through the acquisition and/or financing of the U.S.-based defendant companies and other investment projects in the U.S. through which defendants engaged in the their numerous acts of racketeering on behalf of the Enterprise. *See* **Exhibit 6**.

27.     Naftogaz and RUE entered into another contract on July 29, 2004 (No. 13/935-3/04) that was similarly signed by Boyko and designated the same two New York bank accounts to be used for the wire transfer of funds. *See* **Exhibit 7**.

28.     On January 4, 2006, Gazprom, Naftogaz and RUE entered into a contract "on development of relations in gas sector," that designated RUE as the sole "supplier" of Gazprom natural gas for the transport of the natural gas through Ukraine and export to Western Europe. *See* **Exhibit 8**.

29.     Non-party co-conspirator **Yuriy Boyko** ("Boyko") a Ukrainian citizen, has been an ally and co-conspirator of Firtash for many years, and has strong financial ties to Firtash. In 2004, Boyko served as Chairman of Naftogaz's Board.  In this capacity, Boyko signed and, upon information and belief, helped to secure RUE's contracts as an intermediary in the Russia-Ukraine gas trade despite significant conflicts of interest. *See*, e.g., **Exhibits 6, 7 and 8**. Among other conflicts of interest, Boyko was simultaneously serving on RUE's Coordination Committee, which was responsible for all major decisions of the company, and was authorized to represent Firtash's interests before Ukrainian state and local bodies and in all contracts,

agreements, and legal transactions pursuant to a Power of Attorney executed by Firtash. After Yanukovych's election, Boyko was named Ukraine's Minister of Fuel and Energy, leading the Ukrainian government to reverse its stance on the legality of the 2009 gas contracts that Tymoshenko had negotiated cutting out RUE as a middleman. As a result of this change in position, an arbitral award against Naftogaz valued at over $3 billion was issued.

30.      Defendants **JOHN DOES # 1 through 100** are other individuals and companies, some of whose identities are presently unknown, who conspired with and/or aided and abetted the named defendants as part of a racketeering conspiracy to funnel unlawfully obtained funds from the natural gas contracts into various U.S. based bank accounts, for the purpose of acquiring, financing and/or operating the defendant companies and various other U.S.-based investment projects through a pattern of racketeering activity in furtherance of the Enterprise's unlawful objectives, spanning a time period of at least several years, and which continues through the present and into the foreseeable future.

## III.    JURISDICTION AND VENUE

31.      This Court has personal jurisdiction over all defendants by virtue of either their location in New York, their business and/or tortious activities in this state, or by operation of Fed. R. Civ. P. 4(k)(1-2).

32.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction),  and 18 U.S.C. § 1964(c) (RICO). Plaintiffs allege that Defendants conducted multiple racketeering activities that had a continuity of structure and purpose over an extended period of time.  RICO provides federal jurisdiction for persons "injured in [their] business or property" by acts taken pursuant to a racketeering "enterprise."  18 U.S.C. § 1964(c).

33.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under the laws of the State of New York.

34.     Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c).  Furthermore, there is no foreign independent or impartial forum in which to bring this action.

IV.     **STATEMENT OF FACTS**

      A.     <u>**Ukraine's Political Leadership**</u>

35.     Yulia Tymoshenko first came to power as Prime Minister of Ukraine in 2004 following Ukraine's bloodless "Orange Revolution," which was sparked by mass demonstrations in Kyiv's Independence Square protesting the election of Viktor Yanukovych as Ukraine's next President.  Yanukovych had been declared the 2004 election winner by a small margin amidst widespread complaints of voting fraud.

36.     Under international and domestic pressure, Ukraine's Supreme Court ultimately struck down the initial 2004 election results and ordered a run-off election to be held. When Yanukovych's opponent, Victor Yushchenko, emerged victorious in the 2004 run-off elections, Tymoshenko was appointed Prime Minister.  She served in this role until September 8, 2005. On December 18, 2007, Tymoshenko again assumed the office of Prime Minister of Ukraine and ran for President against Yanukovych in 2009.  In February 2010, however, Yanukovych beat Tymoshenko for the presidency by 3% of the vote.

37.     Tymoshenko was thereafter forced to resign as Prime Minister on March 4, 2010.  Thereafter, she was the leader of the largest opposition party in Ukraine's Parliament, the Batkivshchyna Party.

### B.  Yanukovych's Consolidation of Power

38.     Following his election to the presidency, Yanukovych consolidated his power through far-reaching "reforms" of the executive, legislative, and judicial branches and the use of politically-motivated criminal prosecutions brought against his opponents in an attempt to intimidate them and prevent Tymoshenko and her allies from regaining political power and thereby threaten the enormous revenue stream from defendants' Racketeering Enterprise.  The Yanukovych Administration's policies have drawn widespread international criticism for the continued erosion of democratic procedures, which are increasingly turning Ukraine into an authoritarian state.

39.      Upon his election, Yanukovych's political coalition still fell seven votes short of a parliamentary majority.  The Ukrainian Parliament, however, amended its procedural rules for forming a new government to enable a majority coalition to be formed by both factions and individual members of Parliament, notwithstanding the fact that this was in conflict with a prior 2008 decision by Ukraine's Constitutional Court.  Nevertheless, under pressure by the Yanukovych Administration, the Constitutional Court reversed its prior decision, sanctioning Yanukovych's majority coalition and the unseating of the Tymoshenko-led majority.

40.     The Constitutional Court's decision marked the beginning of the politicization of Ukraine's judiciary.  In September 2010, four of the Court's justices who opposed the decision resigned, with two of whom admitting that they had been pressured to step down by Ukraine's Congress of Judges.  On September 21, 2010, new justices loyal to Yanukovych were sworn in as replacements.  Fifteen of the eighteen judges on Ukraine's Constitutional Court are now considered loyal to Yanukovych.

41.     Nine days after these new justices assumed office, the Constitutional Court invalidated Ukraine's 2004 Constitution due to cited "procedural irregularities" in its adoption,

15

notwithstanding that the 2004 Constitution was a direct result of Ukraine's Orange Revolution and, ironically, its decentralization of presidential powers had been demanded by Yanukovych himself.

42.     The Constitutional Court's decision effectively reinstated the 1996 Constitution, which conferred upon Yanukovych greater powers, including the power of appointment over the Prosecutor General's Office ("PGO") and virtually every other important government office.  Thereafter, under the guise of administrative reform and budgetary cuts, Yanukovych substantially reduced the number of ministries, executive advisors, and government agencies, replacing current government appointees with Yanukovych's allies, many of which were also close associates of defendant  Firtash and who had accepted illegal kickbacks and other support from Firtash and his agents, associates, and other co-conspirators in the past.

43.     The Yanukovych Administration "reformed" other aspects of the judiciary, which has effectively deprived Ukraine of any semblance of judicial independence and impartiality.  In order to solidify control over Ukraine's separate Supreme Court, for example, the Yanukovych Administration decreased the number of Supreme Court judges from 49 to 20, and held what have been referred to as judicial "casting calls" to determine which judges were loyal to the administration and would stay on the Court, and which would be dismissed.

44.     A new "Law on the Judicial System and the Status of Judges," signed by President Yanukovych, also significantly reduced the Supreme Court's role by creating a new High Specialized Court in Civil and Criminal Matters, which is headed by a Yanukovych ally and previous Member of Parliament ("MP") for Yanukovych's political party, the Party of Regions ("PoR").  The Law also granted increased powers to Ukraine's High Council of Justice,

such that with the allegiance of at least 16 of the 20 members on the High Council of Justice, Yanukovych has virtually complete control over the hiring and firing of judges.

**C.  Defendants' Campaign to Eliminate Plaintiffs As A Threat to Their Racketeering Enterprise Through Baseless Arrests and Sham Prosecutions,**

45.     What defendants have not been able to accomplish through such institutional "reforms" of Ukraine's executive, legislative, and judicial branches described above, it has attempted to achieve through the illegitimate use of the criminal laws to target and eliminate plaintiffs' political opposition in Ukraine.

46.     On November 4, 2010, Viktor Pshonka assumed office as Ukraine's new Prosecutor General, publicly referring to himself as "a member of President Yanukovych's team." What he failed to publicly disclose was that he was appointed to this immensely powerful position so that he could protect the "skimming" operations from the natural gas contracts, which provided much of the initial financing for defendants' start-up of their U.S.-based Racketeering Enterprise.

47.     To silence Tymoshenko's political opposition and thereby protect the unlawful "income stream" used to finance defendants' Racketeering Enterprise, Pshonka, as head of the PGO, opened numerous politically-motivated criminal cases against Tymoshenko and at least 11 other former senior government officials who served in her administration.

**Criminal Charges Against Yulia Tymoshenko**

48.     The Yanukovych Administration, with the assistance of Firtash and his co-conspirators, misused tremendous governmental resources to pursue these unfounded charges against Tymoshenko and her allies in order to neutralize these opposition leaders and eliminate the threat they posed to the continual and unimpeded flow of unlawfully acquired proceeds used to finance defendants' Racketeering Enterprise.

a)   Kyoto and Opel Combo Charges

49.      A prime example of the bogus "criminal" investigations and prosecutions of plaintiffs is the allegation that Tymoshenko abused her power and improperly used budgetary funds related to the handling of revenues received by Ukraine in 2009 pursuant to international agreements for the sale of carbon emission credits under the framework of the Kyoto Protocol (referred to as "Kyoto Revenues").  Specifically, the PGO accused Tymoshenko of spending these Kyoto Revenues for purposes other than those specified in the agreements, thereby causing state losses to Ukraine and undermining the country's prestige among other Kyoto Protocol member states.[3]   Notably, the Kyoto Charges do not even allege personal financial gain on the part of former Prime Minister Tymoshenko or members of her government.

50.      The Kyoto Charges were patently false. An independent review of government documents by law firm Covington & Burling LLP and auditing firm BDO USA confirmed that none of the Kyoto Revenues were expended during Tymoshenko's tenure in office, with the balance of the Kyoto Special Purpose Fund set up to account for the revenues remaining constant as of the date of receipt. Indeed, the Ukrainian Government privately assured Japan that the revenues were fully accounted for.

51.      Similarly, the Opel Combo Charges allege that Tymoshenko abused her powers as Prime Minister by mandating and signing various orders and resolutions of the Cabinet of Ministers, which secured financing for and executed a contract with Austrian company Vamed Engineering GmbH & Co. KG ("Vamed") for the provision of medical equipment to Ukraine's rural areas, including 1,000 Opel Combo vehicles that were retrofitted to

---

[3] Heorhiy Filipchuk, who served as Environmental Protection Minister under Tymoshenko, was also arrested on charges of abuse of power and misuse of funds related to Ukraine's sale of carbon emission credits under the Kyoto Protocol.

run on rural terrains. The Opel Combo Charges allege that the Tymoshenko Government paid an inflated price for the vehicles as a result of the financing fees charged. As with the Kyoto Charges, however, the Opel Combo charges do not allege any *quid pro quo* or other personal financial benefit received by Tymoshenko or others negotiating the Vamed contract.

52.     The Opel Combo Charges were also not supported by the facts. Indeed, a Ukrainian Ministry of Economics Review found that the price paid for the Opel Combo vehicles was obtained at a significant discount. Law firm Covington & Burling LLP and auditing firm BDO USA also concluded, based on independent research, that the price Ukraine paid for the Opel Combo vehicles was no worse than market price. Likewise, the firms concluded the Vamed contract was a direct commercial contract, with no intermediaries, that followed well-established business practices.

b).     Gas Charges

53.     As it became clear that the Kyoto and Opel Combo Charges were based on politically popular decisions by the Tymoshenko Government, the Yanukovych Administration narrowed its focus on a third set of criminal charges set forth in an order dated April 11, 2011. These Gas Charges allege that during the regional gas crisis of January 2009, Tymoshenko exceeded her powers as Prime Minister by signing "directives" instructing Ukraine's state-owned energy company, Naftogaz, to enter into an agreement with its Russian counterpart, Gazprom, which set gas purchase and transit prices at rates that the Yanukovych Administration asserts in hindsight were unfavorable for Ukraine.

(1)     *Defendants Firtash, Mogilevich and their co-conspirators Worked Inside and Outside of Government Channels to Secure Their Favored Position in the Russia-Ukraine Gas Trade for RUE, from Which Defendants Received Most of Their Initial Funds for the Start-Up Funding for their U.S.-based Racketeering Enterprise*

54.      From its inception, RUE has been the subject of investigations by international law enforcement agencies and others regarding its opaque ownership structure, connections with organized crime, conflicts of interest by two of its directors, and the critical (but unnecessary) role it plays in huge natural gas transactions. RUE appears to have been created primarily to enable Firtash, Mogilevich, and their other associates to continue their lucrative "skimming" operations in natural gas transactions, much of which has been used to finance defendants U.S.-based Racketeering Enterprise.

55.      KPMG International, RUE's auditor, resigned because it determined that RUE "may be part of a larger undisclosed business group, presenting an unacceptable risk to KPMG's reputation." **Exhibit 9.**  The press has exposed RUE's and Firtash's connections to Russian organized crime through Mogilevich, who has been indicted in federal court on 45 counts relating to racketeering activities.  The United States Department of Justice also conducted an investigation in 2006 into RUE's suspected organized crime elements.  *See* **Exhibit 10.** American Ambassador to Ukraine William B. Taylor, Jr.'s diplomatic cables note that Firtash has acknowledged his ties to Russian mafia figure Mogilevich.  *See* **Exhibit 4.**

56.      RUE secured its privileged position in the Russia-Ukraine gas trade as a result of Firtash's close personal and financial ties to Naftogaz's leadership, including Yuriy Boyko and Ihor Voronin (Chairman and Deputy Chairman of Naftogaz's Board respectively), who had been instrumental in securing the 2004 and 2006 intermediary contracts for RUE

57.      On July 29, 2004, the same day that Boyko signed the gas intermediary contract with RUE on behalf of Naftogaz, Centragas appointed Boyko and Voronin to sit on RUE's Coordination Committee, which made "all the major decisions" for RUE. The two men served as key decision makers and leaders of both Naftogaz and RUE notwithstanding the

obvious conflict of interest presented by their simultaneous representation of two opposing parties in a commercial relationship of great importance to Ukraine.

58.     Further compounding this conflict of interest was a Power of Attorney executed by Firtash on December 13, 2005, which authorized Naftogaz Chairman Boyko to represent Firtash's interests at Ukrainian state and local bodies, including notarial bodies, insurance companies, credit and banking institutions, and land resource authorities. The Power of Attorney further gives Boyko "all necessary powers for the management and disposal of all property owned by" Firtash, including "property in collective ownership," such as real property, securities, cash resources, and corporate rights.  The document also authorizes Boyko to submit and sign on Firtash's behalf "all documents, including contracts, agreements, [and] legal transactions."

59.     Notwithstanding this long history of association with Firtash and RUE, Boyko falsely testified at Tymoshenko's trial that he had "no connection" with RUE.

        (2)    *Defendants Firtash, Mogilevich and their associates Funneled Their Ill Gotten Gains Into the United States, Which They Then Used to Acquire Control of and to Finance Various U.S.-based companies and business enterprises that Became a Part of Defendants' U.S.-based Racketeering Enterprise.*

60.     Upon information and belief, a sizable portion of RUE's proceeds from its natural gas transactions and the Stockholm arbitration award were "invested" by Firtash (and his silent partner Mogilevich), through defendant DF Group of affiliated companies, into U.S.-based bank accounts, companies and investment projects comprising part of defendants' Racketeering Enterprise.The complexity of the financial transactions also enabled Firtash and other participants in the Racketeering Enterprise to aid and abet the campaign to destroy members of the political opposition in Ukraine who were the most vocal critics of the continued "skimming"

from the natural gas deals being carried out under the guise of "commissions."  Consequently,

defendants have largely been able to carry out their racketeering activities in the U.S. with the

mask of legitimacy.

61.     Firtash and his agents and co-conspirators in the Racketeering Enterprise

made investments through a labyrinth of shell companies and other entities, almost all of which

are U.S.-based entities:

> American Land Capital Advisors, LLC
> American Land Diversified Fund LLP
> Arthur G. Cohen & Partners
> Barbara Ann Holdings, LLC (Delaware corporation)
> Balcott & Morgan Management, LLC (New York corporation)
> Belles Dynamic Holdings, LLC
> Blue Acquisition Member, LLC
> Brookmar Corp. (New York corporation)
> Brooklyn Marina Corp. (Delaware corporation)
> Calister Investments LLC
> CMZ Ventures Fund Advisors, LLP (Delaware limited liability partnership)
> CMZ Ventures, LLC
> CMZ Ventures Real Estate Fund I, LP (Delaware limited partnership)
> CMZ Ventures Real Estate Fund II, LP (Delaware limited partnership)
> Dvn Eleuthera Development, Inc. (Panama corporation)
> Dynamic Capital Corporation
> Dynamic Capital Inc.
> Dynamic Fund Advisors, LLC (Delaware limited liability company)
> Dynamic Fund Management, LLC (Delaware limited liability company)
> The Dynamic Group
> Dynamic Nevada Eleuthera, LLC
> Dynamic Vulcan Eleuthera Inc. (Panama corporation)
> Dynamic Real Estate Fund 1, LP (Delaware limited partnership)
> Dynamic Real Estate Solutions Ltd. (New York corporation)
> Dynamic Worldwide Development LLC (New York corporation)
> Dynamic Worldwide Energy LLC
> Dynamic Worldwide Properties, LLC
> Dynamic Worldwide Solar Energy, LLC
> Grandrock International, LLC
> Highrock Holdings (Cyprus firm with Mogilevich's wife as a major shareholder)
> JAB Holdings LLC (Nevada limited liability company)
> Kallista Investments LLC (Delaware corporation)
> Nadra Bank (5th largest Ukrainian bank purchased by Firtash through Centragas in May 2011)

Vulcan Properties, Inc. (Delaware corporation)
Waterview Holdings, LLC
ZMC Investors, LP
ZMC Kallista LLC
ZMC Partners, LP (Cayman Islands exempted limited partnership)
ZMC Ventures, LLC

62.      Upon information and belief, once these otherwise legitimate companies and/or legal entities were acquired with the proceeds of racketeering activities, or were newly formed, they did not observe corporate formalities or engage in arms-length transactions when conducting business, but rather intermingled funds, shared office space, management, and personnel, and were operated by the defendants and their co-conspirators for the purpose of furthering their money laundering and other racketeering activities.

63.      In the U.S., defendants' method of operation was that when one company that was part of their racketeering enterprise was investigated by a government agency or sued, it would be closed down, and its operations transferred to a new, clean company with a similar name to confuse government regulators.  This made it more difficult for government regulators to monitor each company's operations and trace its financing.

64.      Upon information and belief, Firtash and Mogilevich continue to be investigated by the United States Department of Justice for engaging in racketeering and money laundering activities.  Mogilevich has been indicted on racketeering, securities fraud, wire fraud, mail fraud, and money laundering charges in the United States District Court for the Eastern District of Pennsylvania.  *See* **Exhibit 3**.

65.      Although no federal criminal indictment has been brought yet against Firtash, upon information and belief, his application for a U.S. visa has been denied pending the outcome of the Department of Justice's investigation.

66.     Defendants and other members of the Racketeering Enterprise used three U.S. companies and their corporate bank accounts in particular—defendants CMZ Ventures LLC, Kallista Investments LLC, and the Dynamic Fund (which were sometimes referred to collectively as "The Dynamic Group)—to funnel money into the United States under the guise of investing in legitimate business ventures, but in fact were used to further their unlawful racketeering activities.

67.     Defendant CMZ Ventures, a Delaware-based company, was formed in mid-2008 with the help of Firtash and companies affiliated with Group DF. CMZ's three publicly listed owners were Barbara Ann Holdings LLC (controlled by Brad Zackson), Vulcan Properties, Inc. (run by Arthur Cohen and wholly owned by his wife), and a third company referred to as XXX LLC (owned by Paul Manafort). *See* **Exhibit 11**.  Firtash and Mogilevich were undisclosed "silent partners" in both CMZ Ventures and its affiliated companies, including Kallista Investments LLC (which also went by the name of "Callister Investments"), as would be made clear by subsequent communications with and among the individuals who control the listed owners

68.     Defendants agreed that CMZ Ventures and Kallista Investments would establish an "international investment fund" called "the Dynamic Fund" (also sometimes referred to as the "Global Real Estate Funds") which would be used to facilitate the movement of illegally-obtained funds into the U.S. and other unlawful acts in furtherance of the Enterprise's racketeering objectives.

69.     In order to further solidify the relationship between the U.S.-based defendants and Firtash, on August 25, 2008, Manafort sent an email to defendants Zackson and Rick Gates, one of Firtash's agents and associates, attaching a revised "Vision Statement" for "CMZ

24

Ventures- Global Real Estate Funds" that Manafort wanted "DF"[Dimitry Firtash] to "sign off" on. *See* **Exhibit 12** attached hereto.

70.        Upon information and belief, Firtash was also advised by other defendants and their agents that CMZ Ventures had already entered into a Letter of Intent ("LOI") on July 16, 2008 with 440 Park Avenue Owners Associates LLC and Macklowe Properties to purchase the Drake Hotel project site in Manhattan, with an initial deposit of $10 million and $885 million to be paid upon closing. *See* **Exhibit 13.**

71.        Firtash (on behalf of himself and Mogilevich), both directly and through co-conspirator David Brown, the CEO of the defendant DF Group**,** agreed to make a large commitment of funds to the U.S. investment ventures with which Manafort was associated, including CMZ**,** Kallista Investments, the Dynamic Group, the Dynamic Fund and their numerous affiliated companies. In addition, Firtash agreed to put various real estate holdings that he had in Ukraine into the Fund so that the Enterprise's New York-based companies could market his properties at inflated values to U.S. investors, providing defendants and their associates with a virtual labyrinth of corporate and investment structures in the U.S. that were utilized for defendants' money laundering and other racketeering purposes.

72.        In December 2008, Firtash met with Paul Manafort to discuss establishing one of their various funds, referred to as the "Global Real Estate Fund,"  that would enable Firtash, Mogilevich and the other defendants to acquire and purchase real estate investments in the United States.  Defendants agreed that the Global Real Estate Fund was to be incorporated and based in New York, with Group DF to secure satellite offices for the Fund in Kyiv.

73.        At this meeting, Firtash and Manafort agreed that Group DF would make initial capital commitments of $100 million to invest in the Global Real Estate Fund. Firtash

further agreed that Group DF would pay an initial fee of $1.5 million to CMZ to manage the

establishment of the Fund, which reflected 1.5% of the initial capital commitments.  After

determining which additional assets Group DF would invest, Firtash and CMZ Ventures then

completed and executed a Limited Partnership Agreement and other documents necessary to

establish the Fund.  *See* **Exhibit 14** (e-mail dated January 9, 2009 from Rick Gates to David

Brown summarizing Firtash and Manafort's December 2008 meeting).

74.        Then, on June 8, 2009, in an e-mail sent to Zackson, attached as **Exhibit 15**,

Manafort summarized his recent trip to Kyiv, Ukraine to discuss additional foreign investments

by Firtash, Mogilevich, Group DF, and their associates.  Manafort's email reported that "DF is

still totally on board and a wire will be forthcoming either the end of this week or next week as a

partial payment on the 1.5 [million]."

75.        Once they were acquired by defendants and became part of defendants'

Racketeering Enterprise, these American companies were no longer operated as legitimate

businesses, but rather were solely used for purposes of furthering the unlawful objectives of the

Racketeering Enterprise.They shared the same office space at 1501 Broadway in New York and

operated interchangeably as agents under the control of Firtash and the other defendants in

furthering their racketeering scheme through acquisitions and interstate investments in the

United States.

76.        After receiving a formal complaint from present and former employees of

certain of the defendant companies, the New York State Department of Labor ("NYSDOL")

opened an investigation of CMZ Ventures, Dynamic Worldwide Properties and their related

companies operating out of the 25th floor of 1501 Broadway, N.Y., N.Y., for failing to fully pay

employee wages and back wages, misclassifying employees as "independent contractors" to

avoid paying them worker's compensation and unemployment benefits, and misidentifying

salary payments as expense reimbursements and travel expenses. The employees' complaint

stated, in relevant part: "It has recently become clear as to how the employer's [Dynamic

Worldwide Properties, LLC's] partnership fraudulently operates within the offices located at

1501 Broadway, 25th floor, N.Y., N.Y. 10036 and how we have been considerably harmed by

being denied our full salary-or any for that matter." The complaint identifies the partners as

including defendants Brad S. Zackson, Karen B. Cohen, Arthur G. Cohen and Paul Manafort, Jr.,

who is described as having "close ties to the businesses of troubled Ukranian billionaire, Dmitry

Firtash of Group DF."

77.     As part of its investigation, the NYSDOL urgently "requested" employment

and wage data relating to, among others, Samuel S. Lee, the Senior Acquisitions Director, who

filed for unemployment insurance but was unable to establish the "gross wages paid" to him

since the defendants' New York-based companies never gave him a W-2 and, instead, falsely

reported most of his salary as "expense reimbursement." *See* **Exhibit 16.**

78.     Upon information and belief, the Internal Revenue Service also launched an

investigation of the defendant New York-based companies for violating federal tax laws by

failing to issue either W-2 or 1099 forms, for not deducting and maintaining accurate records

regarding federal and state withholdings, and for not making Medicare, Social Security, and

Workers' Compensation Insurance deductions.

79.     In addition, one principal of  the New York-based companies, defendant Brad

Zackson, had his real estate license revoked on November 3, 2008, because Zackson had "failed

to cooperate with a New York Department of State investigation" and "demonstrated

untrustworthiness" in violation of New York's real property law.  *See* **Exhibit 17**.

(a)     <u>Real Estate Transactions</u>

80.     Firtash and his racketeering associates also used the defendant New York-based companies to, among other things, funnel money through the United States under the guise of investing in real estate projects, such as the Drake Hotel and St. Johns Terminal project in Manhattan.  Upon information and belief, Firtash committed illegally-obtained funds to these companies directly and through Group DF Director David Brown with assurances that he and Mogilevich would be treated as "silent partners" In the case of a number of these real estate projects, however, after the "investment funds" had been sufficiently "laundered," such funding was abruptly "withdrawn" prior to closing.

81.     These real estate projects gave the impression that Firtash and his affiliated companies were investing in legitimate business ventures, when in fact defendants primarily intended to use these funds to further their racketeering activities.

(i)     *The Drake Hotel's Bulgari Tower Project*

82.     On July 16, 2008, CMZ Ventures, "c/o The Dynamic Group," submitted a Letter of Intent ("LOI") to purchase the Drake Hotel project site to build a 65-story Bulgari Tower that would include a mall, a private club, and a spa.  *See* **Exhibit 18**.  The LOI was accompanied by an initial deposit of $10 million and an offer to pay $885 million upon closing.

83.     On August 20, 2008, CMZ Ventures' owners (both disclosed and undisclosed) were confident that Firtash and his associates had committed to finance the purchase of the Drake Hotel property.  Brad Zackson, who owned 90% of Barbara Ann Holdings, emailed Harry Macklowe, the then-owner of the Drake Hotel site, to report that he had just "returned from our investor meeting in Monte Carlo and want you to know it could not have gone better," and that "CMZ's 112[ ]m[illion] in equity has been firmed up and is ready to go."  *See* **Exhibit 19**.

Pursuant to Firtash's explicit instructions, Zackson never disclosed the identity of CMZ Ventures's foreign investors.

84.     On November 6, 2008, Group DF Director David Brown sent a letter to Calister (a/k/a Kallista) Investments c/o the Dynamic Fund, in which Group DF Real Estate, "a subsidiary company of Group DF Limited, the holding company of Dmitry Firtash" and the "major financial source" behind Calister Investments, "confirm[ed] [its] commitment to the Bulgari Tower Project." *See* **Exhibit 20**.  Brown's letter stated that Group DF Finance Limited was "prepared to provide $112 million in equity for the project" and had executed a $25 million escrow deposit with the First American Title Insurance Company.

85.     Later that day, Brown signed an escrow agreement with Calister Investments on Group DF's behalf, which confirmed that $25 million had been wired from Raiffeisen Bank AG, Group DF's primary bank, to CMZ Ventures, Calister Investments, and the Dynamic Fund's New York escrow account with the First Amendment Title Insurance Company.  *See* **Exhibit 21** The escrow agreement was then forwarded by  e-mail from one of Firtash's agents and representatives, Rick Gates, to Zackson.

86.     On January 21, 2009, using the $25 million in funds wired by Firtash through Group DF, Kallista Investments and the Dynamic Group made a formal offer, attached as **Exhibit 22**, to purchase the Senior A-1 and A-2 Notes secured by the Drake Hotel site.  The same day, Zackson reported via e-mail that he had received "everyone's approval" on the offer for the Drake site proposal, including the approval of "our overseas partners."  *See* **Exhibit 23**.

87.     Despite having sufficient financing from Group DF and Firtash, CMZ Ventures, Kallista Investments, and the Dynamic Group, never closed on the Drake property, which another company purchased.  Group DF and Firtash never had any intention to purchase

the Drake property, but instead used the real estate project as a vehicle for moving another $25 million into New York bank accounts in furtherance of the Enterprise's racketeering activities.

(ii)    <em>The St. Johns Terminal Project</em>

88.    The Drake Hotel is not the only real estate investment that Firtash and Group DF agreed to finance before abruptly withdrawing their support.  In early 2008, Firtash and Group DF agreed to finance the Dynamic Group, the Dynamic Fund, and other entities controlled by Defendants to acquire the St. Johns Terminal project, a 200,000 square foot plot located at 550-570 Washington Street, New York, New York, which encompassed three entire city blocks and 850 linear feet of high-exposure waterfront along Hudson River Park.

89.    The Dynamic Group, also referring to itself as "Dymanic Worldwide Properties, LLC," prepared a brochure, dated March 14, 2008,  regarding defendants' proposed acquisition of the "St. John's Center Redevelopment" project, which included plans for a 4 to 5 star hotel tower with over 600 rooms, and a letter of interest from MGM Mirage Hospitality. *See* **Exhibit 24**.  Brad Zackson and others associated with The Dynamic Group included this brochure in a packet of materials mailed and e-mailed to Group DF, Firtash, and others.

90.    CMZ Ventures never closed on the St Johns Terminal project. Firtash, Group DF and the other defendants never had any intention of investing in the project; instead, they expressed interest in the project to make it appear that they were working on legitimate real estate investment deals while, at the same time, secretly transferring and "laundering" the funds through New York accounts in furtherance of their racketeering activities.

(iii.)  <em>South Cat Cay Island</em>

91.    Firtash, Mogilevich, and Group DF also agreed to provide financing to CMZ Ventures, Kallista Investments, and the Dynamic Group to acquire and develop the South Cat Cay island, one of the Bimini Islands in the Bahamas.  The island is located close to Miami.  The

30

project was estimated to cost $35 million, and included plans to develop 150 estates on the island valued at $1 million per estate, 50 townhouse condominiums, 50 luxury bungalows, a 9-hole golf course, a deep water marina and a helipad.  A copy of the development plan and brochure for the island is attached as **Exhibit 25.**

92.     As with the Drake Hotel and St. Johns Terminal Projects, although Firtash Mogilevich, and Group DF allocated substantial funds to the project, the project never closed.

(b)     <u>Group DF's American Marketing Campaign</u>

93.     At Firtash and his associates' request, CMZ Ventures and its affiliated companies based in New York began tp actively market Group DF's properties in Kyiv and elsewhere to American customers.  Such investments were aimed at obtaining American investment money at fraudulently inflated prices in order to enhance the Enterprise's financing. A color brochure and PowerPoint presentation prepared for CMZ Ventures' marketing campaign on behalf of "DF Properties" (meaning properties of Dmitry Firtash) is attached as **Exhibit 26**.

94.     On November 13, 2008, Carolyn Schlam, who was working on a DF properties presentation, sent an email to a CMZ Ventures employee to request pictures to complete the PowerPoint portion of the "DF Report."  *See* **Exhibit 27**.  The same day, Rick Gates of Pericles LP, one of Firtash's agents and a participant in defendants' Racketeering Enterprise, e-mailed Zackson a copy of a presentation on Group DF.

95.     Various defendants and CMZ Ventures employees who worked on the DF Properties presentation e-mailed various drafts to one another, including the "Revision Notes for DF Properties Presentation," attached as **Exhibit 28**.

(a)     <u>Panamanian Corporations</u>

96.     Firtash, Mogilevich, and others associated with the Racketeering Enterprise, with the assistance of the U.S.-based defendants, including Brad Zackson, also created a number

of additional companies registered in Panama to siphon off and transfer their funds to New York

bank accounts.  Firtash associate Robert Entler registered three corporations for Firtash in

Panama: DVN Eleuthera Development, Inc., Dynamic-Vulcan Eleuthera, Inc., and Grey Wolf

Enterprises Inc.  The incorporations are attached as **Exhibit 29**.  **[**

97.       Dynamic Worldwide Development, LLC was listed as part owner of

Dynamic-Vulcan Eleuthera, Inc., which in turn owned 50% of DVN Eleuthera Development,

Inc., as explained in an email exchange between Stephen B. Delman, Defendants' New York

attorney, and Alvaro Aguilar, a Panamanian attorney Entler had used to file Grey Wolf's

incorporation papers.  *See* **Exhibit 30.**  Brad Zackson was named one of the Directors of DVN

Eleuthera Development, Inc., with Arthur Cohen serving as President.  *See* **Exhibit 31**.

98.       The "First Draw" on the DVN Eleuthera Development Inc.'s account was a

deposit of $500,000, as reflected in a letter emailed from Zackson to Entler, which is attached as

**Exhibit 32.**  Defendants used two New York bank accounts for the wire transfers:  CMZ

Ventures account with Metropolitan National Bank, and a law firm account with Capital One

bank.  *See* **Exhibit 33**.

99.       Firtash, Mogilevich, and the other defendants also used American Capital

Holding LLC to sign a "Facilitation and Broker Disbursement Agreement" with Firtash's

Panamanian and U.S. companies to create another vehicle to siphon off and "launder" funds

from the various investment projects for defendants' benefit.

100.      On September 16, 2009, Attorney Aguilar reminded Zackson and other

defendants by an email, attached as **Exhibit 34**, that United States law required them to file

Foreign Bank Account Reports (FBARs) disclosing information regarding offshore accounts,

and that the United States Amnesty program to report offshore accounts expired on September

23, 2009.  Defendants nonetheless failed to file any FBARs with the American government because they did not want to disclose the connections between their American companies, their Panamanian companies and offshore bank accounts, or the wire transfers among the various companies that Firtash, Mogilevich and their associates and other defendants controlled.

(b)      Pharmaceutical Company

101.      In June 2009, although defendants had no experience or expertise in the medical or pharmaceutical fields, they established another company, Dynamic BL Health, LLC, that was purportedly aimed at importing low-cost prescription drugs from Canada to the United States.  *See* **Exhibit 35**.  Once again, defendants' actual intention was to create yet another vehicle to launder funds for the Racketeering Enterprise, targeted at the United States.

(c)      Nadra Bank

102.      On May 4, 2011, Firtash, through Centragas, acquired a controlling interest in Nadra Bank, Ukraine's fifth largest bank.  Upon information and belief, Firtash was able to acquire Nadra Bank using the proceeds received from the fraudulently procured Stockholm arbitration award.

103.      As of June 2011, Nadra Bank had approximately $500 million on deposit in New York bank accounts at JP Morgan Chase (Acct No. 762804508), BNY Mellon (formerly Bank of New York) (Acct. No. 8900341629); and Standard Chartered Bank (Acct No. 3582021684001).

104.      Since the acquisition, Firtash and the other defendants have used Nadra Bank to transfer unlawfully obtained proceeds from the Stockholm arbitration and recent natural gas transactions  to bank accounts in New York in furtherance of their racketeering activities.

(3)      *Tymoshenko and her Allies Pose A Grave Threat to One of Defendants' Sources of Funding for their Racketeering Enterprise By Repeatedly Attacking Firtash and RUE,*

*Ultimately Depriving RUE of its Lucrative Position in the
Russia-Ukraine Gas Trade*

105.     Tymoshenko and her allies have been longstanding critics of RUE's

privileged position in the Russia-Ukraine gas trade and have raised concerns about government

and corporate corruption involving the company and its owners, including Firtash. Tymoshenko

and other opposition leaders openly questioned RUE's lack of transparency and its lack of

legitimate business purpose as an intermediary in the Naftogaz-Gazprom contracts.

106.     When Tymoshenko resumed her position as Prime Minister in December

2007, she pledged to eliminate RUE and other intermediaries from the Russia-Ukraine gas trade.

Early in 2008, Tymoshenko revoked the authority of Ukrgaz-Energo (the RUE-Naftogaz joint

venture) to operate in Ukraine, effectively requiring RUE to sell directly to Naftogaz. The loss of

access to Ukraine's lucrative domestic industrial customers through Ukrgaz-Energo was

financially damaging to RUE.

107.     Thereafter, in negotiating Ukraine's 2009 gas purchase and transit contracts,

then Prime Minister Tymoshenko reached an agreement with then Russian Prime Minister

Vladimir Putin to eliminate RUE as an intermediary, providing for the direct sale of natural gas

from Gazprom to Naftogaz.   This agreement was an important step forward in shifting the

Russia-Ukraine gas relationship to a less politicized, more purely commercial footing.  The

United States Embassy, which had described Firtash as a "questionable character" in cables to

Washington, opined that eliminating Firtash and RUE as intermediaries would introduce

"transparency and accountability" to the natural gas trade.  *See* **Exhibit 36**.

108.     Ukraine's 2009 gas purchase and transit contracts negotiated by Tymoshenko

and Putin also included an agreement by Naftogaz to assume the payment of $1.7 billion of RUE

debt to Gazprom, in exchange for 11 billion cubic meters of natural gas that Gazprom had

delivered, but for which RUE and Firtash (through Centragas) had not yet paid.  Natogaz then assumed the 11 billion cubic meters of natural gas being stored by RUE in Ukrainian government storage tanks.

109.     The 2009 gas contracts were a disaster for RUE, Firtash and their co-conspirators, resulting in a significant loss of their income stream.  Firtash was outraged by the 2009 gas contracts and publicly denounced them, stating that if anyone aside from Tymoshenko had negotiated the contracts, "he would have already been hanging from the street lights."  *See* **Exhibit 36**.  He further complained to the United States Ambassador to Ukraine that the 2009 gas contracts were "criminal and the 'most stupid contract in Ukraine's history.'"

110.     Although Firtash, Boyko, and their associates attempted to sabotage the 2009 gas contract negotiations, they were unsuccessful at the time.  As a result of RUE and Firtash's influence over former President Yushchenko, however, the Naftogaz delegation ceased negotiations with Gazprom in December 2008 rather than finalize an agreement in principle that the parties had accepted.  This resulted in the widely publicized 2009 European gas crisis.  Tymoshenko publicly blamed Firtash and Boyko for having interfered with, and prevented, the finalizing of the parties' gas contracts at that time.

111.     While in Moscow to sign the January 19, 2009 gas contracts, Naftogaz Deputy Chairman Ihor Didenko received phone calls from RUE and Firtash's agents and co-conspirators threatening that if he signed them, he would "do time."  Following Yanukovych's election, Firtash and his co-conspirators succeeded in having politically-motivated criminal charges brought against Didenko related to the January 2009 gas contracts.

>               (4)     *Defendantss and Their Co-Conspirators Retaliate*
>                       *Politically Against Tymoshenko and Regain Their*
>                       *Financial Foothold in the Russia-Ukraine Gas Trade*

112.     Unable to prevent the conclusion of Ukraine's 2009 gas purchase and transit contracts at the time, Firtash, RUE and the other defendants have since worked to redress the damage done to their interests as a result of the contracts negotiated by Tymoshenko and her allies.

(a)     Defendants' Virtual Control of
the Yanukovych Administration

113.     With the election of Yanukovych as President, Naftogaz's entire management team was also replaced with managers loyal to Yanukovych, Firtash, and their co-conspirators. With defendants' virtual control over the Yanukovych Administration, defendants and their co-conspirators have operated both inside and outside of government channels to redress the damage done to their income stream from the gas contracts by Tymoshenko and her allies.

(b)     Yanukovych Administration Fails to Defend
Ukraine's Interests in Stockholm Arbitration and
Ukrainian Court Proceedings Related to Transfer of
Natural Gas Pursuant to 2009 Gas Contracts

114.     Upon the conclusion of the 2009 gas contracts, RUE and Firtash initially attempted to void Naftogaz's confiscation of RUE's natural gas in Ukrainian court.  Under Tymoshenko's leadership, however, the Ukrainian government successfully defended the transfer on the basis that Naftogaz, not RUE, had paid for the gas in question, meaning that RUE had no claim of ownership over the gas.

115.     Firtash and his associates then filed an arbitration claim, on behalf of RUE, with the Arbitration Institute of the Stockholm Chamber of Commerce, alleging that Gazprom's assignment of RUE's debt and subsequent transfer of gas to Naftogaz was illegal. Upon information and belief, Firtash retained U.S. law firm DLA Piper, LLP to provide legal assistance with respect to the Stockholm arbitration claim.

36

116.     As in the Ukrainian courts, Naftogaz initially defended the transfer of natural gas as a legal collection of the debt owed by RUE and assigned to Naftogaz by Gazprom. During the pendency of the Stockholm arbitration proceedings, however, Ukraine's political leadership changed, with Yanukovych becoming President in February 2010.  By March 2010, under the leadership of Yanukovych and new Energy Minister Boyko, the Ukrainian government had completely reversed its position in the Stockholm arbitration.

117.     As explained by a November 2010 Supreme Court of Ukraine opinion, "Naftogaz of Ukraine admitted completely that there were no legal reasons [for it] to acquire [the] disputed quantity of natural gas." The Ukrainian government conceded that the gas in dispute had always been owned by RUE and that the government's seizure of RUE's natural gas had been illegal.  This complete reversal of Naftogaz's position adverse to the interests of Ukraine and its citizens was a shocking about-face and can only be explained by the corrupt ties Boyko and other government officials had to Firtash, RUE and their other co-conspirators.

118.     In June 2010, in light of the Ukrainian government's and Naftogaz's withdrawal of their opposition to RUE's ownership claim over the disputed gas, the Stockholm Arbitration Tribunal ("Tribunal") granted RUE's claim.  The Tribunal held that Naftogaz owed RUE 12.1 billion cubic meters of gas:  the 11 billion cubic meters which allegedly had been confiscated from RUE in 2009, as well as a fine of 1.1 billion cubic meters.  Because Naftogaz is a state-owned company, the arbitral award, which is valued at approximately $3.5 billion, is being paid by Ukrainian citizens.

119.     Following the Tribunal's decision, RUE moved to enforce the Tribunal award in Ukrainian court.  Naftogaz and the current Ukrainian government again failed to defend Ukrainian citizens' interests in these proceedings by neglecting to produce any evidence

countering the award.  Naftogaz "did not challenge the jurisdiction, the competence of the arbitration and arbitrability of the dispute," but rather again admitted completely "the illegality of seizure of natural gas from RosUkrEnergo."  Although Naftogaz asserted that the award would be contrary to public policy, the company did not "furnish any proof" of this claim.

120.     On November 24, 2010, the Ukrainian Supreme Court affirmed the Stockholm Tribunal award, which inflicted severe economic harm upon Naftogaz and, by extension, Ukraine and its citizens.  As Naftogaz has acknowledged, its satisfaction of the arbitral award directly transferred to RUE natural gas "exceed[ing] 50% of the total natural gas extracted in the country annually from [the] country's own resources, and 50% of [the] annual needs of natural gas by the population."

121.     Upon information and belief, Firtash and his affiliates, agents, and co-conspirators have used a significant portion of their Arbitration Award—which sources have estimated to be valued between $3.5 billion and $5.4 billion—to finance the ever-expanding operations of their Racketeering Enterprise in the U.S.

## CLAIMS FOR RELIEF

### COUNT I

**Racketeering Activity in Violation of the Racketeering Influenced and Corrupt Practices Act, 18 U.S.C. § 1961 *et seq.***

122.     Plaintiffs repeat and reallege the paragraphs of this Second Amended Complaint as though fully set forth herein.

123.     Over a number of years and continuing to the present, Defendants and their agents and co-conspirators have participated in an association in fact engaged in foreign and interstate commerce that constitutes a racketeering "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The instant "Racketeering Enterprise" is an association of persons, both inside and

outside of the United States, who have worked to facilitate the funneling of illegally-obtained

funds obtained from various natural gas contracts into the United States for the purpose of

financing the U.S.-based Racketeering Enterprise engaged in primarily by the U.S. defendants,

with some financing by and participation of Firtash and the other European-based individual and

corporate defendants.

124.     At all times relevant to this Complaint, Defendants and their agents and co-

conspirators have, as part of the Racketeering Enterprise, conducted, directly and indirectly

participated in, and conspired in a pattern of racketeering activity, including money laundering

and mail and wire fraud that took place in New York and elsewhere in the United States, in

violation of 18 U.S.C. §§ 1962(c) and (d).  Each defendant subscribed to and endorsed the

unlawful purposes of the Racketeering Enterprise, and either participated in, facilitated and/or

aided and abetted at least two of the predicate acts that had sufficient relatedness and continuity

to form a pattern of racketeering activity that continues to the present.

125.     Defendants' pattern of racketeering activity included the unlawful actions and

activities of defendants and their co-conspirators identified in this Second Amended Complaint

and in the Exhibits attached thereto, including but not limited to, the money wire transfers, faxes

and email communications between various international locations, such as Stockholm and Kiev,

and New York and elsewhere in the U.S. constituting wire fraud in violation of 18 U.S.C. §

1343, the use of the mails for purposes of mail fraud in violation of 18 U.S.C. § 1341, and money

laundering activities in violation of 18 U.S.C. § 1956.

126.     Since approximately 2007 and continuing to the present, Defendants and their

agents and co-conspirators have invested their racketeering proceeds in real estate and other

financial investments in New York and elsewhere in the United States, in violation of 18 U.S.C.

§ 1962(a).  These investments have enabled the Racketeering Enterprise to operate under the cover of legitimacy when engaging in their various acts of racketeering.

127.     Since approximately 2007 and continuing to the present, Defendants and their agents and co-conspirators have also acquired and maintained control of and interests in various companies and enterprises operating in interstate and foreign commerce in New York and elsewhere in the United States, as well as abroad, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).  Defendants' Racketeering Enterprise involved a complicated web of shell companies, business deals and investment vehicles in the United States, which engaged in interstate commerce and over which the named defendants and their co-conspirators had total dominion and control.  These acquisitions and maintenance of interests have enabled Defendants to operate under the cover of legitimacy when engaging in their racketeering activities and distributing the unlawful profits of the Racketeering Enterprise.

128.     As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 1962(a)-(d), Plaintiffs have been injured in their business and property within the meaning of the civil RICO statute, by among, other things (a) being prevented from pursuing their careers, businesses and/or professions by which they support themselves and their families, (b) in the case of plaintiffs Snizek and Rullis, and the other U.S.-based employees of the defendant companies, being deprived of the salaries, commissions and other income that defendants had promised they would receive, and which they would have received if the defendant companies had been operated for legitimate business purposes and in accordance with generally accepted business laws and practices, (c) in the case of the non-defendant real estate and business owners who were misled by defendants into believing that said defendants had a serious and good-faith intent to "close" on the projects and contracts under negotiation, only to find out later that their

time and money had been wasted by defendants, whose undisclosed intention was to create the

appearance that they were engaged in legitimate business activities, and (d) in the case of

plaintiff Tymoshenko and others similarly situated, being forced to pay for legal representation

in order to defend themselves against politically-motivated charges and malicious prosecutions

that would not otherwise have been brought against them but for the defendants' scheme to

eliminate them as a threat to defendants' unlawful practices and income stream from the natural

gas contracts.

129.     The injuries each Plaintiff suffered were reasonably foreseeable, and, in fact,

anticipated and intended by Defendants as the natural consequence of their acts.

## COUNT II

### FRAUD (by the U.S.-based plaintiffs against all defendants)

130.     Plaintiffs repeat and reallege the paragraphs of this Second Amended

Complaint as though fully set forth herein.

131.     Defendants engaged in a scheme to defraud the U.S.-based employees, such as

plaintiffs Snizek and Rullis, promising to pay them salaries, commissions and other benefits, as

well as career opportunities, and misrepresenting to said plaintiffs that the defendant companies

operating from 1501 Broadway were legitimate and reputable companies, when in truth and in

fact, said defendant companies were merely vehicles by which defendants were able to engage in

their racketeering activities with the guise of legitimacy.

132.     To their substantial detriment, Plaintiffs relied upon the fraudulent

misrepresentations of defendants.

133.     Defendants' actions resulted in substantial financial losses to the U.S.-based

plaintiffs and plaintiff class members, including lost income, interference with business careers,

and lost opportunities which plaintiffs would have pursued but for defendants' failure to inform

them that the companies they were working for were not legitimate business operations, but rather merely vehicles for defendants to disguise their racketeering activities with the cloak of legitimacy.

## COUNT III

### Malicious Prosecution

### (By Plaintiff Tymoshenko and others similarly situated)

134.     Plaintiffs repeat and reallege the paragraphs of this Second Amended Complaint as though fully set forth herein.

135.     Defendants and their co-conspirators caused, aided and abetted, and facilitated the selective and malicious prosecution of Tymoshenko and other political opposition leaders on false and trumped-up charges, with the purpose of intimidating and eliminating them as an effective opposition force to defendants' continued and hugely profitable practice of "skimming" millions of dollars from the natural gas contracts.

136.     At the time the prosecutions were initiated against Plaintiffs, Defendants knew, or should have known, that Plaintiffs were guilty of any criminal offenses.  Rather, the prosecutions were brought maliciously and/or in reckless disregard of Plaintiffs' rights as an attempt to intimidate, suppress, and retaliate against Plaintiffs for their participation in activities that threatened the financial interests of Defendants and their Racketeering Enterprise.

137.     As a result of Defendants' malicious prosecutions, Plaintiffs have suffered damage to their reputation, as well as financial and physical harm.

### JURY TRIAL DEMAND

138.     Plaintiffs demand trial by jury on all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, by and through their attorneys, demand judgment against each of the Defendants, as follows:

a.  Judgment in favor of Plaintiffs;

b.  An award of treble damages on Count I (Civil RICO);

c.  An award of compensatory and punitive damages on Counts II and III;

d.  An award of attorneys' fees and costs incurred in pursuing this action; and

e.  A grant of such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        November 11, 2013

                          **McCALLION & ASSOCIATES LLP**

                          _____/s/_____
                          Kenneth F. McCallion (Bar # KFM-1591)
                          100 Park Ave, 16th floor
                          New York, NY 10017-5538
                          (646) 366-0880

                          *Attorney for Plaintiffs*

VERIFICATION

KENNETH F. McCALLION, an attorney duly admitted to the practice of law before this Court,

declares as follows under penalty of perjury:

1.  I am the principal attorney with the law firm of McCallion & Associates LLP, counsel for
    plaintiffs in this matter. As such, I am fully familiar with this case.

2.  The facts and allegations contained in the accompanying Second Amended Complaint are
    true to the best of my knowledge and belief, except as to those matters alleged upon
    information and belief, and as to those allegations, I believe them to be true.

3.  The reason why I am making this Verification is that Plaintiff Tymoshenko is presently
    unavailable, since she is incarcerated in a Ukraine prison. The other two named plaintiffs
    reside in counties different that the county where counsel maintains its offices.

    Dated: New York, New York
           November 11, 2013

                                    _____/s/_____
                                      Kenneth F. McCallion
                                      McCallion & Associates LLP
                                      Attorneys for Plaintiffs
                                      100 Park Avenue – 16th floor
                                      New York, New York 10017
                                      (646) 366-0880