UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

YULIA TYMOSHENKO, SCOTT SNIZEK,
CHRISTY GREGORY RULLIS, and JOHN
DOES 1 through 50, *On Behalf of Themselves
and All Those Similarly Situated*,

                               Plaintiffs,                             11-CV-2794 (KMW)
                                                               **OPINION AND ORDER**

               -against-

DMYTRO FIRTASH, et al.,

                               Defendants.
-------------------------------------------------------------X

KIMBA M. WOOD, District Judge:

      The Second Amended Complaint ("SAC") in this action alleges that several Ukrainian

defendants, led by businessman Dmytro Firtash, financed a domestic racketeering enterprise (the

"U.S. Enterprise") conducted primarily by defendant United States citizens and corporations.

Plaintiff Yulia Tymoshenko is the former Prime Minister of Ukraine and a longstanding critic of

Firtash's energy company, RosUkrEnergo ("RUE").  Money laundered by the U.S. Enterprise

was allegedly used to finance Tymoshenko's "persecution" in Ukraine, in retaliation for her

hostility to RUE while in office.  Plaintiffs Scott Snizek and Christy Gregory Rullis, meanwhile,

are former employees of several defendant U.S. corporations that allegedly participated in the

U.S. Enterprise.  According to the SAC, those corporations failed to provide wages and other

benefits promised to Snizek and Rullis.  The SAC claims that the defendants' conduct violated

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968,

and state fraud law.

Several defendant U.S. corporations and citizens — CMZ Ventures, LLC ("CMZ"); the Dynamic Group ("Dynamic"); Barbara Ann Holdings, LLC; Vulcan Properties, Inc. ("Vulcan"); Paul Manafort; and Brad Zackson (collectively, the "Moving Defendants") — have moved to dismiss the SAC with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).[1]  For the reasons set forth below, the Court GRANTS the motions to dismiss the SAC, but with leave for Plaintiffs to amend.

## I.   BACKGROUND

### A.  The Amended Complaint

On December 19, 2011, Tymoshenko filed the Amended Complaint ("AC") in this action on behalf of herself, unnamed former members of her administration, and all those similarly situated.  *See* [Dkt. No. 23].  The Court's opinion in *Tymoshenko v. Firtash*, No. 11-CV-2794, 2013 WL 1234821 (S.D.N.Y. Mar. 26, 2013) (Wood, J.) ("*Tymoshenko I*"), describes the AC's factual allegations in detail.  To summarize briefly here, the AC claimed that Firtash and his associates directed Ukrainian officials to unlawfully persecute and arbitrarily detain the plaintiffs, in retaliation for the plaintiffs' political opposition to RUE.  *See* AC ¶¶ 15, 93–94, 160–162, 279.  The Ukrainian officials did Firtash's "bidding" because he had secured their loyalty through the payment of "illegal kickbacks."  *Id.* ¶ 94, 279.  Firtash financed those kickbacks, in turn, with money he laundered through transactions with a "labyrinth" of defendant U.S. corporations and citizens.  *Id.* ¶ 105.

The AC brought federal claims under RICO and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, as well as state law claims for breach of fiduciary duty and malicious

---

[1] Vulcan filed a separate motion to dismiss in which it "joins, adopts and incorporates the arguments" made by the other Moving Defendants.  Mem. of Law in Supp. (Vulcan) [Dkt. No. 93] at 3.  Consequently, the Court considers the motions together.

prosecution.  *See id.* ¶¶ 261–294.  The AC claimed that the defendants had violated RICO by laundering Firtash's money, and had violated the ATS by using some of that money to orchestrate and implement arbitrary detentions in Ukraine.  *See id.*  Several defendants moved to dismiss the AC in its entirety, arguing primarily that the AC failed to state any claim upon which relief could be granted.  *See* [Dkt. Nos. 45, 50, 57].

On March 26, 2013, this Court dismissed the AC.  *See Tymoshenko I*, 2013 WL 1234821, at *1.  In keeping with this District's jurisprudence at the time, the Court dismissed the AC's RICO claim as impermissibly extraterritorial because the alleged enterprise and pattern of racketeering were both essentially foreign.  *See id.* at *11–13.  The Court dismissed the ATS claim, in turn, because the AC failed to plead facts sufficient to establish that plaintiffs' detentions were arbitrary (or that the U.S. defendants aided and abetted those detentions).  *Id.* at *7–11.  Having dismissed all claims over which it had original jurisdiction, the Court then declined to exercise supplemental jurisdiction over the remaining state-law claims.  *Id.* at *13.  The Court granted the plaintiffs leave to amend.  *Id.* at *14.

B.  *The Second Amended Complaint*

On November 11, 2013, Tymoshenko, now joined by Snizek, Rullis and several unknown "John Doe" U.S. corporations and citizens, filed the SAC.  *See* [Dkt. No. 87].  It names as defendants Firtash and his alleged associate, Semyon Mogilevich; several Ukrainian John Does; four Ukrainian corporations allegedly controlled by Firtash, which do business using the name "Group DF"; and several U.S. corporations and citizens.  With the exception of two U.S. citizens, all of those defendants are carried over from the AC.  The SAC initially asserted RICO claims and state law claims for fraud and malicious prosecution.  *Id.* ¶¶ 122–137.  Plaintiffs have

since withdrawn their malicious prosecution claim.  *See* Mem. of Law in Opp. [Dkt. No. 97] at 23 n.24.

The SAC reiterates many of the AC's allegations but ostensibly describes a different, "U.S.-based" racketeering enterprise.  SAC ¶ 2; *see also* Mem. of Law in Opp. 3.  The factual allegations that follow are accepted as true for the purposes of the Moving Defendants' motions to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### i.  *RUE's Operations and Income in Ukraine*

From 2004 to 2009, RUE earned millions of dollars by serving as a "middleman" in natural gas contracts between Naftogaz, a Ukrainian state-owned gas company, and Gazprom, a Russian gas company.  *See* SAC ¶¶ 3, 5, 22.  Firtash secured RUE's participation in those contracts through "his close relationship with, and payment of illegal kickbacks to, Ukrainian government officials."  *Id.* ¶ 3.

In December 2007, Tymoshenko — a "vocal critic" of RUE — became Ukraine's Prime Minister.  *Id.* ¶¶ 5, 106.  Over the next two years, she took several steps to exclude RUE from Ukraine's natural gas transactions with Russia.  In 2008, Tymoshenko revoked the authority of an RUE/Naftogaz joint venture to operate in Ukraine, and in 2009, she negotiated new natural gas contracts with Russia that eliminated RUE as an intermediary.  *Id.* ¶¶ 106–107.  Those new contracts also provided for Naftogaz to take control of, and assume the debt for, 11 billion cubic meters of natural gas that Gazprom had delivered to RUE, but for which RUE had not yet paid.  *Id.* ¶ 108.

After Naftogaz took control of RUE's natural gas, RUE and Firtash sought legal redress.  They initially sued Naftogaz in Ukrainian court; when that action proved unsuccessful, they filed an international arbitration claim with the Arbitration Institute for the Stockholm Chamber of

Commerce.  *Id.* ¶¶ 114–115.  Under Tymoshenko's leadership, Naftogaz contested RUE's

arbitration claim.  *Id.* ¶ 116.  In February 2010, however, Viktor Yanukovych — an ally of

Firtash — narrowly defeated Tymoshenko to become the President of Ukraine, which prompted

Tymoshenko to resign as Prime Minister.  *Id.* ¶¶ 36–37.  Under Yanukovych's leadership,

Naftogaz changed course in the arbitration and admitted that RUE's claim was valid.  *Id.* ¶¶ 116–

117.  In June 2010, the Stockholm tribunal found in favor of RUE and ordered Naftogaz to

transfer 11 billion cubic meters of natural gas, plus interest, to Firtash's company.  *Id.* ¶ 118.

The gas was valued at $3.5 billion at the time.  *Id.*

> ii.  *The Defendants Use RUE's Income as "Initial and Ongoing Financing" for the*
> *U.S. Enterprise*

Firtash and his co-defendants used some of the money that RUE received from its natural

gas contracts and related arbitration as "initial and ongoing financing" for a "U.S.-based

Racketeering Enterprise."  *Id.* ¶¶ 19, 22.  The U.S. Enterprise consisted largely of U.S.

corporations and citizens working together to commit "money laundering and other racketeering

acts . . . from their New York base under the guise of otherwise legitimate real estate deals and

other investment activities in New York and elsewhere in the United States."  *Id.* ¶ 20.  The SAC

identifies 39 corporate entities that participated in the U.S. Enterprise.  *Id.* ¶ 61.

Firtash and others "funneled" money to the U.S. Enterprise through several types of

transactions.  *Id.* ¶ 20.  First, Firtash wired funds for the ostensible purpose of financing real

estate investment proposals prepared by defendant U.S. corporations.  *Id.* ¶ 80.  Those proposed

investments were, by design, never consummated; they served merely as a pretense for Firtash to

send money to the U.S. Enterprise.  *Id.*  The SAC identifies one wire transfer of this type.  In

2008 and 2009, three defendant companies — CMZ, Dynamic, and Calister Investments

("Calister"), all of which served as "investment vehicles" for Firtash, *id.* ¶ 17 — collectively

sought to purchase and rebuild the "Drake Hotel project site" in New York.  *Id.* ¶¶ 82–86.
Firtash, acting through one of his Ukrainian corporations, committed to invest $112 million in
the project, and actually wired $25 million to CMZ, Dynamic, and Calister's domestic escrow
account.  *Id.*  The U.S. companies never closed on the deal, but they retained access to Firtash's
$25 million.  *Id.* ¶ 87.

The SAC describes two additional sham investment proposals that never closed:  CMZ,
Dynamic and Calister's "South Cat Cay Island" project in Miami, and CMZ and Dynamic's "St.
Johns Terminal project" in New York.  *Id.* ¶¶ 88–92.  Although the SAC alleges that Firtash
"agreed to finance" both proposals, it does not identify any associated transfer of funds.  *Id.*[2]

Second, Firtash instructed CMZ and its affiliates to market in the United States various
foreign real estate properties that Firtash and his Ukrainian corporations owned.  *Id.* ¶ 93.  That
marketing was "aimed at obtaining American investment money at fraudulently inflated prices in
order to enhance the [U.S.] Enterprise's financing."  *Id.*  The SAC does not identify any
properties sold through this marketing campaign, or explain how property prices were
fraudulently inflated.

Third, Firtash — acting through a non-defendant Viennese corporation — purchased a
controlling interest in Ukraine's Nadra Bank.  *Id.* ¶ 102.  Firtash and other defendants
subsequently used the bank "to transfer unlawfully obtained proceeds from the Stockholm
arbitration and recent natural gas transactions to bank accounts in New York in furtherance of
their racketeering activities."  *Id.* ¶ 104.  The SAC does not identify any particular transaction
through which Nadra Bank transferred money.

---

[2] The SAC also claims that Firtash and Manafort discussed establishing another, apparently legitimate real estate investment vehicle, the "Global Real Estate Fund."  SAC ¶ 72.  The SAC alleges that Firtash initially promised to invest $100 million in the fund and pay CMZ a $1.5 million fee for "manag[ing] the establishment" of the company.  *See id.* ¶ 73.  Again, however, the SAC does not identify any associated money transfer.

Finally, Firtash and his associates established several Panamanian corporations to "siphon off and transfer their funds to New York bank accounts."  *Id.* ¶ 96.  The SAC does not clarify how the Panamanian corporations facilitated the movement of money to New York.  The SAC identifies one specific transaction involving a Panamanian corporation, in which CMZ, along with a non-defendant law firm, deposited $500,000 in the Panamanian entity DVN Eleuthera Development, Inc.  *Id.* ¶ 98.

Firtash also established Dynamic BL Health, LLC, a company "purportedly aimed at importing low-cost prescription drugs from Canada to the United States," but actually created "to launder funds for the Racketeering Enterprise."  *Id.* ¶ 101.  The SAC does not explain whether Dynamic BL Health functioned to "funnel" Firtash's money to the U.S. Enterprise, facilitate the U.S. Enterprise's acts of money laundering, or both.

> iii.   *The U.S. Enterprise's Racketeering Activities*

The SAC asserts that the U.S. Enterprise engaged in racketeering activity that violated three RICO predicate statutes:  18 U.S.C. § 1343, the wire fraud statute; 18 U.S.C. § 1341, the mail fraud statute; and 18 U.S.C. § 1956, the money laundering statute.  *See id.* ¶¶ 124–125.

> a.   *Wire and Mail Fraud*

Plaintiffs never explicitly identify any particular act or transaction that constituted wire or mail fraud.  The SAC does, however, describe three courses of fraudulent conduct by the defendants.  First, domestic corporations participating in the U.S. Enterprise falsely promised to provide their employees, including Snizek and Rullis, with "salaries, commissions and other benefits, as well as career opportunities," and misrepresented "that the defendant companies . . . were legitimate and reputable."  *Id.* ¶ 131.  That scheme purportedly "resulted in substantial financial losses to the U.S.-based plaintiffs and plaintiff class members, including lost income,

interference with business careers, and lost opportunities which plaintiffs would have pursued." *Id.* ¶ 133.  Second, as described above, defendants prepared sham real estate investment proposals.  Those proposals "misled" the owners of the target properties "into believing that [the] defendants had a serious and good-faith intent to 'close,'" which "wasted" the property owners' "time and money."  *Id.* ¶ 128.  Third, also as previously described, CMZ planned to market Firtash's properties in the United States at "fraudulently inflated" prices.  *See id.* ¶¶ 93–95.

The defendants used interstate wires or mail in connection with two of those three courses of fraudulent conduct:  the sham real estate investment proposals and the overpriced property marketing.  Regarding the investment proposals, (1) Group DF Director David Brown sent a letter to Calister, care of Dynamic, stating that "Group DF Finance Limited was 'prepared to provide $112 million in equity'" for the Drake Hotel project, "'and had executed a $25 million escrow deposit,'" *id.* ¶ 84 & Ex. 20; (2) Defendant Zackson sent an email to the owner of the Drake Hotel site reporting that "'CMZ's 112[ ]m[illion] in equity has been firmed up and is ready to go,'" *id.* ¶ 83 & Ex. 19; (3) Rick Gates, an associate of Firtash, sent an email to Zackson attaching an escrow agreement between Group DF and Calister that "confirmed that $25 million had been wired" to CMZ, Dynamic and Calister's escrow account, *id.* ¶ 85 & Ex. 21; (4) Zackson sent an email to unidentified recipients stating that "he had received 'everyone's approval' on the offer for the Drake site proposal," *id.* ¶ 86;[3] and (5) Dynamic sent a brochure related to the St. John's Center Redevelopment project to "Group DF, Firtash, and others" by email and mail, *id.* ¶ 89 & Ex. 24.

Regarding the overpriced property marketing, (a) Carolyn Schlam, whose affiliation is not clear, sent an email to CMZ requesting pictures in connection with "a DF properties

---

[3] The SAC indicates that this email is Exhibit 23, but Plaintiffs failed to file that exhibit electronically.

presentation," *id.* ¶ 94 & Ex. 27; (b) Gates sent an email to Zackson attaching a "presentation on

Group DF," *id.* ¶ 94; and (c) "[v]arious defendants and CMZ Ventures employees" exchanged

emails attaching drafts of "the DF Properties presentation," *id.* ¶ 95 & Ex. 28.  The SAC does not

identify any wire or mail communication related to the defendants' misrepresentation of

employee benefits.  *See id.* ¶¶ 76, 131–133.

    *b. Money Laundering*

   The SAC asserts that the transactions through which Firtash "funneled" money to the

U.S. Enterprise, described in detail above, constituted acts of money laundering by the

defendants.  *See id.* ¶ 19 (claiming that Firtash was "able to money launder" his "funds" by

becoming a "major 'investor'" in CMZ); *id.* ¶ 23 (alleging that Firtash "utilize[d] various U.S.

based companies to facilitate [his] money laundering"); *id.* ¶ 80 (asserting that Firtash's

investments in real estate projects were "abruptly 'withdrawn'" after they "had been sufficiently

'laundered'"); *id.* ¶ 99 (describing the purpose of Firtash's Panamanian corporations as "to

siphon off and 'launder' funds . . . for defendants' benefit").

   The SAC also asserts that the U.S. Enterprise used the money it received from Firtash to

"finance" additional "money laundering . . . from [its] New York base."  SAC ¶ 20; *see also id.*

¶¶ 23, 62.  The SAC does not explicitly identify any additional act or transaction that constituted

money laundering, but it describes two uses of the U.S. Enterprise's funds distinct from the

transactions with Firtash described above.  First, the U.S. Enterprise used its "money laundered

funds" to "purchase and/or maintain an interest in the various defendant companies that

comprised part of the Racketeering Enterprise."  SAC ¶ 22.  Second, "a portion of the [U.S.

Enterprise's] money-laundered funds were . . . funneled back to Ukraine to provide the

'financing' for the persecution and political suppression of Tymoshenko."  *Id.* ¶ 22.  The SAC

does not specify who transferred that money or how the money was transferred.  And although the SAC explains that Tymoshenko was persecuted in Ukraine through several politically motivated prosecutions, it never mentions what role, if any, money transferred from the U.S. Enterprise played in those prosecutions.  *See id.* ¶¶ 45–53.

## II.     LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the supporting factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Where a plaintiff has failed to "nudge" a claim "across the line from conceivable to plausible," a district court must dismiss the complaint.  *Twombly*, 550 U.S. at 570.

The Court must accept as true all well-pleaded factual allegations in a complaint and "draw[] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotations omitted).  But a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555.

## III.    DISCUSSION

The Moving Defendants contend that the SAC fails to plead the elements of either a civil RICO claim or a state-law fraud offense, and that the SAC's RICO claims impermissibly apply the statute to extraterritorial conduct.[4]  *See* Mem. of Law in Supp. (Manafort et al.) [Dkt. No. 89]; Mem. of Law in Supp. (Vulcan) [Dkt. No. 93].  The Court agrees that the SAC fails to plead a civil RICO violation, because it does not plead a predicate act of racketeering that proximately

---

[4] Defendant Manafort also moves for dismissal, as he did regarding the AC, because the Court lacks personal jurisdiction over him.  *See* Mem. of Law in Supp. (Manafort et al.) 17–20.  As it did in *Tymoshenko I*, the Court now resolves Manafort's motion without reaching that jurisdictional argument.

caused Plaintiffs' injuries.  Accordingly, the Court dismisses the SAC's RICO claims without reaching the issue of extraterritoriality.

    A.   *The SAC's RICO Claims*

    Under 18 U.S.C § 1962, a person can violate RICO in four ways.  First, the statute bars "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity" from investing that income "in acquisition of any interest in, or the establishment or operation of, any enterprise" affecting interstate or foreign commerce.  18 U.S.C. § 1962(a).  Second, the statute bars any person from acquiring or maintaining "any interest in or control of any [such] enterprise" "through a pattern of racketeering activity."  *Id.* § 1962(b).  Third, the statute bars "any person employed by or associated with [such an] enterprise" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  *Id.* § 1962(c).  Fourth, RICO bars any conspiracy to commit the preceding violations.  *Id.* § 1962(d).

    Thus, to violate 18 U.S.C. § 1962(a)–(c), a person must affect an "enterprise" through a "pattern of racketeering activity."  An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Id.* § 1961(4).  A pattern of racketeering activity, in turn, requires at least two "predicate acts" that would violate a specified state or federal law, and that are "related to each other and to the enterprise."  *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006); *see* 18 U.S.C. § 1961(5).  As for 18 U.S.C. § 1962(d), "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990).

RICO provides a civil remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).  In order to establish RICO standing, therefore, "a plaintiff must plead (1) the defendant's violation of [18 U.S.C] § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Svs., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001).  To satisfy that causation requirement, "the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well." *City of New York v. Venkataram*, 396 F. App'x 722, 724 (2d Cir. 2010) (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)).

To establish proximate causation under civil RICO, a plaintiff must show that an enterprise's acts of racketeering "were a substantial factor in the sequence of responsible causation," and that the plaintiff's injury "was reasonably foreseeable or anticipated as a natural consequence." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003) (internal quotation marks omitted); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts."); *Picard v. Kohn*, 907 F. Supp. 2d 392, 397 (S.D.N.Y. 2012) (Rakoff, J.) (explaining that "proximate cause" under civil RICO refers "to the directness of the relationship between the purported enterprise's alleged criminal acts and the plaintiff's injuries"). "[T]he reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise." *Lerner*, 318 F.3d at 124; *see also Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 238 (2d Cir. 1996) (concluding that the plaintiff could not bring a civil RICO suit because he "was neither an intended target of the scheme nor an intended beneficiary of the laws prohibiting it").

The SAC alleges that the defendants violated all four subsections of 18 U.S.C. § 1962. *See* SAC ¶¶ 124, 126–128.  As mentioned above, the SAC claims that the defendants committed three types of predicate acts:  money laundering under 18 U.S.C. § 1956, wire fraud under 18 U.S.C. § 1343, and mail fraud under 18 U.S.C. § 1341.  *See id.* ¶¶ 124–125.  The SAC fails, however, to adequately plead any predicate act that proximately caused Plaintiffs' injuries.  The SAC thus fails to state a civil RICO claim.[5]

> ### i.   *Predicate Acts of Wire Fraud and Mail Fraud*

"The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires."  *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000).  The elements of mail fraud under 18 U.S.C. § 1341 are identical, except that mail fraud must be furthered by use of the mails.  *See United States v. Vilar*, 729 F.3d 62, 91 n.26 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2684 (2014).  Thus, to violate either the wire fraud or mail fraud statute, "the object of the fraud" must "be [money or] property in the victim's hands."  *Pasquantino v. United States*, 544 U.S. 349, 355 & n.2 (2005) (internal quotation marks omitted) (alteration in original); *see also Pierce*, 224 F.3d at 165 ("A scheme to deceive,

---

[5] The SAC contains no factual allegations about how the unknown "John Doe" plaintiffs were injured by the defendants' conduct.  *See* SAC ¶ 13 (making the conclusory assertion that the "John Doe" plaintiffs "have been damaged as a result of the acts of racketeering engaged in by defendants and other participants in the Racketeering Enterprise," but making no factual allegations in support of that assertion).  Accordingly, those plaintiffs fail to state a civil RICO claim.  The remainder of this Opinion and Order explains why Plaintiffs Snizek, Rullis and Tymoshenko also fail to state a civil RICO claim.

In their Memorandum of Law in Opposition, Plaintiffs ask the Court to take judicial notice of the allegations in a complaint filed in state court by Inovalis SA against CMZ and Dynamic, among others.  *See* Mem. of Law in Opp. 12 & n.11.  According to Plaintiffs, Inovalis alleges that CMZ and Dynamic "defrauded [Inovalis] out of at least $465,000" that it invested in the Drake Hotel real estate proposal.  *Id.* at 12.  Plaintiffs appear to request that the Court draw factual inferences in the instant case based on Inovalis's allegations in state court.  Plaintiffs also contend that Inovalis "may be considered . . . one of the plaintiff 'John Does #1-50.'"  *Id.* at 12 n.11.

Such a use of judicial notice would be improper.  The Court may "'take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.'"  *OneBeacon Ins. Co. v. Empress Ambulance Serv., Inc.*, No. 02 Civ. 2595, 2003 WL 1857622, at *2 (S.D.N.Y. Mar. 28, 2003) (Pauley, J.) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).  But the Court cannot "make factual inferences based on the content" of the pleadings in another case "that it could not otherwise make pursuant to its power under Fed. R. Evid. 201 to take notice of widely known and indisputable facts."  *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, No. 06 Civ. 6278, 2006 WL 3771013, at *2 (S.D.N.Y. Dec. 18, 2006) (Stein, J.).

however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with."); *United States v. Martin*, 411 F. Supp. 2d 370, 373–74 (S.D.N.Y. 2006) (Cedarbaum, J.) ("The wire fraud statute . . . requires that money or property be the object of the defendant's 'scheme to defraud.'" (citing *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004)).  Additionally, a "complaint alleging mail and wire fraud must plead facts that give rise to a strong inference that the defendant possessed fraudulent intent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).

As noted above, the SAC describes three courses of fraudulent conduct:  (1) defendant U.S. corporations' misrepresentations regarding employee benefits, *see* SAC ¶¶ 131–133; (2) defendants' sham real estate investment proposals, *see id.* ¶ 128; and (3) CMZ's plan to market foreign properties at inflated prices, *see id.* ¶¶ 93–95.

The SAC fails to adequately plead wire or mail fraud in connection with either of the first two schemes.  Regarding the misrepresentations to employees, the SAC never alleges that the defendants used interstate wires or mail in connection with their fraudulent conduct.  *See* SAC ¶¶ 76, 131–133.  Regarding the sham real estate investment proposals, in turn, the SAC does not allege that the defendants used — or intended to use — their misrepresentations to target a third party's money or property.  To the contrary, the SAC alleges that the defendants' intention in preparing the sham proposals "was to create the appearance that they were engaged in legitimate business activities."  *Id.* ¶ 128.  At this stage, the Court accepts as true Plaintiffs' claim that property owners "wasted" their "time and money" by treating the defendants' sham proposals as legitimate.  *Id.*  But that fact alone is insufficient to establish that the property owners' money

was the *object* of the defendants' fraudulent conduct, as required by the wire and mail fraud statutes.  *See Pasquantino*, 544 U.S. at 355 & n.2; *Martin*, 411 F. Supp. 2d at 373–74.[6]

Whether the SAC adequately pleads wire fraud in connection with the third course of fraudulent conduct — CMZ's overpriced marketing scheme — is a closer question.  The Court need not decide that question, however, because even if that scheme constituted wire fraud, it would not have proximately caused Plaintiffs' injuries under the civil RICO statute.  To establish proximate causation, Plaintiffs must plead that they were "the targets, competitors [or] intended victims" of the marketing scheme.  *Lerner*, 318 F.3d at 124.  Plaintiffs have failed to meet that pleading requirement.  The intended victims of the marketing scheme were unidentified American investors, not employees of defendant corporations or a Ukrainian politician critical of Firtash's business practices.  Defendants' plan to sell properties at inflated prices simply had no significant connection to Snizek and Rullis's deprivation of employee benefits or Tymoshenko's prosecutions.[7]

### ii.   Predicate Acts of Money Laundering

To establish a violation of the money laundering statute cited in the SAC, 18 U.S.C. § 1956, a plaintiff must first show "(1) that the defendant conducted a financial transaction;

---

[6] Again, the Court declines to make factual inferences in this action based on Plaintiffs' description of Inovalis's allegations against CMZ and Dynamic in state court.  *See* Mem. of Law in Opp. 12 & n.11.

[7] Plaintiffs contend that their defendant employers "no longer operated as legitimate businesses" after they joined the U.S. Enterprise.  SAC ¶¶ 62, 75.  Specifically, the companies "did not observe corporate formalities or engage in arms-length transactions when conducting business, but rather intermingled funds, shared office space [at 1501 Broadway in New York], management, and personnel, and were operated by the defendants and their co-conspirators for the purpose of furthering their money laundering and other racketeering activities."  *Id.* ¶ 62.

The Court assumes at this stage that those allegations are true.  Plaintiffs never allege, however, that the defendants' abandonment of corporate formalities *caused* those defendants to withhold promised employee benefits.  Such an allegation would, in any event, fail to establish proximate causation; at best, it would establish that the defendants' participation in the U.S. Enterprise caused them to abandon corporate formalities, which incidentally interfered with the provision of employee benefits.  That type of incidental interference does not satisfy civil RICO's proximate cause standard.  *Cf. Hecht*, 897 F.2d at 24 (holding that the plaintiff's loss of employment for failure to cooperate in his employer's RICO scheme was not proximately caused by the employer's racketeering activity because the employee was not "the target of the racketeering enterprise").

(2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in

§ 1956(c)(7); [and] (3) that the defendant knew that the property involved in the financial

transaction represented the proceeds of some form of unlawful activity."  *United States v. Maher*,

108 F.3d 1513, 1527–28 (2d Cir. 1997).  The plaintiff must then make one of two additional

showings:  (a) that the defendant knew "the transaction was designed in whole or in part . . . to

conceal or disguise the nature, the location, the source, the ownership, or the control of the

proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i); or (b) that the defendant

conducted or attempted to conduct the transaction "with the intent to promote the carrying on of

specified unlawful activity," *id.* § 1956(a)(1)(A)(i).  A plaintiff "need not allege money

laundering with great particularity, [but the] plaintiff must plead all elements of the offense."

*Casio Computer Co., Ltd. v. Sayo*, 98CV3772, 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13,

2000) (Knapp, J.).

As noted above, the SAC describes three types of transactions that might constitute

money laundering:  (1) the transactions through which Firtash "funneled" money to the U.S.

Enterprise, *see* SAC ¶¶ 19, 23, 80, 99; (2) the defendants' acquisition of corporate entities to

expand the U.S. Enterprise, *see id.* ¶ 22; and (3) the transfer to Ukraine of money previously

laundered by the U.S. Enterprise, *see id.*

The SAC does not adequately plead that the third type of transaction — the transfer of

money to Ukraine — violated 18 U.S.C. § 1956.  Only one sentence in the SAC mentions that

transfer, and it fails to identify who conducted the transfer, how the money was moved, or how it

was used in connection with Tymoshenko's persecution.  *See* SAC ¶ 22.  The Court would thus

need to infer the basic fact that a defendant was involved in moving the money.  And even if the

Court were to make that inference, the SAC does not allege — or justify an inference — that the

16

defendants involved acted with the intent required by 18 U.S.C. § 1956.  The SAC never claims

that any defendant knew the transfer of money to Ukraine was intended to conceal the proceeds

of specified unlawful activity, as required by 18 U.S.C. § 1956(a)(1)(B)(i), or that any defendant

participated in the transaction with the intent to promote specified unlawful activity, as required

by 18 U.S.C. § 1956(a)(1)(A)(i).[8]  Plaintiffs thus fail to adequately plead a predicate act of

money laundering in connection with the transfer of money to Ukraine.

Whether the SAC adequately pleads money laundering in connection with the other two

types of transactions — Firtash's "funneling" of money and the U.S. Enterprise's corporate

acquisitions — is a closer question.  The Court need not decide that question, however, because

even if those transactions constituted money laundering, they still would not have proximately

caused Plaintiffs' injuries under the civil RICO statute.

Firtash's monetary transfers were intended to provide "start-up" capital for the U.S.

Enterprise's "racketeering activities," *see* SAC ¶ 17, while the corporate acquisitions were

apparently intended to expand the number of companies available for "racketeering activity," *see*

*id.* ¶ 22.  Collectively, therefore, Firtash's investments and the defendants' corporate acquisitions

served to establish and expand the infrastructure of the U.S. Enterprise.  Those transactions did

not directly target any victims, including Plaintiffs; rather, they built an apparatus through which

the defendants could conduct other racketeering activities.  As explained above, those other

racketeering activities consisted — at most — of CMZ's scheme to market foreign properties at

inflated prices, which may have constituted a predicate act of wire fraud.  Since that scheme did

not proximately cause Plaintiffs' injuries, the Court concludes, *a fortiari*, that the investments

---

[8] The money laundering statute identifies a long list of violations that constitute "specified unlawful activity," including "an offense against a foreign nation involving . . . bribery of a public official."  18 U.S.C. § 1956(c)(7)(B).  But the SAC fails to adequately plead that the money transferred to Ukraine promoted (or was intended to promote) any such violation.

and corporate acquisitions that facilitated the scheme also did not proximately cause Plaintiffs' injuries.

At this stage, the Court accepts as true the allegation that some of the money that passed through the U.S. Enterprise was "funneled back to Ukraine" — albeit by unidentified actors — and somehow used as "'financing'" for Tymoshenko's "persecution." *Id.* ¶ 22. Even assuming Defendants had previously laundered that money, however, the mere fact of its subsequent transfer to Ukraine is insufficient to establish that any predicate act of money laundering proximately caused Tymoshenko's injuries. Plaintiffs' allegations may demonstrate that the U.S. Enterprise's racketeering activity was a "but for" cause of harm to Tymoshenko. *Cf. Venkataram*, 396 F. App'x at 724. But Plaintiffs never adequately plead that Tymoshenko was the target, competitor or intended victim of the U.S. Enterprise's money laundering, as civil RICO requires. *See Lerner*, 318 F.3d at 124.

Accordingly, the SAC's RICO claims are dismissed.

### B.  The State Fraud Claim

The SAC's RICO allegations were the only claims over which this Court had original jurisdiction.[9] Having dismissed those claims, the Court declines to exercise supplemental jurisdiction over the SAC's state fraud claim, pursuant to 28 U.S.C. § 1367(c)(3).

## IV.   Conclusion

For the foregoing reasons, the SAC is dismissed. But the Court grants leave to amend, primarily to allow Plaintiffs to reconsider their pleadings in light of a recent Second Circuit decision regarding RICO's extraterritorial scope.

---

[9] The addition of U.S. citizens as plaintiffs in the SAC does not create diversity jurisdiction under 28 U.S.C. § 1332, as there are still Ukrainian nationals on both sides of the litigation. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980) ("We have held that the presence of aliens on two sides of a case destroys diversity jurisdiction.").

In *Tymoshenko I*, this Court dismissed the AC's RICO claim as impermissibly extraterritorial because both the alleged enterprise and the alleged pattern of racketeering were essentially foreign.  *See* 2013 WL 1234821, at *11.  At the time, several district courts in this Circuit had interpreted *Norex Petroleum Ltd. v. Access Industries, Inc.*, 631 F.3d 29 (2d Cir. 2010), to bar any extraterritorial application of RICO.  *See, e.g.*, *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 543 (S.D.N.Y. 2013) (Stein, J.); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 239 & n.33 (S.D.N.Y. 2012) (Kaplan, J.).   District courts did not agree, however, on a standard for determining whether a particular RICO claim was extraterritorial.  In competing applications of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 266 (2010), some decisions asked whether the location of the enterprise was foreign, *see, e.g.*, *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (Rakoff, J.), while at least one decision focused on whether the pattern of racketeering was located abroad, *see Chevron*, 871 F. Supp. 2d at 245.  The Court's decision in *Tymoshenko I* did not choose between those standards, as it held that the AC's RICO claim was impermissibly extraterritorial under either approach.  2013 WL 1234821, at *11.

The Second Circuit's decision in *European Community v. RJR Nabisco, Inc.*, 11-2475-CV, 2014 WL 4085863 (2d Cir. Aug. 20, 2014), established a new framework for evaluating RICO's permissible territorial scope.  That decision — issued after the SAC was filed — first clarified that *Norex* had not, in fact, barred *any* extraterritorial application of RICO; it had merely held that RICO does not apply extraterritorially "in all of its applications."  2014 WL 4085863, at *4.  The panel then concluded that:

> RICO applies extraterritorially if, and only if, liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate.  Thus, when a RICO claim depends on violations of a predicate statute that manifests an unmistakable

congressional intent to apply extraterritorially, RICO will apply to extraterritorial
conduct, too, but only to the extent that the predicate would.

*Id.*  The panel subsequently noted that the money laundering statute applies extraterritorially in

certain circumstances, but held that the wire fraud and mail fraud statutes do not.  *Id.* at *8.

Plaintiffs likely drafted the SAC with the RICO extraterritoriality framework from

*Tymoshenko I* in mind.  *See* Mem. of Law in Opp. 2–6.  The Court now grants leave to amend

the SAC so that Plaintiffs may reconsider their pleadings in light of *European Community*'s

holding.  This Opinion and Order resolves Docket entries 88 and 92.


        SO ORDERED.

DATED:   New York, New York
              September 30, 2014


                                        _____/s/_____
                                           KIMBA M. WOOD
                                        United States District Judge