**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

YULIA TYMOSHENKO, SCOTT SNIZEK,
CHRISTY GREGORY RULLIS and JOHN DOES 1
**through 50,** on behalf of themselves and all of those
similarly situated,

*Plaintiffs,*

-*v*-

DMYTRO FIRTASH a/k/a DMITRY FIRTASH,
SEMYON MOGILEVICH, VIKTOR
YANUKOVYCH, MYKOLA AZAROV, YURIY
BOYKO, VIKTOR PSHONKA, RENAT
KUZMIN,ARTHUR G. COHEN, KAREN COHEN;
BRAD S. ZACKSON, PAUL J. MANAFORT, CMZ
VENTURES, LLC, KALLISTA INVESTMENTS
LLC a/k/a CALISTER INVESTMENTS LLC, THE
DYNAMIC GROUP a/k/a THE DYNAMIC FUND,
BARBARA ANN HOLDINGS LLC, VULCAN
PROPERTIES, INC., GROUP DF, GROUP DF
LIMITED, GROUP DF FINANCE LIMITED,
GROUP DF REAL ESTATE, and JOHN DOES 1
**through 100,**

*Defendants.*

11-CV-2794 (KMW)


**THIRD AMENDED COMPLAINT**

**INTRODUCTION**

1.      This case concerns the unlawful operations of a Racketeering Enterprise

formed by the named defendants and their co-conspirators for the purpose of engaging in

an  unlawful acts of racketeering within the United States.

2.      Upon the agreement of defendants **Dymtro Firtash** and **Semyon Mogilevich** to

provide the initial funding for the formation of defendants' U.S.-based Racketeering  Enterprise,

the New York and Washington-based defendants **Arthur G. Cohen**, his wife, **Karen  Cohen,**

**Brad S. Zackson** and **Paul J. Manafort**, and their various companies - **CMZ Ventures,  LLC,**

**Kallista Investments LLC a/k/a Calister Investments LLC,** The **Dynamic Group a/k/a The**

**Dynamic Fund**, **Barbara Ann Holdings LLC, and Vulcan Properties, Inc.—**all of  whom

were part of the Racketeering Enterprise, conducted a series and pattern of racketeering acts within the U.S., including the acquisition of various U.S. companies and businesses in furtherance of their Racketeering Enterprise, in violation of the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

3.      The initial funds for the operation of defendants' Racketeering Enterprise came from the unlawful profits that defendant Dmytro Firtash and others "skimmed" from RosUkrEnergo AG ("RUE") which, from 2004 to early 2009, served as a middleman in natural gas dealings between Naftogaz, a Ukrainian state-owned gas company, and Gazprom, a Russian company. Firtash, who largely controls RUE, was able to secure profits from various corrupt Russia-Ukraine gas deals due to his close relationship with, and payment of illegal kickbacks to, Ukrainian government officials, including then Naftogaz Chairman Yuriy Boyko and Deputy Chairman Ihor Voronin, both of whom were nominated to RUE's Coordination Committee after securing RUE's initial brokerage contract.

4.      Firtash and the U.S.-based defendants and co-conspirators, which together constitute a domestic U.S. racketeering enterprise, used the proceeds from the Russia-Ukraine gas deals to acquire various U.S.-based companies and entities, which were then incorporated into defendants' racketeering enterprise and used to generate unlawful proceeds by means of a series of racketeering acts spanning over a period of several years and continuing to the present, including but not limited to the laundering of money through various U.S.-based companies and real estate development entities for the purpose of (a) defrauding innocent third party real estate owners, investors and businesses of their valuable time, money and property through sham real estate development and sales proposals that lured said third parties into thinking that defendants were making legitimate investments into various U.S.-based real estate projects and offering

2

legitimate real estate investment opportunities in Ukraine for U.S.-based investors, when in truth and in fact, defendants never intended to actually close on and complete any of the U.S. and Caribbean-based real estate development projects, and, in the case of the Ukrainian based real estate investment "opportunities" for unsuspecting U.S. investors, offering said "investment opportunities" at grossly inflated prices and thus defrauding those investors who paid defendants money for participation in such sham and grossly overpriced projects; (b) funneling a substantial portion of the money that was laundered through New York bank accounts under the guise of supposedly legitimate real estate development projects back through the labyrinth of Firtash and Group DF companies and bank accounts located in Europe, Cyprus, Panama and elsewhere so that virtually untraceable funds could be generated to pay the Ukrainian defendant prosecutors and others in the Yanukovich Administration to "finance" the continued campaign to destroy, neutralize and silence Tymoshenko and her political opposition allies; and (c) using their New York-based "front" companies to defraud the New York based individual plaintiffs and their co-workers of the compensation and benefits to which they were entitled for the extensive time, money and energy that they devoted to defendants' real estate development projects that they thought were genuine, but which the defendants were merely using to further their money laundering and other racketeering activities in the U.S. but had no intention of actually bringing said projects to fruition.

5.      Throughout the relevant time period, former Prime Minister Tymoshenko  was a vocal critic of RUE's gas contracts and the government corruption that enabled RUE to  secure these contracts.  Early in 2008, for example, during Tymoshenko's second term as Prime Minister, she revoked the authority of a RUE/Naftogaz joint venture to operate in Ukraine. Thereafter, to end the European "gas crisis" in January 2009, Tymoshenko facilitated the

negotiation of gas purchase and transit contracts with Gazprom (hereinafter referred to as Ukraine's "2009 gas contracts"), which eliminated RUE as a middleman, resulting in a significant loss of revenue to RUE, which was the primary source of the initial funding used by defendants to establish their U.S. based Racketeering Enterprise.

6.      Although defendants Firtash, and his agents and co-conspirators, attempted to sabotage the 2009 gas contracts during Tymoshenko's term as Prime Minister, they were unsuccessful in doing so at the time.  Following the conclusion of the contracts and Naftogaz's confiscation of RUE's gas, Firtash and RUE developed a scheme and strategy to eliminate Tymoshenko and other leaders of the political opposition as a threat to their initial funding of the  newly formed and U.S.-based racketeering enterprise they were building.

7.      When Yanukovych took office as the President of Ukraine in February 2011, several of Firtash's close allies were appointed to senior posts in the Yanukovych Administration  and other positions of influence.  For example, Yuriy Boyko, a close associate of Firtash who  was instrumental in securing RUE's brokerage contracts in Ukraine's earlier Naftogaz-Gazprom  gas deals, was appointed Minister for Fuel and Energy. Another close Firtash associate also  replaced Naftogaz CEO Ihor Didenko, who has since been arrested for signing the 2009 gas  contracts on behalf of Naftogaz.

8.      In order to recoup the monies that Firtash and his co-conspirators had "lost" when RUE was barred from acting as the broker in the natural gas contracts between Russia and  Ukraine, the Yanukovych government essentially conceded RUE and Firtash's bogus claims and  failed to defend Ukrainian citizens' financial interests in the Stockholm Arbitration brought by  RUE and Firtash. As a result of this complete reversal of position in the Arbitration proceedings, Firtash and RUE were awarded 12.1 billion cubic meters of gas, equal

in value to $3.5 billion and exceeding half of Ukraine's domestic reserves at the time.[1]

9.     To ensure that the natural gas "commission" monies, which were being used as the initial financing of their U.S.-based Racketeering Enterprise, would never again be cut-off, Firtash, RUE and their co-conspirators targeted for elimination former Prime Minister Tymoshenko and other political opposition leaders who were outspoken critics of RUE's involvement in the Russia-Ukraine gas trade. These sham investigations and "show trials" were part of a widespread and systematic pattern of terror and intimidation carried out by the defendants and their co-conspirators within the Yanukovych Administration, against leaders of the political opposition who posed a threat to the uninterrupted flow of natural gas contract "commissions" being used to finance the start-up of defendants' U.S.-based Racketeering Enterprise.

## PARTIES

A.     **Plaintiff and Plaintiff Class Members**

10.     Plaintiff **YULIA TYMOSHENKO** brings this civil RICO action individually and on behalf of the entire class of persons who have been damaged by defendants' acts of racketeering in furtherance of their scheme to establish and fund their U.S.-based Racketeering Enterprise. Tymoshenko was the Prime Minister of Ukraine for a period of time in 2005, and again from 2007 to 2010. She has also served as the leader of the largest opposition party in Ukraine. As part of a concerted attempt to protect the flow of gas contract-related "commissions" used to fund the expansion of defendants' racketeering enterprise based in the U.S., defendants and their co-conspirators have subjected Tymoshenko to a series of politically

---

[1] Because Naftogaz is entirely state-owned, this colossal judgment is ultimately being paid by Ukrainian citizens.

motivated investigations and sham prosecutions, designed to neutralize and eliminate her outspoken opposition to defendants' corrupt practices. In the course of these "show trial" prosecutions, Tymoshenko was unjustly incarcerated on August 5, 2011, and despite the fact that she was gravely ill and in urgent need of medical attention, was incarcerated for an inordinately lengthy period of time, completely without justification.[2] Defendants intentionally and knowingly "financed" these unlawful investigations and prosecutions of Tymoshenko through unlawful secret payments to defendants Yanukovich, Azarov, Pshonka, Kuzmin and other members of the Ukrainian Prosecutor's Office and other officials in the Yanukovich Administration with money that had originated from unlawful European natural gas transactions and other racketeering acts engaged in by the defendants, which monies were then wired through various Firtash-controlled European banks and bank accounts to New York-based banks, and then wired back to European bank accounts the Group DF defendants, including but not limited to defendants Group DF Finance Limited and Group DF Real Estate

---

[2] Other political opposition leaders who were also jailed and/or prosecuted for criticizing defendants and their co-conspirators for their "skimming" of gas contract monies under the guise of "commissions" are: **Yuriy Lutsenko**, an important ally of Tymoshenko during her second term as Prime Minister, who was jailed for "failing to cooperate with the prosecution; **Valeriy Ivashchenko,** another Plaintiff Class Member and former Acting Minister of Defense during Tymoshenko's premiership, was arrested on August 21, 2010 on politically-motivated charges of "abuse of power of official position;" **Ihor Didenko**, Naftogaz's former CEO who signed the 2009 gas contracts on behalf of Naftogaz, was arrested in July 2010 , **Yevhen Korniychuk**, the former First Deputy Minister of Justice in the Tymoshenko administration, was arrested and jailed on December 22, 2010 on politically-motivated charges that courts had twice concluded to be without merit; **Anatoly Makarenko,** the Customs Chief of Ukraine in the Tymoshenko administration; **Mykola Petrenko,** who was a member of Ukraine's executive administration during Tymoshenko's term as Prime Minister and Director of UkrMedPostach, the Ukrainian state-run enterprise through which Ukraine's Ministry of Health was attempting to improve the health of Ukraine's rural population; **Taras Shepitko,** who served as Deputy Head of the Department of the Kyiv Regional Customs Office in the Tymoshenko administration; **Mykola Synkovsky,** former Deputy Head of the State Committee of State Material Reserves under Tymoshenko; **Mykhailo Pozhyvanoy,** former Chairman of the State Committee of State Material Reserves and Deputy Economy Minister; **Bogtdan Danylyshyn,** the former Minister of the Economy under Tymoshenko; **Viktor Bondar,** former Minister for Transport and Communications and Deputy Head of the State Customs Service; **Vitaliy Nikitin**, who served as Acting Head of the State Committee of State Material Reserves under the Tymoshenko Government; **Tetyana Slyuz,** former head of the State Treasury of Ukraine; **Tetyana Grytsun**, former First Deputy Head of the State Treasury; **Victor Kolbun**, former Deputy Pension Fund Board Chairman; and **Oleksandr Danyevych,** former State Treasury Deputy Chief.

through various complex and circuitous transfers so that that sources of the money used to pay-off the Ukrainian prosecutors and other officials could not be traced back to the defendants or their Racketeering Enterprise. But for defendants' complex and intentional money laundering activities, the defendants would not have been able to generate sufficient untraceable cash to pay off the Ukrainian officials spearheading the persecution and prosecution of Tymoshenko, which was one of the primary objectives of defendants' money laundering conspiracy. The defendants knew that the funds being laundered represented the proceeds of the various unlawful racketeering acts engaged in by the defendants; that the financial transactions constituting the money laundering were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership and the control of the proceeds of their racketeering activities; and that the defendants conducted their unlawful money laundering financial transaction with the intent to promote the carrying on of specific unlawful activities, including the financing with untraceable funds of the campaign to neutralize and destroy Tymoshenko and other leaders of the political opposition in Ukraine by means of illegal pay-offs to prosecutors and others in the Yanukovich Administration who orchestrated the sham and politically-motivated investigations and prosecutions of both her and her political allies. Moreover, defendants' money laundering conspiracy was the proximate cause of Tymoshenko's damages since it provided the necessary funds to make the unlawful payments to the Ukraine prosecutors and other corrupt administration officials who engineered defendants' unlawful campaign to deprive Tymoshenko and other opposition political leaders of their human rights recognized under international law, including the right to not be subjected to prolonged arbitrary detention, the right to be provided with adequate medical attention while incarcerated, and the right not to be subjected to systematic abuses of the judicial system through sham, politically-motivated "show trials" and other abuses.

7

11.    Plaintiff **SCOTT SNIZEK**, a U.S. citizen and resident of New York, also brings this action individually and on behalf of others similarly situated who were damaged by defendants' Racketeering Enterprise. Mr. Snizek worked with the U.S.-based defendants from their offices at 1501 Broadway in Manhattan. He, like many others, was duped and deceived by the defendants, through the use of false representations made –at least in part-- in mailings and through the use of interstate and international wires, into believing that defendants were engaged in legitimate business ventures in  New York and elsewhere in the U.S., when in truth and in fact, defendants operated their various  U.S.-based companies as part of their Racketeering Enterprise for various unlawful purposes, including violations of the U.S. and New York State Labor Laws requiring employers to properly  compensate their employees and to keep accurate records of the payment of salaries, commissions and other compensation. Instead, defendants disguised certain payments to Snizek as "reimbursement of expenses," and completely failed to pay him for most of the services that he rendered. These unlawful practices are currently being investigated by the U.S. and New York  State Departments of Labor.

12.    Plaintiff **CHRISTY GREGORY RULLIS**, a U.S. citizen, brings this action individually and on behalf of other persons who were damaged by defendants' racketeering acts in the U.S. Ms. Rullis worked for defendants' New York based operations at 1501 Broadway, New York, New York, and suffered monetary damages when defendants deceived her through --at least in part – the use of the mails and interstate/international wire facilities -- and failed to pay her for her  services and deceived her into thinking that the defendant companies she was working for were  legitimate business enterprises, when in truth and in fact, they were part of defendants' Racketeering Enterprise engaged in a carefully and secretly planned pattern of racketeering  activity.

13.     Plaintiff**s JOHN DOES # 1 through 50** are various individuals, companies

and businesses in the United States, including real estate owners and developers, architects

and other professionals, some of whom are identified herein**,** who have been damaged as a

result of the acts of  racketeering engaged in by defendants and other participants in the

Racketeering Enterprise. These plaintiffs, who were the targets and intended victims of

defendants' scheme to defraud investors and/or real estate owners, include U.S. investors who

were targeted as the intended victims of defendants' fraudulent scheme to market Ukrainian

property at grossly inflated prices, and real estate owners and businesses in the U.S. to whom

defendants falsely represented that they intended to purchase and/or develop their properties,

such as the Drake Hotel and St. Johns Terminal sites in Manhattan, and then deprived these

owners/businesses of their money and property by, among other things, precipitously

withdrawing from these projects at the last minute after defendants had finished laundering

funds through the project and siphoning off their victims funds and other property invested in

these projects.

**B.     Defendants and their Co-Conspirators**

14.     Defendant **DMYTRO FIRTASH** a/k/a Dmitry Firtash ("Firtash") is a

Ukrainian billionaire and a close associate and advisor to the former Ukrainian President,

defendant Victor Yanukovych. Firtash is one of the principal co-conspirators of defendants'

Racketeering   Enterprise, exercising complete dominion and control over at least six of the

following defendant  companies, including a number of American companies, which he

acquired and financed with illegally-obtained funds:  Centragas Holding AG ("Centragas");

defendant CMZ Ventures, LLC;   the Dynamic Fund a/k/a The Dynamic Group; Kallista

Investments LLC a/k/a/ Calister  Investments LLC, Group DF Limited (a/k/a Group of Dmitry

Firtash), and its subsidiaries and  affiliates Group DF Finance Limited and Group DF Real

Estate.

15.     Defendants **GROUP DF LIMITED** (otherwise known as Group of Dmitry

Firtash), and its subsidiaries and affiliates **GROUP DF FINANCE LIMITED** and **GROUP**

**DF  REAL ESTATE** (collectively, "**GROUP DF**") operate as Firtash's alter egos.  Group DF

is  Firtash's international private holding company and identifies itself on its website as "The

Firtash Group of Companies" and "the international private holding company of prominent

Ukrainian businessman Dmitry Firtash."  *See* **Exhibit 1**.  Firtash and his silent partner,

defendant Semyon Mogilevich, own a controlling interest in Group DF, with Firtash serving as

Group DF's  executive chairman.  Firtash has total control and dominion over Group DF, which

he has used to (a) purchase and control interests in several U.S.-based companies comprising a

significant part of defendants' Racketeering Enterprise, and (b) launder money obtained through

illegal natural gas transactions in Ukraine and elsewhere in Europe through Group DF controlled

bank accounts in Europe and elsewhere by transferring said funds to New York based bank

accounts of the various New York-based defendant companies, and then transferring a

substantial portion of these laundered funds back through Group DF controlled bank accounts in

Europe, Cyprus, UAE, Panama and elsewhere for the making of illegal pay-offs to Ukraine

prosecutors and other members of the corrupt Yanukovich regime for the purpose of financing

the unlawful campaign to neutralize, incarcerate and silence plaintiff Tymoshenko and other

members of the political opposition in Ukraine. Such money laundering activities continued

unabated up to and including the recent fall of the Yanukovich Administration following the pro-

democracy political demonstrations and election of a new government in Ukraine.

16.     Defendant **SEMYON MOGILEVICH,** a leader of the most powerful  Russian

organized crime syndicate, is on the FBI's "Most Wanted" list and has been described as "the most dangerous mobster in the world." *See* **Exhibit 2**. Mogilevich was the subject of a 45-count racketeering and money laundering indictment in the United States District Court for the Eastern District of Pennsylvania, captioned *United States v. Mogilevich*, Crim. No. 02-157, in which the U.S. Government alleges Mogilevich organized a sophisticated stock fraud and money laundering scheme in the U.S., using complicated financial transactions made through shell companies located in Europe. *See* **Exhibit 3**. Defendant Firtash has admitted that he got his start in the gas trading business with Mogilevich's assistance. *See* U.S. Embassy Cables: "Gas Supplies Linked to Russian Mafia." The Guardian (Dec. 1, 2010), **Exhibit 4.**

17.     Defendant **VIKTOR YANUKOVYCH** is the former President of Ukraine, who recently fled Ukraine after the pro-democracy demonstrations in Kyiv, Ukraine forced both him and other members of his corrupt administration out of office.

18.     Defendant **MYKOLA AZAROV** is the former Prime Minister of Ukraine.

19.     Defendant **YURIY BOYKO,** a close affiliate of defendant Firtash and the Group DF defendants, is the former Minister of Energy in the Yanukovich Administration and former Chairman of Naftogaz, the natural gas company used by Firtash and the other defendants to obtain huge sums through unlawful natural gas transactions, which they then funneled into the U.S., where it was money laundered through a series of complex financial transactions, and then a substantial portion was the moved back to Ukraine for the purpose of financing the sham politically-motivated prosecutions of plaintiff Tymoshenko and her political allies.

20.     Defendant **VIKTOR PSHONKA** is the former Prosecutor General of Ukraine, who orchestrated the sham investigations, incarceration and prosecutions of plaintiff

Tymoshenko and many of her political opposition allies. Both he and other members of the

Yanukovich Administration received illegal payments from Group DF and other defendants

and their co-conspirators as unlawful compensation and "pay-offs" for their relentless and

totally unlawful campaign to neutralize, incarcerate and silence Tymoshenko and other

opposition political leaders.

21.    Defendant **RENAT KUZMIN** in the former Deputy Prosecutor General of

Ukraine.

22.    Defendants **CMZ VENTURES, LLC**, **the DYNAMIC FUND** a/k/a The

Dynamic Group, and **KALLISTA INVESTMENTS LLC** a/k/a/ Calister Investments LLC

operate out of shared offices at 1501 Broadway, 25th floor, New York, New York 10036.  CMZ

Ventures and Kallista Investments were incorporated in Delaware and do business in New York.

The Dynamic Fund is an international investment fund established by Group DF and Firtash,

through CMZ Ventures and Kallista Investments.  Although the three companies have different

names, they have no meaningful corporate structure, but rather are corporate "fronts" for the

racketeering activities engaged in by Firtash and the other defendants in New York and

elsewhere in the U.S. Among other things, these corporate defendants act as investment vehicles

for Firtash and his co-conspirators to intentionally channel their illegal proceeds from the

Naftogaz-Gazprom gas contracts into the U.S. to fund the start-up and continued operations of

their racketeering activities in New York and elsewhere in the U.S, and for the further purpose

of funneling a substantial portion of the money from these New York corporate accounts back

into Ukraine through various Group DF-controlled bank accounts in Europe, Panama, Cyprus

and elsewhere for the purpose of making illegal payments to the Ukrainian defendants,

including defendants Yanukovich, Azarov, Pshonka, Kuzmin and other Ukrainian prosecutors

and officials of the Yanukovich Administration who were orchestrating and participating in the unlawful campaign to investigate, incarcerate and prosecute Tymoshenko and her political opposition allies on trumped-up sham criminal charges. CMZ Ventures has an account at the Metropolitan National Bank in New York (Acct. No. 2000506) that it uses for various money laundering and other racketeering purposes.

23.     CMZ Ventures "Preliminary Term Sheet" lists as joint owners the following three corporations:  (1) Defendant **BARBARA ANN HOLDINGS, LLC**, a corporation registered in Delaware and 90% owned by Defendant **BRAD S. ZACKSON**; (2) Defendant **VULCAN PROPERTIES, INC.**, a corporation run and controlled by Defendant **ARTHUR G. COHEN**, although wholly owned by his wife, Defendant **KAREN COHEN**; and (3) a corporation described in the formation papers as "XXX LLC", controlled by defendant **PAUL MANAFORT.**  *See* **Exhibit 5**. Each of these corporations and their owners acted as agents for Firtash and other participants in the Racketeering Enterprise by covertly investing their money through CMZ Ventures, Kallista Investments, and the Dynamic Fund for the specific purpose of carrying out the Enterprise's racketeering activities, including acquisition of legitimate businesses into their unlawful racketeering enterprise, and the laundering of money through these New York-based companies of monies initially obtained by defendant Group DF through unlawful natural gas transactions in Europe and elsewhere, and then, after the monies had been laundered through the various corporate New York based bank accounts, funneling a substantial portion of the monies back to Ukraine through Group DF bank accounts in Europe, Cyprus, Panama and elsewhere for the purpose of financing the payment to defendants Yanukovich, Azarov, corrupt Ukraine prosecutors such as Pshonka and Kuzmin, and others in the Yanukovich Administration who were leading the unlawful persecution and prosecution of

Tymoshenko and her political opposition allies.

24.     Defendant **PAUL J. MANAFORT** is a well-known Washington D.C.  lobbyist and political consultant. He is the senior partner in the firm Davis, Manafort and  Freedman. Manafort also worked in Ukraine on various political campaigns, including the  successful 2010 presidential campaign of Victor Yanukovich, the former President of Ukraine. Manafort played a key role in the defendants' conspiracy and racketeering enterprise by  assisting Firtash to become a major "investor" and silent partner in defendants CMZ Ventures  (sometimes referred to as "ZMC Investors"), Group DF and their affiliated companies, through  which Firtash and his associates were able to money launder and invest in various U.S-based companies a large portion of the funds that Firtash, Group DF and RUE were skimming from numerous Gazpron/Naftogaz natural gas transactions, as well as the windfall payments and profits worth approximately $3.5 billion that they received as a result of the corrupt transactions  and breaches of fiduciary duties that resulted in the Stockholm Arbitration award, as described  below in greater detail.

25.     These monies were then intentionally funneled into various New York based bank accounts and used to finance the money laundering and other racketeering acts engaged in by defendants from their New York base under the guise of otherwise legitimate real estate deals and other investment activities in New York and elsewhere in the United States. The contracts, agreements, meetings, discussions and electronic communications (e.g., computer, email and fax transmissions) relating to said racketeering activities were primarily conducted through defendants' offices located at 1501 Broadway, 25th floor.

26.     Each of the defendants had substantial and purposeful contacts with New York in that the defendants either were based at the New York offices ("the New York

defendants") or, as to the defendants who were based elsewhere, they had the New York

defendants act as their agents with regard to all activities of their racketeering enterprise

that  were conducted from the New York offices.

27.    Through the use of numerous wire transfers from various European banks to

New York-based banks, the defendants intentionally engaged in a complex scheme to

money launder funds generated by the European gas transactions in furtherance of

defendants' Racketeering Enterprise, and a substantial portion of said funds were used to

purchase and/or maintain an interest by defendants in the various defendant companies that

comprised part of the Racketeering Enterprise, which were then used for various unlawful

purposes, including the conversion of defendants' otherwise legitimate real estate

development businesses based in New York into sham business fronts used solely for the

purpose (a) of laundering money for the Enterprise, (b) defrauding the "John Doe" plaintiffs

and other innocent third party real estate owners and investors of their money and property,

and (c) defrauding the New York-based individually named plaintiffs and other employees

of their salaries, benefits and career opportunities, which were shattered when the defendant

New York-based companies failed to complete even one of the many real estate ventures

that these employees had worked on both long and hard, to their substantial detriment. Said

money laundering activities by defendants, which primarily involved the wire transfer

from Firtash controlled bank accounts in Europe to various New York banks, constituted a

pattern of racketeering activity that substantially involved predicate acts or money laundering

and other racketeering acts (such as mail and wire fraud) in New York and elsewhere in the

United States. In addition, a portion of the money-laundered  funds were then funneled back

to Ukraine to provide the "financing" for the persecution and  political suppression of

Tymoshenko and other leaders of the political opposition in Ukraine who had vocally opposed the "skimming" of millions of dollars from the gas contracts by Firtash, RUE and their associates. Firtash and his co-defendants and co-conspirators knew that the transfer of the money back to Ukraine was intended to conceal the proceeds of specified unlawful activity, namely the unlawful acquisition of the proceeds of illegal gas transactions in Europe and the proceeds of fraudulent real estate marketing and sham "real estate development" activities in New York and elsewhere in the U.S. and the Caribbean, as prohibited by 18 U.S. C. 1956(a)(1)(B)(i). Firtash, Manafort and their co-defendants also know that the laundered funds would be (and in fact were) used to make illegal payments to the Ukrainian Prosecutor's office and other officials in the Yanukovich Administration who were spearheading the campaign of terror and intimidation which had as its objective the elimination of Tymoshenko and her political allies as a threat to defendants' corrupt practices relating to the gas contracts, which generated a significant portion of the initial and ongoing financing for defendants' U.S.-based Racketeering Enterprise and money laundering activities.

28.     Since defendant **Manafort** had been a key advisor to former-President Yanukovich and other Ukraine political figures since 2003, he knew exactly how Firtash and his affiliated companies and co-conspirators were able to skim billions of dollars from the natural gas deals between Russia and Ukraine, and he knew that the monies were used to acquire ownership and control of various U.S.-based companies in furtherance of defendants' Racketeering Enterprise.  By inviting Firtash (and his silent partner Mogilevich) to utilize various U.S. based companies to facilitate Firtash's money laundering and political corruption activities, Manafort gave Firtash and his European-based

16

co-conspirators the opportunity to participate with the U.S.-based  defendants in a new

Racketeering Enterprise focused on corporate acquisitions, money laundering and other

racketeering activities in the United States, where it continues to operate.

29.     Non-Party Co-conspirator **CENTRAGAS HOLDING AG ("Centragas")** is  a

Firtash alter ego and holding company incorporated in Vienna, with offices in Austria.

Centragas conducts a significant part of its business in the United States and is 90% owned by

Group DF.  As such, Centragas is controlled by Firtash through Group DF and is essentially

indistinct from Group DF and Firtash himself.  Centragas, in turn, has been used repeatedly by

Firtash in the Racketeering Enterprise as a vehicle for defendants' money laundering activities

and as an intermediary to purchase stock in and control various U.S.-based companies and

other entities.

30.     Non-party co-conspirator **ROSUKRENERGO AG ("RUE")** was created to

serve as a middleman in the transportation of natural gas from Turkmenistan through Russia to

Ukraine.  Firtash owns 45% of RUE through his holding company, Centragas Holding AG.

Ukrainian businessman and Firtash associate Ivan Fursin also owns a 5% share of RUE through

Centragas, with Gazprom owning the remaining 50% of RUE through Arosgas Holding AG.

*See*  Minutes from RUE Meeting (July 29, 2004).  Even though Firtash and his co-conspirators

are  not majority shareholders, they effectively control RUE's operations.

31.     From 2004 to 2009, RUE and Firtash, through Centragas, received huge

"profits" through their unlawful manipulation, as the intermediary, of prices in natural gas deals

between Gazprom, the Russian-owned natural gas company, and Naftogaz Ukrainy National

Joint-Stock Company ("Naftogaz"), a natural gas company owned solely by the Ukrainian

state.  For example, on July 29, 2004, Naftogaz and RUE entered into a contract (No. 14/935-

1/4) for the sale and purchase of natural gas during the period from 2005-2028, which was signed by defendant and co-conspirator Yuriy Boyko ("Boyko") as the Chairman of the Board of Naftogaz, and which designated two Naftogaz bank accounts in New York at the Bank of New York (Acct. 890-0260- 947) and Deutsche Bank (Acct. 04-094-040) through which huge sums of money were transferred to the defendants and their co-conspirators in furtherance to their racketeering scheme and enterprise, for the primary purpose of funding their U.S.-based Racketeering Enterprise ("the Enterprise") through the acquisition and/or financing of the U.S.-based defendant companies and other investment projects in the U.S. through which defendants engaged in the their numerous acts of racketeering on behalf of the Enterprise. *See* **Exhibit 6**.

32.     Naftogaz and RUE entered into another contract on July 29, 2004 (No. 13/935-3/04) that was similarly signed by defendant Boyko and designated the same two New York bank accounts to be used for the wire transfer of funds. *See* **Exhibit 7**.

33.     On January 4, 2006, Gazprom, Naftogaz and RUE entered into a contract "on development of relations in gas sector," that designated RUE as the sole "supplier" of Gazprom natural gas for the transport of the natural gas through Ukraine and export to Western Europe. *See* **Exhibit 8**.

34.     Defendant **Yuriy Boyko** ("Boyko") a Ukrainian citizen, has been an ally and co-conspirator of Firtash for many years, and has strong financial ties to Firtash. In 2004, Boyko served as Chairman of Naftogaz's Board. In this capacity, Boyko signed and, upon information and belief, helped to secure RUE's contracts as an intermediary in the Russia-Ukraine gas trade despite significant conflicts of interest. *See*, e.g., **Exhibits 6, 7 and 8**. Among other conflicts of interest, Boyko was simultaneously serving on RUE's Coordination Committee, which was

responsible for all major decisions of the company, and was authorized to represent Firtash's interests before Ukrainian state and local bodies and in all contracts, agreements, and legal transactions pursuant to a Power of Attorney executed by Firtash. After Yanukovych's election, Boyko was named Ukraine's Minister of Fuel and Energy, leading the Ukrainian government to reverse its stance on the legality of the 2009 gas contracts that Tymoshenko had negotiated cutting out RUE as a middleman. As a result of this change in position, an arbitral award against Naftogaz valued at over $3 billion was issued.

35.     Defendants **JOHN DOES # 1 through 100** are other individuals and companies, some of whose identities are presently unknown, who conspired with and/or aided and abetted the named defendants as part of a racketeering conspiracy to funnel unlawfully obtained funds from the natural gas contracts into various U.S. based bank accounts, for the purpose of (a) laundering said monies through various U.S. based bank accounts controlled by defendants and then transferring a substantial portion of said laundered monies back to Ukraine for payments to the Ukrainian defendant prosecutors and others who were leading the campaign to destroy, neutralize, incarcerate and prosecute Tymoshenko and other opposition political leaders, (b) acquiring, financing and/or operating the defendant companies and various other U.S. and Ukraine-based investment projects designed to defraud both the plaintiff U.S.-based employees of defendants' U.S. based companies of their valuable time, money and career opportunities, and to defraud U.S. based investors of their money and property through "investments" in Ukraine-based real estate projects that were grossly inflated in price and value, all with the objective of engaging in a pattern of racketeering activity in furtherance of the Enterprise's unlawful objectives, spanning a time period of at least several years, and which continues through the present and into the foreseeable future.

## JURISDICTION AND VENUE

36.    This Court has personal jurisdiction over all defendants by virtue of either  their

location in New York, their business and/or tortious activities in this state, or by operation  of

Fed. R. Civ. P. 4(k)(1-2).

37.    This Court has federal question subject matter jurisdiction pursuant to 28

U.S.C. § 1331 (federal question jurisdiction), and 18 U.S.C. § 1964(c) (RICO). Plaintiffs allege

that Defendants conducted multiple racketeering activities that had a continuity of structure and

purpose over an extended period of time.  RICO provides federal jurisdiction for persons

"injured in [their] business or property" by acts taken pursuant to a racketeering "enterprise."

18 U.S.C. § 1964(c).

38.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over

claims brought under the laws of the State of New York.

39.    Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)  and

(c).  Furthermore, there is no foreign independent or impartial forum in which to bring this action.

## STATEMENT OF FACTS

**A.**    **Ukraine's Political Leadership**

40.    Yulia Tymoshenko first came to power as Prime Minister of Ukraine in 2004

following Ukraine's bloodless "Orange Revolution," which was sparked by mass

demonstrations  in Kyiv's Independence Square protesting the election of Viktor Yanukovych

as Ukraine's next  President.  Yanukovych had been declared the 2004 election winner by a

small margin amidst  widespread complaints of voting fraud.

41.    Under international and domestic pressure, Ukraine's Supreme Court  ultimately

struck down the initial 2004 election results and ordered a run-off election to be held.  When Yanukovych's opponent, Victor Yushchenko, emerged victorious in the 2004 run-off elections, Tymoshenko was appointed Prime Minister.  She served in this role until September 8,  2005. On December 18, 2007, Tymoshenko again assumed the office of Prime Minister of  Ukraine and ran for President against Yanukovych in 2009.  In February 2010, however,  Yanukovych beat Tymoshenko for the presidency by 3% of the vote.

42.     Tymoshenko was thereafter forced to resign as Prime Minister on March 4, 2010.  Thereafter, she was the leader of the largest opposition party in Ukraine's Parliament, the Batkivshchyna Party.

**B      Yanukovych's Consolidation of Power**

43.     Following his election to the presidency, Yanukovych consolidated his power through far-reaching "reforms" of the executive, legislative, and judicial branches and the use of  politically-motivated criminal prosecutions brought against his opponents in an attempt to intimidate them and prevent Tymoshenko and her allies from regaining political power and thereby threaten the enormous revenue stream from defendants' Racketeering Enterprise.  The Yanukovych Administration's policies have drawn widespread international criticism for the continued erosion of democratic procedures, which are increasingly turning Ukraine into an authoritarian state.

44.     Upon his election, Yanukovych's political coalition still fell seven votes  short of a parliamentary majority. The Ukrainian Parliament, however, amended its procedural  rules for forming a new government to enable a majority coalition to be formed by both factions  and individual members of Parliament, notwithstanding the fact that this was in conflict with a prior 2008 decision by Ukraine's Constitutional Court.  Nevertheless, under pressure by the

Yanukovych Administration, the Constitutional Court reversed its prior decision, sanctioning Yanukovych's majority coalition and the unseating of the Tymoshenko-led majority.

45.     The Constitutional Court's decision marked the beginning of the politicization of Ukraine's judiciary.  In September 2010, four of the Court's justices who opposed the decision resigned, with two of whom admitting that they had been pressured to step down by Ukraine's Congress of Judges.  On September 21, 2010, new justices loyal to Yanukovych were sworn in as replacements.  Fifteen of the eighteen judges on Ukraine's Constitutional Court are now considered loyal to Yanukovych.

46.     Nine days after these new justices assumed office, the Constitutional Court invalidated Ukraine's 2004 Constitution due to cited "procedural irregularities" in its adoption, notwithstanding that the 2004 Constitution was a direct result of Ukraine's Orange Revolution  and, ironically, its decentralization of presidential powers had been demanded by Yanukovych  himself.

47.     The Constitutional Court's decision effectively reinstated the 1996 Constitution, which conferred upon Yanukovych greater powers, including the power of appointment over the Prosecutor General's Office ("PGO") and virtually every other important  government office.  Thereafter, under the guise of administrative reform and budgetary cuts, Yanukovych substantially reduced the number of ministries, executive advisors, and government  agencies, replacing current government appointees with Yanukovych's allies, many of which  were also close associates of defendant  Firtash and who had accepted illegal kickbacks and  other support from Firtash and his agents, associates, and other co-conspirators in the past.

48.     The Yanukovych Administration "reformed" other aspects of the judiciary,

which has effectively deprived Ukraine of any semblance of judicial independence and impartiality.  In order to solidify control over Ukraine's separate Supreme Court, for example, the Yanukovych Administration decreased the number of Supreme Court judges from 49 to 20,  and held what have been referred to as judicial "casting calls" to determine which judges were  loyal to the administration and would stay on the Court, and which would be dismissed.

49.     A new "Law on the Judicial System and the Status of Judges," signed by President Yanukovych, also significantly reduced the Supreme Court's role by creating a new High Specialized Court in Civil and Criminal Matters, which was headed by a Yanukovych ally  and previous Member of Parliament ("MP") for Yanukovych's political party, the Party of  Regions ("PoR").  The Law also granted increased powers to Ukraine's High Council of Justice, such that with the allegiance of at least 16 of the 20 members on the High Council of Justice,  Yanukovych has virtually complete control over the hiring and firing of judges.

**C     Defendants' Campaign to Eliminate Plaintiffs As A Threat to Their   Racketeering Enterprise Through Baseless Arrests and Sham Prosecutions,**

50.     What defendants have not been able to accomplish through such institutional "reforms" of Ukraine's executive, legislative, and judicial branches described above, it has attempted to achieve through the illegitimate use of the criminal laws to target and eliminate plaintiffs' political opposition in Ukraine.

51.     On November 4, 2010, defendant Viktor Pshonka assumed office as Ukraine's new  Prosecutor General, publicly referring to himself as "a member of President Yanukovych's  team." What he failed to publicly disclose was that he was appointed to this immensely powerful  position so that he could protect the "skimming" operations from the natural gas contracts, which   provided much of the initial financing for defendants' start-up of

their U.S.-based Racketeering Enterprise.

52.     To silence Tymoshenko's political opposition and thereby protect the  unlawful "income stream" used to finance defendants' Racketeering Enterprise, Pshonka, as  head of the PGO, opened numerous politically-motivated criminal cases against Tymoshenko  and at least 11 other former senior government officials who served in her administration.

**D.     Criminal Charges Against Yulia Tymoshenko**

53.     The Yanukovych Administration, with the assistance of Firtash and his co-conspirators, misused tremendous governmental resources to pursue these unfounded charges against Tymoshenko and her allies in order to neutralize these opposition leaders and eliminate the threat they posed to the continual and unimpeded flow of unlawfully acquired proceeds used  to finance defendants' Racketeering Enterprise.

Kyoto and Opel Combo Charges

54.     A prime example of the bogus "criminal" investigations and prosecutions of plaintiffs is the allegation that Tymoshenko abused her power and improperly used budgetary funds related to the handling of revenues received by Ukraine in 2009 pursuant to international agreements for the sale of carbon emission credits under the framework of the Kyoto Protocol (referred to as "Kyoto Revenues").  Specifically, the PGO accused Tymoshenko of spending these Kyoto Revenues for purposes other than those specified in the agreements, thereby causing  state losses to Ukraine and undermining the country's prestige among other Kyoto Protocol member states.[3]   Notably, the Kyoto Charges do not even allege personal financial gain

---

[3] Heorhiy Filipchuk, who served as Environmental Protection Minister under Tymoshenko, was also arrested on charges of abuse of power and misuse of funds related to Ukraine's sale of carbon emission  credits under the Kyoto Protocol.

on the part of former Prime Minister Tymoshenko or members of her government.

55.     The Kyoto Charges were patently false. An independent review of government documents by law firm Covington & Burling LLP and auditing firm BDO USA confirmed that none of the Kyoto Revenues were expended during Tymoshenko's tenure in office, with the balance of the Kyoto Special Purpose Fund set up to account for the revenues remaining constant as of the date of receipt. Indeed, the Ukrainian Government privately assured Japan that the revenues were fully accounted for.

56.     Similarly, the Opel Combo Charges allege that Tymoshenko abused her powers as Prime Minister by mandating and signing various orders and resolutions of the Cabinet of Ministers, which secured financing for and executed a contract with Austrian company Vamed Engineering GmbH & Co. KG ("Vamed") for the provision of medical equipment to Ukraine's rural areas, including 1,000 Opel Combo vehicles that were retrofitted to run on rural terrains. The Opel Combo Charges allege that the Tymoshenko Government paid an inflated price for the vehicles as a result of the financing fees charged. As with the Kyoto Charges, however, the Opel Combo charges do not allege any *quid pro quo* or other personal financial benefit received by Tymoshenko or others negotiating the Vamed contract.

57.     The Opel Combo Charges were also not supported by the facts. Indeed, a Ukrainian Ministry of Economics Review found that the price paid for the Opel Combo vehicles was obtained at a significant discount. Law firm Covington & Burling LLP and auditing firm BDO USA also concluded, based on independent research, that the price Ukraine paid for the Opel Combo vehicles was no worse than market price. Likewise, the firms concluded the Vamed contract was a direct commercial contract, with no intermediaries, that followed well-

established business practices.

**Gas Charges**

58.    As it became clear that the Kyoto and Opel Combo Charges were based on politically popular decisions by the Tymoshenko Government, the Yanukovych Administration narrowed its focus on a third set of criminal charges set forth in an order dated April 11, 2011. These Gas Charges allege that during the regional gas crisis of January 2009, Tymoshenko exceeded her powers as Prime Minister by signing "directives" instructing Ukraine's state-owned energy company, Naftogaz, to enter into an agreement with its Russian counterpart, Gazprom, which set gas purchase and transit prices at rates that the Yanukovych Administration   asserts in hindsight were unfavorable for Ukraine.

**Defendants Firtash, Mogilevich and their co-conspirators Worked Inside and Outside of Government Channels to Secure Their Favored Position in the Russia-Ukraine Gas Trade for RUE, from Which Defendants Received Most of Their Initial Funds for the Start-Up Funding for their U.S.- based Racketeering Enterprise**

59.    From its inception, RUE has been the subject of investigations by international law enforcement agencies and others regarding its opaque ownership structure,  connections with organized crime, conflicts of interest by two of its directors, and the critical  (but unnecessary) role it plays in huge natural gas transactions. RUE appears to have been  created primarily to enable Firtash, Mogilevich, and their other associates to continue their  lucrative "skimming" operations in natural gas transactions, much of which has been used to  finance defendants U.S.-based Racketeering Enterprise.

60.    KPMG International, RUE's auditor, resigned because it determined that RUE  "may be part of a larger undisclosed business group, presenting an unacceptable risk to KPMG's  reputation." **Exhibit 9.**  The press has exposed RUE's and Firtash's

26

connections to Russian  organized crime through Mogilevich, who has been indicted in federal court on 45 counts  relating to racketeering activities.  The United States Department of Justice also conducted an  investigation in 2006 into RUE's suspected organized crime elements.  *See* **Exhibit 10.** American Ambassador to Ukraine William B. Taylor, Jr.'s diplomatic cables note that Firtash  has acknowledged his ties to Russian mafia figure Mogilevich.  *See* **Exhibit 4.**

61.     RUE secured its privileged position in the Russia-Ukraine gas trade as a result  of Firtash's close personal and financial ties to Naftogaz's leadership, including Yuriy Boyko and Ihor Voronin (Chairman and Deputy Chairman of Naftogaz's Board respectively), who had  been instrumental in securing the 2004 and 2006 intermediary contracts for RUE.

62.     On July 29, 2004, the same day that Boyko signed the gas intermediary contract with RUE on behalf of Naftogaz, Centragas appointed Boyko and Voronin to sit on RUE's Coordination Committee, which made "all the major decisions" for RUE. The two men  served as key decision makers and leaders of both Naftogaz and RUE notwithstanding the obvious conflict of interest presented by their simultaneous representation of two opposing  parties in a commercial relationship of great importance to Ukraine.

63.     Further compounding this conflict of interest was a Power of Attorney executed by Firtash on December 13, 2005, which authorized Naftogaz Chairman Boyko to represent Firtash's interests at Ukrainian state and local bodies, including notarial bodies, insurance companies, credit and banking institutions, and land resource authorities. The Power of  Attorney further gives Boyko "all necessary powers for the management and

27

disposal of all property owned by" Firtash, including "property in collective ownership," such as real property, securities, cash resources, and corporate rights. The document also authorizes Boyko to submit and sign on Firtash's behalf "all documents, including contracts, agreements, [and] legal transactions."

64.    Notwithstanding this long history of association with Firtash and RUE, Boyko falsely testified at Tymoshenko's trial that he had "no connection" with RUE.

**Defendants Firtash, Mogilevich and their associates Funneled Their Ill Gotten Gains Into the United States, Which They Then Used to Acquire Control of and to Finance Various U.S.-based companies and business enterprises that Became a Part of Defendants' U.S.-based Racketeering Enterprise.**

65.    Upon information and belief, a sizable portion of RUE's proceeds from its natural gas transactions and the Stockholm arbitration award were "invested" by Firtash (and his silent partner Mogilevich), through defendant DF Group of affiliated companies, into U.S.-based bank accounts, companies and investment projects comprising part of defendants' Racketeering Enterprise. The complexity of the financial transactions also enabled Firtash and other participants in the Racketeering Enterprise to aid and abet the campaign to destroy members of the political opposition in Ukraine who were the most vocal critics of the continued "skimming" from the natural gas deals being carried out under the guise of "commissions." Consequently, defendants have largely been able to carry out their racketeering activities in the U.S. with the mask of legitimacy.

66.    Firtash and his agents and co-conspirators in the Racketeering Enterprise made investments through a labyrinth of shell companies and other entities, almost all of which are U.S.-based entities:

American Land Capital Advisors,
LLC American Land Diversified

Fund LLP  Arthur G. Cohen &
Partners
Barbara Ann Holdings, LLC (Delaware corporation)
Balcott & Morgan Management, LLC (New York
corporation)  Belles Dynamic Holdings, LLC
Blue Acquisition Member, LLC
Brookmar Corp. (New York
corporation)
Brooklyn Marina Corp. (Delaware corporation)
Calister Investments LLC
CMZ Ventures Fund Advisors, LLP (Delaware limited liability
partnership)  CMZ Ventures, LLC
CMZ Ventures Real Estate Fund I, LP (Delaware limited
partnership)  CMZ Ventures Real Estate Fund II, LP (Delaware
limited partnership)  Dvn Eleuthera Development, Inc. (Panama
corporation)
Dynamic Capital Corporation
Dynamic Capital Inc.
Dynamic Fund Advisors, LLC (Delaware limited liability
company)  Dynamic Fund Management, LLC (Delaware limited
liability company)  The Dynamic Group
Dynamic Nevada Eleuthera, LLC
Dynamic Vulcan Eleuthera Inc. (Panama corporation)
Dynamic Real Estate Fund 1, LP (Delaware limited
partnership)  Dynamic Real Estate Solutions Ltd. (New York
corporation)  Dynamic Worldwide Development LLC (New
York corporation)  Dynamic Worldwide Energy LLC
Dynamic Worldwide Properties,
LLC Dynamic Worldwide Solar
Energy, LLC Grandrock
International, LLC
Highrock Holdings (Cyprus firm with Mogilevich's wife as a major
shareholder)  JAB Holdings LLC (Nevada limited liability company)
Kallista Investments LLC (Delaware corporation)
Nadra Bank (5th largest Ukrainian bank purchased by Firtash through Centragas in May
2011)

Vulcan Properties, Inc. (Delaware corporation)
Waterview Holdings, LLC
ZMC Investors,
LP ZMC
Kallista LLC
ZMC Partners, LP (Cayman Islands exempted limited
partnership)  ZMC Ventures, LLC

29

67.     Upon information and belief, once these otherwise legitimate companies and/or legal entities were acquired with the proceeds of racketeering activities, or were newly formed, they did not observe corporate formalities or engage in arms-length transactions when  conducting business, but rather intermingled funds, shared office space, management, and   personnel, and were operated by the defendants and their co-conspirators for the purpose of  furthering their money laundering and other racketeering activities.

68.     In the U.S., defendants' method of operation was that when one company that was part of their racketeering enterprise was investigated by a government agency or sued, it would be closed down, and its operations transferred to a new, clean company with a similar name to confuse government regulators.  This made it more difficult for government regulators to monitor each company's operations and trace its financing.

69.     Upon information and belief, after an extensive investigation of Firtash's racketeering and money laundering activities by the United States Department of Justice, he was indicted on various federal charges by the U.S. Attorneys' Office for the Northern District of Illinois.  Similarly, Mogilevich was indicted on racketeering, securities fraud, wire fraud, mail fraud, and money laundering charges in the United States District Court for the Eastern District of Pennsylvania.  *See* **Exhibit 3**.

70.     Upon information and belief, Firtash was arrested on the U.S.-based federal charges in Vienna, Austria, where he remains subject to certain bail restrictions.

71.     Defendants and other members of the Racketeering Enterprise used three U.S. companies and their corporate bank accounts in particular—defendants CMZ Ventures LLC, Kallista Investments LLC, and the Dynamic Fund (which were sometimes referred to collectively as "The Dynamic Group)—to funnel money into the United States under the guise

of investing in legitimate business ventures, but in fact were used to further their unlawful racketeering activities.

72.     Defendant CMZ Ventures, a Delaware-based company, was formed in mid-2008 with the help of Firtash and companies affiliated with Group DF. CMZ's three publicly listed owners were Barbara Ann Holdings LLC (controlled by Brad Zackson), Vulcan Properties, Inc. (run by Arthur Cohen and wholly owned by his wife), and a third company referred to as XXX LLC (owned by Paul Manafort). *See* **Exhibit 11**. Firtash and Mogilevich were undisclosed "silent partners" in both CMZ Ventures and its affiliated companies, including Kallista Investments LLC (which also went by the name of "Callister Investments"), as would be made clear by subsequent communications with and among the individuals who control the listed owners.

73.     Defendants agreed that CMZ Ventures and Kallista Investments would establish an "international investment fund" called "the Dynamic Fund" (also sometimes referred to as the "Global Real Estate Funds") which would be used to facilitate the movement of illegally-obtained funds into the U.S. and other unlawful acts in furtherance of the Enterprise's racketeering objectives.

74.     In order to further solidify the relationship between the U.S.-based defendants and Firtash, on August 25, 2008, Manafort sent an email to defendants Zackson and Rick Gates, one of Firtash's agents and associates, attaching a revised "Vision Statement" for "CMZ Ventures- Global Real Estate Funds" that Manafort wanted "DF"[Dimitry Firtash] to "sign off" on. *See* **Exhibit 12** attached hereto.

75.     Upon information and belief, Firtash was also advised by other defendants and their agents that CMZ Ventures had already entered into a Letter of Intent ("LOI") on July 16,

31

2008 with 440 Park Avenue Owners Associates LLC and Macklowe Properties to purchase the
Drake Hotel project site in Manhattan, with an initial deposit of $10 million and $885 million
to  be paid upon closing. *See* **Exhibit 13.**

76.     Firtash (on behalf of himself and Mogilevich), both directly and through co-
conspirator David Brown, the CEO of the defendant DF Group**,** agreed to make a large
commitment of funds to the U.S. investment ventures with which Manafort was associated,
including CMZ**,** Kallista Investments, the Dynamic Group, the Dynamic Fund and their
numerous affiliated companies. In addition, Firtash agreed to put various real estate holdings
that he had in Ukraine into the Fund so that the Enterprise's New York-based companies could
market his properties via the mails, internet and wires at inflated values to U.S. investors,
providing defendants and their  associates with a virtual labyrinth of corporate and investment
structures in the U.S. that were utilized for defendants' money laundering and other
racketeering purposes, including the fraudulent taking of investment monies and other property
from unsuspecting U.S. investors and legitimate businesses.

77.     In December 2008, Firtash met with Paul Manafort to discuss establishing one
of their various funds, referred to as the "Global Real Estate Fund," that would ostensibly
enable Firtash, Mogilevich and the other defendants to acquire and purchase real estate
investments in the United States, but which, in actuality, was solely designed to further the
money laundering activities and to further defendants' scheme to deprive legitimate U.S.
businesses and real estate owners of their money and property.  Defendants agreed that the
Global Real Estate Fund was to be incorporated and based in New York, with Group DF to
secure satellite offices for the Fund in Kyiv.

78.     At this meeting, Firtash and Manafort agreed that Group DF would make  initial

capital commitments of $100 million to invest in the Global Real Estate Fund. Firtash

further agreed that Group DF would pay an initial fee of $1.5 million (by means of wire

transfer) to CMZ to manage the establishment of the Fund, which reflected 1.5% of the initial

capital commitments.  After determining which additional assets Group DF would invest,

Firtash and CMZ Ventures then completed and executed a Limited Partnership Agreement and

other documents necessary to  establish the Fund.  *See* **Exhibit 14** (e-mail dated January 9, 2009

transmitted via interstate wire from Rick Gates to David  Brown summarizing Firtash and

Manafort's December 2008 meeting).

79.     Then, on June 8, 2009, in an e-mail sent to Zackson, attached as **Exhibit 15**,

Manafort summarized his recent trip to Kyiv, Ukraine to discuss additional foreign investments

by Firtash, Mogilevich, Group DF, and their associates.  Manafort's email, transmitted via

interstate wire, reported that "DF is  still totally on board and a wire [transfer] will be

forthcoming either the end of this week or next week as a  partial payment on the 1.5 [million]."

80.     Once they were acquired by defendants and became part of defendants'

Racketeering Enterprise, these American companies were no longer operated as legitimate

businesses, but rather were solely used for purposes of furthering the unlawful objectives of the

Racketeering Enterprise. They shared the same office space at 1501 Broadway in New York and

operated interchangeably as agents under the control of Firtash and the other defendants in

furthering their racketeering scheme to use the mails and interstate wires in connection with the

acquisitions and interstate investments being made in the United States.

81.     After receiving a formal complaint from present and former employees of

certain of the defendant companies, the New York State Department of Labor ("NYSDOL")

opened an investigation of CMZ Ventures, Dynamic Worldwide Properties and their related

companies operating out of the 25th floor of 1501 Broadway, N.Y., N.Y., for failing to fully pay

employee wages and back wages, misclassifying employees as "independent contractors" in

official government forms and tax returns submitted to government agencies through the use of

the mails and interstate wire transmissions to avoid paying them worker's compensation and

unemployment benefits, and misidentifying  salary payments as expense reimbursements and

travel expenses. The employees' complaint identified various instances by which the defendants

used the mails and interstate wires in furtherance of their fraudulent scheme, stating, in relevant

part: "It has recently become clear as to how the employer's [Dynamic  Worldwide Properties,

LLC's] partnership fraudulently operates within the offices located at  1501 Broadway, 25th

floor, N.Y., N.Y. 10036 and how we have been considerably harmed by  being denied our full

salary-or any for that matter." The complaint identifies the partners as including defendants

Brad S. Zackson, Karen B. Cohen, Arthur G. Cohen and Paul Manafort, Jr.,  who is described as

having "close ties to the businesses of troubled Ukranian billionaire, Dmitry  Firtash of Group

DF."

82.     As part of its investigation, the NYSDOL urgently "requested" employment  and

wage data relating to, among others, Samuel S. Lee, the Senior Acquisitions Director, who  filed

for unemployment insurance but was unable to establish the "gross wages paid" to him  since

the defendants' New York-based companies never gave him a W-2 and, instead, falsely

reported, in various official filings made through the use of the mails and/or interstate wires, that

most of his salary was "expense reimbursement." *See* **Exhibit 16.**

83.     Upon information and belief, the Internal Revenue Service also launched an

investigation of the defendant New York-based companies for violating federal tax laws by

failing to issue either W-2 or 1099 forms, or by using the mails and interstate wires to issue

false W-2 or 1099 forms, for not deducting and maintaining accurate records  regarding federal and state withholdings, and for not making Medicare, Social Security, and Workers' Compensation Insurance deductions.

84.     In addition, one principal of  the New York-based companies, defendant Brad Zackson, had his real estate license revoked on November 3, 2008, because Zackson had "failed to cooperate with a New York Department of State investigation" into**,** among other things, his fraudulent use of the mails and interstate wires in furtherance of defendants' scheme, and "demonstrated  untrustworthiness" in violation of New York's real property law through the use of mailings and interstate wire communications containing fraudulent representations and documentation.  *See* **Exhibit 17**.

**Real Estate Transactions**

85.     Firtash and his racketeering associates also used the defendant New York-based companies to, among other things, funnel money through the United States under the guise  of investing in real estate projects, such as the Drake Hotel and St. Johns Terminal project in  Manhattan.  Upon information and belief, Firtash committed illegally-obtained funds to these  companies directly and through Group DF Director David Brown with assurances that he and  Mogilevich would be treated as "silent partners" In the case of a number of these real estate  projects, however, after the "investment funds" had been sufficiently "laundered," such funding  was abruptly "withdrawn" prior to closing, thus defrauding innocent third party investors, businesses, real estate developers, architects and other professionals, and depriving them of their valuable time, money and property.

86.     These real estate projects gave the impression that Firtash and his affiliated

companies were investing in legitimate business ventures, when in fact defendants primarily intended to use these funds to further their racketeering activities while, at the same time, targeting and defrauding innocent and unsuspecting third parties of their time, money and property.

**The Drake Hotel's Bulgari Tower Project**

87.     On July 16, 2008, CMZ Ventures, "c/o The Dynamic Group," submitted a Letter of Intent ("LOI") to purchase the Drake Hotel project site to build a 65-story Bulgari Tower that would include a mall, a private club, and a spa.  *See* **Exhibit 18**.  The LOI was accompanied by an initial deposit of $10 million and an offer to pay $885 million upon closing.

88.     On August 20, 2008, CMZ Ventures' owners (both disclosed and undisclosed used the mails and the interstate and foreign wires to falsely claim that Firtash and his associates had committed to finance the purchase of the Drake Hotel property when, in truth and in fact, Firtash and his co-conspirators in CMZ were only creating the appearance of being seriously interested in closing on the Drake Hotel deal as a disguise for their money laundering activities and as a means of defrauding Harry Macklowe, the then-owner of the Drake Hotel site, of his valuable time, money and property.  Brad Zackson, who owned 90% of Barbara Ann Holdings, emailed Macklowe to report that he had just "returned from our  investor meeting in Monte Carlo and want you to know it could not have gone better," and that "CMZ's 112[ ]m[illion] in equity has been firmed up and is ready to go."  *See* **Exhibit 19**. Pursuant to Firtash's explicit instructions, Zackson never disclosed the identity of CMZ Ventures's foreign investors.

89.     On November 6, 2008, Group DF Director David Brown sent a letter to

Calister (a/k/a Kallista) Investments c/o the Dynamic Fund, in which Group DF Real Estate, "a subsidiary company of Group DF Limited, the holding company of Dmitry Firtash" and the "major financial source" behind Calister Investments, "confirm[ed] [its] commitment to the Bulgari Tower Project [*i.e.* the Drake Hotel project]." *See* **Exhibit 20**. Brown's letter, which was sent both via international mail and by use of the interstate and foreign wires, falsely stated that Group DF Finance Limited  was "prepared to provide $112 million in equity for the project." However, in truth and in fact, although Group DR had executed a $25 million  escrow deposit with the First American Title Insurance Company, it failed to disclose to unsuspecting third party investors and real estate developers, such as the site owner Harry Macklowe, that it had no intention of investing any of the remainder of the "$112 million in equity" into the project.

90.     Later that day, Brown signed an escrow agreement with Calister Investments on Group DF's behalf, which confirmed that $25 million had been wired from Raiffeisen Bank AG, Group DF's primary bank, to CMZ Ventures, Calister Investments, and the Dynamic Fund's  New York escrow account with the First Amendment Title Insurance Company. *See* **Exhibit 21**  The escrow agreement was then forwarded by  e-mail from one of Firtash's agents and  representatives, Rick Gates, to Zackson. Upon information and belief, Zackson then forwarded a copy of the escrow agreement via the mails and/or interstate wires/internet email to Macklowe and other innocent third parties as part of the scheme to deprive them of their valuable time, money and property.

91.     On January 21, 2009, using the $25 million in funds wired by Firtash through Group DF, Kallista Investments and the Dynamic Group made a formal offer, attached as **Exhibit 22**, to purchase the Senior A-1 and A-2 Notes secured by the Drake Hotel site. This

"offer," which was delivered to third party victims of the fraud via the mails and/or interstate wires, was in fact a sham offer designed to deprive the third parties of their money and property.   The  same day, Zackson reported via e-mail that he had received "everyone's approval" on the offer  for the Drake site proposal, including the approval of "our overseas partners."  *See* **Exhibit 23**.

92.     Despite having sufficient financing from Group DF and Firtash, CMZ Ventures, Kallista Investments, and the Dynamic Group, never closed on the Drake property, which another company purchased.  Group DF and Firtash never had any intention to purchase the Drake property, but instead used the real estate project as a vehicle for moving another $25 million into New York bank accounts in furtherance of the Enterprise's racketeering activities while, at the same time, depriving innocent third party investors and real estate owners/developers, such as Harry Macklowe, of their money and property.

**The St. Johns Terminal Project**

93.     The Drake Hotel is not the only real estate investment that Firtash, Group  DF and their co-conspirators agreed to finance before abruptly withdrawing their support.  In early 2008, Firtash and  Group DF falsely "agreed" to finance the Dynamic Group, the Dynamic Fund, and other entities  controlled by Defendants for the ostensible purpose of acquiring the St. Johns Terminal project, a 200,000 square foot plot  located at 550-570 Washington Street, New York, New York, which encompassed three entire  city blocks and 850 linear feet of high-exposure waterfront along Hudson River Park.

94.     As part of its fraudulent scheme to deprive innocent third parties of their money and property, including the owners of the St. Johns Terminal and the MGM/Mirage Hospitality company, the Dynamic Group, also referring to itself as "Dynamic Worldwide  Properties,

LLC," prepared a brochure, dated March 14, 2008, falsely representing the "details" regarding

defendants' proposed acquisition of the "St. John's Center Redevelopment" project, which

included plans for a 4 to 5  star hotel tower with over 600 rooms, and a letter of interest from

MGM Mirage Hospitality. *See* **Exhibit 24**. Brad Zackson and others associated with The

Dynamic Group included this  brochure in a packet of materials mailed and e-mailed to Group

DF, Firtash, and others, including the St. Johns Terminal Owners and representatives of

MGM/Mirage Hospitality.

95.     In furtherance of defendants' fraudulent scheme, CMZ Ventures never closed on

the St Johns Terminal project. Firtash, Group  DF and the other defendants never had any

intention of investing in the project; instead, they  expressed interest in the project to make it

appear that they were working on legitimate real  estate investment deals while, at the same

time, secretly transferring and "laundering" the funds  through New York accounts in

furtherance of their racketeering activities and, in addition, depriving various third party real

estate owners others, including hotel chains, of their valuable time money and property.

(iii.) *South Cat Cay Island*

96.     As part of their scheme, Firtash, Mogilevich, and Group DF also "agreed" to

provide financing to CMZ  Ventures, Kallista Investments, and the Dynamic Group to acquire

and develop the South Cat Cay Island, one of the Bimini Islands in the Bahamas.  The island is

located close to Miami.  The project was estimated to cost $35 million, and included plans to

develop 150 estates on the island valued at $1 million per estate, 50 townhouse condominiums,

50 luxury bungalows, a 9-hole golf  course, a deep water marina and a helipad. A copy of the

development plan and brochure for the island is attached as **Exhibit 25.**

97.     As with the Drake Hotel and St. Johns Terminal Projects, although Firtash

39

Mogilevich, and Group DF allocated substantial funds to the project, and used the

interstate/international wires to transfer some of those funds, the project never closed, thus

depriving various third party businesses of their money and property, as well as time and money

committed to the project by plaintiffs Scott Snizek and Christy Gregory Rullis, who worked on

this and other projects for substantial periods of time without pay, based upon defendants' false

representations that these projects were "real," that they were "definitely going to happen," and

that these plaintiffs would be fully compensated for their time and money devoted to working on

this and other projects once those projects "were completed" (which never happened).

**Group DF's American Marketing Campaign**

98.     At Firtash and his associates' request, CMZ Ventures and its affiliated

companies based in New York began to actively market Group DF's properties in Kyiv and

elsewhere to American customers, through the use of brochures mailed to unsuspecting third

party investors in the U.S and elsewhere, and through the use of the interstate and international

wires.  Such "investments" were aimed at obtaining American investment money at

fraudulently inflated prices in order to enhance the Enterprise's financing and to deprive the

defrauded investors of their money and property.   A color brochure and PowerPoint

presentation prepared for CMZ Ventures' marketing campaign on behalf of "DF Properties"

(meaning properties of Dmitry Firtash) is attached as **Exhibit 26**. Not only did this aspect of

defendants' scheme deprive various third party investors of their money and property; it also

deprived plaintiffs Scott Snizek, Christy Gregory Rullis and other co-workers of their time,

money and property, since they worked tirelessly on this and other projects for substantial

periods of time without pay, based upon defendants' false representations that these projects

were "real," that they were "definitely going to happen," and that these plaintiffs would be fully

compensated for their time and money devoted to working on this and other projects once those projects "were completed" (which never happened).

99.     For example, in furtherance of defendants' scheme, on November 13, 2008, Carolyn Schlam, who was working on a DF properties presentation, sent an email via the wires to a CMZ Ventures employee to request pictures to complete the PowerPoint portion of the "DF Report." *See* **Exhibit 27**. The same day, Rick Gates of Pericles LP, one of Firtash's agents and a participant in defendants' Racketeering Enterprise, e-mailed Zackson a copy of a presentation on Group DF.

100.    In addition, various defendants and CMZ Ventures employees who worked on the DF Properties presentation e-mailed various drafts to one another via the interstate and/or international wires, including the "Revision Notes for DF Properties Presentation," attached as **Exhibit 28**.

**Panamanian Corporations**

101.    Also in furtherance of their racketeering scheme, including their money laundering operations and scheme to defraud third parties of their money and property, Firtash, Mogilevich, and others associated with the Racketeering Enterprise, with the assistance of the U.S.-based defendants, including Brad Zackson, created a number of additional companies registered in Panama to siphon off and transfer their funds to New York bank accounts. Firtash associate Robert Entler registered three corporations for Firtash in Panama: DVN Eleuthera Development, Inc., Dynamic-Vulcan Eleuthera, Inc., and Grey Wolf Enterprises Inc.These incorporations are attached as **Exhibit 29**.

102 . Dynamic Worldwide Development, LLC was listed as part owner of Dynamic-Vulcan Eleuthera, Inc., which in turn owned 50% of DVN Eleuthera Development, Inc., as

explained in an email exchange (via interstate/international wires) between Stephen B. Delman, Defendants' New York attorney, and Alvaro Aguilar, a Panamanian attorney Entler had used to file Grey Wolf's incorporation papers. *See* **Exhibit 30.** Brad Zackson was named one of the Directors of DVN Eleuthera Development, Inc., with Arthur Cohen serving as President. *See* **Exhibit 31**.

103.    The "First Draw" on the DVN Eleuthera Development Inc.'s account was a deposit of $500,000, as reflected in a letter emailed from Zackson to Entler, which is attached as **Exhibit 32.** Defendants used two New York bank accounts for the wire transfers: CMZ Ventures account with Metropolitan National Bank, and a law firm account with Capital One bank. *See* **Exhibit 33**.

104.    Firtash, Mogilevich, and the other defendants also used American Capital Holding LLC to sign a "Facilitation and Broker Disbursement Agreement" with Firtash's Panamanian and U.S. companies to create another vehicle to siphon off and "launder" funds from the various investment projects for defendants' benefit.

105.    On September 16, 2009, Attorney Aguilar reminded Zackson and other defendants by an email, attached as **Exhibit 34**, that United States law required them to file Foreign Bank Account Reports (FBARs) disclosing information regarding offshore accounts, and that the United States Amnesty program to report offshore accounts expired on September 23, 2009. Defendants nonetheless failed to file any FBARs with the American government because they did not want to disclose the connections between their American companies, their Panamanian companies and offshore bank accounts, or the wire transfers among the various companies that Firtash, Mogilevich and their associates and other defendants controlled.

**Pharmaceutical Company**

106.    In June 2009, although defendants had no experience or expertise in the medical or pharmaceutical fields, they established, through the use of the mails and interstate/international wire facilities, another company, Dynamic BL Health, LLC,  that was purportedly aimed at importing low-cost prescription drugs from Canada to the United  States. *See* **Exhibit 35**.  Once again, defendants' actual intention was to create yet another vehicle to launder funds for their Racketeering Enterprise through United States and foreign based banks, while, at the same time, defrauding investors and legitimate businesses of their money and property.

**Nadra Bank**

107.    On May 4, 2011, Firtash, through Centragas, acquired a controlling interest in Nadra Bank, Ukraine's fifth largest bank.  Upon information and belief, Firtash was able to acquire Nadra Bank using the proceeds received from the fraudulently procured Stockholm arbitration award.

108.    As of June 2011, Nadra Bank had approximately $500 million on deposit in New York bank accounts at JP Morgan Chase (Acct No. 762804508), BNY Mellon (formerly Bank of New York) (Acct. No. 8900341629); and Standard Chartered Bank (Acct No. 3582021684001).

109.    Since the acquisition, Firtash and the other defendants have used Nadra Bank  to transfer unlawfully obtained proceeds from the Stockholm arbitration and recent natural gas transactions to bank accounts in New York in furtherance of their racketeering activities.

**Tymoshenko and her Allies Pose A Grave Threat to One of Defendants' Sources of Funding for their Racketeering Enterprise By Repeatedly Attacking Firtash and RUE, Ultimately Depriving RUE of its Lucrative Position in the Russia-Ukraine Gas Trade**

110.    Tymoshenko and her allies have been longstanding critics of RUE's privileged position in the Russia-Ukraine gas trade and have raised concerns about government and corporate corruption involving the company and its owners, including Firtash, Tymoshenko and other opposition leaders openly questioned RUE's lack of transparency and its lack of legitimate business purpose as an intermediary in the Naftogaz-Gazprom contracts.

111.    When Tymoshenko resumed her position as Prime Minister in December 2007, she pledged to eliminate RUE and other intermediaries from the Russia-Ukraine gas trade. Early in 2008, Tymoshenko revoked the authority of Ukrgaz-Energo (the RUE-Naftogaz joint venture) to operate in Ukraine, effectively requiring RUE to sell directly to Naftogaz. The loss of access to Ukraine's lucrative domestic industrial customers through Ukrgaz-Energo was financially damaging to RUE.

112.    Thereafter, in negotiating Ukraine's 2009 gas purchase and transit contracts, then Prime Minister Tymoshenko reached an agreement with then Russian Prime Minister Vladimir Putin to eliminate RUE as an intermediary, providing for the direct sale of natural gas from Gazprom to Naftogaz. This agreement was an important step forward in shifting the Russia-Ukraine gas relationship to a less politicized, more purely commercial footing. The United States Embassy, which had described Firtash as a "questionable character" in cables to Washington, opined that eliminating Firtash and RUE as intermediaries would introduce "transparency and accountability" to the natural gas trade. *See* **Exhibit 36**.

113.    Ukraine's 2009 gas purchase and transit contracts negotiated by Tymoshenko and Putin also included an agreement by Naftogaz to assume the payment of $1.7 billion of

RUE debt to Gazprom, in exchange for 11 billion cubic meters of natural gas that Gazprom had delivered, but for which RUE and Firtash (through Centragas) had not yet paid.  Natogaz then assumed the 11 billion cubic meters of natural gas being stored by RUE in Ukrainian government storage tanks.

114.    The 2009 gas contracts were a disaster for RUE, Firtash and their co-conspirators, resulting in a significant loss of their income stream.  Firtash was outraged by the 2009 gas contracts and publicly denounced them, stating that if anyone aside from Tymoshenko  had negotiated the contracts, "he would have already been hanging from the street lights."  *See*  **Exhibit 36**.  He further complained to the United States Ambassador to Ukraine that the 2009  gas contracts were "criminal and the 'most stupid contract in Ukraine's history.'"

115.    Although Firtash, Boyko, and their associates attempted to sabotage the 2009 gas contract negotiations, they were unsuccessful at the time.  As a result of RUE and Firtash's influence over former President Yushchenko, however, the Naftogaz delegation ceased negotiations with Gazprom in December 2008 rather than finalize an agreement in principle that  the parties had accepted.  This resulted in the widely publicized 2009 European gas crisis. Tymoshenko publicly blamed Firtash and Boyko for having interfered with, and prevented, the finalizing of the parties' gas contracts at that time.

116.    While in Moscow to sign the January 19, 2009 gas contracts, Naftogaz Deputy Chairman Ihor Didenko received phone calls from RUE and Firtash's agents and co-conspirators threatening that if he signed them, he would "do time."  Following Yanukovych's election, Firtash and his co-conspirators succeeded in having politically-motivated criminal charges brought against Didenko related to the January 2009 gas contracts.

**Defendantss and Their Co-Conspirators Retaliate Politically Against Tymoshenko and Regain Their Financial Foothold in the Russia-Ukraine Gas Trade**

117.    Unable to prevent the conclusion of Ukraine's 2009 gas purchase and transit contracts at the time, Firtash, RUE and the other defendants have since worked to redress the damage done to their interests as a result of the contracts negotiated by Tymoshenko and her allies.

## Defendants' Virtual Control of the Yanukovych Administration

118.    With the election of Yanukovych as President, Naftogaz's entire management team was also replaced with managers loyal to Yanukovych, Firtash, and their co-conspirators. With defendants' virtual control over the Yanukovych Administration, defendants and their co-conspirators have operated both inside and outside of government channels to redress the damage done to their income stream from the gas contracts by Tymoshenko and her allies.

**Yanukovych Administration Fails to Defend Ukraine's Interests in Stockholm Arbitration and Ukrainian Court Proceedings Related to Transfer of Natural Gas Pursuant to 2009 Gas Contracts**

119.    Upon the conclusion of the 2009 gas contracts, RUE and Firtash initially attempted to void Naftogaz's confiscation of RUE's natural gas in Ukrainian court. Under Tymoshenko's leadership, however, the Ukrainian government successfully defended the transfer on the basis that Naftogaz, not RUE, had paid for the gas in question, meaning that RUE had no claim of ownership over the gas.

120.    Firtash and his associates then filed an arbitration claim, on behalf of RUE, with the Arbitration Institute of the Stockholm Chamber of Commerce, alleging that Gazprom's assignment of RUE's debt and subsequent transfer of gas to Naftogaz was illegal. Upon information and belief, Firtash retained U.S. law firm DLA Piper, LLP to provide legal

assistance with respect to the Stockholm arbitration claim.

121.    As in the Ukrainian courts, Naftogaz initially defended the transfer of natural gas as a legal collection of the debt owed by RUE and assigned to Naftogaz by Gazprom. During the pendency of the Stockholm arbitration proceedings, however, Ukraine's political leadership changed, with Yanukovych becoming President in February 2010.  By March 2010, under the leadership of Yanukovych and new Energy Minister Boyko, the Ukrainian government  had completely reversed its position in the Stockholm arbitration.

122.    As explained by a November 2010 Supreme Court of Ukraine opinion, "Naftogaz of Ukraine admitted completely that there were no legal reasons [for it] to acquire [the] disputed quantity of natural gas." The Ukrainian government conceded that the gas in dispute had always been owned by RUE and that the government's seizure of RUE's natural gas had been illegal.  This complete reversal of Naftogaz's position adverse to the interests of Ukraine and its citizens was a shocking about-face and can only be explained by the corrupt ties Boyko and other government officials had to Firtash, RUE and their other co-conspirators.

123.    In June 2010, in light of the Ukrainian government's and Naftogaz's  withdrawal of their opposition to RUE's ownership claim over the disputed gas, the Stockholm Arbitration Tribunal ("Tribunal") granted RUE's claim.The Tribunal held that Naftogaz owed RUE 12.1 billion cubic meters of gas: the 11 billion cubic meters which allegedly had been  confiscated from RUE in 2009, as well as a fine of 1.1 billion cubic meters.  Because Naftogaz is a state-owned company, the arbitral award, which is valued at approximately $3.5 billion, is being paid by Ukrainian citizens.

124.    Following the Tribunal's decision, RUE moved to enforce the Tribunal award in Ukrainian court.  Naftogaz and the current Ukrainian government again failed to defend

Ukrainian citizens' interests in these proceedings by neglecting to produce any evidence countering the award.  Naftogaz "did not challenge the jurisdiction, the competence of the arbitration and arbitrability of the dispute," but rather again admitted completely "the illegality of  seizure of natural gas from RosUkrEnergo."  Although Naftogaz asserted that the award would  be contrary to public policy, the company did not "furnish any proof" of this claim.

125.    On November 24, 2010, the Ukrainian Supreme Court affirmed the Stockholm Tribunal award, which inflicted severe economic harm upon Naftogaz and, by extension, Ukraine and its citizens.  As Naftogaz has acknowledged, its satisfaction of the arbitral award directly transferred to RUE natural gas "exceed[ing] 50% of the total natural gas extracted in the country annually from [the] country's own resources, and 50% of [the] annual needs of natural gas by the population."

126.    Upon information and belief, Firtash and his affiliates, agents, and co-conspirators have used a significant portion of their Arbitration Award—which sources have estimated to be valued between $3.5 billion and $5.4 billion—to finance the ever-expanding operations of their Racketeering Enterprise in the U.S.

**Recent Developments**

127.    **The Skadden Arps Investigation**. Following the recent fall of the Yanukovich Regime, a number of documents were retrieved from former Prosecutor General Pshonka's home, including certain documents found in his sauna, including a Russian translation of an email/memo dated August 24, 2012 from Gregory B. Craig to defendant Paul Manafort. A copy of the Russian-language document and the English translation is attached hereto as **Exhibit 37.** [4]

---

[4] Mr. Craig is President Obama's former White House counsel and a partner at the Skadden Arps law firm, which was working at that time on an allegedly "independent" investigation and report regarding the Tymoshenko criminal prosecutions.

The clear inference of this document is that Manafort was orchestrating and "coordinating" the Skadden law firm's supposedly "independent" investigation with the Ukrainian government so that Yanukovich and his racketeering co-conspirators, including Firtash, could be kept fully informed of what the Skadden "team" members were looking at, what they were looking for, and where their "investigation" was headed.

128.     In addition, it has also been reported in the press that "[t]he papers in the sauna … included an early draft of Skadden's report that had been annotated by Ukrainian government officials, who appeared to be pushing the Americans for a more sympathetic interpretation of the case…" *See New York Times, Andrew E. Kramer, Feb. 26, 2014, "Prize Catch for Ukrainians at Boat Harbor: A Soggy Trove of Government Secrets."* This draft (or multiple drafts) of the Skadden Report (which concluded that the Tymoshenko prosecution was not politically motivated, albeit procedurally flawed) was, therefore, leaked to Yanukovych and his agents for edits and comments prior to the release of final "independent" Report.

129,     Evidence has also recently arisen indicating that the Yanokovich Administration grossly underestimated the amount of money that was paid to the Skadden firm for its "investigation."  In a letter dated June 25, 2012, the Ukraine Ministry of Justice represented that the entire contract price relating to the hiring and retention of the Skadden Firm was ninety-five thousand (95,000) hrivnas, which is less than $12,000 USD (1 USD is the equivalent of approximately 8 hrivnas). See **Exhibit 38** attached hereto. Upon information and belief, the importance of this absurdly low retainer amount was that, under Ukrainian "anti-corruption" law, any contract of 100,000 hrivnas or more (less than $13,000 USD) was subject to "tender proceedings" requiring detailed disclosures and a bidding procedure, which would have permitted other law firms to submit bids for this government contract.

In an email sent by Tymoshenko's Ukrainian counsel, Sergiy Vlasenko, to Gregory Craig and Alex Haskell, two of the Skadden partners who visited Ukraine during the investigation, the Skadden Firm was specifically asked how two "highly ranked" partners of Skadden and a large team of associates could have been working for more than five months (May through October 2012) on the investigation for $12,000, when their travel and lodging expenses alone for the time they spent in Kyiv would alone have exceeded that sum. Mr. Vlasenko never received a response from the Skadden Firm to his questions.

130.    Upon information and belief, several partners and associates from the Skadden Firm were in Kiev on May 24-25, May 29-31 and June 5, 2012, allegedly in furtherance of their investigation. Although numerous witnesses were interviewed at the time, and documents were made provided to them documenting the blatant political motivation behind the sham investigations" and "prosecutions" of Tymoshenko and other political opposition leaders, this evidence of the systemic use of prolonged arbitrary detention for political ends was completely excised and "white washed" from the Skadden final report. Now that documents have come to light establishing the key role that Manafort played in orchestrating the Skadden "investigation," the failure of the Skadden report to find (or even to investigate) the clear evidence provided regarding the political nature of the Tymoshenko "show trial" is unsurprising.

131.    Upon information and belief, since one round trip ticket (business class) between Washington, D.C. and Kyiv costs approximately $3000, the air fare alone for five attorneys (the minimum number of Skadden attorneys sent to Kyiv on any one of the multiple excursions) exceeded the $12-13,000 "contract amount" represented to the public and the Ukrainian Parliament.

In addition, upon information and belief, the cost of a hotel room in Kyiv is a minimum of $200 per night, or $1000 per night for five Skadden attorneys. The Skadden group stayed at the Fairmount Kiev Hotel, which is, upon information and belief, an excellent hotel, which leads to the reasonable conclusion that the Skadden hotel charges alone (excluding meals and other services) was substantially in excess of $1000 per day. Moreover, evidence has been uncovered that there were at least two Skadden partners (Gregory Craig and Cliff Sloan) present during the Skadden expeditions to Kyiv, and three associates. Since, upon information and belief, the two partners were billed out at $750 per hour (or $1500/hour for both), and the billing rates for the three associates were at least $400 per our (or $1200/hour for all three), the hourly billing for the five Skadden attorneys was thus at least $2700/hour, and a conservative estimate of the Skadden billing for attorneys' time is $2 million.

132.    It appears, therefore, that one of the reasons why the Yanukovych Administration staunchly misrepresented the amount of compensation provided to the Skadden firm was that most of the funding for, and "monitoring" of, the Skadden so-called investigation came from non-governmental sources, such as Manafort, Firtash and the companies they and their co-conspirators control. In this way, Firtash, Manafort and their co-conspirators could monitor and "steer" the Skadden investigation away from certain sensitive areas (such as the massive, politically-motivated violations of human rights and suppression of political dissent) and towards less dangerous subjects (relatively minor procedural irregularities in the Tymoshenko investigations and prosecutions).

133.    **The Chicago Indictment of Firtash.** In early July, 2014, the U.S. Attorney's Office for the Northern District of Illinois (Chicago) has unsealed the RICO indictment of Firtash and five other defendants relating to a bribery scheme involving Boeing Corp. (identified

in the indictment as "Company A," and as a " purchaser of titanium products") and various licensing authorities in India. In essence, the Chicago Indictment alleges that Firtash and his co-conspirators engaged in the same kind of money laundering and fraud scheme in India that Firtash, Manafort and their U.S. co-conspirators conducted in the U.S., Just as the domestic racketeering and real estate fraud scheme alleged in this Third Amended Complaint damaged numerous *bona fide* U.S. businesses and real estate ventures in New York and elsewhere, Firtash's Indian conspiracy caused significant damages in India and elsewhere, according to the Chicago Indictment. A copy of the Firtash Chicago Indictment is attached hereto as **Exhibit 39**. In addition, as detailed in the Indictment, Firtash and his co-conspirators used the same *modus operendi* as alleged in the Third Amended Complaint, conducted their racketeering scheme through literally dozens of companies in order to obscure the money trail.

134.   **Evidence of Defendants' Russian Organized Crime Connections Through Manafort and Gates**. The attached Memorandum dated July 1, 2008 (in both English and Russian) is from defendant Rick Gates, a former partner of Paul Manafort in the Davis Manafort firm and a principal of Pericles LLC, to Andrey Zagorskiy and Anton Vishnevsky, who, upon information and belief, are associates of Oleg Deripaska (referred to in the memo only as "Mr. D"). See **Exhibit 40** attached hereto. The memo summarizes a meeting between Paul Manafort and Oleg Deripaska the day before the memo was written, and a meeting held the prior month. Upon information and belief, Deripaska is the Chairman of the Supervisory Board of the Russian company, Basic Element Company, and a member of the Board of Directors and CEO of United Company Rusal, the largest aluminum company in the world. Deripaska is reported to have an estimated net worth of US $6.5 billion, placing him amongst the top 20 Russia oligarchs. See Rapoza, Kenneth, Forbes (Feb. 13, 2012),

Case 1:11-cv-02794-KMW Document 106 Filed 04/09/14 Page 2 of 3"Russia's Most Respected

Billionaires," (http://www.forb "Russia's Most Respected Billionaires,"

(http://www.forbes.com/profile/oleg-deripaska).

135.    In July 2006, while Deripaska was involved in a bid to buy the Daimler Chrysler

Group, it was reported that the U.S. had cancelled his entry visa, alleged due to his alleged links

with Russian organized crime. See Wolf, Jim (May 11, 2007), Reuters, "U.S. revoked Deripaska

visa – State Dep't Official." Later, in 2009, Deripaska was reported as having been permitted

entry into the U.S. on two occasions, during which time the Wall Street Journal reported that he

met with FBI agents regarding a continuing criminal probe. See Wall Street Journal, Oct. 30,

2009). "Deripaska Accused U.S. of Blackmail." On January 25, 2010, the Financial Times

published an article that explored Deripaska's business relations with Sergei Popov and Anton

Malevsky, two Russian organized crime figures. See "Comment/Analysis – Rusal: A Lingering

Heat," Financial Times, Jan. 25, 2010.

136.    Plaintiffs believe this additional Memo is significant in that it confirms that Paul

Manafort had direct contacts with high-level Russian figures who were, upon information and

belief, under investigation by the FBI and the U.S. Dept. of Justice for alleged money laundering

and other criminal activities within (and without) the U.S., and that Manafort, Gates and the

other U.S. based defendants were directly conspiring to defraud Harry Macklowe, Fisher

Construction, Alatau Hospitality and Inovalis Real Estate and other major players in the U.S.-

based real estate, hotel development and construction fields with regard to the Drake

Hotel/Bulgari Tower project in midtown Manhattan.

**CLAIMS FOR RELIEF**

**COUNT I**
**Act, 18 U.S.C. § 1961 *et seq.***

137.     Plaintiffs repeat and reallege the paragraphs of this Second Amended

Complaint as though fully set forth herein.

138.     Over a number of years and continuing to the present, Defendants and

their agents and co-conspirators have participated in an association-in-fact engaged in

foreign and interstate commerce that constitutes a racketeering "enterprise" within the

meaning of 18 U.S.C. § 1961(4).  The instant "Racketeering Enterprise" is an

association of persons, both inside and outside of the United States, who have worked

to facilitate the funneling of illegally-obtained  funds obtained from various natural gas

contracts through various bank accounts controlled by Firtash and the defendant

Group DF into the United States for the purpose, among other things, of financing the

U.S.-based Racketeering Enterprise engaged in primarily by the U.S. defendants, with

some financing by and participation of Firtash and the other European-based individual

and   corporate defendants.

139.     Specifically, Firtash and the U.S.-based defendants and co-conspirators,

which together constitute a domestic U.S. racketeering enterprise, used the proceeds

from the Russia-Ukraine gas deals to acquire various U.S.-based companies and

entities, which were then incorporated  into defendants' racketeering enterprise and

used to generate unlawful proceeds by means of a  series of racketeering acts spanning

over a period of several years and continuing to the present, including but not limited

to the laundering of money through various U.S.-based companies and real estate

development entities for the purpose of (a) defrauding innocent third party real estate

owners, investors and businesses of their valuable time, money and property through sham real estate development and sales proposals that lured said third parties into thinking that defendants were making legitimate investments into various U.S.-based real estate projects and offering legitimate real estate investment opportunities in Ukraine for U.S.-based investors, when in truth and in fact, defendants never intended to actually close on and complete any of the U.S. and Caribbean-based real estate development projects, and, in the case of the Ukrainian based real estate investment "opportunities" for unsuspecting U.S. investors, offering said "investment opportunities" at grossly inflated prices and thus defrauding those investors who paid defendants money for participation in such sham and grossly overpriced projects; (b) funneling a substantial portion of the money that was laundered through New York bank accounts under the guise of supposedly legitimate real estate development projects back through the labyrinth of Firtash and Group DF companies and bank accounts located in Europe, Cyprus, Panama, UAE and elsewhere so that virtually untraceable funds could be generated to illegally pay defendants Yanukovich, Azarov, Boyko, Pshonka, Kuzman, and other Ukrainian prosecutors and others in the Yanukovich Administration to "finance" the continued campaign to destroy, neutralize and silence Tymoshenko and her political opposition allies through sham investigations, prolonged arbitrary detention, prosecutions and denial of critical medical treatment; and (c) using their New York-based "front" companies to defraud the New York based individual plaintiffs and their co-workers of the compensation and benefits to which they were entitled for the extensive time, money and energy that they devoted to defendants' real estate development projects that they thought were genuine,

55

but which the defendants were merely using to further their money laundering and other racketeering activities in the U.S. but had no intention of actually bringing said projects to fruition.

140.    But for defendants' complex and intentional money laundering activities, the defendants would not have been able to generate sufficient untraceable cash to pay off the Ukrainian officials spearheading the persecution and prosecution of Tymoshenko, which was one of the primary objectives of defendants' money laundering conspiracy. The defendants knew that the funds being laundered represented the proceeds of the various unlawful racketeering acts engaged in by the defendants; that the financial transactions constituting the money laundering were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership and the control of the proceeds of their racketeering activities; and that the defendants conducted their unlawful money laundering financial transaction with the intent to promote the carrying on of specific unlawful activities, including the financing with untraceable funds of the campaign to neutralize and destroy Tymoshenko and other leaders of the political opposition in Ukraine by means of illegal pay-offs to prosecutors and others in the Yanukovich Administration who orchestrated the sham and politically-motivated investigations and prosecutions of both her and her political allies.  Moreover, defendants' money laundering conspiracy was the proximate cause of Tymoshenko's damages since it provided the necessary funds to make the unlawful payments to the Ukraine prosecutors and other corrupt administration officials who engineered defendants' unlawful campaign to deprive Tymoshenko and other opposition political leaders of their human rights recognized

under international law, including the right to not be subjected to prolonged arbitrary

detention, the right to be provided with adequate medical attention while incarcerated,

and the right not to be subjected to systematic abuses of the judicial system through

sham, politically-motivated "show trials" and other abuses.

141.     At all times relevant to this Complaint, Defendants and their agents and

co-conspirators have, as part of the Racketeering Enterprise, conducted, directly and

indirectly participated in, and conspired in a pattern of racketeering activity, including

money laundering and mail and wire fraud that took place in New York and elsewhere

in the United States, in  violation of 18 U.S.C. §§ 1962(c) and (d).  Each defendant

subscribed to and endorsed the unlawful purposes of the Racketeering Enterprise, and

either participated in, facilitated and/or aided and abetted at least two of the predicate

acts that had sufficient relatedness and continuity to form a pattern of racketeering

activity that continues to the present.

142.     Defendants' pattern of racketeering activity included the unlawful

actions and activities of defendants and their co-conspirators identified in this Third

Amended Complaint and in the Exhibits attached thereto, including but not limited to,

the money wire transfers, faxes and email communications between various

international locations, such as Stockholm and Kiev, and New York and elsewhere in

the U.S. constituting wire fraud in violation of 18 U.S.C. §  1343, the use of the mails

for purposes of mail fraud in violation of 18 U.S.C. § 1341, and money laundering

activities in violation of 18 U.S.C. § 1956.

143.     Since approximately 2007 and continuing to the present, Defendants

and their agents and co-conspirators have invested their racketeering proceeds in real

estate and other financial investments in New York and elsewhere in the United States, in violation of 18 U.S.C.§ 1962(a).  These investments have enabled the Racketeering Enterprise to operate under the cover of legitimacy when engaging in their various acts of racketeering, including money laundering and sham real estate investment projects targeting unsuspecting third party businesses, real estate owners and others, with the intention of fraudulently depriving said third parties of their money and property while, at the same time, depriving the individual New York-based plaintiff employees of their just compensation and career opportunities.

144.    Since approximately 2007 and continuing to the present, Defendants and their agents and co-conspirators have also acquired and maintained control of and interests in various companies and enterprises operating in interstate and foreign commerce in New York and elsewhere in the United States, as well as abroad, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(b).  Defendants' Racketeering Enterprise involved a complicated web of shell companies, business deals and investment vehicles in the United States, which engaged in interstate commerce and over which the named defendants and their co-conspirators had total dominion and control.  These acquisitions and maintenance of interests have enabled Defendants to operate under the cover of legitimacy when engaging in their racketeering  activities and distributing the unlawful profits of the Racketeering Enterprise.

145.    As a direct and proximate result of Defendants' violations of 18 U.S.C. §§  1962(a)-(d), Plaintiffs have been injured in their business and property within the meaning of the civil RICO statute, by among, other things (a) being prevented from

pursuing their careers, businesses and/or professions by which they support themselves and their families, (b) in the case of plaintiffs Snizek and Rullis, and the other U.S.-based employees of the defendant companies, being deprived of the salaries, commissions and other income that defendants had promised they would receive, and which they would have received if the defendant companies had been operated for legitimate business purposes and in accordance with generally accepted business laws and practices, (c) in the case of the non-defendant, third party real estate owners and developers, businesses, architects and other professionals who were deprived of their valuable time, money and property as a direct result of defendants' scheme to defraud, and who were intentionally misled and deceived into believing that said defendants had a serious and good-faith intent to "close" on the projects and contracts under negotiation, only to find out later that their time and money had been wasted by defendants, whose undisclosed intention was to create the appearance that they were engaged in legitimate business activities, and (d) in the case of plaintiff Tymoshenko and others similarly situated, being forced to pay for legal representation in order to defend themselves against politically-motivated charges and malicious prosecutions that would not otherwise have been brought against them but for the defendants' scheme to eliminate them as a threat to defendants' unlawful practices and income stream from the natural gas contracts.

146.    The injuries each Plaintiff suffered were reasonably foreseeable, and, in fact, anticipated and intended by Defendants as the natural consequence of their acts.

## COUNT II
### FRAUD (by the U.S.-based plaintiffs against all defendants)

147.    Plaintiffs repeat and reallege the paragraphs of this Second Amended

Complaint as though fully set forth herein.

148.    Defendants (a) engaged in a scheme to defraud the U.S.-based

employees, such as plaintiffs Snizek and Rullis, through various misrepresentations

communicated, at least in part, through the use of the mails and interstate wires,

promising, among other things, to pay them salaries, commissions and other benefits,

as well as career opportunities, and misrepresenting to said plaintiffs that the defendant

companies operating from 1501 Broadway were legitimate and reputable companies,

when in truth and in fact, said defendant companies were merely vehicles by which

defendants were able to engage in their racketeering activities with the guise of

legitimacy, and (b) engaged in a scheme to defraud the "John Doe" plaintiff U.S.-based

investors, legitimate businesses, real estate developers, architects and other

professionals of their valuable time, money and property by deceptively luring them

into their sham real estate development projects under the guise of legitimacy, and then

precipitously bailing out of the projects at the last minute without actually "closing."

149.    To their substantial detriment, Plaintiffs and other third party victims of

defendants' fraud relied upon the fraudulent  misrepresentations of defendants, which

were transmitted to them, at least in part, through the use of the mails and interstate

wire facilities.

150.    But for defendants' complex series of apparently legitimate real estate

investment deal, both in the U.S. and in Ukraine, through defendant companies

operating under the guise of legitimacy, the defendants would not have been able to

achieve their objective of getting plaintiffs Snizek and Rullis and their co-workers to

devote countless hours of their time working on seemingly legitimate real estate

development projects without compensation and benefits upon the hope and

expectation that they would be fully compensated for their time upon the successful

completion of one or more of the projects, and without this convincing guise of

legitimacy, defendants would not have been able to successfully achieve their other

objective of convincing the "John Doe" U.S.-based investor plaintiffs to "invest" in

Ukrainian based real estate investment projects at grossly inflated prices.  The

defendants knew at the time that they defrauded the U.S. based employees and

investors that they had no intention of actually closing on any of the U.S./Caribbean

based real estate investment projects, or that the Ukrainian real estate investment

projects would be offered at anything approaching market-based prices. Rather,

defendants' true objective was to defraud the U.S. based plaintiff employees and

investors, and to deprive them of their valuable time, money and property, while, at

the same time, concealing or disguising the nature, location, source, ownership and

control of the proceeds of their racketeering activities, and with the further objective

of promoting the carrying on of their specific unlawful activities, including the money

laundering and conversion of unlawfully obtained funds into untraceable funds.

Moreover, defendants' racketeering activities involving sham and overpriced real

estate development projects in the U.S. and Ukraine was the proximate cause of the

damages caused to both the U.S. based employees such as plaintiff Snizek and Rullis,

as was as the damages caused to the unsuspecting U.S. based plaintiff "John Doe"

plaintiffs who were lured into investing in overinflated real estate development

projects in Ukraine.

      151.    Defendants' actions resulted in substantial financial losses to the U.S.-

based plaintiffs and plaintiff class members, including, (a) in the case of U.S.-based

plaintiff employees, lost income, interference with business careers, and lost

opportunities which plaintiffs would have pursued but for defendants' false

representations communicated to them, at least in part, through the mails and interstate

wires, and but for defendants' failure to inform them that the companies they were

working for were not legitimate business operations, but rather merely vehicles for

defendants to disguise their racketeering activities with the cloak of legitimacy, and (b)

in the case of U.S.-based businesses, real estate owners, professionals and investors, the

loss of valuable time committed to defendants' sham projects, lost money committed to

development and other costs associated with defendants' sham projects, and the loss of

other property.

## COUNT III
### Malicious Prosecution
### (By Plaintiff Tymoshenko and others similarly situated)

152.   Plaintiffs repeat and reallege the paragraphs of this Second Amended

Complaint as though fully set forth herein.

153.   Defendants and their co-conspirators caused, aided and abetted, and

facilitated the selective and malicious prosecution of Tymoshenko and other political

opposition leaders on  false and trumped-up charges, with the purpose of intimidating

and eliminating them as an  effective opposition force to defendants' continued and

hugely profitable practice of "skimming"  millions of dollars from the natural gas

contracts.

154.   At the time the prosecutions were initiated against Plaintiffs, Defendants

knew, or should have known, that Plaintiffs were guilty of any criminal offenses.

Rather, the  prosecutions were brought maliciously and/or in reckless disregard of

Plaintiffs' rights as an  attempt to intimidate, suppress, and retaliate against Plaintiffs

for their participation in activities  that threatened the financial interests of Defendants

and their Racketeering Enterprise.

155.    As a result of Defendants' malicious prosecutions, Plaintiffs have

suffered  damage to their reputation, as well as financial and physical harm.

## JURY TRIAL DEMAND

156.    Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, by and through their attorneys, demand judgment against

each of the Defendants, as follows:

   a.   Judgment in favor of Plaintiffs;

   b.   An award of treble damages on Count I (Civil RICO);

   c.   An award of compensatory and punitive damages on Counts II and III;

   d.   An award of attorneys' fees and costs incurred in pursuing this action; and

   e.   A grant of such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        November 9, 2014

**McCALLION & ASSOCIATES LLP**

_____/s/_____
Kenneth F. McCallion (Bar # KFM-1591)
100 Park Ave, 16th floor
New York, NY 10017-5538 (646)
366-0880

*Attorney for Plaintiffs*

**VERIFICATION**

KENNETH F. McCALLION, an attorney duly admitted to the practice of law before this

Court,  declares as follows under penalty of perjury:

1. I am the principal attorney with the law firm of McCallion & Associates LLP, counsel

   for  plaintiffs in this matter. As such, I am fully familiar with this case.

2. The facts and allegations contained in the accompanying Third Amended Complaint are

   true to the best of my knowledge and belief, except as to those matters alleged upon

   information and belief, and as to those allegations, I believe them to be true.

3. The reason why I am making this Verification is that the named plaintiffs reside in

   different states or countries than where counsel maintains its offices.


Dated: New York, New York
         November 9, 2014


                                                 _____/s/_____
                                                 Kenneth F. McCallion
                                                 McCallion  &  Associates  LLP
                                                 Attorneys for Plaintiffs
                                                 100 Park  Avenue – 16th  floor
                                                 New  York,  New  York  10017
                                                 (646) 366-0880