EXHIBIT 5

## PRELIMINARY TERM SHEET

This Preliminary Term Sheet serves to outline the general terms and conditions under which **Barbara Ann Holdings LLC ("BAH";** which is 90-% owned by Brad Zackson) and **Vulcan Properties, Inc. ("Vulcan";** which is wholly-owned by Karen B. Cohen, the spouse of Arthur G. Cohen, and represented by Arthur G. Cohen) and XXX LLC (which is majority-owned by Paul J. Manafort) will enter into a Delaware registered limited liability company known as **"CMZ Ventures, LLC" (the "Company",** which was organized in the State of Delaware on June 9, 2008), for the purpose of, directly or through affiliated entities, (1) establishing, promoting, raising capital for, investing in, managing and maintaining a real estate investment fund **(the "Fund"),** the purpose of which shall be to invest in both US domestic and international properties that possess inherent unrealized values where investment returns can be enhanced through efficiency, pricing through portfolio acquisitions, repositioning and redevelopment or new development, and (2) acquiring, financing, developing, owning, managing and disposing of, on a project-by-project basis, interests in real property of any type or description (whether located in the United States or overseas). To the extent expressly provided herein, this Preliminary Term Sheet shall not constitute a binding agreement among the parties hereto unless and until a definitive operating agreement of the Company and other appropriate agreements **(collectively, the "Definitive Agreements")** have been entered into among the parties hereto.

**Company Structure:**   BAH, Vulcan and XXX (Manafort) will enter into a limited liability company operating agreement for the Company, containing, among other customary provisions which are consistent with the terms set forth below in this Preliminary Term Sheet, the following:

1. BAH, Vulcan and Manafort shall each own an equal membership interest in the Company of 33 and 1/3%.

2. BAH, Vulcan and Manafort (or their respective affiliated entities) shall act as the Board of Managers of the Company, with unanimous approval or consent of such Managers required for major decisions, such as decisions to proceed with specific projects, budget approvals, acquisitions, financings, refinancings, construction contracts, asset sales, amendments to the operating agreement and the admission of new members.

3. BAH and Vulcan shall be responsible for the day-to-day development, management and operation of the Company's properties and will work in conjunction with Manafort on deal origination, strategic direction of the fund, capital formation and deal development.

4. Although the term of the Company shall be perpetual, any of BAH, Vulcan and Manafort deals shall (subject to any restrictions in the Company's financing agreements or the

constituent documents or financing agreements of the Fund) have the right to call for a sale of any or all of the Company's property interests at any time after four (4) years from the acquisition of the Company's first property interest.

**Distributions:** Cash flow of the Company available for distribution after payment of project costs (including the payment of property-level and mezzanine-level debt service and operating expenses and the establishment of appropriate reserves) shall be distributed as follows:

1. Firstly, BAH, Vulcan and Manafort, as to their 10% aggregate investment, and their equity partner in each project, as to its 90% investment, shall receive pro rata an accruable priority return (expected to be 10%-12%, compounded annually) on their respective cash investments.

2. Secondly, BAH, Vulcan and Manafort, as to 10%, and their equity partner in each project, as to 90%, shall receive pro rata 100% of distributable cash until each has received an amount equal to its cash investment.

3. Thereafter, cash flow in each project shall be distributed 50% to BAH, Vulcan and Manafort (collectively), and the remaining 50% to their equity partner in such project. BAH, Vulcan and Manafort shall divide equally the distributed 50% from the proceeds of each deal transacted.

**Cash Capital Contributions:** Except for the pro rata contributions of BAH, Vulcan and Manafort as required for the Company's 10% equity participations in the deals, and contributions for the Company's working capital as referred to below in the budget, no capital contributions are expected or required of the Company's members.

**Financing Arrangements:** BAH, Vulcan and Manafort (and/or their respective affiliates) shall arrange all financings for the Company (i.e., land, development and construction loans and also mezzanine and preferred equity financings). In doing so, they may retain the services of financing advisors and/or mortgage brokers to facilitate financings. Financing fees shall be shared equally among BAH, Vulcan and Manafort.

The members of the Company understand that, in connection with the Company's obtaining financing for its projects, their membership interests and equity in the Company may be diluted.

2

**Fundraising :**

While proceeding with its efforts to consummate potential deals, the Company expects to pursue its capital-raising efforts with respect to the Fund and to conclude the arrangements necessary in order for the Fund to be established and operative (with the Company or a subsidiary or affiliate of the Company as the Fund's manager and asset manager) upon the successful completion of the Fund's minimum capital requirement.

**Company Budget:**

In order for the Company to proceed with pursuing business opportunties, BAH, Vulcan and Manafort have reviewed and approved a proposed preliminary budget for the 12-month period which began on June 1, 2008 (a copy of which is attached hereto). It is understood that monthly reconciliations of actual expenses to such budget will be provided by BAH to the members of the Company promptly following the end of each month during the period covered by the budget.

During the fourth month covered by the budget (i.e., September 2008), the members of the Company will evaluate the Company's progress. Any member of the Company which is unsatisfied for any reason (in its sole discretion) with such progress shall be permitted to withdraw from the Company and shall thereafter have no further obligations, financial or otherwise, to the Company (provided, however, that such withdrawal shall have no effect upon any other contractual obligations that such withdrawing member may have to, or be owed by, any other member of the Company or any of its affiliated or related persons or entities).

It is understood and agreed that any member of the Company which shall withdraw from the Company as provided above or at any time thereafter shall retain its one-third equity interest in all projects consummated prior thereto or remaining pending (and which shall be consummated thereafter), but such member shall have no interest in any project of the Company which shall first be initiated subsequent to such member's withdrawal.

**Operating Expenses:**

In order to fund the operating expenses of the Company reflected in the approved budget referred to above, each of BAH, Vulcan and Manafort has agreed (subject to the execution and delivery of the Definitive Agreements on or before June 30, 2008) to contribute to the working capital of the Company, for application as contemplated by such approved budget, an amount equal to one-third of each month's budget for the months of June – September 2008. Notwithstanding such

3

agreement, for each of such four (4) months (during which the budget is approximately $100,000 per month), such budgeted monthly amount of $100,000 shall be funded 50% by Vulcan and 50% by Manafort, each of which shall deposit $50,000 per month in a segregated bank account of the Company, with all disbursements there from to require two signatures, one of which shall be designated by BAH and one of which shall be designated by Vulcan. Such account shall be used for all receipts and disbursements of the Company, unless BAH, Vulcan and Manafort shall otherwise unanimously agree.

As soon as prior capital contributions from the initial projects described above have been refunded to BAH or its affiliates, BAH shall apply, to the extent necessary, all or part of such refunded contributions to equalize its capital contributions (and funded operating expenses) in the Company with Vulcan and Manafort, it being understood that such equalization shall return to Vulcan and Manafort their respective prior capital contributions and funded operating expenditures which are in excess of their respective one-third interests in the equity of the Company. If no such refund of prior capital contributions shall be available to BAH, then BAH (and its principal, Brad Zackson) shall nevertheless be liable to Vulcan and Manafort, on a demand basis, for the excess amounts funded by them for the account of BAH.

It is further understood and agreed that, when the cash is available from a specific project, capital contributions and advances made prior to the date hereof by any of the members of the Company with respect to such project (all such capital contributions and advances being identified on a schedule attached hereto) shall be repaid and/or refunded from such available cash to the extent necessary to equalize the capital contributions of the three members with respect to such project.

**Exclusivity:**

Until the first to occur of (a) the failure of BAH, Vulcan and Manafort to have entered into the Definitive Agreements by July 31, 2008 (or such later date as shall have been agreed to by all of the parties hereto), (b) December 31, 2008, (c) the abandonment of capital-raising efforts for the Fund and the failure of the Company to have consummated at least one of the five (5) projects described above or another substantial project submitted to and approved by the members of the Company, or (d) a determination by all the members of the Company to terminate their pursuit of the transactions contemplated herein, BAH, Vulcan and Manafort agree that they will become

4

involved in any transaction relating to any project contemplated herein (including any investment fund similar to the Fund and any project not specifically referred to herein but subsequently submitted to and approved by the members of the Company) only in partnership with each other as contemplated herein or as they all may otherwise hereafter agree.

The foregoing is approved by the undersigned as of June 9, 2008:

BARBARA ANN HOLDINGS LLC

By: _____

Brad Zackson, Manager

VULCAN PROPERTIES, INC.

By: _____

Arthur G. Cohen, Vice Pres.

_____
Paul Manafort

_____
Brad Zackson

5

EXHIBIT 6

[illegible/ unknown handwritten notes]

**CONTRACT No. *14/935 – 1/04***
**For Sale and Purchase of Natural Gas in 2005 – 2028**

City of Kyiv                                                                                   *July 29*, 2004

**Naftogaz Ukrainy National Joint-Stock Company**, a legal entity incorporated under the laws of Ukraine, hereinafter referred to as the Buyer, represented by Yuri Anatolievich Boiko, its Chairman of the Board, acting pursuant to the Company's Bylaws, on one part,
and
**ROSUKRENERGO AG**, a legal entity incorporated under the laws of Switzerland, hereinafter referred to as the Seller, represented by Wolgang Putschek, its authorized representative, acting pursuant to the Power of Attorney issued on July 21, 2004, on the other part,
hereinafter jointly referred to as the Parties, have entered into the present Contract on the following:

### ARTICLE 1
#### Terms and Definitions

The Parties under the present Contract have agreed that the following terms and definitions will be interpreted as follows:

1.1.      "Contract" refers to the present Contract, along with any annexes thereof, incorporated by way of reference into the present document, and in consideration of possible amendments, additions, and changes therein, introduced in accordance with the provisions specified in the present Contract.

1.2.      "Party" refers either to the Seller or to the Buyer, individually, and "Parties" refers to the Seller and the Buyer jointly.

1.3.      "Natural gas" or "gas" refers to the natural gas of Turkmen and (or) Uzbek and (or) Kazakh origin as described in Article 3, and supplied by the Seller and received by the Buyer in accordance with the terms and conditions of the present Contract.

1.4.      "Cubic m" or "$m^3$" refers to the amount of dry gas which takes up the space with the volume of one cubic meter at the temperature of 20 degrees Centigrade, and at the absolute pressure of 0.101325 mPa.

1.5.      "Dew point" refers to the temperature at which condensation of water or other components of natural gas begins.

1.6.      "Pressure" refers to the gas pressure in gas transport system. Pressure is measured in mega Pascal (MPa) and may be also expressed in Bars and kgf/$cm^2$:

1 MPA = 10 Bar = 10.1972 kgf/$cm^2$; 1 kgf/$cm^2$ = 0.98067 Bar = 0.098067 MPa

1.7.      "Day" refers to the 24-hour interval in time, beginning at 10:00 am Moscow time, and ending at 10:00 am Moscow time the following calendar day. At the summer time change, the Day lasts for 23 hours, and at the winter time change, the Day lasts for 25 hours.

1.8.      "Month of Delivery" refers to the interval in time which begins on the first day of the month under consideration at 10:00 am Moscow time, and ends at 10:00 am Moscow time on the first day of the following month.

1.9.      "Quarter of Delivery" refers to any of the periods listed below, lasting three consecutive months, and beginning on the first day of any Quarter at 10:00 am Moscow time, and ending at 10:00 am Moscow time on the first day of the following Quarter.

[stamp:] NAFTOGAZ UKRAINY NJSC
TRUE TO THE ORIGINAL
Head of the Legal Department
*January 31, 2006* [signature]

I – January – March; II – April – June; III – July – September; IV – October – December

1.10.    "Year of Delivery" refers to any of the 12-month interval of time beginning on January 1 at 10:00 am Moscow time, and ending at 10:00 am Moscow time on January 1 of the following year under consideration.

1.11.    "Monthly Volume of Delivery" refers to the volume of gas supplies calculated based on the quarterly volumes divided by three. Monthly volumes of delivery may be adjusted by the Parties in accordance with the procedure specified in the present Contract and in consideration of seasonal consumption fluctuations.

1.12.    "Average Daily Norm of Delivery" refers to the volume of gas supplies calculated based on the monthly volume of delivery divided by the number of days in the corresponding month of delivery.

1.13.    "Delivery Point" refers to the point where the right of ownership, responsibility and all of its costs and risks associated with the gas delivery shall transfer from the Seller to the Buyer. The natural gas delivery point is the point in the area of the corresponding gas measurement station where the gas transport system crosses the border of the Russian Federation and Ukraine.

1.14.    "Gas Measurement Station (GMS)" refers to the station where amount of gas and its quality parameters are measured. Results of these measurements performed at the Gas Measurement Station shall be valid for the Delivery Point.

1.15.    "Gas Measurement Stations": GMS Sokhranovka, GMS Serebryanka, GMS Prokhorovka, GMS Valuyki, and GMS Platovo.

## ARTICLE 2
### Subject of the Contract

2.1.    The subject of the present Contract includes sale and purchase of natural gas.

2.2.    The Seller hereby agreed to deliver, and the Buyer hereby agrees to receive and to pay in the period of January 1, 2005 through December 31, 2028, natural gas on terms DAF border of the Russian Federation/ Ukraine – Delivery Point, pursuant to Incoterms – 2000, in the following volumes (hereinafter referred to as the Annual Contractual Volume):

2005 – Up to 7.0 bln cu. m;
2006 – Up to 10.0 bln cu. m;
2007-2028 – Up to 60 bln cu. m.

2.2.1. The Annual Contractual Volume supplied under the present Contract in 2005 shall constitute up to seven billion cubic m (7,000,000,000) including the quarterly volumes as follows:

| Quarter I – | up to 1.75 bln cu. m |
| Quarter II – | up to 1.75 bln cu. m |
| Quarter III – | up to 1.75 bln cu. m |
| Quarter IV – | up to 1.75 bln cu. m |

2.3. Breakdowns of the Annual Contractual Volume supplied in the period from 2006 to 2028 shall be finalized in annual Supplements to the present Contract. The said Supplements shall be signed by the Parties no later than 3 months prior to the start of the corresponding Year of Delivery.

2.4. The Annual Contractual Volume of gas as provisioned in this Article may be adjusted based on the written agreement between the Parties, but no more than by 5% 2 months prior to the start of the corresponding Year of Delivery.

NAFTOGAZ UKRAINY NJSC
TRUE TO THE ORIGINAL
Head of the Legal Department
*January 31, 2006*

*USA, New York*
**SWIFT: BKTR US 33**
*Acc: 04-182-382*

**Multicurrency a/c:**
**No. 26009001037661**
in the JS Commercial Bank Ukrsotsbank, Kiev
**SWIFT: UKRS UA UX**
**OPERU Branch**
*Corresponding bank: Bank of New York*
*USA, New York*
*SWIFT: IRVT US 3N*
*Acc: 890-0260-947*
*Deutsche Bank Trust Company Americas*
*USA, New York*
*SWIFT: BKTR US 33*
*Acc: 04-094-040*

**Signatures of the Parties**

| On the part of the Buyer: | On the part of the Seller: |
|---|---|
| | |
| **Yu. A. Boiko** | **Wolgang Putschek** |
| **Chairman of the Board of the Naftogaz Ukrainy NJSC** | **Representative of ROSUKRENERGO AG** |
| | [stamp:] **RosUkrEnergo AG** |
| [seal:] Ukraine – Kyiv – Naftogaz Ukrainy National Joint-Stock Company – Identification No. 20077720 | Ageristrasse 66<br>CH-6300 Zug<br>Switzerland |

[stamp:] NAFTOGAZ UKRAINY NJSC
TRUE TO THE ORIGINAL
Head of the Legal Department
*January 31, 2006* [signature]

EXHIBIT 7

[stamp illegible]

## CONTRACT No. *14/935 – 3/04*
### On Volumes and Terms of Pumping Natural Gas into Underground Gas Storage Facilities, and Terms for its Storage, Withdrawal, and Transport
### In 2005 – 2030

City of Kyiv                                                                                    *July 29*, 2004

**Naftogaz Ukrainy National Joint-Stock Company**, a legal entity incorporated under the laws of Ukraine, hereinafter referred to as the Contractor, represented by Yuri Anatolievich Boiko, its Chairman of the Board, acting pursuant to the Company's Bylaws, on one part, and

**ROSUKRENERGO AG**, a legal entity incorporated under the laws of Switzerland, hereinafter referred to as the Client, represented by Wolgang Putschek, its authorized representative, acting pursuant to the Power of Attorney issued on July 21, 2004, on the other part, and hereinafter jointly referred to as the Parties, have entered into the present Contract on the following:

### ARTICLE 1
#### Subject of the Contract

1.1.      The subject of the present Contract includes services provided by the Contractor and directed at pumping of the natural gas owned by the Client (hereinafter referred to as gas) into underground gas storage facilities (hereinafter referred to as GSF) of the Contractor, along with the terms for its storage, withdrawal from GSF, and transport of gas in the period of April 15, 2005 through April 15, 2030 – in order to ensure gas supply of customers in Ukraine and export supplies of the Client's gas to European countries.

1.2.      The Client shall compensate to the Contractor the cost of services associated with pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas in accordance with the terms specified in Article 5 of the present Contract.

### ARTICLE 2
#### Volumes and conditions of pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas

2.1.      The contractual volume of pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas, constitutes up to two hundred fifty bln (250,000,000,000) cu. m. Annual volumes of pumping of the natural gas into GSF, its storage, withdrawal from GSF, and transport of gas constitute up to ten bln (10,000,000,000) cu. m.

2.2.      The Client shall annually supply to the border of the Russian Federation/ Ukraine and (or) the Republic of Belarus/ Ukraine, and the Customer shall receive natural gas in the volume of up to ten bln (10,000,000,000) cu. m with the objective of pumping into GSF, storage, withdrawal from GSF, and transport of gas.

Monthly volumes of pumping of the natural gas shall be specified based on requests submitted by the Client to the Contractor no later than within 10 days prior to the start of the corresponding month for supply of gas into the Contractor's gas transport system.

2.3.      The supply of gas by the Client in volumes specified in Clause 2.1 of the present Article, for its subsequent transit across the territory of Ukraine from the gas delivery/handover stations at the border of the Russian Federation/ Ukraine and (or) the Republic of Belarus/ Ukraine to stations of its pumping into GSF shall be performed as a part of the general supply of gas incoming into the Contractor's gas transport system, via Gazprom OJSC or any other authorized gas transport company.

[text cut off] as close as possible to economic outcome of an invalid/ non-effective provision.

9.8.    In the event of changes in corporate and legal form and (or) merger and (or) another restructuring of either Party, and as a result of it, transfer of rights and obligations under the present Contract to the appropriate structure, the said Party agrees to duly ensure the legal succession.

9.9.    The present Contract may be terminated upon the agreement between the Parties by way of signing of the corresponding supplemental agreement to the present Contract.

## ARTICLE 10
### Effective Term of the Contract

10.1. The present Contract shall become effective on the time of its signing and shall remain in effect till April 15, 2030, in the part related to services, and until its complete and final settlement – in the part related to payments.

10.2. The present Contract may be extended upon the agreement between the Parties by way of signing of the corresponding supplemental agreement to the present Contract.

10.3. The present Contact is executed in Russian, in two counterparts of identical legal value, one copy for each Party.

## ARTICLE 11
### Legal Addresses and Banking Details

| CONTRACTOR | CLIENT |
|---|---|
| **Naftogaz Ukrainy National Joint-Stock Company** | **ROSUKRENERGO AG** |
| Legal and mailing address: 6, B. Khmelnitsky Street, Kiev, Ukraine 01001 | Legal and mailing address: |
| OKPO Code 20077720 | **Aegeristrasse 66** |
| Legal and mailing address: 6, B. Khmelnitsky Street, Kiev, Ukraine 01001 | **CH-6300 Zug** |
|  | **Switzerland** |
| *OKPO Code 20077720* |  |
|  | Bank account: |
|  | **Bank: Julius BAER Co. AG** |
| Account information: | **Banhofstrasse, 38** |
| **Multicurrency a/c: 260053012609 in the** | **CH-8010 Zurich** |
| **Municipal Operational Division of Prominvestbank,** | **Switzerland** |
| Kiev |  |
| MFO 300012, Bank code 00039002 | **Account Number: 302.1627** |
| SWIFT: UPIB UA UX | **SWIFT code: BAERCHZZ** |
| *Corresponding bank:* |  |
| *Bank of New York* |  |
| *USA, New York* |  |
| *SWIFT: IRVT US 3N* |  |
| *Acc: 890-0060-077* |  |
| *Deutsche Bank Trust Company Americas* |  |
| *USA, New York* |  |
| *SWIFT: BKTR US 33* |  |
| *Acc: 04-182-382* |  |
|  |  |
| **Multicurrency a/c:** |  |
| **No. 26009001037661** |  |
| **in the JS Commercial Bank Ukrsotsbank, Kiev** |  |

SWIFT: UKRS UA UX
OPERU Branch
*Corresponding bank: Bank of New York*
*USA, New York*
*SWIFT: IRVT US 3N*
*Acc: 890-0260-947*
*Deutsche Bank Trust Company Americas*
*USA, New York*
*SWIFT: BKTR US 33*
*Acc: 04-094-040*

**Signatures of the Parties**

On the part of the Contractor:

Yu. A. Boiko
**Chairman of the Board of the Naftogaz Ukrainy NJSC**

[seal:] Ukraine – Kyiv – Naftogaz Ukrainy National Joint-Stock Company – Identification No. 20077720

On the part of the Client:

**Wolgang Putschek**
**Representative of ROSUKRENERGO AG**

[stamp:] **RosUkrEnergo AG**
Ageristrasse 66
CH-6300 Zug
Switzerland



EXHIBIT 8

## AGREEMENT
### On Development of Relations in Gas Sector

City of Moscow                                                January 4, 2006

**Gazprom Open Joint-Stock Company (Russian Federation),** hereinafter referred to as Gazprom, represented by A. B. Miller, its Chairman of the Board, acting pursuant to the Company's Bylaws, on one part,

**Naftogaz Ukrainy National Joint-Stock Company (Ukraine),** hereinafter referred to Naftogaz Ukrainy, represented by A. G. Ivchenko, its Chairman of the Board, acting pursuant to the Company's Bylaws, on the other part,

and

With participation of **RosUkrEnergo AG (Switzerland),** hereinafter referred to as RosUkrEnergo, represented by O. A. Palchikov and K. A. Chuichenko, its Executive Directors, acting pursuant to the Company's Articles of Association,

Hereinafter jointly referred to as the Parties,

Seeking to develop relations in gas sector on a mutually beneficial basis, have entered into the present Agreement, having decided on the following:

1. In order to ensure the transit of natural gas belonging to Gazprom (Gazexport LLC) and RosUkrEnergo across the territory of Ukraine and the Russian Federation, the Parties have reached an agreement on the transit rate in the amount of US$1.60 per 1,000 cu. m per 100 km of transit effective for the period till January 1, 2011.

2. In order to ensure supplies of natural gas to Ukraine, the Parties have agreed on RosUkrEnergo acting as a supplier. Effective on January 1, 2006, Gazprom shall no longer engage in supplies of the Russian natural gas to Ukraine, while Naftogaz Ukrainy shall no longer export natural gas supplied from the Russian Federation from the territory of Ukraine.

3. In order to sell natural gas supplied from the territory of the Russian Federation in Ukraine's domestic market, Naftogaz Ukrainy and RosUkrEnergo shall establish a joint venture as soon as possible, and no later than February 1, 2006, with its charter capital formed by monetary contributions and other assets.

4. The Parties shall execute appropriate agreements/ contracts (shall ensure the execution of appropriate agreements/ contracts) with the objective to ensure availability of an annual trade balance of gas inventory at RosUkrEnergo effective as of January 1, 2006, with the following volumes:

[stamp illegible] *November 13, 2006*

*For purchase:*

- 41 bln cu. m of Central Asia (Turkmen) gas, to be purchased from the Gazexport LLC and Naftogaz Ukrainy from volumes available at their disposal;

-Up to 7 bln cu. m of Central Asia (Uzbek) gas, to be purchased from the Gazexport LLC with the objective of, specifically, swapping with gas supplies in the Trans-Caucasus region;

-Up to 8 bln cu. m of Central Asia (Kazakh) gas, to be purchased from the Gazexport LLC with the objective of, specifically, swapping with gas supplies in the Trans-Caucasus region;

-Up to 7 bln cu. m of Russian gas, to be purchased from the Gazprom OJSC at price calculated using the formula and basis gas prices ($P_0$=US\$230 per 1,000 cu. m)

*For sale:*

In 2006 – 34 bln cu. m of gas to be sold at US\$90 per 1,000 cu. m of gas effective during the first six months of 2006, to the joint venture established pursuant to Clause 3 of the present Agreement (prior to the joint venture established, until February 1, 2006, to be sold to Naftogaz) with its subsequent sale in Ukraine's domestic market, without the right to re-export;

Effective in 2007 – up to 58 bln cu. m of gas to be sold to the joint venture established pursuant to Clause 3 of the present Agreement with its subsequent sale in Ukraine's domestic market, without the right to re-export;

15 bln cu. m of gas to be allocated for export pursuant to programs run jointly with the Gazexport LLC.

5.      The transit rate and the price for natural gas specified in the present Agreement may be modified only based on the mutual agreement between the Parties.

6.      Addresses of the Parties:

Gazprom OJSC              16, Nametkin Street, Moscow, Russia 117997

Naftogaz Ukrainy NJSC     6, B. Khmelnitsky Street, Kyiv, Ukraine 01001

RosUkrEnergo AG           7, Banhofstrasse, Zug, Switzerland

On behalf of Gazprom:  On behalf of Naftogaz Ukrainy:  On behalf of RosUkrEnergo:

A. B. Miller          A. G. Ivchenko          O. A. Palchikov K. A. Chuichenko

[stamp illegible]      *November 13, 2006*

# СОГЛАШЕНИЕ
## об урегулировании отношений в газовой сфере

г. Москва

04 января 2006г.

**Открытое акционерное общество «Газпром» (Российская Федерация),** именуемое в дальнейшем Газпром, в лице Председателя Правления А.Б.Миллера, действующего на основании Устава, с одной стороны,

**Национальная акционерная компания «Нафтогаз Украины» (Украина),** именуемое в дальнейшем Нафтогаз Украины, в лице Председателя Правления А.Г.Ивченко, действующего на основании Устава, с другой стороны,

а также

**Компания «РосУкрЭнерго АГ» (Швейцария),** именуемое в дальнейшем РосУкрЭнерго, в лице Исполнительных директоров О.А. Пальчикова и К.А.Чуйченко, действующих на основании Учредительного договора.

именуемые вместе Стороны,

стремясь на взаимовыгодной основе урегулировать взаимные отношения в газовой сфере, заключили настоящее Соглашение, договорившись о следующем:

1. В области обеспечения транзита принадлежащего Газпром (ООО «Газэкспорт») и РосУкрЭнерго природного газа через территорию Украины и Российской Федерации Стороны согласовали на срок до 01.01.2011 года ставку платы за транзит в размере 1,60 долларов США за 1000 куб.м. на 100 км расстояния.

2. В области поставок природного газа в Украину Стороны согласовывают в качестве поставщика компанию РосУкрЭнерго. С 01 января 2006 г. Газпром не производит поставку российского природного газа в Украину, а Нафтогаз Украины не экспортирует с территории Украины поступивший из Российской Федерации природный газ.

3. Для реализации на внутреннем рынке Украины природного газа, поступающего с территории Российской Федерации, Нафтогаз Украины и РосУкрЭнерго в максимально короткие сроки, не позднее 01.02.06 г., создадут совместное предприятие, уставный капитал которого будет сформирован путем внесения денежных средств и других активов.

4. Стороны заключат соответствующие договора/контракты (обеспечат заключение соответствующих договоров/контрактов) с целью формирования, начиная с 01 января 2006 г., годового товарного баланса газа компании РосУкрЭнерго в следующих объемах:

*По закупкам:*

- 41 млрд. куб.м. туркменского газа, подлежащего закупке у ООО «Газэкспорт» и Нафтогаз Украины в имеющихся в их распоряжении объемах;
- до 7 млрд. куб.м. узбекского газа, подлежащего закупке у ООО «Газэкспорт» с целью, в частности, свопирования с поставками газа в Закавказье;
- до 8 млрд. куб.м. казахского газа, подлежащего закупке у ООО «Газэкспорт» с целью, в частности, свопирования с поставками газа в Закавказье;
- до 17 млрд.куб.м. российского газа, подлежащего закупке у ОАО «Газпром» по цене, определяемой по формуле, исходя из базисной цены газа ($P_6$=230 долл. США за 1000 куб. м).

*По продажам:*

В 2006 году - 34 млрд. куб.м. газа, подлежащего продаже по цене 95 долл. США за 1000 куб. м газа, действующей в первом полугодии 2006 года, созданному в соответствии с п.3 настоящего Соглашения совместному предприятию (до создания совместного предприятия, до 01.02.06 продается Нафтогазу) для последующей реализации на внутреннем рынке Украины без права его реэкспорта;

с 2007 года — до 58 млрд. куб.м. газа, подлежащего продаже созданному в соответствии с п.3 настоящего Соглашения совместному предприятию для последующей реализации на внутреннем рынке Украины без права его реэкспорта;

15 млрд. куб.м. газа, подлежащего направлению на экспорт по совместным с ООО «Газэкспорт» программам.

5. Ставка платы за транзит и цена природного газа, определенные в настоящем Соглашении, могут изменяться только по взаимному согласию Сторон.

6. Адреса Сторон:

ОАО «Газпром»:                    117997, Россия, Москва, ул. Наметкина, д.16

НАК «Нафтогаз Украины»:      01001, Украина, г. Киев, ул.Б.Хмельницкого, д.6

Компания «РосУкрЭнерго АГ»:   Швейцария, г. Цуг, Банхофштрассе,д.7

За ОАО «Газпром»:    За НАК «Нафтогаз Украины»:   За компанию «РосУкрЭнерго АГ»:

А.Б. Миллер          А.Г.Ивченко          О.А. Пальчиков      К.А. Чуйченко

EXHIBIT 9

1. U.S. INVESTIGATES CRITICAL SUPPLIER OF RUSSIAN GAS
RosUkrEnergo AG supplies billions of dollars of gas to Ukraine
Europe's Energy Security Is at Heart of Concerns; Opaque Ownership Queried

By Glenn R. Simpson and David Crawford
The Wall Street Journal, New York, NY, Friday, April 21, 2006

The Justice Department is investigating Rosukrenergo AG, the company that
supplies billions of dollars in Russian and Central Asian natural gas to
Ukraine, according to people in Europe and the U.S. with knowledge of the
inquiry.

Representatives of Swiss-registered Rosukrenergo and of Raiffeisen
Investment AG, a subsidiary of Vienna-based Raiffeisen Bank AG that holds
50% of Rosukrenergo's shares for undisclosed owners, met recently with
investigators from the department's organized-crime section at Justice
Department headquarters in Washington, these people said. They discussed
the company's opaque ownership, though further details of what has drawn
the attention of U.S. officials remain unclear.

Spokesmen for Raiffeisen and Rosukrenergo declined to comment. Drew
Wade, a Justice Department spokesman in Washington, said he couldn't
confirm or deny the existence of a criminal investigation.

Rosukrenergo, whose cloudy workings and ownership structure have been
attacked as a threat to Europe's energy security and Ukraine's political
stability, is now reconsidering plans for a public share offering that
would have required disclosure of the company's true owners, people close
to the company said.

The other half of Rosukrenergo is owned by OAO Gazprom, the state-
controlled Russian gas titan. Officials from Gazprom, Russia and Ukraine
have denied they know the identities of the shareholders behind the
Raiffeisen stake.

The latest developments for the company -- which has become a political
issue in Ukraine and has drawn concern from Western government officials --
are likely to heighten concerns among Western nations about the reliability
of Russian energy supplies amid high prices and growing tensions between
the West and the Kremlin.

The U.S. investigation is also likely to prove uncomfortable for Moscow
as it seeks to use its current Group of Eight presidency to champion energy
security, and could increase concerns in Western Europe over Gazprom's
efforts to buy energy assets there.

On Wednesday, Gazprom warned European Union diplomats at a meeting in
Moscow against thwarting its efforts to expand into Western Europe, saying
in a statement that it could sell its gas supplies to China and North
America instead of to EU countries, which now get a quarter of their gas
from Russia. About 80% of that gas moves through Ukraine.

Doubts about Rosukrenergo's ownership structure and affiliates prompted its
auditors to resign in November, according to a resignation letter from the
Vienna office of KPMG International that was obtained by Global Witness, a
London-based, left-leaning, privately funded nonprofit organization that
promotes the emerging world and investigates corruption, and that was
reviewed by The Wall Street Journal.

In the letter, KPMG said Rosukrenergo may be part of a larger undisclosed business group, presenting an unacceptable risk to KPMG's reputation. A KPMG spokesman said he was unable to comment.

Rosukrenergo is at the heart of a bitter political struggle in Ukraine, where President Viktor Yushchenko has come under attack for giving the company the central role in a deal with Gazprom to provide gas to Ukraine in January. Mr. Yushchenko has defended the arrangement as the only way to get an acceptable gas price for Ukraine, but opponents say it invites corruption and opens Ukraine to influence by Gazprom and unidentified businessmen.

In a lengthy forthcoming report, Global Witness provides new details about the origins of Rosukrenergo, and assembles a 15-year history of arbitrage by opaque middleman companies given the lucrative right to sell Central Asian gas to Ukraine via Gazprom's pipelines. people familiar with the matter corroborated key details of its account.

The report says two other little-known companies with ties to Gazprom received energy deals to convey gas to Ukraine, before Rosukrenergo. One of the firms, Hungarian-registered Eural Trans Gas, has numerous ties to Rosukrenergo, the group said. Among other things, Eural Trans Gas was part-owned by an investment company where a British businessman named Robert Shetler Jones served as a director. Mr. Jones was one of the primary founders of Rosukrenergo. Spokesmen for Eural Trans Gas and Mr. Jones had no comment.

Another Gazprom partner highlighted in the Global Witness report is Itera Group, which played a similar role in selling gas to Ukraine. Itera is a Russian company that has an affiliate in Florida. The company came under investigation by the Federal Bureau of Investigation in 2002, according to an article at the time in Barron's, which is published by Dow Jones & Co., publisher of the Journal.

The probe resulted in no charges, but the previous interest and the affiliate's presence in the U.S. could give the Justice Department jurisdiction to inquire into Rosukrenergo affairs. An Itera spokesman in Florida didn't return a call for comment. -30-

EXHIBIT 10

# The St.Petersburg Times

Issue #1164 (30)
Tuesday, April 25, 2006

## Local News

## U.S. to Investigate Gazprom's RosUkrEnergo

By Catherine Belton
Staff Writer

MOSCOW — The U.S. Justice Department is investigating RosUkrEnergo, the secretive gas trader that has a monopoly on billions of dollars in gas sales to Ukraine, people familiar with the situation say.

The Swiss-registered company, half owned by Gazprom and half by unidentified beneficiaries, has come under growing scrutiny after it landed a lucrative role as Ukraine's monopoly gas trader in a controversial Jan. 4 deal between Gazprom and its Ukrainian counterpart, Naftogaz Ukrainy. .

Former Ukrainian Prime Minister Yulia Tymoshenko has branded the deal a threat to European and Ukrainian energy security, w le one of her top aides, Olexander Turchinov, has said he investigated the company for possible links with international organized crime when he headed Ukraine's security service, the SBU, last year.

One person familiar with the situation said RosUkrEnergo executives two months ago traveled to the United States, where "there was a conversation" with Justice Department officials about the group's structure.

While that source said there had been no follow-up since then, another person with knowledge of the situation said U.S. officials had recently requested information about RosUkrEnergo from the Austrian government.

Austria's Raiffeisen Bank holds the 50 percent of RosUkrEnergo not owned by Gazprom on behalf of the unknown beneficiaries.

Justice Department spokesman Drew Wade said he could not "confirm or deny the existence of criminal investigations." The Wall Street Journal reported Friday that investigations were under way.

The company is expected to come under new pressure following the publication Monday of a detailed report on Ukrainian gas deals by Global Witness, a highly respected London-based nongovernmental organization that investigates corruption in the natural resources sector. A Global Witness investigation into the role of so-called blood diamonds in funding armed conflicts in Africa helped kick-start the Kimberley Process for closer monitoring of the global diamond trade, and led to the group being nominated for a Nobel Peace Prize.

The report focuses on the new monopoly role taken by RosUkrEnergo and calls on Ukrainian President Viktor Yushchenko to clean up endemic corruption in the energy sector. It also urges Russia to use its presidency of the G8 this year to end the use of opaque intermediary companies in gas trading.

The Gazprom-Naftogaz Ukrainy deal highlights the threat posed to European energy security by putting middlemen with a murky ownership structure in control of supplies to Ukraine via Gazprom pipelines, the report says. Europe relies on Russia for about one-quarter of its gas imports, and 80 percent of Russian exports to Europe pass through Ukraine.

"Without transparency there cannot be predictability, and without predictability there cannot be security of energy supply," says the 64-page report, a copy of which was made available to The St. Petersburg Times.

European concerns about energy dependence on Russia reached new heights when Russia cut off supplies to Ukraine during a standoff over prices at the beginning of the year, which led to shortfalls to Europe. In the Jan. 4 deal, RosUkrEnergo — previously an intermediary in Turkmen-Ukrainian sales — gained a monopoly over all sales of Russian and Central A                     to Ukraine.

Tymoshenko has criticized the deal, which almost doubled gas prices for Ukraine, as a way for Russia to win back control over the country.

The Global Witness report delves into more than a decade of gas deals between Turkmenistan and Ukraine involving intermediary gas traders with unclear ownership structures.

Starting with the notoriously opaque regime of Turkmen President Saparmurat Niyazov, Global Witness cites bank documents showing that the vast majority of the billions of dollars made by Turkmenistan in annual gas sales never made it to the po'      stricken country's budget. Instead, it say'      y are kept in Frankfurt, in a Deutsche Bank foreign currency      .d. Sole control of the account rests with Ni,      v.

President Leonid Kuchma. Respublika was followed by independent gas producer Itera, which had close ties to the Turkmen regime. Next was Eural Trans Gas, and finally RosUkrEnergo. Unclear ownership of these middlemen has led to billions of dollars in revenues being unaccounted for, the report says. RosUkrEnergo was set up in 2004 to replace its discredited predecessor Eural Trans Gas, but it has retained many of ETG's directors, including three British citizens, Robert Shetler-Jones, David Brown and Howard Wilson, the report says.

Concerns over RosUkrEnergo's ownership structure led KPMG to resign as the trader's auditor, Global Witness said Friday, citing a letter from KPMG to RosUkrEnergo. "The political situation in Ukraine and various allegations raised by the international press contain a risk of reputational damage to our company. ... An adequate assessment of these risks is not possible," says the letter obtained by Global Witness, which is dated Oct. 17, 2005.

ETG was founded in 2002 in a Hungarian village by Zeev Gordon, an Israeli lawyer who for more than 20 years has represented Semyon Mogilevich, a Ukrainian-born suspected organized-crime boss wanted by the FBI.

Gordon told Global Witness that he had been asked to set up ETG by Ukrainian citizen Dmitry Firtash, the director of Highrock Holdings, a Cyprus-based holding company.

Global Witness said Firtash was also the chairman of Nitrofert, a fertilizer plant in Estonia, which shares the same trading company as Crimean Soda Plant, which is owned by Shetler-Jones. The trading company, ACI Trading, has the same Cyprus-based nominee shareholders as a series of investment vehicles that owned ETG in 2004. The investment vehicles were directed by Shetler-Jones and Brown, the report says.

When reached by telephone Friday, Shetler-Jones, who has held a position on the coordinating committee of RosUkrEnergo, refused to comment on the Global Witness and Wall Street Journal reports.

Turchinov said in an interview in Kiev last month that his investigations into RosUkrEnergo and ETG had uncovered the involvement of Mogilevich, Kuchma and Firtash. Turchinov has said the investigation was closed down after Tymoshenko was fired last September and he stepped down as SBU chief.

The current chief of the SBU, Igor Drizhchany, has denied there was ever any investigation into RosUkrEnergo by the SBU under Turchinov.

While Yushchenko has stood by the Jan. 4 gas deal, Tymoshenko has called for it to be canceled.

The rift between Yushchenko and Tymoshenko over the deal was a major campaign issue in last month's Ukrainian parliamentary elections and is hampering attempts to build a new government coalition out of the Western-leaning parties run by the two former leaders of the Orange Revolution. Tymoshenko's party came in second in the elections; she wants to be prime minister again.

Gazprom spokesman Sergei Kupriyanov said Friday that so far there was no alternative to retaining RosUkrEnergo as the broker in the Ukrainian gas deal. He said RosUkrEnergo's business was "transparent enough," while Gazprom's stake in the trader was transparent too. The ownership of the other 50 percent, he said, was a question for Ukraine.

"We clearly defined our position," he said, referring to Gazprom's calls earlier this year for Ukrainian gas monopoly Naftogaz Ukrainy to buy the stake.

Naftogaz has said, however, that it has not received any response to its proposals to buy the stake. Naftogaz president Oleksiy Ivchenko told a news conference in Kiev on Friday that his inquires into who was behind the stake had reached a dead end.

"Should Ukraine seek further explanations? Yes, we have made requests to various institutions, including Gazprom, one of RosUkrEnergo's owners," he said, Reuters reported.

When contacted by telephone Friday, Wolf tschek, an executive at Raiffeisen Investment Group and a director of Centragas, the Vienna-based entity through which the unknown beneficiaries control half of RosUkrEnergo, declined to comment and referred all calls to Merlin, a London-based PR agency that represents Centragas.

Michael Rommel, a director at Merlin, refused to comment Friday.

© The St. Petersburg Times 1993 - 2011