EXHIBIT 11

## PRELIMINARY TERM SHEET

This Preliminary Term Sheet serves to outline the general terms and conditions under which **Barbara Ann Holdings LLC ("BAH"**; which is 90-% owned by Brad Zackson) and **Vulcan Properties, Inc. ("Vulcan"**; which is wholly-owned by Karen B. Cohen, the spouse of Arthur G. Cohen, and represented by Arthur G. Cohen) and XXX LLC (which is majority-owned by Paul J. Manafort) will enter into a Delaware registered limited liability company known as **"CMZ Ventures, LLC"** (the **"Company"**, which was organized in the State of Delaware on June 9, 2008), for the purpose of, directly or through affiliated entities, (1) establishing, promoting, raising capital for, investing in, managing and maintaining a real estate investment fund (the **"Fund"**), the purpose of which shall be to invest in both US domestic and international properties that possess inherent unrealized values where investment returns can be enhanced through efficiency, pricing through portfolio acquisitions, repositioning and redevelopment or new development, and (2) acquiring, financing, developing, owning, managing and disposing of, on a project-by-project basis, interests in real property of any type or description (whether located in the United States or overseas). To the extent expressly provided herein, this *Preliminary Term Sheet shall **not** constitute a binding agreement among the parties hereto unless and until a definitive operating agreement of the Company and other appropriate agreements (collectively, the **"Definitive Agreements"**) have been entered into among the parties hereto.

**Company Structure:** BAH, Vulcan and XXX (Manafort) will enter into a limited liability company operating agreement for the Company, containing, among other customary provisions which are consistent with the terms set forth below in this Preliminary Term Sheet, the following:

1. BAH, Vulcan and Manafort shall each own an equal membership interest in the Company of 33 and 1/3%.

2. BAH, Vulcan and Manafort (or their respective affiliated entities) shall act as the Board of Managers of the Company, with unanimous approval or consent of such Managers required for major decisions, such as decisions to proceed with specific projects, budget approvals, acquisitions, financings, refinancings, construction contracts, asset sales, amendments to the operating agreement and the admission of new members.

* 3. BAH and Vulcan shall be responsible for the day-to-day development, management and operation of the Company's properties and will work in conjunction with Manafort on deal origination, strategic direction of the fund, capital formation and deal development.

4. Although the term of the Company shall be perpetual, any of BAH, Vulcan and Manafort deals shall (subject to any restrictions in the Company's financing agreements or the

constituent documents or financing agreements of the Fund) have the right to call for a sale of any or all of the Company's property interests at any time after four (4) years from the acquisition of the Company's first property interest.

**Distributions:**

Cash flow of the Company available for distribution after payment of project costs (including the payment of property-level and mezzanine-level debt service and operating expenses and the establishment of appropriate reserves) shall be distributed as follows:

1.  Firstly, BAH, Vulcan and Manafort, as to their 10% aggregate investment, and their equity partner in each project, as to its 90% investment, shall receive pro rata an accruable priority return (expected to be 10%-12%, compounded annually) on their respective cash investments.

2.  Secondly, BAH, Vulcan and Manafort, as to 10%, and their equity partner in each project, as to 90%, shall receive pro rata 100% of distributable cash until each has received an amount equal to its cash investment.

3.  Thereafter, cash flow in each project shall be distributed 50% to BAH, Vulcan and Manafort (collectively), and the remaining 50% to their equity partner in such project. BAH, Vulcan and Manafort shall divide equally the distributed 50% from the proceeds of each deal transacted.

**Cash Capital Contributions:**

Except for the pro rata contributions of BAH, Vulcan and Manafort as required for the Company's 10% equity participations in the deals, and contributions for the Company's working capital as referred to below in the budget, no capital contributions are expected or required of the Company's members.

**Financing Arrangements:**

BAH, Vulcan and Manafort (and/or their respective affiliates) shall arrange all financings for the Company (i.e., land, development and construction loans and also mezzanine and preferred equity financings). In doing so, they may retain the services of financing advisors and/or mortgage brokers to facilitate financings. Financing fees shall be shared equally among BAH, Vulcan and Manafort.

The members of the Company understand that, in connection with the Company's obtaining financing for its projects, their membership interests and equity in the Company may be diluted.

2

**Fundraising :**

While proceeding with its efforts to consummate potential deals, the Company expects to pursue its capital-raising efforts with respect to the Fund and to conclude the arrangements necessary in order for the Fund to be established and operative (with the Company or a subsidiary or affiliate of the Company as the Fund's manager and asset manager) upon the successful completion of the Fund's minimum capital requirement.

**Company Budget:**

In order for the Company to proceed with pursuing business opportunties, BAH, Vulcan and Manafort have reviewed and approved a proposed preliminary budget for the 12-month period which began on June 1, 2008 (a copy of which is attached hereto). It is understood that monthly reconciliations of actual expenses to such budget will be provided by BAH to the members of the Company promptly following the end of each month during the period covered by the budget.

During the fourth month covered by the budget (i.e., September 2008), the members of the Company will evaluate the Company's progress. Any member of the Company which is unsatisfied for any reason (in its sole discretion) with such progress shall be permitted to withdraw from the Company and shall thereafter have no further obligations, financial or otherwise, to the Company (provided, however, that such withdrawal shall have no effect upon any other contractual obligations that such withdrawing member may have to, or be owed by, any other member of the Company or any of its affiliated or related persons or entities).

It is understood and agreed that any member of the Company which shall withdraw from the Company as provided above or at any time thereafter shall retain its one-third equity interest in all projects consummated prior thereto or remaining pending (and which shall be consummated thereafter), but such member shall have no interest in any project of the Company which shall first be initiated subsequent to such member's withdrawal.

**Operating Expenses:**

In order to fund the operating expenses of the Company reflected in the approved budget referred to above, each of BAH, Vulcan and Manafort has agreed (subject to the execution and delivery of the Definitive Agreements on or before June 30, 2008) to contribute to the working capital of the Company, for application as contemplated by such approved budget, an amount equal to one-third of each month's budget for the months of June – September 2008. Notwithstanding such

3

agreement, for each of such four (4) months (during which the budget is approximately $100,000 per month), such budgeted monthly amount of $100,000 shall be funded 50% by Vulcan and 50% by Manafort, each of which shall deposit $50,000 per month in a segregated bank account of the Company, with all disbursements there from to require two signatures, one of which shall be designated by BAH and one of which shall be designated by Vulcan. Such account shall be used for all receipts and disbursements of the Company, unless BAH, Vulcan and Manafort shall otherwise unanimously agree.

As soon as prior capital contributions from the initial projects described above have been refunded to BAH or its affiliates, BAH shall apply, to the extent necessary, all or part of such refunded contributions to equalize its capital contributions (and funded operating expenses) in the Company with Vulcan and Manafort, it being understood that such equalization shall return to Vulcan and Manafort their respective prior capital contributions and funded operating expenditures which are in excess of their respective one-third interests in the equity of the Company. If no such refund of prior capital contributions shall be available to BAH, then BAH (and its principal, Brad Zackson) shall nevertheless be liable to Vulcan and Manafort, on a demand basis, for the excess amounts funded by them for the account of BAH.

It is further understood and agreed that, when the cash is available from a specific project, capital contributions and advances made prior to the date hereof by any of the members of the Company with respect to such project (all such capital contributions and advances being identified on a schedule attached hereto) shall be repaid and/or refunded from such available cash to the extent necessary to equalize the capital contributions of the three members with respect to such project.

**Exclusivity:**

Until the first to occur of (a) the failure of BAH, Vulcan and Manafort to have entered into the Definitive Agreements by July 31, 2008 (or such later date as shall have been agreed to by all of the parties hereto), (b) December 31, 2008, (c) the abandonment of capital-raising efforts for the Fund and the failure of the Company to have consummated at least one of the five (5) projects described above or another substantial project submitted to and approved by the members of the Company, or (d) a determination by all the members of the Company to terminate their pursuit of the transactions contemplated herein, BAH, Vulcan and Manafort agree that they will become

4

involved in any transaction relating to any project contemplated herein (including any investment fund similar to the Fund and any project not specifically referred to herein but subsequently submitted to and approved by the members of the Company) only in partnership with each other as contemplated herein or as they all may otherwise hereafter agree.

The foregoing is approved by the undersigned as of June 9, 2008:

BARBARA ANN HOLDINGS LLC

By:

Brad Zackson, Manager

VULCAN PROPERTIES, INC.

By:

Arthur G. Cohen, Vice Pres.

Paul Manafort

Brad Zackson

5

EXHIBIT 12

**From:** Paul Manafort [mailto:pmanafort@davismanafort.com]
**Sent:** Monday, August 25, 2008 6:22 PM
**To:** Brad Zackson; Rick Gates
**Subject:** VISION STATEMENT

Rick and Brad

I have revised the Vision Statement. It was too wordy and self promting. Since our meeting created the strategy, this document is meant to be a summary and a prod to move now. We don't need to promote.

What I have not included is a recommendation on what the next steps are if approved. We should have a checklist organized for me to review this week of what would be the next steps if DF signs off on the Vision Statement. This checklist should include the following (I believe)

1. Amount of each Fund

2. Structure

3. Split between GP and LP

4. Date to commence each Fund

5. Other

1

# CMZ Ventures - Global Real Estate Funds

## Overview

The purpose of this document is to outline CMZ Venture's vision and plan with respect to the global real estate industry. We focus on the investment strategy and our vision for maximizing returns to our investors.

The foundation of the vision is to establish two separate real estate funds:

- One will focus on distressed real estate opportunities solely in the United States
- The second will focus on opportunities in Eastern Europe and the Caucuses

These funds will run in parallel but will focus on separate markets globally, and will have different objectives, strategies and ultimately exit opportunities.

## Investment Strategy

The vision of CMZ Ventures goes beyond a basic model of acquisition and disposal of an asset. The key aspects of our vision include:

### Single Investor Funds

- CMZ is prepared to have a diversified group of shareholders or a single shareholder, depending on the interest of the main investor. The advantages of a single investor include less exposure, more flexibility, less reporting requirements and the ability to organize off-shore to maximize the return of the investor.

### Property Asset Classes

- The capacity to operate the Funds as integrated real estate companies, covering management, development, leasing, finance, sales and marketing.
- Off market real estate opportunities with exclusive rights among multiple asset classes
- Asset turn-around and redevelopment where appropriate
- Targeting existing income producing property, repositioning and redeveloping existing property to enhance performance, more efficient leasing, management and operations, distressed and new property development.

### Diversification

- Diversification through investing across asset classes and geographical areas
- Co-investing that will lead to investment in a much greater number of properties and its own equity in deals
- Not more than 15% of the Fund's capital can be invested in any one asset
- Acquisitions through individual purchases, portfolio acquisitions through REITs, public and private companies and institutions

### Leverage

CMZ will use a leverage strategy that incorporates minimizing upfront equity in a deal, while maximizing its equity position through participation as a day-to-day operating partner and co-developer. This will enable CMZ to generate additional revenue in a transaction at different stages of the deal.

- In our model, CMZ will contribute 10% of the equity and we will source the remaining 90% through a third-party sponsor. The third party would have share control; however, CMZ would have management control of the opportunity.

- We are using a conservative debt/equity ratio of 66% of the value of a deal, which will allow for a tremendous increase in overall buying power available to CMZ. As an example, with a $500 million fund established by CMZ, we will be able leverage buying power to $15 billion.

- The leveraged equity will allow our funds to take full advantage of the current weakness in various global markets, by magnifying the amount of real estate we can acquire below replacement cost for as long as weak market conditions prevail.

CMZ's third party equity groups typically have a 3-5 year outlook for their investments. Therefore, CMZ will be prepared to restructure or take out its partners and hold the real estate for its long term income and appreciation.

## US Real Estate Fund

CMZ will establish a US real estate fund to take immediate advantage of the distressed nature of the US property market. Currently, the market has high value opportunities being sold at substantial discounts. However, many of these opportunities are not available to the general investor. Our personal and unique relationships afford us exclusive and first consideration of many select properties in the United States.

While other global markets have different factors impacting its development, there are several key drivers that will continue to affect the distressed nature of the US market.
- Though distress first appeared in residential sub-prime, it is now spreading to commercial real estate assets e.g. where sponsors are getting caught in the credit squeeze, creating a pressure to refinance or shed assets.

- The "distress" in many cases relates only to the financial health of a specific sponsor, while the real estate fundamentals are good. The "distress" is the opportunity.

- With the tightening of credit markets, there is great opportunity for players with equity, especially now that loan to value ratios have fallen

- In today's real estate investment climate, the driver of success will be players experienced in operations in different stages of the real estate cycle and long

term ROI growth strategies. Speculation will cease to be a viable strategy as it has been in the past.

- Interest rates remain at or near historical lows in the US, giving advantage to credit worthy buyers

These factors will greatly provide our team with several advantages in operating a US real estate fund. At present, our team has already identified multiple real estate opportunities in the US that will provide significant revenue generation.

## International Real Estate Fund

Based on the meetings in Monte Carlo and the presentation of the vision by the principal as relates to the ultimate disposition of current real estate assets (and identified assets not yet ready for development) CMZ is prepared to establish an international real estate fund.

The purpose of this Fund is to immediately combine the strengths of the principal and his projects with the flexibility of a western partner with access to the commercial and financial marketplaces. Rather than wait until the projects are completed, CMZ believes the opportunity exists today to create the Fund to accelerate the realization of return on the projects of the principal. The developments can be specifically constructed with an eye on the financial markets and exit strategies that will allow the principal to benefit while still maintaining control over many of the assets.

## Future Positioning

Our vision to establish two real estate funds is based on providing the most flexible exit terms at the appropriate time. In addition to the reasons outlined above on the advantages of two separate funds given the diverse nature of real estate markets in various parts of the world, two separate funds will provide investors with flexible exit options.

Because some of the real estate projects can be treated in many ways over a longer period of time, some investors may want to exit in 3-5 years while others might prefer to take advantage of the longer term appreciation of the projects. Other options include:

- Keeping each fund distinct allowing for two separate exit scenarios at different times.
- Consolidating both funds at a strategic time to maximize total value.
- Expanding one or both funds depending on the growth and returns of each fund
- Taking one or both of the funds public through an IPO process

Regardless of the ultimate exit strategy, the dual nature of our real estate vision and structure will provide optimal flexibility to our investors.

EXHIBIT 13

CMZ VENTURES, LLC
ALATAU HOSPITALITY LIMITED
INOVALIS S.A.
c/o The Dynamic Group
1501 Broadway - 25th Floor
New York, NY 10036

July 16, 2008

440 Park Avenue Owner Associates LLC
Dakotah Travel Co. LLC
c/o Macklowe Properties
General Motors Building
767 Fifth Avenue
New York, NY 10153

RE:  Drake Hotel Site

Gentlemen:

This letter of intent sets forth the terms and conditions under which an affiliate of CMZ
Ventures, LLC, Alatau Hospitality Limited and Inovalis S.A. (collectively, "CAI") will be
prepared to enter into a purchase and sale agreement (the "Purchase Agreement") with 440 Park
Avenue Owner Associates LLC and Dakotah Travel Co. LLC (collectively, "Joint Venture
Partner") for the properties described below (the "Properties"). The terms are as follows:

Properties:  Marketable fee simple interest in the properties whose addresses
appear on Exhibit A annexed hereto, in the Borough of Manhattan,
City, County and State of New York and the pending contract (the
"Pending Contract") and development rights described on said
Exhibit A. The Properties presently permit as of right
development of one or more structures consisting of approximately
600,000 square feet above grade and an additional 120,000 square
feet below grade.

Background:  The Properties were assembled by affiliates of the Macklowe
Properties controlled by Harry and William Macklowe
(collectively, "Macklowe"). On the date hereof, the sole
tenant/occupant at the fee Properties is Audemars at 40 East 57th
Street, as an occupant pursuant to a lease termination agreement
with a warrant of eviction and stipulation.

Page 2
July 16, 2008

Purchase Price:  $850,000,000.00 paid at the closing of the transaction (the
"Closing"), less any previously funded deposit and any interest
accrued thereon, and any additional amounts necessary to close
under the Pending Contract. It is CAI's intention to fund the
acquisition with approximately $224,000,000.00 of preferred
equity, assuming the existing first mortgage held by Deutsche
Bank in the approximate sum of $513,000,000.00 and by obtaining
mezzanine financing of up to the maximum amount of
$336,000,000.00. The Joint Venture Partner shall not be obligated
to cause Deutsche Bank to permit the assumption, and the Closing
shall not be conditioned on any assumption, of the existing first
mortgage. Likewise, CAI may elect to place an alternative first
mortgage on the Properties.

Deposit:  On or prior to the earlier of (i) ten (10) days after the full execution
and delivery of this letter of intent or (ii) the execution and
delivery of the Purchase Agreement, CAI will deliver an earnest
money deposit of $10,000,000.00 (the "Initial Deposit") to the
account of a mutually acceptable escrow agent (the "Escrow
Agent"). If the parties are unable to agree on an acceptable
Escrow Agent, this letter of intent shall automatically terminate
and be of no further force or effect. The Initial Deposit shall be
held in an interest bearing account and shall be fully refundable to
CAI until the end of the Due Diligence Period (as hereinafter
defined). The Initial Deposit shall be increased to $50,000,000.00
upon the expiration of Due Diligence Period (the "Additional
Deposit") which, combined with the Initial Deposit, shall be non-
refundable except as otherwise set forth in the Purchase
Agreement. In the event CAI fails timely to make the Initial
Deposit, this letter of intent shall automatically terminate and be of
no further force or effect.

Purchase Agreement:  CAI and Joint Venture Partner shall proceed diligently toward the
execution of a Purchase Agreement. The Purchase Agreement
shall contain customary representations and warranties from Joint
Venture Partner, provide for cooperation by Joint Venture Partner
on tenant issues and on assistance with the intended development
and provide for Joint Venture Partner to make the existing due
diligence material (such as environmental reports, title reports,
survey, leases, correspondence with existing tenants, architects'
plans and other matters pertaining to the intended development of
the Properties) in its possession available to CAI and its
representatives.

Page 3
July 16, 2008

| | |
|---|---|
| Due Diligence: | CAI shall have forty (40) days after the execution and delivery of this letter of intent to perform due diligence (the "Due Diligence Period"). Joint Venture Partner shall provide CAI, its authorized agents and representatives with access during the Due Diligence Period to inspect the Properties and conduct such investigations as CAI deems appropriate including, without limitation, engineering studies, Phase I and Phase II environmental studies, lease reviews, tenant file reviews, architectural material review and such other matters requested by CAI to confirm its interest in the project. Joint Venture Partner also agrees to provide CAI, its authorized agents and representatives, true and complete copies of the due diligence items and documents described on Exhibit B annexed hereto. Joint Venture Partner shall provide such due diligence items and documents to CAI by no later than two (2) business days after the full execution and delivery of this letter of intent. |
| Survey/Title: | The Purchase Agreement shall specify the required state of title and permitted exceptions thereto. The title insurance policy shall be issued by Royal Abstract. |
| Confidentiality: | Neither Joint Venture Partner nor CAI shall make any public announcement with respect to the proposed purchase and sale of the Properties without the prior written consent of the other party. |
| Broker: | Each of the parties represents to the other that no broker has been involved in this transaction and agrees to indemnify the other from breach of the foregoing representation by the indemnifying party. |
| Closing: | Provided that CAI has not terminated the Purchase Agreement on or prior to the expiration of the Due Diligence Period, the Closing shall occur within sixty (60) days from the expiration of the Due Diligence Period, time being of the essence as to CAI's obligation to close on said date. Notwithstanding, upon increasing the deposit by $25,000,000.00 (to $75,000,000.00 in the aggregate) prior to the expiration of such 60-day period, CAI may extend the Closing date for one additional thirty (30) day period, which date shall be time of the essence as to CAI's obligation to close. |
| Closing Costs: | Joint Venture Partner will bear its specific costs associated with the transaction, including transfer taxes and its own legal costs. CAI will bear its specific costs associated with the transaction, including its due diligence and its own legal costs and all recording |

Page 4
July 16, 2008

fees, and all title and survey costs. All operating costs will be prorated at Closing, with the day of Closing belonging to CAI. CAI and Joint Venture Partner shall share the fees of the Escrow Agent, if any.

Assignment:

CAI, or its affiliated entity that executes the Purchase Agreement, shall have the right to assign the Purchase Agreement to a subsidiary or affiliated entity controlled and principally owned by CAI. No such assignment shall release the original purchasing entity in the Purchase Agreement from any liability or obligation under the Purchase Agreement.

Exclusivity:

Seller agrees that for twenty-one (21) days from the date hereof: (a) to discontinue active marketing of the Properties and any current negotiations for the sale of the Properties, (b) not to enter into any new negotiations with any third parties for the sale of the Properties, and (c) not to solicit purchase offers for the Properties from other parties, unless CAI does not proceed to Closing on or before the expiration of the Due Diligence Period. This paragraph constitutes the binding obligation of the Joint Venture Partner until this letter of intent terminates or expires or the Purchase Agreement has been executed and delivered by both parties or the expiration of the foregoing 21-day period, whichever is earliest. In the event CAI fails timely to make the Initial Deposit, this letter of intent and the exclusivity provided herein shall automatically terminate and be of no further force or effect.

Joinder by Joint
Venture Partner:

Joint Venture Partner acknowledges having reviewed the Restated Term Sheet dated July 3, 2008 among CMZ Ventures, LLC, Alatau Hospitality Limited and Inovalis S.A. (the "Joint Venture Agreement") as well as the letter among CMZ Ventures, LLC, Alatau Hospitality Limited and HP Luxembourg dated July 3, 2008 regarding, *inter alia*, the entity structure, management, capital, financing and fees agreed upon by the parties in connection with the acquisition of the Properties. At the election of Joint Venture Partner to be made prior to the execution of the Purchase Agreement, either Joint Venture Partner or an entity affiliated with Macklowe may acquire an interest in the project owner, subject in all respects to the Joint Venture Agreement, the nature and terms of which are to be negotiated between the parties and will be reflected in the Purchase Agreement. In the event Joint Venture Partner elects to acquire greater than a ten (10%) percent interest, the mezzanine lender shall receive an equity kicker of up to five

Page 5
July 16, 2008

(5%) percent (prorated to the extent of changes in equity or mezzanine debt, to insure the anticipated return of Inovalis S.A.). Joint Venture Partner shall not acquire more than twenty (20%) percent of the project owner. Joint Venture Partner will, at its election, be listed as a joint developer of the Properties, and shall participate in the day to day management of the project owner, but final decisions shall be made by the Board as described under "Management" in the Joint Venture Agreement. Development fees shall be divided: one-third (1/3) to CMZ; one-third (1/3) to Alatau; and one-third (1/3) to Joint Venture Partner. All of the fees shall be paid as provided in the Joint Venture Agreement, and Joint Venture Partner shall pay its proportionate share of fees due pursuant to the letter with HP Luxembourg.

Project Owner
Structure:

The parties shall explore alternative project owner structures intended to reduce transfer tax exposure. Seller shall be entitled to the benefit of any reduction in transfer tax by reason of an identity in interest (to the extent it participates in the purchasing entity) or otherwise. There shall be no obligation to proceed with any alternative structure, absent the consent of CAI and the Joint Venture Partner; provided that CAI shall make every effort to structure the transaction with reduced transfer tax exposure.

The purpose of this letter of intent is to set forth the mutual intent of CAI and Joint Venture Partner to negotiate and attempt to enter into a Purchase Agreement and an Operating Agreement (assuming Joint Venture Partner elects to participate in the project owner). Neither CAI nor Joint Venture Partner shall be legally bound to purchase or sell the Properties unless and until a Purchase Agreement containing terms, conditions and provisions satisfactory to both CAI and Joint Venture Partner has been executed and delivered by both parties. Notwithstanding the foregoing, the parties acknowledge and agree that the provisions of this paragraph and the paragraphs entitled "Exclusivity", "Broker" and "Closing Costs" will be binding and enforceable against the parties. The terms of a fully executed Purchase Agreement shall fully supersede the terms of this letter of intent. Notwithstanding that either or all parties may expend substantial efforts and sums in anticipation of entering into a Purchase Agreement (including the efforts and sums involved in CAI's due diligence), the parties acknowledge that in no event will this letter of intent be construed as an enforceable contract to sell or purchase the Properties and that each party accepts that risk.

[SIGNATURES ON THE FOLLOWING PAGE]

Page 6
July 16, 2008

If the foregoing accurately reflects our understanding, kindly execute a confirmatory copy in the lower lefthand corner.

Very truly yours,

CMZ Ventures, LLC

By: _____

Alatau Hospitality Limited

By: _____

Inovalis S.A.

By: _____

Agreed and Accepted:

440 Park Avenue Owner Associates LLC

By: _____

Dakotah Travel Co. LLC

By: _____

## EXHIBIT A

FEE PARCELS

| Owner | Property Address | Block / Lot |
|---|---|---|
| 440 Park Avenue Owner Associates LLC | 440 Park Avenue, New York, NY | 1292 / 33 |
| 440 Park Avenue Owner Associates LLC | 44 East 57th Street, New York, NY | 1292 / 44 |
| Dakotah Travel Co. LLC | 40 East 57th Street, New York, NY | 1292 / 145 |

PENDING CONTRACT (EXCHANGE AGREEMENT FOR FEE INTEREST)

| Current Owner | Property Address | Block / Lot |
|---|---|---|
| T&A Holdings, L.L.C. | 42 East 57th Street, New York, NY | 1292 / 45 |

DEVELOPMENT RIGHTS

| Property Address | Block / Lot |
|---|---|
| 38 East 57th Street, New York, NY | 1292 / 46 |
| 46 East 57th Street, New York, NY | 1292 / 43 |
| 48 East 57th Street, New York, NY | 1292 / 42 |
| 50 East 57th Street, New York, NY | 1292 / 41 |

I:\Users\ElizRR\Cohen A\Drake Site\Exhibit A.doc

## EXHIBIT B

### Due Diligence Items and Documents

1.    Copies of current property tax bills and statements of current assessed values.

2.    Statement of insurance coverage by policy type.

3.    Copies of "as built" plans and specifications, including the actual floor area, measurements and floor diagrams for the Properties only to the extent in Macklowe's possession.

4.    Most recent Seller's issued policy of title insurance.

5.    Most recent Seller's survey of the Properties only to the extent in Macklowe's possession.

6.    Copies of all leases, any amendments, guaranties, letters of credit, letter agreements, assignments and subleases relating thereto and all other agreements relating to occupancy of the Properties to the extent in Macklowe's possession.

7.    Engineering, environmental and physical inspection reports generated by third parties in Seller's possession or control regarding the Properties, including soil reports and maintenance records for mechanical equipment.

8.    Copies of all architectural plans prepared for or at the direction of Seller.

9.    Copies of existing loan documents with Deutsche Bank.

EXHIBIT 14

To:     David Brown
From:   Rick Gates
Subject:  Global Real Estate Fund - Next Steps
Date:    January 9, 2009

Following our conversation earlier this week in regards to your meeting
with DF, please find below the immediate next steps required to
establish and implement the Fund. This document reflects the agreements
reached in Paul's last meeting in December with DF.

Action Item
Completion Date

1.   Finalize structural, tax, and legal issues pertaining to the
Fund.     January 23

2.   Transfer the initial management fee of $1.5 million (which
reflects 1.5% of the    January 23
initial capital commitments of $100 million).

3.   Finalize the timing of the capital investment s of the initial
$100 million and    January 30
determine which assets in addition to the capital will be invested by
Group DF.

4.   Complete and execute the Limited Partnership Agreement (LPA) and
other    January 30
documents as necessary to incorporate and establish the Fund.

5.   Establish Fund offices in NY and secure space in Kyiv through
Group DF    February 15

After your meeting with DF we will plan to meet to review the items
covered in your meeting and to implement the items above. I look
forward to seeing you soon.

-----Original Message-----
From: zackson@aol.com [mailto:zackson@aol.com]
Sent: Sunday, January 11, 2009 9:43 AM
To: Rick Gates DM
Subject: Doc for brown

Hi rick I have not seen it please sent before it goes out thanks
Sent from my Verizon Wireless BlackBerry

2

EXHIBIT 15

RE: update on Kyiv
Brad Zackson

Sent:Monday, June 08, 2009 12:38 PM
To:  Paul Manafort [pmanafort@davismanafort.com]

Hi Paul, I have been reading what's going on .I'm glad he' s still on board, let me know if you
need me, keep me posted. Wife is due the 20 of this month so this would be great, it tuff now
Regards Brad  regards 4tell going good should have deal out lined this week and the city is have
2 meeting the week of 15. want deal with 4tell before they have a deal with Louis Freed ex FBI
guy which would be like ours they are sending it to us do"nt you know him.

**From:** Paul Manafort [mailto:pmanafort@davismanafort.com]
**Sent:** Monday, June 08, 2009 12:16 PM
**To:** Brad Zackson
**Subject:** update on Kyiv

Brad
I had an excellent trip there and am going back tomorrow.
Bascially, DF is still totally on board and a wire will be forthcoming either the end of this week or
next week as a partial payment on the 1.5.
Brown is arriving in Kyiv on Weds when I get there and I have a meeting scheduled with DF, SL
and Brown to build out the next few months in detail.
Obviously, there is a lot going on over there, some with DF some on politics but affecting DF.
Things are moving in a forward direction but slowly.
The good news is that there is no change in commitment and the financial situation is improving.
I will get you more specific information from Kyiv later this week.
P

---

**From:** Brad Zackson [mailto:bz@dynamicworldwide.com]
**Sent:** Monday, June 08, 2009 10:57 AM
**To:** Paul Manafort
**Subject:** update

Paul, not sure if your back or still there ,can you give me call to go over what happen Regards
Brad

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.339 / Virus Database: 270.12.56/2162 - Release Date: 06/08/09 06:01:00