EXHIBIT 16

NYS DEPARTMENT OF LABOR
PO BOX 15130
ALBANY NY 12212-5130

**REQUEST FOR EMPLOYMENT AND WAGE DATA**

| URGENT: RETURN TO US WITHIN 7 DAYS |

Determination Date: 07-27-2009
Local Office: 801
Claim Effective Date: 07-13-2009

**REPLY MAY BE FAXED TO:**
(518) 457-9378

Social Security No.: 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

**IF YOU FAX, DO NOT MAIL ORIGINALS.**

Employee Name:   SAMUEL S LEE

CMZ VENTURES
1501 BROADWAY 25TH FL
NEW YORK NY 10036

Other Name:

**ENTER IF MISSING OR INCORRECT**

EMPLOYER
REGISTRATION NO.     89-99999

LOCATION CODE
IF ANY

Employee's Work Location:
NYC NY

The above named employee has filed a claim for unemployment insurance and has indicated that we do not have a record of all wages paid by you during the base period. Please complete and return this report even if the employee did not work for you or you believe that the employee is not eligible. If we do not receive this report within 7 days of the mail date, we will use information from the employee. If benefits are paid erroneously based on the employee's records, you will be liable for the incorrect charges up to the time we receive the corrected information.

1. Earnings:
**For calendar quarters where some wages have already been reported for this employer account number:** The wages have already been entered in the "GROSS WAGES PAID" column below. If these amounts are incorrect, please **cross off and enter the correct amounts.**

**For quarters where no wages have previously been reported, make the following entries: 1)** Enter the **TOTAL GROSS WAGES PAID** in each quarter. **2)** If the employee was not paid wages in the quarter, write **"NO WAGES PAID." 3)** If the employee was paid wages in the quarter but wages were for work performed in excluded employment, enter the wages and write **"EXCLUDED"** after the wage entry and provide a brief explanation. **4)** If the employee was paid wages in the quarter but they were reported to a different state, enter the wages and write **"REPORTED TO (STATE)"** after the wage entry. **5)** If the employee did not work for you, write **"NOT OUR EMPLOYEE." 6)** If the employee's wages were not reported to the Employer Registration number listed above, write **" WAGES REPORTED TO (CORRECT ACCT. #)."**

| BEGINNING | ENDING | GROSS WAGES PAID |
|---|---|---|
| 04-01-2009 | 06-30-2009 | |
| 01-01-2009 | 03-31-2009 | |
| 10-01-2008 | 12-31-2008 | |
| 07-01-2008 | 09-30-2008 | |
| 04-01-2008 | 06-30-2008 | |

2. When did the employee work for you? From _____  To _____
   Month/Day/Year          Month/Day/Year

3. The employee became unemployed because:

☐ LEFT OF OWN ACCORD (Explain details)
  ☐ To accept other work
  ☐ To get married
  ☐ Domestic responsibilities
  ☐ Illness
  ☐ To leave area
  ☐ Other

☐ LACK OF WORK
  ☐ Indefinite (Permanent Lay-Off)
  ☐ Temporary Lay-Off   Recall date _____
☐ DISCHARGED
  ☐ Incompetence
  ☐ Misconduct (See Reverse)
  ☐ Other (Explain details)

☐ INDUSTRIAL CONTROVERSY (Explain details)
☐ RETIREMENT
  ☐ Voluntary
  ☐ Disability
  ☐ Compulsory under company or union rules
☐ OTHER (Explain)

Employer Name _____

Date _____

Authorized Signature: _____

Telephone No. ( ___ )

LO 12 (6-05)

EXHIBIT 17

New York | State | ≡ State Agencies                    ✪ Search all of NY.gov

**1434 DOS 08**

STATE OF NEW YORK
DEPARTMENT OF STATE
OFFICE OF ADMINISTRATIVE HEARINGS
------------------------------------------X

In the Matter of the Complaint of

**DEPARTMENT OF STATE**
**DIVISION OF LICENSING SERVICES,**

                    Complainant,                    **DECISION**

        -against-

**BRAD ZACKSON,**

                    Respondent.

------------------------------------------X

        The above matter was heard by the undersigned, Scott NeJame, on June 4, 2008 at the office of the Department of State located at 123 William Street, New York, New York.

        The respondent did not appear.

        The complainant was represented by David Mossberg, Esq.

**COMPLAINTS**

        The complaint alleges that the respondent real estate broker, in his management of a property on behalf of his principal: failed to obtain an agency disclosure form; presented a check that was returned for insufficient funds; failed to comply with his principal's demand for an accounting; failed to remit income received pursuant to a management agreement; and failed to cooperate with a Department of State investigation.

**FINDINGS OF FACT**

        1) The notice of hearing together with a copy of the complaint was served on the respondent by certified mail at his last known business and home address, both posted on March 27, 2008. No evidence was presented regarding the results of the mailing to the respondent's home address. Regarding the mailing to his last known business address, that mailing was returned by the Postal Service marked "return to sender" with two different addresses for respondent's company (Dynamic Worldwide Properties LLC, 1501 Broadway, Front 3, New York, New York, and 30 Broad Street, New York, New York 10004[1]). On April 15, 2008, the complainant served the respondent with the notice of hearing and complaint at the 1501 Broadway address. No evidence was presented regarding the results of this service. On or about May 20, 2008, the complainant served the respondent with the notice of hearing and complaint by regular mail at the respondent's original business address (681 5th Avenue, 9th Floor, New York, New York). No evidence was presented regarding the results of this service (State's Ex. 1).

        2) The respondent was licensed as a real estate broker representing a limited liability company named Dynamic Worldwide Properties LLC at 681 5th Avenue, 9th Floor, New York, New York for the periods of November 14, 2003 to November 14, 2005 and April 18, 2006 to April

18, 2008 (State's Ex. 2). The respondent was also licensed as a real estate broker representing a limited liability company named Hampton Retreats LLC at 425 County Road 39A, Suite 202, Southampton, New York for the period of March 17, 2003 to March 17, 2005 (State's Ex. 2). The tribunal takes official notice of the records of the Department of State and finds that the respondent was also licensed as a real estate broker representing a limited liability company named Balcott & Morgan Management LLC at the same address as Hampton Retreats LLC for the period of March 10, 2004 to March 10, 2006. The respondent is not presently licensed as a real estate broker or salesperson.

3) On or about April 1, 2004, Rina Anoussi executed a management agreement with Hampton Retreats LLC for Hampton Retreats LLC to manage Rina and Takis Anoussi's property located at 172 Mill Pond Lane, Water Mill, New York ("the property") (State's Ex. 3). The agreement was to run from April 1, 2004 to May 27, 2005 and provided, in part, for Hampton Retreats LLC to lease the property to qualified lessees, make minor repairs, clean the property between guests, and provide the Anoussis with monthly reports showing all income and expenditures. The Anoussis agreed to pay Hampton Retreats LLC pursuant to a pricing list attached to the agreement. Mrs. Anoussi claimed not to know the respondent, but stated that she dealt with the manager/president of the Hampton Retreats LLC, Anke Albert.

4) The respondent did not provide the Anoussis with an agency disclosure form pursuant to Real Property Law §443.

5) On or about July 29, 2004, Mr. Albert sent Mrs. Anoussi a letter enclosing a check for $4,104 which covered the rentals for the periods of June 25-27, 2004 and July 2-4, 2004 (State's Ex. 4). On August 9, 2004, that check was returned by the Bridgehampton National Bank for insufficient funds (State's Ex. 5).

6) On or about September 3, 2004, Hampton Retreats LLC sent an email to Mrs. Anoussi stating that there had been two more rentals of the property, from July 31 to August 7, 2004 and August 27 to 30, 2004, for which it owed the Anoussis $7,900 (State's Ex. 6). Although demanded, the Anoussis never received the $7,900 or the reimbursement for the bounced $4,104 check.

7) On October 29, 2004, the Anoussis' accountant, Steven Bond, sent a letter to Mr. Albert of Hampton Retreats LLC stating that, to date, Hampton Retreats LLC owed $17,104 to Mrs. Anoussi, which included the amount of the bounced check and the $7,900 owed (State's Ex. 7). To date, that amount remains unpaid.

8) The complainant's Senior License Investigator, Victoria Cline ("Inv. Cline"), conducted an investigation in this case, contacted the respondent and interviewed him. At that initial interview, the respondent did not have any records to present to her, so the interview was adjourned so that he could locate them (either in storage or with his accountant). The respondent did not appear for another interview and did not respond to Inv. Cline's further written attempts to contact him. One of Inv. Cline's letters was dated August 29, 2007, in which she requested certain documents and answers to questions, the response of which was required by September 6, 2007 (State's Ex. 8). That letter was sent to the respondent's business and home address by certified mail. The letter sent to the respondent's business address was delivered on August 30, 2007, but the respondent did not respond.

## OPINION AND CONCLUSIONS OF LAW

I- As the party which initiated the hearing, the burden is on the complainant to prove, by substantial evidence, the truth of the charges set forth in the complaint. State Administrative Procedure Act §306(1). Substantial evidence "means such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact... More than seeming or imaginary, it is less than a preponderance of the evidence, overwhelming evidence or evidence beyond a reasonable doubt (citations omitted)." *300 Gramatan Avenue Associates v. State Div. of Human Rights*, 45 NY2d 176, 408 NYS2d 54, 56-57 (1978); *Tutuianu v. New York State*, 22 AD3d 503, 802 NYS2d 465 (2nd Dept. 2005). "The question...is whether a 'conclusion

or ultimate fact may be extracted reasonably--probatively and logically'" *City of Utica Board of Water Supply v. New York State Health Department*, 96 AD2d 719, 465 NYS2d 365, 366 (1983), *quoting 300 Gramatan Avenue Associates, supra*, 408 NYS2d at 57.

II- The Department of State retains jurisdiction to conduct this proceeding even though the respondent's licenses have expired. *Albert Mendel & Sons, Inc. v. NYS Department of Agriculture and Markets*, 90 AD2d 567, 455 NYS2d 867 (3rd Dept. 1982); *Main Sugar of Montezuma, Inc. v. Wickham*, 37 AD2d 381, 325 NYS2d 858 (3rd Dept. 1971). The respondent may renew his limited liability license as Dynamic Worldwide Properties LLC anytime before April 18, 2010 merely by submitting an application and the applicable fee. Real Property Law §441(2).

III- Being an artificial entity created by law, Hampton Retreats LLC can only act through it officers, agents, and employees, and it is, therefore, bound by the knowledge acquired by and is responsible for the acts committed by its representative broker, the respondent, within the actual or apparent scope of his authority. *Roberts Real Estate, Inc. v. Department of State*, 80 NY2d 116, 589 NYS2d 392 (1992); *A-1 Realty Corporation v. State Division of Human Rights*, 35 AD2d 843, 318 NYS2d 120 (2nd Dept. 1970); Real Property Law §442-c. Real Property Law §442-c provides that "No violation of a provision of this article by a real estate salesman or employee of a real estate broker shall be deemed to be cause for the revocation or suspension of the license of the broker, unless it shall appear that the broker had actual knowledge of such violation or retains the benefits, profits or proceeds of a transaction wrongfully negotiated by his salesman or employee after notice of the salesman's or employee's misconduct." In *Roberts*, the Court of Appeals held that "the purposes and limitations of the relevant statute can best be effectuated and harmonized by allowing a corporate broker to be charged with 'actual knowledge' only when its principals, i.e., representative brokers, directors or officers have actual knowledge of the pertinent violation or misrepresentation." 589 NYS2d at 395.

Hampton Retreats LLC, which is liable for the misconduct of its agents, officers and employees, has not been licensed by the Department of State since March 17, 2005 and therefore, the Department has no jurisdiction over it. The issue arises whether the respondent had actual knowledge of the wrongful conduct or whether he or Hampton Retreats LLC retained the benefits, profits or proceeds of the wrongful transaction after receiving notice of the employee's, agent's or officer's misconduct.

IV- In their management of the property, Hampton Retreats LLC served in the capacity of agent for the Anoussis, its principal. The relationship of agent and principal is fiduciary in nature, "...founded on trust or confidence reposed by one person in the integrity and fidelity of another." *Mobil Oil Corp. v. Rubenfeld*, 72 Misc.2d 392, 339 NYS2d 623, 632 (NY Civil Ct. 1972), *aff'd* 77 Misc.2d 962, 357 NYS2d 589, *rev'd on other grounds* 48 AD2d 428, 370 NYS2d 943; *Wende C. v. United Methodist Church*, 6 AD3d 1047, 776 NYS2d 390 (4th Dept. 2004). Included in the fundamental duties of such a fiduciary are reasonable care and skill, good faith, undivided loyalty, obedience, full and fair disclosure, and to account. Real Property Law §443; Restatement (Second) of Agency §379; *L.A. Grant Realty, Inc. v. Cuomo*, 58 AD2d 251, 396 NYS2d 524 (4th Dept. 1977); *Precision Glass Tinting, Inc. v. Long*, 293 AD2d 594, 740 NYS2d 138 (2nd Dept. 2002); *Re/Max All-Pro Realty, Inc. v. New York State Dept. of State*, 292 AD2d 831, 739 NYS2d 321 (4th Dept. 2002) (*quoting Stevens, Inc. v. Kings Vil. Corp.*, 234 AD2d 287, 288, 650 NYS2d 307 (2nd Dept. 1996)). Such duties are imposed upon real estate licensees by license law, rules and regulations, contract law, the principles of the law of agency, and tort law. The object of these rigorous standards of performance is to secure fidelity from the agent to the principal and to insure the transaction of the business of the agency to the best advantage of the principal. *Department of State v. Short Term Housing*, 31 DOS 90, *conf'd. sub nom Short Term Housing v. Department of State*, 176 AD2d 619, 575 NYS2d 61 (1991); *Department of State v. Goldstein*, 7 DOS 87, *conf'd. Sub nom Goldstein v. Department of State*, 144 AD2d 463, 533 NYS2d 1002 (2nd Dept. 1988); *see also, Coldwell Banker Residential Real Estate v. Berner*, 202 AD2d 949, 609 NYS2d 948 (3rd Dept. 1994).

Hampton Retreats LLC breached its fiduciary duties to the Anoussis by failing to properly and fully account for the rents it collected from the tenants and failing to remit portions of those rents to its principals. By breaching its fiduciary duties, Hampton Retreat LLC demonstrated untrustworthiness in violation of Real Property Law §441-c and violated 19 NYCRR §175.2, which requires a real estate broker to render an account and remit monies collected to his client within a reasonable time.

There is no proof that the respondent had actual knowledge of this misconduct. While it can be argued that Hampton Retreats LLC retained the proceeds from the transaction, without evidence that the respondent received notice of the wrongful conduct, it is not permissible to hold him accountable. Even though the respondent was properly served with the notice of the hearing and complaint, which would put him on notice of the misconduct, it is not clear from State's Exhibit 1 that the respondent, in fact, received such notice (see paragraph 1 above). Therefore, these charges against the respondent are dismissed[2].

V- Hampton Retreats LLC further demonstrated untrustworthiness and incompetency by issuing a bad check to and failing to reimburse the Anoussis. *Division of Licensing Services v. Markland,* 1375 DOS 08 (2008). For the reasons stated above, these charges against the respondent are dismissed.

VI- Pursuant to Real Property Law §443(3)(a), "A listing agent shall provide the disclosure form set forth in subdivision four of this section to a seller or landlord prior to entering into a listing agreement with the seller or landlord and shall obtain a signed acknowledgment from the seller or landlord..."

Hampton Retreats LLC did not present or obtain the signature of the Anoussis on a disclosure form pursuant to the Real Property Law. Therefore, it violated Real Property Law §§443(3)(a) and thereby demonstrated incompetency in violation of Real Property Law §441-c. For the reasons stated earlier, those charges are dismissed against respondent.

VII- Real Property Law §442-e(5) states:

The secretary of state shall have the power to enforce the provisions of this article and upon complaint of any person, or on his own initiative, to investigate any violation thereof or to investigate the business, business practices and business methods of any person, firm or corporation applying for or holding a license as a real estate broker or salesman, if in the opinion of the secretary of state such investigation is warranted. Each such applicant or licensee shall be obliged, on request of the secretary of state, to supply such information as may be required concerning his or its business, business practices or business methods, or proposed business practices or methods.

Inv. Cline initially interviewed the respondent, but he did not have any records to present to her, so the interview was adjourned so that he could locate them. The respondent did not appear for another interview and did not respond to Inv. Cline's further written attempts to contact him.

Therefore, the respondent failed to cooperate with a Department of State investigation in violation of Real Property Law §442-e(5) and demonstrated untrustworthiness in violation of Real Property Law §441-c. The respondent's violation was particularly serious because it prevented the complainant from knowing whether the respondent had actual knowledge of the transaction, whether he received notice of the misconduct of Hampton Retreats LLC's employees, officers or agents, and whether the respondent or Hampton Retreats LLC retained the benefits of that transaction.

## DETERMINATION

**WHEREFORE, IT IS HEREBY DETERMINED THAT** respondent Brad Zackson has violated Real Property Law §442-e(5) and demonstrated untrustworthiness in violation of Real Property Law

§441-c. Accordingly, pursuant to Real Property Law §441-c, his license as a real estate broker is deemed revoked, effectively immediately.


Scott NeJame
Administrative Law Judge

Dated: November 3, 2008

---

[1]This latter address was the one used by the complainant's investigator in attempting to communicate with and interview the respondent.

[2]I have considered the fact that the respondent may be liable for the misconduct of Hampton Retreats LLC's agents, officers and employees based solely on the fact that he is the representative broker for that limited liability company, for which he may fined. However, since I have found the respondent to have committed misconduct personally (see Point VII below) and since he did not respond to Inv. Cline's repeated communications nor appear for the hearing, I find that a fine against him is not a sufficient sanction nor would it likely deter him from future misconduct.

New York    State    ≡ State Agencies    ⚹ Search all of N.Y.gov

EXHIBIT 18

CMZ VENTURES, LLC
ALATAU HOSPITALITY LIMITED
INOVALIS S.A.
c/o The Dynamic Group
1501 Broadway - 25th Floor
New York, NY 10036


July 16, 2008


440 Park Avenue Owner Associates LLC
Dakotah Travel Co. LLC
c/o Macklowe Properties
General Motors Building
767 Fifth Avenue
New York, NY 10153

RE:   Drake Hotel Site

Gentlemen:

This letter of intent sets forth the terms and conditions under which an affiliate of CMZ Ventures, LLC, Alatau Hospitality Limited and Inovalis S.A. (collectively, "CAI") will be prepared to enter into a purchase and sale agreement (the "Purchase Agreement") with 440 Park Avenue Owner Associates LLC and Dakotah Travel Co. LLC (collectively, "Joint Venture Partner") for the properties described below (the "Properties"). The terms are as follows:

Properties:
Marketable fee simple interest in the properties whose addresses appear on Exhibit A annexed hereto, in the Borough of Manhattan, City, County and State of New York and the pending contract (the "Pending Contract") and development rights described on said Exhibit A. The Properties presently permit as of right development of one or more structures consisting of approximately 600,000 square feet above grade and an additional 120,000 square feet below grade.

Background:
The Properties were assembled by affiliates of the Macklowe Properties controlled by Harry and William Macklowe (collectively, "Macklowe"). On the date hereof, the sole tenant/occupant at the fee Properties is Audemars at 40 East 57th Street, as an occupant pursuant to a lease termination agreement with a warrant of eviction and stipulation.

Purchase Price:    $850,000,000.00 paid at the closing of the transaction (the
"Closing"), less any previously funded deposit and any interest
accrued thereon, and any additional amounts necessary to close
under the Pending Contract. It is CAI's intention to fund the
acquisition with approximately $224,000,000.00 of preferred
equity, assuming the existing first mortgage held by Deutsche
Bank in the approximate sum of $513,000,000.00 and by obtaining
mezzanine financing of up to the maximum amount of
$336,000,000.00. The Joint Venture Partner shall not be obligated
to cause Deutsche Bank to permit the assumption, and the Closing
shall not be conditioned on any assumption, of the existing first
mortgage. Likewise, CAI may elect to place an alternative first
mortgage on the Properties.

Deposit:    On or prior to the earlier of (i) ten (10) days after the full execution
and delivery of this letter of intent or (ii) the execution and
delivery of the Purchase Agreement, CAI will deliver an earnest
money deposit of $10,000,000.00 (the "Initial Deposit") to the
account of a mutually acceptable escrow agent (the "Escrow
Agent"). If the parties are unable to agree on an acceptable
Escrow Agent, this letter of intent shall automatically terminate
and be of no further force or effect. The Initial Deposit shall be
held in an interest bearing account and shall be fully refundable to
CAI until the end of the Due Diligence Period (as hereinafter
defined). The Initial Deposit shall be increased to $50,000,000.00
upon the expiration of Due Diligence Period (the "Additional
Deposit") which, combined with the Initial Deposit, shall be non-
refundable except as otherwise set forth in the Purchase
Agreement. In the event CAI fails timely to make the Initial
Deposit, this letter of intent shall automatically terminate and be of
no further force or effect.

Purchase Agreement:    CAI and Joint Venture Partner shall proceed diligently toward the
execution of a Purchase Agreement. The Purchase Agreement
shall contain customary representations and warranties from Joint
Venture Partner, provide for cooperation by Joint Venture Partner
on tenant issues and on assistance with the intended development
and provide for Joint Venture Partner to make the existing due
diligence material (such as environmental reports, title reports,
survey, leases, correspondence with existing tenants, architects'
plans and other matters pertaining to the intended development of
the Properties) in its possession available to CAI and its
representatives.

Page 3
July 16, 2008

| | |
|---|---|
| **Due Diligence:** | CAI shall have forty (40) days after the execution and delivery of this letter of intent to perform due diligence (the "Due Diligence Period"). Joint Venture Partner shall provide CAI, its authorized agents and representatives with access during the Due Diligence Period to inspect the Properties and conduct such investigations as CAI deems appropriate including, without limitation, engineering studies, Phase I and Phase II environmental studies, lease reviews, tenant file reviews, architectural material review and such other matters requested by CAI to confirm its interest in the project. Joint Venture Partner also agrees to provide CAI, its authorized agents and representatives, true and complete copies of the due diligence items and documents described on Exhibit B annexed hereto. Joint Venture Partner shall provide such due diligence items and documents to CAI by no later than two (2) business days after the full execution and delivery of this letter of intent. |
| **Survey/Title:** | The Purchase Agreement shall specify the required state of title and permitted exceptions thereto. The title insurance policy shall be issued by Royal Abstract. |
| **Confidentiality:** | Neither Joint Venture Partner nor CAI shall make any public announcement with respect to the proposed purchase and sale of the Properties without the prior written consent of the other party. |
| **Broker:** | Each of the parties represents to the other that no broker has been involved in this transaction and agrees to indemnify the other from breach of the foregoing representation by the indemnifying party. |
| **Closing:** | Provided that CAI has not terminated the Purchase Agreement on or prior to the expiration of the Due Diligence Period, the Closing shall occur within sixty (60) days from the expiration of the Due Diligence Period, time being of the essence as to CAI's obligation to close on said date. Notwithstanding, upon increasing the deposit by $25,000,000.00 (to $75,000,000.00 in the aggregate) prior to the expiration of such 60-day period, CAI may extend the Closing date for one additional thirty (30) day period, which date shall be time of the essence as to CAI's obligation to close. |
| **Closing Costs:** | Joint Venture Partner will bear its specific costs associated with the transaction, including transfer taxes and its own legal costs. CAI will bear its specific costs associated with the transaction, including its due diligence and its own legal costs and all recording |

Page 4
July 16, 2008

fees, and all title and survey costs. All operating costs will be prorated at Closing, with the day of Closing belonging to CAI. CAI and Joint Venture Partner shall share the fees of the Escrow Agent, if any.

Assignment:

CAI, or its affiliated entity that executes the Purchase Agreement, shall have the right to assign the Purchase Agreement to a subsidiary or affiliated entity controlled and principally owned by CAI. No such assignment shall release the original purchasing entity in the Purchase Agreement from any liability or obligation under the Purchase Agreement.

Exclusivity:

Seller agrees that for twenty-one (21) days from the date hereof: (a) to discontinue active marketing of the Properties and any current negotiations for the sale of the Properties, (b) not to enter into any new negotiations with any third parties for the sale of the Properties, and (c) not to solicit purchase offers for the Properties from other parties, unless CAI does not proceed to Closing on or before the expiration of the Due Diligence Period. This paragraph constitutes the binding obligation of the Joint Venture Partner until this letter of intent terminates or expires or the Purchase Agreement has been executed and delivered by both parties or the expiration of the foregoing 21-day period, whichever is earliest. In the event CAI fails timely to make the Initial Deposit, this letter of intent and the exclusivity provided herein shall automatically terminate and be of no further force or effect.

Joinder by Joint
Venture Partner:

Joint Venture Partner acknowledges having reviewed the Restated Term Sheet dated July 3, 2008 among CMZ Ventures, LLC, Alatsu Hospitality Limited and Inovalis S.A. (the "Joint Venture Agreement") as well as the letter among CMZ Ventures, LLC, Alatsu Hospitality Limited and HP Luxembourg dated July 3, 2008 regarding, *inter alia*, the entity structure, management, capital, financing and fees agreed upon by the parties in connection with the acquisition of the Properties. At the election of Joint Venture Partner to be made prior to the execution of the Purchase Agreement, either Joint Venture Partner or an entity affiliated with Macklowe may acquire an interest in the project owner, subject in all respects to the Joint Venture Agreement, the nature and terms of which are to be negotiated between the parties and will be reflected in the Purchase Agreement. In the event Joint Venture Partner elects to acquire greater than a ten (10%) percent interest, the mezzanine lender shall receive an equity kicker of up to five

Page 5
July 16, 2008

> (5%) percent (prorated to the extent of changes in equity or
> mezzanine debt, to insure the anticipated return of Inovalis S.A.).
> Joint Venture Partner shall not acquire more than twenty (20%)
> percent of the project owner. Joint Venture Partner will, at its
> election, be listed as a joint developer of the Properties, and shall
> participate in the day to day management of the project owner, but
> final decisions shall be made by the Board as described under
> "Management" in the Joint Venture Agreement. Development fees
> shall be divided: one-third (1/3) to CMZ; one-third (1/3) to Alatau;
> and one-third (1/3) to Joint Venture Partner. All of the fees shall
> be paid as provided in the Joint Venture Agreement, and Joint
> Venture Partner shall pay its proportionate share of fees due
> pursuant to the letter with HP Luxembourg.

Project Owner
Structure:

> The parties shall explore alternative project owner structures
> intended to reduce transfer tax exposure. Seller shall be entitled to
> the benefit of any reduction in transfer tax by reason of an identity
> in interest (to the extent it participates in the purchasing entity) or
> otherwise. There shall be no obligation to proceed with any
> alternative structure, absent the consent of CAI and the Joint
> Venture Partner; provided that CAI shall make every effort to
> structure the transaction with reduced transfer tax exposure.

The purpose of this letter of intent is to set forth the mutual intent of CAI and Joint
Venture Partner to negotiate and attempt to enter into a Purchase Agreement and an Operating
Agreement (assuming Joint Venture Partner elects to participate in the project owner). Neither
CAI nor Joint Venture Partner shall be legally bound to purchase or sell the Properties unless and
until a Purchase Agreement containing terms, conditions and provisions satisfactory to both CAI
and Joint Venture Partner has been executed and delivered by both parties. Notwithstanding the
foregoing, the parties acknowledge and agree that the provisions of this paragraph and the
paragraphs entitled "Exclusivity", "Broker" and "Closing Costs" will be binding and enforceable
against the parties. The terms of a fully executed Purchase Agreement shall fully supersede the
terms of this letter of intent. Notwithstanding that either or all parties may expend substantial
efforts and sums in anticipation of entering into a Purchase Agreement (including the efforts and
sums involved in CAI's due diligence), the parties acknowledge that in no event will this letter of
intent be construed as an enforceable contract to sell or purchase the Properties and that each
party accepts that risk.

[SIGNATURES ON THE FOLLOWING PAGE]

Page 6
July 16, 2008

     If the foregoing accurately reflects our understanding, kindly execute a confirmatory copy in the lower lefthand corner.

Very truly yours,

CMZ Ventures, LLC

By: _____

Alatau Hospitality Limited

By: _____

Inovalis S.A.

By: _____

Agreed and Accepted:

440 Park Avenue Owner Associates LLC

By: _____

Dakotah Travel Car LLC

By: _____

## EXHIBIT A

FEE PARCELS

| Owner | Property Address | Block / Lot |
|---|---|---|
| 440 Park Avenue Owner Associates LLC | 440 Park Avenue, New York, NY | 1292 / 33 |
| 440 Park Avenue Owner Associates LLC | 44 East 57th Street, New York, NY | 1292 / 44 |
| Dakotah Travel Co. LLC | 40 East 57th Street, New York, NY | 1292 / 145 |

PENDING CONTRACT (EXCHANGE AGREEMENT FOR FEE INTEREST)

| Current Owner | Property Address | Block / Lot |
|---|---|---|
| T&A Holdings, L.L.C. | 42 East 57th Street, New York, NY | 1292 / 45 |

DEVELOPMENT RIGHTS

| Property Address | Block / Lot |
|---|---|
| 38 East 57th Street, New York, NY | 1292 / 46 |
| 46 East 57th Street, New York, NY | 1292 / 43 |
| 48 East 57th Street, New York, NY | 1292 / 42 |
| 50 East 57th Street, New York, NY | 1292 / 41 |

I:\Users\ElizRR\Cohen A\Drake Site\Exhibit A.doc

## EXHIBIT B

### Due Diligence Items and Documents

1.   Copies of current property tax bills and statements of current assessed values.

2.   Statement of insurance coverage by policy type.

3.   Copies of "as built" plans and specifications, including the actual floor area, measurements and floor diagrams for the Properties only to the extent in Macklowe's possession.

4.   Most recent Seller's issued policy of title insurance.

5.   Most recent Seller's survey of the Properties only to the extent in Macklowe's possession.

6.   Copies of all leases, any amendments, guaranties, letters of credit, letter agreements, assignments and subleases relating thereto and all other agreements relating to occupancy of the Properties to the extent in Macklowe's possession.

7.   Engineering, environmental and physical inspection reports generated by third parties in Seller's possession or control regarding the Properties, including soil reports and maintenance records for mechanical equipment.

8.   Copies of all architectural plans prepared for or at the direction of Seller.

9.   Copies of existing loan documents with Deutsche Bank.

EXHIBIT 19

EXHIBIT S

## Update

Brad Zackson

**Sent:** Wednesday, August 20, 2008 4:58 PM

**To:** Harry Mayer <.... <hmaukking's ..... ..... .......>

**Cc:** Arthur L. ..... <a..... <a..... ..... ..... .....>

Harry,

I have returned from our investor meeting in Monte Carlo and want you to know it could not have gone better. CMZ's 112m in equity has been firmed up and is ready to go. This is in addition to the commitment from Frank/Alatau so we are adequately backed up in the event of any shortfall. I will contact you on your cell tomorrow to give you a more detailed update.

Regards,

Brad Zackson

The Dynamic Group Inc.

The Paramount Building

1501 Broadway 25th fl.

New York, N.Y. 10036

O: 212.248.5230

F: 212.248.5236

EXHIBIT 20



GROUP DF
REAL ESTATE

November 6, 2008

Paul J. Manafort
Calister Investments LLC
(c/o The Dynamic Fund)
The Paramount Building
1501 Broadway, 25th Fl.
New York, NY 10036

Dear Paul:

As you know, Group DF Real Estate is a subsidiary company of Group DF Limited, the holding company of Dmitry Firtash.

This letter is to confirm our commitment to the Bulgari Tower project following our recent meetings in Kiev. As the major financial source behind Calister Investments for this project, we are prepared to support the purchase of the land, and we are committed to the development of the mixed use project concept as presented to us by your team.

As you are aware we have completed our commercial due diligence in concert with your efforts, and fully support the proposed ideas for the purchase and development of the property. We are prepared to move forward with the mortgage purchase and invest the capital, provided you are successful in reaching a deal with the seller, which we approve and which should include Calister Investments as the developer.

It is our understanding that an auction process will take place on Monday, November 10, 2008 for the purchase of Note A1 related to the property site. Further, we understand that you are in conversations with certain individuals in New York that intend to participate in this process. We are prepared to provide our portion of the financial capital required to secure this note based on the negotiations that take place in relation to the auction process. The result of these negotiations also have to be approved by us.

Group DF Finance Limited is, subject to formal contract, prepared to provide $112 million in equity for the project. In addition, and as a demonstration of our commitment to this effort, Group DF has executed a deposit of twenty-five million dollars (US $25,000,000.00) into escrow for the project. Separately, we have executed and sent to you the "Escrow Agreement" with First American Title Insurance Company documenting the escrow transfer.

We look forward to being a part of this process and working on the overall development of the Bulgari Tower project with you and your partners. If you require any additional information from our side, please let me know. As a matter of interest, we are happy to provide Raiffeisen Bank AG in Vienna, Austria as a financial reference if requested.

Warm regards,

David Brown
Chief Executive Officer